**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CELEC EP,

     Plaintiff,

v.

PROGEN INDUSTRIES, LLC;
GENERTEK POWER CORP.;
GENERTEK POWER INDUSTRIES,
LLC; JOHN B. MANNING; W. WADE
MANNING; ANDREW S.
WILLIAMSON; ASTROBRYXA, S.A.;
AP INSPECTIONS
LATINOAMERICA, S.A.; A.P.
INSPECTIONS LLC; and DOES 1-99,

     Defendants.

_____

PROGEN INDUSTRIES, LLC,

     Counter-Plaintiff,

v.

CELEC EP,

     Counter-Defendant;

_____/

Case No. 8:25-cv-3433-WFJ-SPF

1

**DEFENDANTS PROGEN INDUSTRIES, LLC, GENERTEK POWER CORP., GENERTEK POWER INDUSTRIES, LLC, JOHN B. MANNING, W. WADE MANNING, AND ANDREW S. WILLIAMSON'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT, AND PROGEN INDUSTRIES, LLC'S COUNTERCLAIM[1]**

Defendants Progen Industries, LLC ("Progen"), Genertek Power Corp., Genertek Power Industries, LLC, John B. Manning, W. Wade Manning, and Andrew S. Williamson (collectively, the "Progen Defendants") file their Answer and Affirmative Defenses to Plaintiff CELEC EP's ("CELEC") Complaint, and in support thereof, state as follows:

## INTRODUCTION

1.      This case involves a fraudulent scheme perpetrated against the Ecuadorian government by Defendants and their co-conspirators. By and through that scheme, Defendants and their co-conspirators formed a criminal enterprise that leveraged a national crisis to embezzle nearly $110 million from Ecuador and its people during an era of uncommon vulnerability.

**ANSWER:** Denied.

2.      Defendants' actions included forging documents, creating sham paperwork and making numerous material misrepresentations to obtain valuable contracts from the Ecuadorian government and extract nearly $110 million.

---

[1] The Progen Defendants' Answer and Affirmative Defenses has been amended to include Progen Industries, LLC's Counterclaim.

Defendants have absconded with the funds and have delivered nothing of value to Ecuador.

**ANSWER:** Denied.

### PARTIES

3.      Plaintiff, Corporacion Electrica del Ecuador (CELEC), is the Strategic Public Company responsible for the generation, transmission, and distribution of electricity in Ecuador. As a strategic public service, CELEC's operations are guided by principles of universality, accessibility, continuity, and quality. Because its functions are paid for, in part, by financing from the Ecuadorian state and multilateral development banks, CELEC considers itself to be a steward of the public trust.

**ANSWER:** Without knowledge, and therefore, denied.

4.      Defendant, Progen Industries, LLC, was established as a Delaware limited liability company and registered to do business in Florida in 2017. Its initial address was 4819 Musket Drive and its current address is 600 Prairie Industrial Pkwy, Mulberry, FL 33860. On information and belief, its members are Florida residents including but not limited to Andrew S. Williamson and John B. Manning, who are also publicly listed as the COO and President of Progen, respectively. Upon information and belief, none of its members are citizens of Ecuador.

**ANSWER:** Admitted Progen is a Delaware limited liability company registered to do business in Florida since 2017.  Admitted Progen's initial address

was 4819 Musket Drive and its current address is 600 Prairie Industrial Pkwy, Mulberry, FL 33860.  Admitted no member of Progen is a citizen of Ecuador. Otherwise, denied.

5.      Defendant, Genertek Power Corp., is a Delaware corporation and was registered to do business in Florida in 2014. Its original name was Megawatt Power Industries, its initial address was 1935 Industrial Park Road, Mulberry FL 33860, and its principal officers were Joseph Adir, John Sams, Mohammad Ayoub, Andrew S. Williamson, and John B. Manning. In December 2014, the company changed its name to Genertek Power Corporation. In 2015, its address changed to 600 Prairie Industrial Pkwy, Mulberry, FL 33860.

**ANSWER:**  Genertek Power Corp. was formed as a Delaware corporation and was registered to do business in Florida in 2014.  Admitted Genertek Power Corp.'s original name was Megawatt Power Industries, its initial address was 1935 Industrial Park Road, Mulberry FL 33860, and its principal officers were Joseph Adir, John Sams, Mohammad Ayoub, and John B. Manning.  Admitted Genertek Power Corp. changed its name from Megawatt Power Industries to Genertek Power Corp. in December 2014.  Admitted Genertek Power Corp. changed its address to 600 Prairie Industrial Pkwy, Mulberry, FL 33860 in 2015.  Otherwise, denied.

6.      Defendant, Genertek Power Industries, LLC, is a Florida Limited Liability Company that was formed in 2013. At one point, it was known as JBM Technology Holdings, LLC. Its current address is 600 Prairie Industrial Pkwy,

4

Mulberry, FL 33860. On information and belief, its members are Florida residents including but not limited to John B. Manning, who is also publicly listed as the President/CEO of Progen. Upon information and belief, none of its members are citizens of Ecuador.

**ANSWER:** Admitted Genertek Power Industries, LLC was formed in 2013 as a Florida limited liability company. Admitted Genertek Power Industries, LLC was once known as JBM Technology Holdings, LLC. Admitted at one point Genertek Power Industries, LLC's address was 600 Prairie Industrial Pkwy, Mulberry, FL 33860. Admitted Genertek Power Industries LLC never had any members that were citizen of Ecuador. Otherwise, denied.

7.     Upon information and belief, Defendant John B. Manning is the CEO of Defendant Progen and an officer of Defendant Genertek Power Industries. Upon information and belief, he resides in Lakeland, Florida.

**ANSWER:** Admitted Manning is the CEO of Progen. Admitted Manning resides in Lakeland, Florida. Otherwise, denied.

8.     Upon information and belief, Defendant W. Wade Manning is the Vice-president of Operations of Genertek Power Industries and a Vice-president of Progen. Upon information and belief, he resides in Lakeland, Florida.

**ANSWER:** Admitted W. Wade Manning is a resident of Lakeland, Florida. Otherwise, denied.

9. Upon information and belief, Defendant Andrew S. Williamson is the President and COO of Defendant Progen and the COO of Defendant Genertek Power Industries. Upon information and belief, he resides in Mulberry, Florida.

**ANSWER:** Admitted Andrew S. Williamson is COO of Progen. Admitted Andrew S. Williamson is a resident of Mulberry, Florida. Otherwise, denied.

10. Defendant, Astrobryxa S.A., is an Ecuadorian corporation. Its principal place of business is in Ecuador.

**ANSWER:** Without knowledge and therefore, denied.

11. Defendant, AP Inspections Latinoamerica S.A., is an Ecuadorian corporation. Its principal place of business is in Ecuador.

**ANSWER:** Without knowledge and therefore, denied.

12. Defendant, A.P. Inspections LLC, is a Texas limited liability company. Its principal place of business is in Houston, Texas. On information and belief, its members are Texas residents.

**ANSWER:** Without knowledge and therefore, denied.

## JURISDICTION AND VENUE

13. The United States District Court for the Middle District of Florida has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim under 18 U.S.C. 1962(c). The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are

citizens of different States and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

**ANSWER:** Admitted for jurisdictional purposes only. Otherwise, denied.

14.     This Court has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because these claims arise out of the same case or controversy as Plaintiff's federal law claim, as all claims in this action arise out of a common nucleus of operative facts.

**ANSWER:** Admitted for jurisdictional purposes only. Otherwise, denied.

15.     This Court has personal jurisdiction over Defendants, Progen, Genertek Power Corp., and Genertek Power Industries LLC, which are domiciled in and have their principal places of business in this District pursuant to Fla. Stat. § 48.193(1)(a) and for other independent reasons. This Court also has personal jurisdiction over Defendants, John Manning, Wade Manning and Williamson because, on information and belief, both are domiciled in the District. This Court has personal jurisdiction over Defendants, Astrobryxa S.A., AP Inspections Latinoamerica S.A. and A.P. Inspections LLC, because, among other things, they conspired to and engaged in tortious conduct in and related to Florida, pursuant to Fla. Stat. §48.193(1)(a) or otherwise engage in substantial and not isolated activity within the state. In the alternative, the Court may exercise specific jurisdiction over each Defendant pursuant to Fla. Stat. § 48.193, 18 U.S.C. §

1965(d), Federal Rules of Civil Procedure 4(k)(1)(A), 4(k)(1)(B), or, in the alternative, 4(k)(2).

**ANSWER:** Admitted Progen has its principal place of business in this District. Admitted Defendants John B. Manning, W. Wade Manning, and Andrew S. Williamson are domiciled in this District. Denied that Genertek Power Corp. and Genertek Power Industries, LLC have a principal place of business in this District. Denied that Progen, John B. Manning, W. Wade Manning, Genertek Power Corp., and Genertek Power Industries, LLC conspired to and engaged in tortious conduct in and related to Florida. Denied that Genertek Power Corp. and Genertek Power Industries, LLC engage in substantial and not isolated activity within Florida. Otherwise, without knowledge, and therefore, denied.

16. Venue is proper in this Court pursuant to Title 18 U.S.C. §§ 1391(b)(2). Defendants are subject to personal jurisdiction in this Court.

**ANSWER:** Admitted for jurisdictional purposes only. Otherwise, denied.

## FACTS

### *The 2024 Energy Crisis and Ecuador's Desperate Need for Generators*

17. In 2024, Ecuador experienced an energy crisis after a severe, years-long drought depleted water levels at hydroelectric plants, resulting in a lack of capacity build-up.

**ANSWER:** Without knowledge, and therefore, denied.

8

18.    The Ecuadorian government declared a national emergency and followed that declaration by imposing daily eight-hour blackouts. At times, fourteen-hour blackouts were common. The crisis cost the Ecuadorian economy hundreds of millions of dollars per month. Even worse, it led to increased crime, house fires, and adverse public health impacts, including heat-related illnesses and deaths.

**ANSWER:** Without knowledge, and therefore, denied.

19.    As discussed in more detail below, Defendants and their co-conspirators took advantage of this crisis to the detriment of the Plaintiff and, indeed, the Ecuadorian people.

**ANSWER:** Denied.

20.    In May 2024, and in response to the crisis, the Ecuadorian government solicited bids for two terrestrial thermal generation projects, one in Quevedo, Ecuador and one in Salitral, Ecuador (the "Quevedo Contract" and the "Salitral Contract," respectively). Given the gravity of Ecuador's energy crisis, the bids for these were solicited, evaluated, and awarded on an expedited basis under emergency procedures.

**ANSWER:** Admitted the Ecuadorian government solicited bids for two terrestrial thermal generation projects in Quevedo, Ecuador and in Salitral, Ecuador.  Otherwise, without knowledge, and therefore, denied.

