# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CELEC EP,

       Plaintiff,

v.

PROGEN INDUSTRIES, LLC;
GENERTEK POWER CORP.;
GENERTEK POWER INDUSTRIES,
LLC; JOHN B. MANNING; W. WADE
MANNING; ANDREW S.
WILLIAMSON; ASTROBRYXA, S.A.;
ASTROBRYXA, LLC; AP
INSPECTIONS LATINOAMERICA,
S.A.; A.P. INSPECTIONS LLC; H&S
INDUSTRY, LLC; TWO LIONS
HOLDINGS, LLC; AOT HOLDING
AG; GESTORES INMOBILIARIOS
LIGHTBLUE, S.A., and DOES 1–95,

       Defendants.

Case No. 8:25-cv-03433

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, the Ecuadorian government, through the Strategic Public Company

Electric Corporation of Ecuador ("CELEC"), represented by undersigned counsel,

submits the following Complaint against Defendants, Progen Industries, LLC;

Genertek Power Corp.; Genertek Power Industries LLC; John B. Manning; W. Wade

Manning; Andrew S. Williamson; Astrobryxa S.A.; Astrobryxa, LLC; AP

Inspections Latinoamerica S.A.; A.P. Inspections LLC; H&S Industry, LLC; Two

Lions Holdings, LLC; AOT Holdings AG; Gestores Inmobiliarios Lightblue, S.A.;

and Does 1–95 (collectively, "Defendants"), seeking damages and equitable relief relating to Defendants' violations of federal and state RICO, violations of the Florida Deceptive and Unfair Trade Practices Act, unjust enrichment, conversion, fraudulent money transfers, and conspiracy to cause substantial harm to CELEC.  In support, Plaintiff states as follows:

## **INTRODUCTION**

1. This case involves a fraudulent scheme perpetrated against the Ecuadorian government by Defendants and their co-conspirators.  By and through that scheme, Defendants and their co-conspirators formed a criminal enterprise that leveraged a national crisis to embezzle nearly $110 million from Ecuador and its people during an era of uncommon vulnerability.

2. Defendants' actions include forging documents, creating sham paperwork, and making numerous material misrepresentations to obtain valuable contracts from the Ecuadorian government and extract nearly $110 million. Defendants have absconded with the funds, engaging in acts of conversion and fraud, and delivering nothing of value to Ecuador.  And the money has now disappeared from Progen's bank accounts, as Progen has fraudulently transferred the funds it received from CELEC to Progen-related individuals and entities, other Defendants, Does 1-95, co-conspirators, and individuals and entities related to Progen's co-conspirators.

## **PARTIES**

3.     Plaintiff, Corporacion Electrica del Ecuador (CELEC), is the Strategic Public Company responsible for the generation, transmission, and distribution of electricity in Ecuador.  As a strategic public service, CELEC's operations are guided by principles of universality, accessibility, continuity, and quality.  Because its functions are paid for, in part, by financing from the Ecuadorian state and multilateral development banks, CELEC considers itself to be a steward of the public trust.

4.     Defendant Progen Industries, LLC ("Progen") was established as a Delaware Limited Liability Company and was registered to do business in Florida in 2017.  Its initial address was 4819 Musket Drive and its current address is 600 Prairie Industrial Pkwy, Mulberry, FL 33860.  On information and belief, its members are Florida residents including but not limited to Andrew S. Williamson and John B. Manning, who are also publicly listed as the President/COO and CEO of Progen, respectively.  Upon information and belief, none of its members are citizens of Ecuador.

5.     Defendant Genertek Power Corp. is a Delaware corporation and was registered to do business in Florida in 2014.  Its original name was Megawatt Power Industries, its initial address was 1935 Industrial Park Road, Mulberry FL 33860, and its principal officers were Joseph Adir, John Sams, Mohammad Ayoub, Andrew

3

S. Williamson, and John B. Manning.  In December 2014, the company changed its name to Genertek Power Corporation.  In 2015, its address changed to 600 Prairie Industrial Pkwy, Mulberry, FL 33860.

6.    Defendant Genertek Power Industries, LLC is a Florida Limited Liability Company that was formed in 2013.  At one point, it was known as JBM Technology Holdings, LLC.  Its current address is 600 Prairie Industrial Pkwy, Mulberry, FL 33860.  On information and belief, its members are Florida residents including but not limited to Andrew S. Williamson and John B. Manning, who is also publicly listed as the CEO of Progen.  Upon information and belief, none of its members are citizens of Ecuador.

7.    Upon information and belief, Defendant John B. Manning is the CEO of Defendant Progen and an officer of Defendant Genertek Power Industries.  Upon information and belief, he resides in Lakeland, Florida.

8.    Upon information and belief, Defendant W. Wade Manning is the Vice-President of Operations of Genertek Power Industries and a Vice-President of Progen.  Upon information and belief, he resides in Lakeland, Florida.

9.    Upon information and belief, Defendant Andrew S. Williamson is the President and COO of Defendant Progen and the COO of Defendant Genertek Power Industries.  Upon information and belief, he resides in Mulberry, Florida.

4

10. Defendant Astrobryxa S.A. is an Ecuadorian corporation. Its principal place of business is in Guayaquil, Ecuador. Its owners are Karla Saud Calero and Jose Walther Manrique Suarez.

11. Defendant Astrobryxa, LLC is a Delaware Limited Liability Company that was formed in February 2025 solely as an affiliate of Astrobryxa S.A. to receive payments from Progen. Its ultimate owners are Karla Saud Calero and Jose Walther Manrique Suarez.

12. Defendant AP Inspections Latinoamerica S.A. is an Ecuadorian corporation. Its principal place of business is in Ecuador.

13. Defendant A.P. Inspections LLC is a Texas Limited Liability Company. Its principal place of business is in Houston, Texas. On information and belief, its members are Texas residents.

14. Defendant H&S Industry, LLC is a Delaware Limited Liability Company that was formed in 2019. Upon information and belief, its members are Florida residents, including but not limited to Andrew S. Williamson. Upon information and belief, none of its members are citizens of Ecuador.

15. Defendant Two Lions Holdings, LLC is a Florida limited liability company that was formed in 2021. Its principal place of business is in Lakeland, Florida. Upon information and belief, its members are Florida residents, including

5

but not limited to Andrew S. Williamson.  Upon information and belief, none of its members are citizens of Ecuador.

16.    Defendant AOT Holding AG is a Swiss corporation.  Its principal place of business is Steinhausen, Switzerland.

17.    Defendant Gestores Inmobiliarios Lightblue, S.A. is an Ecuadorian corporation.  Its principal place of business is Guayaquil, Ecuador.  Upon information and belief, its principals include but are not limited to Karla Saud Calero and Jose Walther Manrique Suarez.

