**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CELEC EP,

     Plaintiff,

v.

PROGEN INDUSTRIES, LLC;
GENERTEK POWER CORP.;
GENERTEK POWER INDUSTRIES,
LLC; JOHN B. MANNING; W. WADE
MANNING; ANDREW S.
WILLIAMSON; ASTROBRYXA, S.A.;
AP INSPECTIONS
LATINOAMERICA, S.A.; A.P.
INSPECTIONS LLC; and DOES 1-99,

     Defendants.

_____

PROGEN INDUSTRIES, LLC,

     Counter-Plaintiff,

v.

CELEC EP,

     Counter-Defendant;

_____/

Case No. 8:25-cv-3433-WFJ-SPF

**PROGEN DEFENDANTS' MOTION TO COMPEL PRODUCTION OF**
**PUBLICLY DISCLOSED ATTORNEY-CLIENT COMMUNICATIONS AND**
<u>**INCORPORATED MEMORANDUM OF LAW**</u>

Defendants Progen Industries, LLC; Genertek Power Corp.; Genertek Power

Industries, LLC; John B. Manning; W. Wade Manning; Andrew S. Williamson, and

Two Lions Holding, LLC (collectively, the "Progen Defendants") respectfully move

this Court pursuant to Federal Rule of Civil Procedure 37(a) for an order compelling Plaintiff CELEC EP ("CELEC") to produce a memorandum (the "Memo") that CELEC's own Board member deliberately published details of to the world on social media, that Ecuadorian media companies downloaded and subsequently republished online in publicly accessible video broadcasts, and that CELEC now refuses to produce in this litigation based upon attorney-client and work product privilege—despite its **direct** relevance to the case and the waiver of privilege.

## INTRODUCTION

The facts underlying this Motion are simple and undisputed. On June 12, 2026, CELEC's counsel at Greenberg Traurig prepared a memorandum titled "Financial Tracing Strategy" and delivered it to its client, CELEC. Five days later, on June 17, 2026, Jose Luis Neira—the General Secretary for Public Administration and one of just three members of CELEC's Board of Directors— posted a video to his public X (formerly Twitter) account discussing the Memo's contents and attaching the Memo itself (the "Neira X Post"). The video was broadcast to the Ecuadorian public, reported on by Ecuavisa (one of Ecuador's largest national broadcasters) (the "Ecuavisa Video Report"), and the Memo was downloaded by the media before its belated removal.

CELEC now takes the remarkable position that despite this deliberate, public disclosure by a member of its own Board of Directors, the Memo remains

2

privileged. This position is untenable as a matter of law and offensive as a matter of fairness. A party cannot voluntarily broadcast privileged materials to the world for its own political advantage and then invoke the very privilege it destroyed to deny its litigation adversary access to the same materials. The attorney-client privilege is a shield, not a sword. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir. 1994).

Recent events—including but not limited to the recent public disclosure—have confirmed that CELEC's real intent and strategy in initiating this litigation in this court is to misuse the American discovery process to promote their scapegoating campaign of Progen in Ecuador, not to advance the resolution of this dispute. This Court should prohibit the attempts by CELEC to undermine this Court's authority and integrity. CELEC could have pursued its claims in Ecuador in accordance with the applicable arbitration clause in the parties' contracts. (D.E. 140, at p. 67, 70.) But CELEC chose to file its suit in this forum, and it should be compelled to respect it. For these reasons and those discussed below, this Court should compel production of the Memo and all related materials on the same subject matter.

