# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA, DIVISION

| | | |
|---|---|---|
| CELEC EP,<br><br>   *Plaintiff,*<br><br>v.<br><br>PROGEN INDUSTRIES, LLC; GENERTEK POWER CORP.; GENERTEK POWER INDUSTRIES, LLC; JOHN B. MANNING; W. WADE MANNING; ANDREW S. WILLIAMSON; ASTROBRYXA, S.A.; ASTROBRYXA, LLC, AP INSPECTIONS LATINOAMERICA, S.A.; A.P. INSPECTIONS LLC; H&S INDUSTRY, LLC; TWO LIONS HOLDINGS, LLC; AOT HOLDING AG; GESTORES INMOBILIARIOS LIGHTBLUE, S.A., and DOES 1-99,<br><br>   *Defendants.* | § § § § § § § § § § § § § § § § § § § § § § § § § § § | **CASE NO. 8:25-cv-03433-WFJ-SPF** |

## ASTROBRYXA, S.A.'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CELEC EP

Defendant/Counter-Plaintiff, Astrobryxa, S.A. ("Astrobryxa"), pursuant to Fed. R. Civ. P. 16(f), 37(b), and 41(b), and the Court's inherent authority to assess sanctions, respectfully moves this Court to enter an Order imposing sanctions against Plaintiff/Counter-Defendant, CELEC EP ("CELEC").

## 1    FACTUAL BACKGROUND

### 1.1    *CELEC Attempts to Intimidate Potential Witnesses with Government Scrutiny to Secure Their Cooperation*

CELEC's bad faith litigation misconduct started early in this case. Astrobryxa already alerted the Court to an email sent by CELEC's counsel of record (the "CELEC Email") to an unknown number of potential witnesses listed in Astrobryxa's Rule 26 initial disclosures. *See* Doc. 73, at 2; Exhibit A. **A true and correct copy of the CELEC Email is attached hereto and incorporated by reference as Exhibit A.**

The CELEC Email sent to potential witnesses in this case, which included Astrobryxa's initial disclosures as an attachment, started with an information-gathering tone, but eventually took an intimidating turn. *Id*. ¶¶ 1-3. In the last paragraph of that email, CELEC asserts that the Government of Ecuador intends to pursue individuals connected to the purported "fraud" and pointedly emphasizes that the government will "note" those who choose to cooperate (and, by extension, those who do not).[1] *Id*. ¶ 4. These statements transcend legitimate investigative inquiry and instead convey a thinly veiled warning that individuals associated with Astrobryxa may become the subject of governmental scrutiny, should they choose not to cooperate with CELEC. Specifically, the CELEC email states:

> We represent CELEC against Progen, Astrobryxa and several other parties.

---

[1] CELEC is Ecuador's state-owned electric utility and a governmental entity responsible for a substantial portion of the nation's electricity generation and transmission. In Ecuador, CELEC is universally understood to be an arm of the government and the country's principal public power supplier.

> Astrobryxa recently listed you as a person with possible knowledge regarding the case. *See* attached [referring to Astrobryxa's Rule 26 initial disclosures].
>
> . . .
>
> **We are considering fraudulent transfer claims against anyone who received funds in connection with the fraud against CELEC. Your cooperation in this matter will be noted.**

*See* Exh. A (emphasis added).[2]

By disseminating Astrobryxa's witness disclosures and expressly invoking the Ecuadorian government's ability to "note" those who cooperate, CELEC created an environment in which current and prospective witnesses could reasonably perceive a risk of governmental scrutiny or retaliation based on their participation in this case.[3] That concern is particularly acute where many of the identified witnesses reside in Ecuador and are subject to the authority and influence of the very government CELEC claimed in the email would be monitoring their conduct. The result is a substantial risk that witness testimony has been tainted or influenced by fear rather than governed solely by the witness's obligation to testify truthfully. CELEC's conduct has compromised the integrity of the witnesses in this case and injected into these

---

[2] The Progen Defendants reported that CELEC's counsel also sent that email to the potential witnesses listed in the Progen Defendants' initial disclosures. *See* Doc. 80, at 6-7 (Progen Defendants asserting that the language of the email "carries an implicit threat of legal action against the very witnesses from whom CELEC purports to seek cooperation – a practice that is inconsistent with the professional courtesy and cooperation expected in this District and raises serious concerns about witness intimidation").

[3] The full extent of the prejudice caused by the CELEC Email is currently unknown; however, on August 11, 2026, Astrobryxa served discovery requests seeking, among other things, the identities of all recipients of the CELEC Email and information sufficient to determine the scope of its dissemination.

proceedings a serious question as to whether Astrobryxa can obtain a fair adjudication on the merits. A plaintiff that interferes with witnesses in this manner should not be permitted to benefit from the litigation environment it created.

### 1.2    The Dissemination of Astrobryxa's Initial Disclosures and the Subsequent Death Threats Referencing CELEC Board Members

Within days of the dissemination of the CELEC Email, Astrobryxa's shareholders, Mr. José Manrique and Ms. Karla Saud, received a series of anonymous threats against their lives (the "Death Threats"). *See* Doc. 73 at 3. The messages included images of the CELEC Email and a page from Astrobryxa's initial disclosures identifying, almost exclusively, high-ranking officials of the Ecuadorian government, including the following individuals who served on CELEC's Board of Directors during the negotiation and execution of the Salitral and Quevedo contracts:

- Mr. Arturo Wong (former Secretary General of Public Administration, and CELEC Board member from November 2023 to August 2024).
- Mr. Michele Sensi Contugi (Representative of the President on CELEC's Board of Director from April 2024 to January 2025).
- Mr. Roberto Luque (former Ministry of Energy, and CELEC Board member from April 2024 to July 2024).
- Ms. Inés Manzano (former Ministry of Energy, and CELEC Board member from October 2024 to May 2026).