### *The May 2024 Visit to Progen's "Factory"*

21.     In May 2024, acting under the fake name "H&S Industry LLC" Progen invited Ecuadorian government officials to visit its "factory" in Tampa, where it had supposedly manufactured and was holding the new power generators for the Ecuadorian government.

**ANSWER:** Denied.

22.     On May 16, 2024, then Minister of Mines and Energy and another CELEC official visited Progen's offices in Tampa. Progen falsely stated that it had manufactured the new power generators from that facility and that they were in apt condition for being delivered to CELEC. As further discussed below, this was false. Progen had not manufactured any new power generators nor did it ever intend to deliver new power generators to CELEC.

**ANSWER:**   Admitted the Minister of Mines and Energy and another CELEC official visited Progen's offices on May 16, 2024.  Otherwise, denied.

### *The  Quevedo Contract*

23.     Four bidders participated in the process to award the Quevedo Contract, including at least one U.S.-based bidder.

**ANSWER:** Without knowledge, and therefore denied.

24.     Bids were evaluated based on technical, economic, and legal parameters, all of which emphasized the bidders' prior experience.

**ANSWER:** Without knowledge, and therefore denied.

25.     In its July 9, 2024 bid for the Quevedo Contract, Progen represented that it had substantial relevant experience. Specifically, Progen submitted certificates purportedly showing that it had completed two similar projects for a customer called Megawatt Power Holdings Limited (Malta) in 2018 and a third similar project for a customer called Lakeland Electric, a public electric power generation company in Lakeland, Florida in 2019. *See* Exhibit "A", attached hereto and incorporated herein by this reference. As CELEC would later discover, the supposed experience with a separate company called "Megawatt Power" was false, and the Lakeland Electric certificate was a forgery.

**ANSWER:**  Admitted that Progen submitted a bid on July 9, 2024 for the Quevedo Contract.  Otherwise, denied.

26.     Based upon Progen's representations, Plaintiff awarded the Quevedo Contract to Progen to the exclusion of other bidders. On August 2, 2024, Plaintiff and Progen signed the Quevedo Contract. *See* Exhibit "B", attached hereto and incorporated herein by this reference.

**ANSWER:**  Without knowledge as to why Plaintiff awarded the Quevedo Contract to Progen.  Admitted on August 2, 2024, Progen signed the Quevedo Contract.  Otherwise, denied.

27.     Under the Quevedo Contract, Progen was to install 20 power generators, each with a capacity for 2,500 KW of electric energy. Those 20

11

generators were to be new (*i.e.* with zero hours of prior use) and recently manufactured by Progen no later than 2023. *Id.* at § 5.1.

**ANSWER:** The Quevedo Contract speaks for itself.  Otherwise, denied.

28.    The Quevedo Contract provided for a period of 95 days from the date the contract was signed for turnkey delivery of all 20 new power generators. *Id.* at § 8. The parties amended the Quevedo Contract on January 11, 2025. Among other changes, the January 2025 amendment extended Progen's compliance deadline to March 15, 2025.

**ANSWER:**   The Quevedo Contract and its amendments speak for themselves.  Otherwise, denied.

29.    In furtherance of the Quevedo Contract, CELEC ultimately paid $37,790,000 to Progen through five separate international wire transfers from January to March 2025. All payments were made to a Progen account at Regions Bank, based in Birmingham, Alabama. *See* Exhibit "C", attached hereto and incorporated herein by this reference.

**ANSWER:** Admitted.

30.    As further described below, Progen did not deliver to CELEC a single new power generator under the Quevedo Contract and overtly lied to CELEC about its purported experience in similar projects.

**ANSWER:** Denied.

*The Salitral Contract*

31.    Several bidders participated in the process to award the Salitral Contract.

**ANSWER:**  Without knowledge, and therefore, denied.

32.    Bids were evaluated based on technical, economic, and legal parameters, all of which emphasized the bidders' prior experience.

**ANSWER:** Without knowledge, and therefore, denied.

33.    In its June 25, 2024 bid, Progen submitted certificates supposedly showing that it had substantial relevant experience. Specifically, Progen represented that it had completed a similar project with Megawatt Power Holdings Limited (Malta) in 2018. *See* Exhibit "D", attached hereto and incorporated herein by this reference. These are the same "Megawatt" documents that were submitted in connection with the Quevedo Contract bid.

**ANSWER:**  Admitted that Progen submitted a bid on June 25, 2024 for the Salitral Contract.  Otherwise, denied.

34.    In addition, the Salitral Contract bid documents also contain the forged Lakeland Electric certificate and contain supposed certificates issued by a company called "Discovery Silver" and PG&E, the California utility company. *See* Exhibits "D.1"and"D.2". On information and belief, CELEC now believes that those Discovery Silver and PG&E documents are also forgeries.

**ANSWER:**    Without knowledge as to CELEC's beliefs, and therefore denied.  Otherwise, denied.

13

35.    Based upon Progen's representations, Plaintiff awarded the Salitral Contract to Progen to the exclusion of other bidders. On August 2, 2024, Plaintiff and Progen signed the Salitral Contract. *See* Exhibit"E", attached hereto and incorporated herein by this reference.

**ANSWER:**  Without knowledge as to why Plaintiff awarded the Salitral Contract to Progen.  Admitted on August 2, 2024, Progen signed the Salitral Contract.  Otherwise, denied.

36.    Under the Salitral Contract, Progen was to install 29 power generators, each with a capacity for 3,500 KW of electric energy. Those 29 generators were to be new (*i.e* .with zero hours of prior use) and recently manufactured by Progen no later than 2023. *Id*. At §5.

**ANSWER:** The Salitral Contract speaks for itself.  Otherwise, denied.

37.    The Salitral Contract provided for a period of 120 days from the date the contract was signed for turnkey delivery of all 29 new power generators. *Id*. At §8. After Progen requested two extensions, Plaintiff extended the deadline for full compliance with the Salitral Contract until February 27, 2025. 38. In furtherance of the Salitral Contract, CELEC paid $69,580,000 to Progen through one international wire transfer on September 30, 2024. The payment was made to a Progen account at Regions Bank, based in Birmingham, Alabama. *See* Exhibit "F", attached hereto and incorporated herein by this reference.

**ANSWER:**  The Salitral Contract speaks for itself.  Admitted Plaintiff extended the deadline for full compliance with the Salitral Contract.  Admitted CELEC paid Progen $69,580,000 under the Salitral Contract on September 30, 2024 to its Regions Bank account.   Otherwise, denied.

39.   As further described below, Progen did not deliver to CELEC a single new power generator under the Salitral Contract and overtly lied to CELEC about its purported experience in similar projects.

**ANSWER:** Denied.

### *Power Generator Progen Enlists Co-Conspirator Astrobryxa*

40.   In connection with both the Salitral and Quevedo bids, Progen falsely represented the types of generators it could or would manufacture. *First*, in its bids, Progen (using the fake name of H&S Industries and Services) represented that it was the exclusive manufacturer of power generators using medium-speed EMD engines, a specific type of power generation engine manufactured by Caterpillar, running on multiple fuels. Progen made these representations through documents purportedly signed and notarized (by no other than Defendant Williamson himself) on April 20, 2024. *See* Exhibit "G", attached hereto and incorporated herein by reference.

**ANSWER:** Denied.

15

41.    *Second*, Progen represented that the new power generators that it had supposedly manufactured and would deliver to CELEC contained EMD engines. *See* Exhibit "H", attached hereto and incorporated herein by reference.

**ANSWER:**  Denied.

42.    As discussed below, these were false representations. CELEC would later learn from the authorized distributer of EMD engines that it had never had any relationship with Progen nor had any record of Progen purchasing or using EMD engines to build power generators.

**ANSWER:**  Denied.

### Progen Enlists Co-Conspirator Astrobryxa

43.    Progen enlisted Astrobryxa S.A. as a participant in its criminal enterprise. Astrobryxa is a local Ecuadorian government that Progen retained to act as its subcontractor in installing the power generators under the Quevedo and Salitral Contracts. Progen paid Astrobryxa $20 million for its supposed services as subcontractor.

**ANSWER:**    Admitted Progen paid Astrobryxa $20 million to pay subcontractors.  Otherwise, denied.

44.    On information and belief, Astrobryxa is a sham company with no experience in projects involving power generation. Further, Astrobryxa appears to be owned or controlled by Karla Saud Calero, an individual who is related to Fabian Calero, CELEC's General Manager at the time of the award of the Quevedo and

Salitral Contracts. Calero has recently fled Ecuador and his whereabouts are unknown.

**ANSWER:**  Admitted that CELEC's General Manager is related to Karla Saud Calero of Astrobryxa. Otherwise, without knowledge, and therefore, denied.

45. Astrobyrxa was essential to the scheme because Progen used Astrobryxa as its Ecuadorian subcontractor while knowing that Astrobryxa was just a sham and that neither Progen nor Astrobryxa intended to deliver the power generators.

**ANSWER:**  Denied.

### *Progen and its Co-Conspirators Create False Records*

46.    Progen and its co-conspirators set out to create false records that Progen had successfully manufactured the power generators, and that the generators were ready to be delivered and installed. In particular, Progen and its co-conspirators caused AP Inspections Latinoamerica, S.A., a local Ecuadorian company, and its Texas affiliate, A.P. Inspections LLC, to issue false reports to fraudulently induce Plaintiff to pay Progen for work and equipment that Progen never delivered.

**ANSWER:**  Denied.

47.    On information and belief, AP Inspections Latinoamerica and A.P. Inspections LLC are sham companies with no real operations, let alone experience in power generators. They participated in the criminal enterprise with the rest of

Defendants by issuing at least 10 sham inspection reports, causing CELEC to pay Progen nearly $110 million.

**ANSWER:**  Without knowledge, and therefore, denied.

48.    AP Inspections Latinoamerica and A.P. Inspections LLC issued three reports dated September 14 and 15, 2024, falsely stating that Progen had successfully manufactured the 29 new power generators under the Salitral Contract and that those generators were apt for being delivered and installed.

**ANSWER:**    The reports of AP Inspections Latinoamerica and A.P. Inspections LLC ("AP Inspections") speak for themselves.  Otherwise, denied.

49.    For example, the September 14 report falsely states that AP Inspections Latinoamerica and A.P. Inspections LLC inspected 21 power generators at Progen's manufacturing facility in Texas. Progen has no manufacturing facilities in Texas. The site belongs to Apollo Electric, a separate company. The participants in the inspection included Defendant Williamson, Astrobryxa S.A.'s principal (Karla Saud Calero), A.P. Inspections LLC's principal (Ricardo A. Nunez Jr.) and AP Inspections Latinoamerica's principal (Pamela Dillon). The report concluded that "all parts looks all good, new and properly fabricated." Progen and its coconspirators used the sham inspection reports to get Progen paid nearly $70 million. Indeed, on September 30, 2024, shortly after the issuance of the three sham reports, CELEC wired $69,580,000 to Progen in the United States.