## JURISDICTION AND VENUE

18.    The United States District Court for the Middle District of Florida has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim under 18 U.S.C. 1962(c).  The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

19.    This Court has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because these claims arise out of the same case or controversy as Plaintiff's federal law claim, as all claims in this action arise out of a common nucleus of operative facts.

20.    This Court has personal jurisdiction over Defendants Progen Industries LLC, Genertek Power Corp., Genertek Power Industries LLC, and Two Lions Holdings LLC as they are domiciled in, are registered in, and/or have their principal places of business in this District pursuant to Fla. Stat. § 48.193(1)(a) and for other independent reasons.  This Court also has personal jurisdiction over Defendants John Manning, Wade Manning and Williamson because, upon information and belief, all are domiciled in the District.   This Court has personal jurisdiction over Defendants Astrobryxa S.A., Astrobryxa LLC, AP Inspections Latinoamerica S.A.,  A.P. Inspections LLC, H&S Industry LLC, AOT Holding AG, and Gestores Inmobiliarios Lightblue, S.A. because, among other things, they conspired to and engaged in tortious conduct in and related to Florida, pursuant to Fla. Stat. § 48.193(1)(a) or otherwise engage in substantial and not isolated activity within the state.   In the alternative, the Court may exercise specific jurisdiction over each Defendant pursuant to Fla. Stat. § 48.193, 18 U.S.C. § 1965(d), Federal Rules of Civil Procedure 4(k)(1)(A), 4(k)(1)(B), or, in the alternative, 4(k)(2).

21.    Venue is proper in this Court pursuant to Title 18 U.S.C. §§ 1391(b)(2). Defendants are subject to personal jurisdiction in this Court.

## FACTS

### *The 2024 Energy Crisis and Ecuador's Desperate Need for Generators*

22.     In 2024, Ecuador experienced an energy crisis after a severe, years-long drought depleted water levels at hydroelectric plants, resulting in a lack of capacity build-up.

23.     The Ecuadorian government declared a national emergency and followed that declaration by imposing daily eight-hour blackouts. At times, fourteen-hour blackouts were common. The crisis cost the Ecuadorian economy hundreds of millions of dollars per month. Even worse, it led to increased crime, house fires, and adverse public health impacts, including heat-related illnesses and deaths.

24.     As discussed in more detail below, Defendants and their co-conspirators took advantage of this crisis to the detriment of the Plaintiff and, indeed, the Ecuadorian people.

25.     In May 2024, and in response to the crisis, the Ecuadorian government solicited bids for two terrestrial thermal generation projects, one in Quevedo, Ecuador and one in Salitral, Ecuador (the "Quevedo Contract" and the "Salitral Contract," respectively).  Given the gravity of Ecuador's energy crisis, the bids for these were solicited, evaluated, and awarded on an expedited basis under emergency procedures.

*The May 2024 Visit to Progen's "Factory"*

26.    In May 2024, acting with (or under the name of) H&S Industry LLC, Progen invited Ecuadorian government officials to visit its "factory" in Tampa, where it had supposedly manufactured and was holding the new power generators for the Ecuadorian government.

27.    On May 16, 2024, then- Minister of Mines and Energy and another CELEC official visited Progen's offices in Tampa.  Progen falsely stated that it had manufactured the new power generators from that facility and that they were in apt condition for being delivered to CELEC.  As further discussed below, this was false. Progen had not manufactured any new power generators, nor did it ever intend to deliver new power generators to CELEC.

*The Quevedo Contract*

28.    Four bidders participated in the process to award the Quevedo Contract, including at least one U.S.-based bidder.

29.    Bids were evaluated based on technical, economic, and legal parameters, all of which emphasized the bidders' prior experience.

30.    In its July 9, 2024 bid for the Quevedo Contract, Progen represented that it had substantial relevant experience.  Specifically, Progen submitted certificates purportedly showing that it had completed two similar projects for a customer called Megawatt Power Holdings Limited (Malta) in 2018 and a third

similar project for a customer called Lakeland Electric, a public electric power generation company in Lakeland, Florida in 2019. *See* Exhibit "A", attached hereto and incorporated herein by this reference. As CELEC would later discover, the supposed experience with a separate company called "Megawatt Power" was false, and the Lakeland Electric certificate was a forgery.

31.    Based upon Progen's representations, Plaintiff awarded the Quevedo Contract to Progen to the exclusion of other bidders. On August 2, 2024, Plaintiff and Progen signed the Quevedo Contract. *See* Exhibit "B", attached hereto and incorporated herein by this reference.

32.    Under the Quevedo Contract, Progen was to install 20 power generators, each with a capacity for 2,500 KW of electric energy. Those 20 generators were to be new (*i.e.* with zero hours of prior use) and recently manufactured by Progen no later than 2023. *Id*. at § 5.1.

33.    The Quevedo Contract provided for a period of 95 days from the date the contract was signed for turnkey delivery of all 20 new power generators. *Id*. at § 8. The parties amended the Quevedo Contract on January 11, 2025. Among other changes, the January 2025 amendment extended Progen's compliance deadline to March 15, 2025.

34.    In furtherance of the Quevedo Contract, CELEC ultimately paid $37,790,000 to Progen through five separate international wire transfers from

January to March 2025. All payments were made to a Progen account at Regions Bank, based in Birmingham, Alabama. *See* <u>Exhibit "C"</u>, attached hereto and incorporated herein by this reference.

35.     As further described below, Progen did not deliver to CELEC a single new power generator under the Quevedo Contract and overtly lied to CELEC about its purported experience in similar projects.

<u>*The Salitral Contract*</u>

36.     Several bidders participated in the process to award the Salitral Contract.

37.     Bids were evaluated based on technical, economic, and legal parameters, all of which emphasized the bidders' prior experience.

38.     In its June 25, 2024 bid, Progen submitted certificates supposedly showing that it had substantial relevant experience. Specifically, Progen represented that it had completed a similar project with Megawatt Power Holdings Limited (Malta) in 2018. *See* <u>Exhibit "D"</u>, attached hereto and incorporated herein by this reference. These are the same "Megawatt" documents that were submitted in connection with the Quevedo Contract bid.

39.     In addition, the Salitral Contract bid documents also contain the forged Lakeland Electric certificate and contain supposed certificates issued by a company called "Discovery Silver" and PG&E, the California utility company. *See* <u>Exhibits</u>

11

"D.1" and "D.2".  CELEC has now confirmed that the Discovery Silver and PG&E documents are also forgeries.

40.     Based upon Progen's representations, Plaintiff awarded the Salitral Contract to Progen to the exclusion of other bidders.  On August 2, 2024, Plaintiff and Progen signed the Salitral Contract.  *See* Exhibit "E", attached hereto and incorporated herein by this reference.

41.     Under the Salitral Contract, Progen was to install 29 power generators, each with a capacity for 3,500 KW of electric energy.  Those 29 generators were to be new (*i.e.* with zero hours of prior use) and recently manufactured by Progen no later than 2023.  *Id*. at § 5.