**FACTUAL BACKGROUND**

**A.    The Memorandum and Its Contents**

On June 12, 2026, CELEC's counsel at Greenberg Traurig, P.A. prepared a memorandum addressed from Daniel Pulecio-Boek to Gabriel Secaira, Andrea

3

Aguilar, and Veronica Alcivar of CELEC, titled "Financial Tracing Strategy." D.E. 147 ¶ 1. The Memo is 13 pages long, and each page of the Memo was marked *"Attorney-Client Work Product Privileged & Confidential."* Pages from the Memo, which were obtained by Progen by screenshotting portions of the Ecuavisia Video Report in which the actual Memo pages and contents were broadcast publicly, are attached hereto as "**Composite Exhibit 3**."[1]

The Memo sets forth "the financial tracing strategy that Greenberg Traurig is executing on behalf of" CELEC in this litigation. It details the service of forty-one (41) third-party subpoenas and seven (7) sets of Requests for Production on party defendants, identifies "principal downstream recipients" of funds from Progen, catalogs real property assets, and discusses, at least in part, limitations on recovering the approximately $110 million at issue. *See* Ex. 3. The Memo contains financial information from discovery, including: (a) the Regions Bank account number into which CELEC's payments were made; (b) the dollar amounts of fourteen (14) transfers made from Progen's account at Regions Bank; and (c) the identities of two previously undisclosed recipients of funds. *Id.*

---

[1] Progen was able to obtain 7 of the 13 pages comprising the Memo. *See* Comp. Ex. 3. Thus, Progen's copy of the Memo is incomplete. To the extent the Memo contained any exhibits or external attachments/references, Progen does not have a copy of such attachments and includes in its request herein copies of the same, to the extent any exist.

**B.    CELEC's Corporate Structure and Mr. Neira's Role**

CELEC is a utility company 100% owned by the Ecuadorian government. Its Board of Directors is composed of three members: the President of Ecuador, the Minister of Energy and Environment, and the General Secretary for Public Administration. D.E. 147 ¶ 3. Jose Luis Neira holds the position of General Secretary for Public Administration—one of only three members of CELEC's governing Board.

On June 17, 2026, Mr. Neira presented on his public X detailed descriptions of the Memo's contents and characterizing the Memo as the product of "international cooperation with the United States of America and the application of the RICO law." *See* D.E. 147 ¶ 4; *see also* José Julio Neira (@JoseJulioNeira), X (as of June 23, 2026, at 8:05 AM), https://x.com/JoseJulio Neira/status/2069391397501784250 (A copy of the translated transcript of the Neira video is attached hereto as "**Exhibit 1**") [hereinafter "Neira X Post"]; *see also* Noticiero Televistazo, *Gobierno revela ruta de USD 104 millones pagados a Progen, pero abogados advierten dificultades para recuperarlos*, ECUAVISA (June 17, 2026), https://www.ecuavisa.com/politica/ gobierno-revela-ruta-104-millones-pagados-progen-20260617-0094.html (A copy of the translated transcript attached as "**Exhibit 2**") [hereinafter "Ecuavisa Video Report"].  Of course, the United States Government has no involvement in this litigation.

The Ecuavisa Video Report did not merely discuss the Memo's contents—it *displayed images of the Memo itself, along with images of the confidential bank account information contained therein,* on camera for public viewing. *See* Ecuavisa Video Report, Ex. 2; *see also* compiled screenshots from Ecuavisa Video Report revealing pages of Memo (attached as **Comp. Ex. 3**). The Report also confirmed that Mr. Neira "published the transactions, but the first and last pages of the document were later deleted. Ecuavisa managed to download it before it was erased." *See* Ecuavisa Video Report, Ex. 2.

Mr. Neira's video was not a private, inadvertent slip. It was a scripted, official government communication designed to publicize the information in the Memo for political purposes in Ecuador. News of his video was broadcast nationally by Ecuavisa, and images of the Memo disseminated to the Ecuadorian public. Neira's X Post video and the Ecuavisa Video Report (containing clearly readable images of the Memo) still remain publicly available for online viewing. *Id.*[2]

## D.    CELEC's Counsel's Admissions

On June 17, 2026, CELEC's counsel promptly notified defense counsel of the disclosure. In that email, Mr. Pulecio-Boek of Greenberg Traurig acknowledged that "Jose Luis [sic] Neira (a senior official in the Ecuadorian government)