*See* Exhibit B, at 10. **A true and correct copy of the Criminal Complaint filed with the authorities in Ecuador in connection with the Death Threats is attached hereto and incorporated by reference as Exhibit B.**

The Death Threats included a screenshot of the page from Astrobryxa's initial disclosures identifying the aforementioned members of CELEC's Board of Directors. *See* Exh. B. Accompanying that screenshot was a message stating that Astrobryxa's shareholders and their preschool-aged children would be assassinated in retaliation for allegedly "naming the Godfather" in the disclosures disseminated through the CELEC Email. *Id.* at 3, 4, 8, 10, 13.[4] The Death Threats also included pictures of Astrobryxa's shareholders, as well as their children and the car they use for daily commute. *Id.* at 14-15.

CELEC's conduct is not permissible under accepted discovery practices in the United States, and in the context of witnesses and parties residing in Ecuador, it could expose them to serious risks.[5] CELEC, an entity led by senior Ecuadorian government

---

[4] Up to this date, Astrobryxa does not know who the "Godfather" is. On April 2, 2026, Astrobryxa's shareholders filed a formal criminal complaint before the Ecuadorian authorities reporting the Death Threats. To Astrobryxa's knowledge, to this date, such authorities have not taken any action whatsoever. In the face of the inaction of the Ecuadorian authorities, Astrobryxa has reported these incidents to the Federal Bureau of Investigation ("FBI") and requested that the FBI investigate them.

[5] Ecuador faces extraordinary levels of violent crime, including homicide, kidnapping, and extortion. By 2025, its homicide rate had risen to approximately 50.9 per 100,000 inhabitants—more than double that of any U.S. state. *See* U.S. Dep't of State, Overseas Sec. Advisory Council, *Ecuador Country Security Report* (Mar. 10, 2025), https://www.osac.gov/Content/Report/19e89ddd-38d6-4062-aa6d-1c2aad29162d (last visited July 16, 2026).; Statista, *Homicide Rate in Ecuador from 2014 to 2025*, https://www.statista.com/statistics/984868/homicide-rate-ecuador/ (last visited July 16, 2026); Nat'l Ctr. for Health Statistics, Ctrs. for Disease Control & Prevention, *Stats of the States—Homicide Mortality*, https://www.cdc.gov/nchs/state-stats/deaths/homicide.html (last visited July 16, 2026). The risks are particularly acute in the Guayaquil area, where Astrobryxa and its shareholders are domiciled. In 2023, Durán, a suburb of Guayaquil, was identified as the "most homicidal" city in the world, while Guayaquil ranked among the world's most violent cities. Robert Muggah & Instituto Igarapé*, Where Are the World's Most Homicidal Cities in 2023?* (May 9, 2024), https://igarape.org.br/en/where-are-the-worlds-most-homicidal-cities-in-2023/ (last visited July 16, 2026). So severe are the security conditions that U.S. government personnel in Ecuador are prohibited from traveling to Durán and to certain areas of Guayaquil, and the U.S. Department of State has issued a "Do Not Travel" advisory for those areas due to terrorism, violent crime, and kidnapping. *See* OSAC, Ecuador Country Security Report (Mar. 10, 2025); U.S. Dep't of State, Ecuador Travel

officials [Doc. 147 ¶ 3], is uniquely familiar with these realities. Accordingly, CELEC knew or should have known that sending and disseminating the CELEC Email would expose Astrobryxa's shareholders and their families to intimidation and/or threats.

In response to the grave dangers to which Astrobryxa's shareholders and their family were exposed to as a direct and foreseeable consequence of the CELEC Email, Astrobryxa moved for a protective order, which was adopted on June 16, 2026 (the "Protective Order").[6]

### 1.3    *CELEC's Use of this Litigation as a Vehicle to Deceive, Intimidate, and Harass*

On June 17, 2026, one day after the Court entered the Protective Order, CELEC, acting through one of its three Board members, Mr. José Neira, launched a nationwide broadcast replete with carefully crafted visual imagery designed to reinforce its accusatory narrative. In that broadcast, CELEC disseminated a series of demonstrably false and inflammatory statements for the sole purpose of intimidating and harassing Defendant Astrobryxa and, by its own admission, exonerating members of CELEC's Board from responsibility for the failure of the Salitral and Quevedo contracts (the "CELEC Broadcast"). **A true and correct copy of the transcript in English of the CELEC Broadcast is attached hereto and incorporated by reference as Exhibit C. A version of the CELEC Broadcast video with subtitles in English is**

---

Advisory    (Oct.    14,    2025),    https://travel.state.gov/en/international-travel/travel-advisories/ecuador.html (last visited July 16, 2026).

[6] On May 7, 2026, following an in-person hearing, Magistrate Judge Flynn ordered the parties to meet and confer regarding the entry of a stipulated protective order incorporating adequate safeguards to protect the life and safety of Astrobryxa's shareholders and their children.