18

**ANSWER:**  The reports of AP Inspections speak for themselves.  Admitted that Progen has no manufacturing facilities in Texas.  Admitted Williamson, Karla Saud Calero, Ricardo A. Nunez Jr. and Pamela Dillon participated in the inspections.  Admitted that on September 30, 2024, CELEC wired $69,580,000 to Progen in the United States.  Otherwise, denied.

50.   As CELEC would later uncover, none of the 29 power generators under the Salitral Contract were new, let alone compliant with any of the Contract's requirements. As such, AP Inspections Latinoamerica and A.P. Inspections LLC's September 2024 reports contained demonstrably false statements.

**ANSWER:**  Denied that the power generators under the Salitral Contract were not compliant with the Contract's requirements.  The AP Inspections reports speak for themselves.  Otherwise, denied.

51. Similarly, AP Inspections Latinoamerica and A.P. and Inspections LLC issued seven reports from January 15 to February 24, 2025, falsely stating that Progen had successfully manufactured the 20 power generators under the Quevedo Contract and that those generators were apt for being delivered and installed.

**ANSWER:**  The AP Inspections reports speak for themselves.  Otherwise, denied.

52.   For example, the January 16, 2025 report falsely states that AP Inspections Latinoamerica and A.P. Inspections LLC inspected 1 power generator

19

at a Progen manufacturing facility in Texas. Again, Progen has no manufacturing facilities in Texas. This site belongs to InterFab Services, a separate company. The participants in the inspection included Defendant W. Wade Manning and A.P. Inspections LLC's principal (Ricardo A. Nunez Jr.). The report concluded that "material inspected was 100% finished, the visual inspection was performed following all international standard protocols and visually confirming that the unit was ready. Result completed and satisfactory." Progen and its co-conspirators used the sham inspection reports to get Progen paid nearly $40 million. Indeed, from January 24 to March 5, 2025, shortly after the issuance of the seven sham reports, CELEC wired $37,790,000 to Progen in the United States.

**ANSWER:** The AP Inspections report speaks for itself. Admitted Progen has no manufacturing facilities in Texas. Admitted W. Wade Manning and Richard A. Nunez Jr. participated in the inspection. Admitted CELEC wired $37,790,000 to Progen in the United States. Otherwise, denied.

53. However, none of the 20 power generators under the Quevedo Contract were new, let alone compliant with any of the Contract's requirements. As such, AP Inspections Latinoamerica and A.P. Inspections LLC's January and February 2025 reports contained demonstrably false statements.

**ANSWER:** The AP Inspections' reports speak for themselves. Otherwise, denied.

*CELEC Uncovers the Truth*

20

54.     During 2025, CELEC's management was replaced, and the truth began to come out. CELEC retained an outside expert firm to inspect the power generators that Progen had imported to Ecuador and purportedly intended to install with the assistance of Astrobryxa, its local contractor. By 2025, the majority of the power generators had been imported into Ecuador but were sitting in a warehouse; not a single one had been installed by Progen or its subcontractor Astrobyrxa.

**ANSWER:** Without knowledge of CELEC's actions, and therefore, denied. Admitted Progen imported power generators into Ecuador.  Otherwise, denied.

55.     Of the 17 power generators that Progen imported into Ecuador under the Quevedo Contract (which called for 20 generators) none were new, and none had been manufactured by Progen. Further, all of the 17 power generators were used, or defective, or entirely non-functioning and some of the equipment had been repainted to hide rust. *See* Exhibit "I", attached hereto and incorporated herein by reference. Of the 29 power generators under the Salitral Contract, none were new, or had been manufactured by Progen and all of them were used, defective or non-functioning. *See* Exhibit "J", attached hereto and incorporated herein by reference.

**ANSWER:** Denied.

56.     With these reports, it became clear that Progen defrauded CELEC by sending it substandard, non-operational equipment, subcontracting with

21

Astrobryxa with knowledge that Astrobryxa would stay silent about Progen's non-performance in exchange for its $20 million; falsifying documents concerning that equipment through AP Inspections' sham reports, and demanding payment for the equipment under false pretenses, all to CELEC's detriment.

**ANSWER:** Denied.

*CELEC Terminates the Contracts*

57.    In June 2025, CELEC terminated both the Quevedo and Salitral Contracts. As a government entity, CELEC did so by issuing an administrative decision. Progen never challenged the administrative decision terminating the contracts and, as such, the termination of the contracts became final.

**ANSWER:** Admitted in June 2025 CELEC attempted to terminate both the Quevedo and Salitral Contracts by issuing an administrative decision.  Otherwise, denied.

*CELEC Finds Additional Evidence of Fraud*

58.    As CELEC continued to investigate, it found additional evidence of fraud. In particular, CELEC has found that Progen overtly lied about its purported experience when bidding for the Quevedo and Salitral Contracts, submitting these false statements through the federal wires.

**ANSWER:** Denied.

59.    *First*, CELEC has uncovered that Progen submitted a forged document in its bid for the Quevedo Contract. Specifically, on or about July 2024,

22

Progen submitted to CELEC a document purportedly signed by Lakeland Electric, a Florida public utility company, stating that Progen had performed on a similar project for Lakeland. That document, which purported to feature the signature of Stephen Brown (supposedly a Lakeland Electric employee), was a forgery. In fact, Lakeland Electric has confirmed in writing that the document is not authentic and that it has never done any business with Progen. *See* Exhibit "K", attached hereto and incorporated herein by reference.

**ANSWER:** Denied.

60.     *Second*, CELEC has uncovered that the other "experience" that Progen advertised was also false. Specifically, in June and July 2024, Progen submitted paperwork to CELEC in its bids for the Quevedo and the Salitral Contracts that Progen had completed three successful, arms-length projects with a customer called Megawatt Power Industries, Inc. (Malta).

**ANSWER:** Denied.

61.     This was a lie. Megawatt Power is not a separate entity. It is a company owned or controlled by Progen or Progen's principals. Florida corporate records reveal that a company with the same name was established in Delaware and registered to do business in Florida in 2014. In December 2014, the company changed its name to Genertek Power Corporation. In 2015, its address changed to 600 Prairie Industrial Parkway, which is Progen's address. And, further, its

President is John B. Manning and its Vice-president is W. Wade Manning, who are Progen's principals.

**ANSWER:**  Denied.

62.    Progen had no prior experience in performing projects with Megawatt Power. Megawatt Power (now Genertek Power) is simply another sham vehicle owned by Progen and Progen's principals, Defendants John B. Manning, W. Wade Manning and Williamson.

**ANSWER:**  Denied.

63.    Further, the "certificates" that Progen provided purporting to have performed similar projects for "Discovery Silver" and for PG&E appear to be forgeries. There is no indication that the projects referenced in those certificates ever happened, that the individuals from those companies that purportedly signed those certificates exist or that Progen had any involvement with those companies.

**ANSWER:**  Without knowledge, and therefore, denied.

64.    *Third*, the authorized distributor for EMD engines informed the Ecuadorian government that it had no knowledge of relationship with Progen and no records of Progen purchasing, using or installing EMD engines in its power generators. *See* Exhibit "L", attached hereto and incorporated herein by reference. As discussed above, Progen had represented when bidding for the Salitral and Quevedo Contracts that its supposed new power generators would have EMD

24

engines and that it was the exclusive manufacturer of a specific type of EMD-based power generator.

**ANSWER:**  Without knowledge of the actions of the authorized distributor for EMD engines, and therefore, denied.  Exhibit L speaks for itself.  Otherwise, denied.

**Count I**
**Violations of RICO U.S.C. § 1962(c)**
**(All Defendants)**

65.    Plaintiff repeats and incorporates paragraphs 1-64 as if set forth herein.

**ANSWER:**  The Progen Defendants repeat and incorporate their responses to Paragraphs 1-64 as if fully set forth herein.

66.    The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., provides a civil cause of action for "any person injured in his business or property by reason of a violation of" the RICO statute. Plaintiff is a person within the meaning of 18 U.S.C. § 1962(c).

**ANSWER:**  Paragraph 66 contains a legal conclusion to which no response is required.  Otherwise, denied.

*The RICO Enterprise*

67.    The RICO enterprise is comprised of Defendants Progen, Genertek Power Corp, Genertek Power Industries, John B. Manning, W. Wade Manning,

25

Andrew S. Williamson, Astrobryxa, S.A., AP Inspections Latinoamerica, S.A., A.P. Inspections LLC and other entities and individuals still to be identified.

**ANSWER:** Denied.

68.    At all relevant times, the enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c) because, *inter alia*, Defendants' predicate acts of mail and wire fraud were committed in the United States and were directed at enriching Defendants in the United States and elsewhere.

**ANSWER:** Denied.

### *The Pattern of Racketeering Activity*

69.    Defendants conducted and managed the operation of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c) as follows:

**ANSWER:** Denied.

Multiple Instances of Mail and Wire Fraud in Violation of 18 U.S.C. §§1341, 1343

70.    At all times relevant to this Complaint, Defendants were engaged in interstate and foreign commerce in an industry that affects interstate and foreign commerce.

**ANSWER:** Admitted Progen is engaged in intestate and foreign commerce in an industry that affects interstate and foreign commerce.  Otherwise, denied.

26

71.     Defendants used interstate and foreign wires to further their scheme to defraud Plaintiff in order to enrich themselves, including through multiple uses of the federal wires since as early as April 2024 through the present.