42.     The Salitral Contract provided for a period of 120 days from the date the contract was signed for turnkey delivery of all 29 new power generators.  *Id*. at § 8.  After Progen requested two extensions, Plaintiff extended the deadline for full compliance with the Salitral Contract until February 27, 2025.

43.     In furtherance of the Salitral Contract, CELEC paid $69,580,000 to Progen through one international wire transfer on September 30, 2024.  The payment was made to a Progen account at Regions Bank, based in Birmingham, Alabama.  *See* Exhibit "F", attached hereto and incorporated herein by this reference.

44.     As further described below, Progen did not deliver to CELEC a single new power generator under the Salitral Contract and overtly lied to CELEC about its purported experience in similar projects.

### *Power Generators*

45.     In connection with both the Salitral and Quevedo bids, Progen falsely represented the types of generators it could or would manufacture.  *First*, in its bids, Progen, with (or under the name of) H&S Industry LLC, represented that it was the exclusive manufacturer of power generators using medium-speed EMD engines, a specific type of power generation engine manufactured by Caterpillar, running on multiple fuels.  Progen made these representations through documents purportedly signed and notarized (by no other than Defendant Williamson himself) on April 20, 2024.  *See* Exhibit "G", attached hereto and incorporated herein by reference.

46.     *Second*, Progen represented that the new power generators that it had supposedly manufactured and would deliver to CELEC contained EMD engines. *See* Exhibit "H", attached hereto and incorporated herein by reference.

47.     As discussed below, these were false representations. CELEC would later learn from the authorized distributer of EMD engines that it had never had any relationship with Progen nor had any record of Progen purchasing or using EMD engines to build power generators.

13

*Progen Enlists Co-Conspirators Astrobryxa S.A. and Astrobryxa LLC*

48.    Progen enlisted Astrobryxa S.A. and Astrobryxa LLC as participants in its criminal enterprise.  Astrobryxa S.A. is a local Ecuadorian corporation that Progen retained to act as its subcontractor in installing the power generators under the Quevedo and Salitral Contracts.  Astrobryxa LLC is a Delaware limited liability company associated with Astrobryxa S.A.  As Astrobryxa S.A. has admitted, Astrobryxa LLC was formed to facilitate wire transfers and payments between Progen and Astrobryxa, S.A.  Progen paid Astrobryxa S.A. and/or Astrobryxa, LLC at least $20 million for its supposed services as subcontractor.

49.    On information and belief, Astrobryxa S.A. and Astrobryxa LLC are sham companies with no experience in projects involving power generation. Further, both Astrobryxa entities are owned or controlled in part by Karla Saud Calero, an individual who is related to Fabian Calero, CELEC's General Manager at the time of the award of the Quevedo and Salitral Contracts.  Fabian Calero has recently fled Ecuador and his whereabouts are unknown.  Progen and its principals have admitted that they knew all along that Karla Saud Calero and Fabian Calero were related.  Despite knowing of their familial relationship, Progen made substantial payments to the Astrobryxa entities and to Karla Saud Calero directly. These potential bribes are in addition to other payments that (as discovery has now revealed), Progen was making to Jose D. Trujillo, a former CELEC official.

14

50.    Astrobyrxa S.A. and Astrobryxa LLC were essential to the scheme because Progen used Astrobryxa S.A. as its Ecuadorian subcontractor while knowing that Astrobryxa S.A. was just a sham and that neither Progen nor Astrobryxa S.A. intended to deliver the power generators.  Astrobryxa LLC was similarly essential as Progen and Astrobryxa S.A. used the Delaware entity to transfer funds amongst themselves—presumably for financial and/or legal reasons, as well as to avoid detection by CELEC.

*Progen and its Co-Conspirators Procure and Repaint Old, Used, Non-Functional Generators to Pass Them Off as New*

51.    As CELEC has recently learned, Progen and its co-conspirators set out to procure used, non-functional generators with the intent to repaint them, make them look new, and ship them to CELEC.

52.    For example, Progen procured 21 of the 49 generators that it was supposed to deliver to CELEC from Apollo Electric, a small company in Texas.  The 21 generators were significantly old, previously used generators.  Progen purchased each of them at a price of $425,000.  Progen knew that those generators were useless and would not run on multiple fuels.  Exhibit M is a copy of Progen's signed purchase order through which it purchased these 21 generators.  On information and belief, the remaining 18 generators were also used and old generators purchased from other parties.

15

53.    On information and belief, Progen then had those generators repainted by a company called InterFab Services to pass them off as new.  Other steps to pass them off as new included scraping pre-existing labels and affixing new labels.

54.    Those old, used,  non-functional, repainted generators are the ones that Progen delivered to CELEC attempting to pass them off as new to defraud CELEC and steal nearly $110 million.

### *Progen and its Co-Conspirators Create False Records*

55.    Progen and its co-conspirators set out to create false records that Progen had successfully manufactured the power generators, and that the generators were ready to be delivered and installed.  In particular, Progen and its co-conspirators caused AP Inspections Latinoamerica, S.A., a local Ecuadorian company, and its Texas affiliate, A.P. Inspections LLC, to issue false reports to fraudulently induce Plaintiff to pay Progen for work and equipment that Progen never delivered.

56.    On information and belief, AP Inspections Latinoamerica and A.P. Inspections LLC are sham companies with no real operations, let alone experience in power generators.  They participated in the criminal enterprise with the rest of Defendants by issuing at least 10 sham inspection reports, causing CELEC to pay Progen nearly $110 million.

57.    AP Inspections Latinoamerica and A.P. Inspections LLC issued three reports dated September 14 and 15, 2024, falsely stating that Progen had successfully

manufactured the 29 new power generators under the Salitral Contract and that those generators were apt for being delivered and installed.

58.    For example, the September 14 report falsely states that AP Inspections Latinoamerica and A.P. Inspections LLC inspected 21 power generators at Progen's manufacturing facility in Texas. Progen has no manufacturing facilities in Texas. The site belongs to Apollo Electric, a separate company from which Progen was purchasing significantly old, non-functional generators.  The participants in the inspection included Defendant Williamson, Astrobryxa S.A.'s principal (Karla Saud Calero), A.P. Inspections LLC's principal (Ricardo A. Nunez Jr.) and AP Inspections Latinoamerica's principal (Pamela Dillon).  The report concluded that "all parts looks all good, new and properly fabricated."  Progen and its co-conspirators used the sham inspection reports to get Progen paid nearly $70 million. Indeed, on September 30, 2024, shortly after the issuance of the three sham reports, CELEC wired $69,580,000 to Progen in the United States.