---

[2] The Neira X Post can be viewed at the following link: https://x.com/JoseJulioNeira/status/2069391397501784250

The Ecuavisia Video Report can be viewed at the following link: https://www.ecuavisa.com/politica/gobierno-revela-ruta-104-millones-pagados-progen-20260617-0094.html

published a video discussing information contained in a report that we prepared for CELEC, which contained certain financial information received in discovery. Further, he posted our report online." A copy of the June 17, 2026 email thread between counsel is attached hereto as "**Exhibit 4**."

On June 22, 2026, CELEC's counsel further admitted: "CELEC's General Manager provided a privileged report prepared by our firm to Mr. Neira. The report discusses and analyzes material received in discovery." Ex. 4. Counsel confirmed that "the only record shared outside of CELEC was the memo that we prepared." *See* Ex. 4.

### E.    Progen's Demand and CELEC's Refusal

On June 24, 2026, Progen's counsel demanded production of the Memo, stating that the report was provided to the Ecuadorian public by a senior government official, and therefore the privilege was waived. Ex. 4. CELEC's counsel refused. *See* Ex. 4.

### F.    CELEC's Notice of Disclosure

On June 24, 2026, CELEC filed a Notice of Disclosure of Confidential Information (D.E. 147), characterizing the disclosure as "inadvertent." But the Notice itself reveals that it was anything but inadvertent: a Board member—who *is* CELEC for governance purposes—deliberately filmed a scripted video, misrepresented the involvement of the United States Government, deliberately and knowingly discussed the Memo's contents at length, and deliberately and

knowingly posted it to his public social media account in a downloadable format with the specific intention of mass dissemination to the public. *See* Neira X Post, Ex. 1; *see also* Ecuavisa Video Report, Ex. 2. The Notice's claim of "corrective measures" rings hollow given that at least one media outlet in Ecuador downloaded the full Memo before any removal, and the Memo's contents have already been broadcast nationally and remain publicly available. *See* Ecuavisa Video Report, Ex. 2. Indeed, Progen obtained a copy of 7 of the 13 pages of the Memo. *See generally* Comp. Ex. 3.

### G.    Progen's Outstanding Discovery Requests

On April 14, 2026, Progen served its First Requests for Production to CELEC (the "Discovery Requests"), which include, *inter alia*: Request No. 11 (all reports, analyses, and evaluations relating to this litigation) and Request No. 13 (all internal memoranda); On May 28, 2026, CELEC responded that it would produce "non-privileged documents" but has withheld the Memo on privilege grounds. The Memo is squarely responsive to Progen's Discovery Requests.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 37(a)(3)(B), a party may move to compel production of documents if the responding party fails to produce documents as requested under Rule 34. Fed. R. Civ. P. 37(a)(3)(B)(iv). The scope of discovery is governed by Rule 26(b)(1), which permits discovery of "any

8

nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

The attorney-client privilege and work-product doctrine protect confidential communications and attorney mental impressions from discovery—but only so long as confidentiality is maintained. *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987). "Once waived, the attorney-client privilege cannot be reasserted," and the privilege "should be construed as narrowly as is consistent with its purpose." *Id.*

According to the Eleventh Circuit, the attorney-client privilege "belongs solely to the client," and the client may waive it, either expressly or by implication. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir. 1994). For example, voluntary disclosure to any third party outside the privilege—particularly a public disclosure—undoubtedly waives the protection. *Hilton Resorts Corp. v. Sussman*, 2019 WL 13249099, at *3 (M.D. Fla. Dec. 23, 2019) ("to the extent a third party is included on any communication or document, there is no attorney-client privilege"). Under the theory of implied waiver, courts have observed that "the doctrine of waiver by implication reflects the position that the attorney-client privilege 'was intended as a shield not a sword.'" *Cox*, 17 F.3d at 1417. In other words, '[a party] may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." *Id.* "Thus, a party waives the attorney-client privilege when that party places privileged

information in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." *Knox c. Roper Pump Co*, 957 F.3d 1237, 1248 (11th Cir. 2020) (*citing Cox*, 17 F.3d at 1417); *United States v. Lee Memorial Health System and Cape Memorial Hospital, Inc.* 2023 WL 7391680, at *7 (M.D. Fla. Jan 13, 2023). That is exactly what happened here.