**identified      as      Exhibit      D      and      may      be      accessed      here**: https://www.youtube.com/watch?v=KWu2UwHeUyg [7]

Throughout the CELEC Broadcast, CELEC repeatedly shows and misrepresents confidential financial information obtained through discovery in this case to depict Astrobryxa and its shareholders as criminals, accusing them of orchestrating one of the "largest heists in Ecuador's history" and of causing the "most significant energy crisis" the country has experienced in recent times. *See* Exh. C, at 1, 2; Exh. D at 00:25, 00:57.

Along with the CELEC Broadcast, CELEC disseminated a memorandum prepared by its counsel containing highly sensitive and confidential financial information relating to Astrobryxa and co-Defendant, Astrobryxa LLC, as well as individuals associated with their shareholders (the "Memorandum"). **A true and correct copy of the Memorandum is attached hereto and incorporated by reference as Exhibit E**. The disclosed information encompassed sensitive and personal financial records, including bank account numbers, account activity and transaction histories, aggregate outgoing transfers, personal expenditures, purchases, and transfers to third parties involving both Astrobryxa LLC's accounts and the personal banking accounts of Astrobryxa's shareholders, José Manrique and Karla Saud. *See* Exh. E (Memorandum), pgs. 8-10.

---

[7] The original CELEC Broadcast is accessible on Mr. Neira's X page at the following link: https://x.com/JoseJulioNeira/status/2069391397501784250

In the CELEC Broadcast, CELEC discussed the content of the Memorandum as well as other information obtained through discovery in this case in detail, including Mr. Manrique and Ms. Saud's private banking activity. This included references to transfers, expenditures, and other financial transactions that CELEC itself expressly characterized as personal in nature and, therefore, unrelated to the issues presented in this litigation. Exh. C at 5, 6; Exh. D at 02:51, 03:21; Exh. E at 9, 10.

Perhaps the clearest example of the bad faith underlying the CELEC Broadcast was CELEC's disclosure of funds that Mr. José Manrique provided to his mother, Angela Maria Manrique Suarez, as family support. In what appears to have been a calculated effort to maximize embarrassment and intimidation, CELEC went so far as to display a photograph of Mr. Manrique's mother during the broadcast. Exh. E (Memorandum) pg. 10; Exh. D at 03:33; Exh. F. **A true and correct copy of the screenshot of the CELEC Broadcast portraying a headshot of Mr. Manrique's mother (Angela Maria Manrique Suarez) is attached hereto and incorporated by reference as Exhibit F.** CELEC's disclosure of such deeply personal and wholly irrelevant financial information was made solely as a vehicle for public shaming, harassment, and intimidation of Astrobryxa and its shareholders.

### 1.4    *CELEC's Campaign of Falsehoods Before the Public and This Court*

CELEC is using information obtained through discovery in bad faith to advance a false narrative and deflect attention from its own responsibility in the awarding and failure of the Quevedo and Salitral projects by using Astrobryxa and its shareholders

as political scapegoats before the Ecuadorian people. The CELEC Broadcast is a clear example.

First, in an intentional misrepresentation of the nature of this case, CELEC, through Mr. Neira, asserts that the documents and the information disclosed in the CELEC Broadcast were obtained through "international cooperation" between Ecuador and the United States. Exh. C at 2; Exh. D at 00:44. This assertion is demonstrably false. The information was obtained through civil discovery by private U.S. counsel, not through any investigation, cooperation, or assistance from the U.S. Government. CELEC's attempt to characterize routine civil discovery in this case as "international cooperation" appears intended to portray the endorsement of the United States as bolstering the credibility of its public allegations and misrepresenting the source of the information.

Second, CELEC publicly accused Astrobryxa shareholder Ms. Saud of exploiting her alleged familial relationship with Mr. Alex Dueñas-Calero to corruptly secure the award of the Quevedo and Salitral contracts in favor of Progen. Exh. C at 5-6; Exh. D at 03:05-03:21.[8] To support this accusation, Mr. Neira claimed that Mr. Dueñas-Calero leveraged his former positions at Corporación Nacional de

---

[8] It is remarkable how CELEC's theory appears to evolve as needed. In its Complaint, CELEC alleged that Ms. Saud used her alleged familial relationship with Fabian Calero to corruptly secure awarding of the Quevedo and Salitral contracts in favor of Progen. *See* Doc. 128, ¶ 49. In the CELEC Broadcast, however, CELEC shifted course and linked her to Alex Dueñas-Calero instead, the name of an individual that CELEC found through discovery. The ease with which CELEC substitutes one alleged connection for another reveals that its main purpose is to link Ms. Saud to anyone who might fit its narrative, while diverting attention from the CELEC and Ecuadorian government officials who actually controlled the procurement decisions at issue.

Electricidad ("CNEL") and CELEC to influence the procurement process in Progen's favor. *Id*. The allegation is demonstrably false. Mr. Dueñas-Calero's employment with CELEC ended in December 2022—nearly two years before the Quevedo and Salitral contracts were awarded—making it impossible for him to have exerted any influence over the procurements at issue.[9] *See* Exh. G at 5. **A true and correct copy of the news article discussing Mr. Dueñas-Calero's tenure at CNEL and CELEC is attached hereto and incorporated by reference as Exhibit G.**[10] Mr. Neira also omitted a critical fact: CNEL is a separate state-owned enterprise with no involvement whatsoever in CELEC's procurement, contracting, or project-award processes.