**ANSWER:** Denied.

72.     The mail and wire fraud acts included:

(i)     issuing two false "certificates" signed and notarized by Defendant Williamson on April 20, 2024 falsely asserting that Progen was the     exclusive manufacturer of a special type of EMD-based power generators running on multiple fuels;

**ANSWER:** Denied.

(ii)     inviting and hosting Ecuadorian government officials in Progen's supposed "factory" in Tampa in May 2024 where Progen falsely represented it had manufactured new power generators from that location and that those power generators were being held in that facility and were apt for delivery to CELEC upon signing the contracts;

**ANSWER:** Admitted Progen invited Ecuadorian government officials to visit its business premises.  Otherwise, denied.

(iii)     electronically and physically submitting from the United States and into Ecuador to CELEC the June 2024 offer for the Salitral Contract falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are

27

owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

**ANSWER:** Denied.

(iv)  electronically and physically submitting from the United States and into Ecuador to CELEC the July 2024 offer for the Quevedo Contract by

a.  falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

**ANSWER:** Denied.

b.  forging a document showing performance in a similar project for Lakeland Electric; and

**ANSWER:** Denied.

c. on information and belief, forging additional documents showing performance in supposed similar projects for "Discovery Silver" and PG&E;

**ANSWER:** Denied.

(v)  electronically and physically from the United States and into Ecuador to CELEC documents falsely indicating that Progen's supposed new power generators would contain EMD engines when in fact no EMD engines were ever sold to Progen;

**ANSWER:** Denied.

28

(vi)   coordinating and causing the delivery to CELEC of at least ten sham inspection reports by AP Inspections Latinoamericana and A.P. Inspections LLC falsely stating that Progen had manufactured new generators, which complied with the contract when in fact the generators were refurbished equipment of little value;

**ANSWER:**  Denied.

(vii)   causing CELEC to wire to Progen's U.S. bank account at Regions Bank nearly $110 million through several international wire transfers;

**ANSWER:**  Admitted CELEC wired nearly $110 million to Progen's U.S. bank account at Regions Bank through several international wire transfers. Otherwise, denied.

(viii)  transferring $20 million of CELEC's funds to Astrobyxa for its services as supposed subcontractor when in fact Astrobryxa provided no services because no new or suitable power generators were ever installed; and

**ANSWER:**  Admitted Progen transferred $20 million of CELEC's funds to Astrobryxa for payments due to subcontractors.  Otherwise, denied.

(ix)   retaining and/or using CELEC's funds for other purposes including payments to other members of the enterprise.

**ANSWER:**  Denied.

73.   This improper use of the federal wires was necessary to the Defendants' scheme and was the direct and proximate cause of Plaintiff's injuries.

29

In short, each of these mailings a necessary part of the scheme to defraud Plaintiff to its detriment, in violation of 18 U.S.C. § 1343.

**ANSWER:**  Paragraph 73 contains a legal conclusion to which no response is required.  Otherwise, denied.

### *Domestic Injury*

74.     As a result of this pattern of racketeering activity, Plaintiff has suffered economic harms in the United States. Critically, Defendants' actions satisfy many of the criteria courts consider relevant to domestic injury, including that (i) many of the activities giving rise to this dispute occurred in or have a nexus to the United States; (ii) Plaintiff suffered injuries in the United States because Defendants' wire fraud deprived Plaintiff of the opportunity to contract with reputable bidders (including at least one U.S.-based bidder) who would have completed the Quevedo and Salitral Contracts; (iii) the United States is the location from which Defendants directed their conduct; and (iv) Defendants received the benefit of their misconduct through domestic bank accounts located in Birmingham, Alabama.

**ANSWER:**  Denied.

75.     *The location of activities giving rise to the underlying dispute.* Defendants directed emails and other correspondence from servers located in the United States in furtherance of their scheme to defraud Plaintiff. This includes (i) their offers to CELEC falsely describing Progen's prior experience; (ii) the falsified inspection report; and (iii) the demands for payment that stated, falsely, that the

equipment and services had been delivered. These domestic actions were the direct and proximate cause of Plaintiff's injuries.

**ANSWER:** Denied.

76. *Target of Defendants' Conduct.* Furthermore, Defendants misrepresentations centered on and affected U.S.-based commerce. These misrepresentations include misstating Defendant Progen's business activities in and with the City of Lakeland, located within the United States and the Middle District of Florida and by forging the signature of Stephen Brown who, upon information and belief, is a United States citizen and resident of the Middle District of Florida. It also includes depriving at least one other U.S.-based bidder of the opportunity to perform the Quevedo and Salitral Contracts.

**ANSWER:** Denied.

77. *The Location of Plaintiff's Injury.* Defendants' scheme harmed Plaintiff's prospective business relationships in the United States, depriving it of the ability to work with qualified U.S.-based bidders who would have actually performed the Quevedo and Salitral Contracts. Additionally, Defendants' fraudulent misrepresentations during the bid process meant that other qualified bidders (including at least one U.S.-based bidder) were passed over for the Quevedo and Salitral Contracts. Those qualified, U.S.-based bidders thus experienced their own domestic injuries.

31

**ANSWER:**   Denied Progen Defendants made any fraudulent misrepresentations.  Otherwise, without knowledge, and therefore denied.

78.   Plaintiff has also had to expend resources to investigate the extent of Defendants' wrongdoing and to redress the harms Defendants inflicted, and has had to retain counsel in the United States.

**ANSWER:**  Denied.

## Count II
## Violations of the Florida RICO Act, Fla, Stat. 895.03
### (All Defendants)

79.   Plaintiff repeats and incorporates paragraphs 1-64 as if set forth herein.

**ANSWER:**  The Progen Defendants repeat and incorporate their responses to Paragraphs 1-64 as if fully set forth herein.

80.   Florida Statute 895.03(1) provides a civil remedy against "any person who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of racketeering activity."

**ANSWER:**  Paragraph 80 contains a legal conclusion to which no response is required.  Otherwise, denied.

81.   By and through their scheme, Defendants acted with criminal intent to fraudulently receive proceeds through a pattern of wire fraud.

**ANSWER:**  Denied.

82.   The mail and wire fraud acts included:

(i)      issuing two false "certificates" signed and notarized by Defendant Williamson on April 20, 2024 falsely asserting that Progen was the exclusive manufacturer of a special type of EMD-based power generators running on multiple fuels;

**ANSWER:** Denied.

(ii)     inviting and hosting Ecuadorian government officials in Progen's supposed "factory" in Tampa in May 2024 where Progen falsely represented it had manufactured new power generators from that location and that those power generators were being held in that facility and were apt for delivery to CELEC upon signing the contracts;

**ANSWER:** Admitted Progen invited Ecuadorian government officials to visit its business premises.  Otherwise, denied.

(iii)    electronically and physically submitting from the United States and into Ecuador to CELEC the June 2024 offer for the Salitral Contract falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

**ANSWER:**  Denied.

(iv)     electronically and physically submitting from the United States and into Ecuador to CELEC the July 2024 offer for the Quevedo Contract by

33

a.     falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

**ANSWER:** Denied.

b.     forging a document showing performance in a similar project for Lakeland Electric; and

**ANSWER:** Denied.

c.     on information and belief, forging additional documents showing performance in supposed similar projects for "Discovery Silver" and PG&E;

**ANSWER:** Denied.

(v)     electronically and physically from the United States and into Ecuador to CELEC documents falsely indicating that Progen's supposed new power generators would contain EMD engines when in fact no EMD engines were ever sold to Progen;

**ANSWER:** Denied.

(vi)     coordinating and causing the delivery to CELEC of at least ten sham inspection reports by AP Inspections Latinoamericana and A.P. Inspections LLC falsely stating that Progen had manufactured new generators, which complied with the contract when in fact the generators were refurbished equipment of little value;

**ANSWER:** Denied.

(vii)   causing CELEC to wire to Progen's U.S. bank account at Regions Bank nearly $110 million through several international wire transfers;

**ANSWER:**  Admitted CELEC wired nearly $110 million to Progen's U.S. bank account at Regions Bank through several international wire transfers. Otherwise, denied.

(viii)  transferring $20 million of CELEC's funds to Astrobyxa for its services as supposed subcontractor when in fact Astrobryxa provided no services because no new or suitable power generators were ever installed; and

**ANSWER:**  Admitted Progen transferred $20 million of CELEC's funds to Astrobryxa for payments due to subcontractors.  Otherwise, denied.

(ix)   retaining and/or using CELEC's funds for other purposes including payments to other members of the enterprise.

**ANSWER:**  Denied.

83.    The course of Defendants' conduct described above constitutes violations of Fla. Stat. 895.03(1) in that the Defendants engaged in a pattern of wrongful conduct involving multiple acts of wire fraud with criminal intent to receive proceeds derived, directly or indirectly, from that pattern of activity.

**ANSWER:**  Paragraph 83 contains a legal conclusion to which no response is required.  Otherwise, denied.

84.    The racketeering activity alleged herein includes multiple predicate offenses of federal wire fraud and offenses under Fla. Stat. 817.034.

**ANSWER:**  Paragraph 84 contains a legal conclusion to which no response is required.  Otherwise, denied.

## COUNT III
## Violations of the Florida Unfair and Deceptive Trade Practices Act (FDUTPA)
## (All Defendants)

85.    Plaintiff repeats and incorporates paragraphs 1-64 as if set forth herein.

**ANSWER:**  The Progen Defendants repeat and incorporate their responses to Paragraphs 1-64 as if fully set forth herein.

86.    The Florida Deceptive and Unfair Trade Practices Act prohibits "unfair methods of competition," "unconscionable acts or practices," and "unfair and deceptive acts or practices in the conduct of any trade or commerce." *See* Fla. Stat. § 501.204.

**ANSWER:** Paragraph 86 contains a legal conclusion to which no response is required.  Otherwise, denied.

87.    The unfair methods of competition, unconscionable acts and practices, and unfair or deceptive actions Defendants engaged in include:

(i)    inviting and hosting Ecuadorian government officials in Progen's supposed "factory" in Tampa in May 2024 where Progen falsely represented it had manufactured new power generators from that location and that those power

36

generators were being held in that facility and were apt for delivery to CELEC upon signing the contracts;

**ANSWER:**  Admitted Progen invited Ecuadorian government officials to visit its business premises.  Otherwise, denied.

(ii)    electronically and physically submitting from the United States and into Ecuador to CELEC the June 2024 offer for the Salitral Contract falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

**ANSWER:**  Denied.

(iii)    electronically and physically submitting from the United States and into Ecuador to CELEC the July 2024 offer for the Quevedo Contract by

a.    falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

**ANSWER:**  Denied.

b.    forging a document showing performance in a similar project for Lakeland Electric; and

**ANSWER:**  Denied.

c.    on information and belief, forging additional documents showing performance in supposed similar projects for "Discovery Silver" and PG&E;

**ANSWER:**  Denied.

(iv)    electronically and physically from the United States and into Ecuador to CELEC documents falsely indicating that Progen's supposed new power generators would contain EMD engines when in fact no EMD engines were ever sold to Progen;

**ANSWER:**  Denied.

(v)    coordinating and causing the delivery to CELEC of at least ten sham inspection reports by AP Inspections Latinoamericana and A.P. Inspections LLC falsely stating that Progen had manufactured new generators, which complied with the contract when in fact the generators were refurbished equipment of little value;

**ANSWER:**  Denied.

(vi)    causing CELEC to wire to Progen's U.S. bank account at Regions Bank nearly $110 million through several international wire transfers;

**ANSWER:**  Admitted CELEC wired nearly $110 million to Progen's U.S. bank account at Regions Bank through several international wire transfers. Otherwise, denied.