59.    As CELEC would later uncover, none of the 29 power generators under the Salitral Contract were new, let alone compliant with any of the Contract's requirements.  As such, AP Inspections Latinoamerica and A.P. Inspections LLC's September 2024 reports contained demonstrably false statements.

60.    Similarly, AP Inspections Latinoamerica and A.P. and Inspections LLC issued seven reports from January 15 to February 24, 2025, falsely stating that

17

Progen had successfully manufactured the 20 power generators under the Quevedo Contract and that those generators were apt for being delivered and installed.

61.    For example, the January 16, 2025 report falsely states that AP Inspections Latinoamerica and A.P. Inspections LLC inspected 1 power generator at a Progen manufacturing facility in Texas.  Again, Progen has no manufacturing facilities in Texas.  This site belongs to InterFab Services, a separate company that Progen was using to repaint the generators in an attempt to pass them off as new. The participants in the inspection included Defendant W. Wade Manning and A.P. Inspections LLC's principal (Ricardo A. Nunez Jr.).  The report concluded that "material inspected was 100% finished, the visual inspection was performed following all international standard protocols and visually confirming that the unit was ready. Result completed and satisfactory."  Progen and its co-conspirators used the sham inspection reports to get Progen paid nearly $40 million.  Indeed, from January 24 to March 5, 2025, shortly after the issuance of the seven sham reports, CELEC wired $37,790,000 to Progen in the United States.

62.    However, none of the 20 power generators under the Quevedo Contract were new, let alone compliant with any of the Contract's requirements.  As such, AP Inspections Latinoamerica and A.P. Inspections LLC's January and February 2025 reports contained demonstrably false statements.

18

### *CELEC Uncovers the Truth*

63.    During 2025, CELEC's management was replaced, and the truth began to come out.  CELEC retained an outside expert firm to inspect the power generators that Progen had imported to Ecuador and purportedly intended to install with the assistance of Astrobryxa, its local contractor.  By 2025, the majority of the power generators had been imported into Ecuador but were sitting in a warehouse; not a single one had been installed by Progen or its subcontractor Astrobyrxa.

64.    Of the 17 power generators that Progen imported into Ecuador under the Quevedo Contract (which called for 20 generators) none were new, and none had been manufactured by Progen.  Further, all of the 17 power generators were used, or defective, or entirely non-functioning and some of the equipment had been repainted to hide rust.  *See* Exhibit "I", attached hereto and incorporated herein by reference.  Of the 29 power generators under the Salitral Contract, none were new, or had been manufactured by Progen and all of them were used, defective or non-functioning. *See* Exhibit "J", attached hereto and incorporated herein by reference.

65.    With these reports, it became clear that Progen defrauded CELEC by sending it substandard, non-operational equipment; subcontracting with Astrobryxa S.A. with knowledge that Astrobryxa S.A. would stay silent about Progen's non-performance in exchange for its $20 million; falsifying documents concerning that equipment through AP Inspections' sham reports; demanding payment from CELEC

19

for the equipment under false pretenses; and then fraudulently transferring funds received from CELEC to various entities, individuals, and co-conspirators to empty Progen's bank account and prevent recovery of the fraudulently obtained funds, all to CELEC's detriment.

<em><u>CELEC Terminates the Contracts</u></em>

66.    In June 2025, CELEC terminated both the Quevedo and Salitral Contracts.  As a government entity, CELEC did so by issuing an administrative decision.  Progen never challenged the administrative decision terminating the contracts and, as such, the termination of the contracts became final.

<em><u>CELEC Finds Additional Evidence of Fraud</u></em>

67.    As CELEC continued to investigate, it found additional evidence of fraud.  In particular, CELEC has found that Progen overtly lied about its purported experience when bidding for the Quevedo and Salitral Contracts, submitting these false statements through the federal wires.

68.    *First*, CELEC has uncovered that Progen submitted a forged document in its bid for the Quevedo Contract.  Specifically, on or about July 2024, Progen submitted to CELEC a document purportedly signed by Lakeland Electric, a Florida public utility company, stating that Progen had performed on a similar project for Lakeland.  That document, which purported to feature the signature of Stephen Brown (supposedly a Lakeland Electric employee), was a forgery.  In fact, Lakeland

20

Electric has confirmed in writing that the document is not authentic and that it has never done any business with Progen.  *See* Exhibit "K", attached hereto and incorporated herein by reference.

69.    *Second*, CELEC has uncovered that the other "experience" that Progen advertised was also false.  Specifically, in June and July 2024, Progen submitted paperwork to CELEC in its bids for the Quevedo and the Salitral Contracts that Progen had completed three successful, arms-length projects with a customer called Megawatt Power Industries, Inc. (Malta).

70.    This was a lie.  Megawatt Power is not a separate entity.  It is a company owned or controlled by Progen or Progen's principals.  Florida corporate records reveal that a company with the same name was established in Delaware and registered to do business in Florida in 2014.  In December 2014, the company changed its name to Genertek Power Corporation.  In 2015, its address changed to 600 Prairie Industrial Parkway, which is Progen's address.  And, further, its President is John B. Manning and its Vice-President is W. Wade Manning, who are Progen's principals.

71.    Progen had no prior experience in performing projects with Megawatt Power.  Megawatt Power (now Genertek Power) is simply another sham vehicle owned by Progen and Progen's principals, Defendants John B. Manning, W. Wade Manning, and Williamson.

21

72.     Further, the "certificates" that Progen provided purporting to have performed similar projects for "Discovery Silver" and for PG&E appear to be forgeries.  There is no indication that the projects referenced in those certificates ever happened, that the individuals from those companies that purportedly signed those certificates exist or that Progen had any involvement with those companies.

73.     *Third*, the authorized distributor for EMD engines informed the Ecuadorian government that it had no knowledge of relationship with Progen and no records of Progen purchasing, using or installing EMD engines in its power generators.  *See* Exhibit "L", attached hereto and incorporated herein by reference.  As discussed above, Progen had represented when bidding for the Salitral and Quevedo Contracts that its supposed new power generators would have EMD engines and that it was the exclusive manufacturer of a specific type of EMD-based power generator.

*Progen Funnels The Funds Out of Its Bank Account and Transfers The Funds to Others In Order to Prevent Recovery by CELEC*

74.     Progen has emptied its bank account at Regions Bank—which, as discussed, is the account in which Progen received payments from CELEC for the Salitral and Quevedo Contracts—funneling the funds it received from CELEC to (and for the benefit of) individuals and entities related to Progen as well as its co-conspirators.  The funneling of funds to others reveals a systematic pattern of transfers designed to dissipate CELEC's funds and render Progen judgment-proof.