Work-product immunity is likewise waived via implied waiver or by disclosure waiver. *Stern v. O'Quinn*, 253 F.R.D. 663, 681-82 (S.D. Fla. 2008). "Generally speaking . . . **work product protection is waived** when protected materials are 'disclosed in a manner which is either inconsistent with the maintenance of secrecy against opponents or substantially increases the opportunity for a potential adversary to obtain the protected information." *Id.* (emphasis added).

## ARGUMENT

### A. CELEC Waived Attorney-Client Privilege and Work Product Protection by Voluntary Public Disclosure

It is black-letter law that voluntary disclosure of privileged materials to third parties waives the privilege. *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987) ("once waived, the attorney-client privilege cannot be reasserted"). Here, the waiver occurred in two distinct steps—each independently fatal to any claim of privilege.

10

*First*, privilege was waived when the Memo was provided to Mr. Neira, who then posted to X (in a downloadable format). Mr. Neira is not some low-level employee who accidentally forwarded an email. He is one of only three members of CELEC's Board of Directors—the President of Ecuador, the Minister of Energy, and Mr. Neira himself. D.E. 147 ¶ 3. Under well-settled law, the attorney-client privilege is waived when privileged communications are disclosed to third parties, such as the entire internet. *See U.S. v. Blackburn*, 446 F.2d 1089, 1091 (5th Cir. 1971); *see also In re Photochromic Lens Antitrust Litigation*, 2014 WL 12617458, at *3 (M.D. Fla. Jan. 3, 2014). The Memo was not leaked by an outsider; it was affirmatively handed by CELEC to the public by a member of its own Board who sits atop the Ecuadorian government's administrative apparatus, and whose actions are therefore fairly attributable to the party itself. *See United States Commodity Futures Trading Commission v. Capital Blu Management*, LLC, 2010 WL 11508355, at *3 (N.D. Ga. July 26, 2010) ("A corporation's current management has the authority to assert and waive the corporation's attorney-client privilege.") (*citing Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 358 (1985)).

*Second*, privilege was further and independently waived when Mr. Neira— in a video viewed by thousands, if not millions, of Ecuadorians—attributed findings directly from the Memo and discussed its specific contents with the general public over social media. The disclosure here could not have been more public. Mr. Neira

posted a video to his X account—a platform accessible to millions—in which he (1) discussed the Memo's contents, (2) disseminated confidential financial details—including Progen's own confidential and sensitive financial details and data—to the Ecuadorian public, and 3) made the Memo available for downloading by the public. *See Batchelor v. Geico Cas. Co.*, 142 F. Supp. 3d 1220, 1243 (M.D. Fla. 2015) (a client "may voluntarily waive [privilege] expressly or by implication by voluntarily disclosing or consenting to disclosure of the privileged matter or a 'significant part' thereof"). Such a disclosure is wholly inconsistent with the purpose of the work product privilege and serves to waive the protection of the same. *Kallas v. Carnival Corp.*, 2008 WL 2222152, at * 4 (S.D.Fla. May 27, 2008) (a party waives otherwise-protected work-product materials "when the covered materials are used in a manner that is inconsistent with the protection"); *see also Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 1996 WL 944011, at *3 (S.D.N.Y. Dec. 19, 1996) ("Work product immunity is waived only if the party has voluntarily disclosed the work product in such a manner that it is likely to be revealed to his adversary."); *Falise v. American Tobacco Co.*, 193 F.R.D. 73, 79 (E.D.N.Y. 2000) (waiver of work-product protection found only if disclosure substantially increases the opportunity for potential adversaries to obtain the information).