Significantly, these are facts that Mr. Neira knew or should have known. As Secretary General of Public Administration and a member of CELEC's Board of Directors, Mr. Neira has access to the employment records of state-owned entities and knew, or readily could have confirmed, that Mr. Dueñas-Calero's employment with CELEC ended in December 2022—nearly two years before the Quevedo and Salitral contracts were awarded. He likewise knew that CNEL is a separate state-owned enterprise with no involvement in CELEC's procurement, contracting, or project-award processes. Nevertheless, Mr. Neira chose to advance these allegations in the

---

[9] Even assuming *arguendo* that Mr. Dueñas's tenure at CELEC had overlapped with the procurement processes that resulted in the award of the Quevedo and Salitral contracts, CELEC neither alleges nor could plausibly allege that Mr. Dueñas occupied a position with responsibility for, or authority over, those procurement proceedings. Nor has CELEC identified any facts suggesting that Mr. Dueñas had the ability to influence, direct, or otherwise affect the evaluation, selection, or award of either contract.

[10] *See Saud–Calero, una familia clave en los sectores estratégicos*, Radio Pichincha, https://www.radiopichincha.com/saud-calero-red-familiarestafa-progen/ (last visited July 16, 2026).

CELEC Broadcast with the sole intention of harassing Ms. Saud and manufacturing a false narrative of corruption.

Another clear instance of CELEC's bad faith is a July 31, 2026 publication in which it publicly accused Ms. Saud of criminal conduct before a national audience based on a blatant misrepresentation of the July 24, 2026 deposition testimony in this case of Defendant Wade Manning. **A true and correct copy of the screenshot of CELEC's publication misrepresenting Defendant Manning's deposition (in English and Spanish) is attached hereto and incorporated by reference as Exhibit H.**[11] Specifically, Mr. Neira claimed that Mr. Manning's deposition testimony in this case proved that Ms. Saud's "organization" had perpetrated a "massive fraud" against CELEC. *Id.* That assertion is demonstrably false. Far from supporting CELEC's accusations, Mr. Manning testified that he had never heard of Astrobryxa, Ms. Saud, or Mr. Manrique. *See* Doc. 167, Ex. C, at 75:11-76:2. Thus, the very testimony upon which CELEC purported to rely directly contradicts the narrative advanced in its publication. CELEC's deliberate mischaracterization of deposition testimony in this matter is yet another example of its bad-faith misuse of information obtained through discovery in this litigation to publicly vilify Astrobryxa and its shareholders, using

---

[11]    *See* José Julio Neira (@JoseJulioNeira), X (July 31, 2026, [12:58 pm]), https://x.com/JoseJulioNeira/status/2083175525225259339 (referring to Wade Manning's deposition and asserting that "[this is] absolutely conclusive evidence showing how Karla Saud's organization operated within and around CELEC EP for several years and how they orchestrated the massive fraud against the Ecuadorian State") (translation by counsel).

them as scapegoats in an effort to deflect attention from CELEC's own responsibility for the failure of the Quevedo and Salitral contracts.

CELEC has also misrepresented facts to this Court. A central allegation in this case is that Ms. Saud has a familial relationship with CELEC's then-General Manager, Fabian Calero, and purportedly used that relationship to influence the award of the Salitral and Quevedo contracts. *See* Doc. 128, ¶ 49. Ms. Saud, however, has no familial, personal, or professional relationship with Mr. Calero.

On May 6, 2026, Astrobryxa's undersigned counsel notified CELEC's counsel of this fact and requested that CELEC correct the erroneous allegations in its complaint. Exh. I at 1-2. **A true and correct copy of undersigned counsel's clarification request is attached hereto and incorporated by reference as Exhibit I.** Along with that request, Astrobryxa's counsel provided CELEC's counsel with uncontroverted evidence establishing that, contrary to the allegations in the Complaint, Ms. Saud and Mr. Calero are not related in any way. *Id*. Specifically, Astrobryxa's counsel provided CELEC's counsel with the following evidence:

- a filiation report ("Informe de Filiación") issued by Ecuador's Registro Civil,[12] which lists all of Mr. Calero's relatives and does not include Ms. Saud (**attached hereto and incorporated by reference as Exhibit J**);

---

[12] The Registro Civil is the governmental agency responsible for maintaining official civil records and registering vital life events, including births, marriages, divorces, and deaths. It serves as the central repository of individuals' civil status information and issues the official certificates and records that establish and verify these personal and legal facts.

- an affidavit by Ms. Saud listing all her direct relatives, which likewise does not include Mr. Calero (**attached hereto and incorporated by reference as Exhibit K**); and,

- a letter sent by Mr. Calero to CELEC as early as December 2025 clarifying that: a) he has no familial relationship with Ms. Saud; b) any such alleged relationship was already denied by Ecuador's Ministry of Energy; and (3) he likewise denied any relationship in an official response submitted to the Asamblea Nacional (Ecuador's National Congress) while serving as Vice Minister of Electricity. **Attached hereto and incorporated by reference as Exhibit L.**