(vii)    transferring $20 million of CELEC's funds to Astrobyxa for its services as supposed subcontractor when in fact Astrobryxa provided no services because no new or suitable power generators were ever installed; and

38

**ANSWER:** Admitted Progen transferred $20 million of CELEC's funds to Astrobryxa for its services as subcontractor. Otherwise, denied.

(viii) retaining and/or using CELEC's funds for other purposes including payments to other members of the enterprise.

**ANSWER:** Denied.

88. These acts are prohibited under the FDUTPA because, *inter alia*, they (i) misrepresented Progen's prior experience through falsified wire transmissions and forged documents; (ii) were intended to mislead Plaintiff into believing that the equipment and services were both provided and met the specifications called for in the Quevedo and Salitral Contracts; (iii) did reasonably mislead Plaintiff into assuming that Progen was both experienced and delivered equipment and services that satisfied the Quevedo and Salitral Contracts; and (iv) the relied-upon misrepresentations were material.

**ANSWER:** Paragraph 88 contains a legal argument to which no response is required. Otherwise, denied.

89. As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiff has suffered economic losses.

**ANSWER:** Denied that the Progen Defendants violated FDUTPA. Otherwise, without knowledge of Plaintiff's losses, and therefore, denied.

**COUNT IV**
**CONVERSION**
**(All Defendants)**

90.     Plaintiff repeats and incorporates paragraphs 1-64 as if set forth herein.

**ANSWER:** The Progen Defendants repeat and incorporate their responses to Paragraphs 1-64 as if fully set forth herein.

91.     Defendants wrongfully and intentionally transferred and/or removed funds that were not earned by Defendants, but that were instead a result of at least the following material misrepresentations:

(i)     electronically and physically submitting from the United States and into Ecuador to CELEC the June 2024 offer for the Salitral Contract falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

**ANSWER:** Denied.

(ii)    electronically and physically submitting from the United States and into Ecuador to CELEC the July 2024 offer for the Quevedo Contract by

a.      falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer,

Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

**ANSWER:** Denied.

b.      forging a document showing performance in a similar project for Lakeland Electric; and

**ANSWER:** Denied.

c.      on information and belief, forging additional documents showing performance in supposed similar projects for "Discovery Silver" and PG&E;

**ANSWER:** Denied.

(iii)    coordinating and causing the delivery to CELEC of at least ten sham inspection reports by AP Inspections Latinoamericana and A.P. Inspections LLC falsely stating that Progen had manufactured new generators, which complied with the contract when in fact the generators were refurbished equipment of little value;

**ANSWER:** Denied.

(iv) causing CELEC to wire to Progen's U.S. bank account at Regions Bank nearly $110 million through several international wire transfers;

**ANSWER:**  Admitted CELEC wired nearly $110 million to Progen's U.S. bank account at Regions Bank through several international wire transfers. Otherwise, denied.

(v)     transferring $20 million of CELEC's funds to Astrobyxa for its services as supposed subcontractor when in fact Astrobryxa provided no services because no new or suitable power generators were ever installed; and

**ANSWER:**  Admitted Progen transferred $20 million of CELEC's funds to Astrobryxa for payments due to subcontractors.  Otherwise, denied.

(vi)     retaining and/or using CELEC's funds for other purposes including payments to Defendants or their co-conspirators.

**ANSWER:**  Denied.

92.     Plaintiff has a legitimate property interest in funds transferred to Defendants as a result of fraudulent documentation, including the documentation identified above.

**ANSWER:**  Without knowledge, and therefore, denied.

93.     By engaging in the conduct averred herein, Defendants converted property rightfully belonging to Plaintiff that was not otherwise earned or owed to them, damaging Plaintiff as a result.

**ANSWER:**  Denied.

94.     Defendants' conduct was, and remains inconsistent with, and in denial of, Plaintiffs' rights to this property.

**ANSWER:**  Denied.

## COUNT V
## Constructive Trust
## (Defendant Progen)

95.    Plaintiff repeats and incorporates paragraphs 1-64 as if set forth herein.

**ANSWER:**  The Progen Defendants repeat and incorporate their responses to Paragraphs 1-64 as if fully set forth herein.

96.    Plaintiff seeks the imposition of a constructive trust on Progen's assets and bank accounts, including Progen's bank account located at Regions Bank at which CELEC delivered nearly $110 million.

**ANSWER:**  Without knowledge, and therefore, denied.

97.    Progen made false promises, including providing CELEC forged documents. Relying on Progen's misrepresentations, CELEC wired nearly $110 million into Progen's bank account. CELEC relied upon Progen but Progen never intended to and never actually delivered any new or functional power generators to CELEC. Progen cannot and should not be allowed to retain its ill-gotten proceeds.

**ANSWER:**  Denied.

## GENERAL DENIAL

The Progen Defendants deny each and every allegation in Plaintiff's Complaint to which they are required to respond that they do not specifically admit above, including any allegations contained in introduction, the prayers for relief,

and other allegations upon which Plaintiff relies upon.  The Progen Defendants expressly deny that Plaintiff is entitled to any relief.

## FIRST AFFIRMATIVE DEFENSE

Count I and Count II of CELEC's Complaint fail to state causes of action. CELEC has failed to allege a "domestic injury," as required for a RICO claim.  *See RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 354 (2016).  CELEC is an Ecuadorian strategic public service "responsible for the generation, transmission, and distribution of electricity in Ecuador."  (Compl. ¶ 3).  CELEC solicited bids from American companies in Ecuador.  (Compl. ¶ 20).  The equipment under the Quevedo and Salitral Contracts (the "Contracts") were shipped to Ecuador. (Compl. ¶¶ 54-55).  CELEC discovered the alleged defective products delivered under the Quevedo and Salitral Contracts in Ecuador.  (Compl. ¶¶ 58-60).  All of these facts suggest CELEC suffered an injury in Ecuador, not the United States, let alone Florida.  *Worldspan Marine Inc. v. Comerica Bank*, No. 18-21924-CIV, 2020 WL 1238732, at *7 (S.D. Fla. Feb. 27, 2020).  The Contracts entered into are governed by Ecuadorian law and subject to government contracting rules and regulations.  Therefore, CELEC cannot sustain its claims in Counts I and II.

## SECOND AFFIRMATIVE DEFENSE

CELEC's claims against Progen are barred by the independent tort doctrine. CELEC's claims are derived from the terms of the Contracts.  The independent tort doctrine provides that a breach of contractual terms may not form the basis for a

44

claim in tort, and a plaintiff may not circumvent a contractual relationship by bringing an action in tort for damages, which are the same as those which may be brought for a breach of contract. *Ginsberg v. Lennar Florida Holdings, Inc.*, 645 So.2d 490 (Fla. 3d DCA 1994); *see also, Behrman v. Allstate Insurance Company*, 388 F. Supp. 2d 1346, 1349 n.4 (S.D. Fla. 2005) (Under Florida law, where the facts surrounding a breach of contract action are undistinguishable from an alleged tort, and where the alleged tort does not cause harm distinct from that caused by the breach of contract, a plaintiff is barred from bringing a separate tort action.); *Douglas v. Brahman Porsche Audi, Inc.*, 451 So. 2d 1038 (Fla. 3d DCA 1984). Further, in *Tiara Condominium Association, Inc., v. Marsh & McLennan Companies, Inc.*, a case before the Florida Supreme Court which resulted in the narrowing of the efficacy of the economic loss rule, Justice Pariente issued a concurring opinion which clarified the decision and discussed the continued viability of the independent tort doctrine notwithstanding the newly restricted role of the economic loss rule. *Tiara Condominium Association, Inc., v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399 (Fla. 2013). As Justice Pariente explained in her concurrence, "when the parties have negotiated remedies for nonperformance pursuant to a contract, one party may not seek to obtain a better bargain than it made by turning a breach of contract into a tort for economic loss." *Tiara*, 110 So. 3d at 409 (Pariente, J., concurring) (quoting *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 542 (Fla. 2004)). *Kaye v. Ingenio, Filiale*

45

*de Loto-Quebec, Inc.*, Case No. 13–61687–CIV, 2014 WL 2215770 (S.D. Fla. 2014). Therefore, to set forth a claim in tort between parties in contractual privity, a party must allege some action beyond and independent of a breach of contract that amounts to an independent tort. *Tiara*, 110 So.3d at 408 (Pariente, J., concurring) (quoting *Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So.2d 518, 519 (Fla. 3d DCA 1986)).

In the case at hand, CELEC's claims are, by its own allegations, derived from its Contracts with Progen and alleged breaches of the terms of the Contracts. As such, CELEC's claims against Progen cannot stand under the independent tort doctrine, which bars CELEC from obtaining a better deal than was bargained for in its Contracts with Progen.

## THIRD AFFIRMATIVE DEFENSE

CELEC's claims fail to state a cause of action for which relief can be granted. The Progen Defendants did not forge any documents submitted to CELEC. Instead, the Progen Defendants are victims of Astrobryxa, and/or its principals, who forged documents on Progen's behalf and submitted those documents with Progen's bids to CELEC on the Contracts.

## FOURTH AFFIRMATIVE DEFENSE

CELEC's claims fail to state a cause of action for which relief can be granted. Progen and its principals acted in good faith at all times and intended to perform under the Contracts. Progen and its principals took numerous steps to perform

46

under the Contracts, and CELEC knew of and approved these steps. These steps included:

- Hosting Fabian Calero (CELEC CEO) and Roberto Luque (Ecuadorian Minister of Energy) in Florida to examine Progen's products and business premises, prior to execution of the Contracts;

- Traveling to Ecuador following CELEC's award to Progen of the Contracts to sign the Contracts;

- Working with Ecuadorian companies, Astrobryxa, S.A. ("Astrobryxa") and others, to hire contractors and subcontractors to work in Ecuador on the Contracts;

- Hosting AP Inspections LatinoAmerica, S.A. (CELEC's chosen third-party inspector) in Florida to inspect the generators and equipment to be supplied under the Contracts;

- Hosting a delegation of CELEC employees to undertake a second inspection of the generators and equipment to be supplied under the Contracts;

- Shipping and delivering at least 46 "zero-hour" generators to Ecuador; and

- Initiating and participating in mediation and arbitration in Ecuador to resolve issues between Progen and CELEC related to the Contracts.

Thus, there was no scheme to not perform under the Contracts that gives rise to CELEC's claims.