22

75.   Progen established the Regions Bank account at the bank's South Lakeland branch in June 2024 and immediately provided that account number to CELEC as the specifically designated account to receive payments from CELEC. At the time of CELEC's first payment that account had no significant funds.  And now, it has been entirely depleted.  As such, that account was established exclusively to perpetrate fraud against CELEC.  From September 30, 2024 (the date of the first payment from CELEC to Progen) to the present, Progen has transferred millions of dollars to individuals and entities related to Progen as well its co-conspirators, including W. Wade Manning, Andrew Williamson, John Manning, Genertek Power Industries, LLC, H&S Industry LLC, Two Lions Holding LLC, AOT Holding AG, Astrobryxa S.A., Astrobryxa, LLC, Karla Saud Calero, Jose Walther Manrique Suarez, and Gestores Inmobiliarios Lightblue, S.A. (among others).

76.   Upon information and belief, the transfers made by Progen were for no legitimate business purpose and/or to perpetrate fraud against CELEC.

77.   Additionally, the transfers were made with CELEC's funds.  For example, over $10 million was sent to AOT Holding AG just two days after CELEC sent Progen $69,580,000 as payment for the Salitral Contract.  Similarly, $4 million was transferred by Progen to H&S Industry LLC only a week after CELEC sent Progen the payment for the Salitral Contract.  As another example, Two Lions Holding LLC received over $2 million from Progen between December 2024 and

June 2025, which coincides with payments from CELEC to Progen for the Quevedo Contract. These are just three instances among many in which Progen sent entities and individuals related to Progen and its co-conspirators substantial funds shortly after receiving payment from CELEC under the contracts.

78.   Upon information and belief, Progen has made numerous additional transfers to vendors, individuals, and entities, including but not limited to MyBox Inc, Inter Fab Services, Apollo Electric and many others, all of which appear to have been made for no legitimate business purpose and/or to assist in perpetrating the fraud against CELEC.

79.   The shared characteristic between all of Progen's transfers is that they were made shortly after receiving funds from CELEC and were made for no apparent legitimate business purpose.

80.   Upon information and belief, Progen's account balance remained artificially low even as hundreds of millions of dollars passed through the account. This was achieved through a pattern of immediately disbursing funds received from CELEC to the individuals and entities identified above.

81.   By July and August 2025, Progen's account had gone into overdraft, confirming that the account had been systematically drained.

82.   Upon information and belief, Progen's account at Regions Bank is now empty.

## COUNT I
## Violations of RICO, 18 U.S.C. § 1962(c)
**(Defendants Progen Industries LLC, Genertek Power Corp., Genertek Power Industries LLC, John Manning, W. Wade Manning, Andrew S. Williamson, Astrobryxa, S.A., Astrobryxa LLC, AP Inspections Latinoamerica S.A., and A.P. Inspections LLC)**

83.     Plaintiff repeats and incorporates paragraphs 1–82 as if set forth herein.

84.     The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., provides a civil cause of action for "any person injured in his business or property by reason of a violation of" the RICO statute. Plaintiff is a person within the meaning of 18 U.S.C. § 1962(c).

### *The RICO Enterprise*

85.     The RICO enterprise is comprised of Defendants Progen, Genertek Power Corp, Genertek Power Industries, John B. Manning, W. Wade Manning, Andrew S. Williamson, Astrobryxa, S.A., Astrobryxa LLC, AP Inspections Latinoamerica, S.A., A.P. Inspections LLC, and other entities and individuals still to be identified.

86.     At all relevant times, the enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c) because, *inter alia*, Defendants' predicate acts of mail and wire fraud were committed in the United States and were directed at enriching Defendants in the United States and elsewhere.

25

*The Pattern of Racketeering Activity*

87.    Defendants conducted and managed the operation of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c) as follows:

Multiple Instances of Mail and Wire Fraud in Violation of 18 U.S.C. §§1341, 1343

88.    At all times relevant to this Complaint, Defendants were engaged in interstate and foreign commerce in an industry that affects interstate and foreign commerce.

89.    Defendants used interstate and foreign wires to further their scheme to defraud Plaintiff in order to enrich themselves, including through multiple uses of the federal wires since as early as April 2024 through the present.

90.    The mail and wire fraud acts included:

(i)    issuing two false "certificates" signed and notarized by Defendant Williamson on April 20, 2024 falsely asserting that Progen was the exclusive manufacturer of a special type of EMD-based power generators running on multiple fuels;

(ii)    inviting and hosting Ecuadorian government officials in Progen's supposed "factory" in Tampa in May 2024 where Progen falsely represented it had manufactured new power generators from that

26

location and that those power generators were being held in that facility and were apt for delivery to CELEC upon signing the contracts;

(iii) electronically and physically submitting from the United States and into Ecuador to CELEC the June 2024 offer for the Salitral Contract falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

(iv) electronically and physically submitting from the United States and into Ecuador to CELEC the July 2024 offer for the Quevedo Contract by

    a.    falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

    b.    forging a document showing performance in a similar project for Lakeland Electric; and

    c.    on information and belief, forging additional documents showing performance in supposed similar projects for "Discovery Silver" and PG&E;

27

(v)   electronically and physically from the United States and into Ecuador to CELEC documents falsely indicating that Progen's supposed new power generators would contain EMD engines when in fact no EMD engines were ever sold to Progen;

(vi)   coordinating and causing the delivery to CELEC of at least ten sham inspection reports by AP Inspections Latinoamericana and A.P. Inspections LLC falsely stating that Progen had manufactured new generators, which complied with the contract when in fact the generators were refurbished equipment of little value;

(vii)   causing CELEC to wire to Progen's U.S. bank account at Regions Bank nearly $110 million through several international wire transfers;

(viii)   transferring $20 million of CELEC's funds to Astrobyxa S.A. and Astrobyxa LLC for their services as supposed subcontractor when in fact the Astrobryxa entities provided no services because no new or suitable power generators were ever installed; and

(ix)   retaining and/or using CELEC's funds for other purposes including payments to other members of the enterprise.

91.   This improper use of the federal wires was necessary to the Defendants' scheme and was the direct and proximate cause of Plaintiff's injuries. In short, each

28

of these mailings a necessary part of the scheme to defraud Plaintiff to its detriment, in violation of 18 U.S.C. § 1343.

### *Domestic Injury*

92.     As a result of this pattern of racketeering activity, Plaintiff has suffered economic harms in the United States. Critically, Defendants' actions satisfy many of the criteria courts consider relevant to domestic injury, including that (i) many of the activities giving rise to this dispute occurred in or have a nexus to the United States; (ii) Plaintiff suffered injuries in the United States because Defendants' wire fraud deprived Plaintiff of the opportunity to contract with reputable bidders (including at least one U.S.-based bidder) who would have completed the Quevedo and Salitral Contracts; (iii) the United States is the location from which Defendants directed their conduct; and (iv) Defendants received the benefit of their misconduct through domestic bank accounts located in Birmingham, Alabama.