The post was then picked up by Ecuavisa, which confirmed in its own broadcast that it "managed to download [the Memo] before it was erased." *See* Ecuvisa Video Report, Ex. 2. The story and its contents were then widely

12

disseminated by multiple media outlets throughout Ecuador, ensuring that the Memo's substance reached an audience far beyond Mr. Neira's own social media followers.[3] Thus, any conceivable expectation of confidentiality was irrevocably shattered.

It has been recognized that work-product protection is waived where investigators "voluntarily disclosed details of the investigation to third parties, including the author of a book about celebrity and 'countless people' via the Internet, in such a way as to create a substantial risk that the information would be received by plaintiff." *See Stern*, 253 F.R.D. at 682. If disclosure to "the Internet" waives work-product protection, then publication on a major social media platform by a Board member of the privilege holder destroys any remaining claim to confidentiality. The fact that the Memo was then downloaded by a media

---

[3] *See* Ana Rasero, *Gobierno da a conocer la ruta del dinero entregado a Progen que causó perjuicio al Estado*, TELEAMAZONAS (June 17, 2026), https://www.teleamazonas.com/actualidad/noticias/judicial/ruta-dinero-progen-apagon-ecuador-120409/.html (A copy of the translation of the cited media article is attached hereto as "**Exhibit 5**"); *see also* Redaccion Web, *Caso Progen: estos son los nombres que aparecen en el informe sobre la ruta del dinero*, EL TELEGRAFO (June 17, 2026), https://www.eltelegrafo.com.ec/noticias/nacionales/210/caso-progen-nombres-que-aparecen-en-el-informe-sobre-ruta-del-dinero (A copy of the translation of the cited media article is attached hereto as "**Exhibit 6**"); *see also* Mishell Sanchez Gonzalez, *Fiscalía investigará indicios de lavado de activos en caso Progen*, EL COMERCIO (June 17, 2026), https://www.elcomercio.com/actualidad/ecuador/fiscalia-investigara-indicios-lavado-activos-caso-progen/ (A copy of the translation of the cited media article is attached hereto as "**Exhibit 7**"); *see also* Redaccion, *José Julio Neira: 'Hemos identificado a quienes recibieron el dinero de los contratos de Progen'*, EL UNIVERSO (June 17, 2026), https://www.eluniverso.com/noticias/politica/jose-julio-neira-hemos-identificado-a-quienes-recibieron-el-dinero-de-los-contratos-de-progen-nota/ (A copy of the translation of the cited media article is attached hereto as "**Exhibit 8**").

outlet who went on to broadcast the contents of Mr. Neira's presentation on national television removes all possible doubt.

CELEC's characterization of this disclosure as "inadvertent" (D.E. 147) is belied by the undisputed facts. Mr. Neira filmed a scripted video, discussed the Memo's findings in detail, and deliberately posted both the video and the Memo to his public social media account. This was not a misdirected email or an accidental attachment. It was an intentional, calculated act by a director of CELEC to publicize the Memo's contents for political gain and, most tellingly, to prejudice the Progen defendants through widely disseminated disparagement.

Plaintiff's counsel's attempts to minimize the damage by invoking corrective measures fails. By the time of any purported takedown, the damage was already done and prejudice to Progen implicated: Ecuavisa had downloaded the complete Memo, broadcast its contents on national television, Progen obtained certain portions of it, and multiple media outlets had reported and continue to report on it throughout Ecuador.  A bell cannot be unrung. *See Stern,* 253 F.R.D. at 682; *Continental Casualty Co. v. Under Armour, Inc.*, 537 F. Supp. 2d 761, 772 (D. Md. 2008) ("[O]nce an adversary has become aware of information disclosed, it cannot purge that information from its mind." This principle has been stated authoritatively as follows: "Work-product immunity is waived if the client . . . discloses the material to third persons in circumstances in which there is a significant likelihood that an adversary or potential adversary in anticipated