In an effort to confer in good faith and understand the factual basis for CELEC's assertions in its pleadings that Mr. Calero and Ms. Saud were related (which is not true), undersigned counsel asked CELEC's counsel to provide any evidence supporting a good-faith basis for that allegation or otherwise provide evidence contradicting the evidence attached to Astrobryxa's counsel's email. Exhibit M at 2. **A true and correct copy of relevant correspondence is attached hereto and incorporated by reference as Exhibit M**. CELEC's counsel provided no substantive response and simply dismissed the conferral request with: "***Progen makes that allegation in its papers. We will not remove it***." *Id.* at 1 (emphasis added). In sum, having been provided with evidence squarely contradicting and thus negating a key factual allegation in its pleadings in this case, CELEC cannot provide any substantive response and claims that because the Progen Defendants also made the allegation, that somehow provides a good faith factual and legal basis for CELEC to make—and

continue to maintain—the same claim, despite evidence squarely contradicting the claim.[13]

### 1.5    *CELEC's Continued Public Disclosures Following Counsel's Admonition*

On the same day as the CELEC Broadcast, CELEC's counsel acknowledged that CELEC had improperly disclosed confidential financial information obtained through discovery. Exhibit N at 2. **A true and correct copy of email from CELEC's counsel is attached hereto and incorporated by reference as Exhibit N.** In that communication, CELEC's counsel represented that they had addressed the matter with CELEC "in the strongest possible terms," expressly advising that such conduct "cannot happen again." *Id*.

CELEC paid little heed to its counsel's admonition. The very next day, Mr. Neira again appeared on Ecuadorian national television and doubled down on his misconduct (the "Neira Interview"). **The Neira Interview is identified as Exhibit O and available with English subtitles here: https://www.youtube.com/watch?v=VukzwnkLKXg** [14]

---

[13] CELEC and its counsel's conduct violates Federal Rule 11 because they made a material factual allegation without evidentiary support and continue to mislead this Court by maintaining that allegation even after being presented with uncontroverted evidence conclusively establishing its falsity. Fed. R. Civ. P. 11(b)(3). *See also* R. Reg. Fla. Bar 4-3.3(a)(1) (prohibiting making "a false statement of fact . . . to a tribunal or fail[ing] to correct a false statement of material fact . . . previously made to the tribunal . . .").

[14] *See Utilizamos mecanismos de cooperación internacional para caso Progen | Entrevista a José Julio Neira*, YouTube, https://www.youtube.com/watch?v=1vtGse_nF4c (last visited July 16, 2026) (available in Spanish with YouTube-generated English dubbing and translation options). A true and correct copy of the transcript of the Neira Interview is attached hereto and incorporated by reference as Exhibit P.

In the Neira interview, Mr. Neira:

### 1.6    CELEC's Track Record of Intimidation to Cover for its Board Members

CELEC's attacks on Astrobryxa reflect a broader pattern of harassment and intimidation aimed at discouraging scrutiny of CELEC's own role in the failures of the Salitral and Quevedo contracts. A recent example involved Hernán Higuera, a journalist with Ecuavisa, one of the most prominent news outlets in Ecuador. In June 2026, Ecuavisa announced that Mr. Higuera had withdrawn from an investigation into CELEC's own responsibility in the failure of the contracts after purported retaliatory actions by the Ecuadorian government led to the loss of employment of his wife and son. **A version of the video report on CELEC's intimidation against Mr. Higuera with subtitles in English is marked as Exhibit Q and may be accessed here**: **https://www.youtube.com/watch?v=_P_CYORn44E** [15]

---

- Repeated the falsehood that documents and the information disclosed in the CELEC Broadcast were obtained through "international cooperation" between Ecuador and United States. *See* Exhibit P at 2, 8, 12; Exhibit O at 00:38, 04:08, and 06:22.
- Revisited and discussed the same financial transactions previously featured in the CELEC Broadcast. Exhibit P at 3; Exhibit O at 01:08.
- Again, highlighted transfers allegedly made by Progen to Astrobryxa, in an effort to portray ordinary commercial transactions between a contractor and its subcontractor as evidence of wrongdoing. Exhibit P at 3-4; Exhibit O at 01:19.
- Repeated his accusation that Ms. Karla Saud improperly exploited her purported familial relationship with Alex Dueñas-Calero to procure the award of the Salitral and Quevedo contracts for Progen through fraudulent and corrupt means. Exhibit P at 4-5; Exhibit O at 01:43. Mr. Neira again emphasized that Mr. Dueñas-Calero had previously worked at CELEC, while omitting the key fact that his employment ended in December 2022—before the bidding, award, or execution of the Salitral and Quevedo contracts. Mr. Neira persisted in this omission even after being expressly questioned on the matter by the interviewer. Exhibit P at 5-6; Exhibit O at 02:29.

[15] *See* María Cecilia Largacha, *Caso Progen: Periodista Hernán Higuera Deja Investigación Tras Hechos Que Afectaron a Su Familia*, ECUAVISA (June 19, 2026), https://www.ecuavisa.com/politica/caso-progen-periodista-de-ecuavisa-deja-investigacion-tras-hechos-que-afectaron-a-su-familia-20260619-0084.html. A true and correct copy of the aforementioned news article informing of Mr. Higuera's withdrawal from the CELEC investigation is attached hereto and incorporated by reference as Exhibit R.