## FIFTH AFFIRMATIVE DEFENSE

CELEC's claims are barred because any act or omission by the Progen Defendants was not the legal or proximate cause of CELEC's alleged damages, which the Progen Defendants deny. If CELEC sustained any damages, which the Progen Defendants deny, then it is the result of acts or omissions of CELEC, or of others under CELEC's direction or control. CELEC's conduct followed a consistent pattern: create delay and cast blame on Progen. For example, since the Contracts' inception, CELEC has cycled through three different CEOs, three Contract Administrators, and three Ministers of Energy. Each transition forced Progen to start from scratch, re-explaining the project's history and status to officials with no institutional memory and, often, no incentive to resolve the mess their predecessors had created. CELEC also imposed various extra-contractual obligations on Progen and refused to timely fund down payments.

## SIXTH AFFIRMATIVE DEFENSE

Any money damages found to be due to CELEC should be reduced, eliminated, or offset based on the money CELEC has received or will receive from

Seguros Confianza S.A., who reimbursed CELEC for the amounts it is now claiming in this lawsuit.

<strong><u>SEVENTH AFFIRMATIVE DEFENSE</u></strong>

Any money damages found to be due to CELEC should be reduced, eliminated, or offset based on CELEC's failure to mitigate its damages and for the damages it caused through its interference and delay in completion of the projects.

<strong><u>EIGHTH AFFIRMATIVE DEFENSE</u></strong>

CELEC's claims are barred in whole or in part by the doctrine of unclean hands.  CELEC actively sabotaged Progen from performing under the Contracts by, among other things, conspiring with Astrobryxa in luring Progen to enter into the Contracts, cycling through three different CEOs, three Contract Administrators, and three Ministers of Energy.  Each transition forced Progen to start from scratch, re-explaining the project's history and status to officials with no institutional memory and, often, no incentive to resolve the mess their predecessors had created. CELEC also imposed various extra-contractual obligations on Progen and refused to timely fund payments due.

<strong><u>NINTH AFFIRMATIVE DEFENSE</u></strong>

CELEC's damages were caused, in whole or in part, by the acts or omissions of others for which the Progen Defendants have no legal responsibility. Specifically, CELEC's damages were caused by Astrobryxa and/or its principals and/or AP Inspections and/or its principals as well as CELEC's own employees and

49

executives.  Progen realleges and incorporates the allegations in its Counterclaim regarding CELEC's fraudulent inducement.

## TENTH AFFIRMATIVE DEFENSE

CELEC's claims based on Florida law (Counts II, III, and IV) fail for failing to state a cause of action because Ecuadorian law applies to the parties' relationship.

## ELEVENTH AFFIRMATIVE DEFENSE

CELEC's claims against Genertek Power Corp. and Genertek Power Industries, LLC fail because CELEC has not alleged any facts that would render these defendants liable for any requested damages, under the required particularity standard, or otherwise.

## TWELFTH AFFIRMATIVE DEFENSE

CELEC's claims against John B. Manning, W. Wade Manning, and Andrew S. Williamson fail to state a cause of action against such defendants in their individual capacities, under the required particularity standard, or otherwise.

## RESERVATION OF RIGHTS

The Progen Defendants reserve the right to raise additional defenses as they become known through discovery.

## PROGEN INDUSTRIES, LLC'S COUNTERCLAIM

## INTRODUCTION

This action arises out of a series of wrongful acts committed against Progen Industries, LLC ("Progen") by various bad actors in Ecuador especially Plaintiff. In 2024, Progen, an American company, was contacted by Karla Saud Calero ("Saud") on behalf of Empresa Pública Estratégica Corporación Eléctrica del Ecuador CELEC EP Unidad de Negocio Termopichincha ("CELEC") to assist Ecuador in addressing the country's severe energy crisis by supplying power generators for two thermal generation projects solicited by the Ecuadorian government. Saud is the principal of Defendant Astrobryxa, S.A. ("Astrobryxa"). What Progen did not anticipate was that it would become the victim of political subterfuge, defamation, fraud, forgery, and breach of contract, at the hands of the very parties it sought to work with and assist.

Because of CELEC's mismanagement, poor operations, and infrastructure inadequacies, Ecuador suffered severe power outages when the country went through a drought during its dry season in 2024. It created in turn a political firestorm with government officials and politicians pointing at each other and engaging in a public blame game in advance of Presidential elections scheduled in February 2025. In August 2024, Progen was retained to provide emergency thermal power generation services during the crisis. Saud did not disclose and Progen did not know that she was related to CELEC's General Manager, Fabian

Calero, and that she was conspiring with CELEC to lure Progen into assuming responsibility for the installation of generators and completion of the projects while absconding with project funds. Having commenced its contractual obligations amid Ecuador's challenging circumstances, Progen's performance was inevitably compromised because it was caught in the middle of this political firestorm. Despite this, Progen did endeavor to perform as best it could under the circumstances. In total, Progen imported and installed forty-six (46) generators at two sites in Ecuador pursuant to its contractual obligations.

CELEC acted in bad faith throughout its relationship with Progen. CELEC caused repeated and extensive delays, failed to honor its contractual obligations, and ultimately wrongfully terminated both contracts it awarded to Progen, valued at almost $110 million combined, without providing the contractually required notice or opportunity to cure. The situation was exacerbated by repeated changes in CELEC's management with numerous high-level officials charged with fraud and malfeasance. To compound matters, CELEC then disseminated false and defamatory statements about Progen in the Ecuadorian media, using Progen as a scapegoat for CELEC's own failures. Progen now seeks redress for the wrongs committed against it.

Progen was also defrauded by Jose Walther Manrique Suarez ("Manrique") and Saud, principals of Astrobryxa, who initially approached Progen to assist Astrobryxa with the bidding process for the thermal generation projects.

52

Unbeknownst to Progen, Manrique and Saud submitted forged documents, including fabricated certificates bearing a forged digital signature of one of Progen's principals, with Progen's bids to CELEC. Saud is related to Fabian Calero, CELEC's General Manager at the time of the award of two contracts to Progen. According to Plaintiff's Complaint, Fabian Calero fled Ecuador and his whereabouts are unknown.

### PARTIES, JURISDICTION, AND VENUE

1.      This is an action for damages in excess of $75,000, exclusive of interest, attorneys' fees, and costs.

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees, and is between citizens of different states.

3.      Venue is proper in the United States District Court for the Middle District of Florida under 28 U.S.C. § 1391 because all or a substantial part of the causes of action accrued in this District.

4.      Counter-Plaintiff Progen is a Delaware limited liability company that is registered to do business in Florida.  Progen manufactures its own power generator sets in-house and supplies them to power plant projects across the world.  Its current principal place of business is 600 Prairie Industrial Parkway, Mulberry, Florida 33860. Its sole member is Andrew S. Williamson ("Williamson").

5. Counter-Defendant CELEC is a public company responsible for the generation, transmission, and distribution of electricity in Ecuador. At all material times, CELEC conducted business in Florida, which included, without limitation, traveling to Florida on business and repeated business dealings with Progen, a Delaware limited liability company doing business in Florida. Further, CELEC committed a tort in the State of Florida and it has submitted to the jurisdiction of this Court by filing the Complaint in this case.

6. Progen has complied with all conditions precedent to the institution of this action, if any.

7. Progen has retained the law firm of Holland & Knight LLP to represent it in this matter and is obligated to pay its counsel a reasonable fee.

## **FACTUAL BACKGROUND**

### Progen Is Approached to Provide Equipment and Infrastructure to the Ecuadorian Government

8. In or around May 2024, Progen was approached by two individuals, Manrique and Saud, principals of Astrobryxa.

9. Manrique and Saud told Progen about the energy crisis in Ecuador— namely that, after a severe, years-long drought, water levels at hydroelectric plants were depleted, resulting in a lack of generation capacity build-up.

10. Manrique and Saud told Progen and its principals that the Ecuadorian government was soliciting bids for terrestrial thermal generation projects. The bids were to be submitted to CELEC, Ecuador's state-owned electric utility company.

11. Manrique and Saud, through their company, Astrobryxa, intended to submit bids for these projects and provide all contracting services in Ecuador, but needed generators to be supplied by a vendor such as Progen.

12. Manrique and Saud provided Progen with specific details regarding the type of generators and specifications the Ecuadorian government was seeking.

13. Progen possessed the ability to assist in such a crisis and expressed interest in the opportunity.

14. Progen, however, had concerns about entering a foreign marketplace and working with unknown actors.

15. Manrique and Saud represented that Progen would not be entering into any contracts with the Ecuadorian government. Instead, Progen would be responsible only for providing the generators and any related infrastructure.

16. Manrique and Saud represented that they would be submitting the bids to CELEC on behalf of their company, Astrobryxa. They also represented that they had a general contractor who would be handling the installation.

17. Specifically, Astrobryxa was planning to submit bids to CELEC claiming it was on behalf of a company called INYCOFYI Ingenieria y Construcciones S.A. ("FYI") for two contracts: (1) the Quevedo Contract; and (2)

the Salitral Contract (collectively, the "Contracts") each with its own specifications, discussed further below.

18. Based on these representations, Progen agreed to provide the necessary generators and related infrastructure.

19. At some point during these initial dealings, Manrique and Saud told Progen that FYI had been disqualified from submitting the bids directly to CELEC. Manrique and Saud did not disclose the reason for the disqualification, but stated it was a technicality. Saud assured Progen that all of the contract performance guarantees would still be provided by FYI and that all of the installation work would be performed, financed and funded by FYI.

20. Manrique and Saud suggested that they submit the bids on Progen's behalf, since they had everything lined up in Ecuador and Progen was the entity providing the generators anyways.

21. Manrique and Saud assured Progen there would be no issues with the submission.

22. Because the bidding process took place in Ecuador, in a foreign language, and with foreign officials, Progen agreed that Manrique and Saud could submit the bids on Progen's behalf.

23. Progen reviewed the bid submissions with Manrique and Saud to ensure accuracy and provided the make and model of the generators it intended to deliver to CELEC.

24.    Manrique and Saud represented to Progen and its principals, John B. Manning ("Manning") and Williamson, that they would submit the bid submissions that Progen had reviewed.

25.    Manrique and Saud, on behalf of Progen, submitted a bid for the Salitral Contract on June 25, 2024.

26.    Manrique and Saud, on behalf of Progen, submitted a bid for the Quevedo Contract on July 9, 2024.

27.    Unbeknownst to Progen, Manrique and Saud submitted forged and falsified records with Progen's bids to CELEC.

<u>Progen and CELEC Enter into the Contracts</u>

28.    After reviewing Progen's bid submissions, CELEC awarded both the Quevedo Contract and the Salitral Contract to Progen on August 2, 2024. A copy of the Quevedo Contract is attached as **Exhibit A**. A copy of the Salitral Contract is attached as **Exhibit B**.