93.     ***The location of activities giving rise to the underlying dispute***. Defendants directed emails and other correspondence from servers located in the United States in furtherance of their scheme to defraud Plaintiff. This includes (i) their offers to CELEC falsely describing Progen's prior experience; (ii) the falsified inspection report; and (iii) the demands for payment that stated, falsely, that the equipment and services had been delivered. These domestic actions were the direct and proximate cause of Plaintiff's injuries.

94.    ***Target of Defendants' Conduct***.   Furthermore,   Defendants misrepresentations centered on and affected U.S.-based commerce. These misrepresentations include misstating Defendant Progen's business activities in and with the City of Lakeland, located within the United States and the Middle District of Florida and by forging the signature of Stephen Brown who, upon information and belief, is a United States citizen and resident of the Middle District of Florida. It also includes depriving at least one other U.S.-based bidder of the opportunity to perform the Quevedo and Salitral Contracts.

95.    ***The Location of Plaintiff's Injury***. Defendants' scheme harmed Plaintiff's prospective business relationships in the United States, depriving it of the ability to work with qualified U.S.-based bidders who would have actually performed the Quevedo and Salitral Contracts. Additionally, Defendants' fraudulent misrepresentations during the bid process meant that other qualified bidders (including at least one U.S.-based bidder) were passed over for the Quevedo and Salitral Contracts.  Those qualified, U.S.-based bidders thus experienced their own domestic injuries.

96.    Plaintiff has also had to expend resources to investigate the extent of Defendants' wrongdoing and to redress the harms Defendants inflicted, and has had to retain counsel in the United States.

30

WHEREFORE, Plaintiff demands judgment for damages, including actual losses, consequential damages, lost profits, treble damages, pre- and post-judgment interest, Plaintiff's costs and attorneys' fees, and such other relief as may be just and necessary under the circumstances.

### COUNT II
### Violations of the Florida RICO Act, Fla. Stat. 895.03
**(Defendants Progen Industries LLC, Genertek Power Corp., Genertek Power Industries LLC, John Manning, W. Wade Manning, Andrew S. Williamson, Astrobryxa, S.A., Astrobryxa LLC, AP Inspections Latinoamerica S.A., and A.P. Inspections LLC)**

97.     Plaintiff repeats and incorporates paragraphs 1–82 as if set forth herein.

98.     Florida Statute 895.03(1) provides a civil remedy against "any person who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of racketeering activity."

99.     By and through their scheme, Defendants acted with criminal intent to fraudulently receive proceeds through a pattern of wire fraud.

100.    The mail and wire fraud acts included:

(i)     issuing two false "certificates" signed and notarized by Defendant Williamson on April 20, 2024 falsely asserting that Progen was the exclusive manufacturer of a special type of EMD-based power generators running on multiple fuels;

(ii)    inviting and hosting Ecuadorian government officials in Progen's supposed "factory" in Tampa in May 2024 where Progen falsely

31

represented it had manufactured new power generators from that location and that those power generators were being held in that facility and were apt for delivery to CELEC upon signing the contracts;

(iii)   electronically and physically submitting from the United States and into Ecuador to CELEC the June 2024 offer for the Salitral Contract falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

(iv)   electronically and physically submitting from the United States and into Ecuador to CELEC the July 2024 offer for the Quevedo Contract by

a.   falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

b.   forging a document showing performance in a similar project for Lakeland Electric; and

    c.    on information and belief, forging additional documents showing performance in supposed similar projects for "Discovery Silver" and PG&E;

(v)    electronically and physically from the United States and into Ecuador to CELEC documents falsely indicating that Progen's supposed new power generators would contain EMD engines when in fact no EMD engines were ever sold to Progen;

(vi)    coordinating and causing the delivery to CELEC of at least ten sham inspection reports by AP Inspections Latinoamericana and A.P. Inspections LLC falsely stating that Progen had manufactured new generators, which complied with the contract when in fact the generators were refurbished equipment of little value;

(vii)    causing CELEC to wire to Progen's U.S. bank account at Regions Bank nearly $110 million through several international wire transfers;

(viii)    transferring $20 million of CELEC's funds to Astrobyxa S.A. and Astrobryxa LLC for their services as supposed subcontractor when in fact the Astrobryxa entities provided no services because no new or suitable power generators were ever installed; and

(ix)    retaining and/or using CELEC's funds for other purposes including payments to other members of the enterprise.

101.    The course of Defendants' conduct described above constitutes violations of Fla. Stat. 895.03(1) in that the Defendants engaged in a pattern of wrongful conduct involving multiple acts of wire fraud with criminal intent to receive proceeds derived, directly or indirectly, from that pattern of activity.

102.    The racketeering activity alleged herein includes multiple predicate offenses of federal wire fraud and offenses under Fla. Stat. 817.034.

WHEREFORE, Plaintiff demands judgment for damages, including actual losses, consequential damages, lost profits, treble damages, pre- and post-judgment interest, Plaintiff's costs and attorneys' fees, and such other relief as may be just and necessary under the circumstances.

### COUNT III
### Violations of the Florida Unfair and Deceptive Trade Practices Act (FDUTPA)
**(Defendants Progen Industries LLC, Genertek Power Corp., Genertek Power Industries LLC, John Manning, W. Wade Manning, Andrew S. Williamson, Astrobryxa, S.A., Astrobryxa LLC, AP Inspections Latinoamerica S.A., and A.P. Inspections LLC)**

103.    Plaintiff repeats and incorporates paragraphs 1–82 as if set forth herein.

104.    The Florida Deceptive and Unfair Trade Practices Act prohibits "unfair methods of competition," "unconscionable acts or practices," and "unfair and deceptive acts or practices in the conduct of any trade or commerce." *See* Fla. Stat. § 501.204.

34

105.    The unfair methods of competition, unconscionable acts and practices, and unfair or deceptive actions Defendants engaged in include:

(i)    inviting and hosting Ecuadorian government officials in Progen's supposed "factory" in Tampa in May 2024 where Progen falsely represented it had manufactured new power generators from that location and that those power generators were being held in that facility and were apt for delivery to CELEC upon signing the contracts;

(ii)    electronically and physically submitting from the United States and into Ecuador to CELEC the June 2024 offer for the Salitral Contract falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

(iii)    electronically and physically submitting from the United States and into Ecuador to CELEC the July 2024 offer for the Quevedo Contract by

a.    falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

35

b.    forging a document showing performance in a similar project for Lakeland Electric; and

c.    on information and belief, forging additional documents showing performance in supposed similar projects for "Discovery Silver" and PG&E;

(iv)    electronically and physically from the United States and into Ecuador to CELEC documents falsely indicating that Progen's supposed new power generators would contain EMD engines when in fact no EMD engines were ever sold to Progen;

(v)    coordinating and causing the delivery to CELEC of at least ten sham inspection reports by AP Inspections Latinoamericana and A.P. Inspections LLC falsely stating that Progen had manufactured new generators, which complied with the contract when in fact the generators were refurbished equipment of little value;

(vi)    causing CELEC to wire to Progen's U.S. bank account at Regions Bank nearly $110 million through several international wire transfers;

(vii)    transferring $20 million of CELEC's funds to Astrobyxa S.A. and Astrobryxa LLC for their services as supposed subcontractor when in fact the Astrobryxa entities provided no services because no new or suitable power generators were ever installed; and

(viii) retaining and/or using CELEC's funds for other purposes including payments to other members of the enterprise.