14

litigation will obtain it."). Third—and most tellingly—Mr. Neira has *continued* to discuss the report's contents on social media even after the alleged takedown, demonstrating that the supposed corrective measures have not, in fact, corrected anything. The information remains in the public domain, CELEC has purposely continued its public campaign and CELEC has made no effort to mitigate its ongoing dissemination. "Once waived, the attorney-client privilege cannot be reasserted." *Suarez*, 820 F.2d at 1160.

**B.    CELEC's Disclosure Was Made in Bad Faith to Gain Litigation Advantage**

The circumstances of this disclosure reveal a calculated strategy by CELEC to weaponize the American litigation process for political purposes in Ecuador while shielding the very same materials from its adversary in this Court. The strategy is designed to deflect responsibility for CELEC's malfeasance in this case and every other project it has administered the past two years.

CELEC chose to file this breach of contract dispute in federal court even though the parties' agreement stated that arbitration was to be held in Ecuador.  It invoked the broad discovery powers of the federal rules—including third-party subpoenas under Rule 45 and party discovery under Rules 33 and 34—to obtain financial records from banks, third parties, and the Progen Defendants. It then took the fruits of that discovery—information obtained *solely because of this litigation*—and disseminated it through a Board member to the Ecuadorian public

in a scripted video designed to portray the Progen Defendants as criminals before any adjudication of liability.

In Mr. Neira's video, he presents the information as if it were the product of the Ecuadorian government's own investigation, claiming it came from "international cooperation with the United States of America and the application of the RICO law." *See* Neira X Post, Ex. 1. This claim is a deliberate falsehood. The United States government has no involvement in this case and is providing no "cooperation" to Ecuador or CELEC. There is no joint investigation. There is no intergovernmental partnership. This is a private civil lawsuit filed by CELEC through its privately retained United States counsel. By falsely attributing the fruits of private litigation discovery to "international cooperation" with the United States, CELEC and the Ecuadorian government are continuing their campaign to lend credibility to the government's narrative in Ecuador at the Progen Defendants' expense, now through the use of formerly privileged material.

Having deployed the Memo as a weapon in the court of public opinion in Ecuador, CELEC cannot credibly assert that it wishes to maintain the document's confidentiality—particularly where a portion of the contents have already been made known to the Progen defendants. The Memo has served its intended political purpose: to publicly accuse the Progen Defendants and named individuals of corruption and money laundering without any adjudication by this Court. CELEC's refusal to produce the same Memo to Progen—the actual adversary in this

16

litigation—is an act of extraordinary bad faith and has resulted in severe prejudice to the Progen defendants in this action. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1417–19 (11th Cir. 1994) ("Selective disclosure for tactical purposes waives the privilege.") (quoting *United States v. Jones,* 696 F. 2d 1069, 1072 (4th Cir. 1982)).

## C.   CELEC Has Put the Privileged Matter Directly At Issue in this Case

"Waiver of either privilege can occur if the holder of the privilege asserts a claim or affirmative defense that puts the privileged matter directly at issue." *Lee Memorial Health System*, 2023 WL 7391680, at *9 (quoting *In re Mongelluzzi*, 568 B.R. 702, 710 (Bankr. M.D. Fla. 2017) (declining to analyze whether work doctrine protection was waived after already finding the attorney client privilege was waived, and the contents of those communications were put directly at issue in the case by disclosing party)).