Mr. Higuera's investigation uncovered voice notes from Inés Manzano, Ecuador's former Minister of Energy and a CELEC board member, discussing an apparent agreement with a congresswoman aligned with the ruling party to limit legislative scrutiny of the Quevedo and Salitral contracts and ensure that congressional appearances remained largely superficial. Exhibit S at 00:58**. A version of the video report on Ms. Manzano's communications with subtitles in English is marked as Exhibit S and may be accessed here**: **https://www.youtube.com/watch?v=g9-7FSLm144** [16]

## 2    LEGAL STANDARD

"Courts have the inherent power to police those appearing before them." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (internal citations omitted). "A court's inherent power is governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. . ..." *Id*. "A court may exercise this power to . . . sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id*. "In assessing whether a party should be sanctioned, a court examines the wrongdoing in the context of the case . . ." *Id*. at 1225.

---

[16] Héctor Hernán Higuera, *Exclusiva: Audios y Chats Atribuidos a Inés Manzano la Comprometerían en el Caso Progen*, ECUAVISA (June 2, 2026), https://www.ecuavisa.com/politica/ines-manzano-audios-chats-caso-progen-20260602-0103.html. A true and correct copy of the news article discussing Ms. Manzano's communications in Spanish and English is attached hereto and incorporated by reference as Exhibit T.

The key to unlocking a court's inherent power is a finding of bad faith." *Id.* at 1223. "[Bad] faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Roadway Express v. Piper*, 447 U.S. 752, 766 (1980). "To trigger the Court's inherent powers, the party moving for sanctions must show subjective bad faith. That means showing intentional and not just reckless behavior. This showing can be done with either (1) direct evidence of subjective bad faith or (2) evidence of conduct so egregious that it could only be committed in bad faith. *Noshirvan v. Couture*, No. 2:23-cv-1218-JES-KCD, 2025 U.S. Dist. LEXIS 154992, at *8 (M.D. Fla. Aug. 12, 2025) (internal citations omitted).

"Once a showing of subjective bad faith is made, the full force of the Court's inherent powers is unleashed, and the Court can utilize its discretion to impose wide-ranging sanctions against any offending party for a full range of litigation abuses." *Id.* (citing *Mingo v. Sugar Cane Growers Co-op. of Fla.*, 864 F.2d 101, 102 (11th Cir. 1989) ("The sanctions imposed can range from a simple reprimand to an order dismissing the action with or without prejudice.")); *see also In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006) ("Federal courts have the inherent power to impose sanctions on parties, lawyers, or both."); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) ("[T]he inherent power extends to a full range of litigation abuses.")).

### 3    ARGUMENT

CELEC was not compelled to litigate before this Court. It could have pursued its claims in Ecuadorian courts or resorted to arbitration. Instead, CELEC voluntarily

invoked the jurisdiction of a federal court of the United States and, in doing so, accepted the obligations that accompany litigating before such a tribunal. Those obligations include adherence to the rule of law, respect for the judicial process, compliance with discovery and protective orders, and the fair treatment of opposing parties and witnesses. The time has come for CELEC to be held to the standards of appropriate conduct that this Court rightly demands of all litigants who affirmatively seek relief before it.

### 3.1    The CELEC Email Was a Calculated Attempt to Influence and Intimidate Witnesses, Warranting Sanctions Against CELEC

CELEC's campaign of intimidation began with the CELEC Email.  Through its attorney and agent, CELEC, a state-owned entity controlled by senior Ecuadorian government officials, emailed Astrobryxa's initial disclosures to potential witnesses and used that communication to deliver an unmistakable warning: the Government of Ecuador would "note" those who failed to cooperate with it. *See* Exh. A ¶ 4 ("We are considering fraudulent transfer claims against anyone who received funds in connection with the fraud against CELEC. Your cooperation in this matter will be noted.")

The CELEC Email was not a careless or impulsive communication. It was drafted and sent by CELEC and reflects a deliberate choice of words. While parties may properly contact witnesses identified in initial disclosures, the email's final paragraph served no legitimate fact-gathering purpose. Instead, by warning recipients with chilling language that the Government of Ecuador would "note" those who failed

to cooperate, it sought to intimidate potential witnesses into cooperating with CELEC and to deter cooperation with Astrobryxa. *See* Exh. A ¶ 4.

In the context of litigation brought by an instrumentality of a government with the power to start criminal investigations, and against a backdrop of government efforts to intimidate journalists from speaking or reporting critically on the matter, CELEC invoked the authority and perceived power of said government to pressure third parties through the implied threat of adverse consequences. The deliberate inclusion of such language constitutes direct evidence that the CELEC Email was intended to coerce and intimidate. While Astrobryxa does not yet know how many potential witnesses appearing on its Initial Disclosures (or any others) received the CELEC Email (or a similar email), the language of that email speaks for itself and Astrobryxa has a well-founded concern that witnesses in this case were and will be intimidated.

This Court's authority to sanction misconduct derives not only from its inherent power to protect the integrity of its proceedings, but also from the Federal Rules of Civil Procedure and the United States Code. *See Quiroz v. Superior Bldg. Maint., Inc.*, No. 06-21594-CIV, 2008 WL 3540599, at *5 (S.D. Fla. Aug. 12, 2008) (holding that ". . . the authority to sanction parties for bad faith litigation misconduct stems not only from the Federal Rules of Civil Procedure and the United States Code, but also from the Court's inherent power to effectively manage its affairs by punishing and deterring abuses of the judicial process.")