29.    Under the Contracts, Progen was required to provide certain power generators that were "zero hour" generators, as well as all related infrastructure. "Zero hour" is an industry term of art that does not necessarily mean the unit is factory-new. It could mean that the engine was overhauled or rebuilt, and the hour

meter was reset accordingly; the controller was replaced, and old runtime data was lost; or that the unit was refurbished and tested post-servicing.[2]

30.    When the parties entered into the Contracts, both parties were aware that the generators would be "zero hour," not "factory-new."   This was communicated to Astrobyxa and the CELEC representatives that visited Progen prior to the submission of the bid.

31.    Under the Quevedo Contract, Progen was required to install 20 power generators, each with a capacity for 2,500 KW of electric energy. Those 20 generators were to be "zero hour" generators.

32.    The Quevedo Contract provided for a period of 95 days from the date the contract was signed for turnkey delivery of all 20 "zero hour" power generators. *Id*. at § 8. The parties amended the Quevedo Contract on January 11, 2025, which extended Progen's completion date to March 15, 2025.

33.    The Quevedo Contract contained the following provisions, requiring CELEC to:

> "Designate Contract Administrators and Supervisors, and necessary technical team, for adequate control of contractual execution, who will ensure the complete and timely fulfillment of each and every one of the obligations derived therefrom, for which they will take the necessary actions to avoid non-compliance. ... Sign the partial and definitive delivery and acceptance reports once the goods

---

[2] Industrial Generators, *Understanding Industrial Generator Hours*, https://turnkey-industries.com/understanding-industrial-generator-hours (last visited February 20, 2026).

58

have been received; and, generally comply with obligations derived from the contract." *Id.* at § 13.2.

"Before proceeding with unilateral termination, CELEC EP will notify the contractor, with ten (10) business days advance notice, of its decision to unilaterally terminate it. Along with the notification, technical and economic reports shall be sent, regarding compliance with the contractor's obligations. The notification shall specifically indicate the non-compliance or delay incurred by the contractor and shall warn that, if not remedied within the indicated term, the contract will be terminated unilaterally. If the contractor does not justify the delay or does not remedy the non-compliance, within the term granted, CELEC EP may unilaterally terminate the contract, by resolution of the highest authority, which shall be communicated to the contractor." *Id.* at § 14.2.1.

34. Progen imported 17 "zero-hour" generators that met the requirements of the Quevedo Contract to Ecuador under the Quevedo Contract.

35. Progen installed these 17 "zero-hour" generators in Quevedo, Ecuador.

36. CELEC paid Progen $37,790,000 under the Quevedo Contract.

37. Under the Salitral Contract, Progen was required to install 29 power generators, each with a capacity for 3,500 KW of electric energy. Those 29 generators were to be "zero hour" generators.

38. The Salitral Contract provided for a period of 120 days from the date the contract was signed for turnkey delivery of all 29 "zero hour" power generators. *Id.* at § 8. The parties eventually extended the completion date for the Salitral Contract until February 27, 2025.

39. The Salitral Contract contained the following provisions, requiring CELEC to:

"Designate the Contract Administrators and Supervisors, and necessary technical team, for the adequate control of its contractual execution, who shall ensure the full and timely compliance with each and every one of the obligations derived therefrom, for which they shall adopt the necessary actions to avoid non-compliance. ... Sign the partial and final delivery receipts once the goods have been received; and, generally, comply with the obligations derived from the contract." *Id.* at § 13.2.

"Before proceeding with unilateral termination, CELEC EP shall notify the contractor, with ten (10) business days advance notice, of its decision to unilaterally terminate it. Along with the notification, technical and economic reports shall be sent, regarding compliance with the contractor's obligations. The notification shall specifically indicate the non-compliance or delay incurred by the contractor and shall warn that, if not remedied within the indicated term, the contract shall be unilaterally terminated. If the contractor does not justify the default or does not remedy the non-compliance, within the term granted, CELEC EP may unilaterally terminate the contract, by resolution of the highest authority, which shall be communicated to the contractor." *Id.* at § 14.2.1.

40. Progen imported 29 "zero-hour" generators that met the requirements of the Salitral Contract to Ecuador under the Salitral Contract.

41. Progen installed these 29 "zero-hour" generators in Salitral, Ecuador.

42. CELEC paid Progen $69,580,000 under the Salitral Contract.

## Issues with the Contracts Arise

43.    From the moment CELEC awarded Progen the Contracts, delays began and became a hallmark of the way CELEC carried out business with Progen. Despite the Quevedo Contract requiring performance in 95 days and the Salitral Contract requiring performance in 120 days, CELEC's delays and interference caused Progen to be unable to perform under the original schedules, as set forth below.

44.    After the award of the Contracts to Progen, Progen's principals, Manning and Williamson, traveled to Ecuador to execute the Contracts in person on August 2, 2024, as is required under Ecuadorian law.

45.    After Manning and Williamson's arrival, it became clear that CELEC was unprepared to execute the Contracts. CELEC could not—or would not—gather all the individuals required to sign the Contracts. Manning and Williamson waited after signing the Contracts for the fully executed Contracts without explanation.

46.    CELEC told Manning and Williamson to return home, as it could not gather the necessary individuals to sign the Contracts.

47.    Ten (10) days later, on August 12, 2024, CELEC executed the Contracts, but did not provide the notarization required for government contracts in Ecuador.  Progen was now already ten (10) days into the 95- and 120-day Contracts.

48.     Under Ecuadorian law, the next step in the Contracts' ratification was notarization. CELEC delayed in notarizing the Contracts without providing a reason.  CELEC did not notarize the Contracts until September 2, 2024. This was a thirty-one (31) day delay.

49.     The first "milestone" to be completed under the Contracts was an inspection of the generators. Once each inspection was done, CELEC would authorize the release of a 70% deposit of the total contract prices to Progen.

50.     Under both Contracts, CELEC was supposed to send representatives from Ecuador to the United States to inspect the generators at Progen's facility.

51.     The first inspection was to take place under the Salitral Contract. CELEC, however, encountered problems with forming its inspection committee and obtaining visas for its representatives, creating additional delay.

52.     Progen sent CELEC various correspondence insisting that the inspections be conducted in a timely manner in accordance with the Contract in order to avoid further delay. CELEC, however, continued to delay the formation of its technical committee needed for inspections.

53.     CELEC retained and hired AP Inspections LatinoAmerica, S.A. and AP Inspections LLC (collectively "AP Inspections") to carry out its inspections of the Salitral units.

54.     Progen had no involvement in the selection of AP Inspections.

55. Progen had no communication with AP Inspections beyond the inspections.

56. In September 2024, AP Inspections attended an inspection with Progen to review the generators that were manufactured for the Salitral Contract.

57. Progen (through Williamson), Astrobryxa (through Saud), and AP Inspections (through Richard A. Nunez Jr. ("Nunez") and Pamela Dillon) participated in the September 2024 inspection.

58. CELEC attended the September 2024 inspection via Zoom. CELEC participated in the inspection, asking questions, and virtually inspecting the generators.

59. On September 14 and 15, 2024, AP Inspections issued reports approving the generators as proper and compliant with the terms of the Salitral Contract, stating that the generators were apt for delivery and installation.

60. Despite the reports, on September 18, 2024, CELEC stated the approvals were "not enough" and decided to send a different delegation of its own employees this time.

61. These employees included non-management personnel and assistants. Progen had anticipated the delegation would include engineers and energy specialists from Ecuador. It did not.

62. The CELEC delegation appeared more interested in having Progen's principals take them to Disney World and shopping malls than in inspecting the generators they were in the United States to examine.

63. After examining the generators, CELEC's delegation issued reports from the second inspection approving the generators as proper and compliant with the terms of the Salitral Contract.

64. CELEC also appointed AP Inspections to carry out an inspection of the generator units under the Quevedo Contract.

65. Thus, in mid-to-late January 2025, AP Inspections attended a second inspection with Progen to review the generators that were manufactured under the Quevedo Contract.

66. Progen (through W. Wade Manning) and AP Inspections (through Nunez) participated in the January 2025 inspection.

67. Again, CELEC attended the January 2025 inspection via Zoom. CELEC participated in the inspection, asking questions, and virtually inspecting the generators.

68. From January 15 to February 24, 2025, AP Inspections issued reports approving the generators as proper and compliant with the terms of the Quevedo Contract, stating that the generators were apt for delivery and installation.

69. Despite Progen's generators passing inspection, CELEC caused delays routinely both before and after the inspections.

70. Progen would soon realize that much of CELEC's delay tactics had to do with ever changing government and political turmoil, large turnover within CELEC itself, and the upcoming Ecuadorian presidential election.

71. Unbeknownst to Progen when it entered into the Contracts, Ecuador's energy crisis had become a politically charged issue, with widespread public dissatisfaction over rolling blackouts that affected homes, businesses, and essential services throughout the country.

72. Progen discovered that CELEC was under intense pressure from government officials to remedy the energy crisis. The Ecuadorian president, who was facing re-election, publicly promised to resolve the blackouts, placing enormous pressure on CELEC to deliver results on an accelerated timeline—regardless of whether such timelines were realistic or achievable.

73. This political pressure manifested in CELEC's erratic and inconsistent management of the Contracts. CELEC, in turn, blamed Progen to deflect its responsibility for the crisis in the country's electrical grid.

74. For example, from the time Progen signed the Contracts to the Contracts' termination, a period of less than one year, CELEC cycled through three different CEOs, three Contract Administrators, and three Ministers of Energy.

75. Each leadership transition forced Progen to start from scratch. Progen's principals were required to re-explain the project's history, the status of deliverables, the reasons for delays (which CELEC itself had caused), and the path

forward, often multiple times to officials who had no institutional memory of prior negotiations or agreements.

76. These new officials frequently had no incentive to resolve the issues their predecessors had created and, in some cases, appeared motivated to distance themselves from prior decisions by blaming Progen. The officials were openly hostile to Progen, disinterested in assisting in the completion of the projects and more interested in transferring blame than understanding and overcoming the problems CELEC created.

77. As the political pressure mounted and the energy crisis persisted, CELEC used Progen as a scapegoat in the Ecuadorian media. CELEC's defamation campaign against Progen went so far as falsely stating that Progen had misappropriated $110 million as alleged in the Complaint ignoring the delivery and installation of 46 generators over an extended period of time.

78. CELEC, through its officials or representatives, fabricated and disseminated false statements to Ecuadorian news outlets, including claims that Progen was under investigation by the FBI and that Progen and its principals were bad actors engaged in fraudulent conduct.

79. These statements were false and were made with the intent to deflect blame from CELEC's own failures onto Progen, thereby tarnishing Progen's reputation in Ecuador and internationally.

66

80.     This politically charged backdrop resulted in a series of delays and underhandedness by CELEC, including but not limited to the following:

- On November 7, 2024, CELEC falsely told Progen it had breached the Contracts.