106.  These acts are prohibited under the FDUTPA because, *inter alia*, they (i) misrepresented Progen's prior experience through falsified wire transmissions and forged documents; (ii) were intended to mislead Plaintiff into believing that the equipment and services were both provided and met the specifications called for in the Quevedo and Salitral Contracts; (iii) did reasonably mislead Plaintiff into assuming that Progen was both experienced and delivered equipment and services that satisfied the Quevedo and Salitral Contracts; and (iv) the relied-upon misrepresentations were material.

107.  As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiff has suffered economic losses.

WHEREFORE, Plaintiff demands judgment for damages, including Plaintiff's actual damages, pre- and post-judgment interest, Plaintiff's costs and attorneys' fees, and such other relief as may be just and necessary under the circumstances.

## COUNT IV
### Conversion
**(Defendants Progen Industries LLC, Genertek Power Corp., Genertek Power Industries LLC, John Manning, W. Wade Manning, Andrew S. Williamson, Astrobryxa, S.A., Astrobryxa LLC, AP Inspections Latinoamerica S.A., and A.P. Inspections LLC)**

108.  Plaintiff repeats and incorporates paragraphs 1–82 as if set forth herein.

109. Defendants wrongfully and intentionally transferred and/or removed funds that were not earned by Defendants, but that were instead a result of at least the following material misrepresentations:

(i)    electronically and physically submitting from the United States and into Ecuador to CELEC the June 2024 offer for the Salitral Contract falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

(ii)    electronically and physically submitting from the United States and into Ecuador to CELEC the July 2024 offer for the Quevedo Contract by

a.    falsely stating that Progen had performed on a similar project with a third-party customer, when in fact both Progen and its supposed customer, Megawatt (now Genertek), are owned and controlled by Progen's principals, including John B. Manning and W. Wade Manning;

b.    forging a document showing performance in a similar project for Lakeland Electric; and

    c.    on information and belief, forging additional documents showing performance in supposed similar projects for "Discovery Silver" and PG&E;

(iii)    coordinating and causing the delivery to CELEC of at least ten sham inspection reports by AP Inspections Latinoamericana and A.P. Inspections LLC falsely stating that Progen had manufactured new generators, which complied with the contract when in fact the generators were refurbished equipment of little value;

(iv)    causing CELEC to wire to Progen's U.S. bank account at Regions Bank nearly $110 million through several international wire transfers;

(v)    transferring $20 million of CELEC's funds to Astrobyxa S.A. and Astrobryxa LLC for their services as supposed subcontractor when in fact the Astrobryxa entities provided no services because no new or suitable power generators were ever installed; and

(vi)    retaining and/or using CELEC's funds for other purposes including payments to Defendants or their co-conspirators.

110. Plaintiff has a legitimate property interest in funds transferred to Defendants as a result of fraudulent documentation, including the documentation identified above.

111.  By engaging in the conduct averred herein, Defendants converted property rightfully belonging to Plaintiff that was not otherwise earned or owed to them, damaging Plaintiff as a result.

112.  Defendants' conduct was, and remains inconsistent with, and in denial of, Plaintiffs' rights to this property.

WHEREFORE, Plaintiff demands judgment for damages, including actual losses, consequential damages, lost profits, pre- and post-judgment interest, Plaintiff's costs, attorneys' fees if available, and such other relief as may be just and necessary under the circumstances.

## COUNT V
## Constructive Trust
## (Defendant Progen Industries LLC)

113.  Plaintiff repeats and incorporates paragraphs 1–82 as if set forth herein.

114.  Plaintiff seeks the imposition of a constructive trust on Progen's assets and bank accounts, including Progen's bank account located at Regions Bank at which CELEC delivered nearly $110 million.

115.  Progen made false promises, including providing CELEC forged documents. Relying on Progen's misrepresentations, CELEC wired nearly $110 million into Progen's bank account. CELEC relied upon Progen but Progen never intended to and never actually delivered any new or functional power generators to CELEC.  Progen cannot and should not be allowed to retain its ill-gotten proceeds.

40

## COUNT VI
## Fraudulent Transfer
**(Defendants Progen Industries LLC; John B. Manning; W. Wade Manning; Andrew S. Williamson; Genertek Power Industries, LLC; Astrobryxa, S.A.; Astrobryxa, LLC; Two Lions Holdings, LLC; AOT Holding AG; H&S Industry, LLC; and Gestores Inmobiliarios Lightblue, S.A.)**

116. Plaintiff repeats and incorporates paragraphs 1–82 as if set forth herein.

117. Plaintiff seeks recovery against certain Defendants pursuant to Florida's Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.101 et seq.

118. At all times material hereto, CELEC was and remains a creditor of Progen, holding a claim against Progen arising from Progen's fraudulent procurement of the Quevedo and Salitral Contracts and its failure to perform thereunder. CELEC's claim arose no later than August 2, 2024, when the Quevedo and Salitral Contracts were executed, and was further fixed upon CELEC's first payment to Progen under the contracts, which was sent on September 30, 2024.

119. Progen is a debtor of CELEC, as it is liable on CELEC's claim.

### *Actual Fraudulent Transfers*
### (Fla. Stat. § 726.105(1)(a))

120. After receiving funds from CELEC under the contracts—funds which Progen was not entitled to retain because it had fraudulently induced CELEC to pay them—Progen transferred those funds, *inter alia*, to John B. Manning; W. Wade Manning; Andrew S. Williamson; Genertek Power Industries, LLC; Astrobryxa, S.A.; Astrobryxa, LLC; Two Lions Holdings, LLC; AOT Holding AG; H&S

Industry, LLC; and Gestores Inmobiliarios Lightblue, S.A. (collectively, the "Transferee Defendants"), with actual intent to hinder, delay, or defraud CELEC as a creditor.