Here, CELEC disclosed a comprehensive memorandum addressing its entire financial tracing strategy to use third-party subpoenas to collect voluminous financial data and records of Defendants to investigate its claims against Progen. These details include the scope of subpoenas issued, identities of fund recipients, dollar amounts of transfers, and limitations on recovery. *See* Screenshots of Memo pages from Ecuavisa Video Report, Ex. 3. Having disclosed the substance of its counsel's strategy on these subjects along with the financial tracing data CELEC has compiled for its RICO and conspiracy claims, CELEC has placed the financial

17

tracking data directly at issue, and Progen is entitled to review it. *See Lee Memorial Health System*, 2023 WL 7391680, at *9 (court would not "allow [party] to cherry pick what information is disclosed: revealing only that which is favorable and claiming the attorney-client privilege for that which is unfavorable").

**D.    Fairness and the Prohibition on Selective Use of Privilege**

Courts universally condemn the use of privilege as both a sword and a shield. *GAB Bus. Services, Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir. 1987) (privilege "was intended as a shield, not a sword"); *Cox*, 17 F.3d at 1417 ("The attorney-client privilege was intended as a shield, not a sword"). CELEC's conduct is a textbook example of this prohibited tactic.

CELEC used the Memo as a sword when Mr. Neira broadcast its contents to the Ecuadorian public—using the Memo as an authoritative report, naming the Progen Defendants and their alleged co-conspirators, disclosing dollar amounts, and publicly accusing them of criminal conduct under the guise of the United States' participation and cooperation in such efforts. CELEC now seeks to use the Memo as a shield by refusing to produce it in the very litigation from which the information was derived.

This Court should not countenance such gamesmanship. "Under the doctrine of waiver by implication, a defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." *Lee Memorial Health System*, 2023 WL 7391680, at *4 (M.D.

Fla. 2023). "Courts have often recognized that manifest unfairness occurs when an opposing party is deprived of privileged information after a selective disclosure. . . ." *Batchelor*, 142 F. Supp. 3d at 1243–44.

The unfairness here is acute, and the prejudice to Progen is severe and ongoing. CELEC's conduct here is part of an ongoing public campaign in Ecuador to attack Progen to avoid public accountability for CELEC and its senior officials. CELEC is now resorting to privileged communications to support its public statements. Having just been publicly disparaged by the Ecuadorian government via this improper and bad faith disclosure, Progen will inevitably be hard-pressed to find cooperation with relevant foreign parties and third parties in Ecuador whose participation and cooperation with Progen in its discovery efforts in this case is not only required but vital to proving Progen's defense—that all damages alleged in this action are the result of CELEC and its agents' own fraud, not by any bad acts of Progen. Under Eleventh Circuit precedent, this fact alone warrants compulsion of the Memo and any other accompanying materials part of the disclosure from CELEC. *See Cox*, 17 F.3d at 1417; *Knox*, 957 F.3d at 1248.

CELEC chose this federal forum. It invoked this Court's authority to obtain broad discovery from banks, third parties, and the Progen Defendants, which the Court granted despite Progen's objections (D.E. 97, 105, 111) and despite the parties' subsequent agreement to compromise by entering into an Agreed Protective Order to address the exact issues now confronting the parties and this

Court. (D.E. 135, 138). CELEC is using an ongoing public campaign to disparage Progen in the interest of shielding CELEC's own senior officials from responsibility.

CELEC then took the fruits of that discovery and broadcast them publicly in Ecuador—while simultaneously refusing to produce the same materials to its litigation adversary. If CELEC is permitted to withhold the Memo and any other materials or communications that were part of the disclosure, the Progen Defendants will be in the extraordinary position of having their confidential financial information—including that personal financial information of Defendant Andrew Williamson—publicly disseminated and discussed on national television in Ecuador, yet being unable to review the very document that formed the basis for those public accusations.