"[T]o obtain a conviction for witness tampering in violation of 18 U.S.C. § 1512(b)(2)(A) & (b)(3), it must be proven that the person (1) knowingly corruptly persuaded the witness (2) with the intent to induce the witness to 'withhold testimony,' from an official proceeding." *In re Brican Am. LLC Equip. Lease Litig.*, 977 F. Supp. 2d 1287, 1296–97 (S.D. Fla. 2013). Substantially the same elements must be established to prove witness tampering under Florida law. *Id.*

"[C]ourts have found that even if conduct does not meet the precise definition of witness tampering under [18 U.S.C. § 1512(b)], such litigation misconduct may still be sanctionable under the court's inherent power." *Santana v. Telemundo Network Gp. LLC*, No. 6:20-cv-1157-WWB-LHP, 2022 U.S. Dist. LEXIS 42673, at *41 (M.D. Fla. March 10, 2022). Sanctions against parties and attorneys can include the imposition of attorney's fees and costs, warnings, and public reprimands. Further violations of the court's authority can result in dismissal or other severe sanctions. *See Noshirvan*, 2025 U.S. Dist. LEXIS 154992, *40.

The CELEC Email falls well within the ambit of 18 U.S.C. § 1512(b). Although the purpose of the first 3 paragraphs of the email appear to be for routine fact gathering, the last paragraph of the email changes the tenor from fact-gathering to a statement having the obvious intent to intimidate.

CELEC is the Ecuadorian government, its attorney was speaking for the Ecuadorian government, and the recipients of the CELEC Email knew that. The CELEC Email implied criminal or other disciplinary action **by their own government**.

Page 20 of 27

Specifically, it threatens criminal action or, conversely, offers immunity from criminal action, in exchange for cooperation in a civil matter.

For these reasons, Astrobryxa respectfully requests that the Court grant this Motion and exercise its statutory and inherent authority to impose appropriate sanctions against CELEC as established in the Relief Requested section below.

### 3.2    CELEC Violated the Protective Order by Publicly Disclosing Confidential Information for the Purpose of Harassing and Intimidating Astrobryxa

A protective order entered by the Court is not a suggestion; it is a pretrial order that binds the parties and governs their conduct throughout the litigation. The Federal Rules of Civil Procedure authorize courts to sanction any party that violates a protective order. *See* Fed. R. Civ. P. 16(f)(1)(c); Fed. R. Civ. P. 37(b)(2)(A)(ii)–(vii); *see also Fontainebleau Fla. Hotel, LLC v. Jacob*, 2026 U.S. Dist. LEXIS 40429, *14 (S.D. Fla. Feb. 26, 2026) (holding that "Rule 16(f) serves as the appropriate vehicle for enforcing a court's protective order and sanctioning those who willfully disregard it."). When a party disregards a protective order and publicly disseminates protected information, sanctions are appropriate to remedy the violation, deter future misconduct, and preserve the integrity of the judicial process.

The Court should sanction CELEC's conduct. The Protective Order [Doc. 135-1] was not a routine confidentiality agreement. It was entered after Astrobryxa moved for protection [Doc. 73] and the Court recognized serious safety concerns arising from the Death Threats that followed the CELEC Email. The Protective Order expressly defines "Confidential" information to include "any information which, if disclosed,

could reasonably be expected to endanger the safety, security, or life of any party, witness, attorney, or non-party associated with this litigation, including information that could facilitate harassment, intimidation, or threats." [Doc. 135-1, ¶1].

The information publicly disclosed during the CELEC Broadcast falls squarely within the Protective Order's definition of "Confidential" information. CELEC used information obtained through discovery to publicly discuss and display sensitive financial information concerning Astrobryxa, its shareholders, and affiliated individuals, including private banking activity, personal expenditures, family-support payments, transfers involving third parties, and other financial records having no legitimate connection to the matters discussed in this case. CELEC weaponized that information during a nationwide broadcast in which it accused Astrobryxa, its shareholders, and related parties of corruption and criminal misconduct. In light of the undisputed history of threats directed at Astrobryxa's shareholders following dissemination of the CELEC Email, there can be little doubt that public disclosure of such information was reasonably capable of facilitating further harassment, intimidation, and threats against the very individuals the Protective Order was designed to protect.

But the violation goes even further. The CELEC Broadcast did not merely create a risk that third parties would harass or intimidate Astrobryxa and its associates; the broadcast itself was an act of harassment and intimidation. CELEC used confidential discovery material as a tool to publicly shame, disparage, and target Astrobryxa, its shareholders and their family members before a nationwide audience.

Page 22 of 27

This is precisely the type of conduct contemplated by the Protective Order's express protection of information that could facilitate "harassment, intimidation, or threats." Accordingly, the disclosed information constituted "Confidential" information under the plain terms of the Protective Order.

Most troubling is the fact that CELEC's disclosures were not accidental. They were deliberate and calculated. This occurred less than twenty-four hours after entry of the Protective Order and reiterated even after CELEC's own counsel's admonition. By doing so, CELEC demonstrated bad faith, and complete disregard for the Protective Order entered by this Court, as well as for the safety concerns that prompted its adoption in the first place.

Accordingly, the Court should find that CELEC violated the Protective Order and impose appropriate sanctions against CELEC, as established in the Relief Requested section below.

### 3.3     CELEC's Conduct Warrants Sanctions Under the Court's Inherent Authority

The statutory and rule-based grounds for sanctions discussed above are independently sufficient to sanction CELEC. But even if they were not, this Court should exercise its inherent authority to address what is plainly a campaign of bad-faith litigation misconduct by the plaintiff in this case.