- On November 8, 2024, CELEC's Manager Byron Orozco threatened early termination of the Contracts, creating a hostile working relationship between CELEC and Progen.

- CELEC delayed Progen's coordination of shipping the generator units for unexplained reasons, costing Progen $350,000 and a delay of nine days.

- Between February 21, 2025 and April 27, 2025, CELEC issued fines to Progen, citing non-compliance with milestones set in the schedule agreed to in January 2025. As stated above, Progen did not cause these delays.

- On May 30, 2025, CELEC wrongfully terminated the Quevedo Contract.

- On June 3, 2025, CELEC wrongfully terminated the Salitral Contract.

81.     Despite CELEC's chaotic administration of the Contracts and the resulting obstacles, Progen made diligent efforts to complete its performance and ultimately resorted to the dispute resolution channels provided in the Contracts.

82.     Progen first sought to collaborate with CELEC to agree on extensions for milestones affected by delays caused by CELEC and force majeure events. However, CELEC either refused many of Progen's reasonable requests or, in some instances, agreed to extend certain milestones only to then refuse to authorize the revised schedule necessary to implement the extension. Through this conduct, CELEC hindered Progen's performance and then invoked the inevitable consequences of its own actions as a pretext to terminate the Contracts.

83.     The Salitral and Quevedo Contracts each contain mediation clauses. *See* Ex. A, Clause 6; Ex. B, Clause 16. In light of CELEC's refusal to cooperate, in early 2025, Progen invoked these provisions and sought to mediate the disputes arising from CELEC-caused delays. The mediation process failed to produce a resolution.

84.     Meanwhile, CELEC continued to harm Progen by imposing fines and creating circumstances to justify termination, rather than engaging in good faith mediation as required by the Contracts. By early 2025, CELEC had caused Progen financial instability, making it even more difficult for Progen to perform its obligations.

85.     Eventually, on May 30, 2025, CELEC wrongfully terminated the Quevedo Contract.

86.     And, on June 3, 2025, CELEC wrongfully terminated the Salitral Contract.

87. CELEC's wrongful terminations occurred after Progen had made every effort to perform under the Contracts and had delivered forty-six (46) generators under the Contracts.

## COUNT I
## BREACH OF QUEVEDO CONTRACT

88. Progen reincorporates and re-alleges Paragraphs 1 through 87 as if fully set forth herein.

89. The Quevedo Contract is a valid contract between Progen and CELEC.

90. CELEC has breached the Quevedo Contract as follows: (1) CELEC has failed, under Section 13.2, to designate Contract Administrators that ensured full and timely compliance with CELEC's obligations under the Quevedo Contract; (2) CELEC caused repeated delays and interfered with Progen's performance by delaying execution of the Contracts, making false accusations to the media, failing to timely inspect equipment, delaying payments that were due, imposing fines for delay that CELEC itself caused, addressing issues raised by the local communities and repeatedly harassing Progen with threats and false accusations in the media; and (3) CELEC failed, under Section 14.2.1, to properly notify Progen of its intent to terminate the Quevedo Contract and give Progen the opportunity to cure any alleged breached.

91. CELEC's breaches of the Quevedo Contract were material and has caused Progen damages, plus attorneys' fees and costs and expenses of this lawsuit.

WHEREFORE, Progen requests that this Court enter a judgment against CELEC for damages, including pre-judgment and post-judgment interest and attorneys' fees and costs, and award such other relief as this Court determines is proper.

## COUNT II
## BREACH OF SALITRAL CONTRACT

92. Progen reincorporates and re-alleges Paragraphs 1 through 87 as if fully set forth herein.

93. The Salitral Contract is a valid contract between Progen and CELEC.

94. CELEC has breached the Salitral Contract as follows: (1) CELEC has failed, under Section 13.2, to designate Contract Administrators that ensured full and timely compliance with CELEC's obligations under the Salitral Contract; (2) CELEC caused repeated delays and interfered with Progen's performance by delaying execution of the Contracts, making false accusations to the media, failing to timely inspect equipment, delaying payments that were due, imposing fines for delay that CELEC itself caused, addressing issues raised by the local communities and repeatedly harassing Progen with threats and false accusations in the media; and (3) CELEC failed, under Section 14.2.1, to properly notify Progen of its intent to terminate the Salitral Contract and give Progen the opportunity to cure any alleged breached.

95. CELEC's breaches of the Salitral Contract were material and has caused Progen damages, plus attorneys' fees and costs and expenses of this lawsuit.

WHEREFORE, Progen requests that this Court enter a judgment against CELEC for damages, including pre-judgment and post-judgment interest and attorneys' fees and costs, and award such other relief as this Court determines is proper.

**COUNT III**
**<u>FRAUD IN THE INDUCEMENT</u>**

96. Progen reincorporates and re-alleges Paragraphs 1 through 87 as if fully set forth herein.

97. In or around May 2024, CELEC, acting through its agent Saud, approached Progen to enter into the Contracts. That same month, CELEC visited Progen's business premises in Mulberry, Florida. Saud organized CELEC's visit to Progen's facilities and was present during the visit.

98. CELEC knew, or should have known, at the time it solicited Progen's participation in the bidding process and induced Progen to enter into the Contracts, that Saud maintained a personal and/or familial relationship with Fabian Calero, CELEC's General Manager at the time of the award of the Contracts to Progen.

99. CELEC failed to disclose this relationship to Progen at any time before or during the formation of the Contracts, despite the fact that the relationship was

material to Progen's decision to enter into the Contracts and to entrust Saud, through Astrobryxa, with the submission of bids and related dealings with CELEC on Progen's behalf.

100. Had Progen known of the relationship between Fabian Calero and Saud, Progen would have recognized that Saud was not acting as an independent intermediary but was instead personally connected to the very entity awarding the Contracts.

101. This undisclosed conflict of interest compromised the integrity of the bidding process and the arm's-length nature of the Contracts, and Progen would not have agreed to participate in the bidding process or enter into the Contracts under such circumstances.

102. All communications with CELEC during the bidding process were conducted by Saud and Manrique. Saud told Progen that CELEC's Fabian Calero told Saud to approach Progen and together with Saud, caused Progen to enter into the Contracts and assume responsibility for the installation of the generators falsely claiming that FYI had been disqualified from bidding. CELEC and Saud assured Progen that the installation could be handled by FYI all the same since they were already in place and they were in an emergency situation.

103. Further, Saud and Manrique told Progen they would manage FYI's construction and installation costing by getting three quotes to compare to each FYI cost item for Progen's approval prior to installation. They never did. They also

committed to managing the construction and installation project schedules knowing they would not be dedicating the necessary time and resources to execute the necessary oversight. At all times, CELEC knew and accepted Progen was relying on FYI and Saud for execution of the project.

104. Saud also assured Progen that it would not need to provide performance guarantees and stated that FYI's Fabian Yar was taking full responsibility.

105. In addition, at the time CELEC induced Progen to enter into the Contracts, CELEC knew, or should have known, that Ecuador's energy crisis had become a deeply politicized issue that had created a political firestorm within the country.

106. Progen reasonably relied on CELEC's, Saud's and Manrique's false representations and proceeded to execute the Contracts.

107. Government officials and politicians were publicly blaming one another for the crisis in advance of the February 2025 presidential elections, and CELEC was under intense pressure from the Ecuadorian president (who had publicly promised to resolve the rolling blackouts) to deliver results on an accelerated and unrealistic timeline.

108. CELEC failed to disclose to Progen, at any time before or during the formation of the Contracts, the existence and severity of this political firestorm, the extreme political pressure under which CELEC was operating, the likelihood

that the Contracts would be subject to erratic political interference, or the risk that Progen would be scapegoated for CELEC's own failures in order to shield CELEC and Ecuadorian government officials from public accountability.

109. These omissions were material.

110. CELEC knew that Progen was an American company with no prior experience operating in Ecuador and that Progen had specifically expressed concerns about entering a foreign marketplace and working with unknown actors. CELEC was aware that Progen was relying on the representations and omissions of CELEC and its agents in deciding whether to submit bids and enter into the Contracts.

111. CELEC had a duty to disclose the foregoing material facts to Progen. CELEC's failure to do so constituted a fraudulent omission and concealment of facts that were material to Progen's decision to enter into the Contracts.

112. CELEC made these omissions with the intent to induce Progen to enter into the Contracts, knowing that full disclosure of the relationship between Fabian Calero and Saud and the political circumstances surrounding the Contracts would have dissuaded Progen from participating.

113. Progen justifiably relied on CELEC's representations and omissions in deciding to enter into the Contracts.

114. Progen had no independent means of discovering the relationship between Fabian Calero and Saud or the full scope of the political firestorm

engulfing Ecuador's energy sector, as these facts were not reasonably discoverable by Progen, a foreign entity unfamiliar with the internal politics of Ecuador.

115.    As a direct and proximate result of CELEC's fraudulent inducement, Progen entered into the Contracts and committed substantial resources—including the manufacture, importation, and installation of forty-six (46) generators at two sites in Ecuador—only to be subjected to CELEC's erratic management, repeated delays, wrongful imposition of fines, false accusations in the media, and ultimate wrongful termination of both Contracts.

116.    But for CELEC's fraudulent omissions, Progen would not have entered into the Contracts and would not have suffered the resulting damages.

117.    As a result of CELEC's fraud in the inducement, Progen has suffered damages including, but not limited to, lost profits, costs of performance, reputational harm, and other consequential damages.

WHEREFORE, Progen requests that this Court enter a judgment against CELEC for damages, including pre-judgment and post-judgment interest and attorneys' fees and costs, and award such other relief as this Court determines is proper.

## **Jury Demand**

Progen hereby demands a trial by jury on all issues so triable.

Dated: February 23, 2026

Respectfully submitted,

75

/s/ Adolfo E. Jiménez
Adolfo E. Jiménez
Florida Bar No. 869295
Email: Adolfo.Jimenez@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

and

Jason H. Baruch
Florida Bar No. 10280
Jason.baruch@hklaw.com
Anne Colbert
Florida Bar No. 1026226
anne.colbert@hklaw.com
Allison M. Powers
Florida Bar No. 1025549
allison.powers@hklaw.com
Michael S. Wyse
Florida Bar No. 1032243
michael.wyse@hklaw.com
HOLLAND & KNIGHT LLP
100 N. Tampa Street, Suite 4100
Tampa, FL 33602
Telephone: (813) 227-8500
Facsimile: (813) 229-0134 (fax)


*Attorneys for Defendants Progen Industries, LLC; Genertek Power Corp.; Genertek Power Industries, LLC; John B. Manning; W. Wade Manning; and Andrew S. Williamson*