121.  The following circumstances, individually and collectively, evidence Progen's actual intent to hinder, delay, or defraud CELEC:

    a.  **Transfers to Insiders.**  Many of the transfers identified herein were made to insiders of Progen within the meaning of Fla. Stat. § 726.102(8), including: John B. Manning, Progen's CEO and relative of W. Wade Manning; W. Wade Manning, Progen's Vice-President of Operations and relative of John B. Manning; Andrew S. Williamson, Progen's President and COO; Two Lions Holdings, LLC, upon information and belief an entity owned or controlled by Andrew S. Williamson; Genertek Power Industries, LLC, an entity owned and controlled by Progen's principals John B. Manning and W. Wade Manning (who are related); and H&S Industry, LLC, upon information and belief an entity owned or controlled by Andrew S. Williamson.

    b.  **Debtor Retained Possession**.  As many transfers were made to Progen's principals—the Mannings and Williamson, as well as their related entities (Genertek Industries, H&S Industry LLC, and Two Lions Holdings LLC)—Progen constructively remained in possession

of CELEC's funds, albeit in the names of other individuals and entities, some of which, upon information and belief, are fictious and/or were created to funnel funds away from Progen (and out of CELEC's reach).

c. **Timing of Transfers.** The transfers were made shortly after Progen received funds from CELEC, demonstrating that Progen was systematically stripping its assets to prevent CELEC from recovering its funds.

d. **Artificial Account Balance.** Despite receiving approximately $110 million from CELEC, Progen's Regions Bank account balance artificially maintained a low balance month-to-month. This is direct evidence that Progen was systematically disbursing funds as soon as they were received, with the intent of keeping those funds beyond CELEC's future reach. And it is evidence that the transfers were a substantial portion of Progen's assets.

e. **Insolvency / Depletion of All Assets**. By July and August 2025, Progen's Regions Bank account had gone into overdraft, confirming that Progen had depleted substantially all of its assets, leaving it unable to satisfy CELEC's claim.

f. **Concealment.** Progen actively concealed the nature and extent of its transfers from CELEC. And, upon information and belief, some

43

entities are either fictious or were sent payments solely to keep the funds out of CELEC's reach.

g. **Prior Proceedings.** Upon information and belief, at the time some transfers were made, Progen was aware that CELEC had discovered the fraud and that litigation was imminent or had commenced. Specifically, Progen was aware by no later than mid-2025 that CELEC had terminated the Quevedo and Salitral Contracts and was pursuing legal remedies.

h. **Lack of Reasonably Equivalent Value.** Upon information and belief, many of the transfers identified herein were made without Progen receiving reasonably equivalent value in exchange.

122.   The Transferee Defendants were aware, or reasonably should have been aware, that Progen was indebted to CELEC and that the transfers were made with intent to hinder, delay, or defraud CELEC.  Specifically:

a. John B. Manning, W. Wade Manning, and Andrew S. Williamson were the principals and officers of Progen who orchestrated the fraudulent scheme described herein and had direct, personal knowledge of all aspects of the fraud.

b. Two Lions Holdings, LLC and H&S Industry, LLC are entities owned or controlled by Andrew S. Williamson, who had direct, personal knowledge of all aspects of the fraud.

c. Genertek Power Industries, LLC is an entity owned and controlled by John B. Manning and W. Wade Manning, who had direct, personal knowledge of all aspects of the fraud.

d. Astrobryxa S.A. and Astrobryxa LLC participated directly in the fraudulent scheme described herein, including by serving as Progen's sham subcontractor, and were therefore aware of Progen's obligations to CELEC and of the fraud.

e. AOT Holding AG received over $10 million from Progen just two days after CELEC wired $69,580,000 to Progen. This money was wired to Switzerland, a known tax haven outside of creditors' reach. Given the magnitude and immediacy of this transfer, AOT Holding AG knew or reasonably should have known that the funds originated from CELEC and were transferred to AOT Holding AG to place them beyond CELEC's reach.

f. Gestores Inmobiliarios Lightblue, S.A., upon information and belief, is an entity ultimately owned or controlled by Jose Walther Manrique Suarez and/or Karla Saud Calero, who own Astrobryxa S.A. (and,

ultimately, Astrobryxa LLC), and who participated in the fraudulent scheme described herein.  Gestores Inmobiliarios therefore knew or reasonably should have known that the funds transferred to it by Progen originated from CELEC and were fraudulently obtained.

### *Constructive Fraudulent Transfers* (Fla. Stat. §§ 726.105(1)(b) and 726.106)

123.  In the alternative, and without waiving the foregoing, the transfers described herein constitute constructive fraudulent transfers under Fla. Stat. §§ 726.105(1)(b) and 726.106(1) because:

a. Progen did not receive reasonably equivalent value in exchange for the transfers to the Transferee Defendants.

b. At the time of the transfers, Progen was insolvent or became insolvent as a result of the transfers, within the meaning of Fla. Stat. § 726.103, because Progen's liabilities to CELEC exceeded its assets. Alternatively, Progen intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due, given that it had accepted nearly $110 million from CELEC for power generators that it had no ability and no intention of delivering.

c. Additionally, the transfers to John B. Manning, W. Wade Manning, Andrew S. Williamson, Two Lions Holdings LLC, H&S Industry LLC,

46

and Genertek Power Industries LLC (the "Insider Transferees") constitute constructive fraudulent transfers under Fla. Stat. § 726.106(2) because:

   i.  CELEC's claim arose before these transfers were made;

   ii.  the transfers were made to insiders of Progen for antecedent debts or for no value;

   iii.  Progen was insolvent at the time of the transfers, as it had incurred an obligation to CELEC of approximately $110 million that it had no ability to satisfy; and

   iv.  the Insider Transferees had reasonable cause to believe that Progen was insolvent at the time of the transfers, given their direct involvement in Progen's operations and their personal knowledge of Progen's fraud.

124. As a direct and proximate result of the foregoing actual (and, in the alternative, constructive) fraudulent transfers, CELEC has been damaged in an amount equal to the value of the assets transferred, up to the full amount of CELEC's claim against Progen (approximately $110 million).

WHEREFORE, Plaintiff respectfully requests that this Court temporarily and permanently enjoin Defendants and Transferee Defendants from any further dissipation of funds or assets and enter judgment in its favor and against Defendants

(both Progen as the debtor and the Transferee Defendants) for avoidance of the fraudulent transfers described herein to the extent necessary to satisfy CELEC's claim, and award damages, interest, costs, and such other legal and/or equitable relief that may be just or necessary under the circumstances.

### Jury Demand

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  June 2, 2026

By: /s/ *Courtney M. Keller*
(*Lead Counsel*)
Courtney M. Keller, Esquire
Florida Bar No. 28668
Meredith P. Yates, Esquire
Florida Bar No. 1058373

**GREENBERG TRAURIG, P.A.**

450 South Orange Avenue, Suite 650
Orlando, Florida 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Email:    kellerc@gtlaw.com
           Meredith.yates@gtlaw.com
           Nef-iws@gtlaw.com
           ORLLitDock@gtlaw.com

Daniel Pulecio-Boek
(admitted *pro hac vice*)
Michael A. Pusateri
(admitted *pro hac vice*)
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
T: 202.331.3117
pulecioboekd@gtlaw.com
pusaterim@gtlaw.com
*Counsel for Plaintiff*