The prejudice extends beyond the mere asymmetry of information. Through Mr. Neira's video and the ensuing media coverage, CELEC and the Ecuadorian government have advanced a false and defamatory narrative that the funds CELEC paid to Progen were improperly used in some kind of conspiracy. In fact, the funds Progen received from CELEC pursuant to their contract were legitimately used to pay suppliers, service providers, and subcontractors globally in connection with the performance of the Contracts—precisely what one would expect of a company procuring, manufacturing, and delivering forty-six power generators to Ecuador through an international supply chain. Progen and its principals have been

20

publicly branded as criminals based on CELEC's one-sided characterization of discovery materials—characterizations that Progen has had no opportunity to contest in any public forum. The Progen Defendants are highly prejudiced by this conduct, and the only partial remedy available is to ensure that Progen has access to the very materials CELEC has chosen to publicize so that it may, at a minimum, defend itself in this litigation against the narrative CELEC has built.

**E.      CELEC's Failure to Produce the Memorandum Violates Its Discovery Obligations**

Independent of privilege waiver, CELEC has an obligation under Rule 26(e) to supplement its discovery responses. CELEC agreed to produce "non-privileged documents" in response to Progen's Requests for Production Nos. 11, 13, and 22. The Memo is now non-privileged by virtue of CELEC's voluntary public disclosure. CELEC's continued refusal to produce it is a violation of its affirmative discovery obligations.

Moreover, CELEC's assertion of privilege over the Memo is inconsistent with its own Notice of Disclosure (D.E. 147), which acknowledges that "most of what was contained in the Memo was *not* designated as Confidential Information under the Protective Orders." D.E. 147 ¶ 2 (emphasis in original). If the information was not even confidential under the Protective Order, CELEC cannot credibly maintain that it remains privileged after a Board member published it to the world, and Progen obtained 7 of the 13 total pages of it.

**CONCLUSION**

For the foregoing reasons, the Progen Defendants respectfully request that this Court enter an order:

1. Compelling CELEC to produce, within five (5) days, the June 12, 2026 memorandum titled "Financial Tracing Strategy" prepared by Greenberg Traurig, P.A. and publicly disclosed by CELEC Board member Jose Luis Neira on June 17, 2026 and disseminated on national television in Ecuador;

2. Finding that CELEC has waived attorney-client privilege and work product protection as to the Memo and all related materials addressing the same subject matter, including all financial tracing analyses, reports, and communications between CELEC and its counsel on the topics of fund tracing, downstream recipients, and asset identification;

3. Compelling CELEC to produce all materials that were part of or related to the public disclosure, including any versions of the Memo provided to Mr. Neira or other Ecuadorian government officials; and

4. Granting such other and further relief as this Court deems just and appropriate, including sanctions for CELEC's bad faith conduct in publicly disseminating privileged materials while refusing to produce them in this litigation and/or performing an in-camera review of the

22

Memo and any accompanying materials part of the disclosure to ascertain privilege.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), undersigned counsel certifies that counsel for the Progen Defendants has conferred in good faith with counsel for CELEC via email correspondence between June 17, 2026, and June 29, 2026, as well as via video conference on July 1, 2026, in an effort to resolve the issues raised in this Motion without Court action, and Plaintiff opposes the relief sought herein.

Dated: <u>July 1, 2026</u>

Respectfully submitted,

*/s/ Adolfo E. Jiménez*
Adolfo E. Jiménez
Florida Bar No. 869295
Email: Adolfo.Jimenez@hklaw.com
Gabriella A. Lanzas
Florida Bar No. 1059806
Email: Gabriella.Lanzas@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

and

Jason H. Baruch
Florida Bar No. 10280
Jason.baruch@hklaw.com
Anne Colbert
Florida Bar No. 1026226
anne.colbert@hklaw.com

*Attorneys for Defendants Progen Industries, LLC; Genertek Power Corp.; Genertek Power Industries, LLC; John B. Manning; W. Wade Manning; and Andrew S. Williamson*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June [**], 2026, I electronically served Progen Defendants' Motion for Protective Order Regarding Notice of Intent to Serve Subpoenas on Twenty-Four Non-parties on all counsel of record.

/s/Adolfo E. Jiménez _____
Adolfo E. Jiménez