CELEC's misconduct is both intentional and egregious. This is not a case involving an isolated discovery dispute, an inadvertent disclosure, or a momentary lapse in judgment. Rather, the record reflects a coordinated pattern of conduct designed to intimidate witnesses, harass Astrobryxa and its principals, and weaponize

this litigation to silence individuals who may expose the responsibility of CELEC in the failure of the Salitral and Quevedo contracts.

It began with the CELEC Email. It continued with CELEC's public dissemination of confidential discovery materials in direct violation of the Protective Order. And it culminated in the CELEC Broadcast and subsequent media appearances, during which CELEC publicly disclosed sensitive personal and financial information obtained through discovery to portray Astrobryxa and its shareholders as corrupt criminals before a nationwide audience (including many potential witnesses who likely saw those broadcasts in their own country).

The context of CELEC's misconduct is critical. The Protective Order was entered because Astrobryxa's shareholders and their family had already received death threats after CELEC disseminated information obtained through this litigation in the CELEC Email. Yet less than twenty-four hours after the Order's entry, CELEC publicly disclosed the very type of information the Order was designed to protect. That conduct served no legitimate litigation purpose and demonstrates bad faith. More telling still, CELEC repeated the misconduct after its own counsel expressly warned that such disclosures were improper and "cannot happen again." By disregarding both the Court's Order and its own counsel's admonition, CELEC demonstrated that its actions were neither accidental nor negligent, but deliberate. The Court need not infer bad faith; CELEC's knowing and repeated violations provide direct evidence of intentional misconduct.

Accordingly, the Court should invoke its inherent authority and impose sanctions sufficient to address the seriousness of CELEC's misconduct, as established in the Relief Requested section below.

## 4    RELIEF REQUESTED

Astrobryxa respectfully requests that the Court exercise its statutory and inherent authority to impose sanctions sufficient to address the seriousness of CELEC's misconduct and deter future violations.

At a minimum, Astrobryxa requests that the Court:

- Find that CELEC violated the Protective Order;
- Prohibit CELEC and its agents from further disclosing, publishing, or otherwise using information obtained through discovery outside the confines of this litigation;
- Exclude from evidence, testimony, motion practice, or trial any information or materials disclosed in violation of the Protective Order;
- Prohibit CELEC from introducing as evidence testimony from any witness who received the CELEC Email; alternatively, permit Astrobryxa to use the CELEC Email and the witnesses' receipt thereof as evidence of the witnesses' potential bias in giving testimony after he/she received an intimidating email from the witnesses' own government. The Court should require CELEC to produce a copy of all emails containing the same or similar language as the CELEC Email that were sent to any witnesses in this case so the full scope of CELEC's attempted witness intimidation can be determined;
- Award Astrobryxa all reasonable attorney's fees, costs, and expenses incurred as a result of CELEC's misconduct, including those incurred in connection with:

- o Defendant Astrobryxa's Motion for Protective Order and Modification of Case Management Order (Doc. 73), Defendant Astrobryxa's Reply in Support thereof (Doc. 86), and related hearing (including costs, expenses, travel, lodging, and other reasonable expenditures incurred in preparing for and attending such hearing);
- o This Motion for Sanctions, all supporting, supplemental, and responsive briefing, including replies, sur-replies, and any other papers necessitated by the misconduct at issue; and,
- o Any hearing ordered by the Court concerning these matters, including all fees, costs, expenses, travel, lodging, and other reasonable expenditures incurred in preparing for and attending such hearing.

- Warn CELEC that similar future misconduct may result in more severe sanctions, including dismissal of its claims. *Porton v. SP One, Ltd.*, 2015 U.S. Dist. LEXIS 48256, *5 (M.D. Fla. Mar. 19, 2015) ("The most severe sanction, dismissal with prejudice, may be appropriate when a plaintiff's recalcitrance is due to willfulness, bad faith or fault").
- Grant such other and further relief as the Court deems just, appropriate, and necessary to remedy the misconduct and deter future violations.

## Local Rule 3.01(g) Certificate

Prior to filing this motion, counsel for Astrobryxa conferred on the telephone with counsel for CELEC on August 7, 2026 about the contents of this motion. Counsel for CELEC represented that they do not agree with the relief requested in this motion.

Dated: August 11, 2026

Respectfully submitted,

FERGUSON BRASWELL FRASER KUBASTA PC

/s/    *Enrique A. Jaramillo Vargas*
Enrique A. Jaramillo Vargas*
Texas Bar No. 24132917
*Admitted Pro Hac Vice*
ejaramillo@fbfk.law
Kenneth H. Holt
Texas Bar No. 00793012
*Admitted Pro Hac Vice*
kholt@fbfk.law
3200 Southwest Freeway, Suite 3200
Houston, Texas 77027
T: (713) 403-4200
F: (713) 403-4201
  *Designated Lead Counsel
  (L.R. 2.02(a))

-and-

Christopher W. Prusaski
Florida Bar No. 121525
PRUSASKI-LAW, P.A.
7879 Red River Road
West Palm Beach, Florida 33411
Telephone: (561) 310-6680
Email: chris@prusaski-law.com
  *Co-Counsel for Defendant Astrobryxa, S.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2026, a true and correct copy of the foregoing Motion was served on all parties of record, via the Court's CM/ECF system.

/s/    *Enrique A. Jaramillo Vargas*
Enrique A. Jaramillo Vargas

Page 27 of 27