**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| CELEC EP,<br><br>Plaintiff,<br>v.<br><br>PROGEN INDUSTRIES, LLC, *et al.*,<br><br>Defendants. | No. 8:25-cv-03433-WFJ-SPF<br><br>Judge Jung |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT ASTROBRYXA, S.A.'S MOTION FOR SANCTIONS [DE 176]**

Astrobryxa's Motion for Sanctions (the "Motion") [DE 176] is a transparent attempt to divert attention from its own fraudulent conduct and to delay this litigation.

Although Defendants have only just begun responding meaningfully to discovery, evidence already uncovered strongly supports CELEC's fraud claims and confirms that its allegations were well-founded from the start. *See, e.g.*, DE 167 at 5–6 (discussing damning admissions obtained during deposition of Defendant Wade Manning on July 24, 2026); DE 70-3 (Regions records, demonstrating funds Progen defendants received from CELEC were used to pay other debts, to fund child support payments, to fund their purchase of lavish real estate property and to pay nearly $20 million to Astrobryxa, its principals, and their sham corporate vehicles).

More recently, the Progen Defendants have produced some of their text messages with Astrobryxa, and CELEC was able to depose Defendant John Manning. The text messages paint a troubling picture. For example, in response to fraudulent documents that Astrobryxa sent to Progen, which Progen knew Astrobryxa would provide to CELEC,

Defendant John Manning responded that the forged documents "will land us in jail." *See* Exhibit A (attached). Defendant John Manning's admissions during his deposition were even worse. *See* Exhibit B (J. Manning Deposition Transcript) (attached). His admissions included the following: (i) Progen has delivered no completed generators to CELEC, *see* Ex. B at 225; (ii) Astrobryxa sent forged documentation to Progen, which Progen knew would be submitted to CELEC, to attempt to show Progen had experience in similar projects (which it did not), *see* Ex. B at 157, 345–50; (iii) Progen has spent CELEC project funds for purposes unrelated to the projects, *see* Ex. B at 249, 252–53, 283–84, 304; (iv) Progen never disclosed to CELEC how it intended to use CELEC's project funds, *see* Ex. B at 199, 212, 251–52; and (v) Progen intended to make a profit from CELEC of at least $30 million, the largest profit (by far) in Progen's history, *see* Ex. B at 307, 310.

This incriminating evidence barely scratches the surface of what discovery is likely to reveal once Defendants actually begin producing documents in earnest, and all depositions are completed. Astrobryxa, in particular, has dragged its feet at every turn and *still* has not substantially completed its production in response to CELEC's discovery requests served on February 13, 2026—more than six months ago. However, documents produced by Progen demonstrate Astrobryxa's role in the scheme. For instance, texts produced by Progen show Astrobryxa's principal Karla Saud Calero ("Saud") wanted to bribe the Ecuadorian government to resolve the generator dispute. *See* Exhibit C (attached).

Astrobryxa fails to disclose in its Motion that Saud is a fugitive currently hiding in Spain. Ecuador is seeking her extradition, which she is contesting. She is wanted for multiple criminal offenses related to her fraud against CELEC. Jose Walther Manrique

Suarez ("Manrique"), Astrobryxa's other principal, was deported from the United States in late 2025, *see* DE 47-1 (Verification of Removal filed by Astrobryxa), and is also currently in Spain. *See* Exhibit D (attached) (emails with Counsel for Astrobryxa). Astrobryxa also fails to mention how it has dragged its feet in scheduling Saud's and Manrique's depositions, making CELEC jump through hoops to accommodate numerous of Astrobryxa's counsel's requests. Despite that CELEC sought their depositions in person, in this jurisdiction, as early as July 17th, the depositions will finally take place on September 17th and 18th, remotely, while Saud and Manrique are in Spain.

To distract from their own misconduct, Defendants have repeatedly attempted to put CELEC on trial instead and tried to hinder its ability to prosecute this case. For instance, the Progen Defendants have filed *three* motions to prevent discovery—*see* DEs 67, 97, 149—all of which they have substantially ***lost***—as well as a motion for judgment on the pleadings, *see* DE 166—which this Court should deny.[1] Astrobryxa, in turn, has filed a weak motion to dismiss [DE 24], which was denied; a frivolous motion to halt discovery [DE 73], which was denied; and a frivolous motion to compel arbitration under a contract they are not even a party to [DE 78], which was also denied. Astrobryxa has also brought several meritless counterclaims against CELEC [DE 154], which CELEC seeks to dismiss [DE 162]—and which are, in large part, based on the same conduct complained of in this Motion.

Astrobryxa has now filed the present Motion for Sanctions [DE 176]. But this Motion, like all of its previous motions and attempts to derail this litigation, is frivolous. It

[1] CELEC's response in opposition is forthcoming. *See* DE 179 (setting response deadline).

is light on facts, light on evidence, and light on legal support . . . but heavy on inflammatory rhetoric. Distilled to its core, Astrobryxa seeks sanctions against CELEC for the following four actions:

1. CELEC's U.S. counsel contacting witnesses listed in Astrobryxa's initial disclosures. *See* Motion at 2–6, 18–21.

2. CELEC's allegation in the operative complaint that Saud is related to Fabian Calero (CELEC's General Manager at the time of the Quevedo and Salitral contracts). *See* Motion at 8–10, 12–14.

3. One of the members of CELEC's Board of Directors, who is a senior Ecuadorian government official, disclosing on X (formerly known as Twitter) an attorney-client and work product privileged memorandum prepared by CELEC's outside counsel.[2] *See* Motion at 6–7, 8, 14, 21–24.

4. That same member of the Board's discussions in the Ecuadorian media about public filings in this litigation. *See* Motion at 6–7, 8, 11, 14, 21–24.

In essence, what Astrobryxa seeks is to impose a gag order on CELEC. *See* Motion at 25–26 (relief requested). It wants to prevent CELEC from being able to prosecute its case and contact witnesses, including unrepresented witnesses disclosed by Astrobryxa itself. It also seeks to impose costs on CELEC for an unrelated, previous Motion ***that Astrobryxa lost***, *see* Motion at 26 (requesting costs and fees associated with DE 73 (the MPO Astrobryxa lost)). And, worst of all, it seeks to prevent foreign officials from discussing public case filings in a case that is the subject of daily media coverage in Ecuador.

The relief Astrobryxa seeks is as meritless as the "misconduct" alleged—that "misconduct" being standard discovery conduct, the embarrassing disclosure of an

[2] This memorandum analyzed how the Defendants embezzled the money they received from CELEC and discussed that the Defendants have dissipated their ill-gotten gains, with few assets remaining.

attorney-client and work product protected communication for which CELEC has already publicly acknowledged and taken accountability for [*see* DE 147], and standard communications between the government and the people it represents and is publicly accountable to. There is no precedent for a motion for sanctions being used as a vehicle to silence an opposing party (in this case, a foreign sovereign), including its ability to speak with witnesses and to discuss public information with the media.

For these reasons and the reasons that follow, the Motion should be ***denied***.

## FACTS AND PROCEDURAL HISTORY

The following litigation timeline places Astrobryxa's Motion in its proper context—as a litigation tactic designed to obscure mounting evidence of fraud and delay Astrobryxa's own discovery obligations rather than address any genuine misconduct by CELEC:

- **November 2025**: CELEC filed its initial Complaint [DE 1], alleging that Defendants perpetrated a nearly $110 million fraud against the Ecuadorian government in connection with the 2024 Ecuadorian energy crisis.
- **Late 2025**: Manrique was deported from the United States. *See* DE 47-1.
- **January 9, 2026**: Astrobryxa filed a Motion to Dismiss [DE 24], which the Court summarily denied and ordered Astrobryxa to answer the Complaint [DE 48].
- **February 13, 2026**: CELEC served its First Set of Requests for Production and First Set of Interrogatories on Astrobryxa. More than six months later, Astrobryxa has still not substantially completed its production in response to those requests.
- **February 26, 2026**: Astrobryxa answered the Complaint, bringing no counterclaims whatsoever against CELEC [DE 61].
- **March 16, 2026**: Astrobryxa requested a two-week extension to respond to CELEC's discovery requests, to which CELEC agreed.
- **March 30, 2026**: On its extended discovery deadline, Astrobryxa sought another thirty-day extension to respond. CELEC agreed to a one-week extension.

- **April 8, 2026**: On its second extended discovery deadline—after two agreed-to extensions from CELEC—Astrobryxa filed a frivolous motion to halt all discovery against it [DE 73], based on a forthcoming, equally-frivolous motion to compel arbitration under contracts it is not a party to. Astrobryxa refused to produce discovery. Astrobryxa's motion is eventually denied [DEs 111, 115], but discovery is delayed for 1.5 months pending the Court's rulings.

- **April 17, 2026**: Astrobryxa filed a frivolous motion to compel arbitration [DE 78] under contracts to which it is not a party, which the Court denied in May [DE 115].

- **May 28, 2026**: CELEC's counsel contacted Astrobryxa's counsel, requesting Astrobryxa's discovery responses. Astrobryxa responded a day later, refusing to produce any discovery responses until a joint confidentiality agreement is in place. It took the parties two weeks to negotiate a joint confidentiality agreement, during which time Astrobryxa still produced no discovery.

- **June 2, 2026**: CELEC filed its Amended Complaint [DE 128], detailing Defendants' fraudulent scheme, including allegations that Astrobryxa functioned as a sham subcontractor, that it received nearly $20 million from Progen for no legitimate services, and that its principal Saud is related to Fabian Calero, CELEC's General Manager at the time the Quevedo and Salitral Contracts were awarded.

- **June 12, 2026**: CELEC, Astrobryxa, and Progen Defendants moved for the entry of an agreed-to confidentiality agreement [DE 135], which the Court granted [DE 128].

- **June 16, 2026**: Astrobryxa filed its Answer, Affirmative Defenses, and Counterclaims [DE 140], asserting meritless counterclaims against CELEC. Astrobryxa filed an Amended Answer and Counterclaims on July 7, 2026 [DE 154]. The same day, counsel for CELEC requested that Astrobryxa provide an update of when Astrobryxa would provide its discovery responses given the repeated delays and the Court's approval of the parties' confidentiality agreement. Counsel for Astrobryxa confirmed the same day that the discovery responses would be served the next day (June 17th)—which they weren't.

- **June 17, 2026**: A member of CELEC's Board of Directors—a senior Ecuadorian government official publicly accountable to the Ecuadorian people—disclosed on X an attorney-client memorandum prepared by CELEC's outside counsel without the approval or knowledge of undersigned counsel. CELEC immediately informed all counsel of record of the incident that same day. CELEC also promptly brought the disclosure to the Court's attention. *See* DE 147. Whereas Progen responded to CELEC's email, requesting additional information and requesting CELEC produce the memorandum (which it did, *see* DE 157), Astrobryxa was silent. Astrobryxa's

silence speaks volumes given that Astrobryxa waited nearly two months before seeking sanctions based on the very same conduct that it did not even bother to address when CELEC notified all counsel of the disclosure by email.

- **June 22, 2026**: Astrobryxa finally served its Responses and Objections to CELEC's First Set of Requests for Production and First Set of Interrogatories, largely objecting to or deferring responses, thereby providing nothing of substance in response to CELEC's February requests.

- **July 1, 2026**: Astrobryxa made its first production of documents in response to CELEC's February discovery requests, producing a mere 76 pages of documents, nearly all of which are carelessly (and improperly) designated as "Confidential" under the confidentiality agreement.

- **July 17, 2026**: CELEC requested to take the in-person depositions of Astrobryxa's principals, Saud and Manrique. Thirteen days later, Astrobryxa confirmed the date, time, and place for these depositions.

- **July 24, 2026**: CELEC deposed Defendant Wade Manning. That deposition produced damning admissions confirming the fraudulent nature of Defendants' conduct. *See* DE 167 at 5–6 (discussing admissions).

- **July 21, 2026**: Astrobryxa made a second production of documents in response to CELEC's February discovery requests, producing ~500 pages of documents, nearly all of which it carelessly (and improperly) designated as "Confidential."

- **July 30, 2026**: CELEC noticed the videotaped depositions of Saud and Manrique, scheduled for August 25 and 28, 2026, respectively, in Madrid, Spain—where both individuals currently reside.

- **August 6, 2026**: Astrobryxa made its third production of documents in response to CELEC's February discovery requests, most of which is irrelevant or was already in CELEC's possession, and again improperly designates several documents as "Confidential." CELEC still awaits additional document production.

- **August 11, 2026**: Astrobryxa filed the present Motion for Sanctions [DE 176]—notably, while its discovery responses remain incomplete and while its principals are residing abroad, one as a fugitive from Ecuadorian justice.

- **August 18, 2026**: CELEC deposed Defendant John Manning. That deposition produced damning admissions confirming the fraudulent nature of Defendants' conduct. Among other things, John Manning testified that Astrobryxa's principals

falsified documents and forged the signatures of Progen's shareholders—direct evidence corroborating CELEC's core fraud and RICO allegations. Immediately following the deposition, Astrobryxa carelessly designated ***all*** testimony involving Astrobryxa as "Confidential," in an attempt to prevent CELEC from being able to attach that transcript to this Response.[3] This is a repeated pattern of conduct for Astrobryxa: to designate non-confidential materials as "Confidential" to stall their filing on the public docket, despite Astrobryxa's knowing inability to satisfy this Court's stringent burden for actual sealing.

- **August 20, 2026**: CELEC filed Amended Notices of Deposition for both Saud and Manrique, rescheduling their depositions to September 17 and 18, 2026, respectively, in Madrid, Spain, remotely, following Astrobryxa's refusal to produce these deponents on the previously-agreed-upon dates of August 25 and 28, 2026. This was as a result of numerous accommodations that Astrobryxa's counsel demanded and was also based on the supposed unavailability of Spanish counsel.

In short, while CELEC has been diligently prosecuting its claims and uncovering mounting evidence of fraud, Astrobryxa has done nothing but delay, obstruct, and file meritless motions—and its Motion for Sanctions is simply the latest entry in that pattern.

## ARGUMENT

Astrobryxa purports to seek sanctions against CELEC "pursuant to Fed. R. Civ. P. 16(f), 37(b), and 41(b)," DE 176 at 1, as well as pursuant to this Court's "inherent authority to assess sanctions," *id.* But Astrobryxa cannot satisfy the standards of any of these sanctions mechanisms.

***Rule 16(f).*** Rule 16(f) permits sanctions against those who fail to comply with a "scheduling or other pretrial order." Rule 16(f) sanctions are "designed to punish lawyers

[3] Upon Astrobryxa's "Confidential" designation, CELEC immediately gave notice that it intended to file the transcript of John Manning, thereby triggering Astrobryxa's ten-day deadline to move to seal the transcript. *See* D.E. 135-1 (Confidentiality Agreement). Astrobryxa requested to extend the deadline until August 31, 2026, and CELEC agreed. That deadline has now passed, and Astrobryxa has not filed a motion to seal the transcript or any exhibits using during the deposition. Accordingly, CELEC may file it and treat it as if it had not been designated as "Confidential."

and parties for conduct which *unreasonably* delays or otherwise interferes with the expeditious management of trial preparation." *Goforth v. Owens,* 766 F.2d 1533, 1535 (11th Cir. 1985) (emphasis added). Here, the only "order" Astrobryxa identifies is the parties' agreed-to Rule 26 confidentiality agreement [DE 135-1]. *See* Motion at 21–23. Whether such an agreement qualifies as an "order" for purposes of Rule 16(f) remains unsettled in this Circuit, and Astrobryxa relies on only one non-binding district court decision applying Rule 16 in this context. *See* Motion at 21 (citing *Fontainebleau*); *Fontainebleau Fla. Hotel, LLC v. Jacob*, 2026 WL 548040, at *4 (S.D. Fla. Feb. 27, 2026) ("[N]either the Eleventh Circuit nor any court in this District has expressly held that Rule 16(f) authorizes sanctions for violations of a Rule 26(c) stipulated protective order . . . . The question therefore remains an open one in this Circuit."). CELEC submits that this Court should follow the reasoning of *Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1323 (11th Cir. 2001), where the Eleventh Circuit held that Rule 37 sanctions are unavailable for violations of a confidentiality agreement, to decline to impose sanctions under Rule 16 here.

***Rule 37(b).*** Rule 37(b) permits sanctions for failure to obey a court's *discovery* order. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993) (the "rule gives district judges broad discretion to fashion appropriate sanctions for violation of *discovery* orders" (emphasis added)). Accordingly, Rule 37(b) is inapplicable to Astrobryxa's Motion, which does not identify any discovery order CELEC has violated. Rather, the only "order" identified is the parties' Rule 26 confidentiality agreement [DE 135-1], which does <u>not</u> qualify as a "discovery order" for purposes of Rule 37(b). *See Lipscher*, 266 F.3d at 1323

(holding "a Rule 26(c) protective order is not 'an order to provide or permit discovery,'" and that "such orders do not fall within the scope of Rule 37(b)(2)").

***Rule 41(b).*** Rule 41(b) generally permits a Court to dismiss an action on the merits if a plaintiff "fails to prosecute or to comply with [the] rules [of civil procedure] or a court order"—"a sanction of last resort, applicable only in extreme circumstances." *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985). As a "sanction of last resort," it is certainly inapplicable to a minor violation of a voluntarily-agreed-to confidentiality agreement—especially given the "the legal standard to be applied under Rule 41(b) is whether there is a clear record of delay or willful contempt and a finding that lesser sanctions would not suffice." *Id.* No "misconduct" alleged in the Motion rises to this level of "willful contempt," *id.*—indeed, the word "willful" does not at all appear in Astrobryxa's Motion (except once in its discussion of Rule 16(f)).

***Inherent Authority.*** Lastly, this Court has the "inherent power" to impose sanctions beyond the mechanisms set forth in the Federal Rules of Civil Procedure, and that power extends to a broad range of "litigation abuses." *Peer v. Lewis*, 606 F.3d 1306, 1315–16 (11th Cir. 2010) (internal quotation marks omitted). The Court's inherent authority is arguably the *only* sanctions mechanism Astrobryxa can meaningfully invoke given the inapplicability of Rules 16(f), 37(b), and 41(b). Even so, "a district court's broad discretion to impose sanctions . . . is subject to the *most fundamental safeguard of fairness*," *Yaffa v. Weidner*, 717 Fed. App. 878, 883 (11th Cir. 2017) (internal quotation marks omitted and emphases added), and requires "a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998);

*see Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) (same). To obtain sanctions under the Court's inherent authority, Astrobryxa must show that CELEC or its counsel acted in bad faith by pursuing objectively untenable factual or legal positions. *See Am. Tech. Inc. v. Velocity Micro, Inc.*, 2011 WL 7498935, at *6 (M.D. Fla. Oct. 28, 2011), *adopted sub nom.* 2012 WL 859345 (M.D. Fla. Mar. 14, 2012). That is a high bar, and Astrobryxa cannot clear it merely by repeatedly asserting, in conclusory fashion, that CELEC and its counsel acted in "bad faith." Motion at 2, 8.

## I. None of the four "wrongful" actions identified by Astrobryxa are actually wrongful or sanctionable.

Astrobryxa's Motion identifies four categories of alleged misconduct as the basis for its request for sanctions. None of them, individually or collectively, comes close to meeting the very high burden required for sanctions under any of the mechanisms Astrobryxa invokes. Each is addressed in turn below.

***First***, Astrobryxa seeks sanctions against CELEC because CELEC's counsel sent an email to *unrepresented* individuals that Astrobryxa itself identified in its Rule 26(a)(1) initial disclosures—disclosures that Astrobryxa *never* designated as confidential—as persons with knowledge of relevant facts. *See* Motion at 2–6, 18–21. There is no legal support for this position—and Astrobryxa cites none. Contacting unrepresented witnesses identified in an opponent's initial disclosures is not just permissible—it is routine discovery practice, not "witness tampering" under 18 U.S.C. § 1512(b) (a criminal statute inapplicable to the case at hand), *see* Motion at 20. Indeed, this Court has already rejected, implicitly but clearly, Astrobryxa's effort to weaponize this single email. Astrobryxa raised the email in its motion

to halt discovery [DE 73], which this Court did not entertain during the hearing on the same [DE 110]—and which the Court ultimately denied [DEs 111, 115]. Astrobryxa raised the email again in support of its motion to compel arbitration [DE 78], which the Court also denied [DE 115]. Astrobryxa has now elevated the same email into three purportedly separate counterclaims against CELEC [DE 154]—counterclaims CELEC is actively seeking to dismiss [DE 162]. This Motion is just the latest iteration of Astrobryxa's efforts to use a routine litigation communication as a sword against CELEC to divert attention from its own discovery failures and the mounting evidence of fraud against it.

CELEC does not seek to minimize the allegations that Astrobryxa and its principals have faced public criticism since litigation commenced. But Astrobryxa's repeated effort to lay responsibility for every adverse consequence of its own conduct at CELEC's feet—and to do so based on a *single* email sent in the ordinary course of discovery—is unsupported by fact or law. The Motion's central factual narrative is that disseminating Astrobryxa's initial disclosures "foreseeabl[y]" led to death threats against shareholders and their children. Motion at 4–6. But that's extreme. For contacting witnesses identified by an opposing party in its initial disclosures is not misconduct. It is not a discovery violation. It is not a violation of any order. And it certainly does not warrant sanctions under this Court's inherent authority given Astrobryxa cannot demonstrated CELEC acted in "bad faith" under the plain text of the email—which is all Astrobryxa has to support its imaginative legal theory. The fact remains that Astrobryxa's principals are receiving threats because of their own fraudulent conduct—conduct supported by direct and unequivocal testimony and evidence which Astrobryxa conveniently and inappropriately designates as "Confidential."

***Second***, Astrobryxa seeks sanctions against CELEC for alleging in the Amended Complaint that Astrobryxa principal Saud is related to Fabian Calero, CELEC's General Manager at the time the Quevedo and Salitral Contracts were awarded. *See* Motion at 8–10, 12–14. But pleading a factual allegation made in good faith, based on publicly reported information, is not sanctionable conduct. For CELEC's allegation *was* made in good faith, based on reporting in the Ecuadorian media in late 2024 and early 2025, and it is consistent with information Progen itself has confirmed. *See* DE 100 at 6 (Progen's Response to Astrobryxa's Motion to Compel Arbitration) (discussing Saud's family relationships).

Saud is now a fugitive from Ecuadorian justice, wanted in connection with the very fraud at the center of this litigation. The fact that an alleged family relationship between Saud and a corrupt former CELEC official is embarrassing to Astrobryxa does not transform a good-faith allegation into sanctionable conduct, even should the allegation later be found untrue. Pleading allegations "upon information and belief" based on publicly available reporting is permitted under the Federal Rules and does not constitute bad faith. *See* Rule 11(b)(3) (requiring only that allegations "have evidentiary support" or "likely have evidentiary support after a reasonable opportunity for further investigation or discovery"). Indeed, discovery itself is designed to help define and clarify the issues raised in pleadings. *Coursen v. JP Morgan Chase & Co.*, 2012 WL 12905598, at *3 (M.D. Fla. Aug. 9, 2012) (denying motion to dismiss because plaintiff "must be afforded the opportunity to prove . . . allegations through . . . discovery").

Critically, Astrobryxa's counsel requested that CELEC remove this allegation by email on May 19, 2026, *see* Motion at Ex. M—before Astrobryxa had served a *single*

discovery response to CELEC's discovery requests (which did not occur until over a month later, on June 22, 2026). Thus, at the time, CELEC had received no discovery from Astrobryxa whatsoever to support its self-serving assertions that Saud was not related to Fabian. Accordingly, CELEC was under no obligation to withdraw a good-faith allegation supported by public reporting simply because Astrobryxa requested it do so. Rather than accept Astrobryxa's self-serving denial, CELEC appropriately sought to retain the good-faith allegation and pursue its ultimate veracity through discovery, including by noticing the deposition of Saud herself—a deposition Astrobryxa has stalled for months, and which is now rescheduled to September 18, 2026. CELEC intends to explore Saud's familial, social, and economic relationships with former CELEC officials at that deposition.[4]

In sum, a good-faith allegation supported by public reporting, made in a pleading filed in active litigation, and subject to ongoing discovery, is the opposite of sanctionable conduct. Astrobryxa's sanctions request on this basis should be denied for it *cannot* demonstrate "bad faith" sufficient to trigger this Court's inherent authority to sanction.

***Third***, Astrobryxa seeks sanctions based on the disclosure of an attorney-client memorandum on X by a member of CELEC's Board of Directors on June 17, 2026. *See* Motion at 6–7, 8, 14, 21–24. CELEC has already taken full and prompt accountability for this disclosure. *See* DE 147. As discussed during the most recent hearing before Judge Flynn [DE 185], this disclosure was *embarrassing* to the undersigned counsel. CELEC's counsel immediately notified all counsel of record by email the same day it learned of the disclosure.

[4] CELEC does not understand why Astrobryxa is so fixated on this single allegation because even if Saud is not related to Fabian, it does not affect Astrobryxa's liability here.

CELEC instructed the official to remove the content, which was done promptly. CELEC's counsel brought the matter to the Court's attention [DE 147]. CELEC also produced the memo to all parties. These are the actions of a party acting in *good* faith—not a party acting with the "bad faith" required for this Court to exercise its inherent power to sanction. CELEC's prompt, voluntary remediation is affirmatively inconsistent with the intentional bad-faith conduct the standard demands.

Further, and critically, Astrobryxa's conclusory assertion that the memorandum contained "highly sensitive and confidential financial information relating to Astrobryxa" is vastly overstated. The vast majority of the information contained in the memorandum was not designated as Confidential and had *already* been publicly filed on the docket. *See, e.g.*, DE 70-3 (Regions Bank records). CELEC attaches as Exhibit B to this Response a highlighted version of the memorandum demonstrating exactly what information, if any, was designated as Confidential subject to the Protective Order. *See* Exhibit E (attached) (highlighted memorandum, as filed by Astrobryxa). As that exhibit demonstrates, the very limited information highlighted in the memorandum is the only information that was ever designated as Confidential and/or not already publicly filed in this case. The highlights relating to Astrobryxa consists of a handful of financial figures that are, in any event, not confidential at all, *see Presley v. United States*, 895 F.3d 1284, 1291–93 (11th Cir. 2018) (holding that financial records held by banks are simply registries of financial transactions and do not constitute "confidential communications"); *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001) (per curiam) (burden on "party seeking protection" to demonstrate documents designated as "confidential" are

actually so),[5] and have not led to any particularized harm to Astrobryxa, *McArdle v. City of Ocala, FL*, 463 F. Supp. 3d 1288, 1289–90 (M.D. Fla. 2020) (finding party "failed to meet its burden" to show information "is truly confidential and that specific harm would result from its disclosure"); *Wyndham Hotels & Resorts, LLC v. Leisure Getaways, Inc.*, 2017 WL 10059023, at *3 (M.D. Fla. Oct. 25, 2017) ("Generalized concerns, conclusory statements, or unsupported contentions are insufficient reasons for entry of a protective order. . . .[T]he Court will only issue a protective order on the basis of confidentiality when the moving party demonstrates, through affidavit or other evidence, that each responsive document that is withheld is truly confidential and a specific harm would result from its disclosure or loss of confidentiality."). Astrobryxa cannot come close to meeting its burden of demonstrating that any information prejudicial to it was disclosed or that acted CELEC acted in "bad faith" by disclosing it.

Moreover, Astrobryxa's silence upon receiving CELEC's June 17, 2026, email notifying all counsel of the disclosure speaks for itself. Whereas Progen's counsel responded promptly, requesting additional information and ultimately moving to compel production of the memorandum (which CELEC produced, *see* DE 157), Astrobryxa said nothing. Astrobryxa's decision to stay silent at the time—only to later seize upon the disclosure as a basis for this sanctions motion—is itself indicative of the opportunistic, rather than genuine,

---

[5] The only truly confidential information contained in the memorandum is the full account number for *Progen's* bank account at Regions Bank. Progen has not taken issue with the disclosure of the account number—undoubtedly because the account was drained and has a balance of $0.

nature of this Motion, especially given Astrobryxa identifies no specific harm that resulted from the memorandum's disclosure. If any party has acted in "bad faith," it is Astrobryxa.

***Fourth***, and finally, Astrobryxa asks this Court to sanction CELEC because a member of its Board of Directors discussed publicly available court filings with the Ecuadorian media. *See* Motion at 6–7, 8, 11, 14, 21–24. This request is as extraordinary as it is unsupported. Astrobryxa cites no authority—because none exists—for the proposition that a foreign government official can be sanctioned for discussing the public filings of a high-profile case with journalists who are already covering it.

This litigation concerns one of the largest frauds ever perpetrated against an Ecuadorian government entity—a fraud committed during a declared national energy emergency that imposed daily blackouts on the Ecuadorian population. The case is the subject of near-daily media coverage across multiple Ecuadorian outlets. CELEC, as an arm of the Ecuadorian state, is accountable to the Ecuadorian government and to the Ecuadorian people. Its officials have not only the right but the obligation to communicate with the public about matters of public significance. That a government official discussed publicly available court filings—documents that anyone with PACER access can read—with journalists covering the case is entirely unremarkable. It is also commonplace. Astrobryxa falls far short of demonstrating "bad faith."

What Astrobryxa *actually* seeks through this Motion is a gag order on the Ecuadorian government—a sweeping prior restraint on the ability of a foreign sovereign to communicate with its own people about a matter of profound public importance and which already on the public docket. *See* Motion at 25–26 (relief requested). Courts have

consistently recognized the heavy presumption against prior restraints on speech. There is no legal basis for such an order; the Court should decline to issue one here.

To be clear, CELEC acknowledges that it made a mistake in posting the attorney-client memorandum on X, and CELEC has taken accountability for that. *See* DE 147. But that discrete incident—which CELEC addressed immediately and from which no party has alleged or shown any resulting harm—is categorically different from a government official exercising his ordinary and appropriate responsibility to communicate with the public about a matter of immense public concern using publicly-available information. The former was an isolated error that CELEC corrected; the latter is protected conduct that cannot be the subject of sanctions. Such conduct does not meet the "bad-faith" standard necessary for this Court to sanction pursuant to its inherent powers. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) ("[T]he inherent-powers standard is a subjective bad-faith standard.").

## II. The "sanctions" Astrobryxa seeks lack legal support and are not proportional to the alleged "misconduct."

Even setting aside the absence of any sanctionable conduct, the specific relief Astrobryxa seeks is itself unsupported by law and wildly disproportionate to CELEC's alleged "misconduct."

In the Motion, Astrobryxa essentially requests that this Court, among other things: restrict counsel's ability to contact unrepresented witnesses; institute a gag order on CELEC preventing it from publicly discussing the case; and award fees and costs associated with

the present Motion ***as well as*** Astrobryxa's own previously-denied Motion for Protective Order [DE 73].

It is well-settled that sanctions must be tailored to the conduct at issue and may not exceed what is necessary to address the harm caused. *See Sec'y of Lab. v. Caring First, Inc.*, 2017 WL 4764350, at *4 (M.D. Fla. Oct. 20, 2017) ("[S]anctions should be tailored specifically to address the prejudice caused by the misconduct."); *Purchasing Power*, 851 F.3d at 1223 (explaining the court's inherent "power" to sanction "must be exercised with restraint and discretion" and "used to fashion an appropriate sanction for conduct which abuses the judicial process").

Here, the sanctions sought by Astrobryxa are not tailored to any legitimate harm—they simply seek to advantage Astrobryxa in the litigation. That is not a legitimate purpose of sanctions. *In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 664 (M.D. Fla. 2007) ("[S]anctions should be a last resort,. . . and may be imposed for general or specific deterrence, to punish, or to remedy the consequences of misconduct." (modified)). Astrobryxa's requested restrictions on media communications are legally unsupported and constitutionally untenable. They amount to a gag order on the political speech of a foreign sovereign. Prior restraints are presumptively invalid and represent "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976) (internal quotation marks omitted); *see also United States v. Trump*, 88 F.4th 990, 1019 (D.C. Cir. 2023) (vacating in part a gag order that was not narrowly tailored to preserve protected speech).

Further, Astrobryxa's request for an award of fees and costs associated with its previous Motion for Protective Order [DE 73] that this Court denied months ago [DEs 111, 115] fails on its face. Sanctions, whether awarded under Rule 37, Rule 16, *or* the Court's inherent authority, must be causally connected to (and limited to the costs incurred as a result of) the specific sanctionable conduct at issue. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 103–04 (2017); *see also* Fed. R. Civ. P. 37(b)(2)(C) (limiting fee awards to expenses "caused by the failure" to comply with a court order). Astrobryxa does not—and cannot—explain how any alleged "misconduct" by CELEC caused it to incur fees in connection with its failed protective order motion that Astrobryxa filed *months ago*, *before* the memorandum was posted on X. Awarding Astrobryxa its fees for that motion would not be a sanction tailored to any misconduct by CELEC—it would be a generous reimbursement of Astrobryxa's prior failed attempt to halt discovery.

**Conclusion**

The Motion is a transparent attempt to divert this Court's attention from the mounting evidence of fraud that discovery continues to uncover, to stall CELEC's ability to prosecute its claims, and to impose a gag order on a foreign sovereign engaged in litigation of profound public importance. None of the four actions identified by Astrobryxa as "misconduct" is sanctionable under any legal standard. None of the relief Astrobryxa seeks is supported by law or proportionate to the alleged misconduct. The Motion should be denied, or, at minimum, lesser sanctions must be considered.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 1, 2026, I electronically served **Plaintiff's Response in Opposition to Defendant Astrobryxa, S.A.'s Motion for Sanctions [DE 176]** on all counsel of record.

By: */s/ Meredith P. Yates*
Courtney M. Keller, Esquire
Florida Bar No. 28668
Meredith P. Yates, Esquire
Florida Bar No. 1058373

**GREENBERG TRAURIG, P.A.**
450 South Orange Avenue, Suite 650
Orlando, Florida 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Email: kellerc@gtlaw.com
Meredith.yates@gtlaw.com
Nef-iws@gtlaw.com
ORLLitDock@gtlaw.com

Daniel Pulecio-Boek, Esquire
(admitted *pro hac vice*)
Michael Pusateri, Esquire
(admitted *pro hac vice*)

**GREENBERG TRAURIG, P.A.**
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone: (202) 331-3117
Email: pulecioboekd@gtlaw.com
pusaterim@gtlaw.com

*Counsel for Plaintiff*

**Platform:** WhatsApp **Timezone:** UTC+0000

18184287788@s.whatsapp.net Karla Saud
18184287788@s.whatsapp.net

18634506795@s.whatsapp.net John Manning (Owner)
18634506795@s.whatsapp.net

System Message

2024/07/05

18634506795@s.whatsapp.net John Manning (Owner)

Good morning sister Karla.
01:44:55 pm

18184287788@s.whatsapp.net Karla Saud

Buenos días John
01:51:29 pm

I'm in Quito now
01:51:41 pm

18634506795@s.whatsapp.net John Manning (Owner)

Good know your safely there.

Can you please help explain to me what the contact budget amount manly $49.7 million.

It's been worrying me all night and morning. 😊
01:53:03 pm

🙏
02:02:53 pm

**Exhibit "A"**

Sorry for the darned typos.

¿Pueden ayudarme a explicarme por qué el monto del presupuesto del contrato es de solo $49,7 millones de Cuevedo?

02:05:17 pm

18184287788@s.whatsapp.net Karla Saud

Yes that is only Quevedo

02:14:16 pm

Remember are 3 separate contracts

02:14:33 pm

Today coming Salitral

02:14:51 pm

Certificate Progen

Sent an attachment
Title: Certificate Progen.pdf
Size: 163 KB
Type: application/pdf

02:20:00 pm

18634506795@s.whatsapp.net John Manning (Owner)

But Quevedo alone is 100 Megawatts.
Ok so Quebido is only a 50 megawatt site.

02:20:14 pm

System Message

Karla Saud (18184287788@s.whatsapp.net) started a call.
status: Answered
type: audio call
duration: 00:07:10
2 joined:
Karla Saud (18184287788@s.whatsapp.net)
(owner)
02:20:38 pm

John Manning (18634506795@s.whatsapp.net owner) started a call.
status: Answered
type: audio call
duration: 00:00:28
2 joined:
John Manning (18634506795@s.whatsapp.net owner)
Karla Saud (18184287788@s.whatsapp.net)
02:55:30 pm

18634506795@s.whatsapp.net John Manning (Owner)

Odio el empujón de Karla, pero no estamos en la ciudad y tendremos que viajar mucho para imprimirlo, certificarlo ante notario y luego enviarlo hoy.

¿Debería usar el que tengo y limpiarlo? No estoy seguro de qué cambiar.
03:38:27 pm

18184287788@s.whatsapp.net Karla Saud

Sorry they are working on it because they are full with ERSSA TOO
04:07:45 pm

almost done
04:07:50 pm

18634506795@s.whatsapp.net John Manning (Owner)

Ok thanks
04:08:20 pm

18184287788@s.whatsapp.net Karla Saud

Sent an attachment
Title: Progen's certificate Quevedo.pdf
Size: 161 KB
Type: application/pdf
04:25:36 pm

Sent an attachment
Title: Progen's certificate Santa Elena.pdf
Size: 161 KB
Type: application/pdf
04:25:36 pm

Certificate Progen

Sent an attachment
Title: Certificate Progen.pdf
Size: 163 KB
Type: application/pdf
04:25:44 pm

18634506795@s.whatsapp.net John Manning (Owner)

Karla's the Quevedo letter will land us in Jail. The other ones are ok.
The (20) generator sets are newly packaged new units with zero hour Remanufactured engines in them with a new sun assembly components.

We can assembled with zero hour engines

I don't know what of do here.

We at committing fraud if we say new engines

What do you have to say about it?
04:33:52 pm

Or just say newly assembled units.

Or new packaged units
04:44:44 pm

The units for Quevedo are all newly packaged and assembled generator sets
04:49:32 pm

Also Karla, what is the 40 yewr warranty about ???
05:22:02 pm

System Message

Karla Saud (18184287788@s.whatsapp.net) started a call.
status: Answered
type: audio call
duration: 00:01:01
2 joined:
Karla Saud (18184287788@s.whatsapp.net)
(owner)
07:20:37 pm

18634506795@s.whatsapp.net John Manning (Owner)

Hey Karla I will send you a good copy of this afternoon.
07:40:56 pm

The apostille can all be by done digitally rhis weekend
07:41:24 pm

18184287788@s.whatsapp.net Karla Saud

Ok perfect
07:56:17 pm

Hi Skohm
11:25:27 pm

Hi John
11:25:37 pm

18634506795@s.whatsapp.net John Manning (Owner)

He there
11:25:59 pm

Hey there
11:26:14 pm

18184287788@s.whatsapp.net Karla Saud

Can we have a zoom meeting tomorrow to discuss all the projects?
11:26:28 pm

All th update
11:26:33 pm

18634506795@s.whatsapp.net John Manning (Owner)

Yes
11:26:43 pm

Just tell me what time
11:26:50 pm

18184287788@s.whatsapp.net Karla Saud

You tell me the time best works for you in the morning
11:27:25 pm

So I can have the secretary set up the link
11:27:50 pm

18634506795@s.whatsapp.net John Manning (Owner)

I'm free all day.
11:27:54 pm

Set it up
11:27:59 pm

18184287788@s.whatsapp.net Karla Saud

10 am Ecuador time
11:28:49 pm

18634506795@s.whatsapp.net John Manning (Owner)

Perfect

11:29:07 pm

18184287788@s.whatsapp.net Karla Saud

Oki

11:29:11 pm

José will be in the meeting too

11:29:24 pm

18634506795@s.whatsapp.net John Manning (Owner)

✅

11:29:24 pm

2024/07/06

18634506795@s.whatsapp.net John Manning (Owner)

Ok

12:38:49 am

✓ Delivered

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

---

CELEC EP,
Plaintiff,
v. Case No. 8:25-CV-03433

PROGEN INDUSTRIES, LLC; GENERTEK POWER CORP.; GENERTEK POWER INDUSTRIES, LLC; JOHN B. MANNING; W. WADE MANNING; ANDREW S. WILLIAMSON; ASTROBRYXA, S.A.; ASTROBRYXA, LLC; A.P. INSPECTIONS LATINOAMERICA, S.A.; A.P. INSPECTIONS, LLC; H&S INDUSTRY, LLC; TWO LIONS HOLDINGS, LLC; AOT HOLDING AG; GESTORES INMOBILIARIOS LIGHTBLUE, S.A., and DOES 1-95,
Defendants.

---



**Exhibit "B"**

VIDEOTAPED DEPOSITION OF
JOHN B. MANNING

DATE: August 18, 2026
TIME: 10:14 a.m.
LOCATION: Greenberg Traurig, P.A.
101 East Kennedy Boulevard
Suite 1900
Tampa, Florida 33602
REPORTED BY: Tiffany Reed
JOB NO.: 8351460

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF CELEC EP:

DANIEL PULECIO-BOEK, ESQUIRE.
DANIELLA JOHNSON RESTREPO, ESQUIRE. (by videoconference)
Greenberg Traurig, P.A.
2101 L Street, Northwest, Suite 1000
Washington, D.C. 20037
pulecioboekd@gtlaw.com
daniela.johnsonrestrepo@gtlaw.com
(202) 331-3100

MEREDITH P. YATES, ESQUIRE.
Greenberg Traurig, P.A.
450 South Orange Avenue, Suite 650
Orlando, Florida 32801
meredith.yates@gtlaw.com
(407) 420-1000

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS PROGEN INDUSTRIES, LLC, GENERTEK POWER CORP., GENERTEK POWER INDUSTRIES, LLC, JOHN B. MANNING, W. WADE MANNING, ANDREW S. WILLIAMSON:

ADOLFO JIMENEZ, ESQUIRE.
GABRIELLA LANZAS, ESQUIRE. (by videoconference)
WILLIAM A. SAN PEDRO, ESQUIRE. (by videoconference)
Holland & Knight LLP
701 Brickall Avenue, Unit 3300
Miami, Florida 33131
adolfo.jimenez@hklaw.com
gabriella.lanzas@hklaw.com
William.sanpedro@hklaw.com
(305) 374-8500

ANN COLBERT, ESQ.
Holland & Knight LLP
100 North Tampa Street, #4100
Tampa, Florida 33602
anne.kelley#hklaw.com
(813) 227-8500

A P P E A R A N C E S (Cont'd)

On behalf of the Defendants, ASTROBRYXA, S.A., ASTROBRYXA, LLC:

ENRIQUE JARAMILLO, ESQUIRE. (by videoconference)
FBFK Law
3200 Southwest Freeway, Suite 3200
Houston, Texas 77027
ejaramillo@fbfk.law
(713) 403-4200

ALSO PRESENT:

Nick DeHaas, Videographer
Edwardo Lascano Holmes, CELEC EP Representative
(by videoconference)

# I N D E X

WITNESS: JOHN B. MANNING


| EXAMINATION | PAGE |
|---|---|
| By Mr. Pulecio-Boek | 8 |


# E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | - Jose's Service Provision Contract | 122 |
| Exhibit 2 | - Jose's Service Provision Contract | 212 |
| Exhibit 3 | - WhatsApp Messages 2024/07/05 | 284 |
| Exhibit 4 | - To Whom It May Concern | 312 |
| Exhibit 5 | - WhatsApp Messages 2024/07/11 | 332 |
| Exhibit 6 | - WhatsApp Messages 2024/07/15 | 344 |
| Exhibit 7 | - Discovery Silver Certificate of Service Order No. DS-0012-PR | 350 |
| Exhibit 8 | - WhatsApp Messages 2024/07/30 | 355 |
| Exhibit 9 | - Megawatt 13-03-18 | 360 |

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We're going on the record at approximately 10:16 a.m. on August 18th of 2026. This convenes the media unit number 1 to the video recorded deposition of John B. Manning, taken by counsel for the plaintiffs in the matter of CELEC EP v. ProGen Industries, LLC, et al., filed in the United States District Court for the Middle District of Florida, Tampa Division. Case number 8:25-cv-03433. This deposition is being held at the offices of Greenberg Traurig, located at 101 East Kennedy Boulevard in Tampa, Florida.

My name is Nick deHaas. I'm a videographer with Veritext, and your court reporter is Tiffany Reed, also with Veritext and Milestone Reporting, a Veritext company.

Appearances for Counsel have been previously noted on the stenographic record. At this time, will our court reporter please swear in our witness and we can proceed?

THE REPORTER: Can you please raise your right hand?

//

//

//

WHEREUPON,

JOHN B. MANNING,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.

You all may begin.

EXAMINATION

BY MR. PULECIO-BOEK:

Q Hi, Mr. Manning. Good morning.

A Good morning.

Q Mr. Manning, have you been deposed before?

A I have.

Q How many times?

A A couple times.

Q Approximately how many times?

A Two, maybe, as far as I know. Can't remember.

Q As far as you recall?

A Yes.

Q And when -- approximately when were those two depositions?

A One was about a month ago, and the other, I can't recall how many years ago it was.

Q And in what case was the one from a month

ago?
A In a lawsuit between ProGen and Hunt Energy.
Q Who is the plaintiff in that lawsuit?
A Hunt.
Q And the defendant is ProGen?
A It is.
Q And you personally?
A Huh?
Q And you personally?
A I don't think so, no.
Q And that lawsuit is pending here in Tampa?
A No. It's in Texas.
Q It's in Texas.
A Yeah.
Q And you were deposed in that case a month ago?
A I was.
Q Okay. And the previous deposition, do you have any idea when that was?
A I can't even recall what it was for --
Q Okay.
A -- at the moment, but I know I have.
Q Okay. So you're generally familiar with the rules of a deposition, yes?
A I am, yes.

Q You are aware that your brother, Wade Manning, was deposed a few weeks ago?
A I am.
Q Did you get a chance to speak to him about his deposition?
A No, I did not.
Q How do you know that he was deposed?
A I saw the video.
Q You saw the entire video --
A Yes.
Q -- deposition?
A Yeah. All -- all of it, yes.
Q And why did you review the entire video?
A This is important to our company.
Q Okay. In the Hunt litigation, have other ProGen officers, employees, owners been deposed?
A No.
Q Other than watching the video of your brother's deposition, did you do anything else? Did you review the documents that were submitted in that deposition as exhibits?
A The documents?
Q The documents that were used in that deposition as exhibits, did you review them?
A No. I've reviewed the documents that are

involved in the entire case.
Q Yeah. What do you mean?
A Documents that related to the case. The contract and emails, WhatsApp text, other things. I've reviewed some of it, yeah.
Q And when did you review them?
A On and off since the lawsuit began.
Q So since the lawsuit began in 2025, on and off, you've reviewed contracts, you've reviewed emails, and you've reviewed text messages?
A I don't recall what date the lawsuit started, but since it started in the last several months, I've reviewed them.
Q So at least over the past six months, you've reviewed, on and off, contracts, emails, text messages. Anything else?
A Not in their entirety.
Q Have you reviewed anything else other than contracts, text messages, and emails over the course of the past six months?
A Memory.
Q What do you mean?
A Memory, things you remember. Review what actually happened in this event or experience with CELEC and --

Q Yeah. Okay. So what you're saying is that the contracts, the emails, and the text messages that you've reviewed have made you recall what happened? They have refreshed your memory, yes?
A Yeah. It's -- details. More details.
Q Okay. What else have you reviewed in terms of documentation and evidence, other than contracts, evidence, and -- contracts, emails, and text messages?
A I don't know of anything else.
Q Okay. Did you get a chance to speak about Wade Manning's deposition with Andrew Williamson?
A A little bit. He reviewed it as well.
Q He also looked at the entire video?
A The entire video.
Q Okay. And what did you discuss with Andrew about Wade Manning's deposition?
A Just what was said.
Q Or what specific?
A What questions were asked, what things were said. A view of where the case is coming from, because we have a whole different perspective on that.
Q Who has a different perspective?
A All of us at ProGen.
Q Can you explain that? I don't think I understand.

A I can. Our perspective is is that CELEC irresponsibly and nefariously caused the contract to cancel and then tried to blame us on something that wasn't even the contract wasn't canceled for, after knowing exactly what we were delivering. That's our perspective on it. That's what we intend to prove.
Q I'm sorry. I understand ProGen has a different perspective from CELEC. I thought people within ProGen had that different perspective. Everyone in ProGen is on the same page?
A Everybody.
Q Got it. So give me specifics about what you discussed with Andrew about Wade Manning's deposition. What aspect of Wade Manning's deposition did you discuss with Andrew?
A Most of your comments about old and used generators.
Q Okay. And what -- I noticed that you're laughing and grinning. What is funny about that?
A Because it's not what we delivered. We never delivered anything, actually.
Q Yeah. Okay. But is that funny to you that you didn't deliver anything to the State of Ecuador after they paid you over $100 million? Is that funny to you?

A No.

MR. JIMENEZ: Objection as to form.

THE WITNESS: Yeah. It's funny to me that you're trying to over and over again call them old and used generators like that's what we delivered, and we didn't -- and we didn't deliver old and used generators. We actually didn't deliver the product -- finished product, because CELEC caused the contract to collect -- to cancel.

BY MR. PULECIO-BOEK:

Q Is it funny to you that you didn't deliver anything to the State of Ecuador after they paid you -- please let me finish my question. Is it funny to you that you didn't deliver anything to the State of Ecuador after they paid you over $100 million?

MR. JIMENEZ: Objection as to form.

BY MR. PULECIO-BOEK:

Q Is that funny to you?

A It's not -- it's not funny to me and it's not funny to me that you would characterize it that way because it's not true.

Q Well, the reason why I'm asking you if it's funny is because you're grinning. So I'm wondering if there's something --

A I'm -- yeah.

Q -- funny to you about that fact, since you are grinning on a video.

A Yeah, because it's your silly effort to keep saying old and used generators a hundred times.

Q Okay.

A That you made sure that you had to get it into every sentence. That was funny to me and Andrew because we know what your strategy is, is to call them old and used generators, and they're not. That's not what we delivered. We didn't deliver anything yet.

Q Okay.

A Because CELEC wouldn't let us. They defaulted on the contract.

Q So you think that delivering nothing to the State of Ecuador, despite you receiving over $100 million, is silly? That's what you -- that's silly?

A We shipped hundreds of --

MR. JIMENEZ: Objection as to form.

THE WITNESS: Yeah. We shipped millions of dollars of things to Ecuador. We didn't deliver anything because we weren't able -- we were prevented from completing.

BY MR. PULECIO-BOEK:

Q Okay.

A We shipped millions and millions of dollars

of equipment to Ecuador.
Q Okay.
A So your characterization is wrong.
Q So other than discussing with Andrew Williamson the expression --
A Yeah.
Q -- old and used during the deposition of Wade Manning, what else did you discuss with Andrew Williamson?
A Just the actual facts of the -- what happened.
Q Any specifics?
A Everything. It's involved in what you're going to continue to ask me about today and our counterclaims.
Q Did you discuss Wade Manning's deposition with anyone else?
A My wife. We watched it together.
Q Okay. What's the name of your wife?
A Jennifer.
Q Is that Jennifer Manning?
A It is, yes.
Q And what's her maiden name?
A O'Connell.
Q And when did you and your wife, Jennifer,

watch the entirety of Wade Manning's deposition?
A We watched it together for the first time.
Q When?
A Oh, probably a week afterwards.
Q Okay. Did you discuss the Wade Manning deposition with anyone else other than your wife, Jennifer Manning, and Andrew Williamson?
A My attorneys.
Q Oh. Other than your attorneys, with anyone else?
A No.
Q Okay. Did anyone else at ProGen review the Wade Manning deposition?
A No.
Q Your wife, Jennifer Manning, she's employed by ProGen?
A No. Never has been.
Q She's never received a salary from ProGen?
A Never.
Q She's never had an office at ProGen?
A Never.
Q Okay. And why did you watch the Wade Manning deposition with her?
A Because it's my brother and we wanted to see what my brother would say in the questions.

Q Okay. But your wife isn't a named party in the lawsuit, right?
A No.
Q And according to you, she doesn't work with ProGen?
A No.
Q Okay. And yet, despite that, you felt it was appropriate for her to watch the entire deposition --
A Well --
Q -- video of Wade Manning?
A We're kind of like what the Good Book says. You know, we've been married 42 years and we're basically one people, person --
Q Okay.
A -- so we share everything together.
Q Okay. And has she also reviewed contracts and emails --
A No.
Q -- and text messages that you have been reviewing over the past six months?
A Yeah, sorry to answer early. No.
Q But you have been discussing the case with her, yes?
A Oh, yeah. It's absorbed our whole life.

It's destroyed our life.
Q It has -- you said it has destroyed your life?
A Absolutely. It's disrupted our whole family and our whole life.
Q Okay. And is there anyone else within your family that you have been discussing the evidence of the case with and the Wade Manning deposition with other than your wife, Jennifer Manning?
A My son-in-law. Shane Lawlor, which you know he works there, so --
Q Anyone else?
A My daughter, Laura, a little bit, though, but she doesn't want to hear, so don't really say too much to her.
Q And Laura is married to Shane?
A She is, yeah.
Q And Shane is -- what is his role at the company?
A He's executive vice president of sales and marketing and has been since we almost started the company.
Q Did you go to college?
A Briefly. But my dad had a heart attack and I dropped out and tried to help him run the business

around 1979 and never went back.
Q What year did you go to college?
A '79 and '80.
Q And after '80, you left?
A I did, yeah.
Q And what was -- what were you studying?
A I was just doing the basics at that time.
Q And where was that?
A San Jacinto.
Q Sorry, what is it?
A San Jacinto College.
Q And after you dropped out in 1980, you started your professional career, so to speak?
A No. I kept working with my father. Well --
Q Right. You started working?
A I was working for him in the summers from the time I was 14. And then I worked for him after I graduated until he sold the company in 1981 to a group out of Germany called the Stinnis Corporation.
Q And what did you do after your father sold the company in 1981?
A I went to work for another gentleman, the largest EMD locomotive rebuilder in the world, who knew my father very well for many years, and moved my family to Illinois and completely rebuilt their EMD

remanufacturing shop and did that for several years.
Q Until what year approximately?
A Oh, gosh. I don't know. 1984, something like that, maybe.
Q Three years?
A Yeah.
Q And after that?
A I opened up a power generation division for them because they were only in the locomotive. I opened up a marine division for them in Houma, Louisiana, which is still there today. And then resigned from the company about a year after we got everything set up.
Q And when -- you're saying, "them." Who was the gentleman that owned that operation?
A Laurence Bill.
Q Laurence Bill? And what was the name of the company?
A National Railway.
Q National Railway?
A Yeah.
Q And you said that you set up for National Railway their marine?
A I did.
Q And what was the name of the marine

operation?
A NREC Power Systems. And I named it.
Q NREC?
A Power Systems.
Q And you said that you also set up for National Railway there?
A Yeah.
Q What other business?
A It was -- that was the same company, Power Generation and Marine Division. I opened that up.
Q Power Generation and Marine Division.
A Yeah. NREC Power Systems.
Q And then you said that you resigned?
A I did. Yeah.
Q When?
A I'm going to say that was probably around, I don't know, '87, '86, something like that. I'm just guessing now. I'm really -- I'm just guessing, so don't hold me to those dates.
Q And what did you do after you left Laurence's company?
A I was contacted by a gentleman in the Dominican Republic who wanted me -- I'd solved a whole bunch of problems for him, saved him, and wanted me to move to the Dominican Republic and package generator

sets because he was selling energy to the -- to the country CDE. I said, I won't move to the DR, but I would move to Miami or -- or Florida. And that's how I wound up in Florida, in Coral Springs, Pompano Beach area. And was there for -- until 1994 when I moved to Lakeland. We packaged massive numbers of generator sets and power plants for the DR, several hundred megawatts.

Q What was the name of the gentleman in the Dominican Republic that sought you out?

A Roberto Camino.

Q So Roberto Camino, in approximately 1987, give or take, sought you out for you to build power generators in the Dominican Republic for providing electricity to the Dominican Republic, correct?

A Yeah. Make them in Florida and then ship them to the Dominican Republic.

Q Okay.

A Yeah.

Q And what was the name of Mr. Camino's company?

A His power plant company or my -- our company that we had there together, because he gave me a 25 percent stake in that. Which one would you like the name of?

Q Both.
A Laesa is his company. And --
Q Can you spell that?
A L-A-E-S-A, I believe. Laesa. And then he owned a -- RG Engineering was actually the owner of -- you know, my partner in that. Not Laesa. It was his company of -- where he sold power to the government from. Ideeco was the name of the company in Pompano, I-D-E-E-C-O. But I resigned from that company.
Q Approximately when?
A Around '93, '2.
Q And what did you do after?
A I opened my own company, literally across the street and -- Florida Power and Energy Systems.
Q So that was the name of the company?
A Yeah.
Q Forward Power?
A Florida Power and Energy Systems.
Q Florida Power and Energy Systems. And why did you quit Mr. Camino's company?
A Because he came and asked me to file bankruptcy and we had no -- no reason to file bankruptcy. And we made millions. And I refused. I said, I'll tell you what I'll do. I'll help you wind down the company. I'll start my own. I'll pay the

vendors down because we owed about 750 grand. And I'll pay the vendors off and I'll help you wind this down. And he agreed. And then two weeks later, he sent his partner over there with some local police and kicked me out the building.

And so I hired an attorney and contested the bankruptcy. And thank God we had our accountant that went with me, and said that -- well, proved with all the banking records that we made a lot of money and there's no way we could file bankruptcy. And we petitioned for an -- a controller. And we got the examiner to look at all the records and he agreed. And he stood up in court and said, I recommend the immediate appointment of a trustee. And all four of Roberto's Camino's attorneys stood up and said, Mr. Camino offers to pay 100 percent. And they did. And I -- so we weren't friends after that. And I started my own company after that.

Q And were you deposed in connection with that matter?

A I don't remember. I -- I don't think so, but I don't remember.

Q And was this the first time that you were involved in litigation?

A Yes. I was very young. Yeah. I was in my

30s and it was.
Q But prior to that, in connection with the company of Laurence Bill and the other things you had done, had you ever been involved in litigation?
A No. No. We did a lot of business and never had any litigation against us.
Q So you quit Mr. Camino's firm. You got into some litigation with him, and then you opened a new company?
A Yeah.
Q It's approximately --
A Well -- yeah.
Q -- '94?
A Somewhere around there. '93, I think. Maybe '92, '93.
Q Okay.
A I'm not real sure. It's been a while, so -- and I hadn't even thought about that until now.
Q And that company was located in Pompano Beach, you said?
A It was. Yeah.
Q All right. And then you moved to Lakeland?
A Yes.
Q Okay. And you did that for personal reasons or professional reasons?

A I did it for professional reasons. And that's where I've been ever since.
Q But what was the professional reason?
A To start a company up there with a partner.
Q And what company was that?
A Genertek.
Q And who -- what -- who was the partner?
A Dae Shinn. He's the largest --
Q What --
A Sorry. I dropped my microphone. He's the largest minority-owned defense contractor in the United States. And he was a very substantial guy. So he offered to set me up in business. When I had tried to get funding for the company, and a group tried to do it, and Dae was one of the people interested. And they basically failed on their full funding raise. And -- and so they had to give all the money back. And then Dae called me and asked me would I move to Lakeland. He's got plenty of facilities here. He was building rich and cash poor coming off the -- the Clinton years. And I said, yeah, I'll do it. And so he gave me 15 percent of the company and said he would fund everything. And so we did. That's how we started.
Q So what happened to your Pompano Beach

company?
A We shut it down.
Q You shut that down because you or your partners were unable to raise capital for that company?
A Yeah. An outside group. A guy named Payne -- company Payne Financial. They couldn't do it, so --
Q Payne Financial --
A Yeah.
Q -- was your financial advisor?
A Yeah. Well, he was the group that was interested in wanting to fund what we had.
Q All right. When you say, "we," was it you and another partner or was this your company?
A It was me -- just me at that time. And --
Q So when the fundraising for that company fails, then you moved to Lakeland and you opened Genertek with --
A Uh-huh.
Q What's the name?
A Dae Shinn.
Q As a 50/50 venture?
A No. 15 percent owner was me. I own 15 percent.

Q One five?
A One five. Yeah.
Q And what's the name? Can you spell the name of the gentleman that you're --
A It's D-A-E S-H-I-N-N.
Q And he owned 85 percent of the company?
A Yes.
Q So you and him go to -- go in business together in around 1994 in Lakeland and you opened Genertek, yes?
A Yes.
Q Okay.
A '95.
Q '95. And you had met him in connection with the efforts to raise capital for your Pompano Beach --
A Yeah.
Q -- venture?
A Yeah. That's correct. Yes.
Q And what was the corporate name of Genertek?
A Genertek. That's it.
Q Well, was it Genertek, Inc. or Genertek, LLC?
A It was an LLC. Yeah.
Q That was the name Genertek, LLC?
A Yeah. I -- I -- yeah, named it. Yeah.

Q And what did Genertek do? What was its business?
A Built EMD generator sets, power plants. We packaged the gen sets. We developed the natural gas fuel injection systems and the heavy fuel fuel injection systems there and the high pressure common rail fuel injection systems there. Some of the first things ever done in the EMD business in the world and developed projects for those.
Q What does it mean to build an EMD generator set? What does that mean?
A Well, so you build the skids. You engineer the electronic and build the electronic engine generator controls and alarm systems. You do all that. We did all that in-house. We re-manufactured the engines or we assembled brand new engines there. We had partnered with GE. They were making the brand new EMD engine. And so we were packaging new gen sets and re-manufactured gen sets.
Q What is EMD?
A EMD is electromotive diesel. It was owned by General Motors. And then it was sold off in the -- I think, the 1990s, I'm thinking. To a group out of New York. And they held on it -- to it for probably another ten years or so, and then sold it off to

Caterpillar.

Q So when you say, "build EMD generators," you mean either assemble or re-manufacture generators then run on a specific type of engine, which is an engine manufactured by EMD?

A Well, you build the generator set -- assemble a generator set every time. What components you use on it depends on the order. So you can build an EMD engine up. Either it's new or re-manufactured. You build it up from the ground up. That means you're starting with a separate block and pan, and then you install the cranks, and you assemble the pan and block together. And then you install the power assemblies and you install the -- the front ends and rear ends and housings and you time the engine and -- and then you load test the engine or the whole gen set when you're done.

But you assemble that with either a brand new alternator or a re-manufactured or rebuilt alternator. And then you either sell it as a unit that has a house over it, like we did in Quevedo, or you sell it as a stationary plant like we did at Salitral. And then you provide service for it, parts and consumables and -- and service to help service those gen sets while they're running in the market.

Q And how long was Genertek in business?
A Oh, started in '95 and I resigned from the company around 2002, something like that. I'm not sure exactly. 2002, maybe 2003 or something like that.
Q So you worked at Genertek as a 15 percent owner of the business from approximately 1995 to approximately 2002?
A Yeah.
Q And why did you quit?
A Another partner. So we had spent two years -- a year and a half, fairly, prepping the company to go public because we were doing good. And hired a group out of New York with six track and owner, Norman Nie, was a professor of political sciences at Stanford. And they put together an offer to buy the company. Worked very hard to put that whole thing together and actualize everything from finances through engineering, quality control, policy and procedures, methods of operation. We went ISO 9000. We did everything to qualify that company to go public. And we were going to put a new -- put a CEO in there because we didn't have one. I was just president. From -- Dave Bloomfield, which was the senior partner at Deloitte & Touche of their power

generation division, was coming over as the CEO of the company. Got everything done, ready, got the contracts drafted and agreed to.

And the day before they were going to fund us to -- they were going to pay us $38 million. And I'd get 15 percent of that. And they would fund the company to continue its operations and go fund it, go public, which is many millions of dollars to underwrite and market that. And that -- the day they turned in the contract, Dae Shinn declined to sign it. And -- and then I was -- everybody -- because I've become good friends with everybody in the public group that was going to take it public. And we were all just flabbergasted. We didn't understand why. And I know -- I know why now, but -- so a week later, his daughter came in and introduced a fractional CEO a -- yeah, CEO. And -- a guy named Dave Glazer, right out here in Tampa. And when she introduced him, I said, where's Dae?

She goes, he's sick. He can't be talked to anymore.

I said, okay. Well, you tell Dave if he wants to talk to me, I'm -- he can reach me at home. And I resigned.

And he tried to do it without me. His whole

point for getting all that documented so he didn't need me anymore. And he thought he could keep the thing going. And -- and so I -- I resigned and left. And they went out of business about nine months later, and I bought all the assets out after about a year and a half later when I got started on my own.

Q Was there any litigation in connection with your departure of Genertek?

A No. I testified he owed vendors money. There's no reason, he was a mega millionaire, hundreds of millions. And he just tried to stiff the vendors. And I helped them, you know, with signing documents that, yeah, it's a real invoice, things like that. And they eventually made him pay. And so, we're no longer friends because of it.

Q So I'm sorry. I asked you whether there was litigation in connection involved with your departure?

A No, not at all. I didn't see the point to even fighting him. What was I going to do, you know?

Q What you're saying is that, after you left the company, vendors sued, with your assistance, Genertek?

A Well, some of my support for documentation that they wanted me to verify or deny as far as a real accounts payable or that was owed to them.

Q Right.
A And -- and I did some of that, not a lot, a little bit. And then, I went on my own.
Q And you testified on behalf of those vendors against your partner and your company?
A No. I didn't testify to anything. I just signed some documents that verified where they were in my capacity at the time, that those were verifiable invoices from their company.
Q Do you recall whether you were deposed or testified in front of the Court?
A I never was, no.
Q But you do recall signing potentially affidavits or witness declarations --
A Something like that.
MR. JIMENEZ: Objection as to form.
BY MR. PULECIO-BOEK:
Q Attesting -- sorry. Let me finish the question. So you recall signing declarations or affidavits attesting to certain vendor invoices?
MR. JIMENEZ: Objection as to form.
THE WITNESS: Oh, I recall exactly what I explained, and that's about all I recall on details.
I don't remember all that now.

BY MR. PULECIO-BOEK:
Q I'm sorry. So you --
A That's a long time ago.
Q Sorry. So you mean you signed documents attesting to the veracity of vendor invoices --
A I think --
Q -- so that those vendors could recover?
MR. JIMENEZ: Objection as to form.
THE WITNESS: I think I signed one or two documents that verified that those invoices were real and issued by ProGen -- I mean, Genertek when I was there.
BY MR. PULECIO-BOEK:
Q Okay. And did you -- did Genertek or Mr. Shinn ever sue you or commence any litigation against you?
A No.
Q So you said that you were able to take out the assets of Genertek after Genertek went out of business?
A I purchased all the assets. Yeah.
Q And how much did you purchase them for?
A I don't recall. That's a long time ago. I -- I don't even recall the amount. But everything they had, I purchased. He had no more use for it,

because he closed the doors.
Q And this was approximately in the year 2005?
A I think earlier. 2004 I think. I don't know. I don't really even have any records anymore of all of that, but somewhere around then, yeah.
Q And what did you do then?
A I started my own company.
Q What was the name?
A Motor Works.
Q Motor Works. And you were the 100 percent owner of Motor Works?
A I was. Yeah.
Q And around -- and you started it in around 2004?
A Maybe '5. 2004. Yeah. 2004, yeah. Something or -- because I had projects that were in the door and -- and we needed equipment and things in order to build the projects and continue to grow. So yeah, I guess around 2000, somewhere around there.
Q And Motor Works did essentially the same or was in the same line of business as Genertek?
A Yeah.
Q And you started and pursued Motor Works with the assets that you bought from Genertek?
A No. I was already -- already building when

the assets came up for sale.

Q So part of the assets that you brought into Motor Works were the assets that you purchased from Genertek?

A No. Part of the assets I bought after I was in business came from Genertek.

Q Right. Okay. And how long was Motor Works in business?

A I don't even recall. It was several years. Through 2008, '9, maybe beyond. We opened a facility in Johannesburg, had 35 employees there and was packing generator sets for mining companies over there and some oil and gas. And -- including what we were doing in Motor Works, which is right down the street from our current location.

Q So you did Motor Works from approximately 2004, 2005 to approximately 2008 or '9?

A Something like that.

Q And what happened to Motor Works?

A We shut it down.

Q What do you -- when you say "we," what was we?

A Oh, I did. I shut it down.

Q And why did you shut it down?

A Well, we did a project in Chile with -- for

PG&E with a group called CTG for some units going into Chile. And we started that project and very aggressive delivery schedule. So they were paying us every single week. We would turn in the invoices and -- and -- and labor, and they would pay us on that. That went on for weeks and weeks and weeks, months, a couple months. And all of a sudden, they stopped sending the -- the funds.

Q Yep.

A After about four weeks, I called their -- their customer and asked them what did they -- did they stop paying them?

And they said, no, we've been paying them every week.

Our customer, CTG, lied and said they weren't paying them. So I went directly to their -- their source and confirmed that it was. We wound up suing them for fraud and -- which took a year and a half. And meanwhile, we've had a lot of accounts payable out there. And we -- they knew we were going to win, and so did their customer who was supporting us in our case. And they agreed to settle out of court.

Well, apparently, they had no assets, so they agreed to sign over the contract to Motor Works.

But by that time, we were -- we were hurting a lot financially because at the same time, after the 2008 crash, it destroyed our business in Africa. Because there just wasn't enough -- well, all the mining stopped because at the time, what behooved us to open a facility there was that there were -- platinum was, you know, more expensive than gold, and it was a huge market for us.

Everybody was going after platinum. And when the crash hit and the motor -- and the auto industry went down, the -- the market for platinum went down. And a lot of those companies went belly up. They just stopped or filed bankruptcy because they -- some even the big mining companies opened mines as LLCs. And they -- some of them just bankrupted and start -- stopped. And we got screwed on a big project on one of them from a company that was one of the companies that went belly up.

And so, the starvation for capital and cash flow, you know, basically was my decision to shut it down. We had no lawsuits from it. Nobody sued us. We tried to sue Wade or file a complaint against Wade, because while he was working for me, he was going behind our backs during all that and trying to talk to a company that bought the assets of the gen sets that

I was unpaid for from the other project and seeking to collect. And he went behind my back and went to work for the company that bought it. Totally mischaracterized it in his deposition. And it wasn't -- the judge threw anything out. We just decided it wasn't worth it.

And so, we had actually been engineering the power plant for the new company that bought the old company's assets that we delivered and weren't paid for. And during that, while we were doing all of that, he goes behind my back and goes to the owner, said, you don't need to hire them. You can hire me. So that's, you know -- number one, we're -- you know, we've had issues like that over the years. And then, that didn't go through.

And then, you know, we're doing the project with CTG and they stopped paying us and I'm shutting the company down. He finishes that deal and he goes to work for CTG, the company we went after for fraud. Strike two, right? A strangeness to my brother, right? And I still hire him because I still love him. That's why he even got a chance to work at Genertek, ProGen. And that's where all that ended right there.

Q Okay. Let's unpack that a little bit.

A It's --

Q Insurmounting [sic]. So the reason why -- I'm sorry, what's the name of the company? What's the name of the Florida company that we're talking about? Your company from 2000 --
A Florida Power and Energy.
Q Motor Works.
A Oh, Motor Works.
Q So the reason why Motor Works shut down in around 2008, 2009 was a confluence of two factors, if I understood you correctly. Number one, a project in Chile in which you didn't receive payments from customer as a result of what you allege was fraud. And then, second, because a customer in Africa also did not meet, according to you, their contractual commitments to you?
A Not just that, that we had no more business, so we shut that down there first.
Q Yeah. So it was a confluence of, let's say, just three factors to see if I understood correct, because Motor Works shuts down because of what you call a fraud against you in Chile by a customer that didn't pay you?
A Well, in the United States here, not Chile, but the customer was in the United States.
Q Okay. So one of the reasons why Motor Works

shuts down in around 2008, 2009 is because a U.S. customer defrauds you in connection with a project in Chile for which you, according to you, were not getting paid?

A Right.

Q Yes?

A Yes.

Q The second reason is a project in Africa in which, according to you, a customer didn't pay you, correct?

A Correct.

Q And third reason, the fact that just business in Africa generally was taking a hit after that financial crash?

A And the U.S. That was the great crash.

Q Right.

A In 2008 and '9, '10.

Q And in connection with the Chilean project, you filed a lawsuit -- a litigation for fraud against the U.S. customer involved in that project in Chile?

A Yeah.

Q Yeah. And this was now your third encounter with litigation, I gather, yes?

A Yes. That's the one I did the deposition in, yeah.

Q Right. And then, did you sue or were you sued by your African counterparties in connection --

A No.

Q Okay.

A No.

Q So that did not result in litigation?

A No.

Q Okay. And while all that is happening, while you're dealing with the closure of Motor Works and the related litigation, you sued your brother, Wade Manning?

A I don't remember actually suing him. I just remember filing a complaint and notify him. I don't recall any of that, to be honest with you.

Q Right.

A I -- I don't have any details of that.

Q Right. And you filed a complaint against your brother because your brother had done something that, according to you, was inappropriate in connection with the African customer that didn't pay you?

A Yeah.

Q Okay. So in parallel in that period of time, you're suing your U.S. customer in connection with the Chilean project and you're also suing your

brother, yes?
A No. That thing with my brother lasted one notice. There was no lawsuit filed against him that I recall. I don't know.
Q So at around the same time, you have filed a complaint against your brother and you are suing for fraud, your customer because of the Chilean project?
A Yes.
Q Okay. So Motor Works shuts down in 2009. What did you do after that?
A I don't even recall for immediate period. I don't recall on that. I -- I -- the timing, I don't recall what business I did. I know I moved into another facility after that one, next door to the facility I'm in right now. It's a very small place. I think I did odds and -- and small projects or something until -- because the market was gone. It was, you know, crashed, here in the U.S. and overseas with the savings and loans debacle thing that happened to us.
I don't know. I struggled for a couple years. I can't remember, to be honest with you, what I did. But I remember -- I can't even remember when it started -- started up again. But I think there's another company that we -- that started. I don't know

what it -- name of -- I don't know if it was Motor Works still keep going or did it change the name or -- or start a new company because we shut that one down. I don't recall.
Q Okay. Had -- up until the time in which you filed a complaint against your brother, Wade Manning, had you ever been involved in litigation against any other family member?
A No. My brother had. He lied.
Q Did you and your brother, Wade Manning, you have other siblings?
A I have three sisters. Yeah.
Q Three sisters. What are their names?
A Phyllis and Kathy and Terry. Terry's passed. And my older sister is in Houston and my other older sister is in Houston. I was the youngest.
Q And was there ever any litigation between siblings?
A No.
Q Okay. And was there any -- ever litigation with your father?
A No. He's -- my father sued Wade, but not me ever.
Q Okay. So while -- when did your father pass?

A I don't recall. I think it was the '80s. '86, maybe.
Q So --
A Very young. I don't recall, exact --
Q So prior to your father passing in the mid '80s, he had sued your brother, Wade Manning?
A Uh-huh.
THE REPORTER: Is that a yes?
THE WITNESS: Yes.
THE REPORTER: okay.
BY MR. PULECIO-BOEK:
Q And the complaint that you filed against your brother, Wade Manning, in around 2008, 2009, that -- was that the first time that you sued your brother or had you sued him before?
A Like I said, I don't recall suing my brother.
Q Was it the first complaint that you had filed in court --
A It was the first -- it was the first --
Q Just let me --
A -- complaint.
Q The -- was the -- that's the first complaint that you filed in court against your brother, Wade Manning, that you recall?

A That I recall.
Q Okay. So up until approximately 2008, 2009, your brother, Wade Manning, had been sued by your father prior to his passing in the mid '80s. And then he was the subject of a complaint filed in court by you, yes?
A I don't know if he was the subject of a complaint filed in court by me. I just remember filing a complaint. I think maybe he got it noticed by the attorney. I don't recall ever going to court. Maybe we did. Maybe we didn't. I don't know.
Q Okay. Okay. You -- but you did see the video of your brother's deposition --
A I did.
Q -- in which he described in detail that litigation, yes?
A Yeah. But -- yeah, he mischaracterized some of the things there. So I don't know whether he said, yes or no.
Q And looking at that video transcript with your wife, Jennifer Manning, a few weeks ago, didn't refresh your recollection about that litigation?
A No.
Q Okay. And so what do you recall between 2008, 2009 when -- should I can't put the name up

there. Manpower Power Source?

THE REPORTER: Motor Works.

BY MR. PULECIO-BOEK:

Q Motor Works. What do you recall doing after Motor Works shuts down in 2008, 2009, and ProGen starting in 2020? Wait -- what's -- give us a sense of when you did those 11 years?

A Well, I -- I remember we did start a company. I just can't remember the name of it. I just can't remember the name of it. But it eventually got -- we did a project with that company and partnered with a group called Megawatt to build a project.

And eventually tried to sell the company to Megawatt in, I don't remember what year, 2012. And they defaulted on the money they promised to pay me. And so I hired an attorney and went after them. And every -- long story short, I was right. And they -- you know, and they settled out of court and gave me the company back for a dollar.

We had no debt when I sold it. We had 180 employees when I sold it. And when I got it back, we had three employees and nine and a half million dollars in debt. And I took it in that condition. We turned it around. It took several years. Paid off

all the debt, and continued what we've always -- I've always done my whole life, building generator sets for other companies, customers.

Q Let's unpack that a little bit. So did you own and operate a company between 2009, approximately, after Motor Works shuts down, and ProGen in 2021?

A Yeah. I think -- yeah. I just don't recall the name or the details of incorporation dates or whatever. I just don't know.

Q So you don't recall the company that you founded and operated for 11 years?

A I don't recall what I just said. I didn't say I don't recall the company. I just can't recall the name of it right now.

Q Okay.

A And I don't recall the year of actual legal incorporating documents registered with the State of Florida. I don't recall that.

But that company contracted with Megawatts. It's in the documents, the names of them. I know that. And I know you know them. But I just can't -- for some reason, I've got a blank right now. I can't remember the name.

Q And that was a single company or multiple companies that you owned at --

A It was a single company.
Q That's not what I mean. Was that a single company or multiple companies that you owned and operated from approximately 2009 to 2021?
A Not at the same time. So clearly established that I've had multiple companies.
Q Sorry. Between the period of 2009, when Motor Works shuts down, and 2021, when you established ProGen, in that period of 11 or 12 years, how many companies, to the best of your recollection, do you own and operate?
A We owned and operated one. It changed names when the company sold to Megawatt. It changed from -- I can't remember the damn name. Anyway, the company that sold to Megawatt. And then I filed a legal action against Megawatt because they didn't pay me for the company as promised in a -- in a 300-page contract done by a group out of California that they didn't pay me.
And so I got it back eventually for a dollar, an agreement to get it back, which they had changed the name I had from my previous company, which I'm struggling to remember the name of.
Q Let me see if I can --
A They -- it required I change the name. So

the same assets that started before it was sold to Megawatt is the same company. And I named it Genertek Power Industries.
Q So the company --
A Because I liked the name.
Q Okay. Sorry. The company, is it PowerTeam Solutions?
A Yes.
Q Okay. So you -- do you remember approximately what year after 2009 when Motor Works shuts down, did you establish and started running PowerTeam Solutions?
A I don't recall the exact date. That's why I said I -- I don't remember the date it's legally registered with the state. I don't recall exact date.
Q All right. So at some point after 2009, you establish -- on your own, or did you have partners?
A No. On my own.
Q So at some point after 2009, when Motor Works shuts down, you establish 100 percent and operate PowerTeam Solutions. And PowerTeam Solutions essentially did the same as Genertek and essentially did the same as Motor Works, yes?
A Yes.
Q And eventually, you don't recall the year

you sold PowerTeam Solutions to Megawatt?
A I don't recall the exact year. I think it was 2012 or something like that. Or that might be the year I got it back. I'm not exactly sure.
Q And you allege that Megawatt didn't pay you the purchase price and you sue Megawatt?
A Uh-huh.
THE REPORTER: Is that a yes?
THE WITNESS: Yes. Sorry.
BY MR. PULECIO-BOEK:
Q This is now your fourth round of litigation in connection with companies that you're involved in. And that ends up in Megawatt paying you?
A So -- giving the company back to me.
Q So Megawatt's --
A In lieu of me suing them for money.
Q So Megawatt, as a result of this fourth round of litigation, gives you the company back, and you rename it Genertek?
A Yes.
MR. JIMENEZ: Objection as to form.
THE WITNESS: The contract with Megawatt for me getting it back for a dollar stipulated that I had to change the name. Same company, but just a name change was required by the

law at that point because the contract was -- was signed by both sides.

BY MR. PULECIO-BOEK:

Q And the Genertek -- the new company named Genertek was this -- was it a different Genertek than the one that you had worked with before and sued, yes?

A That's -- yeah. Yes.

Q Okay.

A Kind of obvious.

Q And this -- let's call it the -- should -- can we call it the new Genertek?

A No. We just called it Genertek Power Systems, I believe, or Power Industries. Genertek Power, I believe is what we named it. Yeah.

Q Okay. So at some point in approximately 2012, give or take, you establish -- or you rename PowerTeam Solutions, you rename it -- after getting it back from Megawatt, you rename it Genertek Power Solutions, yes?

A Yes.

Q And then Genertek Power Solutions did the same -- or essentially the same as its predecessors, meaning the same as Motor Works and the same as PowerTeam and the same as Genertek, yes?

A Yes.

MR. JIMENEZ: Objection as to form.
BY MR. PULECIO-BOEK:
Q And so then you start Genertek Power Solutions. And you were the sole owner of Genertek Power Solutions?
A I was.
Q And Genertek Power Solutions is the company that you ran from approximately 2012 to 2021 when you established ProGen?
A Yes. I didn't establish ProGen. I'm not an owner of that.
Q I'm sorry?
A I didn't establish ProGen financially or as an ownership. I'm not an owner of it.
Q What happened to Genertek Power Solutions?
A I sold all the assets to ProGen.
Q Do what? I'm sorry.
A I sold all the assets to ProGen. I was retiring at the time. Then COVID hit and none of it worked out.
Q Approximately when did Genertek Power Solutions sell all of its assets to ProGen?
A I'm thinking around 2021, something like that.
Q Who established ProGen?

A Andrew Williamson.
Q You do not have any ownership interest in ProGen?
A I do not.
Q How much did ProGen pay you for all of the assets of Genertek Power Industries?
A Approximately three and a half million, but it's not paid that amount.
Q Okay.
A It hasn't been able to.
Q How much of the three and a half million that you agreed to sell those assets for have you received?
A For the assets themselves, probably around two million since 2021.
Q Did you sell anything else, just because you qualified it?
A Well, all the assets. And you might want to know what those are, but yeah. The assets are all --
Q So Genertek Power Solutions enters into a signed -- is it a signed contract with Power -- with ProGen?
A It's in a -- it's in a written agreement between me and him, yes.
Q You on behalf of Genertek Power Solutions

and Andrew Williamson on behalf of ProGen Industries?

A On behalf of them -- ourselves, because I didn't name ProGen. He did, so. But the agreement to sell the assets, my personal assets in the company and the company name and all that, everything was sold as is. And his choice was to rename it because he was going to do it under his own name, his own company. So I agreed to it.

Q Did you --

Why wouldn't I not agree? I'm just -- I agreed to stay on for a few years to help him manage it and get it running. And then it just still going on because -- it would've worked out great if, you know, this deal hadn't have gone south for no reason. But anyway, here we are.

Q Is the -- just to see if I understood correctly. So in approximately 2021, you, on your personal name, and Andrew Williamson in his personal name, signed a written document, through which you agreed to sell to him all of your ownership interests in Genertek Power Solutions and the assets and operations of Genertek Power Solutions?

A Correct.

Q And the purchase price was three and a half million dollars, approximately?

A Approximately.
Q And of that, Andrew Williamson has only paid you about two million?
A Approximately.
Q And where has Andrew Williamson paid you that money?
A Huh?
Q Where has it -- has he paid you that money?
A Where has he paid you?
Q Has he paid you in cash?
A No. Never. Everything's -- he was -- I still -- actually, I still operated, now that I think about it, the Genertek bank account for that transaction to wind it down until last year -- sometime last year, I believe.
Q Got it.
A So he paid Genertek the -- to the Genertek account, some to my -- to me personally over the years, but yeah. Anyway, there's a complete accounting of all that.
Q So the way in which Andrew Williamson has paid you those $2 million for your interests and the assets of Genertek Power Business -- power Corporation have been through wire transfers -- banking wire transfers, to either Genertek's bank account or to

your personal accounts?
A All of them.
Q And where are the Genertek bank accounts?
A There's no bank accounts anymore. We closed it down because it was inactive.
Q Where -- in what bank were the Genertek bank accounts into which Andrew Williamson --
A Regions.
Q -- in -- into which Andrew Williamson paid approximately -- or a part of the $2 million that he has paid you for?
A Into Regions.
Q And where are your bank accounts, in which you have received a part of the $2 million that Andrew Williamson paid in connection with the sale of the assets in general?
A Making too much noise. Sorry. Yes. To answer your question, yeah.
Q No. Where are your bank accounts where you received that money?
A At Regions.
Q Regions as well. At that -- at the time that Genertek Power -- did it shut down?
A Yeah.
Q How many employees did Genertek have when it

shut down?

A I don't recall.

Q Ten?

A It -- it ceased to operate functionally when ProGens officially became a corporation, and the assets were transferred. So I don't actually recall the number. That's years ago, so I don't -- I don't recall. I really don't.

Q Could it have been ten employees?

A More.

Q 50?

A Maybe.

Q Approximately 50?

A Maybe. I don't know. But it wouldn't have been ten. It would have been more.

Q And those approximately 50 employees of Genertek, did they move over to ProGen or were they fired?

A Yeah. Sorry. Yes.

Q All of them?

A Yeah. Everything. Yeah. Everyone. Yeah.

Q Was there any litigation surrounding or involving the winding down of Genertek's operations?

A No. Not that I recall. No.

Q Lawsuits by employees?

A No. Not on Genertek, no.
Q Lawsuits by vendors?
A No. Not that I recall. I don't -- I don't recall.
Q Lawsuits between and among partners?
A No.
Q Lawsuits between and among your brother?
A No.
Q Okay. Was Genertek, the company that you ran from approximately 2013 to 2021, was that company successful?
A Yeah.
MR. JIMENEZ: Objection as to form.
THE WITNESS: It was successful. It was there from 2012 to 2021, so relatively, yeah. I mean, COVID kind of knocked things down at the time for several years, but it was successful. Did a lot of good projects.
BY MR. PULECIO-BOEK:
Q So if I get the timeline correct, those -- that company that lasted approximately seven years, that was the longest-running company that you had owned and operated up until that time?
A As far as name, but, actually, every asset all the way from the first Genertek until -- until

then, when it shut down, it was the same personnel, the same assets, the same know-how, the same engineering, all the same team.

I mean, I got a -- for example, the electrical engineer that worked for me was with me 35 years, all the way through all that. Those things of changing company names were strategies to keep doing what we all love to do. And we do very well.

Outside issues that influence what you're doing, you've got to be able to -- if your goal is to continue doing what you love to do and do well, you know, you make adjustments.

Q Yeah. When Genertek winds down, you sold the assets. Did those assets that you personally sold to Andrew Williamson, did they include real estate property?

A Yes.

Q What real estate property was included in that sale?

A Buildings. I think at the 600 Prairie Industrial Parkway building. And -- well, I was leasing another building, too, but once -- it's still leasing. But the main building and then the expansion of that building, the main 600 Prairie Industrial Parkway building.

Q So just how many real estate properties was included in that sale? Just the one, the 600 Prairie?
A Just one that I recall, yeah. Maybe.
Q So 600 Prairie is worth --
A Yeah.
Q -- less than three and a half million. It's -- because it was just part of the -- all the assets that were being sold?
A Somewhere around there, yeah.
Q Okay.
A And millions in inventory and IP and intellectual property development, all of that.
Q So the $3.5 million purchase price included the 600 Prairie real estate property, included millions of dollars in inventory, included intellectual property. What else did it include?
A I would have to get the list. There's a list of all of that, of course. But that would be it, the company, that I can think of.
Q And all of those assets and operations that you sold to Andrew Williamson through that written contract in approximately 2021, were they worth more than three and a half million?
A They were more -- they're worth many times more.

Q And why did you decide to sell them to Andrew Williamson for under their market value?
A Because it was enough for me. I was ready to get out.
Q $3.5 million, as of 2021, were enough for you?
A For -- enough for the assets. The -- the value in the company, for me, would be me staying on several years and consulting and, you know, commissions for -- for projects I brought in the door and -- you know.
Q So you signed the written agreement with Andrew Williamson. You sell him all of the assets for about $3.5 million.
And then you start working as an employee of ProGen?
A Contractor.
Q You have never been an employee of ProGen?
A No. There's no W-6s or 4s or whatever. It's all W-9s.
Q "It's all W-9s," you mean --
A 1099s. Sorry.
Q You mean 1099s?
A Yeah.
Q You mean that you file with the IRS a 1099 -

-
A Yeah.
Q -- tax form that identifies you and the compensation that you receive from ProGen as an independent contractor?
A And other places, yeah.
Q Where else are you providing those contractor services?
A I'm not. I'm just saying, and other income sources that I have that are not contractor sources.
Q All right. What other income sources do you have?
A Stocks, rent, real estate, things I've borrowed money on, like my assets. That's all income. Whether you say it's a loan, it's still income when it comes to doing your taxes, right? So that kind of thing. Nothing elaborate.
Q And since approximately 2021 to the present, the -- your primary professional occupation has been to provide independent contracting services for ProGen?
A Yes. Full-time. 24/7, literally.
Q And what was your compensation as an independent contractor of ProGen from approximately 2021 to the present?

A In the total dollar volume?
Q Sure.
A I -- everything I receive from ProGen is income, whether it's buying the assets or not. So my -- whatever I've received is, you know, being currently gone through by all the accounting attorneys -- you know, accounting firm, and will spell it out perfectly what was -- what I received for assets or anything else.
But there hasn't been a differentiation between what I sold the company for, and it's not yet paid off, and what I might have received as some sort of a consulting fee because my tax accountants haven't figured it all out yet. I won't know until they do.
Q So --
A We've got an extension until October.
Q So what you're saying is that you have -- that the $2 million that you previously referenced as the total that you have received from Andrew Williamson for the sale of Genertek's assets, that that includes the compensation that you have received from 2021 to the present as an independent contractor of ProGen?
A Yeah. I don't have an independent contractor contract with them yet because it just

hasn't had the income to pay me. So all the compensation I've got is -- so far, has been from the sale of my assets.

Q Let me see if I understand it. So you consider -- your -- you consider yourself to have been an independent contractor of ProGen since 2021 to the present, despite that you've never had an independent contractor agreement with ProGen, yes?

A Legally, I am designated as that by the Internal Revenue Service. That's how I have to file my taxes. Otherwise, what am I? You know?

Q But that's -- have you signed any agreement documenting or memorializing your relationship with ProGen from 2021 to the present, such as an independent contractor agreement?

A No.

Q Okay. But you have filed with the IRS 1099s, identifying yourself as an independent contractor of ProGen?

A Yes.

Q What compensation have you received from ProGen in your capacity as independent contractor?

A None.

Q So you have just filed forms with the IRS, identifying yourself as an independent contractor --

A Yeah.
Q -- but not declaring any revenue for that independent contractor role?
A I haven't filed as an independent contractor with the Internal Revenue Service. My capacity, the -- should I earn revenue as an independent contractor, would be designated as such. My revenue is -- is -- revenue is being derived from the sale of the assets.
Q So that's -- so you have -- to this date, you have not filed any form with the IRS, 1099 or otherwise, identifying yourself as an independent contractor of ProGen?
A No.
Q So you --
A Although --
Q I'm sorry.
A Until I designate it. That's what we're trying to do right now. As what the -- what the accountant has designated at, as required by the IRS, I don't know all that, or I would be an accountant. So this is more complicated than I am right now, but whatever it is is out there, so --
Q So just to see if I understand correctly. So since the sale of Genertek assets to ProGen, approximately 2021 to the present, you have not signed

any contract with ProGen; you have not received any income or revenue from ProGen; and you have not identified yourself as an independent contractor with the IRS?

A No. That's totally wrong.

Q Okay.

A I didn't say that.

Q Please?

A You said I haven't received any revenue. Of course I received revenue from the sale of the assets.

Q Just -- so let me clarify.

A Okay.

Q So setting aside the purchase price of approximately two million that Andrew Williamson has paid to you, from 2021 to the present, you have not signed a written agreement with ProGen; you have not received revenue in connection with your independent contractor services to ProGen; and you have not filed with the IRS any Form 1099?

A Now you got it. Correct.

Q Okay. How have you reported to the IRS the $2 million that you've received from Andrew Williamson so far?

A Yes.

Q You have reported it?

A Yeah. I've reported it on my tax returns that are being prepared and were prepared. Whatever income I received is all on any tax returns. Although I'm going through a three-year re-audit, not by the IRS, but by my own accountants, to re-characterize some of the years of what is considered as -- as income and consolidating those years. I don't know how to explain it more than that, so --
Q Approximately --
A -- asking me is pointless.
Q Approximately in what year did Andrew Williamson pay you those $2 million for the sale of Genertek's assets?
A He's been paying every year since he sold the company -- since I sold the company. Small amounts, bigger amounts, whenever the company could afford it amounts. You know, there's a lot of times I don't get paid anything. If the -- if the revenue's not there, I don't get paid anything.
So I, you know, have been very lenient and structured on how I can get paid. I just need to get something from time to time. And sometimes it's very regular. I split it up either into months or every two weeks or whatever it is, where the company has the cash flow to be able to afford that.

There's nothing written about it. It's just me saying, hey, just send me -- you know, I'm going to need at least, you know, 30K for now, whatever it is. As -- you know, because I haven't got paid for the company assets.

And, you know, with this -- especially with this Ecuadorian deal up there, the way it's characterized, it's destroying all opportunities right now. So anyway -- so it's -- cash is not there.

Q And to see if I understood correctly, all that -- all those -- or those portions of the -- of that $2 million purchase price that Andrew Williamson has been gradually paying you since approximately 2021, you are now trying to report to the IRS as 1099 independent contractor?

A Not now. I've been reporting.

Q So you have been filing Forms 1099 with the IRS?

A With my tax accountants, yeah.

Q Throughout the years?

A Yeah. They're doing it, not me. Yeah.

Q So as of today, every year since 2021, you have filed 1099, independent contractor forms with the IRS?

A No. No. There is an extension right now

for '25, and I think '24. We're revamping all that right now, but I think there's an extension -- well, there is an extension, but yeah. Other than -- before that, yes.

Q In 2020, you filed a 1099 independent contractor form with the IRS identifying yourself and the income you received from Andrew Williamson?

A We have filed for those years.

Q In 2021, there is an independent contractor form 1099 that you filed with the IRS identifying yourself as an independent contractor of ProGen and --

A No. No.

Q -- the income that you received?

A But you're asking me things I don't know the answer to, so if you keep doing it --

Q Please let me finish the question. Please let me finish the question.

A -- but I'm not going to be able to help you anymore. I don't know how.

THE REPORTER: I can only do one at a time.

MR. JIMENEZ: Let him finish. He asked the question, then you wait, and you answer.

THE WITNESS: Yeah. Well, I answered --

BY MR. PULECIO-BOEK:

Q In 2020, did you file a 1099 form with the IRS identifying yourself as an independent contractor of ProGen Industries and identifying as independent contractor revenue, the money that Andrew Williamson had paid?

A No. Never as an independent contractor. There's your answer. That I know of.

Q In 2020, you characterized with the IRS the income that you -- the money that you received from Andrew Williamson as income, yes?

A I don't know how much --

MR. JIMENEZ: Objection as to form.

THE WITNESS: -- I have no idea how it's -- I'm not looking at it. It's a long time ago. I don't know how it was actually applied for.

BY MR. PULECIO-BOEK:

Q In 2021, did you file a form with the IRS identifying yourself as an independent contractor of ProGen and identifying the money that you had received from Andrew Williamson as independent contractor payments?

A I don't know.

Q In 2022, did you file --

A As a contractor. Sorry. I don't know how

it was -- what I was called on the applications.

Q In 2022, did you file a form with the IRS identifying yourself as an independent contractor of ProGen?

A I don't know how the form was -- characterized who I was.

Q In 2022, did you report the income that you received from Andrew Williamson to the IRS?

A All income that I received was reported for a -- for the years -- for the years 2021, '22, '23, and I believe '24 they're working on -- I believe we did '24.

MR. PULECIO-BOEK: We've been going for about one and a half hours, so I think you wanted more coffee. Is this okay -- a good time to take a break?

THE WITNESS: Yeah.

THE REPORTER: That'd be great.

THE WITNESS: Sounds good.

(Off the record.)

THE VIDEOGRAPHER: We're back on the video record. This begins media unit 2. The time is 11:46 a.m.

BY MR. PULECIO-BOEK:

Q Mr. Manning, you said that you -- that ProGen is currently being sued by Hunt in Texas and

that you were deposed in that matter about a month ago. Where is that matter pending?
A In Texas. I don't know the name of the county.
Q Is it a state case or a federal case?
A It's a state.
Q Is the law firm of Holland & Knight representing ProGen in that matter?
A No.
Q What law firm is representing ProGen in that matter?
A I actually can't recall their name -- their actual name.
Q And how many other cases currently are you personally or ProGen being sued?
A I can't recall any other. I have -- I'm not being sued personally for anything. We've had some pending. I'm not sure if it's still litigation with suppliers because of how long we've -- this Ecuadorian deal has delayed us being able to, you know, pay the vendors. But other than that, I don't know.
Q How many lawsuits can you recall being filed against ProGen or yourself personally?
A I can't recall any other ones than those against ProGen, and certainly not against me

personally.
Q As you sit here testifying, the only lawsuit that you can recall against yourself personally is the present lawsuit?
A Yeah, is the present one, yeah. It's the only lawsuit I have against me.
Q And that you have had against you?
A Yeah. That I can recall.
Q And as you sit here testifying, the only lawsuit that you can recall against ProGen is the lawsuit filed by Hunt, that -- who -- which is pending in Texas?
A Currently, yes.
Q And you don't recall -- and you potentially recall that ProGen has been sued over the past couple of years or presently by vendors, yes?
A I don't recall. I don't recall who or if we -- those things were worked out or not. I don't know.
Q And you know that ProGen is being sued by employees, yes?
A Yes. I do know that.
Q Okay. How many employees are suing ProGen?
A I don't know.
Q And you do know that you are also named personally in those cases?

A I know of one. That's true. Yeah.
Q And you also obviously know that Astrobryxa is suing ProGen in Florida?
A I do know that. Yeah.
Q All right. And you know that the Polk County is also suing ProGen, yes?
A Polk County?
Q For taxes, yes?
A I don't know that.
Q I want to confirm with you. The only real estate asset that was sold by you to Andrew Williamson in the approximately 2020 sale agreement is the 600 Prairie Industrial Parkway property?
A Can you repeat that?
Q The only real estate property that was sold by you to Andrew Williamson as a result of the written contract of approximately 2020 is the 600 Prairie property?
A As far as I can recall.
Q You mentioned that the -- when we're talking about your 1099 forms, that you have multiple sources of income. You describe rent. Is that a real estate that you rent?
A Yes. It's a house my mom -- not my mom, my wife inherited from her mother when she passed away

this last year.
Q And what is the address of that property?
A I don't know.
Q What other real estate properties do you own?
A I own my home. I've been there -- bought it in 1995. And there's some adjacent land contiguous to it that we bought over the years.
Q What is the address of your home?
A It's 4614 Drew Court.
Q And the -- what is the address of the adjacent land?
A I think it's 4543 Ollie Road.
Q And when did you buy that adjacent land?
A Oh, God, I don't know. 15 years ago or more. Maybe 20. I don't recall.
Q Are you building property, house, and the like in that adjacent land?
A No.
Q So between you and your wife, the only real estate properties that you own is the property that your mother inherited -- that your wife inherited from her mother and the house where you and your wife reside, plus the adjacent land?
A The -- I made a mistake. The 4543 is my

wife's property. Her mother, when she passed away, willed it to her. And I had sold it to her mother years and years before. Anyway. And there's -- I don't -- there's some adjacent lots that are -- because I don't know how it's all divided up. But even our house -- our main house is more than one lot, so I don't know all the details, so.

Q So the address -- the property that your wife inherited from her mother is that 4543 address?

A Correct.

Q And your house is -- what is the address of your house?

A Huh?

Q What is the address of your home?

A 4614 Drew Court.

Q And then the -- as you described it, the adjacent land that you've been purchasing throughout the years is in Ollie Road?

A Well, the 4543 is the adjacent land that's outside of the neighborhood, but contiguous to that house.

Q Okay. So I'm confused. The land that your wife inherited from her mother is the land that you had purchased 15 years ago?

A Yeah. I think it was 20 years ago.

Q So --
A And then we sold it to her mother.
Q So approximately 15 or 20 years ago, you purchased adjacent land to your house in Drew Court, and then you transfer that adjacent land to your mother-in-law. And now that your mother-in-law has passed, that adjacent land has come back --
A Yes.
Q -- to your wife?
A Correct. Yes, sir.
Q Okay. So to summarize, you and your wife only own two pieces of real estate property, the address where your house is located and the adjacent land to that house?
A And the adjacent land to that house, yes. Yeah.
Q Do you own or control real estate property indirectly through companies that you own?
A No.
Q You also said that one of your other sources of income is stocks?
A Uh-huh.
THE REPORTER: Is that a yes?
THE WITNESS: Sorry. Yes. Sorry.

BY MR. PULECIO-BOEK:
Q Through what brokerage or bank do you manage your securities, the securities that you own or control?
A I -- I don't. I have some online stocks with a -- an online platform called Stash. And there's three stocks in there. I think it's worth about $10,000. That's all the stock I have.
Q So when you were describing your other sources of revenue that you report to the IRS, you said a revenue derived from stocks, you said rental, you said money that you received from Andrew Williamson pursuant to the sale agreement. Any other sources of revenue or income over the past five years?
A No. Not revenue other than is considered revenue on your tax returns from loans that you borrowed against assets that you have. And until you -- if you take that income, you -- and it's not paid back before the -- the next tax year, then it's considered income if it's into the next year. I'm just learning all that. But anyway, so --
Q I'm not sure I follow that, but what you're saying is that you have issued or extended loans to third parties?
A I have borrowed money on assets that have

been, strangely enough, considered as income. I just want to be accurate with what I know, but I don't know a lot about it. I'm not a tax expert, sir.

Q What you're saying is that over the course of the past five years, you have borrowed money from third parties and you have provided assets that you or your wife own as collateral for that loan?

A Exactly, yeah.

Q What assets have you provided as collateral for loans that you've received from third parties?

A Boats, automobiles. That's about it. Tractor from time to time when we had a bind. Sad things.

THE REPORTER: You said when?

THE WITNESS: We got in a bind.

BY MR. PULECIO-BOEK:

Q What third parties have given you loans against those assets that you just mentioned?

A Individuals. Pawn shop right now. I haven't got any personal loans out right now with individuals.

Q Give me the names of those individuals.

A I don't have any personal loans out.

Q Individuals that have given you loans over the past five years?

A I need to check the confidentiality agreements I have with them in order to disclose. But currently, I can't tell you the names. I can't remember of people, maybe the names I've borrowed money from, but I've never, you know, borrowed any money from anyone without some sort of collateral.
Q A personal --
A It's always been 98 percent, maybe the pawn shop.
Q Approximately how many individuals have lent you money over the past five years that you have provided your assets as collateral for?
A Well, personally or professionally?
Q Explain the distinction.
A Probably three or four. Well, if the company assets were put up, not for personal loans, but for company loans.
Q I'm asking loans to you personally by individuals that you have provided your personal assets for as collateral?
A Yeah.
Q Give me the names of those individuals.
A Okay. Stuart Fitzgerald is one of them. And that's the last I can think of. But I put my personal property up for corporate loans, the money we

needed for the company. And he's been paid back everything years ago. Has nothing to do in the time period of this case, just so I say it.

Q What companies have given you personal loans over the past five years

A Pawn shop.

Q What is the name of that pawn shop?

A Value Pawn.

Q Anyone else?

A La Familia. That's it.

Q Anyone else?

A No.

Q Okay. Was Andrew Williamson a partner of Genertek Power?

A No.

Q Was he an employee of Genertek Power?

A Yes.

Q What was his role at Genertek Power?

A As the operations manager for the company. President -- no, I was president. Operations manager.

Q Did Andrew Williamson also work for you during the period of time prior to the sale back to Megawatt?

A Yes.

Q How long has Andrew Williamson worked for

you?
A I would say since 2012. '11, '12. Somewhere back then.
Q So approximately since the period in which you -- after Motor Works shut down in approximately 2008, 2009, that's when he joined you?
A I don't recall the exact dates, but approximately.
Q He would have joined you around the time where you established PowerTeam Solutions, your venture after Motor Works, yes?
A I don't recall the exact time of the company name, but approximately.
Q What is -- your role as -- at ProGen Industries from 2021 to the present has been president and CEO?
A No. Andrew's the president. I'm the CEO of the company.
Q And you have been the CEO of the company since approximately 2021, after the sale of the Genertek assets to Andrew Williams?
A Correct. Yes.
Q And that is how you represent yourself to the public, as CEO of ProGen Industries?
A Correct.

Q You are aware that in this case, your attorneys have produced, through CELEC, discovery materials, evidence, yes?
A I would assume.
Q And you understand that that includes emails, that that includes text messages, yes?
A I would assume, yeah. I -- I don't know what they've given them, but I would assume, yes.
Q Who at ProGen has worked with your attorneys to give them access to ProGen servers and cell phones?
A I think Garrett Kyle, Andrew, and that's probably all I know who would be working with the attorneys to do that.
Q Who is Garrett?
A Garrett Kyle. That's Andrew's son.
Q Andrew Williamson's son?
A Yeah.
Q And who else?
A And Andrew Williamson.
Q And you personally provided your cell phone for imaging to the attorneys?
A I -- yeah. Yes.
Q When did you provide your cell phone for imaging to the attorneys?
A Approximately three weeks ago, maybe. I

could be wrong.
Q Yeah.
A It could be longer.
Q And you authorized your attorneys to make a full image of your phone?
A I didn't know what they were going to do with it. I just gave them my phone.
Q To whom did you give your phone?
A An individual, a technical individual who was copying what was on the phone.
Q Did you also make available your computer?
A I don't recall what is involved in that. I know I think they -- we provided access to the emails, and -- but what they took, or didn't take, or copy, I don't know. Or how that was done, I don't even know.
Q Yep. And prior to the technical person taking your phone to make an image approximately three weeks ago, when was the last time before then that you had changed your phone, your mobile device?
A I don't recall. I don't recall.
Q Were you ever directed to preserve the text messages and other communications that you had in your phone prior to it being collected approximately three weeks ago?
MR. JIMENEZ: Objection to the extent

it calls for communications with Counsel. Those are privileged. But go ahead and you can answer without --

THE WITNESS: Yes.

BY MR. PULECIO-BOEK:

Q When were you told you could not delete or destroy anything that was in your phone?

A Well, I was already under that requirement with the Hunt case. So we don't delete anything anyway. I mean, data and documentation is everything.

Q Yep. So since the commencement of the Hunt litigation, you have been preserving all of the data, including text messages in yourself?

A Correct.

Q When did you meet Karla Saud?

A I don't recall the date. She was introduced to -- or introduced herself first to Shane Lawlor. She -- I don't recall the date at all. I don't know the date. You'd have to go through calendars and emails for me to recall when I met her, actually.

Q You said she introduced herself. Can you explain that?

A Yeah. She reached out to ProGen. We didn't reach out to her, is what I mean by that.

Q So -- out of the blue, she one day reached

out to Shane Lawlor, your son-in-law?
A Sorry. Yes.
Q And that would have been at some point in early 2024?
A I -- I would think somewhere around there. Yeah.
Q And how did she reach us -- how did she reach out, out of the blue, to your son-in-law, Shane Lawlor at ProGen? Was it via text? Was it via e-mail? Was it via phone call?
A I don't know which one it was. I -- I -- I don't recall.
Q And the -- what did she say to Shane Lawlor when she reached out out of the blue?
A I don't know.
Q Well, how did you become aware that she had, out of the blue, reached out to your son?
A Shane mentioned that we had, that's what it was, an inquiry on our e-mail for sales and marketing, you know, and that someone was interested in buying our equipment in Ecuador. That's how I originally found out.
Q Did Shane Lawlor, your son, show you this e-mail?
A No. He would have sent me an e-mail and

said somebody, this person reached out.

Q Right.

A Or he would have called me. I don't know which one he did, but that's how it would have happened.

Q Right. And then you followed up with Karla Saud?

A Eventually. I -- I met her, and I don't recall the -- I don't remember the details. It's -- it's a good question, though, but I don't recall what we did next, or exactly what happened in chronological order next.

Q Where was that first meeting between you and Karla Saud?

A I don't recall.

Q Was it in Lakeland or was it in Ecuador?

A I don't recall. I don't recall. I know that we went to -- our -- our team, our engineering team and sales and marketing, went to Ecuador to meet with Karla first, to look at the project and see what it was all about.

Q Who from ProGen traveled to Ecuador?

A Shane Lawlor and Scott Crampton, head of our engineering.

Q Your son-in-law Shane and Scott traveled to

Ecuador at some point in 2024, before you met Karla Saud, yes?
A Yeah. I don't know if that's true, before I met her or not. I don't recall.
Q At around the same time of your first meeting with Karla Saud?
A Huh?
Q At around the same time of your first meeting with Karla Saud, they traveled to Ecuador?
A I don't recall. That's a good question, but I don't recall.
Q During this first meeting between you and Karla Saud, was anyone else present?
A I don't recall.
Q Is there any document that could refresh your recollection?
A I'm sure there are.
Q Such as?
A I don't know. Emails or, you know, meeting invites. Things like that might help put perspective on the timeline.
Q There should be emails or text messages putting an approximate date on this first meeting that you personally had with Karla Saud?
A There --

MR. JIMENEZ: Objection as to form.
THE WITNESS: There would be something. I don't know exactly what, but --
BY MR. PULECIO-BOEK:
Q Yeah.
A -- it would be something.
Q Is there any record, notes, or anything else of this first meeting between you and Karla Saud in early 2024?
A I don't know what would exist. I'm sure there's something memorializing that there was some meeting. Like, you know, itineraries or trips, you know, arrival times, things like that. There would have been something organized through administration for a meeting that would -- and somebody's coming to our facility. So there would be some things around what actually happened. I don't recall exactly how I met Karla face-to-face. I don't recall the date.
Q And what did Karla Saud tell you during that first meeting?
A She wanted to buy our equipment for a project that she was working on in Ecuador.
Q She told you this?
A Yes.
Q And did she say this to anyone else from

ProGen that was present at that meeting?
A I wouldn't know, because I don't know who was there, but I would assume if I was there, there was other people there. I just don't recall who.
Q But you know for certain that she told you that she needed to buy ProGen equipment for use in a project in Ecuador?
A Yeah.
Q I'm sorry. What equipment did she say she needed to buy from ProGen for use in a project in Ecuador?
A Generator sets, you know? And there is a lot of -- I mean, as was -- there's a lot of documentation about the things she asked for. There is a lot of information of things that we provided for her, for just equipment, and proposals, and probably -- and, you know, descriptions of the equipment, and what we had, what we could provide for her, for her project. So that would be probably fairly well-documented or illustrated in whatever documents are there.
Q Did Karla Saud communicate with you in English?
A Yes.
Q Do you understand Spanish?

A A little bit, (Speaking in Spanish).
Q But primarily the communications with her were in English?
A Always in English with Karla.
Q Was Karla Saud accompanied in those meetings with you by anyone else?
A No, that I recall, which whoever was there -- I don't think so. I don't recall if her buddy, Jose, was ever -- well, I recall he was present a few times, but not in the beginning. It was all Karla.
Q Did Karla Saud tell you who was the customer that wanted to buy the ProGen generator sets in Ecuador?
A She was the customer.
Q Karla Saud said that she personally was the customer for --
A Yeah.
Q -- the generator sets that she wanted to buy from ProGen?
A Correct.
Q Did ProGen agree to sell those generator cells to Karla Saud personally?
A ProGen would have neither agreed or not -- or disagreed. It would have just proposed until somebody said, we want to order.

Q And ProGen made a proposal to Karla Saud for her to be able to purchase personally generator sets from ProGen?
A Sorry. Yeah. Several different ones. Yeah.
Q Several different proposals, you said?
A Correct.
Q So ProGen sent several different proposals for Karla Saud for her to personally buy generator sets for using in Ecuador?
A Correct.
Q Okay. Did Karla Saud ultimately agree with any of those proposals submitted by ProGen for her to buy, personally, generator sets for use in Ecuador?
A I don't understand the question.
Q Did she accept any of the proposals that ProGen made to her to send her, personally, generator sets?
A In what -- in what capacity or way?
Q You said that ProGen sent several proposals to her for the sale of generator sets that she personally needed. Did she accept any of those proposals?
A She received the e-mail for each one of them.

Q As a result of any of those proposals, did ProGen and her enter into a contract?
A No.
Q And what [sic] ProGen was responsible for preparing those proposals that ProGen sent to Karla Saud for her to buy generator sets from ProGen personally?
A Can you repeat?
Q What ProGen was responsible for preparing those proposals that ProGen sent to her for her to buy, personally, generator sets?
A Was ProGen -- I need to see if I -- was ProGen responsible for preparing --
Q Who?
A -- a proposal?
Q Who at ProGen?
A Oh, it could have either been a combination of me or Shane.
Q So you or your son-in-law would have prepared written proposals for Karla Saud.
A Correct.
Q And you would've sent those via e-mail?
A Correct.
Q Or via text message.
A Probably more e-mail at that time.

Q Okay.

A We didn't have too many communications as far as sending documents by WhatsApp.

Q And when did ProGen move from that conversation of Karla Saud personally buying generator sets to an opportunity with CELEC?

A Can you repeat that, please?

Q When did the conversation evolve towards a sale of generators to CELEC?

A Oh. We were -- and I have -- I don't know the dates, but it'll be in whatever schedule of looking at emails and dates and things, but she -- we were to provide her generator sets equipment only for the project. Her and a company called FYI, we were told was bidding the project and that for some reason, that FYI couldn't bid the project, and she couldn't bid the project directly through her company, and that -- did we want to do the project? And we refused. We said, no, we can't do it.

And she goes, well, why can't you do it?

I said, because we can't get a bond in Ecuador. Nobody's going to issue anyone a bond for Ecuador from the United States. And there's no one that's going to fund us in a project to do a project in Ecuador, period. End of lines. End of story.

Can't do it.

She said, that's not a problem.

Because FYI will put up the bond to do the project for ProGen, and it will complete the entire installation of the power plants and not bill you until the project is done. And I said, well, we can't ship any equipment without getting paid up front. That's never going to happen. I'm not going to do it. So that was the big stickler until we got into, you know, the -- the terms of payment for the contract at CELEC, with CELEC and their attorneys, where we negotiated the payment terms of the project.

Q You -- I don't -- I may have missed something. Well, what is the project? What do you mean when you say the project?

A Well, there was a -- from that point on, it -- you know, when we -- they wanted us to bid the project, and we decided, okay, we'll bid it under these certain terms, we went through a bidding process. And we were awarded five contracts, and we only wound up doing two under CELEC.

Q What do you mean the project when you say the project? What is the project?

A Well, they were -- we were asked to bid on several projects for capacity, size projects that we

bid on. Eventually bid on and decided we would take, after the award, Salitral and Quevedo, 100 megawatt and a 50-megawatt plant.

Q So what you're saying is that Karla Saud, after initially telling you that she needed some generator sets from ProGen -- after that, she told you that she wanted ProGen to bid on multiple contracts with Ecuador in-state agencies, yes?

A Karla asked us if we were interested in quoting directly or proposing -- doing the project directly with CELEC. And in that initial conversation, we refused.

Q So at some point, the conversation moves from Karla wanting personally generator sets to Karla proposing to ProGen that ProGen directly bid for contracts with entities of the Ecuadorian government, yes?

A Yes.

Q And -- ProGen and you specifically declined to do that, yes?

A Originally.

Q And you declined to do that because of the difficulties in obtaining a performance bond.

A And financing.

Q And by that, you mean by -- the difficulties

in obtaining financing from third parties to be able to build equipment and deliver it in Ecuador.
A Yeah. Correct. Yeah.
Q And the response that Karla Saud gave was that Karla, together with a company called FYI, would obtain a bond, yes?
A Yes.
Q And did that convince CELEC that that was enough for CELEC to go and directly bid for contracts with Ecuadorian state agencies?
A Man, I did -- that -- that -- sorry, that didn't make any sense. What now?
Q Karla told you that you didn't need to worry about the performance bond because FYI and Karla together would obtain the necessary performance bonds, yes?
A It wasn't just that, but yes.
Q And as a result of Karla telling you that FYI and Karla together would obtain the necessary performance bonds, that convinced CELEC that it should bid for these different contracts in Ecuador.
A That CELEC should bid?
Q That ProGen should bid.
A Okay.
Q Yeah.

A No.
Q Still with that offer, ProGen declined to participate in bids?
A Well, it was -- yes. And we needed more.
Q What else did you need?
A We needed -- if we were going to bid on the project, we needed to be able to fund the project, and we needed to be able to construct the project with someone in country who could do the -- you know, that could guarantee the performance and fund the construction. That was the basis of going forward. No problem. We can do that. John, I'll set it up.
Q So what you said to Karla Saud in response to Karla Saud's proposal that Karla, together with FYI, would obtain a performance bond, is that for ProGen to be able to bid on these contracts in Ecuador, ProGen needed to get paid in advance, basically?
MR. JIMENEZ: Objection as to form.
THE WITNESS: No. ProGen needed terms that it could realistically, responsibly complete the project under. The biggest negotiations was that with CELEC. Bidding a project's easy. Being awarded a project is easy. Contracting a project is tough. And so massive amounts of time went in -- in negotiating

the terms and conditions of what we were delivering after we were awarded the projects.
BY MR. PULECIO-BOEK:
Q So what you said to Karla is that ProGen, in order to bid in these Ecuador contracts, needed to have payment terms, meaning paid in advance, and a schedule that would allow it to perform, yes?
MR. JIMENEZ: Objection as to form.
THE WITNESS: Not paid in advance. A certain portion had to be paid before we would ship -- agree to ship equipment. I think the details of that are extremely important, so --
BY MR. PULECIO-BOEK:
Q So you said to Karla that for ProGen to proceed and bid in these open opportunities in Ecuador, ProGen needed to be paid at least a meaningful part of the contracts prior to shipment, yes?
MR. JIMENEZ: Objection as to form.
THE WITNESS: That's not correct. No.
BY MR. PULECIO-BOEK:
Q Needed to be paid some amount that was satisfactory to ProGen prior to shipment.
A Not even that. To bid the projects -- to bid the projects, we needed to know that we had the

ability to ship the equipment and get paid. And before it left the country, it's the only way we would do the project. And that the construction portion would be handled by a local current firm and would do the projects and not require to get paid until the end of the project. Because the amount of money that -- that would go to ProGen would support some of that. But majority of it was to pay for the equipment before it shipped. We negotiated that directly with CELEC, too.

Q Just try to see if I understand. So what you said to Karla Saud is that ProGen would only proceed with bids for Ecuadorian contracts?

A As long as they agreed that we would get paid before we shipped.

Q Okay.

A There you go.

Q And that in addition to getting paid before shipment -- the entirety of the price, yes?

MR. JIMENEZ: Objection as to form.

THE WITNESS: Incorrect.

BY MR. PULECIO-BOEK:

Q How much did ProGen want to get paid before shipment?

A The value of the equipment being shipped.

Q No profit?
A No. The value of the equipment is including profits.
Q Okay. Yeah. So 100 percent of the equipment being shipped, including the profit, that ProGen would make?
MR. JIMENEZ: Objection as to form.
THE WITNESS: No, not 100 percent of the project profit, just the sale price of the equipment before it's shipped.
BY MR. PULECIO-BOEK:
Q Plus a profit for ProGen.
A Well, the sale price always includes a profit.
Q Okay. And that ProGen would only accept to participate in these bids if it got that payment for 100 percent of the equipment, including the relevant profit for ProGen, and that there would be someone in Ecuador to, I think you said, build -- build what?
A Well, you're -- you're really spilling over one thing into another, which really kind of needs to be separate with the construction and the equipment. You're also mischaracterizing how the project terms were negotiated. We simply informed Karla that we're not able to bid a project that we cannot finance.

There's your key. We can't finance it if we got to borrow money from the U.S. and finance the project.

That's all basically that was involved in conversations that we were willing to -- to propose equipment for -- or projects for Select under their RFQs, because they issued RFQs to quote, right? All right. The issues of the percentage of payment came up with CELEC in meetings with Fabian Calero, and their attorneys, and their, you know, management teams, us in those meetings. They agreed to the terms. By law -- and I'm -- I'm, you know, volunteering too much. I'm going to get -- for it, but by law, Ecuador cannot issue a down payment. It can't happen. And so the negotiations with -- that -- that you're talking about getting paid a percentage plus profit was not the game plan going forward. It was the inevitable result of negotiations directly with CELEC. And when we were ready to walk away. If you can't do it, we understand, but I can't do a project we cannot perform. We have to get paid what we need to -- in order to execute the contract. Very clear, very well articulated, very well received. And, you know, the negotiations went very well on that.

They came up with the idea of, we will pay

you 70 percent of the value of the contract upon inspection. And we're like, well, that's going to be tough because you got to do it quick. You got to do it quick because this is a 90-day and 120-day project. And if you don't execute perfectly, every day you delay to come inspect and then pay, you're delaying the contract.

And our concern is that, you know, we don't want to be held up on our production because you don't come and do your portion to inspect your pay. All right. That was a very real concern. That was the whole project, really, for us. We can't perform if there's no funding to get paid. And we let them know we can't get funding for Ecuador. It's not going to happen. It wasn't an insulting thing. It was a practical reality. And there's no way we're going to get bonds outside of the country.

We got the bonding handled. They know who was doing the contract, who was going to work with us, which is FYI. FYI had already done a lot of projects with CELEC. The evolution of -- all of what happened in the contract was because of long-term negotiations with CELEC and understanding who was doing this and how we were going to do it. Okay. There you go. Too much.

Q So eventually Karla Saud tells you that she wants to introduce you to CELEC for you to engage -- for you to at least start bidding on contracts, yes?
A No. Karla -- you know, depending on what you're saying for introduce, I mean, personally or the company to CELEC. Again, when we originally met Karla, we were proposing to her, she was going to sell the project, bid it to CELEC, and her company and FYI would do the project. They -- CELEC already knew about our equipment by then. They'd already presented our equipment to CELEC when they were going to do the project. CELEC knew who we were.
But then they found out that they can't bid the project, so we were told, and that, you know, an outside company from the country had to bid the project. That's how we got sucked into it. And -- and then that's when the talk about the terms -- which happened long time and ongoing after that with CELEC, after they knew who we were. So CELEC -- we had to get qualified as a bidder. So Karla took care of what it need -- what needed to be done in order for us to qualify officially as a bidder. Yeah.
Q What reason did Karla Saud would give you for why FYI and Karla could not be the bidders and why the bidder needed to be ProGen?

A She said there was some government requirement that it can't be bid by a local company for an emergency power supply for the country. We didn't know any better.

Q Did you ask to review that government decision?

A No.

Q Did anyone at ProGen ask to review that government decision?

A No.

Q Okay.

A We -- we didn't like it when we heard it. We was like, nah. Okay. Whatever. We're not doing it. We were suspicious of it, but we didn't know how to verify it or not verify it. At that point -- particular point, we were just bidding equipment at that point.

Q So you believe what Karla said to you and as a result of that, you allow Karla to try to qualify ProGen as bidders, yes?

MR. JIMENEZ: Objection as to form.

THE WITNESS: Well, we -- not immediately, no. In -- in practical timeline of it happening, eventually.

BY MR. PULECIO-BOEK:
Q Okay. Did you or others at ProGen take any steps to determine what was required in Ecuador for ProGen to be qualified as an eligible bidder?
A For ProGen, yes. We didn't check into whether Karla was lying or not about why she couldn't bid it.
Q My question is whether you or anyone else at ProGen checked what were the requirements in Ecuador for ProGen to get qualified as a bidder?
A Yeah. We had some folks checking into it. Yeah.
Q What folks?
A Garrett Kyle.
Q Garrett Kyle, Andrew Williamson's son?
A Yes. Garrett Kyle Williamson. Yeah.
Q Kyle Williamson, which is -- who is Andrew Williamson's son?
A Yeah.
Q Checked into what was required by CELEC for ProGen to be qualified as a bidder?
A Yeah. Did a lot of research.
Q Did that research involve retaining an Ecuadorian attorney?
A We didn't know that at that -- we were

checking into the bid documents.
Q What did Garrett, or Kyle, Andrew Williamson's son, do to determine what requirements ProGen needed to meet to be qualified as a bidder for CELEC?
A I don't know exactly.
Q Did he do anything else than Google it?
A Hmm?
Q Did he do anything else other than Google it?
MR. JIMENEZ: Objection as to form.
THE WITNESS: I don't know what he did. Sorry.
BY MR. PULECIO-BOEK:
Q Did you ever ask him?
A Yeah. We talked about his -- what he did show us, which was, you know, basically the bidding criteria for the project. He checked to see if the documents that Karla was sending us for the bid documents were legit, things like that.
Q And upon Kyle's -- let's call him Garrett, okay? Upon Garrett's inquiries, ProGen was satisfied that it could meet CELEC's requirements to be considered an eligible bidder?
A No. Not just on Garrett's. Some of what

Garrett found specifically that we needed confirmed, some things that we needed to know or understand internally that, okay, this is a real deal.

Q Very specifically, I'm asking you whether based on the information that Garrett identified, ProGen determined that it did meet or that it would meet the requirements to be considered an eligible bidder for CELEC?

A No. His job was really to verify the legitimacy of the RFQs being -- that the projects were real, basically, and that's it. And it wasn't extensive. It wasn't, you know, scientific. It was just check in to see if this is really going on and this is a real project, and if you can figure out if anybody already bid yet or not, or if anybody signed up for bidding. Things like that.

Q Okay. So did anyone at ProGen at any point in time determine that ProGen in fact met the requirements to be a bidder for CELEC prior to providing the bids?

A It -- we never -- no. That wasn't really the end game result of everybody, multiple people, and anybody making sure. That was Andrew and my's concern, and we were gathering information. A lot of information about -- for personally, between him and

I, is -- is this a real deal or not? But you can't do a lot. You can only do so much. There's no -- ultimately, we decided, yeah, it's good to do the project. It's okay to bid. And we did.

Q And ProGen authorized Karla Saud to prepare the paperwork for the bids and to actually submit the bids to CELEC?

MR. JIMENEZ: Objection as to form.

THE WITNESS: Karla was a contractor who was willing to put the work in to go through and understand and comply with whatever documentation submittals were required for us to qualify to bid and even bid. And we let her be that person in her contractor capacity as someone who wanted to represent us in Ecuador as a representative. Was not just -- that's not why we originally had her working on the Ecuador CELEC deals. It was a -- a natural progression of us and being interested in that project and the prospects of doing other projects in Ecuador for an extended period of time. We had plans for -- you know, in bringing our presence more permanently to Ecuador.

BY MR. PULECIO-BOEK:

Q Ultimately, the conversation evolved to the point where ProGen did in fact authorize Karla Saud to

prepare the bidding materials and submit the bids to CELEC on behalf of ProGen?

A No.

MR. JIMENEZ: Objection as to form.

THE WITNESS: No, not on her own.

BY MR. PULECIO-BOEK:

Q With the assistance and under the supervision of ProGen?

A Correct.

Q Did you or anyone else at ProGen at any point conduct a background check on Karla Saud?

A Well, through our own network of people we knew. There wasn't much to know. She seemed personable and very kind and gracious and, you know, humble. And I introduced her to some friends of mine or -- who -- introduced who she was to some friends. And then we eventually introduced them. One is our international business development and business manager, which is Elio Muller, who's an attorney. And then Joaquin Mavares, who we eventually had assist her on a lot of the -- on several of the trips and in the beginning stages of -- of reviewing the contract. And our opinions changed over time.

Q My question is whether you or anyone else at ProGen ever conducted a background check on Karla

Saud?

A Yeah.

Q Who?

A Elio Muller. And we checked with the embassy. We had another individual who's done a lot of work in Ecuador, who was promoting us in Ecuador when Karla got a copy of one of our brochures that he was giving out to other folks. That's how we found out she -- you know, eventually found out how she knew about us, learned about us. So Joaquin Mavares was promoting us in Ecuador for private sector.

Q Okay. So there was a gentleman called Joaquin Mavares. Can you spell his last name, please?

A M-A-V-A-R -- I believe it's E-S, Mavares. M-A-V-A-R-E-S. Yeah. Mavares.

Q Joaquin Mavares is an individual who had been, prior to or as of 2024, promoting ProGen in Ecuador, yes?

A Yes.

Q Is Joaquin Mavares Ecuadorian?

A No. He's Venezuelan.

Q And Joaquin Mavares was he a contractor at ProGen?

A Yeah. Basically a rep -- contracted rep -- representative.

Q And Joaquin Mavares provided a brochure of ProGen to Karla Saud?

A No. She got it from -- the story goes that she got it from someone that Joaquin had given it to, a company.

Q And that is what prompted Karla Saud to reach out eventually to the e-mail of ProGen?

A Yes.

Q So you and ProGen did conduct a background check on Karla Saud prior to authorizing her to submit the bids, yes?

MR. JIMENEZ: Objection as to form.

THE WITNESS: Best we could. We didn't hire a professional.

BY MR. PULECIO-BOEK:

Q Okay. What background check did you and ProGen conduct on Karla Saud?

A We didn't conduct the background check. We just asked questions about her.

Q Who did ProGen ask questions about Karla Saud prior to authorizing her to submit the bids?

A Friends that we knew in the industry.

Q What friends?

A Joaquin Mavares, who spent a lot of time in Venezuela. Didn't really know that much about her.

She was apparently dealing in government deals more than she was private.

Q Did ProGen ask anyone else other than Joaquin Mavares about Karla Saud prior to authorizing Karla Saud to submit the bids on behalf of ProGen?

A Anybody we could, but nobody ever heard of her.

Q Who else did ProGen ask about Karla Saud in addition to Joaquin Mavares prior to authorizing --

A I don't recall.

Q -- Karla Saud to submit bids on behalf of ProGen?

A I don't recall. I've got a lot of, you know, Latino friends and long-term associates that -- nobody ever heard of her. Now, Elio never heard of her, but he checked with the embassy on her eventually, not in the beginning. And so we just did the best we could by asking people if they heard of her. And nobody ever heard of her.

Q Who is Elio?

A Elio Muller is a good friend of mine who lives here in Tampa. He's an attorney. And --

Q What does he do for ProGen?

A Consults with us on business matters, things like that.

Q And Elio an external counsel for ProGen?
A Not officially, no. He -- he acts more in the capacity of a business advisor.
Q Not a -- not as an attorney?
MR. JIMENEZ: Objection. He is an attorney. And to the extent you're going to ask about anything that's communicated, we do assert a privilege.
THE WITNESS: Yes. Yeah. On that part, yeah.
BY MR. PULECIO-BOEK:
Q Is he a business advisor or is he a -- or is he providing ProGen with legal advice?
A He has done both.
Q He does both?
A Yes.
Q And ProGen asked Elio to check into Karla Saud?
A I did.
Q And Elio told you that he had checked with the embassy?
A Well --
MR. JIMENEZ: Objection. Any communication between Elio Muller and ProGen is privileged. We do assert a privilege as to anything

that's communicated between the two of them.

THE WITNESS: But he did none before we, you know, agreed -- I mean, eventually agreed that we would bid on the projects.

BY MR. PULECIO-BOEK:

Q I'm sorry?

A He didn't check into her until way -- long after we started running into problems. Not before we decided to bid.

Q Okay. So the -- as you sit here testifying, the only person that you recall ProGen inquired with regarding Karla Saud prior to authorizing Karla Saud to submit the bids was Joaquin Mavares?

A Yeah.

MR. JIMENEZ: Objection as to form.

BY MR. PULECIO-BOEK:

Q Yes?

A Yes.

MR. JIMENEZ: Objection as to form.

THE WITNESS: And he knows everybody.

BY MR. PULECIO-BOEK:

Q And did ProGen do anything else to vet, check, verify Karla Saud or her history prior to --

A No. No.

Q Prior to authorizing her to submit bids to

CELEC on behalf of ProGen?
A No. We did a certain amount and that's it. I don't know.
Q Anything else that you can recall other than speaking with Joaquin Mavares?
A No.
Q Who at ProGen was responsible for communicating with Joaquin Mavares with respect to Karla Saud?
A Always me.
Q You would either e-mail or text Joaquin?
A Yeah. Both. Probably text more than anything, or just talk on the phone mostly. Joaquin is -- just so you know, he's very well known in South America. Very well. Especially in Ecuador and Colombia and Venezuela and other places. He's -- he's an American citizen. He's been here forever. But he was executive vice president of Pratt Whitney for 15 years for Latin America, so he is the best go-to I could think of I could ever go to versus five others or ten others to ask him to find out, do you know this person.
Q Did you or anyone else at ProGen Google Karla Saud's name?
A I don't recall.

Q And eventually, obviously, prior to authorizing Karla to submit the bids on behalf of ProGen, ProGen realized that the company that Karla would use is Astrobryxa, yes?
A No. No. Can you repeat the question?
Q I mean, just because Astrobryxa is the -- ultimately the contractor, correct? So I assume that at some point, ProGen realizes that Karla is not going to be acting purely on her own name, but that she's also going to be using her company, Astrobryxa, yes?
A I have no context for that question. I don't understand it.
Q Okay. When is the first time that you became aware of Karla Saud's company, Astrobryxa?
A I didn't know she had -- I didn't even know she has a part -- a company named Astrobryxa. To this day, I don't know who owned Astrobryxa. I assumed it was Jose.
Q So the first time you learned about Astrobryxa was when this lawsuit was filed?
A No. We learned about Astrobryxa, and I'm still skeptical of whether it even existed before then, was when there became problems between -- I mean, Jose and Karla and FYI, who we wanted to do the project. We always wanted them to do the project.

They're a great company. Incredible group. Very capable, you know. Come to find out it's, you know, Jose and Karla that destroyed the relationship they had with FYI and was undermining it towards the end of the project, or the middle of it. And we didn't understand that, how -- the depth of it, but they were lobbying us to let them take over the FYI contract.

Q Did ProGen become aware of Astrobryxa prior to authorizing Karla Saud to submit bids to CELEC on behalf of ProGen?

A No. I don't recall.

Q ProGen would've become then aware of Astrobryxa after Karla Saud submitted the bids on behalf of ProGen?

A I wasn't aware of Astrobryxa until after we started building the project.

Q Once you and ProGen became aware of Astrobryxa after the contracts were ongoing, did you or anyone else at ProGen do anything to inquire or verify what was Astrobryxa or its background?

A No.

Q Did you ask anyone?

A Huh?

Q Did you ask anyone?

A No.

Q Did you or ProGen ask Mr. Mavares about Astrobryxa?

A No.

MR. PULECIO-BOEK: It's 12:48. I think this would be a good time for lunch.

(Off the record.)

THE VIDEOGRAPHER: We're back on the video record. This begins media unit number 3. The time is 1:47 p.m.

BY MR. PULECIO-BOEK:

Q Welcome back, Mr. Manning.

A Thank you. We're going to hand you a document that we've labeled Exhibit 1 for the purposes of this deposition.

(Exhibit 1 was marked for identification.)

You -- do you have it in front of you?

A I see it.

Q This is the contract between ProGen and Jose Manrique, yes?

A It appears to be a contract. I can't verify if it is the contract.

Q Can you tell us when you're ready?

A Okay. I -- I can't verify if it is or not the contract.

I remember there being other language concerning -- very specific language about, and it may be in there I just don't want to sit here for 30 minutes to read it, concerning the fact that they were agreeing, if they're going to take that over, the construction portion of it, which was many months after the project started, it was already basically under massive construction by other company, that Karla and Jose was supposed to manage.

This is a result of a later term agreement to take projects over from the original contractor.

But it had some language in there that was about -- because I drafted it, and I don't remember all of this word, but that was concerning them gifting back or, you know, what do you call the -- not gifting, but refunding back, crediting back, us around 17, $18 million for works they asked us to take over, and it described a lot of them -- us taking over responsibilities for paying for some of that work.

Anyway, I -- I can't see it. I can't find it in there, so I'm not -- I can't verify if it's actually the -- but I -- I get it. It's a -- it's a contract you're showing me.

Q How many contracts did ProGen sign with Astrobryxa?

A One.
Q So if you can't recall or you haven't seen anyone -- any other contract, this would be the only contract?
A I would -- I don't know if this is the contract. I can't verify it. I don't know where it came from, the copy.
Q Yeah. I would represent to you that this document has been produced in litigation by multiple parties.
A Okay. Right. Did it come from -- though, from my perspective, did they come from Astrobryxa --
Q Yes.
A -- or did it come --
Q Both.
A Okay, then, I can't --
Q So, is --
A Yeah.
Q How many --
A They forged a lot of things.
Q How many --
THE REPORTER: I'm sorry?
THE WITNESS: They forged a lot of documents.
BY MR. PULECIO-BOEK:

Q Yeah. How many contracts did ProGen sign with Astrobryxa?
A One.
Q How many contracts did ProGen sign with Jose Manrique personally or individually?
A None.
Q How many contracts did ProGen sign with Karla Saud personally or individually?
A No contracts that I can recall. I don't know if that's true or not, though, but I don't recall any.
Q How many contracts did ProGen sign with any other company affiliated or connected with Karla Saud or Jose Manrique?
A None. Well, that's not true. We signed agreements. I don't know if you call them contracts, but agreements with others.
Q You -- Progen has signed agreements with other entities affiliated or related to Jose Manrique or Karla Saud?
A Well, we had an agreement with the confiance to provide the bonds. Who was providing -- and FYI who was putting up collateral for the bonds.
Q There is a written agreement between ProGen and FYI regarding FYI providing performance bond for

ProGen's contracts with CELEC?
A It was an agreement. What the contents of it exactly is is lengthy, but yes.
Q And FYI is owned or controlled by Karla Saud and Jose Manrique?
A No. FYI is not owned by Karla -- Karla and Jose.
Q By Karla or Jose?
A Or Jose either, as far as we know.
Q Who is the owner of FYI?
A I don't know.
Q Who is the principal at FYI?
A Fabian Yar.
Q That is Fabian and last name, Y-A-R?
A Yeah.
Q Other than the sole contract between ProGen and Astrobryxa and the contract between ProGen and FYI, are there any other documents, contracts, between ProGen and other parties?
A CELEC.
Q And CELEC, in connection with the Ecuadorian projects?
A Best of my knowledge, I don't recall any more.
Q And this document that I'm showing you is a

contract between ProGen and Astrobryxa dated August 2nd of 2014, yes? Of 2024? You can see the date in the second to last page at the bottom.

A '24? I don't -- okay. It says that. I don't know if it's true. August of '24. May I ask you a question? What was the date the contract was signed with CELEC?

Q It was the same date.

A This was never signed by ProGen. 100 percent.

Q Okay.

A Without a doubt. No hesitation. This was not our -- we did not sign this contract.

Q Okay. This is not a real document, is what you're --

A No.

Q Okay.

A That's a forgery.

Q And if you see at the end -- or in the signature page, there are two signatures. Can you see that?

A I saw it. Yeah.

Q See -- would you please open the document --

A It's definitely --

Q -- and look at the signature page.

A Yeah.
Q You will see that there is what appears to be an electronic signature of Andrew Williamson dated November 1, 2024. Do you see that?
A I see it.
Q And you say that that is not true, accurate, or that it is otherwise a forgery?
A Absolute forgery, yes.
Q Okay. The contract that you mentioned that exists between ProGen and Astrobryxa was signed at a different date?
A Yes.
Q When was it signed?
A I don't know the date. It would've -- substantially after the project started and major work had been accomplished at the site.
Q Would that have been still within 2024 or in 2025?
A '24.
Q It would've been later in 2024?
A 2020 -- no, it would've been 2025, I think, when we -- when did they cancel the contract? What was the date?
Q They canceled the contract in the middle of 2025.

A In the middle of 2025? So yeah, that would've probably been the first -- somewhere around the first part of 2025 --
Q Okay.
A -- that we actually wound up signing a contract, guessing with Astrobryxa. Never at this time.
Q Okay.
A This was a copy of a contract that FYI wanted us to sign. We never -- Astrobryxa, as far as I knew, didn't even exist at that time.
Q The --
A Which I think it needs to be found out.
Q What I'm showing you that -- what you're saying is that Exhibit 1, the document that I am showing you, is a copy of a contract that was drafted to be signed between ProGen and FYI?
A No, I'm guessing that may be what it is. I don't know that it is.
Q Okay.
A It's -- Karla and Jose tried to get us to sign, and we flat out refused. Got angry about it. Absolutely refused.
Q This contract refers to a company called HS Industries, LLC [sic]. What is HS Industries, LLC

[sic]?

A Apparently, that is a company represented that it was owned by Karla.

Q How do you know that that is a company owned by Karla?

A I don't know that it is, but she represented it as her company. Whether it had partners or if she had any equity or ownership, we don't know.

Q Karla Saud told you that she owned H&S Industry?

A That that was her company. Yeah. We didn't talk about who had shares, but she said that was her company.

Q And Karla Saud told you this before ProGen authorized Karla to submit bids on behalf of CELEC -- on behalf of ProGen to CELEC?

A Well, to help us process. We didn't give her an authorization to submit bids on our behalf, but to help us process the bids. She physically handled the deliveries of the bid documents, submittals that we had to submit during the bid. Her and her attorney. Our attorney.

Q Did Karla Saud tell you before submitting the bids on behalf of ProGen to CELEC that H&S Industries was a company that belonged to her?

A There was no conversations really about specifically that that was in any detail. We just assumed it was her company when she said, "This is my company, John." That's -- when she says it like that, you go, okay. That's great, Karla. That's your company.

Q Did you or anyone else at ProGen take any steps to verify or check what H&S Industries was?

A I don't recall what we did on that.

Q Did you or anyone else at ProGen do anything to verify the history of H&S Industry?

A I don't recall what we did.

Q Is there any document that I could show you to refresh your recollection?

A Yes. If you want to.

Q What document?

A Oh, I thought you said -- I thought you were going to show me something, sorry.

Q Is there any document that I could show you to refresh your recollection as to what, if anything, you or others at ProGen did to verify what H&S Industry was or its history?

A Well, other than taking her word for it and that of her attorney, eventually. We didn't see any reason not to trust her.

Q What you're saying is that in addition to Karla, also one of Karla's attorneys told you that H&S Industry was a company that belonged to her?

A No. We just assumed. We wasn't concerned about the ownership. We're not concerned about the ownership at all. We were concerned about her personally working as a contractor to help us process and translate information for the bidding requirements and the bidding of the contract.

Q My contract [sic] is very specific. You mentioned an attorney. I'm asking you whether an attorney of Karla Saud represented to you prior to the authorization to Karla Saud to submit --

A No.

Q -- bids on behalf of ProGen to CELEC, that H&S Industry was a company that belonged to Karla Saud?

A No. I do recall her saying, "This is our company."

Q And -- okay. Eventually, Karla Saud did submit bids working jointly with ProGen to obtain contracts from CELEC; yes?

A Did submit bids?

MR. JIMENEZ: Can you repeat that question?

BY MR. PULECIO-BOEK:

Q Eventually, Karla Saud did in fact submit bids working together with ProGen to CELEC to obtain contracts with CELEC?

A Well, I think it's important to -- for me to note that Karla working as a contractor processing ProGen's paperwork for submittal under the bid requirements by CELEC, she physically did some of that work.

Q My question is, eventually that did happen? Bids were submitted --

A By ProGen.

Q -- by ProGen or on behalf of ProGen to CELEC; yes?

A No. By ProGen.

Q Directly to CELEC?

A Yes.

Q Who at ProGen directly submitted bids to CELEC?

A We did. ProGen did as a company, because it took the whole company to process all the -- all the documents for it. We collectively, as a corporation, prepared all of the documentation that needed to be submitted.

Karla physically handed over that

documentation. She would review it and make sure it was correct, according to what she understood as the bidding document requirements as a contractor on our behalf.

Her submitting them was her physical work of doing that. So I'm not -- you know, what I'm saying is we didn't hire her as an official representative, a legal representative of ProGen to do anything like that ever.

In fact, we emphatically made sure that she was well aware on many occasions that are documented in -- in this case that she was not to submit anything as a legal representative of ProGen whatsoever without ProGen's prior written approval. And it's in writing that way with her.

Q Did you or anyone else at ProGen communicate with anyone at CELEC or the Ecuadorian government before Karla Saud submitted the bids?

A We've -- we've presented -- no, not in the government. We've presented proposals for projects in Ecuador for many years.

Q Did you or anyone else at ProGen in -- at any point inform CELEC prior to Karla Saud submitting the ProGen bids that Karla Saud was not authorized to act on behalf or represent ProGen?

A We never had to. There was no reason to do that with them. There was a reason to do it with Karla to make sure she understood. And we all had boundaries of what the limits of her responsibilities or tasks to be performed under what we needed to comply with. The RFQ documents were very specific on what they were.
Q Prior to the date that Karla Saud submitted the ProGen bids to CELEC, was there any written agreement of any kind with Karla Saud laying out her responsibilities or duties?
A Not agreements, but letters confirming what they were. What her capabilities were.
Q And those letters were sent by ProGen to Karla Saud in email?
A Probably by email.
Q And also text messages?
A Maybe, yes. Yeah. Maybe by text message.
Q And these would be letters sent by ProGen to Karla Saud prior to the date --
A Yeah.
Q -- which Karla Saud submitted the ProGen bids to CELEC in which her duties and responsibilities were outlined?
A Yes. And there are documents -- multiple

documents that reiterate the same to her. She's not authorized to sign contracts on our behalf or commit us to any obligations on -- ProGen to any obligations. Sorry. Or bind us to any contracts. Some other ones were specifically to make change orders. She was not authorized to do any of that.

Q Do you recall approximately what date Karla Saud submitted those ProGen bids to CELEC?

A I sure don't. I don't recall.

Q Would've been at some point, perhaps in June or July of 2024?

A I would say July, maybe, or something. I'm not sure. Around that time. Just when time of the -- you know, basically the contract. So anytime up to then, June, July, maybe. Yes.

Q As of that moment in time when Karla Saud submitted the ProGen bids to CELEC, had ProGen ever performed -- ever delivered generators in a foreign country?

A Yes.

Q In which countries had ProGen delivered generators?

A Which country didn't we? Over the years. Africa, many of the nations in Africa. Nigeria, Botswana, South Africa. Ribeirao -- I mean, not

Ribeirao Preto. Yeah. Ribeirao Preto in -- in Brazil. Several other African nations. I can't remember their names right now.

Middle East, Yemen, Ecuador. I mean, Colombia, Peru, Brazil. I know there's some more, but I've been doing it so long I can't remember them all.

Q I just wanted to --

A But not ProGen. ProGen, some over in Africa. And that was your question. Yeah. Sorry.

Q Yes, Mr. Manning. I'm asking you very specifically about ProGen. Had ProGen ever shipped or delivered generators to a country outside of the United States?

A Yes.

Q To which countries?

A Africa.

Q Which countries in Africa?

A I can't -- can't remember the name of it. It's -- it's a funny name. I can't recall the name of that.

Q Who was the customer that purchased ProGen generators in Africa?

A There's another one, and I can't remember their name either. I'd have -- we'd have to ask Shane. I don't -- I can't recall the names of them

right now.

Q How many generators did ProGen ship to Africa?

A Out of all of them, maybe -- I mean, I couldn't count because I don't remember all the -- the deals we did, but -- I don't know. At least ten. I don't know of any more to Africa itself, but --

Q So as you sit here today testifying, you recall that ProGen delivered at least ten generators to some country in Africa and some customer in Africa, but you cannot recall neither the name of the country nor the customer in Africa?

A Yeah. Burkina Faso is the one. Burkina Faso. And then I can't remember the other one. God dang it. I can't remember the name of it, but --

Q Was it two countries or just one?

A It was two.

Q And those ten -- at least ten generators that ProGen delivered to Burkina Faso and another country you can't recall in Africa, the customers of those at least ten generators were satisfied with the generators that were delivered?

A Yeah. In fact, we got -- we got a call on one of them recently to provide parts for them from time to time.

Q And those customers in Africa paid, in fact, ProGen for those generators?
A Well, we -- and Wade mentioned this in his deposition, that we -- we sold a project to Ginsermer [ph] and they defaulted on the contract. And so their customer, which is the company I can't think of, asked us to complete the project with them directly because Ginsermer [ph] wasn't delivering a whole lot of things, like the switchgear for the project and some other electrical apparatuses and things that was supposed to accompany our units and they never delivered it.
And also they owed us money. And the company reached out to us directly to see if we wouldn't mind finishing, and we did.
Q My question was whether the customers that have purchased those at least ten ProGen generators in Burkina Faso and another country in Africa have indeed paid ProGen for those generators?
A Yes.
Q Entirely?
A I think one of them still owed us some money on three of them. I just can't remember. It's been a while.
Q And those were ten generators that ProGen

manufactured and delivered in Burkina Faso and that other country?
A Yes.
Q Those were ten generators -- or at least ten generators that ProGen manufactured in its Florida facilities and delivered and installed in Africa?
A Yes.
Q And how much did ProGen get paid in connection with --
A I don't recall.
Q -- those two contracts?
A Sorry. Don't recall.
Q Was it more than $50 million?
A I don't recall. I really don't. I don't recall.
Q Anywhere --
A Those things sell for around 2.3 million each, so I don't recall.
Q So 2.3 million each for approximately ten generators, you estimate that ProGen would've received in connection with those two African contracts, approximately $25 million?
A Estimated over the years, yeah, maybe.
Q Over how many years?
A I don't know. A couple years, probably.

Q How long did it take ProGen to complete those two contracts? Meaning build the generators in its Florida facilities and deliver them to those two countries in Africa?
A I don't recall.
Q Was it one year?
A I don't recall. I didn't -- I didn't follow that all the way along, so I don't recall. It's been a while, and I don't recall.
Q Was it a couple of months?
A You can literally find it out exactly. So no, it wasn't.
Q Was it was more than a couple of months?
A It would be more. It'd have to be more for those because those were brand-newly packaged from the ground up engines, remanufactured everything, completely converted for those particular units in that -- in those.
And they were these big containerized units to a specific -- very specific buildup because of extreme heat and high dust and all kind of other -- a little different than a standard generator. But yeah, it would've taken longer than that. And they didn't need them any faster than that, so.
Q It would've taken more than one year?

A By the time we got them probably built load tested and fully commissioned, maybe. It could have been sooner. I don't know. I don't recall.
Q Did you provide evidence of that expertise in your bid documents to CELEC in connection with the bids?
A I don't know. I could have. Yeah. Whatever was in our brochure. Yeah.
Q Your -- Progen's brochures or marketing materials that were provided to CELEC would disclose those two African contracts?
A It would -- it would have disclosed those projects and many more that were done prior to the name of ProGen, but by the company or the group of people at ProGen, the assets of ProGen.
Q What you're saying is that, for example, the experience and expertise of Genertek should be counted as part of and included in ProGen's experience?
A It was very clearly explained that way to CELEC. Very clearly.
Q That is what you're saying? That --
A Yeah. That we're -- we were promoting that ProGen is a continuation of a previous companies or company that -- that nothing's changed with the company, but the name of the company.

And it's the same group doing it. The same me that sold them. The same team that built them, engineered them, installed them, and commissioned them. And then -- and it's just because of some of the reasons we went over that some names changed, and -- and but it's the same company.

Q Other than those two African contracts you've described for approximately ten generators, prior to Karla Saud submitting the ProGen bids to CELEC, had ProGen delivered generators to any other country?

A I don't recall. I'd have to look in the records and see exactly when. Some projects that ProGen, when they took over, were actually already working under Genertek and got transferred over to ProGen.

So I don't know. I'd have to go through the records. As I'm sitting here, unfortunately, I can't recall the exact dates. You can certainly find them out.

Q Okay. And did ProGen ever -- sorry. So just to see if I understand what you're saying is that ProGen is essentially what we would call a successor to many of your prior businesses, and therefore the entire experience, assets, operations of all your

prior businesses are part of ProGen's assets and business?

MR. JIMENEZ: Objection as to form.

THE WITNESS: So what CELEC was interested in was in the past experiences of ProGen. Not past projects, but past experience.

And it was very clearly explained, as we explained to anybody that asked, as we always take people to Lakeland Electric, like we did Luque and Fabian Calero, when we explained exactly what we were delivering, that you'll see the name of Genertek on the side of the tax. That's -- company became ProGen eventually. Okay. No problems. You know?

BY MR. PULECIO-BOEK:

Q My question to you specifically is what you're saying here today as you testify is that ProGen is the successor of all your prior businesses and that ProGen kind of incorporates or encapsulates all of your prior businesses and assets and operations?

MR. JIMENEZ: Objection as to form.

THE WITNESS: I -- I would say close.

BY MR. PULECIO-BOEK:

Q Close, yes?

A Close.

MR. JIMENEZ: Objection as to form.

THE WITNESS: Okay. Because ProGen's developed some of its own products new -- on its own. So and it's continuing to do so, evolve and grow and expand its capabilities.

BY MR. PULECIO-BOEK:

Q What is -- as you sit here testifying today, do you recall any other contract -- lets focus only on ProGen formally, any other contract in which ProGen was paid over $100 million?

A Yeah. We have Hunt. We have All Sorts Alaska. We've got Coast Oil. We've got -- there's more. I just can't remember the name of them.

Q So ProGen specifically, at some point from 2021 to 2024, prior to Karla Saud submitting the bids to ProGen, had a contract of over $100 million with Hunt; yes?

A It was supposed to be -- it was predicated on us receiving an order for half a billion dollars, $500 million order. And that's what Hunt started out as. And it was a strategy to joint venture our companies with them to do that.

Q Very specific question.

A Yeah.

Q Did ProGen receive in connection with any contract prior to Karla Saud submitting the bids to

ProGen -- to CELEC, I'm sorry. Did it receive in connection with any contract more than $100 million?
MR. JIMENEZ: Objection as to form.
THE WITNESS: No, not from one contract. No.
BY MR. PULECIO-BOEK:
Q Prior to Karla Saud submitting the ProGen bids to CELEC in the middle of 2024, had ProGen received from any customer in connection with any contract, over $50 million?
A Prior to when?
Q To Karla Saud submitting the bids to CELEC.
A Did ProGen or ProGen's successor businesses companies?
Q ProGen.
A I don't really recall, but I would think not one contract. No.
Q So it is correct that the largest contract that ProGen had in its history was -- were the CELEC contracts?
A No. We had the ERSA [ph] contract before CELEC contracts. That was a -- I think it was 11, $12 million, $14 million project. But now there was -- before the CELEC contracts, that was actually included, too. I didn't think about that one for

ProGen. I don't recall the exact numbers. You'd have to get with, you know, our accounting and -- and somebody else. I don't know the numbers.

Q The question was --

A For one contract. Yeah.

Q All right. The question was the largest contracts that ProGen had had in its history were the CELEC contracts; yes?

MR. JIMENEZ: Objection as to form.

THE WITNESS: Yes.

BY MR. PULECIO-BOEK:

Q Prior to the date in which Karla submitted the bids to CELEC in the middle of -- prior to Karla submitting the bids to CELEC in the middle of 2024, had ProGen ever received in connection with a specific contract or customer over $20 million?

A I think so. Yeah. I just can't recall which one. Yeah.

Q Can you try to give me a name that --

A No, I don't have any. I don't recall any specific. You can go through our records and get the names of our contracts, but I don't recall specifically, but I think we did. Yeah.

Q There may be at least one contract prior to the CELEC contracts in which ProGen received over $20

million?

MR. JIMENEZ: Objection as to form.

THE WITNESS: I don't know.

BY MR. PULECIO-BOEK:

Q No?

A No.

Q Prior to the CELEC contracts, ProGen, specifically ProGen, had ProGen ever entered into a contract that entailed manufacturing and delivering 60 new power generators?

A Can you repeat the question?

Q Prior to the CELEC contracts, had ProGen ever entered into a contract requiring manufacturing and delivering nearly 60 generators?

A How many?

Q 60?

A No.

Q Prior to the CELEC contracts, had ProGen ever entered into a contract requiring ProGen to manufacture and deliver over 30 generators?

A Yes. Well, not ProGen, but a successor did. Yeah.

Q Focusing on ProGen.

A Yeah.

Q ProGen, yes or no?

A I don't think so. No.
Q Prior to the CELEC contracts, had ProGen ever entered into a contract requiring it to manufacture and deliver over 15 power generators?
A Maybe. I don't know.
Q With what customer?
A I wouldn't know. Well, we've done a lot of projects. I just don't know the numbers for which ones that we've done. I really don't remember. I don't recall the size of the contracts. But we've --
Q You have been the CEO of ProGen since the beginning of ProGen; yes?
A Yes. Which is the same company I sold, and I've been doing it for 35 years. And we've done 50, 100 megawatt projects before. So we know how to do it. And the company's equipped to do it. Certainly facility-wise equipped to do it.
Q And your son-in-law, Shane, has been since the start of ProGen, the vice president of ProGen, yes?
A No. I think only in the last maybe three or four years.
Q Okay.
A Not immediately because nobody had a title when we started originally, so.

Q Prior to the CELEC contracts, had ProGen ever entered into a contract requiring it to manufacture and deliver over five power generators?
A Yes.
Q With whom?
A I don't know. Sitting here today, I can't tell you the names of any companies right now.
Q What would you need to be able to answer that question?
A Go home and get with the accountants and everybody and get a list of all the generator set sales that ProGen's done, and, you know, refresh my memory.
Q And who at ProGen would know that information?
A Shane Lawlor and Andrew Williamson. Probably Andrew Williamson better than anybody because he keeps all the records, financial records.
Q So in order to determine whether ProGen ever had any contract prior to the CELEC contracts that required it to build and deliver over five generators, you would need to speak to Andrew Williamson or your son-in-law Shane?
A I wouldn't. You would. But yes, anybody would. I just can't tell you right now.

Q I'm sorry. Is there anything that I said that is funny in connection with a lack of experience of ProGen?

A There's -- you said that ProGen has a lack of experience, which I take extreme issue with. Experience isn't just the dollar size. It's, can you do the job? Are you equipped -- capable to do the job?

So what do you know about ProGen that we're not equipped and experienced to do the project? You don't because you don't know anything about us, other than your little case about old and used generators. That's what you know.

And you're going to try to substantiate it with sizes of contracts recently that we've done, and you're going to do everything you can to discredit us. I get it. So I'm here to help you. Whatever you need.

Q You think that the $100 million that CELEC paid you for delivering nothing is silly or is --

A I didn't deliver nothing. I take exception with delivering nothing. And again, you say things that are not true. We -- we delivered tens of millions of dollars worth of equipment for the project.

If you ask me a question, instead of saying nothing, be sure that you're accurate because, oh, otherwise, we're just all telling lies here and wasting time.

Q Sir, there's no need --

A I don't like the lies.

Q There's no need to get agitated. You use the words --

A Why? When you accuse somebody?

Q You provoke --

MR. JIMENEZ: Wait, wait, wait. You provoked him by asking what --

MR. PULECIO-BOEK: Do not -- do not interfere. Do not interfere.

THE REPORTER: Please one at a time.

MR. JIMENEZ: No, no, no. You do not interfere. You provoked him --

MR. PULECIO-BOEK: Do not --

MR. JIMENEZ: -- by saying, is there something that I said that is funny?

MR. PULECIO-BOEK: Do not interfere.

MR. JIMENEZ: Anytime he said -- he has any kind of reaction --

MR. PULECIO-BOEK: Going forward --

MR. JIMENEZ: -- you -- let me finish

and then you can speak. Anytime he has any kind of reaction, you provoke him by asking that. So I ask you to please control yourself. You don't need to ask how his reactions are.

MR. PULECIO-BOEK: If you do another speaking objection like this, I'm going to call the Court.

MR. JIMENEZ: It's not a speaking objection.

MR. PULECIO-BOEK: Okay. I'm going to call the Court.

MR. JIMENEZ: My objection is to you.

THE WITNESS: I think we'd like to call the Court because I don't like people lying in the deposition. I don't like you characterizing things that are outright lies. Don't do it, and we cannot get in a problem like this.

Am I going to get pissed about it? Who wouldn't? What human likes anybody lying on them and trying to record it so he can narrate it to his own terms? So I'm going to take a little break because I'm really pissed at you right now for doing that.

Because we have a lot of ethics in our company. We've been doing this forever. We built a great product. We're well-known and famous for the

quality of what we build. And I don't like you attacking that by lying about it.

You have some specific thing you can say that, you know, is true? Go ahead. I can defend and I can walk toe to toe with you under.

If we did something wrong, we're going to admit it. And I'm not going to sit here and listen to you characterize lies. Why would I do that? Who would?

Nobody wants to be abused that way and just say, please answer the question. I'm not going to do that. So you can characterize me however you want, but I'm going to take a break. Because I need to right now.

BY MR. PULECIO-BOEK:

Q You are not excused. We're not in break.

MR. JIMENEZ: He's going to take a break right now. He will take a break.

BY MR. PULECIO-BOEK:

Q Mr. Manning --

MR. JIMENEZ: He's going to take a break. He will take a break.

THE WITNESS: I will take a break. And you can kiss my ass over it.

MR. PULECIO-BOEK: Don't -- stop -- Mr.

Manning, you are not excused.

MR. JIMENEZ: He is excused.

MS. COLBERT: He's taking a break.

MR. PULECIO-BOEK: He just gave the finger to the attorney. The witness has left without consent of Counsel and in doing so he showed the finger to the questioning attorney as he was stepping out the door. There have been several witnesses here about Mr. Manning showing the finger to the questioning attorney as he was stepping out the door without the consent of Counsel.

MS. COLBERT: He asked for a bathroom break and was denied that break and told to remain in the room, which is inappropriate. He left to go to the bathroom. He had -- there was no question pending at the time he asked to go to the bathroom.

MR. PULECIO-BOEK: There was a question pending.

MR. JIMENEZ: And you provoked him. You did it on purpose to provoke him.

MS. COLBERT: We're off the record. We're taking a bathroom break.

THE VIDEOGRAPHER: Going off the video record at 2:29 p.m.

(Off the record.)

THE VIDEOGRAPHER: We're back on the video record. This begins media unit number 3 -- excuse me, 4. The time is 2:43 p.m.

MR. JIMENEZ: Mr. Manning would like to say a few words before we restart.

THE WITNESS: Yeah. I just wanted to apologize to everybody for my -- I lost my temper there, which is unusual for me to do so, but just defending our -- our company.

BY MR. PULECIO-BOEK:

Q Mr. Manning, before the break, you mentioned that the -- that we had a little case. Do you consider a little case to be a claim for over $100 million?

A I don't recall actually saying that, probably in the heat of when I was angry. I don't consider anything about this case small or the contract small, including our commitment and responsibility to the contract.

You know, indeed, we -- we definitely exhibited our commitment to the contract overwhelmingly throughout the contract, always trying to do what we had to -- to complete the contract.

And I've lost tens of millions of dollars because of the contract, if not more. So nothing

about this contract is small, not the impact on it -- on us, not the impact on the Ecuadorian people, certainly not the impact on the company. So no, I don't consider it small.

Q Mr. Manning, focusing on ProGen, specifically in -- ProGen specifically, as you sit here testifying, can you recall any other contract similar in scope or magnitude to the CELEC contracts?

A Under ProGen proper its name, no.

Q Did CELEC disclose to the -- did ProGen disclose to CELEC that it did not have any contract comparable in scope or magnitude?

A No. CELEC was highly informed of everything about ProGen and its assessor companies when Roberto Luque and Fabian Calero visited our facilities.

They came to look at the company because they knew we didn't have any projects comparable under ProGen's name, but that the company and its prior -- prior companies had done many projects, which we showed to them, but that was being -- that were still this part of the company.

And although it's not the same name, it's the same company structure, the same company personnel there that -- that could execute the contract and have -- and have executed comparable projects in the past

as a corporate group.

So when Fabian Calero came to visit us, we went over the company structure and who we were and, you know, how ProGen came to be as ProGen.

And we explained exactly what we were delivering for the project to them and took them over to visit the Lakeland Power Plant to show them an example of the company's past experiences, personnel, and predecessor companies. And the name of the -- Genertek was on the units.

And we, you know, said, look, there's the name I told you we -- our previous company that -- that became ProGen has executed incredible projects.

That is a world-class, world-class power plant that we showed them that is -- is something that we were very proud of as a team, same team named ProGen when they did under Genertek, accomplished, and went through exactly what we were delivering, the kinds of equipment and all for the project.

Q Mr. Manning, did ProGen disclose to CELEC, prior to submitting the bids to CELEC, that it did not have any comparable experience as ProGen?

A Yes.

Q Did ProGen disclose that to CELEC in writing?

A I don't think so. I don't recall.
Q Did ProGen disclose that to CELEC verbally?
A Well, ProGen proposed that what experience ProGen had in the previous projects we'd done through ProGen and its predecessor, you know, named companies, and included those in the contract even. And explained to them, yes, verbally, while they came to visit us, exactly who ProGen was.
Q Did ProGen disclose to CELEC its lack of experience as ProGen at any other point in time, other than verbally in connection with that meeting that you referenced?
A They didn't -- thank you. Sorry. ProGen didn't need to explain its lack of experience because it didn't have any lack of experience.
Q So you are referencing a meeting that took place between you and the former general manager of CELEC prior to ProGen submitting the bins to CELEC; yes?
A And the Minister of Energy, Roberto Luque.
Q Okay. I just -- I previously had asked you whether ProGen had at any point met with anyone from CELEC or the Ecuadorian government prior to the submission of the bids. And you said no. So there was a meeting?

A Yeah. I misunderstood your question. I though you meant it on another issue.
Q Okay. What did you think I mean?
A I -- I think it was about -- I can't recall, but I -- I just -- I heard it wrong. I thought it was about -- and I can't recall now. I'd have to go back to the transcript, but I thought it was in relationships to some communications at CELEC.
Q Yep.
A And I -- I misunderstood it, so that's my bad.
Q Prior to Karla Saud submitting the ProGen bids to CELEC, ProGen did meet officials from CELEC or the Ecuadorian government?
A Oh. Prior to submitting the bids -- it was during the time we were submitting the bids to -- to -- not prior to, but during that time, if I recall correctly. Yeah.
Q And how many times did ProGen meet with CELEC or officials from the Ecuadorian government prior to signing the contracts with CELEC?
A Many times, in Ecuador. Yeah.
Q There were meetings in the United States and in Ecuador?
A In Ecuador. The only meeting in the United

States with CELEC was Roberto Luque and Fabian Calero, who was the -- the director. Yes.

Q So there was one meeting in the United States, specifically where?

A At ProGen.

Q That means in the 600 --

A Yes.

Q -- Prairie?

A Yes.

Q There was one meeting between ProGen and Fabian Calero and Mr. Luque in ProGen's headquarters prior to signing the contracts with CELEC?

A Correct.

Q And in that meeting, you are testifying that ProGen disclosed that, as ProGen, it didn't have any comparable experience, but that its management team or you primarily and Andrew Williamson had comparable experience in the past?

A Correct. Yeah.

Q Did you deliver a PowerPoint presentation to CELEC?

A No. We probably showed them brochures, and we might have on the board. We went through a brochure. We don't have a PowerPoint presentation for ProGen. We have brochures.

Q There -- so you're -- what you're saying is that there are materials at ProGen that ProGen showed to CELEC in connection with that meeting in which ProGen disclosed that, as ProGen, it didn't have any comparable experience, but that its management team could have prior comparable experience?
A I don't believe we did. I believe they saw all of that long before they came.
Q So no such --
A To Karla.
Q -- no such materials were provided to CELEC during that meeting?
A I don't recall.
Q Who would know?
A Shane, maybe. Somebody else that was there other than me. I don't -- wouldn't be paying attention to that because that's not what I do, so --
Q Is there any written document, presentation, email, text messages where ProGen disclosed that to CELEC?
A Yeah. And their copies of them are in the contract -- or brochures. Yeah.
Q Is there any email, text message, document, presentation where ProGen disclosed to CELEC that, as ProGen, didn't have any comparable experience?

A No.

Q Other than the meeting in the United States between CELEC and -- or CELEC and an official from the Ecuadorian government and ProGen, you said that there were other meetings in Ecuador prior to signing the contracts?

A Yes.

Q Were there meetings in Ecuador prior to submitting the bids?

A I don't recall.

Q So you do recall meetings, but those would've been at around the time of the bids and the signature of the contract or in between?

A It would've been around the time before they awarded the bids and after they awarded the bids. And then all the way up to the time when we signed -- negotiated the contract at CELEC with CELEC up until the time we actually signed the contract.

Q Okay. As you sit here testifying, what is the -- what contract did you have worked on personally would you say compares to the CELEC contracts?

A Several hundred millions of dollars in contracts over the last 35 years.

Q Okay.

A Hundreds of millions.

Q Let's focus on your prior ten years prior to being ProGen CEO, which I guess means your time with PowerTeam and Genertek; yes?
A Yes.
Q What contract would you say is comparable in scope and magnitude to the CELEC contracts?
A 100-megawatt project we did in Yemen.
Q Anything else?
A 40-megawatt project we did in Venezuela -- or we sold to Venezuela. I -- I can't recall any more.
Q Who was the customer in the Yemen contract that is comparable to the CELEC contracts?
A Megawatt.
Q Megawatt is a company in Yemen?
A No. Sorry.
Q What is Megawatt?
A It's a -- it was a company out of Dubai that was a power seller. They sold power. So they would buy equipment and sell energy.
Q And who -- was it Genertek Power business -- Genertek Power that had a contract with Megawatt?
A Yeah.
Q Genertek Power sold how many power generators to Megawatts [sic]?

A 40.
Q And how much did Megawatt pay Genertek for those 40 power generators?
A The contract was worth about $119 million --
Q And --
A -- or 40 generators.
Q Yeah. And Megawatt paid those $120 million?
A They -- they didn't. They bought the company from me before they finished the contract.
Q Was Megawatt satisfied with the 40 generators that Genertek built and --
A Well --
Q -- delivered for them in Yemen?
A I don't know because they fired me before -- before they finished the project. And I'm not sure exactly what they did to finish the project, but I do know that I went to sue them with the -- their customer in Yemen for their non-performance.
And we joined forces, and I got them to capitulate to give me the company back for $1.
Q Did Megawatt pay for that 100 -- I'm sorry, for that 40 generators that Genertek built and delivered in Yemen?
A Megawatt, I don't know what they did towards the end of the contract because I wasn't there. But I

was trying to retire back then.

And motor -- I mean, Megawatt was a complicated structured company. I don't know who or what they were, you know, in Yemen -- I mean, in Dubai. But I know they had about 30 investors, and I don't know how they paid, what they paid, how they did it, but --

Q Who --

A They strong-armed me into selling the company, so --

Q Who's the principal at Megawatt that you communicated with or interacted with?

A Joe Adir.

Q Can you please spell the name?

A G -- J-O-E, A-D-I-R. And his boss, which is Mohammad [ph] -- sorry, Mohammad [ph] Ayuhed. It's A-Y-U-H-E-D. Mohammad [ph] Ayuhed. So you had a Jewish partner and a Muslim partner. We were in business together, and they raised a bunch of capital with a bunch of investors out of the Middle East. That's all I know.

Q Were they based in the United States?

A Nope, they were based in Dubai.

Q You have their phone numbers?

A I don't.

Q Did you communicate with them via email?
A No. I haven't communicated with them in ten years.
Q Did you communicate with them via email?
A I would, sure. I would -- I would have if we had Florida Power and Energy. I mean, what was the name of the company? I keep forgetting that name.
Q PowerTeam?
A PowerTeam. Sorry. I can't believe I can't remember that. Must be getting old.
Q So you did communicate with them in -- via email?
A Huh?
Q You did communicate with them via email?
A Sure. Yeah.
Q And you did communicate with them via phone?
A Back then, yeah.
Q Did your company -- let's say it was PowerTeam. Did PowerTeam in fact build and deliver, in Yemen, 40 power generators for Megawatt?
A Which company?
Q With whatever company you used for that contract.
A Yeah. Well, like I said, I closed it under PowerTeam, and they wanted to come in and be a

partner, and then I don't know how it was finished. I wasn't there.

Q It's a very specific question. You -- do you recall the name of the company that had the contract with Megawatt?

A Yeah. PowerTeam.

Q Did PowerTeam in fact build and deliver 40 power generators for Megawatt in Yemen? Yes or no?

A Yes.

Q Yes. And Yemen received those generators to -- Megawatt received those 40 power generators to its satisfaction?

A No. Because they defaulted on the contract. They defaulted. I don't know what they did with all the generators.

Because they bought into -- they got 50 percent of the shares of ProGen when they closed that contract with us, and then they cut off the funding on me and said that their partners wanted more percentage ownership in the company.

And I turned them down, and they came back, and sure enough, they cut off the funding, and then I agreed.

I said, "Okay. I'll tell you what. I'm just going to sell the company. I'm not going to deal

with this anymore. You guys are breaking your word. You were going to do what you're going to do, and you didn't do it."

So I hired an attorney out of California. I think it was about a 300-page M&A agreement, and I sold the company, and they got owners -- majority ownership of the company. I didn't want to give them majority because I didn't want them to do what they did. I just didn't trust them.

Anyway, I gave them majority ownership of the company, which is -- I think it would've been about 80 percent or more, and I don't recall because it's been so long. And they were going to pay me, immediately, $300,000, and then several millions of dollars each month for the company.

And as soon as I signed the contract, they fired me the -- three days later, fired Andrew a few -- few or four days later, fired us both, and then cut off all communications with us. And so that's what happened. So that's why I don't know.

Q So you mentioned two comparable contracts. One is a contract with Megawatt for the building and delivery of power generators in Yemen, and you mentioned a second comparable contract in Venezuela; yes?

A A second contract with what?
Q Comparable contract, and I believe you said it was in Venezuela?
A Yeah, 40-megawatt for Venezuela. Yeah.
Q Who was your customer in that Venezuela contract?
A I can't recall their name.
Q What company did you use for that Venezuela contract? Was that PowerTeam Services?
A It was Genertek. It was Genertek.
Q Genertek. Genertek had a contract to build how many power generators for the customer in Venezuela?
A I don't recall how many 40-megawatts. I think it was 16. I think it was 16 if I recall right. Yeah.
Q So Genertek had a contract with a company in Venezuela to build and deliver 16 power generators?
A Uh-huh. Yes. The end -- end customer was -- was Chevron, for an oil refinery. The customer that did the contract with us was here, out of Houston, and I can't remember the name of the company.
Anyway, we were building and shipping units, and then Trump came in with the embargo against Venezuela. And the contract canceled because we

couldn't -- and we couldn't deliver anymore, and it got cut off. So I don't know what happened to it, but --

Q How many power generators did Genertek, in fact, build and deliver for?

A We shipped all of them. And five of them got -- four of them got stopped at the port in Miami. And I tried to buy them back for several years, but they were all tied up, so --

Q Your testimony is that Genertek did in fact build and deliver to a customer in Venezuela, and ultimately, Chevron, 12 power generators?

A No. To a customer that was in Houston who was selling those to a customer in Venezuela. Yeah. That many generators.

Q And you have no way of recalling who was that customer in Houston?

A I can't, no. I'm sorry.

Q Okay.

A I can't recall their name.

Q And that customer in Houston, whose name you don't recall, did in fact pay Genertek for those 16 power generators that Genertek built?

A No. They wound up owing us $6 million.

Q I'm sorry?

A They wound up owing us $6 million.
Q Okay.
A And I tried to stop the shipment of the units in Miami and get them back, like I said, first couple years, but they were all tied up.
Q And what was the total amount of the contract?
A I don't recall. I think we'd have to look at the documents. I don't recall.
Q You don't recall the total amount of the contract, but you do recall that they ended up owing you $6 million?
A Well, that stuck out a lot at the time. Yeah.
Q And again, you do not recall if Megawatt eventually did, in fact, pay anything to PowerTeam in connection with 40 power generators that PowerTeam --
A Say that again?
Q Did Megawatt pay anything to PowerTeam for the 40 power generators that you say PowerTeam built and delivered in Yemen?
A Yes, it did.
Q How much did they --
A I don't recall, but it was a lot.
Q Can you --

A It was probably upwards of $50 million that that company got paid --
Q Megawatt --
A -- before I exited. PowerTeam, while it was transitioning to Megawatt.
Q Megawatt did in fact pay over $50 million to PowerTeam in connection with approximately --
A I believe so.
Q -- in connection with approximately 40 power generators that PowerTeam built and delivered in Yemen?
A Well, half of your question, I can't respond to. I can respond that they -- I believe they paid 40 to $50 million dollars in before I left the company.
Q Okay. Do you have an estimated amount for the contract relating to Venezuela, which -- who said customer was Chevron, the total amount of that contract?
A I would've -- think it was around 22 million or more. I would think, thinking about the pricing, but I don't know that for sure.
Q Any other contract comparable in magnitude, scope, and size to the CELEC contracts, other than the Yemen contract and the Venezuela contract?
A No, that I can recall.

Q Did you disclose to CELEC at any point in time that those two comparable contracts, that you, as the leader of the management team, had ended up either in litigations, defaults, or lack of payment?
A Can you repeat that, please?
Q Did you disclose to CELEC at any point in time that those two comparable contracts, that you at -- as manager had previously to the contracts with CELEC, had ended up in defaults, litigation, lack of payment, and the like?
A Nobody asked. No. There was nobody wanting to disclose, asking to disclose. They just wanted to mainly see our -- our experiential capabilities and experience in the past, which is what we were focusing on. We knew how to do the contract and execute it exactly --
Q If --
A -- perfectly executed. We knew how to.
Q If I understand correctly, and you can correct me if I'm wrong, your and ProGen's position, with respect to the contracts, specifically the Quevedo and Salitral contracts, is that ProGen would -- I'm trying to summarize your position. You tell me if it's accurate or not.
A Can't wait.

Q Is that ProGen would find generators -- I know you take issue with the expression "old and used," but that it would find generators in the marketplace, rewind them so that they were zero hours, clean them, paint them, ship them to Ecuador, and that in Ecuador, a separate team, a team separate from ProGen, basically subcontractors of ProGen, would take those generators that ProGen would ship and install them so they were functional and were able to generate electricity for CELEC. Is that a fair description?

A No.

MR. JIMENEZ: Objection as to form.

BY MR. PULECIO-BOEK:

Q It is not?

A No.

Q Okay. What was wrong about it?

A It was a lot. It was a lot. Might it be better if I described what we agreed in writing in the contract to provide? This is exactly what we were trying to do. Might that help?

Q Let's take it in pieces. Your -- ProGen's understanding is that under the contract, it was required to rebuild power generators; yes?

A No. No.

Q Okay. Tell us, in your own words, what is

your understanding of the Quevedo and Salitral contracts and ProGen's obligations thereunder?

A So the contracts weren't for the sale of generators whatsoever. They were for the sale of two new power plants. All right? That's what it was for. Everything in the contract was about two power plants, a 50-megawatt in 90 days and 100-megawatt in 120 days, very rapid delivery projects.

What we were to deliver was newly-packaged, either new surplus, unused, and zero-hour equipment, as far as the generators were concerned, with everything else being brand new, which -- that is perfectly described in the contract.

The contract also describes every -- you know, brand new, but it also described specifically the condition of the generation equipment and the power plants that we were going to deliver, very specifically.

Everybody just -- you know, since CELEC caused the contract to cancel, everything went towards old and used generators, rather than -- why did the contract cancel? It didn't contract because of old and used generators.

It contract because -- I mean, it canceled due to the lack of progress at the sites. It was only

until they canceled it that somebody got the bright idea to start calling it old and used generators.

We were in the process of delivering newly-packaged, either new surplus, unused, and zero-hour equipment when the contract canceled. We never got to deliver our product, not the completed power plant or even the completed components in the power plant that were very well-described in the contract.

Q Okay. So your testimony --

A That's what we're fighting.

Q So that your testimony is that what ProGen told CELEC it would do, and what it agreed to do in the contracts, is that it would build two power plants; yes?

A Yeah.

Q And in order to build those two power plants, ProGen would provide power generators and would provide -- and would construct or build the site for those power generators to be installed and to generate power?

A Yeah. It was a -- an EPC contract to build and supply two power plants.

Q And the generators that ProGen was going to provide for those two power plants were generators that had to meet, according to you, three

requirements. They would have to be new surplus --
A No.
Q -- unused and zero-hours?
A It would -- it would have to be, first, according to the contract, newly-packaged. And it would be utilizing either new surplus, unused, and zero-hour equipment.
So when they came to visit us, they knew there was no brand-new engines and generators on the market, they did not exist anywhere, and that we didn't have any new engines and new generators. That we would -- could -- we discussed very specifically, which -- what turned into the contract.
It started then. We would provide newly-packaged equipment with utilizing either zero-hour engines and alternators that were unused, zero-hour and zero-hour equipment, which means we had took existing engines and alternators and packaged brand-new generator sets, other than the engines and alternators, which would be zero-hour.
Now, that's what we're going to march all the way through the end of this thing, because it's true.
Q Your testimony --
A The old and used generators are not that.

Q Your testimony is that what ProGen said to CELEC and what is stated in the contracts is that the power generators would be newly-packaged generators; yes?
A Yes.
Q And that those newly-packaged generators would -- all of them would have to contain parts -- meaning engine, alternators, and other parts that were -- had to meet three criteria. They all had to be zero-hours, unused, and new surplus; yes?
A And zero-hour engines. I mean, and zero-hour equipment. So it'd either be new surplus. It's in the contract. It's not new, right? So the way you go right there is not new; right? Unused and zero-hour equipment.
So we had new surplus, a mixture of new surplus units, which we let them know, and very clearly, and they saw. And we had equipment that we could zero-hour the engines from and newly package those into heavy fuel generator sets --
Q And so --
A -- with everything on them brand new but the engines and alternators.
Q I'm trying to understand. So your testimony is that the -- first of all, that the generators that

ProGen would provide for these power plants, for these two power plants, needed to be newly-packaged power generators; yes?
A Correct. Yeah.
Q And that those newly-packaged generators had to contain one or two of the following: number one, either engines or parts that were new surplus, or, alternatively, engines and parts that were zero-hours unused?
A That's exactly right. Now you got it correctly there.
Q What does "new surplus" mean?
A New surplus means that units that were packaged in a certain year originally, and they were never sold to anybody. They never -- or they never got put into service.
Q New surplus, then, means engines or parts that had never been used in any way, shape, or form, and that they had been -- although they had been previously sold?
A Yes.
Q Without regard to -- they could have been sold in the past ten years or 15 years?
A Whenever they were. As long as they were unused, yeah.

Q Okay. And zero -- so you say it was either a new surplus or zero-hours and unused, yes?
A No. The -- a new surplus would be unused; right? It means it has never been put into service. And zero-hour was meaning some of the units would be zero-hour engines and alternators.
Q What does "zero-hours" mean?
A For us, in a brief, very brief term, unless you want to go into a full education industry-wide, what it means, I'll do it, but in -- in brief terms, it means that we return the engines in -- any equipment that would be the engine and alternator, in that case, because that's what it meant, back to zero-hour condition that we can warranty it as a new engine for full service life operating hours between major overhauls.
So we would take the engines and alternators and we would zero-hour out the -- you know, the finishes on them. That means we have to sand them and clean them and repaint them.
And we would clean the engine so that -- you don't want to leave old grease in them and because you got to put new power assemblies in them and then you got to run for full-service life. And if you have dirtiness on either outside or inside, it's not going

to last a full-service life between the next overhaul.

And that we can warranty it. That means we'll give it a brand-new warranty. The reason CELEC asked us to do extended warranties on them, because they knew that was true. Well, they -- they required it because after Luque and -- and Fabian Calero came, they required that, that they were zero-hour and not remanufactured.

And why are they not remanufactured fully? Which means we break them down to the bare metal, and we weld, re-machine the blocks, and bring them back to brand new tolerances from OEM. Why couldn't we do that? Why did we do zero-hour?

Well, because Roberto Luque and Fabian said they can't be -- the name can't be remanufactured. Nothing can be remanufactured.

And so we said, well, here's -- you know, here's what we're -- we can do.

We worked all of that out with them there. And we took them to Lakeland to show what it would act like. We can zero out the engines, which is nothing, you know, short of remanufacturing, except that we're not taking it down to the bare metal and splitting the blocks and pans and pulling the crankshafts out. We're just going to zero-out the engines for a full

service life warranty on it.

And then they said, "Okay, let's do that. That's what we'll call it."

I said, "Okay."

It just needs to be newly-packaged.

I said, "Well, it'll all be newly-packaged because these are diesel engines and alternators from diesel engines, and some of them on skid, some of them not, that we're going to newly package into HFO engines, which is a massive undertaking to do that."

That can be done on site or in the shop. Our original idea was to do it in the factory. But they delayed the project for so many months that we had to revamp all of our plans to do some of it at the factory and some of it on site. That's because of their delays, well-documented delays, for months. All right?

So everything everybody's saying is smokescreen. It's just the reason they got shut down there, they didn't get delivered, that the gen sets got shipped in whatever work-in-progress condition they were in, is because of the delays caused by CELEC, which are well-documented. And they agreed to it, and we agreed we'd do it there.

But after they cancel, they -- the only

thing they focused on, well, they didn't use new generators.

We're like, oh my God, really, you know?

Q So, to see if I understand that, what ProGen told CELEC was -- according to you, the contract states, is that ProGen would provide to these two power plants generators, engines and parts, including alternators, that were either new surplus, meaning unused, or zero-hours; yes?

A Correct.

Q And, if I understood you correctly, zero-hours means engines or parts that are cleaned?

A And alternators, yeah.

Q And alternators that are cleaned thoroughly, painted; correct?

A Correct.

Q And that after being cleaned and painted, ProGen certifies them as new?

A No.

Q Or issues a warranty?

A I'm sorry to laugh, but no. And you know that's not true, but okay. No. We were willing to give, and we offered to give, a full -- I mean, a warranty, a new engine warranty, on those units, which is a year warranty. But they wanted more.

And because of -- they were worried, and well, we don't really know that it'll work for, you know, 20,000 hours between overhauls. Can you guarantee it?

We said, "Yeah, we'll guarantee it."

And so we put it in the contract and then we guaranteed that they'd have a full-life warranty of 40 years. We've never had to do that before, but we did it because they knew what they were getting.

Q Zero-hours means, therefore generators, engines, parts, including alternators, that ProGen cleans, paints, and then makes part of a warranty saying that they will perform as new for whatever period of time the warranty indicates; yes?

A No. Because you have to zero out the engines. Painting them, cleaning them doesn't zero out the engines.

Q What does zeroing out the engines means?

A Okay. That means that you will qualify the turbochargers for a full-service life warranty because whether they're brand new or they're -- they can qualify to run for 20,000 hours, doesn't matter. They're -- they're qualified to give a zero-hour warranty on the engine. You change the power assemblies up. All right?

So you put new power assemblies in the engine and you do the same thing on the water pumps and oil pumps. Exchange them or qualify them for a full-service warranty. Well, these engines, most of them, had very low hours.

In fact, just because they're carboned, you know, on the inside when you take them apart, doesn't mean they won't run for another 15, 20,000 hours; right? So we qualify all that, but we all had to change all the power assemblies out for -- not diesel engines, but for heavy fuel engines.

And so all this as new. All the pistons, the rods, the liners, the heads, the injectors, the fuel pump systems, the HFO fuel handling systems, the engine generator controls and alarms, the HFO controls and alarms, our predictive preventative maintenance control system, all the switchgear, all the cabling, all the -- you know, the auxiliaries for the engine, like the -- you know, the pumps and the prelude pumps and the fuel forwarding pumps, all that is brand-new stuff.

Q So, see if I understood, zero-hours means cleaning, means painting, and means replacing the components of the generator, which may include pumps and power assemblies; yes?

A Required to be able to guarantee a service warranty, yeah. 20,000 hours of operation.

Q All right. And the -- what ProGen said to CELEC and what, according to you, is stated in the contract is that the warranty that ProGen would issue for all of the power generators for these power plants was that they would last and function properly for 40 years; yes?

A No. For 20,000 hours. If they only run 20,000 hours in 40 years, okay, because there's 8,760 hours in a year. So times that times, you know, they were -- divide by 20, it's three, a little more than three years. Now, how are we going to guarantee that?

Well, it's in the contract that we have to be on site to operate and maintain and train all their personnel to operate and maintain for the -- at least the first six months. But we're going to locate it.

But there was a draft agreement going with CELEC that we were going to operate and maintain the power plant for ten years. That means that if we do that, we have to change anything that breaks. We have to change turbos or, you know, whatever happens to it, it -- it's on warranty because we're operating and maintaining it.

Q So --

A That was originally the plan for doing this and it just never got done and we don't know why.
Q So the -- what CELEC -- what ProGen said to CELEC and what, according to you, stated in the contract, is that each of the power generators that would go into each of these two power plants would be warrantied to function properly and fully for 20,000 hours; yes?
A Yes.
Q And one of the additional requirements of the contracts were that these generators that ProGen would deliver as either new surplus, unused, or zero-hours, would operate, would run, on heavy fuel oil; yes?
A Correct.
Q And that entailed that when either -- that entailed that when making them new surplus or unused or zeroing out -- zeroing them out -- zero-hours, ProGen would install parts in those generators that would allow the generator to operate with heavy fuel oil; yes?
A Correct.
Q And that entails or entailed or would've entailed changing some of that components, such as the power assembly or the pumps to run on heavy fuel oil

as opposed to other --
A Yeah.
Q -- lighter types of fuel?
A It's a specific list of components, yes.
Q And according to ProGen, once these new surplus or unused or zero-hour generator sets were put together in the United States running on heavy fuel oil, they would be shipped to Ecuador and they would be installed in the power plants; yes?
A Yes.
Q And those two power plants with those generator sets would be delivered to CELEC, let's call it turnkey; yes? Meaning fully functional and operational; yes?
MR. JIMENEZ: Objection as to form.
THE WITNESS: What we would deliver would be a fully commissioned power plant, a 50 to 100 megawatt, operating for -- ready for commercial operations.
BY MR. PULECIO-BOEK:
Q Two fully operating commissioned power plants; yes?
A Yes.
Q Containing the generator sets that would be put together in the United States and shipped to

Ecuador?

A Yes. Yes.

Q Is there any email, text message, document, presentation, of any kind in which you or anyone else at ProGen disclosed to CELEC that the generators that CELEC was paying for under these two contracts would be new surplus unused?

A Yeah. In the contract.

Q Other than the contract, is there any other email, document, writing, communication, text message, presentation in which --

A There would --

Q -- you or anyone else at ProGen at any point in time disclosed to CELEC that the generators that CELEC would pay for were new surplus generators?

A It's abundantly documented in emails, I'm sure, in WhatsApp text, and -- and, you know, if we -- if there's any minutes of the meetings at CELEC where that letter was introduced face-to-face at some point, requiring it, that it be included as a term of the contract or we were not -- sign the contract.

Because from the time Luque and them met and the idea of what we're delivering and the time we got the first drafts of the contract, you know, we realized that, you know, it's describing the project

perfectly, but it's describing every single thing as being brand new.

And we knew that that's not what's going to happen. It's not what we agreed on or we would've never bid the project. And made a big point and a very big to-do about it at CELEC, that it has to be included in the contract. They agreed to it.

Q Your testimony, Mr. Manning, under oath, is that there are emails between you or others at ProGen and CELEC in which you or others at ProGen disclosed to CELEC that the generator sets for which CELEC would pay were to be generator sets that were new surplus?

A Yes, there has to be because the document got created and included in the contract. So there has to be others that, you know, were in some sort of chain of WhatsApp or -- or even regular phone or email and delivered not only through us, but probably also through Karla Saud, that those that had to be included in the contract.

Q As you sit testifying as you sit here testifying today, can you recall one email or one text message or one document or one presentation in which you said to CELEC that the generators that CELEC would pay were either new surplus or zero-hour generators?

A I can remember four hours of meetings with

Fabian and Calero going over exactly what we were delivering and then taking them to show them what the results would look like when we got done doing that --

Q But --

A -- for the Lakeland power plant --

Q My question --

A -- which is why we went there. Yeah.

Q I'm sorry. My question is very specific. As you sit here testifying, Mr. Manning, can you recall one document, writing, email, presentation, text message, between you and anyone at CELEC in which you disclosed to CELEC that the generators that CELEC would pay for were going to be either new surplus or zero-hour generators?

A Does that include meeting with CELEC and Ecuador and giving them the letter?

Q I'm -- I am asking you about documents.

A Does it include that it's in the contract as a document? That's an email issue. It had to happen somewhere.

Q Mr. Manning, you can say that you don't know or that you don't want to answer the question, but I'll ask it again.

A I want to answer that question. I don't know. I know what your question is, but I don't know

exactly offhand. Nobody's ever asked me that in the whole time, you know? But it wound up in the contract very clearly. And the contract points to it very clearly three times.

Q As you sit here testifying today, you are unaware and you do not know of a single e-mail, text message, document, presentation of any kind that you ever sent to CELEC disclosing --

A I can't -- I can't recall.

Q Please -- disclosing --

A You said it, then you paused, so sorry.

Q -- disclosing that the generators that CELEC would pay ProGen for were either new surplus or zero-hours?

MR. JIMENEZ: Objection as to form.

THE WITNESS: I don't know how to answer it. I really -- I'm -- I know there are emails. I can't think of a specific one because I don't have my computer here. But I already know for sure there are emails. 100 percent.

BY MR. PULECIO-BOEK:

Q Okay. Can you recall a specific one?

A I can recall there are specific emails, but I can't recall the looking at it right now and what date it was sent on, because I don't have a computer.

Q Okay.
A Sorry. I don't mean to laugh.
Q The Quevedo and Salitral contracts had an aggregate value of approximately $110 million; yes?
A No. The Salitral and Quevedo had a value of about 149 million total.
Q Under the Quevedo and Salitral contracts, CELEC would pay and ProGen would receive approximately $150 million, yes?
A 149,500, more or less.
Q And your understanding is that CELEC, in fact, agreed to pay nearly $150 million for 60 -- approximately 60 generators --
A No.
Q -- that were new surplus or zero-hours, yes?
A There were 49 generators.
Q Your testimony is that CELEC agreed to pay nearly $150 million for, thank you for correcting me, 49 power generators?
A No.
Q That were --
A They didn't.
Q That were --
A Sorry.
Q That were new surplus or zero-hours?

A No. None of that. They agreed to pay us $149 million for two functioning power plants.

Q CELEC agreed to pay you 100 and -- approximately $150 million for two fully functioning power plants that would contain 49 power generators that were zero-hours or new surplus; yes?

A No, not at all.

Q Okay.

A So I can help you out here. They agreed to pay us $149 million approximately to build two power plants, one 50 megawatt, one -- one 100 megawatts. The 100-megawatt plant had 29 stationary power plants.

And the Quevedo power plant had -- what was it? 20 -- yeah. 22 and a half megawatt containerized power modules that were already prepackaged in their own house.

They agreed to buy two brand new power plants from us with everything in the power plants brand new, with the exception of the engines and alternators, which would be zero hour-ed, packaged into -- newly packaged HFO power plants, generator sets. That's the most accurate you can get. That's real.

Q And those $150 million that ProGen intended CELEC to pay for those two power plants, describe to

me what was the budget for that project.

To be specific, how much money would be spent in making the generator sets new surplus or zero-hours and convert it to HFO? And how much would be spent in building the construction the power plant sites and installing there the power generators. Break down the budget for me.

A 30 percent for the construction and 30 -- 70 percent for the generators' equipment.

Q Did you at any point in time or anyone else at ProGen disclose that budget to CELEC?

A Very detailed.

Q There should be emails, text messages?

A There should be meetings of notes and confirming why they agreed to 75 -- 70 percent. 100 percent documented. Yes.

Q As you sit here testifying, you are certain that there are emails, text messages, documents, presentations, or other type of documents in which you disclosed to CELEC that the budget for the project was 30 percent of the 150 million would go to the power plant sites, and 70 percent of the 150 million would go to the generator sites?

A I can tell you that we spent days at CELEC in Ecuador with Fabian and the attorneys and some of

their cabinet negotiating the payment terms of the contract before it was executed and wound up as the terms of the contract.

So there are massive amounts of -- of, I'm sure, documentation within CELEC. We did all of our work at their offices on why we had to have the terms that we required. There's a reason why they paid us 70 percent. You may not realize that because I know you don't have all the details, but there was a reason why it was 75 -- 70 percent.

And we told them very clearly after they realized we had a lot of good experience in building power plants of that size, even, 100 megawatts, 50 megawatts, 40 megawatts, 20 megawatts. We've done it for years. All right. This team. They realized that.

What they -- you know, we told them, though, was that because it's a -- doing a power plant in Ecuador, and there's -- specifically, there's no way we could get funding to do the project. Very clearly ex-close, discuss. No hiding our financial capabilities. Very clearly disclosing there is no way we can fund that power plant in Ecuador.

And there's no way we're going to ship equipment to Ecuador without getting paid for the

equipment portion first. And there's no way we can construct the power plant in Ecuador because we can't get anybody to fund the rest of the -- the project in Ecuador for the construction, approximately $40 million in construction costs.

So we clearly explained that, well, it's not a problem for that because FYI agreed with ProGen that it would completely -- we were still going to just ship equipment at that point. That's why we originally agreed to -- to do it.

We would ship the equipment to the country. We would help manage the installation of the equipment technically. And FYI, who CELEC knew very well, felt very comfortable with, was going to -- would agree to build and install the equipment at the site without any payment required until we commissioned the plant. That was huge.

And so they agreed to pay us 70 percent for the equipment before it shipped, because by law, they could not pay a 75 percent deposit in contracts. That wasn't allowed.

Q Mr. Manning, my question was very specific. As you sit here testifying today, you are certain that there are emails, text messages, documents, presentations, or any sort of document in which you or

others at ProGen disclosed to CELEC --
A I'm --
Q -- that the contract --
A I'm -- I'm 100 percent sure.
Q -- that the contract budget was going to be 70 percent of the 150 million for --
A Yeah.
Q -- putting together the generator sets and --
A Yeah.
Q -- 30 percent of the contract budget of 150 million for the power plant sites; yes?
A It's -- has to be obvious; right? Because that's the term in the -- to pay for the equipment before it's shipped.
Q Mr. Manning, the answer is yes, you're certain?
A I am certain. 100 percent.
Q Okay.
A Main document --
Q And those -- that's 70 percent of 150 million or approximately $110 million would be used by ProGen to --
A Well, there were two contracts. So they didn't just pay us one payment. They paid us

separately for each project. Then they had --
Q Mr. Manning --
A -- to pay us --
Q -- I'd appreciate if you let --
A -- upon inspection.
Q -- let me finish my question.
A Okay. Sorry.
Q Mr. Manning, that 100 -- approximately 110 million, which is 70 percent of the aggregate, 150 million -- 70 percent was going to be used by ProGen to purchase, acquire 49 generators, and make them new surplus and zero hours, yes?
A Not just that.
Q Let me rephrase. Was it going to be used by ProGen to purchase or acquire these generators, make them new surplus, zero-hours, and convert them to HFO?
A And a lot more.
Q Okay.
A A lot more materials.
Q Okay.
A The balance of plant, the transformers, the switchgear we had to buy all brand new. All the controls, components, all the balance of plant, which is air compressors and HFO equipment and fuel forwarding and piping and all the cables and wiring

and all the -- all protection equipment and all the substation equipment.

Millions of dollars, which we put immediately -- deposits on when we started the project and got paid.

Q So just to see if I got this correct.

So of the 70 percent of the aggregate, 150 million or approximately 110 million were going to be used by ProGen to obtain, procure 49 power generators and make those 49 power generators new surplus or zero-hours, convert them to HFO, and then purchase a set of components, materials, equipment necessary to connect the power generators into that power plant in Ecuador? Yes or no?

A No.

MR. JIMENEZ: Objection as to form.

THE WITNESS: No, I don't agree. It's not what it was.

BY MR. PULECIO-BOEK:

Q Okay.

A So we didn't purchase 49 generators. All right. We purchased engines and alternators and every single -- or the -- I mean, the -- sorry, the Quevedo units are completely different than the Salitral units. Massively different. Those are units that we

sourced all the alternators, rebuilt to zero-hour condition by a third party.

We sourced the engine cores and we zeroed out those engine cores. We fabricated all the skids, all the switchgear, all the controls, all of the -- supplied all the controls for them. Built the self-contained houses. They're mobile power modules versus stationary units.

The Salitral units sit in that building forever. The mobile power modules just sit on a piece of concrete and you can move them wherever you want to. That was the intention because they thought they would move it later.

Plus it's something that we could do quickly together in unison with doing the major units in Houston that were the Salitral unit. It expanded our production capability. It created the viability physically to do both projects.

No, they were never tied together as a production strategy or assembly strategy or a completion strategy. They were two different strategies to build a stationary power plant and a mobile power module plant.

All those units for Quevedo were packaged. We built skids, built the engine separately, had the

alternators -- purchased those, completely remanufactured, rebuilt with -- with warranties on them and offered to us anyway. And we packaged all that together into separate power modules that we built all of them in Mulberry.

The Salitral units were cores, some alternator cores with no skids, some engines with no skids in alternators. Some we bought as core gen sets and, you know, and assembled those, repackaged those, or packaged those into newly packaged HFO power plants.

So it's very important that that's really understood for anybody to go "old and used generators." But I just want to be clear for you on that.

Q Of the aggregate price of 150 million that CELEC was going to pay ProGen, 70 percent, or approximately 110 million, was going to be used by ProGen to either purchase or let's call it build new surplus or zero-hour generator sets, convert them to HFO, and then purchase the necessary equipment to be able to properly install those generator sets in two power plants in Ecuador; yes?

A Not all of it. No. That's -- there's a lot more of it -- to it than that. You know, you're

describing only pieces of what we would be doing for each project.

The 70 percent was the sale price of the equipment, which we required that they pay before it shipped. So they didn't pay us until they came and inspected that equipment. It's a big issue here; right?

Q So $110 million was the sale price of the 49 power generators; yes?

A Yeah.

Q Yes?

A No.

Q You said the sale price of the equipment.

A The -- yeah, the equipment for the power plant was $70 million for -- for Salitral. And I think it was 30 million for -- for Quevedo, more or less.

Q Did you --

A Two separate projects.

Q Did you or anyone else at ProGen at any point in time prepare a budget describing or outlining in detail how those approximately $110 million were going to be spent?

A We always do internal budgeting. Yes.

Q There should be documents --

A Absolutely. Costing programs.

Q I would appreciate if you could let me finish my question.

A Sorry, buddy.

Q There should be documents, presentations, email correspondence regarding specifically how those approximately $110 million were going to be allocated for the power plant equipment, including the power generators?

MR. JIMENEZ: Objection as to form.

THE WITNESS: Not exactly. I don't know exactly that they say how they were going to be allocated. They designate for us how they will be -- how they are spent.

In other words, we've been doing it for a long time together, we know how to build a cash flow budget for the project. And all those, you know, that discussion would've been between me and Andrew, some between Garrett, but nobody else. We create our own cash flow budgets for the projects before we even bid them.

BY MR. PULECIO-BOEK:

Q Mr. Manning, is there any document that ProGen, Excel spreadsheet, documents, PowerPoint presentations, emails, text messages, outlining,

describing, itemizing how those approximately $110 million were going to be used in connection with the 49 power generators and related power plant equipment?

A I can't -- I can't confirm yes or no. I know there's documents that can be presented of how it was spent. Literally how it was spent. And which can be verified through the wire bank transfers and vendors list, which has already been presented.

Q As you sit here testifying, can you think of any Excel document, PowerPoint presentation, email, document of any kind at ProGen that described --

A Not that I --

Q -- how that approximately $110 million of CELEC was going to be spent in those 49 power generators and related power plant equipment?

A Well, it's important. You keep saying it the same way, how it was going to be spent; right? I don't know exactly what's existing there. I know we built budgets to do the project.

But exactly how it was going to be spent is one thing and exactly how it was spent and the spreadsheets created off of the budgeted -- because we don't have any exact budget, you know, to know exactly because we don't know when they're going to close. They're -- we've got cores and equipment available.

And so we use different vendors and different suppliers. But there's certainly budgets that were created before the project of not how it's going to be spent, how -- what we would have to spend money on for a project. So it's not one we created, and then we went right to it and followed it, if that's what you're asking.

Q That's all right. I just want to try to determine what documents exist. I'd appreciate a yes, a no, or an I don't know. Is there any document existing in ProGen, Excel spreadsheet, PowerPoint presentation, email, document, text message, any document of any kind, that outlined, described, itemized how that $110 million of CELEC was going to be spent in 49 power generators and related power plant equipment? Yes or no?

A Not on a 110 million single spreadsheet, no. I know there were spreadsheets created. You keep asking me the same thing over and over again. Yes, there were budgets created.

Q Were those budgets of how the CELEC's $110 million were going to be spent, or are you referring to documents that describe the actual expenditures of those $110 million?

A There were both. We never did a project for

110 million. We did -- when we proposed projects, we put budgets together for a 50-megawatt plant and 100-megawatt plant. And yeah, there are budgets built around so that we could propose the project.

Q Yes. And who at ProGen would've prepared those budgets describing how -- in aggregate for the two contracts --

A Never in aggregate.

Q -- how those $110 million would've been spent?

A Sorry. No. Never in aggregate. Always individual.

Q Okay.

A Because we didn't know if we were going to close them all.

Q Who at ProGen would've prepared Excel spreadsheets, budgets, documents of any kind in connection with the Quevedo and the Salitral contracts explaining the itemizing, detailing how CELEC's funds were going to be used?

A That would be myself and Andrew and Garrett. And we had a CFO that no longer works for us since what happened, but he would -- would've helped put together cash flows for -- for everything we're doing.

Q You would've been responsible for preparing

those budgets?
A Partially. Parts of it. Yeah.
Q And as you sit here today, you recall preparing them?
A Hmm?
Q As you sit here testifying today, you recall preparing such budgets, itemized analysis --
A Absolutely.
Q And Andrew Williamson would've done the same?
A Yeah. He would've worked off of what my costing estimates were in the beginning. Yeah.
Q And Garrett?
A Yeah.
Q Andrew Williamson's son would've also worked on such spreadsheets, budgets?
A If he did. I don't know that he did. But if he did, yes. He -- he would've been the only other one other than our CFO that would have done that.
Q And what is the name of the CFO that no longer works at the company?
A Sandy Vereb.
Q Can you spell the last name, please?
A V-E-R-E-B.
Q And he has left ProGen because ProGen no

longer pays his salary?
A No, we don't.
Q Is that why he left the company?
A No.
Q Why did he leave the company?
A Because we didn't need him anymore. I mean, we couldn't afford people. After CELEC screwed us over money, we had to let people go.
Q When did ProGen fire the CFO?
A I don't recall. Somewhere around the first, second month of this year, maybe. Third. I don't recall.
Q At some point in early 2026, ProGen fired its CFO?
A Yes.
Q Now focusing on the -- as an aggregate number, on the $40 million for approximately 30 percent of 150 million, that was for constructing or building the two power plants; yes?
A I'm sorry, could you repeat the question?
Q Approximately 30 percent of $150 million, or approximately 40 million in aggregate, the two contracts, that was what was going to be spent for building the two power plants; yes?
A More or less. Yeah.

Q And those two power plants were going to be built by ProGen?
A They were contracted to ProGen through CELEC, but ProGen was -- was going to have a company, FYI, and did, do all the construction work.
Q FYI was ProGen's subcontractor to build the two power plants for an aggregate price of approximately 40 million?
A Yes. They were a subcontractor.
Q Yes. And there is a contract between ProGen and FYI describing FYI's obligation to build for approximately $40 million, these two power plans for ProGen?
A We didn't wind up signing a final contract. No.
Q But there was a draft contract between ProGen and FYI, which detailed FYI's obligation to build for approximately $40 million, these two power plants for ProGen; yes?
A Yes.
Q At any point in time, did FYI prepare budgets, details, analysis of any kind for ProGen describing how those $40 million would be spent?
A Yes.
Q And those documents were delivered to ProGen

via email, text message, or otherwise?
A Email.
Q Email; yes?
A Yes.
Q At any point in time, did you or anyone else at ProGen disclose to CELEC the budgets that ProGen had prepared detailing and itemizing how CELEC's $110 million were going to be spent?
A Not that I recall.
Q At any point in time, did you or anyone else at ProGen disclose to CELEC budgets or detailed analysis or itemized how the $40 million for the construction, other than power plants, were going to be spent?
A Not that I recall.
Q Okay. I'm going to hand you over a document we're going to mark as Exhibit Number 2.
(Exhibit 2 was marked for identification.)
A Thank you.
MS. COLBERT: Thank you.
BY MR. PULECIO-BOEK:
Q You will see, Mr. Manning, this is an almost identical copy of Exhibit Number 1. Do you see that?
A I do.

Q Yes, sir. And if you see, to the bottom right, it is labeled "ProGen"; yes?
A Correct.
Q This is a document that ProGen produced in litigation in this matter; yes?
A I don't know.
Q Okay. Is this document authentic or also a forgery?
A I don't know.
Q Okay. Is it possible that it's a forgery?
A Everything is possible with those people, but yeah, I don't know if it is or not.
Q Okay. Do you see the signatures at the -- in the last page?
A I do.
Q You were certain that the Exhibit Number 1 is a forgery. Are you certain that Exhibit Number 2 is a forgery?
A I believe it is, because we -- if we would've signed the contract, our -- we have a notary that would've notarized this, the document. But I can't say for sure.
Q Are you aware whether your attorneys disclosed to us that they were producing a document that it was a -- that was a forgery?

A I'm pretty sure it wouldn't have said Jose's Service Provision Contract.
THE REPORTER: I'm sorry?
THE WITNESS: I'm pretty sure it wouldn't have said Jose's Service Provision Contract.
BY MR. PULECIO-BOEK:
Q I'm asking you whether you are aware if your attorneys in this case disclosed to CELEC that a document they were including in their document production was a forgery?
A Oh, yeah.
Q Okay.
A Absolutely.
Q Okay.
A Was this included in something that went to CELEC?
Q You don't get a chance to ask questions, but thanks for the answer.
A Okay.
Q Mr. Manning, CELEC did, in fact, pay approximately $110 million to ProGen; is that correct?
A More or less, yeah.
Q And those $110 million were used as budgeted, meaning they were used to purchase or build 49 power generators and related power plant equipment;

yes?
A Nothing, one, is budgeted because of the delays by CELEC, but yes.
Q Okay.
A Whatever funds that we utilize was utilized appropriately for the project.
Q If you take, again, that document, Exhibit Number 2, you'll see that, to the top right, it has a number. It says, "M," and then a number that starts with 17. Do you see that?
A I do.
Q What is that number?
A I have no idea.
Q Okay. And underneath that, you see a telephone number starting by 818. Do you see that?
A I do.
Q What is that telephone number?
A I have no idea.
Q And underneath that, you see an e-mail address, which is hs@ProGen1.com. Do you see that?
A I do.
Q What is that e-mail address?
A That was an e-mail that was set up for correspondence for project management with Karla, her -- her and her team.

Q Meaning that was an e-mail address that was set up by ProGen to be able to communicate more fluidly with Karla Saud?
A Yes. Everybody could identify, you know, easily what that e-mail is coming in to ProGen for, yeah, who it was coming from.
Q And who had access within ProGen to the hs@ProGen e-mail account?
A I don't know. I didn't, but I don't know. It would've been project management. Garrett Kyle, he would be the first one to ask.
Q Andrew Williamson?
A No, I mean --
Q I'm sorry. Andrew Williamson?
A I don't think so. Not directly. It would've come through whatever Dropbox file that -- for project management that Garrett would've set up, as far as I know. I don't know the whole thing. I didn't get involved in that stuff. That was basically project management's, you know, department there.
Q That's fine. Does ProGen currently have sources of revenue?
A A little.
Q What are ProGen's sources of revenue?
A Just small projects here and there. We've

got a capacity holding agreement that we just worked on for a huge company, for a 300-megawatt power plant for a data center. In fact, 11 of those, we've proposed, and they're in the process of trying to close their funding on it, and they're paying us a million dollars a month to hold our production capacity.

And to -- in order to deliver those projects, we spent a year with them, you know, proposing those and building strategy, how we would increase our production capability to meet it within the time period.

We've -- you know, we've probably got 5 gigawatts of power quoted to data centers right now that are -- been approved for the design for people like Meta and NVIDIA and Anthropics and AWSs or just Amazon and -- a lot of them.

So that's our sources of revenue since this thing hit. This thing is destroying everything. This false accusations are -- and lawsuit and the publicity that they're pumping out down there, which is all wrong, is destroying our business. Literally, because everybody sees that.

And we haven't been able to put out any of our own narratives because we are carefully instructed

not to, because if you're in arbitration in Ecuador, you're not allowed to arbitrate in the public.

Well, they're certainly trying to, you know, prosecute in the public on their side. It's all a political game anyway. We understand that. But anyway, we have very limited income right now.

Q How is ProGen paying for the lawyers it has to retain and pay in connection with the multiple litigations it's facing?

MR. JIMENEZ: Objection as to form. And I will instruct the witness not to answer that question.

BY MR. PULECIO-BOEK:

Q Is ProGen using part of the $110 million it received from CELEC to pay its lawyers in the multiple litigations it's facing?

MR. JIMENEZ: Objection as to form. And I instruct the witness not to answer.

BY MR. PULECIO-BOEK:

Q Are you going to follow your attorney's instruction?

A Yes. By the way, we spent more than 110 million on the project. Sorry. And we've been spending -- we spent our own funds. We borrowed money to help do that project because CELEC screwed us. So

we spent more money than we received on the project.
Q You have spent, on the 49 power generators and related equipment, more than $110 million?
A Absolutely.
Q How much have you spent?
A I don't know. But I know it's substantially more.
Q Can you give me an estimate?
A I don't know. Probably another 5 to 7 million dollars more than we received on the project.
Q Your testimony under oath today is that ProGen has spent approximately somewhere between 115 to 117 million dollars in connection with the 49 power generators that are the subject of the Quevedo and Salitral contracts and related power plant equipment?
A Yeah. Including what we've lost in penalties from vendors and suppliers and lawsuits that were going to come back up. It's going to be a lot more.
Q I'm asking you specifically what's out of pocket. You -- your testimony is that ProGen has spent somewhere between 115 to 117 million dollars in connection with the 49 power generators that are the subject of the Quevedo and Salitral contracts and related power plant equipment?

A I can't confirm the amount. I don't know right now.
Q You said it's approximately 5 to 7 million dollars over $110 million?
A Right. I'm sure we have. Yeah. I'm not saying exactly. I'm just saying that's what my best estimate is right now. And I can't wait until you get through all the forensics to prove that. I'm waiting. Hurry, please.
Q There is already a forensic analysis that is being conducted of all the money --
A Yeah.
Q There is?
A No. You guys have our bank accounts. You have our vendors. You know where every single dime went. You could track it very easily already instead of wasting all this time to find out that there is no case there.
Now, your case is about dirty and used generators, then we'll go ahead and get this thing out of the way so that we can get to the real cases to which they defaulted the agreement and destroyed our company.
Q Mr. Manning --
A That's where we're going to go with this.

Q Mr. Manning, is there any document within ProGen, records, Excels, PowerPoint presentations, emails, that describe in detail each and every cent of the over $110 million that have been spent in connection with the 49 power generators and related power plant equipment?
A Every dime that ProGen has ever sent out of its bank accounts is documented.
Q Besides what is reflected in banking records or bank statements, is there any document of any kind at ProGen that summarizes details, itemizes each and every single cent of the $110 million they received from CELEC --
A I'm sure there is.
Q -- and how that was used in connection with the 49 power generators and related power plant equipment?
A I'm sure there is, yes.
Q Sure.
A I haven't seen them, but I'm sure there is.
Q And you would have prepared them?
A No.
Q Who would have prepared them?
A Andrew and accounting would've done that.
Q Mr. Williamson was supposed to be testifying

tomorrow. You're aware of that?
A I am. Yeah.
Q And you're aware that he is not going to testify tomorrow?
A I am.
Q And you're aware that the reason that we were provided for his inability to testify tomorrow is that he was diagnosed with cancer?
A Yeah. Throat cancer.
Q When was he diagnosed with throat cancer?
A A couple weeks ago. I'm not real sure exactly the day. He kept a lot of it to himself. I found out a couple weeks ago. Yeah.
Q You found out through him?
A Yeah. When he left the office in an emergency to go to the emergency room because his neck was all swelled up real big. So yeah.
Q And have you discussed with Mr. Williamson the treatment that he's going to have to follow, including surgery and the like?
A Briefly.
Q When is he going to be subject to surgery?
A I don't know. He's got to go through surgery next. He went through surgery today and had five of his teeth pulled, because when you have that

operation, they're worried about inflammation, swelling, and then infection in those areas of the mouth when they're going to remove the tumor off the back of his tongue.

So he had that oral surgery done today. And then I think he waits another week and then they go in and remove the -- no, he -- no. Sorry. They're not going to do that. He did the biopsy a few days ago, and when they identify exactly which strain it is, then he goes into 12 weeks of chemo every single day for 12 weeks. That's what he does.

Q Understood.

MR. PULECIO-BOEK: It's a good time for a break, I think.

(Off the record.)

THE VIDEOGRAPHER: We're back on the video record. This begins Media Unit number 5. The time on the video monitor is 4:30 p.m.

BY MR. PULECIO-BOEK:

Q Mr. Manning, in each of the breaks that we've had today, have you been discussing the deposition with your attorneys?

A (No verbal response.)

Q In each of the breaks that we have had today, have you been discussing the deposition with

your attorneys?
A Have I been discussing what?
Q Discussing the deposition with your attorneys?
A Yes.
Q And what have you been discussing with them?
A Just basically how I'm doing.
Q And what have they said?
A Just doing good.
Q And what, specifically, have you discussed with them about how the deposition is going?
A That I'm just trying to answer the question instead of getting lost in the weeds, basically.
Q They've been instructing you to answer in a way that is more straightforward --
MR. JIMENEZ: Objection as to form. I have not -- that's not what he said at all. He never said the word instruction.
MR. PULECIO-BOEK: Please don't interrupt. If you want to instruct him not to respond, you're going to instruct him not to respond.
BY MR. PULECIO-BOEK:
Q Mr. Manning, they've -- your attorneys have counseled you that you should not get too much into the weeds; is that what they told you?

A No.
Q What did they tell you?
A They just said to answer truthfully.
Q Anything else?
A That's it.
Q ProGen has not delivered to CELEC 49 power generators, correct?
A We have not delivered two power plants.
Q Let's start with that, then. ProGen has not delivered two turnkey power plants to CELEC, correct?
A Correct.
Q ProGen has not delivered 49 power generators to CELEC, correct?
A We didn't deliver any generators. We have shipped equipment, including generators.
Q How many generators has ProGen shipped to Ecuador?
A 46, and three more are sitting in our yard.
Q In what yard are those three sitting?
A In ProGen in Mulberry.
Q You mean in the 600 Prairie Industrial?
A Correct.
Q And those three generators that are sitting in ProGen's headquarters in Mulberry were for the Quevedo or the Salitral contract?

A Quevedo.
Q And those three generators that are sitting in ProGen's headquarters are generators that had already been, in your words, zeroed out?
A No. Those are newly packaged generators with zero hour engines. They're completely manufactured from the ground up generator sets.
Q Completely manufactured generator sets with the -- from the ground up?
A Yeah.
Q Do they have new engines?
A No. They have zero hour engines on them.
Q So engines that have been, as you call it in this deposition, zeroed out?
A Yes.
Q And they have other components that are also zeroed out?
A And all the other components are new, other than the alternators, which are zero hour alternator.
Q So the three generators that are sitting here in ProGen's facilities have engines that have been zeroed out and alternators that have been zeroed out and other components that are all new, yes?
A Correct.
Q And they have been converted to HFO?

A No, not completely.
Q Partially?
A Partially.
Q Okay. Have those -- has anyone had access to those generators since the beginning of this litigation?
A We have. ProGen has.
Q Who at ProGen has had access to those generators since the beginning of this litigation?
A I -- I can't say exactly, but just the personnel that would need to if they needed to. Some of the shop personnel and Andrew, myself, Shane, Garrett, anybody that would need to, but there hasn't been any need to access them.
Q No one has touched, accessed, manipulated, opened those three generators in ProGen's facilities?
A Yes. They've been opened. They haven't -- they've been maintained because they're sitting outside in the front of the facility.
Q Those three power generators that ProGen has in its headquarters in Florida, since when have they been sitting outside?
A Since we notified CELEC that they were ready to ship.
Q When was that?

A I don't know. I don't know the date.
Q Would that have been in early 2025?
A I -- I don't know the date. It'll have been in 2025.
Q And since that day, those three power generators have been sitting outside?
A In the same place. They were ready to be loaded onto trucks to go to the port.
Q And ProGen has been cleaning them since that date?
A Maintaining those.
Q Have those generators been photographed from 2025 to the present?
A I don't know.
Q What is AOT Holding AG?
A I don't know.
Q Why did ProGen send $10 million of CELEC's money to AOT Holding AG?
A Now I know because of the amount. There are four new plus generators that we bought for the projects.
Q I'm sorry?
A They are four brand new surplus or new surplus generators that we bought for the project.
Q Project sent AOT Holding approximately $10

million for four new surplus power generators?

A Yes.

Q For what contract?

A For -- well, it turns out they were for the Catamayo project. It was the first project that closed. So when we introduced Fabian and Luque to the project, and of course, Carla knew that we had four brand new surplus units and other units that we would zero hour out. And depending on which contract, because we bid all three projects at the same time more or less, depending on which project closed first, which project that would go to.

Q Who was the principal at AOT Holding that you communicated with?

A I don't know. I don't recall.

Q You don't know?

A I -- I don't. I don't recall. They were out of, I think, Europe somewhere, Switzerland or something.

Q As you sit here testifying today, you do not recall the name of anyone of the company to which you wired $10 million?

A I don't. I didn't wire any money.

Q Who wired the money?

A Andrew.

Q That's Andrew Williams?
A Yes. He's --
Q Did you communicate with AOT Holding?
A Maybe -- no, not directly. I don't believe.
Q What do you mean directly?
A I mean, directly to them. They were the company that owned -- we sold the units to -- originally, we sold them, originally to a group in Houston for a project in that -- in Dominican Republic. And they paid us, and their project went canceled. It was for a mining company at Falcon Bridge Gold Mine in -- in the DR. And their project wound up canceling because they canceled the mining project. And they had them sitting in their building in Houston, and we bought them back for these projects.
Q I'm not sure I understood. ProGen sent $10 million to AOT Holding of CELEC's money for four power generators that ProGen sold to a company in Houston?
A I don't know if it was CELEC's money. It was -- we had already been paid for the project and it canceled and we bought them back. So they paid us for the units, but their project canceled, so we bought them back. Whose money you want to say it was, I don't -- I don't know because --

Q The four power generators that set -- that ProGen purchased from AOT Holding were four power generators that ProGen sold to a company in Houston?

A Called Enerset. They sold it to a nickel mining company, which I think is AOT. I didn't know the details. All I know is we negotiated the deal with Enerset, who we originally sold them for, and that's where they asked us to wire the money.

Q I'm sorry. Maybe it's my fault and I'm not understanding. Who initially sold those four power generators to ProGen?

A Enerset.

Q Enerset sold four power generators to ProGen?

A Yeah.

Q When did Enerset sell those four power generators to ProGen?

A We originally sold them to Enerset.

Q Okay.

A Enerset sold them to a nickel mine. That nickel mine mining company was going to do a -- a mining project in the Dominican Republic. And we sold those units to Enerset, and they resold them to that mining company, AOT.

Somehow they were the holding company or the

main company, I don't know. But anyway, that's when we bought those units back from Enerset when their mining project canceled on them. We negotiated with Enerset, who we sold them to originally. And they -- when we got all the terms worked out directly with Enerset, the wire transfer number the company wanted us to send them to was AOT. And they explained that AOT was the company that bought those units from Enerset that -- which we sold to Enerset and -- or they owned the company that owned the -- you know, that is the company that Enerset sold them to, which I don't know who they sold them to.

But anyway, he said that's who the money was going to. And they sold them back to us. And I think they negotiated a deal with AOT to sell them back to us. I didn't know who owned them at the time when we negotiated the deal with Enerset. All I know is we sold them to Enerset.

Q When did ProGen sell four power generators to Enerset?

A Huh?

Q When did ProGen sell four power generators to Enerset?

A I don't know the date. It was probably a year before then.

Q Approximately 2023?
A I don't know. I can't tell you exactly. Would be maybe around that time period.
Q Was there e-mail correspondence with Enerset or text messages in connection with the sale of those four power generators?
A Sure.
Q And there was also power -- e-mail correspondence or text messages, as a result of which you learned that Enerset would sell those four power generators to AOT?
A Say that again?
Q You became aware, because Enerset told you via e-mail or text messages, that Enerset would sell those four power generators to AOT?
A No. We didn't know who they were selling them to originally.
Q Eventually --
A It was a mining project.
Q Eventually --
A That wasn't our business.
Q Eventually, you did become aware that Enerset sold those four power generators to AOT?
A I don't think they sold them to AOT. I think AOT owned the company that they sold them to --

that Enerset sold them to, of some division of -- they seemed like a very big, you know, foreign company, a Swedish company, I believe it was, who's in the mining business. They're the largest nickel mining company in the world.

Q And Enerset told you that they had sold those four power generators to a subsidiary of AOT Holdings?

A No. Never. They just -- when we went to -- we -- we didn't know they didn't -- that they delivered them and they -- apparently they didn't. But actually, those units were still sitting at the facility that we outfitted them for, for their Dominican project, and they never delivered them. And so they were having to pay rent on the facility that we rented to do the project in Houston with for them.

Those were new surplus generator sets that we bought from, I believe it was a group called Keppel's out of China, not India. And those generator sets were eventually, you know, included in the Catamayo project.

Q The four --

A Catamayo paid for those. Their project money came in before. That's why I say I don't know whose money you're going to figure out that it came

from, but it wasn't -- you know, it came -- it was originally, the money came from Catamayo project on their down payment to buy those.

Q The four --

A And then some of that equipment were used on the Salitral project. So there was some of it that couldn't be used on Catamayo, but it could be used on Salitral, blah, blah, blah.

Q The four power --

A You know.

Q -- the four power generators that ProGen sold to Enerset were four power generators that ProGen had purchased from a company in China?

A I think so. I don't know for sure where they came from.

Q ProGen sold those four power generators to Enerset, and then ProGen at some point became aware that Enerset had sold them to a subsidiary of AOT Holding?

A Yeah.

MR. JIMENEZ: Objection as to form.

THE WITNESS: I don't know. I don't know. I just know who we wire transferred the money to. That's all I know.

BY MR. PULECIO-BOEK:
Q Enerset provided to you the instructions to wire the money?
A Yeah. Yeah.
Q And Enerset would've done so via -- in writing via e-mail or text message?
A Absolutely.
Q And as a result of that instruction by Enerset, ProGen wired approximately $10 million for AOT Holding?
A Correct.
Q And as a result of that wire transfer, AOT Holding -- or ProGen was able to obtain those four power generators?
A Yes.
Q Where are those four power generators currently?
A They're in the Catamayo Power Plant.
Q Are you certain of that?
A 100 percent.
Q What is H&S Industry?
A I don't know. Was --
Q Why did ProGen send to H&S Industry $8 million of CELEC's funds?
A It is the -- I don't know who or the details

of that, but H&S was a partner of -- of ProGen's in the project. We got a certain price per megawatt for what we were doing in the project, and they got a certain price per megawatt for what they were doing in the project.

What they were doing in the project was installing fuel tanks and HFO fuel treatment systems down there. And they were going to install the overhead distribution lines at each plant site to tie them into the national power grid.

What they got paid was per an agreement between us and them to pay them for their portions of the work, which all focused on installation. The other portion of their work was to manage the contracts or the installation work being done by FYI, to manage everything on that, to make sure that they did their work on time, the project schedule was managed, that the -- the budgets for all the work was approved and presented to us for approval. When I say approved, then that's why they would've gotten paid.

Q Who is the owner of H&S Industry?

A I don't know. I don't know the exact ownership structure.

Q Do you know anything about the ownership of H&S Industry?

A Nothing more than Karla says it was her company and Jose's company, her and Jose.
Q Karla told you that H&S Industry is a company that is owned or controlled by her and Jose?
A That was our understanding.
Q Okay. And ProGen sent $8 million of CELEC's money to H&S Industry for H&S Industry to do two things, if I understood you correctly: install some of the equipment or machinery in the two power plants in Ecuador and, number two, to manage the performance of FYI?
MR. JIMENEZ: Objection as to form.
THE WITNESS: I -- I think there's more than that, but I don't have that available to me. But basically, yes.
BY MR. PULECIO-BOEK:
Q Is there a contract of any sort between ProGen and H&S Industry?
A I don't know the exact written agreement, but I remember us having an agreement. I believe there is a written agreement. I just don't know where it's at. I haven't seen it in a while.
Q Is there any document of any sort in which H&S Industry itemized or detailed for ProGen how it would spend $8 million of CELEC's money?

A No. They would've gotten more than 8 million in the project. They just never performed, so we stopped paying them.

Q I'm asking very specifically about H&S industry and the $8 million that H&S Industry received. Is there any document of any kind that H&S Industry ever prepared or delivered to you or anyone else at ProGen? Emails, text messages, presentations, any document of any kind explaining or itemizing how they would use $8 million of CELEC's money?

A Yes. There's an agreement that was signed later on with H& -- with Astrobryxa, which H&S, I guess, I don't know why, but they didn't want to do it through H&S, that they were going to do it through a construction company named Astrobryxa that we didn't even know the name of until later on in the contract. Karla had an agreement and Jose, we understood, with FYI to do all of the installation work. There was a budget for the installation work that included FYI's work and the work that Jose and Karla would do. We -- what they got paid was -- and there is an agreement somewhere that outlines how much we get paid and how much they get paid in the contract. That was broken down to a price per megawatt. I think ours was like 850 a megawatt, and I think there was a total of 1,050

or 1,015 per megawatt. I don't know the numbers without looking at it. And they would get the difference between our 850 and the 1,015 or whatever it was per megawatt in the price of each project. So as they bid the -- you know, presented the budget to CELEC based on a price per megawatt for a turnkey-installed power plant.

Q Specific question: Is there any e-mail correspondence or any other document of any kind where H&S Industry explained, discussed, itemized for ProGen how it would spend $8 million of CELEC's money? Yes or no?

A I believe there is, yes.

Q Okay. That includes both documents and emails, yes?

A I don't know what all it includes, but there are some documents that would exist. Yes.

Q And emails, yes?

A Yes.

Q What is Five Star Leasing, LLC?

A It's something that has nothing to do with the project. It was a leasing company that we were leasing units for crypto mining years before the project. But who -- I don't know how they used their company, but loaned us money for our projects at some

point or at some time in some capacity. For example, we had to spend millions of dollars up front ourselves in order to get the units ready for inspection, and so they would've been part of loaning us money for that, and there would've been specific agreements for that money. And anything we paid them back would've been to specifically pay them back for what they spent on the project, if they did spend it on the project. I mean, I don't know all that. Agreements for the details of those sitting here right now.

Q Who owns or controls Five Star Leasing, LLC?

A Somebody that you guys have subpoenaed. I can't think of his name. It's Ray something. Ray Kuntz.

Q And those $6 million approximately that ProGen sent of CELEC's funds to Five Star Leasing were unrelated to the projects?

A They wouldn't be related to the project if they were sent to Five Star.

Q Why not?

A They would've loaned us money to buy cores. He bought the cores from the Indian company you were asking Wade about. He, you know, loaned us money to buy cores because we had to fund the project for -- to get equipment in to do the project for inspection. So

he would've loaned us all that money.
Q But you're testifying is that Five Star Leasing, LLC, a company owned or controlled by Raymond Kuntz, owed -- lent money to ProGen in connection with the Quevedo and Salitral contracts?
A I have no idea what entity he's leased the money on. He did the contracts with Andrew. I don't know what company he is using to send us money with. I don't know if it's Five Star or if it's just Ray Kuntz or something else. I don't know. I didn't sign those agreements, so --
Q How much money has Raymond Kuntz or companies associated or affiliated with him have or lent ProGen in connection with the Quevedo and Salitral contracts?
A I don't know. I don't recall.
Q That is included in documents?
A It would be, yeah.
Q There are loan agreements between Raymond --
A Absolutely.
Q There are loan agreements between Raymond Kuntz or his companies and ProGen documenting loans that Raymond Kuntz or his companies were giving to ProGen in connection with the Quevedo and Salitral contracts?

A 100 percent, yes.
Q Do you know --
A And it would be loan documents.
Q Do you know approximately how many such loan documents exist?
A I have no idea.
Q Do you know approximately how much money Raymond Kuntz directly or through his companies lent ProGen in connection with the Quevedo and Salitral contracts?
A Sitting right here, I have no idea.
Q Would there have been more than $6 million?
A Maybe. Like I said, I don't know.
Q Did you or anyone else at ProGen disclose at any point in time -- I see you're grinning again.
A I -- I don't know if that is --
Q That's --
MR. JIMENEZ: He can grin. Will you please stop?
THE WITNESS: Please stop that. Yeah.
MR. JIMENEZ: Yeah. There's no point in you, like -- you're making faces as well, and you basically go --
MR. PULECIO-BOEK: Please stop making speaking objections.

MR. JIMENEZ: We already went through this.

BY MR. PULECIO-BOEK:

Q Mr. Manning, I assume you know of the gravity of the situation?

A I do, yes.

Q You and companies and individuals associated or affiliated with you have taken over $100 million from the government of Ecuador?

A I disagree.

Q And you have taken that money and not delivered anything.

A I disagree.

Q So I would ask you to treat the deposition --

A There you go again.

Q I would ask you to --

A You're going to get me upset about lying. So if you're going to lie to me, I'm not going to not take it without getting bothered by it.

Q Mr. Manning, I would just ask you --

A You would characterize it that way.

Q I would ask you to take this deposition seriously. And so when you --

A I wish you would, too. That's why I'm

getting at you, because you're not. You're just trying to make a point on your little feather in your hat by throwing things into the deposition record that are not true, and I'm not going to stand by and let it happen.

Q Mr. Manning, because the --

A Mr. Manning, you received 100, you know, million dollars from Ecuador to do these projects.

Yeah, I can answer that.

Q Mr. Manning --

A And you didn't receive it and didn't deliver anything.

I can't take that. That's not true.

Q Mr. Manning, if I could speak without you interrupting, because the deposition is being video recorded. Then the camera can capture you when you grin or smile.

A Because I'm catching your little nuances that are just you trying to create a case that doesn't exist. That's why I smile, because you're doing a lot. You're funny that way.

Okay. Go ahead, bro. I'm sorry.

Q What is funny about questions regarding Mr. Kuntz or companies owned and controlled by Mr. Kuntz and the loans that those companies supposedly provided

to ProGen in connection with the Quevedo and Salitral contracts?
A It's the way you ask and the, you know, the reason you're asking. That's funny to me because it's not going to hold water.
Q You --
A You're trying to characterize it and it makes me smile when I catch it.
Q And what is funny specifically about the money that Raymond Kuntz or companies associated or affiliated with him supposedly lent to ProGen in connection with the Quevedo and Salitral contract?
A Man, good question, because I think you perfectly characterized it. What's funny is you saying that, you know, ProGen and a lot of people took $110 million from -- from CELEC and never delivered anything. What a lie. What a mischaracterization. That's what makes me laugh because I know it's coming when you do that.
Q Is there anything funny to you specifically about the money that Raymond Kuntz or companies associated or affiliated with him supposedly lent to ProGen in connection with the Quevedo and Salitral contract?
A No, because I still owe him millions,

because CELEC screwed us out of the contract. Nothing is funny about that.

Q You personally owe Raymond Kuntz or companies associated or affiliated with millions of dollars in connections with loans that he made for the Quevedo and Salitral contracts?

A We still owe him $4.1 million.

Q You personally or ProGen?

A ProGen.

Q As you sit here testifying today, ProGen owes approximately or over $4 million to Raymond Kuntz or companies associated with Raymond Kuntz for loans --

A I believe so, yes.

Q -- for loans that were provided to ProGen in connection with the Quevedo and Salitral contracts?

A Whatever he loaned it for. Yeah, it could be. It probably is all, but I don't know that for sure.

Q Or those $4 million could be for other loans that he was provided?

A It could be, yeah.

Q And those loans and the purpose of those loans are documented in writing, including in documents, contracts, e-mail correspondence, and text

messages?

A Absolutely.

Q Okay. There is a Chase credit card that is issued to ProGen and is used primarily by Andrew Williamson, yes?

A Yes.

Q Do you also use the Chase credit card?

A Yes, for travel.

Q Who else uses the Chase credit card?

A Several employees for travel. They're issued their own little, you know, card that has its own limit on it, like 5,000, I think, like mine, just to be used for travel and incidental expenses. Yeah.

Q Can you give us a list of who -- which employees are issued a Chase credit card?

A I don't know. Andrew would know.

Q But that includes you. It includes Andrew. It includes your son-in-law, Shane. It includes Andrew's son, Shane -- Andrew's son, Garrett, yes?

A I don't think Shane has one.

Q It includes yourself?

A I don't think Garrett has one. Sorry --

Q It includes, at a minimum, you and Andrew Williamson?

A At a minimum, Andrew and I.

Q Anyone else that you can recall at ProGen has access or has control or uses one of those Chase credit cards?
A I don't know who it would be. Andrew would know that. Andrew.
Q You are aware that ProGen sent nearly $6 million of CELEC's money to Chase for pay -- to pay for expenses on those credit cards?
A I'm not.
Q Are -- as you sit here testifying today, can you be certain that each of the -- each and every one of the expenses in those Chase credit cards had a relation with the Quevedo and Salitral contracts?
A I have no idea.
Q Okay.
A For me, I didn't manage that.
Q Okay. What is Putnam & Creighton, P.A.?
A I don't know. I don't know.
Q Okay. Why did Putnam & Creighton receive approximately $5 million of CELEC's money?
A Putnam & Creighton? I wouldn't know unless it's a shipping company or materials company or equipment company. I don't -- I don't know. I don't recognize the name.
Q You are aware that P.A. refers to

Professional Association? The name of this entity is Putnam and Creighton, P.A., yes?
A No. I'm not even familiar with the name.
Q What is Jiangsu First Power? I'll spell it for the record. J-I-A-N-G-S-U?
A I don't know. How do you pronounce it?
Q I am -- I am going to pronounce it Jiangsu.
A Jiangsu?
Q Yeah.
A Oh, that would be for transformers and switchgear. That's from China.
Q You are aware that ProGen wired over $4.5 million to Jiangsu?
A I'm sure we did. Yeah.
Q And all of the money that ProGen wired to Jiangsu was for parts, components that Jiangsu provided in connection with the Quevedo and Salitral contracts?
A 100 percent, yeah.
Q And there would be -- that it would be documented in e-mail correspondence with Jiangsu, contracts, invoices, and other such documents?
A Correct. Yeah.
Q Okay. At any point in time, did you or anyone else at ProGen disclose to CELEC that ProGen

would use $8 million of CELEC's money to pay H&S Industry agency?
A It's none of their business.
Q Did you or anyone else at ProGen ever disclose to anyone at CELEC that ProGen would use over $6 million of CELEC's money to pay Five Star Leasing?
A None of their business.
Q Did you or anyone else at ProGen ever disclose to anyone at CELEC that CELEC's funds would be used to pay and fund expenses on the Chase credit cards that you, Andrew Williamson, and others used?
A It wasn't their business. Anything you asked me like that, it has nothing to do with the contracts.
Q Did you or anyone else at ProGen ever disclose to CELEC that ProGen would send or was sending $4.5 million or more to Jiangsu?
A Never. Eventually, we did because we were trying to tell them that we owe them balances, and they -- if they don't quit holding up the contracts, we're going to lose the equipment that we spent that kind of money on because they kept delaying the projects.
Q Prior to sending those funds to Jiangsu, did you or anyone else at ProGen ever disclose to CELEC

that that company would receive over $4.5 million of CELEC's money?

A Why would we? No. They never asked us to break down expenses.

Q Who is --

A Who does that?

Q Who is L. Adam?

A I don't know.

Q You have no idea who L. Adam is?

A I don't. Not offhand.

Q Do you have any idea why anyone with the name L. Adam would've received over $4 million of CELEC's funds?

A That wouldn't -- I wouldn't be involved in that. I wouldn't know. That would be operations and production and, you know, those responsible for buying and the purchasing department.

Q You are aware that Andrew Williamson made several withdrawals of money from the Regions Bank account holding CELEC's funds?

A I would not know the specifics of anything he did with that account. I don't sign on it. I'm not on it. I have no access to it. So I wouldn't know anything about what he did or didn't do.

Q You are unaware, as you sit here today,

testifying under oath, that he took over $4 million of that money in cash withdrawals?

A I'm unaware of it. Yeah.

Q Okay. Has he ever discussed or disclosed with you what he did with the cash withdrawals from the Regions Bank accounts?

A We've never talked about it, so I'm sure it's perfectly justifiable, but I don't know what he did it for. Specifically, because I don't have any documents or dates or times. And it's -- more importantly, what he says it was spent on, I'd have to know that in order to -- to comment on it. So no.

Q What is -- did ProGen, at any point in time, receive a Small Business Administration loan?

A SBA?

Q Yep.

A Not that I know of.

Q Okay.

A Maybe. I don't know. Andrew would've done that, and finance or accounting would've done that. I don't know.

Q Did ProGen obtain a Small Business Administration loan in connection with the Quevedo and Salitral contracts?

A Not that I know of.

Q Who is D. Sholar?
A She is head of human resources.
Q She's the head of human resources at ProGen?
A Yeah.
Q And she continues to have that role?
A She does.
Q Okay. How many employees, approximately, did ProGen have in 2024?
A Maybe -- I don't know. I wouldn't know the numbers. 85, more. You know, when we were doing the -- talking about what year?
Q 2024, the year in which the contracts with CELEC were signed?
A Oh, I don't know. Maybe 40, 35. I don't know. Depends on what we were doing in projects at that time. So I wouldn't know that. You'd have to get records from human resources or payroll or whatever. I don't know.
Q Only payroll records would help us identify approximately how many employees?
A I think so. Yeah. Yeah. Just --
Q Just --
A -- my nose is always to the grindstone.
Q Approximately how many employees ProGen had in the year 2024?

A I have no idea.
Q But payroll records would help us identify?
A Yes, sir. Yes, sir. I did it exactly right. Yeah.
Q How many employees, approximately, did ProGen have during 2025?
A I don't know. I think at the height, maybe 80, 85. I don't know. Maybe 90. I don't know. Not including, you know, hundreds of people working on the sites.
Q And these would've been full-time employees in the payroll of ProGen, approximately 80 people during 2025, yes?
A Whatever there was, which I'm telling you I don't know the number, would've been full-time employees. Yes.
Q How many employees did ProGen have, approximately, during 2026, or has ProGen had during 2026?
A I don't know. We currently have around 30, 25 to 30. I don't know.
Q And to be clear, when we are counting ProGen's employees in 2024, 2025, and 2026, we do not include you, correct?
A Correct.

Q And does that include Andrew Williamson?
A He's on the payroll.
Q And does that include your son-in-law?
A It does. Yeah.
Q And that includes Andrew Williamson's son?
A That does.
Q Anyone else related, affiliated with you, directly or indirectly?
A My daughter.
Q Your daughter is Shane's wife?
A Yeah. Laura Lawlor.
Q And Laura is also an employee and in the payroll of ProGen?
A She is, yeah.
Q And what is her role at ProGen?
A She heads up all the social media, does all the posts and all the management of the LinkedIn accounts and the -- any social media accounts, anything that we post on or promote. She manages all the Google reviews and manages all that. I don't -- I don't do all this stuff.
Q And since when has she been on the payroll of ProGen?
A Kids are going to do -- a couple years.
Q Approximately?

A I don't know. I really don't know.
Q More than five years?
A No. She's worked for us in the past, more like at Genertek, and doing similar things, but I don't know. I don't -- I really don't know.
Q Anyone else affiliated or related with Andrew Williamson on the payroll of ProGen?
A Not that I know of.
Q And your brother?
A Well, he was. Yeah.
Q 2024, 2025, and I'm -- part of 2026, yes?
A Yes. Yes.
Q What is SBM Construction?
A I don't know. I really don't know.
Q Why did SBM Construction receive over $3 million of CELEC's funds?
A I don't know.
Q What is Gestores Inmobiliarios Lightblue? Let me spell it for you. G-E-S-T-O-R-E-S, I-N-M-O-B-I-L-I-R-I-O-S, Lightblue. Let me say it for short, Gestores. What is Gestores?
A Hmm?
Q What is Gestores?
A I don't know.
Q Why did Gestores receive over $3 million of

CELEC's funds?

A I don't know. There would be invoices and justifications for it. Everything that would -- you need to document what you sent money for. I'm sure it's there somewhere, or you're just going to --

Q But as you sit here testifying under oath, you are unaware?

A No. I don't know who they are. I think they were subcontractors. Anything that has that Spanish name or Latin name would be probably subcontractor that were managed either by Karla and Jose or FYI. I don't know.

Q You are also aware that there was an American Express card that was used by people at ProGen, including Andrew Williamson, yes?

A Yes.

Q Anyone else used that American Express card?

A Myself. Yeah.

Q Anyone else besides you and Andrew Williamson?

A I don't know. I don't know if he gave it to somebody else. I have no idea.

Q Were the expenses in that American Express card by you, Andrew Williamson, or potentially others associated or related in any way to the Quevedo and

Salitral contracts?
A If they were incurred during that time period, I'm pretty sure they were. I just don't know the details at all.
Q Your personal expenses in that American Express card in 2024, 2025, were they related to the Quevedo and Salitral contracts?
A I have no idea what they were divided into. I haven't seen them. I'm sure accountants should -- could because they document what everything was. Was it personal? Was it business? Was it, you know, whatever.
Q Are you aware of whether all of the expenses in the American Express card that you or Andrew Williamson used or others had a connection with the Quevedo and Salitral contracts?
A I don't know what they were all done for. I really don't.
Q What is Akil Corporation?
A Who?
Q A-K-I-L Corporation.
A Akil is a company we bought some cores for.
Q Where is that company based out of?
A India.
Q Who is the owner or controlling party of

that entity?

A I don't know. Sorry. I don't mean to laugh. I don't know.

Q You are unaware of what individuals own or control Akil Corporation?

A No. I've never -- would never know something like that. Why would I?

Q You wouldn't know what company ProGen conducts business with and wires millions of dollars?

A No, not -- not multimillion dollars. I don't know their organizational structures, who owns what. Never done it in 40 years. Maybe if I -- if I found out, it's because either I did some in some friendly way, but I don't go looking for, you know, who's the shareholders of whatever. But normally, I'll do a research on it and look at the principles and if they're online and, you know, just judge whether they're a credible company. But I've happened to have known Akil for 20 years or more.

Q What person or persons did you communicate with at Akil Corporation?

A I don't remember his name.

Q Do you remember the name of any one single person at Akil Corporation?

A I -- no, I don't. I -- I could look at the

WhatsApp, and I'll remember it for two weeks. But right now, I haven't looked at it in years, or a year or so. I don't remember.

Q You should -- you would have WhatsApp messages with Akil Corporation?

A Sure. A lot.

Q Okay. And you said Akil Corporation sold cores, is what you said?

A Engine cores. Yeah.

Q Engines?

A Engines and alternators. Yeah.

Q Engines and alternators?

A Yeah.

Q Akil Corporation sold engines and alternators to ProGen in connection with the Quevedo and Salitral contracts?

A May have been in connection. Yeah, I would think so. Yeah.

Q Or may have been in connection with other --

A Things that I buy as cores or stock, and then I could use them on any project. I'd use them on whatever project that we're doing. I mean, if it was -- I think some of the purchase came before we got the contracts, but I'm not sure of that. I need to check into that.

Q So there would be e-mail --
A And then some came afterwards. Sorry.
Q There would be e-mail correspondence or text messages with Akil Corporation regarding the money that ProGen sent to Akil Corporation, including what those --
A Purchase orders. Yeah.
Q -- including what those engines and alternators were going to be used for, yes?
A No. There would be purchase orders for what -- exactly what we were buying, but the purchase order to Akil wouldn't say what we're using it for. No.
Q But there would be internal correspondence within ProGen identifying whether the engines and alternators purchased from Akil Corporation were being used in connection with the Quevedo and Salitral contracts?
A Maybe. There would be emails that reference that we were using them, but whether there are references that say, all right, we're buying this number of units and it's going to be used for Quevedo, we don't communicate like that. That would be normally in production meetings and stuff like that. Or, you know, let's take it from this stock or that stock or this, you know? Maybe there is. Maybe there

isn't. I don't know.
Q You are aware that ProGen sent over $2.5 million of CELEC's money to Akil Corporation?
A I don't know if it's CELEC's money, but yeah, I am.
Q Okay. And was all that money that Akil Corporation received in connection with engines and alternators that were used by ProGen in connection with the Quevedo and Salitral contracts?
A I don't know for sure. I would assume yes.
Q But there would be records identifying it either way?
A There would be records identifying what we bought and then where those units went to. Yeah.
Q What is Enerset Electric?
A Enerset is the one we talked about, the four new surplus generators.
Q Enerset sold new surplus generators to ProGen?
A We bought them back, yes. Those are the four that we bought back. We sold them to them originally, not using CELEC money. We -- we sold those to them originally and then bought them back.
Q So the four power generators with Enerset included two payments, the $10 million payment to AOT

and the separate two and -- $2.2 million payment to Enerset?

A That's correct.

Q So ProGen bought back those four power generators from Enerset for the total amount of approximately $12 million?

A Not just the four generators, but a bunch of other equipment that went along with it. Heavy fuel treatment stuffs and switch gear, other things that we planned on using on the projects. Yeah.

Q And that is, in your experience, approximately the price of a new surplus generator and related equipment, $3 million?

A Huh?

Q That is the purchase price, in your experience, of a new surplus generator and related equipment, $3 million per generator?

A It wasn't just for the generators. For the whole amounts of things that we bought, you know, the switch gear or other things that went along with it, you know, to -- to outfit it for heavy fuel -- fuel treatment system, boilers. And I don't know whose money went towards that, because those went to Catamayo and Catamayo paid us enough money to buy those generator sets. So how all that money got mixed

up, yeah, you're going to have to figure that one out, but it doesn't matter in the end at all because the monies that were spent and received by ProGen went for materials for all the projects.

Q What is Coast Oil Dynamic?

A I think it's a company that we sold a generator set to, which we wound up buying it back because they couldn't use it in -- in Mexico. It sat in Houston before they shipped it out, and we negotiated to buy that from them for the Quevedo project.

Q And was that generator shipped to Ecuador?

A Yeah, I think it was. Yeah. Yeah, it actually was. Yeah.

Q CELEC -- so that means ProGen paid approximately $2 million to Coast Oil to purchase back a generator that ProGen then shipped to --

A Yes.

Q -- Ecuador in connection with the Quevedo contract?

A Yes.

Q And that was a new surplus generator?

A It was not new surplus. We actually built that generator using a remanufactured EMD engine. And at the time, it was a dual fuel, natural gas, and

diesel generator. And we converted it in Houston to -- to run on heavy fuel. So yeah.

Q Coast -- the generator that ProGen purchased from Coast Oil for approximately $2.2 million was then zeroed hours -- or zeroed out, as you would put it --

A Yes.

Q -- in Houston --

A Yes.

Q -- by ProGen, and then shipped to Ecuador in connection with the Quevedo contract?

A Yes.

Q Okay. What is A.R. Savage & Son?

A Shipping company out of Tampa.

Q And CELEC paid A.R. -- I'm sorry. ProGen paid A.R. Savage & Son over $2 million for shipping services?

A I'm surprised it's only that low. Yes.

Q And that was for shipping the 46 generator sets?

A No. Some of them. Only a few numbers they -- they actually did, and we used somebody else.

Q What other company was used by ProGen to ship the generators?

A I don't remember their name.

Q And there would be e-mail exchanges or text

messages and contracts with A&R [sic] Savage in connection with their shipping services?

A Very detailed. Yeah.

Q What is Hilliard Enterprises?

A Hilliard Enterprises is a company that makes EMD parts, engine parts.

Q And ProGen paid over $2 million of CELEC's money to Hilliard Enterprises in connection with EMD or engine parts for the Quevedo and Salitral contracts?

A There you go. Yes.

Q Okay. And there would be emails, documents, text messages relating to that?

A Very detailed, yes.

Q Okay. Inter Fab Services is the company that cleaned the generator sets?

A Yeah. They were a labor company, basically.

Q They were the ones responsible for cleaning and painting the 46 generator sets?

A That's -- no. Only the gen sets that were in Houston at Apollo. Only those.

Q How many were those?

A I don't recall. I -- I think there were 19 or maybe a few more. I don't recall the number.

Q And all of the money that ProGen paid to

Inter Fab was for Inter Fab to paint and clean the generator sets that were at Apollo's installations in Houston?

A Yeah. They were there to do all that work.

Q What is Zhuhai -- I'll explain -- I'll spell the name. Z-H-U-H-A-I.

A I think it's another Chinese company that we bought materials from, I think.

Q And those were materials that ProGen paid for that were used in connection with the Quevedo and Salitral contracts?

A Yes.

Q And that would be documented in text messages, emails, and the like?

A Yes. Or Quevedo or -- I mean, Catamayo. There's three projects there in Ecuador.

Q Rayk Holdings is another one of the companies owned and controlled by Raymond Kuntz?

A That's the same guy I was going to say. Yeah.

Q And the -- any payments that Rayk Holdings received from ProGen with CELEC's funds would've been to repay loans that Raymond Kuntz or his companies had provided?

A I don't know what he received or what he

would've received, but presumably, it's another maybe company that he issued loans from that he owns. I don't know.

Q What is ABB?

A ABB is ABB, which is a large electrical company here, multinational. They make switch gear, substation equipment, alternators, things like that. Yeah. It's all kind of stuff we buy from the electrical apparatus stuff.

Q Did ABB provide or sell any materials or equipment or components in connection with the Quevedo and Salitral contracts?

A I have no idea.

Q What is Swift Funding?

A Swift Funding is a mortgage company.

Q Why did Swift Funding receive over $1 million of CELEC's money?

A I wouldn't know. Yeah, I don't think you would call it CELEC's money. You don't know where the money came from to pay them. But if we would've paid them, it would've been in the normal course of business for ProGen for our facilities or mortgages on facilities or whatever. I don't know. Andrew would know more than I do on that.

Q What properties does ProGen mortgage to

Swift Funding?
A I don't know. Andrew would know that.
Q What properties does ProGen own?
A It owns a building, our main building at 600. It's contracted to mortgage and buy out the building next door to us. I think it's 520. And then it has a fabrication shop that was used to manufacture all the skids and the houses from Catamayo that it acquired during the project. And Andrew mortgaged that building and our main building to add to our cash flow of the company during the projects.
Q ProGen has mortgaged both the 600 Prairie building and the building adjacent to it to Swift Funding?
A That's correct.
Q And those properties are still subject to that mortgage to Swift Funding?
A Yes.
Q And how much money has Swift --
A And believe me, I don't know if it's Swift or who it is, but -- so you got to ask Andrew that. I don't know the names of them.
Q How much money has Swift Funding provided to ProGen in connection with those -- how much money, if any, has Swift Funding provided to ProGen?

A I don't know.
Q Who owns or controls Swift Funding?
A I don't know.
Q What is Southern Graphic Systems?
A They're a company that makes stickers for our units. Placards, nameplates, designation stickers.
Q And Southern Graphic Systems provided stickers or labels for ProGen in connection with the Quevedo and Salitral contracts?
A Oh, yeah. A lot of them. Especially for the Quevedo projects. The big wrapping that goes on the containers that tells you what model it is, what kind of unit it is, who manufactured it.
Q What is Consorcio Soluenergy?
A I don't know. What's their name?
Q Consorcio Soluenergy.
A I don't know. I think it's a contractor that H&S or Astrobryxa might have hired. Probably was that. Yeah. For site works.
Q Did Astro -- Astrobryxa -- just to go back, of all the names we just discussed, all the way through Southern Graphic, did you or anyone else at ProGen, at any point in time, disclose to anyone at CELEC that CELEC's money was going to be used for

those parties?

A No. There's no opportunity or reason to do it whatsoever.

Q Okay. Did Astrobryxa, at any point in time, disclose -- or did Karla Saud or Jose Manrique, at any point in time, disclose to you or anyone else at ProGen that they were going to use CELEC's money to pay Consorcio Soluenergy?

A I never knew about them when we started the project. We know there would be subcontractors involved. Who they were, they'd had to go through a bidding process to -- to be able to be chosen to provide whatever they were doing as their company's expertise.

Q Who ran or managed those bidding processes?

A Jose and Karla. Originally, it was HS. And then, eventually, when we broke away from FYI and -- and went directly to Astrobryxa -- excuse me.

Q Yeah. Your testimony is that Karla or Jose, and Jose directly or through companies they owned or controlled, ran bidding processes. And as a result of those bidding processes, they retained companies to act as their subcontractors?

A Correct.

Q And Astrobryxa, Karla Saud, Jose, or their

companies, they disclosed and provided information to ProGen regarding those bidding processes?

A Some. What they provided to us was, you know, confirmation of their responsibility to complete. Who they used, we didn't care. We had no desire. We just wanted to be sure it was in the budget amount. Their job was to get multiple quotes in order to stay within the budget amount. And if it went over the budget amount, then we talked. That was the understanding. Like any other project, same.

Q Did Astro -- Astrobryxa, Karla Saud, Jose, or anyone associated to them provide details to you or anyone else at ProGen about their bidding processes?

A I don't know what you mean by that.

Q You said that Consorcio Soluenergy was a -- would have won a bid from companies owned or controlled by Karla and Jose?

A Yeah. They would have bid on a project. Every once in a while, we would get details of what they were bidding on, and then the price that the bidder would -- was coming in at. It was not what it was supposed to be. It was very -- became very sporadic, you know, at the end there. But -- so we understood what the process was for them to do it. And the required process for them was to get multiple

bids and pick the -- pick at least one. And then they would send us invoices from those. They would let us know they're choosing them. Then that company would invoice them, and Karla and Jose would send us the invoices to pay. And I'm sure every single wire that went out to Karla and Jose was accompanied with invoices amounts.

Q And there would be e-mail correspondence or text messages with Karla or Jose regarding the bidding processes that they ran and the company that they selected?

A I don't think so. Not like you're saying -- you just said it. I think we would've got notification that they were bidding and -- or going out to bid, but that we would get the -- every single, you know, detail by e-mail, no. I think there are some emails that would document that those things were taking place. Yes. The details, I don't know what they are.

Q Okay. Who is Jose Luis Hidalgo?

A I don't know.

Q Was Jose Luis Hidalgo discussed at any point with ProGen as a person that would be receiving part of CELEC's funds?

A I don't know that they did. I don't know

who they are.
Q Okay. What is Consorcio Autotrafo?
A I don't know.
Q Why was Consorcio Autotrafo receiving part of CELEC's funds?
A If I don't know who they are, then I don't know that. No.
Q Who is Anthony M. York?
A I recall their name, but I don't know personally.
Q Why do you recall the name?
A I don't know. I've heard it, it seems like. Look, everything on your details you're asking on that, that's purchasing and accounts payable. They would have all the details of why they got paid money, why would they get paid money, and how they got paid money. And sitting here and asking me that, I don't -- I can only do my best here, which I'm trying to do for you.
Q What is Constructor Nomur, N-O-M-U-R?
A I have no idea.
Q Who is Alex Duenas?
A I have no idea.
Q Are you aware of why Constructor Nomur or Alex Duenas were receiving CELEC's funds?

A They didn't -- I'm not saying they could leave -- received CELEC's funds. I'm saying they received funds from ProGen, ProGen's funds.
Q Are you aware?
A I'm not.
Q Jose Manrique sent approximately $750,000 to ProGen?
A I think so.
Q Why?
A To provide the capital to buy that one unit that we got from Coast Oil.
Q The unit that was worth approximately $2.2 million?
A Something like that. Or another unit. I can't remember. It was a -- it was about buying a unit. I think it was a Coast Oil unit. I'm not sure. But anyway, to buy a unit, and then he would get paid back, you know, when we, you know, got paid on the project and we delivered.
Q What is MyBox?
A MyBox is a company Andrew owns. I -- it's a company that -- it was an entertainment company that converted containers to marketing containers that companies would use. Like, they had a company called Ybor City Cigar. They bought -- they paid MyBox to

convert a container where you put in seating on top, and you convert it to a place where they can put it on site at a festival like Gasparilla, and then they could have a bar there, and they could serve whatever they serve. And anyway, it's a -- it's a -- I don't know, entertainment thing like that.

Q MyBox is the entity that owns 600 Prairie Industrial, correct?

A I don't know. I think it does. I'm pretty sure it does. Yeah.

Q Meaning MyBox is the entity that owns the building where ProGen operates, correct?

A Correct.

Q MyBox also owns 4603 Drew Court, correct?

A No.

Q It doesn't?

A Sorry to laugh, but no. That's my house. I bought it in 1995, and I only owed $100,000 on it. That's my house.

Q MyBox owns 217 Northwest 1st Avenue?

A I don't know.

Q Do you know what that address is?

A That's downtown. That's our administration and engineering building.

Q That is another one of ProGen's buildings?

A It's the --
Q Or the -- or one of the buildings where ProGen operates?
A It's operating out of, yeah.
Q Yes?
A Yes.
Q MyBox also owns 2855 Brooks, correct?
A Yes.
Q What operates in 2855 --
A I don't know if it does. I don't know if it's -- I don't know, but if you say it does. I'm just -- okay. I don't know for sure.
Q What is 2855 Brooks?
A It's a metal fabrication shop in -- for assembling skids or fabricating skids and -- and putting houses on them -- making the houses for them and all the metal fabrication for the projects, exhaust stands, and things like that. We make silencers. We make other things for the industry.
Q And that is part of ProGen's business as well?
A It is, yeah.
Q You previously owned, through Genertek or directly, 600 Prairie Industrial, yes?
A Yes.

Q And then when you sold it, Andrew Williamson put it in the name of MyBox?
A I don't know who he put it in the name of, but I'm assuming, yes.
Q You, directly or through Genertek, owned 217 Northwest 1st Avenue?
A What's that?
Q To -- you, directly or through Genertek, owned 217 Northwest 1st Avenue?
A No. Never owned that building.
Q That was a building that was purchased by MyBox?
A I guess, yeah.
Q From whom?
A I don't know.
Q When?
A I don't know. A couple years ago, as far as I know.
Q You, directly or through Genertek, owned 2855 Brooks?
A Not me.
Q That was a --
A I don't have any ownership in any of the real estates of ProGen or associated with ProGen. None.

Q That was a property that was purchased by Andrew Williamson through MyBox later in time?
A Yeah.
Q How did Mr. Williamson fund the acquisition of 2855 Brooks?
A I have no idea.
Q What is 400 Canterwood Drive?
A I don't know. I think that's Andrew's home.
Q When did he purchase that home?
A I don't know. Last year, maybe, or sometime the year before.
Q Recently?
A Recently, yeah.
Q How much did he pay for that home?
A I have no idea.
Q Have you visited that home?
A I have once.
Q Only once?
A Only once.
Q Do you often visit with Andrew Williamson outside of the office?
A No. We don't hang out at home together, no.
Q I'm sorry?
A We don't hang out at home together, no. We don't spend that time at each other's house.

Q Did Andrew Williamson told you he -- how he had funded the purchase of his new property at 400 Canterwood Drive?
A No, he did not.
Q What is 1621 Gulf Boulevard, Apartment 107?
A That's a home he bought years ago. Sold his home in Lakeland, his first home in Lakeland, I think, and then moved there. Lived there for a couple years before the project.
Q Mr. Williamson lived in 1621 Gulf Boulevard before he purchased and moved into his 400 Canterwood Drive property?
A Oh, yes, he did.
Q What is 3664 Barred Owl Road?
A That's a home he leased for a while when he got tired of driving back and forth from his home in Clearwater. And when him and his wife divorced, he moved into that home. His wife stayed in the Canterwood -- I mean, the other house in Clearwater. He moved to that one when they split up.
Q Andrew Williamson and his wife lived in 1621 Gulf Boulevard. And after they separated, he moved into 3664 Barred Owl Road?
A Yeah. It's a leased house.
Q Who -- when -- who owns that house?

A Well, nobody knows. He leased it from some leasing company. It's not his house. Not my house.
Q Do you know the name of that leasing company?
A I have no idea.
Q When did Mr. Andrew Williamson divorce his wife?
A I don't know. I don't know the date. A year and a half ago, two years ago, I don't know.
Q That would've been after Mr. Williamson purchased the 400 Canterwood Drive, Mulberry property?
A No. No, I don't think so.
Q It would've been around the same time?
A No. He lived in the Barred Owl Road when he got a divorce, so I don't know how long he lived there before he bought his home -- new home.
Q And the -- John -- I'm sorry. Andrew Williamson and his wife -- what is the name of his wife? I'm sorry.
A Laura.
Q Andrew Williamson and his wife -- or his ex-wife, Laura, have been separated since approximately 2024; is that correct?
A No. They've been together for almost -- going on a year now, back together, eight months,

something like that.

Q They separated from approximately 2024 to 2025, and then they got back together?

A Yes. And they're getting ready to get married again. And contrary to Wade's comment, Garrett is their son. They've been -- they were married like 28, 30 years. Garrett is their son. He's not an illegitimate child, or whatever he called him.

Q Part of CELEC's funds in the Regions Bank account were also used to fund child support payments?

A I don't know. I don't get involved in any of that. I have no idea.

Q And those would've been child support payments for Andrew Williamson?

A No. He didn't have any child to support.

Q Do you have child support obligations?

A No. No. I've been married for 42 years, 43 in October. Both of my kids have grown and have three kids a piece of their own.

Q Does Andrew Williamson have child support obligations?

A No.

Q You are unaware of child support payments being paid out of the Regions Bank account with CELEC

money?
A No. That would be Donna Sholar or human resources that would pay that out. That's ordered by the state.
Q To whom?
A To whoever they say to pay it to. They send you a notice. But it's not anybody from Andrew or me or anyone I even know. It's probably going to be for one of the employees out in the shop, or it could be one of the engineers. I don't know.
MR. PULECIO-BOEK: Okay. I think this is a good time for a break.
THE WITNESS: I think it's a good time to quit.
(Off the record.)
THE VIDEOGRAPHER: All right. We're back on the video record. This begins Media Unit 6. The time on the video monitor is approximately 5:54 p.m.
MR. PULECIO-BOEK: Mr. Manning, we've placed in front of you Exhibit number 3.
(Exhibit 3 was marked for identification.)
BY MR. PULECIO-BOEK:
Q This is a WhatsApp text message between you

and Karla Saud, correct?
A Yes.
Q The phone number -- your phone number is 863-450-6795?
A Correct.
Q And Karla Saud's phone number was 18 -- I'm sorry, 818-428-7788?
A I don't recall, but yes.
Q Best as you know, this is an accurate and faithful copy of your WhatsApp text messages with her, yes?
A I don't know.
Q This came from your phone, correct?
A I don't know. Hold on. It's the first time I've seen this.
Q You did correspond through your 863 phone number with Karla Saud via WhatsApp, yes?
A We did, yes.
Q Are you aware that your text messages with Karla Saud were produced in this litigation to us?
A I am, yes.
Q This is a text message chain in WhatsApp?
A Yes, it appears to be. Yeah.
Q Which is dated 2024 in July 5, yes?
A Okay.

Q And you can see that date at the center of the first page towards the top?
A July 2024.
Q Yes?
A Yes.
Q And you say "Good morning" to Karla, and you referred to her -- this is Karla Saud, yes?
A Yes.
Q And you refer to her as Sister Karla, yes?
A Yes.
Q Why did you refer to Karla as sister?
A Just --
Q I'm sorry?
A -- affectionate. That's all.
Q You felt affection towards Karla Saud?
A It was an affectionate -- if you know what affectionate means in the -- you know, describing different languages, it was just an affectionate, nice way to say, hi, Karla.
Q By this point, you had known Karla Saud for a few months?
A Yeah.
Q And despite that you had only known her a few months, you felt sufficiently affectionate to her to refer to her as sister?

A Or call her dear or call her, you know, whatever. It's not -- it's not unnormal.

Q And you would say it is common practice for you that with business associates that you've only known for a few months, you refer to them as sister?

A Somebody I like, yeah, maybe, if it's a girl.

Q Not if it's a man?

A Well, I would call him brother.

Q And so by July of 2024, after a couple of months of knowing Karla, you liked her and felt affection towards her, yes?

MR. JIMENEZ: Objection as to form.

THE WITNESS: No. I just felt okay with her.

BY MR. PULECIO-BOEK:

Q You felt sufficient affection towards her to call her sister?

A I don't know. I would call you, brother, in the next five minutes, you know, if we were going over something. What's up, brother? That, kind of -- what's up, sister? That way.

Q And you were asking her here, "Can you help? Can you please explain to me what the -- why the contact" -- you meant contract, yes?

A I don't know. I don't recall this, but --
Q "Contact budget amount, mainly 47 point" -- I'm sorry, "49.7 million," yes?
A Yes. For Quevedo.
Q And you say that it is worrying you all night and morning, yes?
A Yes.
Q Why is the contract budget of nearly $50 million worrying you?
A I don't recall. I just think our -- I just think that our budget was more than that originally, when we costed the project out. I -- maybe that's it. I don't recall now, though.
Q And this is 49.7 million for that Quevedo Contract?
A Uh-huh.
Q Yes?
A Yes.
Q And this is the budget that CELEC had attributed or assigned to that Quevedo Contract, yes?
A I'm assuming that's where it came from. I don't recall.
Q And you did not believe that $50 million were enough to deliver that power plant under that Quevedo Contract?

A I don't know if I characterized it as anything, or I actually thought at all. I was just concerned about the price.

Q You thought it should be higher?

A Maybe. That's probably what it looks like, yeah.

Q And how much, according to you, should that Quevedo Contract have been worth?

A I have no idea at this point. I don't -- I forgot all about this conversation.

Q But certainly as of July of 2024, you felt that $50 million was not enough money for the Quevedo contract?

A I didn't say it wasn't enough money. I just said it was a lower price. And I was thinking -- I guess is what that's -- what that's all about.

Q Well, you're saying that it is worrying you all night and morning, yes?

A Yeah. Because I like to make money, and maybe I didn't think I was going to make enough money on that.

Q You didn't think you were going to make money -- enough money on $50 million, correct?

A I guess. I'm assuming that because I don't recall what I was thinking at the time or why it was

that. I don't know if there was a solution that proved myself wrong. I don't know.

Q Uh-huh.

A Apparently there was because we did it.

Q And if you go to the document that has the label to the bottom right, 23159, do you see that?

A No. 231 what?

Q 23159.

A Okay. Let's see here.

Q You see it?

A Yes.

Q Karla Saud would be sending you several documents, yes?

A Yes.

Q And you say, "Karla, Quevedo letter would land us in jail," yes?

A Yes. I don't remember it, but yes. It says that.

Q Because that letter contains statements that were false, yes?

A I believe so.

Q And Karla Saud did in fact provide that letter to CELEC, yes?

A I have no idea what the letter is. Do you have a copy of it?

THE REPORTER: I'm sorry. Provide to who?

MR. PULECIO-BOEK: To CELEC.

BY MR. PULECIO-BOEK:

Q And then you say -- after you say that that letter would land you in jail, you say that, "20 generator sets" -- you meant the 20 generator sets under that Quevedo Contract, yes?

A Yeah. I would say it was for Quevedo, yeah.

Q -- "are newly packaged new units with zero-hour remanufactured engines," yes?

A Yes. And new sub-assembly, not "sun-assembly".

Q I'm sorry?

A With new sub-assembly. "Very consistent through everything, every communication, that that's what we're delivering. And don't say it's something else because they're not going to agree to it."

Q You said to Karla Saud that the 20 generator sets for Quevedo were new units, yes?

A "Newly packaged units" is what it says here, "with zero-hour remanufactured engines in them, with new sub-assembly components."

Q You say that they are "newly-packaged new units," correct?

A Yes.
Q New units?
A Newly-packaged units.
Q You say, "Newly-packaged new units." Do you see the "new" before "units"? Yes or no?
A They are newly packaged new units, but with zero-hour remanufactured engines in them.
Q New -- that was incorrect.
A That's what I had to sell at that time.
Q Mr. Manning, that was incorrect. Those were not new units, correct?
A They are new units. They're newly-packaged units. They're new units with zero-hour remanufactured engines. It says what it is. I mean, they're new units with zero-hour remanufacturing. Everything in them is new but the engines. Nothing misleading.
Q So do you remind -- when you use in writing the expression "new units," you mean an old and used engine that you have cleaned, yes?
A No. What does "old and used" mean? You know the description of "old" when you say "old and used"? How old is that old and how used is that used? Do you know that? Do you have any idea? Do you know how many hours were on these when we bought them

originally before we zeroed-houred them out?

Do you know any of that in order to use "old and used"? Do you happen to know that? Are you professional about that, or you got some information that I need to know that allows you to say "old and used," like you know exactly what that means?

Q Mr. Manning, I would ask you to respond to the questions that I am asking. Mr. Manning, when you use in writing that term, "new units," you mean engines that are old and used, yes?

A No.

Q New units means units that have never been used, correct?

A Huh?

Q New units means units that have never been used, correct?

A Newly-packaged units. New. That means they've never been put into service since the engines were remanufactured.

Q Okay. And then you further state to Karla Saud here that, "We are committing fraud if we say new engines," correct?

A Correct.

Q It is fraud to say "new engines," yes?

A It is.

Q Okay.
A And we never did. That's nowhere in the contract.
Q And you believed that, in the Quevedo contract that is being discussed in this chain, CELEC intended to buy, for $50 million, a power plant that contained old and used generators that you had reverted to zero hours?
A No. There was no "old and used generators." We didn't deliver old and used generators.
Q Well, you didn't deliver anything, correct?
A Huh?
Q You didn't deliver anything, correct?
A I didn't deliver anything.
Q Okay.
A We don't use old and used generators. We use engine cores.
Q And then you also asked Karla, "What is the 40-year warranty about," yes?
A Yes.
Q You did not want to provide a 40-year warranty on the old and used generators that you were --
A We didn't --
Q -- zeroing -- please let me finish the

question. You did not want to provide a 40-year warranty on the 20 Quevedo power generators that were old and used and you were zeroing-out, correct?
A I got to tell you --
MR. JIMENEZ: Objection as to form.
THE WITNESS: -- I am going to start -- I'm going to -- every time you say, "Old and used generators," here you are back at it again because you have no case, and that's what you got to do. If you're going to call them what they are, call them what they are. Newly-packaged generators with -- with zero-hour engines.
We didn't give anybody old and used generators, Daniel. Okay. Thank you. All right. Now, 40 years -- and we didn't give them a 40-year warranty. We gave them a 40-year guarantee that if the blocks and pans failed, that we will replace them.
BY MR. PULECIO-BOEK:
Q Mr. Manning?
A Yes, sir.
Q You did not want to provide 40-year warranties on the old and used generators that you were zeroing-out for the Quevedo contract, correct?
MR. JIMENEZ: Objection as to form.
THE WITNESS: I did. I'm not selling

old and used generators, and you need to stop saying it. I'm going to say it every time, and we're going to interrupt every time. Either say what it is or don't.

BY MR. PULECIO-BOEK:

Q Mr. Manning --

A We didn't want to warranty anything for 40 years. Nobody ever has. The only way you can warranty them for 40 years is if you operate and maintain them.

Q Correct. So you did not want to warranty those old and used generators that you were zeroing-out for 40 years, correct?

A I'm not just selling old and used generators, so you're using terminology for something that didn't exist.

Q Okay. You did not want to provide any warranty at all, correct?

A Yes --

MR. JIMENEZ: Objection as to form.

THE WITNESS: -- we did. And we did provide a warranty in the contract, exactly as written. Have you read it? Do you know what the warranty says?

BY MR. PULECIO-BOEK:

Q Mr. Manning, you did not want to provide a 40-year warranty, correct?

A Nobody in the history has ever provided a 40-year warranty. It's stupid.

Q All right.

A This is where she's just introducing all this crap to me, and I'm not even -- I'm not aware. We're not doing it like that, and we didn't wind up doing that in the contract. All righty. This is good stuff.

Q I'm sorry, Mr. Manning?

A This is the good stuff.

Q What is the good stuff?

A You keep saying "old and used generators" to mischaracterize the reality and truth, and I keep pushing back on it. That's the good stuff because it's the truth. I like the truth.

Q The 20 Quevedo power generators that you zeroed out, as you call it, were generators that you purchased from Apollo Electric, correct?

A No, we didn't. When we built a generator set and we newly package it, we didn't buy existing generator sets just to zero those generator sets out. We didn't deliver anything like that. Our plan for

this is to buy cores and provide newly-packaged generator sets on HFO that would be zeroed-out to zero-hour condition -- operating condition of the HFO engine, not the diesel engine.

You're saying we're going to zero-out the old used cores. We didn't do that. We converted those engines that we bought, the cores, to HFO. That's what the contract was calling for. Our job was to convert those to zero-hour HFO, newly-packaged gen sets.

Q Mr. Manning, the 20 power generators that you are discussing here in connection with the Quevedo contract, those -- the engines for those 20 power generators, you purchased from Apollo Electric, correct?

A Not correct, whatsoever.

Q Sorry?

A No.

Q You purchased them from Akil Corporation, correct?

A No.

Q Who did you purchase the engines in those 20 power generators in the Quevedo contract that you are discussing -- in this text message?

A Okay. All right. The -- the 20 generator

sets were packaged from engines that we sourced elsewhere, all over, different places. I don't think we bought a single -- we didn't buy a single engine from Apollo for that. Those were all individually-packaged gen sets.

The engines were sourced from another source. The alternators were sourced, some of them from Apollo Electric, totally rebuilt with zero-hour condition on them. We could supply in zero-hour condition for the purposes of zero-hour conditioning -- condition. And the engines, we built from the ground up.

We bought those engine cores from different sources. I don't know who right now, but none of those came from Apollo Electric. And we zero-houred those engines out, and then we assembled -- we brand new assembled -- completely built the containerized units for Quevedo, a completely different product than Salitral. So none of that came from Apollo. Maybe some alternators.

Q What company or companies provided to ProGen the engines that it used in the 20 power generators that were the subject of the Quevedo contract?

A I don't know. I need to go back and check on those. Offhand, I mean, can't even remember the

name of the company.
Q There would be emails, text messages, and other documentation and correspondence regarding the source?
A Absolutely. Purchase orders --
Q Please let me finish the question. Regarding the source of each of the 20 engines and the 20 power generators that are the subject of the Quevedo contract?
A Absolutely. Purchase orders would be really helpful for that.
Q And there would be e-mail correspondence, including text messages with different counterparties regarding the delivery of those engines to ProGen and the payment of ProGen, the funds for those --
A Yes.
Q -- engines?
A Yes. Yeah.
Q Yeah?
A Yeah.
Q And there would also be text messages, similar correspondence, with the people -- with the companies that provided the alternators and other equipment for those 20 generator sets that were the subject of the Quevedo contract?

A There could be, yeah.
Q There could be?
A Yeah. Probably telephone calls more than anything that -- and emails for purchase orders. But you don't do -- buy generators on text messages, but probably mostly phone calls.
Q And as you sit here testifying, as the CEO of ProGen, you cannot recall the name of a single company that provided the engines for the 20 power generators that are the subject of the Quevedo contract?
A I can't remember it right now.
Q Okay. And do you remember how much, if anything, ProGen paid to any of the companies that provided those engines?
A I don't -- I don't. You can find it in the purchase orders.
Q And do you recall what, if anything, ProGen paid to any of the companies that provided alternators or other components or parts for those 20 power generators that were the subject of the Quevedo contract?
A No. Other than Apollo, I don't know who else we would have bought it from. Of course, I didn't buy those things. Purchasing did all that.

You know, they would handle -- they would have all the details on that.

Q Did you or anyone else at ProGen ever disclose to CELEC the source of the engines in the generators under the Quevedo contract?

A No.

Q Did you or anyone else at ProGen ever disclose to CELEC the source of the alternators or the other equipment in the 20 power generators that are the subject of the Quevedo contract?

A No.

Q Did you or anyone else at ProGen ever disclose to CELEC how much, if anything, ProGen had paid or would pay in connection with the engines and alternators and other equipment in the 20 power generators that are the subject of the Quevedo contract?

A The obvious answer is, of course not. That's absurd. Who would?

Q You believe it is absurd to describe to your counterparty how you're using their money?

A I didn't use their money. I used my money that I was paid to do what I was supposed to deliver.

Q You believe that that $110 million that CELEC paid ProGen was your money?

A If -- when they sent it to me under contract and signed a contract, my -- my portion of the contract, if you pay me, you get consideration for doing your part of the contract, and I do my part of the contract.

Q It's your money and you could have done anything you wanted with it?

A So if I violate that contract, then they can come after that money --

Q You --

A -- which I did none of that.

Q You're testifying that the $110 million that CELEC sent you is your money, and you could do anything you wanted with that money?

MR. JIMENEZ: Objection as to form.

THE WITNESS: I didn't say that. That's not what I said. And again, it's you wanting me to say that, and that's not true. That -- that money becomes the property of ProGen to use responsibly on the project.

BY MR. PULECIO-BOEK:

Q Could ProGen have used it in anything it wanted?

A It could, but it didn't.

Q It used it entirely and exclusively for the

Quevedo and Salitral contracts?

A Absolutely. And -- and for its operations, in order to deliver that project.

Q It used it entirely and exclusively for the Quevedo and Salitral contracts?

A I think it did. I don't know for sure. I don't see the accounting, but you need to.

Q But it could have been used for anything that you wanted?

A As long as it was within the realms of responsibility towards the contract. So in other words, if I made, basically, $20 million on the project, that's -- I could spend $20 million on anything I wanted to if I was making that profit. I can't spend money on things that would prevent us from delivering the project. You won't find that that happened. You may say, well, Andrew made some money, and you made some money. So what? That's our prerogative. As long as we're delivering it responsibly on the contract, then we get to do what we want to with our profits.

Q What was the contemplated profit under the Quevedo and Salitral contracts, that had a total amount of approximately $150 million?

A I don't recall. We'd have to go through the

budgets on that. I don't recall.
Q Was it 10 percent of the value of the contracts?
A More than that.
Q Was it 20 percent of the --
A It should have been more than that. I don't know. It should be more than 10 percent --
Q Was it 30 percent --
A -- or there's no use in doing it. It should be more than 10 percent, or there's no use in doing it.
Q Should be more -- should -- would it be more than 20 percent of the value of the contract?
A I don't think more than 20, no.
Q Approximately 20 percent of the value of the $150 million was profit for ProGen?
MR. JIMENEZ: Objection as to form.
THE WITNESS: I don't know what it actually is right now. You'd have to look at the books. And I don't know. We planned on making at least 20 percent, like we do on every single contract. But I don't know what it eventually -- it eventually turned into a loss because CELEC violated the contract
--

BY MR. PULECIO-BOEK:

Q The --

A -- three times, and we proved it.

Q The standard, ordinary practice -- profit that ProGen makes in its contracts is approximately 20 percent?

A Approximately.

Q Okay. So you would expect that, when we look at the internal correspondence, documents, and the like, regarding budgeting for the project, that we will find that approximately 20 percent of the aggregate 150 million was profit for ProGen?

A Well, since CELEC defaulted on the contract and never paid us, then how do you have a full profit if they never paid you because they defaulted the contract?

Q I'm asking --

A There you go.

Q I'm asking about planning documents that you testified previously existed. You would expect that, when we look at those planning documents, including budgets, containing emails, PowerPoint presentations, or other documents, that we will find that, when ProGen budgeted and planned for the project, it estimated making approximately 20 percent profit on

the aggregate $150 million other projects?

A I don't know what you'll find. I really have no idea. I'm telling you what our intentions were, is to make 20 percent. Now, in our budgeting, we would have figured that out. So I don't know if -- where that exists, how it exists, or if you're ever going to find it, but you can try. You should.

Q The --

A I urge you to.

Q The expectation or plan in the aggregate $150 million price, therefore, was for ProGen to make approximately $30 million, yes?

A More or less, yeah.

Q How much of the $30 million would go to your pocket?

A I don't know. It just depends on the shape of the company after we actually finish the project, because we don't make any money like that unless you get to the end of the project and it actually worked out to work out the way you -- you planned it to. But of course, that never happened because CELEC defaulted the contract grossly and caused us to delay months and months and months. So we'll never know right now until we get done with our damages of what actually the impact was.

Q Did you and Andrew Williamson discuss, at the time that you were entering into the CELEC contracts, how you would distribute amongst the two of you that $30 million profit?

A That thing moved so fast, we weren't really talking about distributing anything. We were talking about executing the contract responsibly. That's all we really worried about. If we wound up with money at the end, that's great. But our main focus was executing the contract. Even though they destroyed the contract, we kept trying to execute and -- while we knew we were losing money, because they defaulted the contract three times, which we went to mediation for, proved it, and then they would fire a director, fire a minister, hire new ones, hire new ones every time they defaulted. They -- so we don't know what we were going to wind up with.

We had hoped to make around 20 percent. But as it turns out, by -- early on in the contracts, they were delaying so badly that we -- we didn't know what was going to happen to us. But we kept going forward, say we wanted to complete the project, which they kept delaying. Every time we would rewrite the contract, they would delay that, and then we go back to mediation.

Q That --
A That's your customer. That's who you're representing.
Q Mr. Manning, my question --
A Yes, sir.
Q -- was whether -- at any point in time as you were entering or at the time that you were entering into the CELEC contracts, did you and Andrew Williamson discuss how you would divvy up the expected --
A Uh-uh.
Q -- or anticipated $30 million profit?
A Never did.
Q Did you have a personal expectation of how much you would end up making?
A I had no idea what we were going to make on it. I would --
Q You and Andrew --
A I just wanted to get paid for my assets. I was trying to help Andrew sell projects, still are, so I could get paid fully for my assets. That was my main consideration. So we never got into details. If I close this Ecuador deal for you, I'm going to get 10 percent of the 20 -- that never happened. Nothing like that. No conversations like that. We were

already in, you know, knee-deep and mobilizing and getting ready even before it started, how we were going to do that project. And even if we did make a dime, that was okay for me.

Q A $30 million profit would have been the biggest and largest profit of your career, correct?

MR. JIMENEZ: Objection as to form.

THE WITNESS: I don't know.

BY MR. PULECIO-BOEK:

Q Yes or no?

A I don't know.

Q At any point in your history, did you ever close a contract in which you had a $30 million profit?

A Which I would have made a 30 million project -- profit? I don't know. I don't think so. Maybe 20. Maybe. I don't know.

Q And did you ever actually make $20 million profit on any contract?

A I never did. Well, it sounds like your customer did, to destroy the contract.

Q What was -- what is the largest profit you ever made in connection with any contract?

A I don't know.

Q As you sit here testifying, you cannot

recall what is the largest profit you had ever made in connection with a contract?

A I cannot.

Q But it sounds to you like $30 million would have been the largest profit of your career -- of your life?

A That's why we wanted to do it.

Q Right. You wanted to do it for the profits?

A We wanted to do it to make money.

Q Right.

A It was a project we could do, and we wanted to do it. Because that's how we make money, is do projects.

Q Yep.

A It would have been a good profit if it ever happened. Of course, it never did.

Q At any point in time, did you or anyone else at ProGen disclose to anyone at CELEC that you and Andrew Williamson intended to make a $30 million profit as a result of the Quevedo and Salitral contracts?

A Say that again?

Q At any point in time, did you or anyone else at ProGen disclose to CELEC -- anyone at CELEC that you and Andrew Williamson intended to make a $30

million profit as a result of the Quevedo and Salitral contracts?
A Never did. Never did.
Q Did you at any point in time -- you or anyone else at ProGen disclose to Karla Saud or Jose Enrique that you and Andrew Williamson intended to make a $30 million profit as a result of the Quevedo --
A Never did.
Q -- and Salitral contracts?
A Never.
MR. PULECIO-BOEK: This one?
THE REPORTER: Yes. One of them -- you got those.
MR. PULECIO-BOEK: I'm going to -- thank you. I'm going to hand you two documents that we can, I guess, collectively label as Exhibit number 4?
(Exhibit 4 was marked for identification.)
BY MR. PULECIO-BOEK:
Q This is one. I have placed in front of you, Mr. Manning, two documents -- two pages that we have labeled Exhibit number 4. I will represent to you that these are attachments to the text message chain

that we just reviewed between you and Karla Saud in which he was attaching PDFs. And you can see that by the Bates label. The Bates label is the number that we call -- that is stamped to the bottom right of the document. Do you see that?

A I do.

Q Yes?

A I see the documents. Yeah.

Q And these are documents that Karla Saud was sending you in WhatsApp that contained the signature of Andrew Williamson?

A They don't contain the signature of Andrew Williamson and they're frauds, so --

Q Did you tell Andrew Williamson that Karla Saud was forging a signature?

A Well, he's -- she signed his name and put my signature on there. Where she got it, we don't know, but she signed my name. That's my signature with Andrew Williamson's name underneath it.

Q But is -- so these two documents that we are discussing here, ProGen 23163 and ProGen 23165 are complete fabrications?

A Absolutely.

Q Okay. Did you tell Andrew Williamson that Karla Saud was sending you complete fabrications and

forgeries via WhatsApp messages?
A I'm sure we discussed it. I can't recall how, but I'm sure we would have. Yeah.
Q Did you disclose to anyone at CELEC, at any point in time, that Karla Saud was preparing and providing to CELEC documents that were complete forgeries?
A I don't know what she provided to them. We're finding documents now, today, that are total forgeries, very serious documents that they forged. So we don't know what all they gave to CELEC. At that time, I wouldn't have known it. I don't think she gave this to CELEC at that time.
Q My question to you is very specific. It is, as of July of 2024, as you are receiving forged documents in your WhatsApp message chain from Karla Saud, did you disclose to anyone at CELEC at any point in time that you were receiving documents from Karla Saud that were forgeries?
A No. Because when I saw this, I don't think I recognized that. I just recognized that I wasn't agreeing with it -- what the wording was. I don't think I -- at that time, I even recognized the signature.
Q You would --

A But no, I would have disagreed with everything she put in here.

Q You saw your signature stamped on another man's name, and you did not recognize that to be a forgery when you received this?

A I didn't. I wouldn't have looked at it. I think I was reading mostly -- especially by WhatsApp. I was having a hard enough time to see the documents, if it came through WhatsApp, and wouldn't have noticed that that's not our letterhead and that's not our company with this stuff and telephone and her construction e-mail on here. I -- you know, it's -- it's insanity. I think I was looking at the wording when she sent it to me.

Q Mr. Manning, did you or anyone else at ProGen ever disclose to CELEC that you were receiving documents from Karla Saud that were false or contained false signatures?

A We didn't know it until, you know, we started having troubles. And I don't know what month that was. It was certainly way into the contract. We didn't know what she was doing. All I know is she sent us lots of letters she wanted us to approve. And we said, no, we can't do that. We're not giving you authority to do anything like that, very specifically.

Q In that text message chain that we just reviewed, you did not tell her that she should not submit these letters to CELEC, correct?

A I would have to look at the rest of the text -- e-mail chain, if you got it.

Q Okay.

A Let me look at it.

Q The third paragraph of that -- both documents are by and large the same. The difference is that one is for Quevedo, one is for Salitral.

A Okay.

Q So let me read the text of one of those two letters. "ProGen is a full service provider of parts, components, and maintenance services for EMD engines. Our team of qualified and certified personnel is dedicated to ensuring the highest standards of excellence in all aspects of our work. ProGen owns its own EMD fuel injection company in Daytona, Florida, which manufactures our own electronic fuel injection components and supplies of ProGen's fuel injection systems."

You see that?

A 100 percent correct.

Q ProGen owns an EMD fuel injection company in Daytona?

A Yes.
Q What is the name of the EMD --
A ProGen.
Q I'm sorry?
A We have a facility there under ProGen. It's the fuel injection division of ProGen.
Q Oh. Is it a different company or the same company?
A It's the same company. It's a different division.
Q What is the address of that division of ProGen in which it has an EMD fuel injection company?
A I don't know it offhand, but there's a facility there that's manned by an individual that lives there that handles all of our fuel injection controls.
Q What is the address?
A I don't know it. I just --
Q What is the name of the individual?
A Jay Estes -- Estes.
Q Jay what? I'm sorry.
A Estes, E-S-T-E-S. Jay Estes.
Q And ProGen owns that facility?
A No. It's leased.
Q From who?

A I don't know. Andrew would know all that. I don't know.
Q It says, "ProGen manufactures its own engine generator controls" --
A Yes.
Q -- "and control -- and alarm panels and packages its own board for each generator set," yes?
A Yes.
Q Is that accurate?
A It's perfectly accurate.
Q ProGen manufactures its own generator -- engine generator controls?
A It does.
Q Where does it manufacture that?
A At the building next door right now. Next door to the 600 building, the 520, I believe, Prairie Industrial Parkway.
Q As of 2024, when you authorized Karla Saud to submit this letter to CELEC, was that an accurate statement? Was ProGen manufacturing its own generator controls?
A 100 percent.
MR. JIMENEZ: Objection as to form.
THE WITNESS: 100 percent. Yes.

BY MR. PULECIO-BOEK:
Q Okay. The next paragraph says, "ProGen manufactures parts and spare parts for EMD engine assemblies, overhaul components, and all necessary operating and maintenance components," yes?
A Correct.
Q And where -- from what facility does ProGen -- did ProGen do that as of July of 2024?
A From its main facility on machining items that it does and its production facility and through various numbers of contracted suppliers who, you know, even do the forge molding and castings and things like that and machining for us under our -- under our design and engineer drawings. Various contractors.
Q This is very specific. It says that ProGen itself "manufactures parts and spare parts for EMD engine assemblies." Is that accurate, yes or no?
A 100 percent. And it -- what it means is, like every other engine supplier, CAT doesn't manufacture its crankshafts. It says CAT crankshafts, but it contracts to various, sometimes hundreds of different companies to manufacture all of its brand new components that it says it makes. That's the standard in the industry. So if you want to make something out of it, go ahead. But it's normal.

Q And then it says, "We have been supporting our customers for four decades with reliable operations," yes?
A Yes.
Q Name all of the companies, all of the customers that you have been supporting for four decades with reliable operations.
A I can't name them offhand right here.
Q Can you name one?
A Yeah. I mean, Lakeland Electric, you don't think -- we do business with. We give them components all the time. All of the -- we just sold some components to -- to Burkina Faso. We sell spare parts and -- parts -- have just sold probably $250,000 in -- in parts to another company. We just -- people will call us from time to time for mostly technical support or parts to support the ongoing operations. Either filters or a spare injector or a spare part, or sometimes we'll, you know, sell overhaul components. But we've -- we've been doing it for decades.
Q And that includes Lakeland Electric, you said?
A Yes.
Q There should be records in your custody, possession, or control that show parts, equipment,

services that you or other companies affiliated to you have provided to Lakeland Electric historically?

A There will not be that. What we have is an agreement with -- a gentleman's agreement with Lakeland Electric to let us show the facility, and we're constantly providing them with things for free. Maybe they have a bad injector and they can't get it. We'll give them an injector or two. Or they don't need the consumables because they've been buying them for 25 years. But we have an understanding between us and Lakeland Electric and give them technical advice constantly, go over there and inspect the engines, and tell them how to fix them. A lot. And then we'll give them parts and services for letting us bring in customers. Now, we're in -- currently, you know, working on an opportunity to convert every one of those diesel engines to natural gas.

Q You and Lakeland Electric have a gentleman's agreement?

A Yeah. Certain --

Q With whom at Lakeland Electric do you have --

A I don't know their name.

Q -- a gentleman's --

A Andrew knows. I don't know their name.

Andrew.

Q You're testifying here today under oath that Andrew Williamson has -- or knows of the name of a gentleman at Lakeland Electric with whom he has a gentleman's agreement, yes?

A Just an -- just an understanding and agreement. Yeah. It's not an agreement -- well, if you give us free this, we'll give you free that.

It's just a -- a thing that's happening that they'll call us and ask us for advice. Anyway, do what you want to with it. It doesn't matter, but go ahead.

Q And that gentleman's agreement between ProGen and Lakeland Electric existed as of 2024 when you made these representations?

A Absolutely.

Q And the gentleman's agreement includes that ProGen can use Lakeland Electric's facilities to show to customers?

A Yeah.

Q And that was the facility that you showed Fabian Calero --

A That's right.

Q -- and Mr. Luque when Fabian Calero and Mr. Luque visited ProGen prior to the execution of the

contracts?
A That's the facility we went and visited. Yes.
Q And that is a facility that belongs to Lakeland Electric?
A It does.
Q Neither you nor any company associated with you built that facility, correct?
A What's that?
Q Neither you nor any company associated with you built that facility, correct?
A I built that facility. I designed it. I engineered it. I sold it. And we built it 100 percent full EPC.
Q Where -- what is the address of that facility?
A I don't know. You would have to look it up online. I have no idea. It's off Airport Road.
Q There --
A It's called the Winston Peaking Facility.
Q There will be documents in your custody, possession, and control that show that you or companies associated with you built the Lakeland Electric facility?
A Absolutely.

Q And in what year did you or companies affiliated with you build the Lakeland Electric facility?
A We finished it in 2001. Commissioned it in six months from the date of order.
Q And what company were you at at that point in time?
A Genertek.
Q There will be documents in your custody, possession, and control showing that Genertek built a facility for Lakeland Electric?
A Absolutely. You can have them all. Enjoy them.
Q And -- I'm sorry?
A And you can enjoy them. You can have them all. Whatever you need.
Q You said enjoy the documents?
A Yeah. So it shows you thoroughly what you need to know. That, yes, I did that.
Q That's what you're saying to the questioning attorney, that you -- that the questioning attorney should enjoy the documents?
A Yeah, because you need the information. I want you to enjoy the thoroughness of them.
Q Okay. And that facility that you say you

and Genertek build for Lakeland Electric is a facility that you use to convince customers to do business with you?

A No. We use that -- so we showed them as an example of what we can do, the kind of products that we provide and build.

Q Okay.

A Good wording, though.

Q Only Andrew Williamson would know the name of that person at Lakeland Electric with whom ProGen has a gentleman's agreement that allows ProGen to use that facility to convince customers to do business with them?

A No. I don't know if it was --

MR. JIMENEZ: Objection as to form.

THE WITNESS: -- just him.

I'm sorry.

Yeah. I don't know if it's just him.

BY MR. PULECIO-BOEK:

Q Potentially also his son, Garrett?

A Several other people may know. I don't know.

Q Have you ever met this gentleman with whom there is a gentleman's agreement?

A I have. He meets us when we go do the --

the -- the -- sometimes he'll meet us when we go do the tours of the facility.
Q Have you, Mr. Williamson, or others at ProGen provided any economic benefits to him in connection with this gentleman's agreement?
A I think what I explained, it was perfect.
Q What was perfect, Mr. --
A What did I say? I said that they call us from time to time for technical support. And then if they get in the jam for some materials, they'll -- we'll give them a component, whether it be a -- I think we've given them injectors in the past, and I think we gave them a pump or two. And when they get theirs replaced, they give it back to us. But we always are there for them 24/7 if they need us to go help get them out of a jam. That's real nefarious.
Q The next paragraph says, "ProGen is establishing a permanent EMD parts and service distribution center for Latin America in Ecuador," yes?
A Yes, it says that.
Q Was that a true statement at the time you made it in July of 2024?
A Absolutely. We had planned on doing that. Yeah.

Q With whom had you planned establishing a permanent distribution center in Ecuador?
A With Karla and Jose. They knew we were doing that, and we needed to do that in order to service the power plants. It wasn't like we just want to do it. We needed to do it.
Q You, Karla, and Jose have e-mail correspondence or text messages discussing establishing a parts and service distribution and service center for Latin America and Ecuador?
A I believe they exist. Yeah. We even looked at facilities over there.
Q But --
A Buildings.
Q But in fact, that was never established, correct?
A No. Because CELEC defaulted on the contracts.
Q And you say, "ProGen certifies that all 29 3,500 kilowatt medium speed generator" -- I'll just -- for purposes of the record, you'll see that it is exactly the same language, just it changes the number of generators and the kilowatt for the other contract. Do you see that?
A Yeah.

Q Sets -- it has generator sets, "It has bid for the stationary plant at the Salitral and Quevedo location in Ecuador, respectively. Our new, unused surplus units with zero hours and that all ancillary support equipment, generator controls, and balance of plant items are new and unused," yes?
A It says it, but that's not what we said.
Q That was a false statement, correct?
A And it wasn't supplied to CELEC. There's a letter that says "to whom it concerns" in the contract that's not only notarized, but it's apostilled, as required by CELEC. It says something completely different there.
Q This is a false statement, correct?
A This is something Karla put together and sent to me. And I didn't even read that part until now, but we just refused to do it anyway.
Q It is false and inaccurate, correct?
A It is. Yeah.
Q Then you say, "All equipment supplied by ProGen for this project is covered by a standard three-year warranty," yes?
A Yeah.
Q It is the practice and the standard for ProGen to have three-year warranties on all of its

generator sets?
A No.
Q What is the --
A I don't know what we actually offered, but it wasn't three years in the contract. I don't think so. I don't recall. It's just another thing that -- looking at this, we're like, we're not signing that.
But when she's -- I don't know how this got sent. I don't know if -- was it sent by WhatsApp?
Q Yes, it was sent by WhatsApp to you by Karla Saud in the text message chain that we received -- that we reviewed a minute ago --
A All right.
Q -- in July of 2024.
A Yeah. And I would -- I would urge you to look at the rest of the WhatsApp. What was my reply to this? I don't know. But I probably -- if I know me, I pushed back and -- but what we drafted at ProGen from ProGen that was notarized at ProGen and apostilled at ProGen is in the contract, and it doesn't say that.
Q Mr. Manning, was it true that all equipment supplied by ProGen in connection with the Quevedo and Salitral contracts were just going to be covered by a standard three-year warranty for new ProGen equipment?

Yes or no?

A I don't recall.

Q Was it true or not?

A I don't recall.

Q Was that -- was this statement true at the time that Karla Saud would send it to you in a WhatsApp channel?

MR. JIMENEZ: Objection.

THE WITNESS: It couldn't be true because it wasn't part of a contract. So I don't know what -- how to answer that any better.

BY MR. PULECIO-BOEK:

Q And then at the end of that sentence, you see that this is a standard warranty for new ProGen equipment, correct?

A Uh-huh.

Q ProGen doesn't make new equipment, correct?

THE REPORTER: Was that a yes?

THE WITNESS: Yes, it does make --

THE REPORTER: You said --

THE WITNESS: -- brand new generators. Brand new EMD generators. We make our own. We make our own engine. We make our -- everything.

BY MR. PULECIO-BOEK:

Q When you say brand new, you mean old engines

that you have zeroed out?
A No. Brand new. Totally brand new box and pans, cranks. We're the only distributor in the world, for example, for EMD crankshafts with Ohio Crank, which is the original manufacturer for EMD, who no longer makes the engine. We were making brand new EMD engines and partnering with GE, which was -- we were going to build for the Lakeland plant in the '90s. So we've been building brand new EMDs. We've put them in power gen shows across America since the '90s.
Q Mr. Manning, is it true that ProGen offers on its allegedly new equipment a standard three-year warranty? Yes or no?
A What's that? Is it true --
Q Is it true that ProGen offers in its allegedly new equipment a standard three-year warranty? Yes or no?
A No.
Q Okay.
A There's no such a thing as a standard three-year warranty in ProGen's equipment.
Q Okay.
A It could be -- you know, we could call it standard because we're extending the one-year standard

to three years, whether it be the -- under the standard -- you know, standard terms of the one-year warranty. The only thing that would change would be -- it would be extended from one to two years. Now, we offer a standard extended two-year warranty if they give us a modem to our controls in the unit so that we can monitor it 24/7. That's an offer unique to ProGen. We've been doing it for a long time.

MR. PULECIO-BOEK: I'm going to hand you another document that we're going to label Exhibit number 5.

(Exhibit 5 was marked for identification.)

THE WITNESS: All righty.

MR. PULECIO-BOEK: It's 5?

THE REPORTER: Yes.

MR. JIMENEZ: 5 or 6?

THE REPORTER: It was 5. The last one was --

MR. JIMENEZ: Because there were two documents --

MR. PULECIO-BOEK: You were there.

MR. JIMENEZ: Given the same --

THE REPORTER: He --

MR. JIMENEZ: -- as one?

THE REPORTER: Yeah. He said there was one.

MR. JIMENEZ: Okay. Thank you.

THE WITNESS: I don't even know what this says.

BY MR. PULECIO-BOEK:

Q Can you see that document that we've put in front of you, Mr. Manning?

A I do.

Q And this is a text message chain in WhatsApp between you and Karla Saud, yes?

A I assume it is, yes. I don't know. I don't recall it and I can't read -- most of it is in Spanish, but yes.

Q And you are informing Karla that you are in Houston with a team of people that are going to do a detailed inspection of the Salitral generator sets, yes?

A And Leah [ph] was never there, so -- okay.

Q That is what you're saying to Karla, correct?

A It's what -- I don't know. I can't read it. It's in Spanish. I need a translator. Do you have a translated copy?

Q You're saying that you do not understand?

A I don't speak Spanish.
Q Mr. Manning, this is a document that was produced by your attorneys to us. This is the document as produced. You're saying that you do not understand your own words in this document that was produced to us by your attorneys?
A It can't be my own words in Spanish because I don't speak Spanish. Now, maybe there was something that converted it to Spanish or converted something in Spanish, but I can't read it. So I don't know what it says right now.
Q Okay. So what you're telling us is that you were communicating with Karla in that language that you don't know or understand?
A Yeah. Maybe there was a translator -- Google Translate used. I've done it before. So I'm -- I'm not saying I didn't write it. I'm just saying I can't read it right now. I don't know what it says.
Q I'm going to read out loud the document in English.
MR. PULECIO-BOEK: Counsel can preserve the right to object to that translation at this point or at a later point in time.
THE WITNESS: Well, just not old and used. I know I didn't say --

BY MR. PULECIO-BOEK:

Q "Good morning, Karla. I am in Houston with a team of people that are going to do a" --

MR. JIMENEZ: Can I just -- if you're going to do that, it says, "Translate text with your camera," to begin with. You're skipping that. I don't know what that means, but it's what it says before.

MR. PULECIO-BOEK: You can preserve --

MR. JIMENEZ: And then --

MR. PULECIO-BOEK: You can preserve --

MR. JIMENEZ: -- it goes back to the --

MR. PULECIO-BOEK: -- objections to the translation.

MR. JIMENEZ: -- the fact you're using your translation since it hasn't really been -- and that you're doing it here spontaneously and there's no way of knowing if it's correct, but --

MR. PULECIO-BOEK: Understood. You can preserve the objection.

MR. JIMENEZ: I just want to register my objection.

MR. PULECIO-BOEK: And you can have that standing objection throughout the entire deposition.

BY MR. PULECIO-BOEK:

Q "Good morning, Karla. I am in Houston with a team of people that are conducting a detailed inspection of the Salitral generator sets. There are six units in a building that look great and are ready to be shipped immediately. There are 14 Baylor units that are in aesthetic decent form, but now look new or in zero-hour form in this moment, but it will not require too much cosmetic work to put them in good form. We plan to do the shipment later, after the shipment of the first six units. There were, at that time, six units in a building that looked great," yes?

A I don't recall. I'm -- I'm not disagreeing. I wrote that, and that's what it -- I'm not recalling that experience at the time, but --

Q And when you're saying that they looked --

A Sorry.

Q Of course. When you're saying that they looked great, you mean that they appear to be new, yes?

A No. When I say they look great, it means that I'm pleased with how they're turning out with the refurbishment of the outside, the zero-houring of the finishes and everything like that.

Q You're saying that, on the outside, they

look clean and they look new, yes?

A I don't know if I --

MR. JIMENEZ: Objection.

THE WITNESS: -- said that.

MR. JIMENEZ: Objection. It doesn't --

THE WITNESS: I don't think I said that.

MR. JIMENEZ: And it doesn't say new.

MR. PULECIO-BOEK: When you --

MR. JIMENEZ: You're putting -- now you're putting words --

MR. PULECIO-BOEK: Please --

MR. JIMENEZ: -- in a translation.

MR. PULECIO-BOEK: Please --

MR. JIMENEZ: No, no, no.

MR. PULECIO-BOEK: Please don't --

MR. JIMENEZ: You're -- no. No. Because if you're going to translate, translate correctly.

MR. PULECIO-BOEK: You know very well --

MR. JIMENEZ: It doesn't --

MR. PULECIO-BOEK: You know very well that these objections are inappropriate.

BY MR. PULECIO-BOEK:

Q Mr. Manning, when you were -- said -- when you were saying that these six units looked great, you intended to convey that they looked new because they -- on the outside, they looked new and clean, yes?

MR. JIMENEZ: Objection as to form.

THE WITNESS: Man, that's stretching, brother. No. Why would you do that?

BY MR. PULECIO-BOEK:

Q Mr. Manning, I would ask you to not --

MR. JIMENEZ: You're making up words.

BY MR. PULECIO-BOEK:

Q -- refer to the questioning attorney as brother. Mr. Manning, I would ask you not to refer to the questioning attorney as brother. I would ask you to respect the formality and the seriousness of this deposition.

A I ask you to respect the truth. Don't put words in anything's mouth, including -- mouth or my mouth.

Q Mr. Manning --

A I didn't say that they were intended to look new.

Q Mr. Manning, when you said to Karla Saud that six units in the inspection looked great, what

you intended to say is that those six units looked new because they were clean on the outside?

MR. JIMENEZ: Objection as to form.

THE WITNESS: That they were looking great, yeah.

BY MR. PULECIO-BOEK:

Q Okay.

A Like I want them to look when we do anything like that. Good. They're looking great, and I'm really happy, I guess.

Q And how you want units to look when you ship them to a client is you want them to look as new, yes?

A No.

MR. JIMENEZ: Objection as to form.

THE WITNESS: I just want them to look great. I don't want them to look red.

BY MR. PULECIO-BOEK:

Q By great, you mean you want them to look clean?

A I want them to look in the condition we intended them to be delivered in, which is described in the contract. No harder to understand than that.

Q These six units in a building that were looking great as you intended them to be delivered, they had not been converted to HFO fuel, correct?

A Correct. Yeah.
Q Okay. And then it says the 14 units Baylor that are in aesthetic decent form.
A Yeah.
Q Those 14 units Baylor were not looking, as you would say, great, correct?
A Yeah. Yeah, I guess.
Q Yet they still required cleaning, correct?
A Correct. Refurbishing. Booking zero hour takes a lot of work. Getting it to that condition that it's zero hour requires, you know, very careful, conscientious work to be sure that's what it is.
Q And then you say, "The units 11 kilobytes will not pass the inspection either right now," correct?
A I think it's kV. That's kilovolts. That's 11,000 volts is what that means. We had several alternators. Some were 4160 and some were 11 kV. And then a couple of them, I think, were 12,470, but I think those went to Catamayo. But anyway, yes.
Q And you were concerned that the equipment was not ready to pass the inspection without -- because without passing the inspection, you would not get paid, correct?
A I need you to read the whole thing. I mean,

where you're trying to characterize it that way, I need to make sure you're doing it correctly.

Q I'm asking you, to the best of your recollection, you were concerned that this equipment was not going to pass the inspection, and that if it didn't pass the inspection, you would not get paid, correct?

A I don't have --

MR. JIMENEZ: Objection as to form.

THE WITNESS: All right.

MR. JIMENEZ: And you're not translating what's on there, so you're --

THE WITNESS: I told him, I don't believe that at all.

MR. JIMENEZ: -- you're not giving him the --

THE WITNESS: If we were --

MR. JIMENEZ: -- basis to respond.

THE WITNESS: Yeah. If -- we were not going to get paid anyway if they don't pass inspection, so.

BY MR. PULECIO-BOEK:

Q Mr. Manning, you were concerned that these 14 Baylor units would not pass the inspection and therefore you would not get paid for the --

MR. JIMENEZ: I'm going to object.
THE WITNESS: No.
MR. JIMENEZ: You don't -- you haven't translated the document. Now you're asking him questions about --
MR. PULECIO-BOEK: Counsel --
MR. JIMENEZ: -- things that he does not remember.
MR. PULECIO-BOEK: -- you already have --
MR. JIMENEZ: No. You haven't translated the document.
MR. PULECIO-BOEK: -- a standing objection.
THE WITNESS: You can't be unfair about that.
MR. JIMENEZ: And you're falsely suggesting to him that you've translated the document, and you haven't.
THE WITNESS: You want it your way without being truthful, so. Okay.
MR. PULECIO-BOEK: Mister --
MR. JIMENEZ: And you're leaving out zero hours. It's on there for at least twice or three times. You're -- if you're going to ask him and

you're going to suggest to him that I'm -- I've translated a document, translate it. But don't stop.

MR. PULECIO-BOEK: Counsel --

THE WITNESS: Thank you, Counsel.

MR. PULECIO-BOEK: -- your objections are wildly inappropriate and sanctionable.

MR. JIMENEZ: They are quite correct when you are misleading a witness.

MR. PULECIO-BOEK: And we will be moving for relief in connection --

MR. JIMENEZ: Go ahead, because --

MR. PULECIO-BOEK: -- with your speaking objections.

MR. JIMENEZ: -- this is -- this is atrocious.

THE WITNESS: Yeah, please do it.

MR. JIMENEZ: I can't believe you're doing this.

THE WITNESS: Please move for that.

BY MR. PULECIO-BOEK:

Q Mr. Manning, you were concerned that those 14 Baylor units would not pass the inspection, and therefore you would not get paid, correct?

MR. JIMENEZ: Objection --

THE WITNESS: No.

MR. JIMENEZ: -- as to form.
BY MR. PULECIO-BOEK:
Q You were not concerned?
A I don't -- I don't know what I was concerned about because you haven't translated it for me --
Q Okay.
A -- exactly like it's supposed to be translated.
Q Okay.
A I don't know what I said here. I told you that when we started. If you're moving on to new paragraphs, you haven't translated yet, like you said you would, and then asking me did I agree with your characterization of something I have no idea. Doesn't make any sense.
Q Okay.
A Get to --
Q We're going to give you Exhibit number 6.
(Exhibit 6 was marked for identification.)
A Thank you.
BY MR. PULECIO-BOEK:
Q Mr. Manning, do you see this e-mail chain in WhatsApp between you and Karla Saud?
A Yes. I sure do.

Q And this is dated approximately July 15 of 2024?
A Let's see. I'm sorry. I can barely focus right now.
Q And you can see the date of the chat because the date is posted in the center of the top first page?
A July of 2024. And then --
Q July 15 of 2024, yes?
A Huh?
Q July 15 of 2024?
A Oh, it's backwards. Yes. And then I see the time, yes.
Q If you go to page -- bates labeled to the bottom right, 25166, do you see that?
A Yes.
Q It says Megawatt certificate, yes? Karla Saud is sending you a Megawatt certificate?
A Okay.
Q If you turn to the next page, 25167, you'll see that Karla Saud is sending you a PG&E certificate and a Lakeland Electric certificate and a Discovery Silver certificate. Do you see that?
A I do. Yeah.
Q For the record, those are the forged

documents that ProGen provided to CELEC in connection with the contracts.

MR. JIMENEZ: Objection as to form.

BY MR. PULECIO-BOEK:

Q You will see that you respond --

A Jesus Christ. It --

Q -- that you will see that you respond to -- is it funny to you that ProGen provided forged documentation --

A No. It's -- your --

Q -- to CELEC in connection with --

A -- normal antics are really funny when you try to characterize something or say something that's not true. They forged documents that ProGen gave to CELEC. I didn't give this to CELEC. We never approved her to do -- give it to CELEC, but go ahead.

Q Okay. You are aware that these documents were provided to CELEC in connection with the contracts?

A Just not through ProGen.

Q You are aware that they were provided to CELEC?

A I am. We found out, yeah. When we -- after this lawsuit, I think, is when we found out they were provided.

Q And you contend that they were provided by Karla Saud without your authorization?
A Absolutely.
Q Okay. So --
A Which we intend to get her on.
Q -- so these documents that were indeed provided to CELEC, as you --
A Yeah.
Q -- just told us, you respond in that e-mail chain. You'll see it at Bates Label 25167. You'll see that it says, "Where in the heck did you get all this?" Do you see that?
A I do.
Q Yeah. And Karla Saud responds to you, "Notarized and Apple seeled with the logos that you gave me, we did." Do you see that?
A I do.
Q Yeah. At any point in time, did you disclose to anyone at CELEC that you were getting copies of forged documentation from Karla Saud that Karla Saud intended to provide to CELEC?
A No. What you -- what she sent wasn't forged yet. All she sent was -- I think I only opened three of them and was something she kept asking me for, which I told her there was no way we could get. And

if you go through all that WhatsApp text, you'll see that.

Q Those three documents that Karla Saud sent you in that text message were forgeries, correct?

A No. They were -- at the time, they were documents that she submitted that I didn't know what they were, who -- you know, if they were real or not, if she really went to those people and got them to sign.

Q Okay.

A I had sent her a project list before that and -- that had the -- you know, the -- the -- the project names and even their logo so you could recognize who they are, which we do sometimes on our website, people we've done business with. And this was a very common thing. And she took it upon herself, come to find out, that she forged -- I didn't know that here now.

All right. All I thought is, you know, what she was sending me, I thought, wow, did you get that? Where'd you get that? And I thought she took it on herself to go to our customers and get them to sign these documents, right? And but what she wanted us to do -- I cut it all off, I thought, because we -- I told her very specifically, which is included in here

at all course, if you follow -- if you included that, you would see it, and the full context of it, that I refused by -- in telling her, there is no way we're going to, you know, ruin our integrity and -- and forge documents.

You know, I meant -- forge, I meant you can't forge a notary's signature on that. You can't apostilles it because if you were -- if we were to get the signatures of those persons and you had to notarize it, that notary had to be with that group signing in order to notarize the document, which is impossible if you're going to the different ones she went to. They're -- they're going to have to have a notary present and she's going to have to go there and -- and have -- or have that group notarize those documents. And I told her, don't ask us to do it because we can't do it. That would be forgery and I'm not going to do that. Very clearly spelled it out for her.

Q Mr. Manning, Karla Saud would send you those documents, the Lakeland document, the Megawatt document, the Discovery Silver document, the PG&E document, and those documents were forgeries, correct?

A Not when she sent them to me. We didn't know what she was sending. We never looked into it

much deeper than -- you know, that we're not -- we're not going to do -- we were looking in the context at that point of we're not going to get them notarized because we -- that would be against the law.

Q Okay. So we are going to show you the documents that Karla Saud was sending you to your personal phone via WhatsApp.

MR. PULECIO-BOEK: And we're going to label that package --

THE WITNESS: Okay.

MR. PULECIO-BOEK: -- collectively as Exhibit number 7.

(Exhibit 7 was marked for identification.)

THE WITNESS: This is a really good thing you're bringing out. I think I'd love to be able to go through this with you.

BY MR. PULECIO-BOEK:

Q You'd love to be able to review forged documentation that was provided to the Ecuadorian government?

A No. Not that.

MR. JIMENEZ: Objection as to form.

THE WITNESS: Love to go with you -- through you with you to prove that we had nothing to

do with it, ProGen. And we will prove it. It's unfortunate it happened, but, you know, it turns out the people we dealt with turned out to be real rascals.

BY MR. PULECIO-BOEK:

Q Mr. Manning, since you've become aware that forged documents were provided to CELEC, according to you by Karla Saud, did you take any steps against Karla Saud?

A I didn't. We're -- we're definitely going to be taking steps against her. We didn't find out she did those until we had problems with the contract, so -- until we started really reviewing everything. We found that, for example, and you'll find it, a document where it shows that she has authority to bind ProGen. That's literally apostilled in Tallahassee that we sent to our apostilles guy in Tallahassee and said that she did an apostilles. He didn't apostilles it. It's a forgery.

Q Mr. Manning, have you or anyone else at ProGen filed a lawsuit against Karla Saud, Jose Manrique, or any companies affiliated or associated with them?

A We're in the process.

Q Have you or anyone else at ProGen --

A Collecting proof.
Q Have you or anyone else at ProGen sent a demand letter, a notice of claim, or any similar document to Karla Saud, Jorge [sic] Manrique, or anyone affiliated or associated with them?
A Man, you're talking too fast. I didn't --
Q Have you or anyone else at ProGen sent to Karla Saud, Jose Manrique, or any companies associated with them, any demand letter, notice of claim of -- or similar document?
A No. We're not ready.
Q Okay.
A We're still collecting evidence and finding new things.
Q You're still collecting evidence of the forgeries that were provided by --
A Yes.
Q -- Karla Saud to CELEC?
A We are. Yeah.
Q Yes?
A Yes.
Q Okay. And what -- how are you going about collecting that evidence?
A Just going through all the review of this contract and all the exhibits and everything. We're

like, wow. That's not even real. Literally shocked.

Q And you and ProGen intend to sue Karla Saud, Jose Manrique, and other companies associated with them, including by -- because of providing false documents to CELEC?

THE WITNESS: Yes.

MR. JIMENEZ: Objection as to form.

BY MR. PULECIO-BOEK:

Q Yes?

A And -- and for that --

Q And when do you --

A -- and fraud to us and other things that go along with that. Yeah.

Q And when do you anticipate that lawsuit will be filed?

A I don't know.

MR. JIMENEZ: Objection as to form.

THE WITNESS: I have no idea.

BY MR. PULECIO-BOEK:

Q So if you see the package of documents that we have put in front of you?

A Yes.

Q These are the certificates that Karla Saud would send you to your WhatsApp -- to your phone via WhatsApp. And these are four documents, each of them

respectively from Discovery Silver, Lakeland Electric, Pacific Gas & Electric, and Megawatt. Do you see that?

A I do.

Q Each of those documents is a forgery, correct?

A We think it is. Yeah. We -- we found out that it is. Yeah.

Q They are, yes?

A Yes.

Q Karla Saud sends you these documents that are forgeries to your WhatsApp. And she tells you that she needs to get them notarized, correct?

A Yes.

Q Notarized to be provided to CELEC, correct?

A Yes. They -- they needed to include the third -- you know, proof from those companies that we actually did the project.

MR. JIMENEZ: How much longer?

THE VIDEOGRAPHER: This segment is an hour and seven minutes. So it's at --

THE REPORTER: I've got 6:44. Should we do a --

THE VIDEOGRAPHER: Yeah. That sounds about right.

THE REPORTER: -- quick five-minute break then, and --

MR. PULECIO-BOEK: Yeah. Let's do a five-minute break for this, okay? 7:00 p.m. Yes.

(Off the record.)

THE VIDEOGRAPHER: We're on the video record. The time is approximately 7:14 p.m.

BY MR. PULECIO-BOEK:

Q Welcome back, Mr. Manning.

A Thank you, David -- Daniel.

MR. PULECIO-BOEK: I'm going to show you a text message chain we're going to label as Exhibit 8?

THE REPORTER: Yes.

(Exhibit 8 was marked for identification.)

MR. PULECIO-BOEK: All right. Thank you.

BY MR. PULECIO-BOEK:

Q You'll see that that is a text message chain dated July of -- July 30, 2024, yes?

A Yes.

Q Between you and Karla Saud, yes?

A Yes.

Q And you are sending to Karla Saud

information about ProGen's -- or the specifications of the generators, yes?

A Yes.

Q Including the fact that ProGen would convert them to run on HFO, yes?

A Yes. That we would build HFO.

Q Yep. If you go to Page 23110. And by that, I mean, the Bates label at the bottom right, 23110.

A Yes.

Q You will see that Karla Saud asks you for Andrew Williamson's divorce, and you will see that you sent it to her at 2:16:50 p.m. Do you see that?

A Yeah. I don't remember even having that or sending it, but okay.

Q You see that it says Williamsondivorcedecree.pdf?

A Yes.

Q Why were you and Karla Saud discussing Andrew Williamson's divorce?

A Man, I don't know. I don't know.

Q Why were you sending to Karla Saud Andrew Williamson's divorce decree?

A I don't know.

Q Were you and Andrew Williamson -- did you discuss with Andrew Williamson the fact that you were

sending his divorce decree to Karla Saud?
A No -- I would've had to because he would've had to give it to me if I actually gave it to her. Does anybody have a printout of that decree, what it says?
Q The reason why Karla Saud was interested in the divorce decree of Andrew Williamson is because she wanted to determine the assets that Andrew Williamson had under his name if sued by CELEC?
MR. JIMENEZ: Objection as to form.
THE WITNESS: I don't know. I have no idea. What was the date on this? Maybe CELEC asked for it. Was this before the contract or after the contract?
BY MR. PULECIO-BOEK:
Q Your testimony under oath sitting here today is that CELEC asked about the divorce decree of Andrew Williamson --
MR. JIMENEZ: Objection to form.
BY MR. PULECIO-BOEK:
Q -- and that why you were sending it to Karla Saud?
MR. JIMENEZ: Objection to form.
THE WITNESS: No, I didn't say that. I said maybe CELEC asked for it. I don't know. I don't

have enough information here to understand why I would send Andrew's divorce decree. I don't -- I don't know what date it's on. What date is -- was this sent on? Can you help me out, Daniel?

BY MR. PULECIO-BOEK:

Q Do you see the first page of the document? The e-mail chat is dated July 30, 2024.

A And it doesn't change during the -- during the text. It's July. So we go from fuel to Andrew's divorce in the same moment? That's a -- "I believe I was" -- personal favor. "Can you do me a personal favor?" All right. This -- this -- $120 MSKW -- oh, that's where she's asking for how much megawatts they get in the contract. Dollars per megawatt. Okay. "And when you -- it's also discussed that when you get here -- yes. Let's do that. When you get here -- been downstairs since 8:00." And it was me when I got there to her. It might have been because of the bond. That might be what it was for. I don't know that, but I think that's what it might have been for.

Q Meaning that the -- eventually that bond was provided by FYI?

A I --

Q I believe you testified previously.

A Yeah. That's real sketchy on all that, but

yes. I don't know how that actually got done. I think that's what it was for. The bonding company may have wanted that decree. Because he was signing on behalf of the company. And I think now that's what that was for.

Q Okay. If you go to Bates label or the document labeled to the bottom right as 23113, do you see that?

A 23113. Okay. I see it.

Q Karla Saud is sending you proof that ProGen has received a wire or has been sent a wire of $400,000. Do you see that?

A 400,000?

Q Do you see that?

A I see it. Yeah.

Q Why was Karla Saud or Jose Manrique sending ProGen $400,000 on July 30, 2024?

A Oh, that was to -- because they were going to help buy one of the generator sets. That one I told you about.

Q This --

A Single generator set.

Q This would've been money for ProGen to buy back from Enerset one of the generator sets that was then --

A I think so. Yeah.
Q -- supposedly used in connection with that Quevedo contract?
A Yes. I think so. I think so.
MR. PULECIO-BOEK: I'm going to show you a document we're going to mark as Exhibit what?
THE REPORTER: 9.
MR. PULECIO-BOEK: Exhibit 9.
THE REPORTER: Thank you.
(Exhibit 9 was marked for identification.)
BY MR. PULECIO-BOEK:
Q You will see that this is a document Bates labeled 24991 to the bottom right. Do you see that?
A Yes.
Q And you will see that the date of this document is April 8 of 2024. You see that?
A I do. I think I do.
Q And this reflects Jose Manrique sending from his bank account in Ecuador $50,000 to ProGen, yes?
A Yes.
Q And the address that is listed for ProGen is 3664 Barred Owl, yes?
A Yes.
Q And what is located in 3664 Barred Owl?

A That's the address injury was at when he divorced his wife, the rental house.
Q And this is an account that ProGen had at SunTrust Bank?
A Yeah. I guess. Yeah. I didn't know SunTrust was still around back then, but okay.
Q Why was Andrew -- why was Jose Manrique sending ProGen -- to ProGen's SunTrust bank account, $50,000 in April of 2024?
A I think it was something to do with showing good faith that they were going to buy the equipment from us. I think it was back in that time when we weren't even bidding on the project. We were telling him that we got a lot of interest in the equipment. And I think he sent that as a, kind of, a show of good faith deposit that they're -- what he was doing was real or they were doing was real. That's the best of my recollection now. So I can't verify that's 100 percent true, but I think that's what it was.
Q Prior to ProGen receiving a $50,000 international wire from Jose Manrique, did ProGen -- you or anyone else at ProGen, take any steps to verify who Walter Marique [ph] --
A No.
Q -- was his history --

A Sorry.
Q -- his experience, his background?
A No. He was introduced by Karla as a very capable, you know, guy. And that him and FYI were close friends, and they'd done projects in the past. And FYI, I think at the time, confirmed that. I know we did the best we could. Yeah. I mean, they were buying equipment from us at that point, not -- you know, we were like, buy from us. That'd be great. You know, it wasn't -- we don't check everybody out deeply until, you know, if we're -- they're buying from us. They do that to us.
Q Did you do anything or anyone else at ProGen do anything prior to receiving a $50,000 international wire from Jose Manrique in April of 2024 to determine who he was, his history, his background, or the provenance of those funds?
A Yeah. Well, we did the best we could with Karla. She's the one that vouched for him. And she was the one that was saying she was going to buy the equipment, not Jose. But I think we were probably, you know, surprised that he sent it instead of her or it didn't come from her company or we didn't know. But we -- I remember us receiving it. I don't know if there's any other documentation with it. You need to

really verify that because I don't know what was -- accompanied this wire. There should be -- there should be either emails or text threads that identify that this was going to occur. We don't just take wire from anybody for no reason, so --
Q Other than you speaking with Karla Saud, for Karla Saud to vouch for Jose Manrique, did you or anyone else at ProGen take any other steps to verify anything about Jose Manrique prior to receiving this $50,000 wire?
A No. We had no reason to. We didn't know --
Q Did you or --
A -- that he was actually going to send that. I don't think. Daniel, I don't think we knew.
Q Did you or anyone else at ProGen ever disclose to CELEC at any point in time that Jose Manrique had sent $50,000 to ProGen in April of 2024?
A No. No, because they were buying from us. We weren't even talking to CELEC about doing a project. I don't think that we were. I think that was at a time where they were going to buy the equipment from us, only the equipment, and they were going to contract with CELEC.
Q Did you or anyone else at ProGen disclose at any point in time to CELEC prior to signing the

contracts that Karla Saud and Jose Manrique had a joint venture with you and were working with you in the connection with the Quevedo and Salitral contracts?

MR. JIMENEZ: Objection as to form.

THE WITNESS: We didn't have a joint venture with them at the time that this was occurring. Karla was bidding the project through FYI, we thought. So we would have no reason to disclose anything with them. And in the progression of things that -- events that happened afterwards where it became our project, all this is, you know -- assumed that Jose had already done projects with CELEC --

BY MR. PULECIO-BOEK:

Q Did you --

A -- and -- and I think he sent us some -- you know, some projects that they did with CELEC, transformer deals or something.

Q Did you or anyone else at ProGen ever disclose to CELEC prior to signing the Quevedo and Salitral contracts that you were working with Karla Saud, Jose Manrique, or companies affiliated or associated with them in connection with the bidding?

A I don't know how to answer that. We would've -- they would know that we were working with

them because Karla was actually doing the, you know, the actual processing work to get us documents and get us registered to bid on the document -- on the contract. So there would be no reason to do that. I don't think so. I don't know.

Q You have no recollection of you or others at ProGen disclosing to CELEC prior to the signature of the Quevedo and Salitral contracts, yours and ProGen's relationship with Jose Manrique, Karla Saud, and companies affiliated with them?

A There's no reason they knew. I mean, months of, you know, working with them and her and the attorney, I think they knew what she was doing for -- you know, as a contractor capacity for our local person to process documents because we didn't speak the language. We didn't understand how to navigate the field when she asked us to bid directly. And she said, "I will do all of the work." And I think CELEC knew more what she was doing than we did.

Q I'm asking you specifically whether you or others at ProGen disclosed that relationship to CELEC, yes or no?

A I think so. Yeah. I mean, verbally and -- and in the process of bidding and negotiating the contract. It's -- I don't know how to answer your

question. Did I send an e-mail and go, CELEC, Karla Saud is processing paperwork for us; is that okay? No, we didn't do stuff like that.

Q Did you or anyone else at ProGen at any point in time disclose to CELEC that the relationship between you and them included them sending payments to you?

MR. JIMENEZ: Objection as to form.

THE WITNESS: I don't understand the question.

MR. PULECIO-BOEK: Okay. How much do we have on the record?

THE REPORTER: I just hit seven on mine.

MR. JIMENEZ: I think we hit seven.

MR. PULECIO-BOEK: Yep.

THE VIDEOGRAPHER: Yeah. I guess we're pretty much all synced up there.

MR. PULECIO-BOEK: Seven? Yeah, that's fine.

So, Mr. Manning, we are going to seek to depose you again. The document production that we've received from your attorneys is drastically incomplete. So we are going to leave this deposition open and we will be back here at some point with

additional documentation that you and your co-defendants will produce.

MR. JIMENEZ: We object and we advised you ahead of time not to schedule this deposition now. You insisted. We specifically requested that you wait until discovery was fully complete, and you chose to proceed anyway. So we do object to any continuation of the deposition.

THE REPORTER: And then would you like to read, Mr. Manning?

MR. JARAMILLO: Before we go off the record --

THE REPORTER: I'm sorry. Could you state who is speaking?

MR. JARAMILLO: Sorry?

THE REPORTER: Could you state who is speaking?

MR. JARAMILLO: Yes. This is Enrique Jaramillo representing Astrobryxa. Astrobryxa would like to designate Mr. Manning's testimony relating to Karla Saud, Jose Enrique, Astrobryxa, and H&S as confidential under the protective order.

MR. JIMENEZ: No objection on ProGen's part.

THE REPORTER: And then, Mr. Manning,

would you like to read or --

THE WITNESS: Say that again?

THE REPORTER: Do you want to -- transcript?

MR. JIMENEZ: He reads.

THE VIDEOGRAPHER: I'll get us off the video record --

THE REPORTER: Do you want to do it through your office?

THE VIDEOGRAPHER: -- and let you take that on the written record.

MR. JIMENEZ: Through our office.

THE REPORTER: Okay.

THE VIDEOGRAPHER: All right. We're off the video record at 7:31 p.m.

THE REPORTER: I'm still on, on my end.

Mr. Daniel, did you want to order the transcript still rush?

MR. PULECIO-BOEK: Super rush.

THE REPORTER: All right. Sounds good.

And then did you all want to order a copy?

MR. JIMENEZ: Yes, please.

THE REPORTER: All right. Same terms, tomorrow, electronic?

MR. JIMENEZ: Whenever.

MS. LANZAS: Can I get your e-mail address?

THE REPORTER: Yeah.

Let me get us off the record.

(Signature reserved.)

(Whereupon, at 7:29 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, TIFFANY REED, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

TIFFANY REED
Notary Public in and for the
State of Florida

[X] Review of the transcript was requested.

Adolfo Jimenez, Esquire
adolfo.jimenez@hklaw.com

August 20, 2026

RE: CELEC EP v. PROGEN INDUSTRIES, Et Al.
8/18/2026, John B Manning (#8351460)

The above-referenced transcript is available for review.

John B Manning should read the testimony to verify its accuracy. If there are any changes, John B Manning should note those with the reason on the attached Errata Sheet.

John B Manning should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

CELEC EP v. PROGEN INDUSTRIES, Et Al.
8/18/2026, John B Manning (#8351460)

E R R A T A  S H E E T

PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

________________________________   ________________
(John B Manning)                    DATE

**&**

**&** 4:10,19 32:25 75:7 249:17,19,21 266:12,15 354:2

**0**

**0012** 6:15
**03433** 1:8 7:10

**1**

**1** 6:8 7:5 35:1 36:1 80:1 81:1 108:1 109:1 122:13,15 128:4 129:15 165:20 212:24 213:16 235:1 236:1 269:16 296:1 297:1 305:1 306:1 318:1 319:1 337:1 338:1
**1,015** 240:1,3
**1,050** 239:25
**1-95** 1:19
**1.310** 371:25
**10** 35:10 36:10 43:17 80:10 81:10 108:10 109:10 228:17 228:25 229:22 230:17 235:10 236:9,10 263:25 296:10 297:10 305:2,7 305:10,10 306:10 309:23 318:10 319:10 337:10 338:10
**10,000** 81:8
**100** 4:20 13:24 14:15 15:15 25:16 37:10 52:20 99:2 104:4,8,17 127:9 145:9,15 146:2 149:15 151:19 156:13 164:7 165:21 176:7 189:17 193:20 195:3 195:11,12 196:15 197:13 199:4,18 200:8 208:2 236:20 243:1 244:8 245:7 250:19 316:23 318:22 318:25 319:18 323:13 361:18
**100,000** 277:18
**1000** 3:7
**101** 2:6 7:11
**107** 281:5
**1099** 64:25 68:10 69:19 71:14,17,23 72:5,10 73:2 77:21
**1099s** 64:22,23 67:18
**10:14** 2:4
**10:16** 7:3
**11** 35:11 36:11 49:7 50:11 51:9 80:11 81:11 85:2 108:11 109:11 146:22 217:3 235:11 236:11 296:11 297:11 305:11 306:11 318:11 319:11 337:11 338:11 340:13,18
**11,000** 340:17
**110** 194:4 199:22 200:8 201:8 203:18 204:8,22 205:7 206:1,13 207:14,17,21 207:24 208:1,9 212:7 214:21 214:23 218:14 218:22 219:3 220:4 221:4,12 246:16 302:24 303:12
**115** 219:12,22
**117** 219:13,22
**119** 165:4
**11:46** 74:22
**12** 35:12 36:12 51:9 80:12 81:12 85:2 108:12 109:12 146:22 171:12 223:10,11 235:12 236:12 264:6 296:12 297:12 305:12 306:12 318:12 319:12 337:12 338:12
**12,470** 340:19
**120** 106:4 165:7 176:7 358:12
**122** 6:8
**12:48** 122:4
**13** 35:13 36:13 80:13 81:13 108:13 109:13 235:13 236:13 296:13 297:13 305:13 306:13 318:13 319:13 337:13 338:13
**13-03-18** 6:17
**14** 20:17 35:14 36:14 80:14 81:14 108:14

109:14 146:23 235:14 236:14 296:14 297:14 305:14 306:14 318:14 319:14 336:6 337:14 338:14 340:2,5 341:24 343:22
**149** 194:6 195:2,10
**149,500** 194:10
**15** 27:22 28:24 28:24 32:6 33:6 35:15 36:15 78:15 79:24 80:3,15 81:15 108:15 109:15 119:18 149:4 180:23 186:8 235:15 236:15 296:15 297:15 305:15 306:15 318:15 319:15 337:15 338:15 345:1,9 345:11
**150** 194:9,12,18 195:4,24 196:21,22 199:6,11,21 200:9 201:7 203:16 210:18 210:21 304:24 305:16 306:12 307:1,11
**16** 35:16 36:16 80:16 81:16 108:16 109:16 170:15,15,18 171:22 235:16 236:16 296:16 297:16 305:16 306:16 318:16 319:16 337:16 338:16
**1621** 281:5,10 281:21
**17** 35:17 36:17 80:17 81:17 108:17 109:17 123:17 215:10 235:17 236:17 296:17 297:17 305:17 306:17 318:17 319:17 337:17 338:17
**18** 2:3 35:18 36:18 80:18 81:18 108:18 109:18 123:17 235:18 236:18 285:6 296:18 297:18 305:18 306:18 318:18 319:18 337:18 338:18
**180** 49:21
**18th** 7:4
**19** 35:19 36:19 80:19 81:19 108:19 109:19 235:19 236:19 267:23 296:19 297:19 305:19 306:19 318:19 319:19 337:19 338:19
**1900** 2:7
**1979** 20:1
**1980** 20:12
**1981** 20:18,21
**1984** 21:3
**1987** 23:12
**1990s** 30:23
**1994** 23:5 29:9
**1995** 32:7 78:7 277:18
**1:47** 122:9
**1st** 277:20 279:6,9

**2**

**2** 6:9 24:11 35:2 36:2 58:22 59:10,14 66:18 69:22 70:12 71:12 74:21 80:2 81:2 108:2 109:2 212:17 212:18 213:17 215:8 235:2 236:2 265:16 266:15 267:7 296:2 297:2 305:2 306:2 318:2 319:2 337:2 338:2
**2.2** 264:1 266:4 276:12
**2.3** 140:17,19
**2.5** 263:2
**20** 35:20 36:20 78:16 79:25 80:3,20 81:20 108:20 109:20 147:16,25 187:12 195:14 197:14 235:20 236:20 260:19 291:6,7,19 295:2 296:20 297:19,20 298:11,13,22 298:25 299:22 300:7,8,24 301:9,20 302:9 302:15 304:12 304:13 305:5 305:13,14,15 305:20,21 306:5,11,20,25 307:4 308:18 309:24 310:17 310:18 318:20

319:20 337:20 338:20 371:3
**20,000** 185:3,22 186:8 187:2,9 187:10 188:7
**2000** 37:19 42:4
**2001** 324:4
**2002** 32:3,4,8
**2003** 32:4
**20037** 3:8
**2004** 37:3,14,15 37:15 38:17
**2005** 37:2 38:17
**2008** 38:10,17 40:2 42:9 43:1 43:17 47:13 48:2,25 49:5 85:6
**2009** 42:9 43:1 45:9 47:13 48:2,25 49:5 50:5 51:4,7 52:10,16,19 85:6
**2012** 49:15 53:3 54:16 55:8 61:15 85:2
**2013** 61:10
**2014** 127:2
**202** 3:11
**2020** 49:6 72:5 73:2,9 77:12 77:17 128:21
**2021** 50:6 51:4 51:8 55:8,23 56:15 57:17 61:10,15 63:22 64:5 65:18,25 66:22 67:6,14 68:25 69:15 71:14,22 72:9 73:18 74:10 85:15,20 145:14
**2022** 73:24 74:2,7
**2023** 233:1
**2024** 89:4 91:1 92:9 114:17 127:2 128:4,17 128:20 136:11 145:14 146:8 147:14 254:8 254:12,25 255:23 257:11 259:6 282:23 283:2 285:24 286:3 287:10 289:11 314:15 318:18 319:8 322:14 326:23 329:14 345:2,8 345:9,11 355:21 358:7 359:17 360:17 361:9 362:15 363:17
**2024/07/05** 6:10
**2024/07/11** 6:12
**2024/07/15** 6:13
**2024/07/30** 6:16
**2025** 11:8 128:18,21,25 129:1,3 228:2 228:4,13 255:6 255:13,23 257:11 259:6 283:3
**2026** 2:3 7:4 210:13 255:18 255:19,23 257:11 371:3
**21** 35:21 36:21 80:21 81:21 108:21 109:21 235:21 236:21 296:21 297:21 305:21 306:21 318:21 319:21 337:21 338:21
**2101** 3:7
**212** 6:9
**217** 277:20 279:5,9
**22** 35:22 36:22 74:10 80:22 81:22 108:22 109:22 173:19 195:14 235:22 236:22 296:22 297:22 305:22 306:22 318:22 319:22 337:22 338:22
**227-8500** 4:23
**23** 35:23 36:23 74:10 80:23 81:23 108:23 109:23 235:23 236:23 296:23 297:23 305:23 306:23 318:23 319:23 337:23 338:23
**231** 290:7
**23110** 356:7,8
**23113** 359:7,9
**23159** 290:6,8
**23163** 313:21
**23165** 313:21
**24** 35:25 36:24 72:1 74:11,12 80:25 81:24 108:25 109:24 127:4,5 128:19 235:25 236:24 296:25 297:24 305:25 306:24

318:25 319:24 337:25 338:24
**24/7** 65:22 326:15 332:7
**24991** 360:14
**25** 23:23 36:25 72:1 81:25 109:25 140:22 236:25 255:21 297:25 306:25 319:25 321:10 338:25
**250,000** 320:14
**25166** 345:15
**25167** 345:20 347:10
**28** 283:7
**284** 6:10
**2855** 278:7,9,13 279:20 280:5
**29** 195:12 327:19
**2:16:50** 356:12
**2:29** 155:24
**2:43** 156:3
**2nd** 127:2

**3**

**3** 6:10 35:3 36:3 80:3 81:3 108:3 109:3 122:8 156:2 235:3 236:3 257:15,25 264:13,17 284:21,22 296:3 297:3 305:3 306:3 318:3 319:3 337:3 338:3
**3,500** 327:20
**3.5** 63:13 64:5 64:14
**30** 123:3 148:20 166:5 196:8,8,21 199:11 204:16 210:17,21 255:20,21 283:7 305:8 307:12,14 308:4 309:12 310:5,13,15 311:4,19,25 312:7 355:21 358:7 359:17 371:16,24
**300** 51:17 169:5 217:2
**300,000** 169:14
**305** 4:16
**30k** 71:3
**30s** 26:1
**312** 6:11
**3200** 5:6,6
**32801** 3:16
**3300** 4:11
**331-3100** 3:11
**33131** 4:12
**332** 6:12
**33602** 2:8 4:21
**344** 6:13
**35** 38:11 62:5 149:14 163:23 254:14
**350** 6:14
**355** 6:16
**360** 6:17
**36311** 370:16
**3664** 281:14,23 360:23,25
**374-8500** 4:16
**38** 33:5

**4**

**4** 6:11 35:4 36:4 80:4 81:4 108:4 109:4 156:3 235:4 236:4 247:11 247:20 252:12 253:1 296:4 297:4 305:4 306:4 312:18 312:19,24 318:4 319:4 337:4 338:4
**4.1** 247:7
**4.5** 250:12 251:17 252:1
**40** 164:9 165:1 165:3,6,10,22 167:20 168:7 168:11 170:4 170:14 172:17 172:20 173:9 173:13 185:7 187:7,10 197:14 198:4 210:17,22 211:8,12,18,23 212:12 254:14 260:12 294:19 294:21 295:1 295:15,15,16 295:21 296:7,9 296:13 297:3,5
**400** 280:7 281:2,11 282:11
**400,000** 359:12 359:13,17
**403-4200** 5:9
**407** 3:18
**4100** 4:20
**4160** 340:18
**42** 18:13 283:18
**420-1000** 3:18
**43** 283:18
**450** 3:15
**4543** 78:13,25 79:9,19

**46** 225:18 266:18 267:19
**4603** 277:14
**4614** 78:10 79:15
**47** 288:2
**49** 194:16,19 195:5 200:11 201:9,10,21 204:8 206:3,14 207:15 214:25 219:2,13,23 221:5,16 225:6 225:12
**49.7** 288:3,14
**4:30** 223:18
**4s** 64:19

**5**

**5** 6:12 35:5 36:5 37:15 80:5 81:5 108:5 109:5 217:13 219:9 220:3 223:17 235:5 236:5 249:20 285:24 296:5 297:5 305:5 306:5 318:5 319:5 332:11,12,15 332:17,18 337:5 338:5
**5,000** 248:12
**50** 60:11,13,16 99:3 140:13 146:10 149:14 168:16 173:1,6 173:14 176:7 189:17 195:11 197:13 208:2 288:8,23 289:12,23 294:6
**50,000** 360:20 361:9,20 362:14 363:10 363:17
**50/50** 28:23
**500** 145:19
**520** 270:6 318:16

**6**

**6** 6:13 35:6 36:6 80:6 81:6 108:6 109:6 171:24 172:1 172:12 235:6 236:6 241:15 243:12 249:6 251:6 284:17 296:6 297:6 305:6 306:6 318:6 319:6 332:17 337:6 338:6 344:18 344:19
**60** 148:9,14,16 194:12,13
**600** 62:20,24 63:2,4,14 77:12,17 161:6 225:21 270:5 270:12 277:7 278:24 318:16
**650** 3:15
**6:44** 354:22
**6s** 64:19

**7**

**7** 6:14 35:7 36:7 80:7 81:7 108:7 109:7 219:9 220:3 235:7 236:7 296:7 297:7 305:7 306:7 318:7 319:7 337:7 338:7 350:12,13
**70** 106:1 196:8 196:15,22 197:8,10 198:18 199:6 199:21 200:9 200:10 201:7 203:17 204:3 204:15
**701** 4:11
**713** 5:9
**75** 196:15 197:10 198:20
**750** 25:1
**750,000** 276:6
**77027** 5:7
**79** 20:3
**7:00** 355:4
**7:14** 355:7
**7:29** 369:7
**7:31** 368:15

**8**

**8** 6:4,16 35:8 36:8 80:8 81:8 108:8 109:8 235:8 236:8,23 238:6,25 239:1 239:5,10 240:11 251:1 296:8 297:8 305:8 306:8 318:8 319:8 337:8 338:8 355:13,15 360:17
**8,760** 187:10
**8/18/2026** 371:4 372:2
**80** 20:3,4 169:12 255:8 255:12
**80s** 47:1,6 48:4

**813** 4:23
**818** 215:15
**818-428-7788** 285:7
**8351460** 2:10 371:4 372:2
**85** 29:6 254:10 255:8
**850** 239:25 240:3
**86** 22:17 47:2
**863** 285:16
**863-450-6795** 285:4
**87** 22:17
**8:00** 358:17
**8:25** 1:8 7:10

**9**

**9** 6:17 35:9 36:9 38:10,17 43:17 80:9 81:9 108:9 109:9 235:9 236:9 296:9 297:9 305:9 306:9 318:9 319:9 337:9 338:9 360:7,8 360:10
**90** 106:4 176:7 255:8
**9000** 32:20
**90s** 331:9,11
**92** 26:15
**93** 24:11 26:14 26:15
**94** 26:13
**95** 29:13,14 32:2
**98** 83:8
**9s** 64:20,21

**a**

**a&r** 267:1
**a.m.** 2:4 7:3 74:22
**a.p.** 1:14,15
**a.r.** 266:12,14 266:15
**abb** 269:4,5,5 269:10
**ability** 103:1 370:10
**able** 15:21 36:18 56:10 62:10 70:25 72:18 75:20 95:2 100:1 101:7,8,16 104:25 150:8 175:9 187:1 203:22 216:2 217:24 236:13 272:12 350:17 350:19
**above** 371:6
**absolute** 128:8
**absolutely** 19:4 129:23 205:1 209:8 214:13 219:4 236:7 242:20 248:2 300:5,10 304:2 313:23 322:16 323:25 324:12 326:24 347:3
**absorbed** 18:25
**absurd** 302:19 302:20
**abundantly** 190:16
**abused** 154:10
**accept** 95:16,22 104:15
**access** 86:10 87:13 216:7 227:4,8,14 249:2 252:23
**accessed** 227:15
**accompanied** 94:5 274:6 363:2
**accompany** 139:11
**accomplished** 128:16 158:17
**account** 58:13 58:18,25 216:8 252:20,22 283:11,25 360:20 361:3,8
**accountant** 25:7 68:19,20
**accountants** 66:13 70:5 71:19 150:10 259:9
**accounting** 58:20 66:6,7 147:2 221:24 253:20 304:7
**accounts** 34:25 39:19 59:1,3,4 59:7,13,19 220:14 221:8 253:6 256:18 256:18 275:14
**accuracy** 371:9
**accurate** 82:2 128:6 152:2 174:24 195:22 285:9 318:9,10 318:19 319:17 370:9
**accusations** 217:20
**accuse** 152:9
**acquire** 200:11 200:15
**acquired** 270:9
**acquisition** 280:4

**act** 134:25 182:20 272:23
**acting** 120:9
**action** 51:16 370:12,16
**acts** 117:2
**actual** 16:10 50:16 75:13 207:23 365:2
**actualize** 32:18
**actually** 11:24 13:21 14:7 24:5 41:7 44:12 58:12 60:6 61:24 73:16 75:12 88:20 92:17 112:6 123:22 129:5 143:14 146:24 156:15 163:18 234:12 265:14,23 266:21 289:2 305:19 307:17 307:19,24 310:18 329:4 354:18 357:3 359:1 363:13 365:1
**adam** 252:7,9 252:12
**add** 270:10
**addition** 103:18 116:9 132:1
**additional** 188:10 367:1
**address** 78:2,9 78:11 79:8,9 79:11,14 80:13 215:20,22 216:1 277:22 317:11,17 323:15 360:22 361:1 369:3
**adir** 166:13
**adjacent** 78:7 78:12,14,18,24 79:4,17,19 80:4,5,7,13,15 270:13
**adjustments** 62:12
**administration** 92:14 253:14 253:23 277:23
**admit** 154:7
**adolfo** 4:6 371:1
**adolfo.jimenez** 4:13 371:1
**advance** 101:17 102:6,9
**advice** 117:13 321:11 322:10
**advised** 367:3
**advisor** 28:11 117:3,12
**aesthetic** 336:7 340:3
**affection** 286:15 287:12 287:17
**affectionate** 286:14,16,17 286:18,24
**affidavits** 35:14 35:20
**affiliated** 125:13,19 242:13 244:8 246:11,22 247:4 256:7 257:6 321:1 324:2 351:22 352:5 364:22 365:10
**afford** 70:17,25 210:7
**africa** 40:3 42:13 43:8,13 136:24,24,25 137:9,16,17,22 138:3,7,10,10 138:12,20 139:1,18 140:6 141:4
**african** 44:2,20 137:2 140:21 142:11 143:7
**ag** 1:18 228:15 228:18
**agencies** 99:8 100:10
**agency** 251:2
**aggregate** 194:4 200:9 201:7 203:16 208:6,8,11 210:16,22 211:7 306:12 307:1,10
**aggressive** 39:3
**agitated** 152:7
**ago** 8:23,24 9:1 9:16 10:2 36:3 36:23 48:21 60:7 73:15 75:2 78:15 79:24,25 80:3 84:2 86:25 87:18,24 222:11,13 223:8 279:17 281:6 282:9,9 329:12
**agree** 57:10 94:21 95:12 102:11 198:14 201:17 291:18 344:13
**agreed** 25:3,12 33:3 39:22,25 56:12 57:8,11 57:20 94:23 103:14 105:10

118:3,3 168:23 175:18 177:12 183:23,24 191:4,7 194:12 194:17 195:1,3 195:9,17 196:15 198:7 198:10,18
**agreeing** 123:5 314:22
**agreement** 51:21 56:23 57:3 64:12 67:8,12,15 69:16 77:12 81:13 123:10 125:21,24 126:2 135:10 169:5 187:18 217:1 220:22 237:11 238:19 238:20,21 239:11,17,21 321:4,4,19 322:5,7,7,13,17 325:11,24 326:5
**agreements** 83:2 125:16,17 125:18 135:12 241:5,9 242:11 242:19,21
**ahead** 88:2 154:4 220:20 245:22 319:25 322:12 343:11 346:16 367:4
**air** 200:24
**airport** 323:18
**akil** 259:19,22 260:5,19,21,24 261:5,7,14 262:4,5,12,15 263:3,6 298:19
**al** 7:7 371:4 372:1
**alarm** 30:14 318:6
**alarms** 186:15 186:16
**alaska** 145:11
**alex** 275:22,25
**allege** 42:12 53:5
**allegedly** 331:13,17
**allocated** 205:7 205:13
**allow** 102:7 108:19 188:20
**allowed** 198:21 218:2
**allows** 293:5 325:11
**alternatively** 180:8
**alternator** 31:19,20 181:12 203:7 226:19
**alternators** 178:16,18,20 179:8,23 181:6 181:17 183:7 184:8,13,14 185:11 195:20 201:22 202:1 203:1,8 226:19 226:22 261:11 261:12,15 262:9,15 263:8 269:7 299:7,20 300:23 301:19 302:8,15 340:18
**amazon** 217:17
**america** 119:15 119:19 326:19 327:10 331:10
**american** 119:17 258:14 258:17,23 259:5,14
**amount** 36:24 56:8 102:22 103:6 119:2 172:6,10 173:15,17 220:1 228:19 264:5 273:7,8 273:9 288:2 304:24
**amounts** 70:16 70:16,17 101:25 197:4 264:19 274:7
**analysis** 209:7 211:22 212:12 220:10
**ancillary** 328:4
**andrew** 1:12 4:4 12:11,15 13:13,15 15:7 16:4,8 17:7 56:1 57:1,18 58:2,5,21 59:7 59:9,14 62:15 63:21 64:2,13 66:19 69:14,22 70:11 71:12 72:7 73:5,11 73:21 74:8 77:11,16 81:12 84:13,21,25 85:21 86:11,16 86:19 109:15 109:17 110:2 111:23 128:3 150:16,17,22 161:17 169:17 205:18 208:21 209:9,15 216:12,14 221:24 227:12 229:25 230:1 242:7 248:4,16

248:17,23,25 249:4,5 251:11 252:18 253:19 256:1,5 257:7 258:15,19,24 259:14 269:23 270:2,9,21 276:21 279:1 280:2,20 281:1 281:21 282:6 282:17,21 283:15,21 284:7 304:17 308:1 309:8,18 309:20 311:19 311:25 312:6 313:11,12,14 313:19,24 318:1 321:25 322:1,3 325:9 356:11,19,21 356:24,25 357:7,8,17 361:7
**andrew's** 85:17 86:15 248:19 248:19 280:8 358:2,9
**angry** 129:22 156:16
**ann** 4:18
**anne.kelley** 4:22
**answer** 18:22 59:18 72:15,23 73:8 88:2 150:8 154:11 192:22,24 193:17 199:16 214:18 218:11 218:18 224:12 224:14 225:3 245:9 302:18 330:11 364:24 365:25
**answered** 72:25
**anthony** 275:8
**anthropics** 217:16
**anticipate** 353:14
**anticipated** 309:12
**antics** 346:12
**anybody** 111:15,15,23 116:6 144:8 150:17,24 153:19 180:15 198:3 203:13 227:13 284:7 295:13 357:4 363:5
**anymore** 33:21 34:2 37:4 59:4 72:19 169:1 171:1 210:6
**anything's** 338:19
**anytime** 136:14 152:22 153:1
**anyway** 51:14 57:15 58:19 71:9 79:3 81:21 88:10 123:20 169:10 170:23 203:3 218:5,6 232:1 232:13 276:17 277:5 322:10 328:17 340:20 341:20 367:7
**aot** 1:17 228:15 228:18,25 229:13 230:3 230:18 231:2,5 231:24 232:7,8 232:15 233:11 233:15,23,24 233:25 234:7 235:18 236:10 236:12 263:25
**apart** 186:7
**apartment** 281:5
**apollo** 267:21 297:21 298:14 299:4,8,15,19 301:23
**apollo's** 268:2
**apologize** 156:7
**apostilled** 328:11 329:20 351:16
**apostilles** 349:8 351:17,18,18
**apparatus** 269:9
**apparatuses** 139:10
**apparently** 39:24 116:1 130:2 234:11 290:4
**appear** 336:19
**appearances** 7:17
**appears** 122:21 128:2 285:23
**apple** 347:15
**applications** 74:1
**applied** 73:16
**appointment** 25:14
**appreciate** 200:4 205:2 207:9
**appropriate** 18:8
**appropriately** 215:6

**approval** 134:14 237:19
**approve** 315:23
**approved** 217:15 237:19 237:20 346:16
**approximate** 91:23
**approximately** 7:3 8:16,21 21:2 23:12 24:10 26:11 32:7,8 37:2 38:16,17 48:2 50:5 51:4 52:10 54:15 55:8,21 56:7 57:17,25 58:1 58:4 59:10 60:13,16 61:10 61:21 63:22 65:18,24 68:25 69:14 70:9,11 71:13 77:12,17 80:3 83:10 85:4,5,8,13,20 86:25 87:17,23 136:7 140:19 140:22 143:8 173:7,9 194:4 194:8,13 195:4 195:10 198:4 199:22 200:8 201:8 203:18 204:22 205:7 206:1,13 210:17,21,22 211:8,12,18 214:21 219:12 220:3 228:25 233:1 236:9 241:15 243:4,7 247:11 249:20 254:7,20,24 255:5,12,18 256:25 264:6 264:12 265:16 266:4 276:6,12 282:23 283:2 284:18 304:24 305:15 306:5,7 306:11,25 307:12 345:1 355:7
**april** 360:17 361:9 362:15 363:17
**arbitrate** 218:2
**arbitration** 218:1
**area** 23:5
**areas** 223:2
**armed** 166:9
**arrival** 92:13
**articulated** 105:22
**aside** 69:13
**asked** 12:19 24:21 27:18 34:16 39:11 72:22 93:14 98:24 99:9 115:19 117:17 123:17 139:6 144:8 155:12 155:16 159:21 174:11 182:4 193:1 231:8 251:13 252:3 294:18 357:12 357:17,25 365:17
**asking** 14:22 70:10 72:14 83:18 111:4 116:18 132:11 137:10 152:12 153:2 174:12 192:17 207:7 207:19 214:7 219:20 239:4 241:23 246:4 275:13,17 287:23 293:8 306:17,19 341:3 342:4 344:13 347:24 358:13 365:20
**asks** 356:10
**aspect** 13:14
**aspects** 316:17
**ass** 154:24
**assemble** 31:3 31:7,12,18
**assembled** 30:16 203:9 299:16,17
**assemblies** 31:13 181:23 185:25 186:1 186:10,25 319:4,17
**assembling** 278:15
**assembly** 188:25 202:20 291:12,13,15 291:23
**assert** 117:7,25
**assessor** 157:14
**asset** 61:24 77:11
**assets** 34:5 36:19,21 37:24 38:1,2,3,5 39:24 40:25 41:9 52:1 55:16,18,22 56:6,12,14,18 56:19 57:4,4 57:21 58:23 59:16 60:6 62:2,14,14 63:7,20 64:7

64:13 65:14 66:4,8,20 67:3 68:8,24 69:10 70:13 71:5 81:17,25 82:6 82:9,18 83:12 83:16,20 85:21 142:15 143:25 144:1,19 309:19,21 357:8
**assigned** 288:20
**assist** 113:20
**assistance** 34:21 113:7
**associated** 242:13 244:7 246:10,22 247:4,12 258:25 273:12 279:24 323:7 323:10,23 351:22 352:5,8 353:3 364:23
**associates** 116:14 287:4
**association** 250:1
**assume** 86:4,7 86:8 93:3 120:7 244:4 263:10 333:12
**assumed** 120:17 131:3 132:4 364:12
**assuming** 279:4 288:21 289:24
**astro** 271:21 273:11
**astrobryxa** 1:13,14 5:2,3 77:2 120:4,6 120:10,14,16 120:17,20,21 121:8,13,15,18 121:20 122:2 123:25 124:12 125:2 126:17 127:1 128:10 129:6,10 239:12,15 271:19,21 272:4,18,25 273:11 367:19 367:19,21
**atrocious** 343:15
**attached** 371:11
**attaching** 313:2
**attachments** 312:25
**attack** 19:24
**attacking** 154:2
**attention** 162:17
**attesting** 35:18 35:20 36:5
**attorney** 25:6 48:10 49:17 109:24 113:19 116:22 117:4,6 130:22,22 131:24 132:11 132:12 155:5,7 155:10 169:4 324:21,21 338:13,15 365:13 370:14 371:13
**attorney's** 218:20
**attorneys** 17:8 17:9 25:15 66:6 86:2,9,13 86:21,24 87:4 98:11 105:9 132:2 196:25 213:23 214:8 223:22 224:1,4 224:23 334:3,6 366:23
**attributed** 288:20
**audio** 370:8
**audit** 70:4
**august** 2:3 7:4 127:1,5 371:3
**authentic** 213:7
**authority** 315:25 351:15
**authorization** 130:18 132:13 347:2
**authorize** 112:25
**authorized** 87:4 112:5 130:15 134:24 136:2,6 318:18
**authorizing** 115:10,21 116:4,9 118:12 118:25 120:2 121:9
**auto** 40:10
**automobiles** 82:11
**autotrafo** 275:2 275:4
**auxiliaries** 186:18
**available** 87:11 206:25 238:14 371:6
**avenue** 3:15 4:11 277:20 279:6,9
**award** 99:2
**awarded** 98:20 101:23 102:2 163:15,15

**aware** 10:1 86:1 89:16 120:14 121:8 121:12,15,17 134:11 213:23 214:7 222:1,3 222:6 233:13 233:22 235:17 249:6,25 250:12 252:18 258:13 259:13 263:2 275:24 276:4 285:19 297:8 346:17 346:21 351:6
**awss** 217:16
**ayuhed** 166:16 166:17

**b**

**b** 1:11 2:2 4:4 6:2,6 7:5 8:2 209:24 257:20 371:4,8,10,12 372:2,23
**back** 20:1 27:17 41:2,11 49:20,22 51:20 51:21 53:4,14 53:18,23 54:18 74:20 80:7 81:19 84:1,22 85:3 122:7,11 123:15,16,16 156:1 160:6 165:20 166:1 167:17 168:21 171:8 172:4 181:13 182:11 219:18 223:4 223:16 230:15 230:22,24 232:2,14,15 241:6,7 263:20 263:21,23 264:4 265:7,16 271:21 276:18 281:16 282:25 283:3 284:17 295:8 297:17 299:24 308:24 326:14 329:18 335:12 355:9 359:24 361:6 361:12 366:25
**background** 113:11,25 115:9,16,18 121:20 362:2 362:16
**backs** 40:24
**backwards** 345:12
**bad** 160:11 321:7
**badly** 308:20
**balance** 200:21 200:23 328:5
**balances** 251:19
**bank** 58:13,25 59:3,4,6,6,13 59:19 81:2 206:7 220:14 221:8,10 252:19 253:6 283:10,25 360:20 361:4,8
**banking** 25:9 58:24 221:9
**bankruptcy** 24:22,23 25:7 25:10 40:13
**bankrupted** 40:16
**bar** 277:4
**bare** 182:10,23
**barely** 345:3
**barred** 281:14 281:23 282:14 360:23,25
**based** 111:5 166:22,23 240:6 259:23
**basically** 18:14 27:16 40:20 101:18 105:3 110:17 111:11 114:24 123:7 136:14 175:7 216:19 224:7 224:13 238:15 243:23 267:17 304:12
**basics** 20:7
**basis** 101:11 341:18
**bates** 313:3,3 345:14 347:10 356:8 359:6 360:13
**bathroom** 155:12,15,16 155:22
**baylor** 336:6 340:2,5 341:24 343:22
**beach** 23:4 26:20 27:25 29:15
**began** 11:7,8
**beginning** 94:10 113:22 116:17 149:12 209:12 227:5,9
**begins** 74:21 122:8 156:2 223:17 284:17
**behalf** 3:2 4:2 5:2 35:4 56:25 57:1,2 113:2 116:5,11 119:1 120:2 121:10 121:14 130:15 130:16,18,24 132:15 133:13

134:4,25 136:2 359:4
**behooved** 40:5
**believe** 24:4 54:13,14 58:15 74:11,11 108:18 114:14 162:7,7 167:9 170:2 173:8,13 213:19 230:4 234:3,18 238:20 240:13 247:14 270:20 288:23 290:21 302:20,24 318:16 327:11 341:14 343:17 358:10,24
**believed** 294:4
**belly** 40:12,18
**belonged** 130:25 132:3 132:16
**belongs** 323:4
**benefits** 326:4
**best** 51:10 115:13 116:18 119:19 126:23 220:6 275:18 285:9 341:3 361:17 362:7 362:18 370:9
**better** 108:4 150:17 175:18 330:11
**beyond** 38:10
**bid** 97:16,17 98:17,18,24 99:1,1,7,15 100:9,21,22,23 101:6,16 102:5 102:15,24,25 104:25 107:8 107:13,15 108:2 109:7 110:1,19 111:15 112:4 112:12,13 118:4,9 130:20 130:21 133:7 142:5 191:5 205:20 229:10 240:5 273:16 273:18 274:15 328:1 365:3,17
**bidder** 107:20 107:22,25 109:4,10,21 110:4,24 111:8 111:19 273:21
**bidders** 107:24 108:20
**bidding** 97:15 98:19 101:23 107:3 108:16 110:17 111:16 113:1 132:8,9 134:3 272:12 272:15,21,22 273:2,13,20 274:9,14 361:13 364:8 364:23 365:24
**bids** 101:3 103:13 104:16 111:20 112:6,7 113:1 115:11 115:21 116:5 116:11 118:13 118:25 120:2 121:9,13 130:15,18,19 130:24 132:15 132:21,23 133:3,11,18 134:18,24 135:9,23 136:8 136:17 142:6 143:9 145:14 145:25 146:8 146:12 147:13 147:14 158:21 159:24 160:13 160:15,16 163:9,12,15,15 274:1
**big** 40:14,17 98:9 141:19 191:5,6 204:6 222:17 234:2 271:12
**bigger** 70:16
**biggest** 101:22 310:6
**bill** 21:16,17 26:3 98:5
**billion** 145:18
**bind** 82:12,15 136:4 351:15
**bins** 159:18
**biopsy** 223:8
**bit** 12:12 19:13 35:3 41:24 50:4 94:1
**blah** 235:8,8,8
**blame** 13:3
**blank** 50:22
**block** 31:11,12
**blocks** 182:11 182:24 295:17
**bloomfield** 32:24
**blue** 88:25 89:8 89:14,17
**board** 161:23 318:7
**boats** 82:11
**boek** 3:3 6:4 8:9 14:10,17 15:23 35:17 36:1,13 47:11 49:3 53:10 54:3 55:2 61:19 73:1,17 74:13,23 81:1

82:16 88:5 92:4 102:3,13 102:21 103:22 104:11 109:1 110:14 112:23 113:6 115:15 117:11 118:5 118:16,21 122:4,10 124:25 133:1 144:14,22 145:5 146:6 147:11 148:4 152:13,18,21 152:24 153:5 153:10 154:15 154:19,25 155:4,17 156:10 175:13 189:20 193:21 201:19 205:22 212:22 214:6 218:13,19 223:13,19 224:19,22 236:1 238:16 243:24 244:3 284:11,20,24 287:16 291:3,4 295:18 296:5 297:1 303:21 306:1 310:9 312:12,15,21 319:1 325:19 330:12,24 332:9,15,22 333:6 334:21 335:1,9,11,13 335:19,23 336:1 337:9,12 337:14,16,20 337:23 338:1,9 338:12 339:6 339:17 341:22 342:6,9,13,22 343:3,5,9,12,20 344:2,22 346:4 350:8,11,18 351:5 353:8,19 355:3,8,11,17 355:19 357:15 357:20 358:5 360:5,8,12 364:14 366:11 366:16,19 368:19

**boilers** 264:22

**bond** 97:21,22 98:3 99:23 100:6,14 101:15 125:25 358:18,21

**bonding** 106:18 359:2

**bonds** 100:15 100:20 106:17 125:22,23

**book** 18:12

**booking** 340:9

**books** 305:20

**borrow** 105:2

**borrowed** 65:14 81:17,25 82:5 83:4,5 218:24

**boss** 166:15

**bothered** 244:20

**botswana** 136:25

**bottom** 127:3 213:1 290:6 313:4 345:15 356:8 359:7 360:14

**bought** 34:5 37:24 38:5 40:25 41:3,8 78:6,8 165:8 168:16 203:8 228:20,24 230:15,22,23 232:2,8 234:18 241:22 259:22 263:14,20,21 263:23 264:4 264:19 268:8 276:25 277:18 281:6 282:16 292:25 298:7 299:3,13 301:24

**boulevard** 2:6 7:12 281:5,10 281:22

**boundaries** 135:4

**box** 331:2

**brand** 30:16,17 31:18 141:15 176:12,15 178:9,18 179:22 182:3 182:12 185:21 186:20 191:2 195:17,19 200:22 228:23 229:8 299:16 319:22 330:21 330:22,25 331:2,2,6,9

**brazil** 137:2,5

**break** 74:15 153:21 154:13 154:16,18,18 154:22,22,23 155:3,13,13,22 156:11 182:10 196:7 223:14 252:4 284:12 355:2,4

**breaking** 169:1

**breaks** 187:21 223:20,24

**brickall** 4:11
**bridge** 230:12
**brief** 181:8,8 181:10
**briefly** 19:24 222:21
**bright** 177:1
**bring** 182:11 321:14
**bringing** 112:21 350:16
**bro** 245:22
**brochure** 115:1 142:8 161:24
**brochures** 114:7 142:9 161:22,25 162:22
**broke** 272:17
**broken** 239:23
**brokerage** 81:2
**brooks** 278:7 278:13 279:20 280:5
**brother** 10:1 17:24,25 41:20 44:10,18,18 45:1,2,6 46:6,9 46:10 47:6,13 47:14,17,24 48:3 61:7 257:9 287:9,19 287:21 338:8 338:14,15
**brother's** 10:19 48:13
**brought** 38:2 64:10
**buddy** 94:8 205:4
**budget** 196:1,7 196:11,20 199:5,11 204:21 205:17 206:23 239:19 240:5 273:7,8 273:9 288:2,8 288:11,19
**budgeted** 206:22 214:24 215:2 306:24
**budgeting** 204:24 306:10 307:4
**budgets** 205:20 206:19 207:2 207:20,21 208:2,3,6,17 209:1,7,16 211:22 212:6 212:11 237:18 305:1 306:22
**build** 23:13 30:10,12,13 31:2,6,8,10 37:18 49:12 100:2 104:19 104:19 141:2 150:21 154:1 167:19 168:7 170:11,18 171:5,11 177:13,16,18 177:21 195:10 198:15 202:22 203:19 205:16 211:6,11,18 214:24 324:2 325:1,6 331:8 356:6
**building** 25:5 27:20 37:25 50:2 62:21,22 62:23,24,25 78:17 121:16 169:22 170:23 196:5 197:12 202:9 210:19 210:24 217:10 230:14 270:4,4 270:6,10,10,13 270:13 277:12 277:24 279:10 279:11 318:15 318:16 331:9 336:5,12 339:23
**buildings** 62:20 277:25 278:2 327:14
**buildup** 141:20
**built** 30:3 142:1 143:2 153:24 165:11 165:22 171:23 172:20 173:10 202:6,25,25 203:5 206:19 208:3 211:2 265:23 297:22 299:11,17 323:8,11,12,13 323:23 324:10
**bunch** 22:24 166:19,20 264:7
**burkina** 138:13 138:13,19 139:18 140:1 320:13
**business** 19:25 22:8 26:5 27:13 29:8 30:2,8 32:1,7 34:4 36:20 37:21 38:6,8 40:3 42:16 43:13 45:13 58:23 113:18 113:18 116:24 117:3,12 144:2 164:21 166:18 217:22 233:21 234:4 251:3,7 251:12 253:14

253:22 259:11 260:9 269:22 278:20 287:4 320:11 325:2 325:12 348:15
**businesses** 143:24 144:1 144:17,19 146:13
**buy** 32:16 78:14 92:21 93:6,10 94:12 94:18 95:9,14 96:6,11 164:20 171:8 195:17 200:22 235:3 241:21,24 261:20 264:24 265:10 269:8 270:5 276:10 276:17 294:6 297:23 298:1 299:3 301:5,25 359:19,23 361:11 362:9 362:20 363:21
**buying** 66:4 89:20 97:5 252:16 262:11 262:20 265:7 276:15 321:9 362:8,11 363:18

**c**

**c** 3:1 4:1 5:1 7:1 24:9
**cabinet** 197:1
**cables** 200:25
**cabling** 186:17
**calendars** 88:19
**calero** 105:8 144:10 157:15 158:2 161:1,11 182:6 192:1 322:22,24
**california** 51:18 169:4
**call** 14:4 15:8 42:21 54:10,11 89:10 110:21 123:15 125:16 138:23 143:23 153:6,11,13 183:3 189:12 203:19 226:13 269:19 287:1,1 287:9,18,19 295:10,10 297:20 313:4 320:16 322:10 326:8 331:24
**called** 8:3 20:19 27:18 39:1,10 49:12 54:12 74:1 81:6 90:3 97:14 100:5 114:12 129:24 231:4 234:18 276:24 283:8 323:20
**calling** 177:2 298:8
**calls** 88:1 301:3 301:6
**camera** 245:16 335:6
**camino** 23:11 23:12 25:16
**camino's** 23:20 24:20 25:15 26:7
**cancel** 13:3 14:9 128:22 176:20,22 183:25
**canceled** 13:4 128:24 170:25 176:24 177:1,5 230:11,13,22 230:23 232:3
**canceling** 230:13
**cancer** 222:8,9 222:10
**canterwood** 280:7 281:3,11 281:19 282:11
**capabilities** 135:13 145:4 174:13 197:22
**capability** 202:17 217:11
**capable** 121:2 151:7 362:4
**capacity** 35:8 67:22 68:5 95:19 98:25 112:14 117:3 217:1,7 241:1 365:14
**capital** 28:4 29:15 40:19 166:19 276:10
**capitulate** 165:20
**capture** 245:16
**carboned** 186:6
**card** 248:3,7,9 248:11,15 258:14,17,24 259:6,14
**cards** 249:3,8 249:12 251:11
**care** 107:20 273:5
**career** 20:13 310:6 311:5
**careful** 340:11
**carefully** 217:25
**carla** 229:7
**case** 1:7 7:9 8:25 9:15 11:1

11:3 12:20 18:23 19:8 39:22 75:5,5 84:3 86:1 88:9 134:12 151:12 156:12,13,17 181:13 214:8 220:18,19 245:19 295:9
**cases** 75:14 76:25 220:21
**cash** 27:20 40:19 58:10 70:25 71:9 205:16,20 208:24 253:2,5 270:10
**castings** 319:12
**cat** 319:19,20
**catamayo** 229:5 234:21 234:23 235:2,7 236:18 264:24 264:24 268:15 270:8 340:20
**catch** 246:8
**catching** 245:18
**caterpillar** 31:1
**caused** 13:2 14:8 176:20 183:22 307:22
**cde** 23:2
**ceased** 60:4
**celec** 1:5 3:2 5:13 7:7 11:25 13:1,8 14:8 15:12 86:2 97:6,9 98:11 98:11,21 99:11 100:8,9,20,22 101:23 103:9 105:8,18 106:21,23 107:2,6,8,9,11 107:12,18,19 109:20 110:5 111:8,19 112:7 112:17 113:2 119:1 121:9 126:1,20,21 127:7 130:15 130:16,24 132:15,22 133:3,4,8,14,16 133:19 134:17 134:23 135:9 135:23 136:8 136:17 142:5 142:10,20 143:10 144:4 146:1,8,12,19 146:22,24 147:8,13,14,25 148:7,12,18 149:2 150:1,20 151:19 157:8 157:10,11,13 158:20,21,24 159:2,9,18,18 159:23 160:8 160:13,13,20 160:21 161:1 161:12,21 162:3,11,20,24 163:3,3,17,17 163:21 164:6 164:13 173:23 174:1,6,9 175:10 176:19 177:12 179:2 182:3 183:23 184:5 187:4,19 188:3,4 189:12 190:5,6,14,15 190:18 191:6 191:10,11,11 191:23,23 192:11,12,12 192:15 193:8 193:12 194:8 194:11,17 195:3,25 196:11,20,24 197:5 198:13 199:1 203:17 206:14 207:14 210:7 211:4 212:6,11 214:8 214:16,20 215:3 218:15 218:25 221:13 225:6,10,13 227:23 240:6 246:16 247:1 250:25 251:5,9 251:16,25 254:13 263:22 265:15 266:14 271:25 283:25 288:19 290:23 291:3 294:5 302:4,8,13,25 303:13 305:23 306:13 307:21 308:2 309:8 311:18,24,24 314:4,6,11,13 314:17 315:16 316:3 318:19 327:17 328:9 328:12 346:1 346:11,15,15 346:16,18,22 347:7,19,21 351:7 352:18 353:5 354:15 357:9,12,17,25 363:16,19,23 363:25 364:13 364:17,20 365:7,18,21 366:1,5 371:4 372:1

**celec's** 110:23 207:21 208:19 212:7 228:17 230:18,20 236:24 238:6 238:25 239:10 240:11 241:16 249:7,20 251:1 251:6,9 252:2 252:13,20 257:16 258:1 263:3,4 267:7 268:22 269:17 269:19 271:25 272:7 274:24 275:5,25 276:2 283:10
**cell** 86:10,20,23
**cells** 94:22
**cent** 221:3,12
**center** 217:3 286:1 326:19 327:2,10 345:6
**centers** 217:14
**ceo** 32:22 33:1 33:16,17 85:16 85:17,19,24 149:11 164:2 301:7
**certain** 35:20 93:5 98:19 102:10 119:2 180:14 196:17 198:23 199:17 199:18 213:16 213:17 236:19 237:2,4 249:11 321:20
**certainly** 75:25 143:19 149:16 157:3 207:2 218:3 289:11 315:21
**certificate** 6:14 345:17,18,21 345:22,23 370:1
**certificates** 353:23
**certified** 316:15
**certifies** 184:18 327:19
**certify** 370:3
**cfo** 208:22 209:19,20 210:9,14
**chain** 191:16 285:22 294:5 312:25 314:16 316:1,5 329:11 333:10 344:23 347:10 355:12 355:20
**chance** 10:4 12:10 41:22 214:17
**change** 46:2 51:25 53:24,25 136:5 185:24 186:10 187:21 187:22 332:3 358:8 372:4,7 372:10,13,16
**changed** 51:12 51:13,22 87:19 113:23 142:24 143:5
**changes** 327:22 371:9
**changing** 62:7 188:24
**channel** 330:7
**characterizati...** 16:3 344:14
**characterize** 14:20 70:5 154:8,12 244:22 246:7 341:1 346:13
**characterized** 71:8 73:9 74:6 246:14 289:1
**characterizing** 153:15
**chase** 248:3,7,9 248:15 249:2,7 249:12 251:10
**chat** 345:5 358:7
**check** 83:1 109:5 111:13 113:11,25 115:10,16,18 117:17 118:7 118:23 131:8 261:24 299:24 362:10
**checked** 109:9 109:20 110:18 114:4 116:16 117:20
**checking** 109:11 110:1
**chemo** 223:10
**chevron** 170:20 171:12 173:17
**child** 283:8,11 283:14,16,17 283:21,24
**chile** 38:25 39:2 42:11,21,23 43:3,20
**chilean** 43:18 44:25 45:7
**china** 234:19 235:13 250:11
**chinese** 268:7
**choice** 57:6
**choosing** 274:3
**chose** 367:6
**chosen** 272:12
**christ** 346:6

**chronological** 90:11
**cigar** 276:25
**citizen** 119:17
**city** 276:25
**civil** 371:24,24
**claim** 156:13 352:3,9
**clarify** 69:11
**class** 158:14,14
**clean** 175:5 181:20,21 268:1 337:1 338:5 339:2,19
**cleaned** 184:12 184:14,17 267:16 292:20
**cleaning** 185:16 186:23 228:9 267:18 340:8
**cleans** 185:12
**clear** 105:22 203:14 255:22
**clearly** 51:5 142:19,20 144:7 179:18 193:3,4 197:11 197:20,22 198:6 349:18
**clearwater** 281:17,19
**client** 339:12
**clinton** 27:21
**close** 144:21,23 144:24 197:21 206:24 208:15 217:5 309:23 310:13 362:5
**closed** 37:1 59:4 167:24 168:17 229:6 229:11
**closure** 44:9
**coast** 145:11 265:5,16 266:3 266:4 276:11 276:16
**coffee** 74:15
**colbert** 4:18 155:3,12,21 212:21
**collateral** 82:7 82:9 83:6,12 83:20 125:23
**collect** 14:9 41:2
**collected** 87:23
**collecting** 352:1,13,15,23
**collectively** 133:22 312:17 350:11
**college** 19:23 20:2,11
**colombia** 119:16 137:5
**combination** 96:17
**come** 80:7 106:6,10 121:2 124:11,12,14 167:25 216:16 219:18 303:9 348:17 362:23
**comes** 65:16
**comfortable** 198:14
**coming** 12:20 27:20 33:1 92:15 216:5,6 246:18 273:21
**commence** 36:15
**commencem...** 88:11
**comment** 253:12 283:5
**comments** 13:16
**commercial** 189:18
**commissioned** 142:2 143:3 189:17,21 198:16 324:4
**commissions** 64:10
**commit** 136:2
**commitment** 156:18,21
**commitments** 42:15
**committing** 293:21
**common** 30:6 287:3 348:16
**communicate** 93:22 134:16 167:1,4,11,14 167:16 216:2 230:3 260:20 262:22
**communicated** 117:7 118:1 166:12 167:2 229:14
**communicating** 119:8 334:13
**communication** 117:24 190:10 291:16
**communicati...** 87:22 88:1 94:2 97:2 160:8 169:19
**companies** 38:12 40:12,14 40:18 50:3,25 51:3,6,10 53:12 80:18 84:4 142:23 145:21 146:14 150:7 157:14 157:19 158:9

159:5 242:13 242:22,23 243:8 244:7 245:24,25 246:10,21 247:4,12 268:18,23 272:20,22 273:1,16 276:24 299:21 300:23 301:14 301:19 319:22 320:5 321:1 323:23 324:1 351:22 352:8 353:3 354:17 364:22 365:10

**company** 7:16 10:14 19:19,22 20:18,21 21:12 21:18 22:9,21 23:21,22,22 24:2,7,8,9,13 24:15,20,25 25:18 26:3,9 26:19 27:4,5 27:14,22 28:1 28:5,7,15,17 29:6 32:3,12 32:17,21 33:2 33:7 34:21 35:5,9 37:7 40:17,25 41:3 41:8,18,19 42:2,3,4 45:25 46:3 49:9,11 49:14,20 50:5 50:10,13,19,24 51:1,3,13,14,17 51:22 52:2,4,6 53:14,18,25 54:4 55:7 57:4 57:5,7 61:9,10 61:21,22 62:7 63:19 64:8 66:11 70:15,15 70:16,24 71:5 83:16,17 84:1 84:19 85:12,18 85:19 97:14,17 100:5 107:6,8 107:15 108:2 115:5 120:3,10 120:14,16 121:1 123:8 125:13 129:24 130:2,4,7,11,13 130:25 131:3,4 131:6 132:3,16 132:19 133:20 133:21 139:6 139:14 142:14 142:24,25,25 143:6 144:12 149:13 153:24 156:9 157:3,16 157:18,21,23 157:23 158:3 158:12 164:15 164:18 165:9 165:20 166:3 166:10 167:7 167:18,21,22 168:4,20,25 169:6,7,11,15 170:8,17,22 173:2,14 209:21 210:3,5 211:4 217:2 220:23 229:21 230:7,11,19 231:3,5,21,24 231:25 232:1,6 232:8,10,11 233:25 234:2,3 234:4 235:13 238:2,2,4 239:15 240:22 240:25 241:22 242:3,8 249:22 249:22,23 252:1 259:22 259:23 260:8 260:18 265:6 266:13,22 267:5,15,17 268:7 269:2,6 269:15 270:11 271:5 274:3,10 276:21,22,22 276:24 282:2,4 299:21 300:1 301:9 307:17 315:11 316:18 316:24 317:7,8 317:9,12 320:15 323:7 323:10 324:6 359:2,4 362:23

**company's** 41:9 149:16 158:8 272:13

**comparable** 157:12,17,25 158:22 161:16 161:17 162:5,6 162:25 164:5 164:13 169:21 169:24 170:2 173:22 174:2,7

**compares** 163:21

**compensation** 65:4,23 66:21 67:2,21

**complaint** 40:22 44:13,17 45:6 46:6 47:12,18,22,23 48:5,8,9

**complete** 58:19 98:4 101:21 139:7 141:1 156:23 273:5 308:22 313:22 313:25 314:6

367:6
**completed** 177:6,7 371:16
**completely** 20:25 141:17 198:8 201:24 203:1 226:6,8 227:1 299:17 299:18 328:12
**completing** 15:22
**completion** 202:21
**complicated** 68:21 166:3
**comply** 112:11 135:6
**component** 326:11
**components** 31:7 177:7 186:24 188:24 189:4 200:23 201:12 226:16 226:18,23 250:16 269:11 291:23 301:20 316:14,20 319:4,5,23 320:11,13,19
**compressors** 200:24
**computer** 87:11 193:19 193:25
**concern** 6:11 106:8,11 111:24
**concerned** 132:4,5,6 176:11 289:3 340:21 341:4 341:23 343:21 344:3,4
**concerning** 123:2,4,14
**concerns** 328:10
**concluded** 369:8
**concrete** 202:11
**condition** 49:24 176:16 181:14 183:21 202:2 298:3,3 299:9 299:10,11 339:20 340:10
**conditioning** 299:10
**conditions** 102:1
**conduct** 113:11 115:9,17,18
**conducted** 113:25 220:11
**conducting** 336:3
**conducts** 260:9
**confiance** 125:21
**confidential** 367:22
**confidentiality** 83:1
**confirm** 77:10 206:4 220:1
**confirmation** 273:4
**confirmed** 39:17 111:1 362:6
**confirming** 135:12 196:15
**confluence** 42:9,18
**confused** 79:22
**connect** 201:13
**connected** 125:13
**connection** 25:19 26:2 29:14 34:7,17 43:2,18 44:2 44:20,24 53:12 59:15 69:17 126:21 140:9 140:21 142:5 145:24 146:2,9 147:15 151:2 159:11 162:3 172:17 173:7,9 206:2 208:18 218:8 219:13 219:23 221:5 221:15 233:5 242:4,14,24 243:9 246:1,12 246:23 247:16 250:17 253:23 259:15 261:15 261:17,19 262:16 263:7,8 265:19 266:10 267:2,8 268:10 269:11 270:24 271:9 298:12 302:14 310:23 311:2 326:5 329:23 343:10 346:1,11,18 360:2 364:3,23
**connections** 247:5
**conscientious** 340:12
**consent** 155:6 155:11
**consider** 67:5,5 156:13,17 157:4
**consideration** 303:3 309:22
**considered** 70:6 81:15,20 82:1 110:24

111:7 371:17
**consistent** 291:15
**consolidating** 70:7
**consorcio** 271:15,17 272:8 273:15 275:2,4
**constantly** 321:6,12
**construct** 101:8 177:18 198:2
**constructing** 210:18
**construction** 101:11 103:3 104:22 123:6,8 196:5,8 198:4 198:5 211:5 212:13 239:15 257:13,15 315:12
**constructor** 275:20,24
**consulting** 64:9 66:13
**consults** 116:24
**consumables** 31:24 321:9
**cont'd** 4:1 5:1
**contact** 287:25 288:2
**contacted** 22:22
**contain** 179:7 180:6 195:5 313:12
**contained** 202:7 294:7 313:10 315:17
**container** 277:1
**containerized** 141:19 195:14 299:17
**containers** 271:13 276:23 276:23
**containing** 189:24 306:22
**contains** 290:19
**contemplated** 304:22
**contend** 347:1
**contents** 126:2
**contested** 25:6
**context** 120:11 349:2 350:2
**contiguous** 78:7 79:20
**continuation** 142:23 367:7
**continue** 16:14 33:7 37:18 62:11
**continued** 50:1
**continues** 254:5
**continuing** 145:3
**contract** 6:8,9 11:4 13:2,4 14:8 15:13 33:10 39:25 51:17 53:22 54:1 56:21 63:22 66:25 69:1 77:17 96:2 98:10 105:21 106:1,7 106:19,22 113:22 121:7 122:19,21,22 122:25 123:23 124:3,4,6 126:16,17 127:1,6,13 128:9,22,24 129:6,9,16,24 132:9,10 136:14 139:5 145:7,8,15,25 146:2,5,10,17 146:18,21 147:5,16,24 148:9,13,19 149:3 150:2,20 156:18,19,21 156:22,23,25 157:1,7,11,24 159:6 162:22 163:13,17,18 163:20 164:5 164:12,22 165:4,9,25 167:23 168:5 168:13,18 169:16,22,24 170:1,2,6,9,11 170:17,21,25 172:7,11 173:16,18,22 173:24,24 174:15 175:19 175:22 176:6 176:13,14,20 176:22,22,24 177:5,8,21 178:5,13 179:13 184:5 185:6 187:5,14 188:5 190:8,9 190:21,21,24 191:7,14,19 192:18 193:2,3 197:2,3 199:3 199:5,11 211:10,14,16 213:20 214:2,5 225:25 229:3,9 238:17 239:16 239:23 246:12 246:24 247:1

265:20 266:10 287:25 288:8 288:15,20,25 289:8,13 291:8 294:3,5 295:23 296:22 297:10 298:8,13,23 299:23 300:9 300:25 301:11 301:22 302:5 302:10,17 303:1,2,3,4,5,8 304:11,20 305:13,21,23 306:13,16 307:22 308:7 308:10,11,13 308:23 310:13 310:19,21,23 311:2 315:21 327:23 328:10 329:5,20 330:10 339:22 351:12 352:25 357:13,14 358:14 360:3 363:23 365:4 365:25

**contracted** 50:19 114:24 211:3 270:5 319:11

**contracting** 65:20 101:24

**contractor** 27:11 64:17 65:5,8,10,24 66:22,25 67:6 67:8,15,19,22 67:25 68:3,4,6 68:12 69:3,18 71:15,23 72:6 72:9,11 73:3,5 73:7,19,21,25 74:3 112:9,14 114:22 120:7 123:11 132:7 133:6 134:3 271:18 365:14

**contractors** 319:14

**contracts** 11:9 11:15,19 12:2 12:7,8 18:17 33:3 98:20 99:7,16 100:9 100:21 101:16 102:5,17 103:13 107:3 121:18 123:24 125:1,4,7,9,12 125:16 126:1 126:18 132:22 133:4 136:2,4 140:11,21 141:2 142:11 143:7 146:20 146:22,24 147:7,8,22,25 148:7,12,18 149:2,10 150:1 150:20 151:15 157:8 160:21 161:12 163:6 163:21,23 164:6,13 169:21 173:23 174:2,7,8,21,22 176:2,3 177:13 179:2 188:11 190:6 194:3,7 198:20 199:24 208:7,18 210:23 219:15 219:24 237:15 242:5,7,15,25 243:10 246:2 247:6,16,25 249:13 250:18 250:22 251:14 251:20 253:24 254:12 259:1,7 259:16 261:16 261:24 262:17 263:9 267:1,10 268:11 269:12 271:10 304:1,5 304:23 305:3 306:5 308:3,19 309:8 311:21 312:2,10 319:21 323:1 327:18 329:24 346:2,19 364:1 364:4,21 365:8

**contractual** 42:14

**contrary** 283:5

**control** 32:19 80:17 81:4 153:3 186:17 249:2 260:5 318:6 320:25 323:22 324:10

**controlled** 126:4 238:4 242:3 245:24 268:18 272:21 273:17

**controller** 25:11

**controlling** 259:25

**controls** 30:14 186:15,15 200:23 202:5,6 241:11 271:2 317:16 318:4 318:12,21 328:5 332:6

**convenes** 7:4

**conversation** 97:5,8 99:12 99:13 112:24 289:10

**conversations** 105:4 131:1 309:25
**convert** 196:4 200:16 201:11 203:20 277:1,2 298:9 321:16 356:4
**converted** 141:17 226:25 266:1 276:23 298:6 334:9,9 339:25
**convey** 338:4
**convince** 100:8 325:2,12
**convinced** 100:20
**copies** 162:21 347:20 371:14
**copy** 87:14 114:7 124:7 129:9,16 212:24 285:10 290:25 333:24 368:22
**copying** 87:10
**coral** 23:4
**core** 203:8
**cores** 202:3,4 203:6,7 206:25 241:21,22,24 259:22 261:8,9 261:20 294:17 298:1,6,7 299:13
**corp** 1:10 4:3
**corporate** 29:19 83:25 158:1
**corporation** 20:19 58:23 60:5 133:22 259:19,21 260:5,21,24 261:5,7,14 262:4,5,15 263:3,7 298:19
**correct** 23:15 29:18 42:19 43:10,11 57:23 61:20 69:20 79:10 80:10 85:22,25 88:14 94:20 95:7,11 96:21,23 100:3 102:20 113:9 120:7 134:2 146:18 161:13 161:19 174:20 180:4 184:10 184:15,16 188:15,22 201:6 213:3 214:21 225:7 225:10,11,13 225:22 226:24 236:11 250:23 255:24,25 264:3 270:15 272:24 277:8 277:12,13,14 278:7 282:23 285:1,5,13 289:23 291:25 292:11 293:13 293:16,22,23 294:11,13 295:3,23 296:11,13,18 297:3,21 298:15,16,20 310:6 316:3,23 319:6 323:8,11 327:16 328:8 328:14,18 330:15,17 333:21 335:18 339:25 340:1,6 340:8,9,15,24 341:7 343:7,23 348:4 349:23 354:6,13,15
**correcting** 194:18
**correctly** 42:10 57:17 68:23 71:10 160:18 174:19 180:11 184:11 238:8 337:19 341:2
**correspond** 285:16
**corresponden...** 205:6 215:24 233:4,9 240:9 247:25 250:21 262:3,13 274:8 300:3,12,22 306:9 327:8
**cosmetic** 336:9
**costed** 288:12
**costing** 205:1 209:12
**costs** 198:5
**counsel** 7:6,17 88:1 117:1 155:6,11 334:21 342:6 343:3,4 370:10 370:13
**counseled** 224:24
**count** 138:5
**counted** 142:17
**counterclaims** 16:15
**counterparties** 44:2 300:13
**counterparty** 302:21
**counting** 255:22
**countries** 136:21 137:15

137:17 138:16 141:4
**country** 23:2 101:9 103:2 106:17 107:15 108:3 136:19 136:23 137:12 138:10,11,20 139:18 140:2 143:11 198:11
**county** 75:4 77:6,7
**couple** 8:15 39:7 45:21 76:15 140:25 141:10,13 172:5 222:11 222:13 256:24 279:17 281:8 287:10 340:19
**course** 11:19 63:18 69:10 82:4 229:7 269:21 301:24 302:18 307:21 311:16 336:18 349:1
**court** 1:1 7:8 7:14,19 25:13 35:11 39:23 47:19,24 48:5 48:8,10 49:19 78:10 79:15 80:4 153:7,11
153:14 277:14
**covered** 328:21 329:24
**covid** 55:19 61:16
**crampton** 90:23
**crank** 331:5
**cranks** 31:12 331:3
**crankshafts** 182:24 319:20 319:20 331:4
**crap** 297:8
**crash** 40:3,10 43:14,15
**crashed** 45:18
**create** 205:19 245:19
**created** 191:14 202:17 206:22 207:3,5,18,20
**credible** 260:18
**credit** 248:3,7,9 248:15 249:3,8 249:12 251:10
**crediting** 123:16
**creighton** 249:17,19,21 250:2
**criteria** 110:18 179:9
**crypto** 240:23
**ctg** 39:1,15 41:17,19
**current** 38:15 103:4
**currently** 66:6 74:25 75:14 76:13 83:3 216:21 236:17 255:20 321:15
**custody** 320:24 323:21 324:9
**customer** 39:11 39:15,21 42:12 42:13,21,24 43:2,9,20 44:20,24 45:7 94:11,14,16 137:21 138:10 138:12 139:6 146:9 147:16 149:6 164:12 165:18 170:5 170:12,19,20 171:11,13,14 171:17,21 173:17 309:2 310:21
**customers** 50:3 138:20 139:1 139:16 320:2,6 321:15 322:19 325:2,12 348:22
**cut** 168:18,22 169:19 171:2 348:24
**cv** 1:8 7:10

**d**

**d** 6:1 7:1 24:9 29:5 166:15,17 254:1
**d.c.** 3:8
**dad** 19:24
**dae** 27:8,15,18 28:22 33:10,19
**damages** 307:24
**damn** 51:14
**dang** 138:15
**daniel** 3:3 295:14 355:10 358:4 363:14 368:17
**daniela.johns...** 3:10
**daniella** 3:4
**data** 88:10,12 217:3,14
**date** 2:3 11:11 52:13,14,15 68:9 88:16,18 88:19 91:23 92:18 127:2,6 127:8 128:11 128:14,23 135:8,20 136:7

147:12 193:25 228:1,3,10 232:24 282:8 286:1 324:5 345:5,6 357:12 358:3,3 360:16 371:12 372:23
**dated** 127:1 128:3 285:24 345:1 355:21 358:7
**dates** 22:19 50:8 85:7 97:11,12 143:19 253:10
**daughter** 19:13 33:16 256:9,10
**dave** 32:24 33:17,22
**david** 355:10
**day** 33:4,9 88:25 106:4,4 106:5 120:17 222:12 223:10 228:5
**days** 169:17,18 176:7,7 196:24 223:8 371:17
**daytona** 316:18 316:25
**deal** 41:18 57:14 71:7 75:20 111:3 112:1 168:25 231:6 232:15 232:17 309:23
**dealing** 44:9 116:1
**deals** 112:17 116:1 138:6 364:18
**dealt** 351:3
**dear** 287:1
**debacle** 45:19
**debt** 49:21,24 50:1
**decades** 320:2 320:7,20
**decent** 336:7 340:3
**decide** 64:1
**decided** 41:5 98:18 99:1 112:3 118:9
**decision** 40:20 108:6,9
**declarations** 35:14,19
**declare** 372:20
**declaring** 68:2
**declined** 33:10 99:19,22 101:2
**decree** 356:22 357:1,4,7,17 358:2 359:3
**dedicated** 316:16
**deep** 310:1
**deeper** 350:1
**deeply** 362:11
**defaulted** 15:13 49:16 139:5 168:13,14 220:22 306:13 306:15 307:21 308:12,16 327:17
**defaults** 174:4 174:9
**defend** 154:4
**defendant** 9:5
**defendants** 1:20 4:2 5:2 367:2
**defending** 156:9
**defense** 27:11
**definitely** 127:24 156:20 351:10
**defrauds** 43:2
**dehaas** 5:12 7:13
**delay** 106:6 307:22 308:24
**delayed** 75:20 183:13
**delaying** 106:6 251:22 308:20 308:23
**delays** 183:16 183:16,22 215:3
**delete** 88:6,9
**deliver** 13:23 14:6,7,11,14 15:10,21 100:2 141:3 148:20 149:4 150:3,21 151:21 161:20 167:19 168:7 170:18 171:1,5 171:11 176:9 176:17 177:6 188:12 189:16 217:8 225:14 245:11 288:24 294:10,11,13 294:14 297:25 302:23 304:3
**delivered** 13:20 13:21 14:5 15:10 41:9 136:18,21 137:12 138:9 138:19,22 139:12 140:1,6 143:10 151:23 165:13,23 172:21 173:10 183:20 189:12 191:17 211:25 225:6,8,10,12 234:11,14

239:7 244:12 246:16 276:19 339:21,24
**deliveries** 130:20
**delivering** 13:5 15:14 102:1 139:8 144:11 148:9,14 151:20,22 158:6,18 177:3 190:23 192:2 291:17 304:16 304:19
**delivery** 39:3 169:23 176:8 300:14
**deloitte** 32:25
**demand** 352:3 352:9
**denied** 155:13
**deny** 34:24
**department** 216:20 252:17
**departure** 34:8 34:17
**depending** 107:4 229:9,11
**depends** 31:8 254:15 307:16
**depose** 366:22
**deposed** 8:12 9:15 10:2,7,16 25:19 35:10 75:1
**deposing** 371:13
**deposit** 198:20 361:16
**deposition** 2:1 7:5,10 9:18,24 10:5,11,19,21 10:24 12:11,16 13:13,14 16:7 16:16 17:1,6 17:13,23 18:8 19:8 41:4 43:24 48:13 122:14 139:4 153:15 223:22 223:25 224:3 224:11 226:14 244:14,23 245:3,15 335:25 338:17 366:24 367:4,8 370:1
**depositions** 8:22
**deposits** 201:4
**depth** 121:6
**derived** 68:8 81:11
**describe** 77:22 195:25 207:23 221:3 302:20
**described** 48:15 79:16 123:18 143:8 175:18 176:13 176:15 177:8 206:11 207:13 339:21
**describes** 176:14
**describing** 81:9 190:25 191:1 204:1,21 206:1 208:6 211:11 211:23 286:17
**description** 6:7 175:10 292:22
**descriptions** 93:17
**design** 217:15 319:14
**designate** 68:17 205:13 367:20
**designated** 67:9 68:7,19
**designation** 271:6
**designed** 323:12
**desire** 273:6
**despite** 15:15 18:7 67:7 286:23
**destroy** 88:7 310:21
**destroyed** 19:1 19:2 40:3 121:3 220:22 308:10
**destroying** 71:8 217:19,22
**detail** 48:15 131:2 204:22 221:3 274:16
**detailed** 196:12 211:17 212:11 238:24 267:3 267:14 333:17 336:3
**detailing** 208:19 212:7
**details** 12:5,5 35:23 44:16 50:8 79:7 90:9 102:11 197:9 211:22 221:11 231:6 236:25 241:10 259:4 273:12,19 274:18 275:13 275:15 302:2 309:22
**determine** 109:3 110:3 111:18 150:19 207:9 357:8 362:15
**determined** 111:6
**developed** 30:4 30:9 145:2

**development** 63:12 113:18
**device** 87:19
**diagnosed** 222:8,10
**diesel** 30:21 183:7,8 186:10 266:1 298:4 321:17
**difference** 240:3 316:9
**different** 12:21 12:22 13:8,9 54:5 95:4,6,8 100:21 128:11 141:22 201:24 201:25 202:21 207:1,2 286:18 299:2,13,18 300:13 317:7,9 319:22 328:13 349:12
**differentiation** 66:10
**difficulties** 99:23,25
**digital** 370:8
**dime** 220:15 221:7 310:4
**directed** 87:21
**directly** 39:16 97:17 99:10,11 99:15 100:9 103:9 105:17 133:16,18 139:7,14 216:15 230:4,5 230:6 232:5 243:8 256:8 272:18,20 278:24 279:5,8 279:19 365:17
**director** 161:2 308:14
**dirtiness** 181:25
**dirty** 220:19
**disagree** 244:10,13
**disagreed** 94:24 315:1
**disagreeing** 336:13
**disclose** 83:2 142:10 157:10 157:11 158:20 158:24 159:2,9 174:1,6,12,12 196:11 212:6 212:11 243:14 250:25 251:5,9 251:16,25 271:24 272:5,6 302:4,8,13 311:18,24 312:5 314:4,17 315:16 347:19 363:16,24 364:9,20 366:5
**disclosed** 142:12 161:15 162:4,19,24 190:5,14 191:10 192:12 196:20 199:1 213:24 214:8 253:4 273:1 365:21
**disclosing** 193:8,10,12 197:22 365:7
**discovery** 6:14 86:2 345:22 349:22 354:1 367:6
**discredit** 151:16
**discuss** 12:15 13:15 16:8,16 17:5 197:21 308:1 309:9 356:25
**discussed** 13:13 178:12 222:18 224:10 240:10 253:4 271:22 274:22 294:5 314:2 358:15
**discussing** 16:4 18:23 19:7 223:21,25 224:2,3,6 298:12,24 313:21 327:8 356:18
**discussion** 205:18
**disrupted** 19:4
**distinction** 83:14
**distribute** 308:3
**distributing** 308:6
**distribution** 237:9 326:19 327:2,9
**distributor** 331:3
**district** 1:1,2 7:8,9
**divide** 187:12
**divided** 79:5 259:8
**division** 1:3 7:9 21:8,10 22:10 22:11 33:1 234:1 317:6,10 317:11
**divorce** 282:6 282:15 356:11 356:19,22 357:1,7,17 358:2,10
**divorced** 281:17 361:2

**divvy** 309:9
**document**
57:19 91:15
122:13 124:9
126:25 127:14
127:23 129:15
131:13,16,19
134:3 162:18
162:23 190:3
190:10 191:13
191:22 192:10
192:19 193:7
198:25 199:20
205:23 206:10
206:11 207:10
207:12,13
212:16 213:4,7
213:21,24
214:9,9 215:7
221:1,10
238:23 239:6,9
240:9 258:4
259:10 274:17
290:5 313:5
332:10 333:7
334:2,4,5,19
342:4,12,18
343:2 349:11
349:21,22,22
349:23 351:15
352:4,10 358:6
359:7 360:6,13
360:17 365:3
366:22 372:20
**documentation**
12:7 34:23
88:10 93:14
112:11 133:23
134:1 197:5
300:3 346:9
347:20 350:20
362:25 367:1
**documented**
34:1 93:20
134:11 183:16
183:23 190:16
196:16 221:8
247:24 250:21
268:13
**documenting**
67:13 242:22
**documents**
10:20,22,23,25
11:3 34:12
35:7 36:4,10
50:17,20 93:20
97:3 110:1,19
110:20 124:24
126:18 130:20
133:22 135:6
135:25 136:1
142:5 172:9
192:17 196:18
196:19 198:24
204:25 205:5
205:24 206:5
207:9,23
208:17 211:25
240:14,17
242:17 243:3,5
247:25 250:22
253:10 267:12
290:13 306:9
306:19,21,23
312:16,23
313:8,9,20
314:6,9,10,16
314:18 315:8
315:17 316:9
323:21 324:9
324:17,22
332:21 346:1
346:14,17
347:6 348:3,6
348:23 349:5
349:16,21,23
350:6 351:7
353:5,20,25
354:5,11 365:2
365:15
**doing** 20:7
32:13 38:14
41:10,16 49:4
62:7,10,11
65:16 71:21
72:15 98:21
99:10 106:19
106:23 108:13
112:19 134:6
137:6 143:1
149:14 153:22
153:24 155:6
188:1 192:3
197:18 202:15
204:1 205:15
208:24 224:7,9
237:3,4,6
245:20 254:10
254:15 257:4
261:22 272:13
297:9,10 303:4
305:9,10
315:22 320:20
326:24 327:4
332:8 335:17
341:2 343:18
361:16,17
363:19 365:1
365:13,19
**dollar** 49:20
51:21 53:23
66:1 151:6
**dollars** 15:20
15:25 33:8
49:24 57:25
63:15 145:18
151:24 156:24
163:22 169:15
173:14 201:3
217:6 219:10
219:13,22
220:4 241:2
245:8 247:5
260:9,10
358:14

**dominican** 22:23,25 23:10 23:14,15,17 230:9 231:22 234:14
**donna** 284:2
**door** 37:17 45:14 64:10 155:8,10 270:6 318:15,16
**doors** 37:1
**doubt** 127:12
**downstairs** 358:17
**downtown** 277:23
**dr** 23:2,7 230:12
**draft** 187:18 211:16
**drafted** 33:3 123:13 129:16 329:18
**drafts** 190:24
**drastically** 366:23
**drawings** 319:14
**drew** 78:10 79:15 80:4 277:14
**drive** 280:7 281:3,12 282:11
**driving** 281:16
**dropbox** 216:16
**dropped** 19:25 20:12 27:10
**ds** 6:15
**dual** 265:25
**dubai** 164:18 166:5,23
**due** 176:25
**duenas** 275:22 275:25
**duly** 8:3 370:5
**dust** 141:21
**duties** 135:11 135:23
**dynamic** 265:5

**e**

**e** 3:1,1 4:1,1 5:1 5:1 6:1,6 7:1,1 24:4,9,9 29:5 89:9,19,23,25 95:24 96:22,25 114:14,15 115:7 119:11 166:15,17 193:6 209:24 209:24 215:19 215:22,23 216:1,5,8 233:4,8,14 236:6 240:8 247:25 250:21 257:19,19 262:1,3 266:25 274:8,16 300:12 315:12 316:5 317:22 317:22 327:7 344:23 347:9 358:7 366:1 369:2 371:24 371:25 372:3,3 372:3
**earlier** 37:3
**early** 18:22 89:4 92:9 210:13 228:2 308:19
**earn** 68:6
**easily** 216:5 220:16
**east** 2:6 7:12 137:4 166:20
**easy** 101:23,24
**economic** 326:4
**ecuador** 13:23 14:12,15 15:15 15:20 16:1 89:21 90:16,19 90:22 91:1,9 92:22 93:7,11 94:13 95:10,14 97:22,23,25 99:8 100:2,21 101:17 102:5 102:16 104:19 105:13 106:14 109:3,9 112:15 112:17,19,22 114:6,6,11,18 119:15 134:21 137:4 160:22 160:24,25 163:5,8 175:5 175:6 189:8 190:1 192:16 196:25 197:19 197:23,25 198:2,4 201:14 203:23 218:1 225:17 238:10 244:9 245:8 265:12,19 266:9 268:16 309:23 326:19 327:2,10 328:3 360:20
**ecuadorian** 71:7 75:19 99:16 100:10 103:13 109:24 114:20 126:21 134:17 157:2 159:23 160:14 160:20 163:4 350:20
**ed** 195:20
**education** 181:9

**edwardo** 5:13
**effort** 15:3
**efforts** 29:15
**eight** 282:25
**either** 31:3,9,18 31:20 58:25 70:23 96:17 119:11 126:9 137:24 174:3 176:10 177:4 178:6,15 179:12 180:7 181:1,25 184:8 188:12,16 191:24 192:13 193:13 203:19 258:11 260:13 263:12 296:3 320:17 340:14 363:3
**ejaramillo** 5:8
**elaborate** 65:17
**electric** 144:9 263:15 297:21 298:14 299:8 299:15 320:10 320:21 321:2,5 321:11,18,21 322:4,14 323:5 323:24 324:2 324:11 325:1 325:10 345:22 354:1,2
**electric's** 322:18
**electrical** 62:5 139:10 269:5,9
**electricity** 23:15 175:10
**electromotive** 30:21
**electronic** 30:13,13 128:3 316:19 368:25
**eligible** 109:4 110:24 111:7
**elio** 113:19 114:4 116:15 116:20,21 117:1,17,20,24
**email** 135:15 135:16 162:19 162:23 167:1,4 167:12,14 190:3,10 191:16,21 192:10,19 205:6 206:10 207:12 212:1,2 212:3 371:13
**emailed** 371:15
**emails** 11:4,10 11:15,19 12:2 12:8 18:18 86:6 87:13 88:20 91:19,22 97:12 190:16 191:9 193:18 193:20,23 196:13,18 198:24 205:25 221:3 239:8 240:15,18 262:18 267:12 268:14 274:17 300:2 301:4 306:22 363:3
**embargo** 170:24
**embassy** 114:5 116:16 117:21
**emd** 20:23,25 30:3,8,10,18,20 30:21 31:2,5,9 265:24 267:6,8 316:14,18,24 317:2,12 319:3 319:16 326:18 330:22 331:4,5 331:7
**emds** 331:9
**emergency** 108:3 222:16 222:16
**emphatically** 134:10
**employed** 17:15 370:11 370:14
**employee** 64:15 64:18 84:16 256:12 370:13
**employees** 10:16 38:11 49:22,23 59:25 60:9,16,25 76:20,22 248:10,15 254:7,20,24 255:5,11,16,17 255:23 284:9
**encapsulates** 144:18
**encounter** 43:22
**ended** 41:23 172:11 174:3,9
**ends** 31:14,14 53:13
**energy** 9:2 23:1 24:14,18,19 42:5 159:20 164:20 167:6
**enerset** 231:4,7 231:12,13,16 231:18,20,23 232:2,4,6,9,9 232:11,17,18 232:20,23 233:4,10,13,14 233:23 234:1,6 235:12,17,18 236:2,5,9 263:15,16,18 263:24 264:2,5

359:24
**engage** 107:2
**engine** 30:13,18 31:4,4,9,15,16 179:8 181:12 181:14,21 184:24 185:24 186:2,15,18 202:3,4,25 261:9 265:24 267:6,9 292:20 294:17 298:4,4 299:3,13 318:3 318:12 319:3 319:17,19 330:23 331:6
**engineer** 30:12 62:5 319:14
**engineered** 143:3 323:13
**engineering** 24:5 32:19 41:7 62:3 90:18,24 277:24
**engineers** 284:10
**engines** 30:16 30:16 141:16 178:9,11,16,18 178:19 179:11 179:19,23 180:7,8,17 181:6,11,17 182:21,25 183:7,8,10 184:7,12 185:11,16,17 185:18 186:4 186:11,11 195:19 201:22 203:7 226:6,11 226:12,13,21 261:10,11,12 261:14 262:8 262:14 263:7 291:11,22 292:7,14,16 293:10,18,22 293:24 295:12 298:7,13,22 299:1,6,11,16 299:22 300:7 300:14,17 301:9,15 302:4 302:14 316:14 321:12,17 330:25 331:7
**english** 93:23 94:3,4 334:20
**enjoy** 324:12 324:15,17,22 324:24
**enrique** 5:4 312:6 367:18 367:21
**ensuring** 316:16
**entailed** 148:9 188:16,17,23 188:24
**entails** 188:23
**enter** 96:2
**entered** 148:8 148:13,19 149:3 150:2
**entering** 308:2 309:7,8
**enterprises** 267:4,5,8
**enters** 56:20
**entertainment** 276:22 277:6
**entire** 10:9,13 11:1 12:13,14 18:8 98:4 143:25 335:24
**entirely** 139:21 303:25 304:4
**entirety** 11:17 17:1 103:19
**entities** 99:16 125:19
**entity** 242:6 250:1 260:1 277:7,11
**ep** 1:5 3:2 5:13 7:7 371:4 372:1
**epc** 177:21 323:14
**equipment** 16:1 37:17 89:21 92:21 93:6,9,16,17 97:13 98:7 100:2 102:11 103:1,8,25 104:2,5,10,17 104:22 105:5 107:10,11 108:16 151:24 158:19 164:20 176:10,16 177:5 178:7,15 178:17 179:12 179:15,18 181:12 196:9 197:25 198:1,9 198:11,12,15 198:19 199:14 200:24 201:1,2 201:12 203:21 204:4,6,13,14 205:8 206:3,15 206:25 207:16 214:25 219:3 219:15,25 221:6,17 225:15 235:5 238:9 241:25 249:23 251:21 264:8,13,17 269:7,11 300:24 302:9

302:15 320:25 328:5,20 329:22,25 330:15,17 331:13,17,22 340:21 341:4 361:11,14 362:8,21 363:22,22
**equipped** 149:16,17 151:7,10
**equity** 130:8
**errata** 371:11 371:13,16
**ersa** 146:21
**es** 370:4
**especially** 71:6 119:15 271:11 315:7
**esq** 4:18
**esquire** 3:3,4 3:13 4:6,7,8 5:4 371:1
**essentially** 37:20 52:22,22 54:22 143:23
**establish** 52:11 52:17,20 54:16 55:10,13
**established** 51:6,8 55:9,25 85:10 327:15
**establishing** 326:18 327:1,9
**estate** 62:15,18 63:1,14 65:13 77:11,15,22 78:4,21 80:12 80:17
**estates** 279:24
**estes** 317:20,20 317:22,22
**estimate** 140:20 219:8 220:7
**estimated** 140:23 173:15 306:25
**estimates** 209:12
**et** 7:7 371:4 372:1
**ethics** 153:23
**europe** 229:18
**event** 11:24
**events** 364:10
**eventually** 34:14 49:10,14 51:20 52:25 90:8 99:1 107:1 108:25 113:17,20 114:9 115:7 116:17 118:3 120:1 131:24 132:20 133:2 133:10 144:13 172:16 233:18 233:20,22 234:20 251:18 272:17 305:22 305:22 358:21
**everybody** 13:11 33:11,12 40:9 111:22 118:20 150:11 156:7 176:19 216:4 217:23 362:10
**everybody's** 183:18
**everything's** 58:11
**evidence** 12:7,8 19:7 86:3 142:4 352:13 352:15,23
**evolution** 106:21
**evolve** 97:8 145:3
**evolved** 112:24
**ex** 197:21 282:22
**exact** 47:4 52:13,15 53:2 85:7,12 143:19 147:1 206:23 237:22 238:19
**exactly** 13:5 32:4 35:22 53:4 82:8 90:11 92:3,17 110:6 126:3 141:11 143:13 144:10 158:5 158:18 159:8 165:16 174:16 175:19 180:10 192:1 193:1 205:11,12 206:18,20,21 206:23 220:6 222:12 223:9 227:10 233:2 255:3 262:11 293:6 296:22 327:22 344:7
**examination** 6:3 8:8
**examined** 8:5
**examiner** 25:12
**example** 62:4 142:16 158:8 241:1 325:5 331:4 351:14
**excel** 205:24 206:10 207:11 208:16
**excellence** 316:17
**excels** 221:2

**except** 182:22
**exception** 151:21 195:19
**exchange** 186:3
**exchanges** 266:25
**exclusively** 303:25 304:4
**excuse** 156:3 272:18
**excused** 154:16 155:1,2
**execute** 105:21 106:5 157:24 174:15 308:11
**executed** 157:25 158:13 174:18 197:2
**executing** 308:7,10
**execution** 322:25
**executive** 19:20 119:18
**exhaust** 278:18
**exhibit** 6:8,9,10 6:11,12,13,14 6:16,17 122:13 122:15 129:15 212:17,18,24 213:16,17 215:7 284:21 284:22 312:17 312:19,24 332:10,12 344:18,19 350:12,13 355:13,15 360:6,8,10
**exhibited** 156:21
**exhibits** 10:21 10:24 352:25
**exist** 92:10 129:11 178:10 207:9 240:17 243:5 245:20 296:16 327:11
**existed** 120:22 306:20 322:14
**existing** 178:18 206:18 207:11 297:23
**exists** 128:10 307:6,6
**exited** 173:4
**expand** 145:4
**expanded** 202:16
**expansion** 62:23
**expect** 306:8,20
**expectation** 307:10 309:14
**expected** 309:9
**expenditures** 207:23
**expenses** 248:13 249:8 249:12 251:10 252:4 258:23 259:5,13
**expensive** 40:7
**experience** 11:24 142:17 142:18 143:25 144:6 151:2,5 151:6 158:22 159:3,10,14,15 161:16,18 162:5,6,25 174:14 197:12 264:11,16 336:15 362:2
**experienced** 151:10
**experiences** 144:5 158:8
**experiential** 174:13
**expert** 82:3
**expertise** 142:4 142:17 272:14
**explain** 12:24 70:8 83:14 88:22 159:14 268:5 287:24
**explained** 35:23 142:19 144:7,8,10 158:5 159:7 198:6 232:7 240:10 326:6
**explaining** 208:19 239:9
**express** 258:14 258:17,23 259:6,14
**expression** 16:5 175:2 292:19
**extended** 81:23 112:20 182:4 332:4,5
**extending** 331:25
**extension** 66:16 71:25 72:2,3
**extensive** 111:12
**extent** 87:25 117:6
**external** 117:1
**extreme** 141:21 151:5
**extremely** 102:12

**f**

**fab** 267:15 268:1,1
**fabian** 105:8 126:13,14 144:10 157:15 158:2 161:1,11 182:6,14 192:1

196:25 229:6 322:22,24
**fabricated** 202:4
**fabricating** 278:15
**fabrication** 270:7 278:14 278:17
**fabrications** 313:22,25
**face** 92:18,18 190:19,19
**faces** 243:22
**facilities** 27:19 140:6 141:3 157:15 226:21 227:16 269:22 269:23 322:18 327:12
**facility** 38:10 40:6 45:14,15 92:16 149:17 227:19 234:13 234:15 317:5 317:14,23 319:7,9,10 321:5 322:21 323:2,4,8,11,12 323:16,20,24 324:3,11,25 325:1,12 326:2
**facing** 218:9,16
**fact** 15:1 43:12 111:18 112:25 123:4 133:2 134:10 138:23 139:1 167:19 168:7 171:5,10 171:22 172:16 173:6 186:6 194:12 214:20 217:3 290:22 327:15 335:15 356:4,25
**factors** 42:9,19
**factory** 183:12 183:15
**facts** 16:10 372:20
**failed** 27:16 295:17
**fails** 28:18 371:20
**fair** 175:10
**fairly** 32:12 93:19
**faith** 361:11,16
**faithful** 285:10
**falcon** 230:11
**false** 217:20 290:20 315:17 315:18 328:8 328:14,18 353:4
**falsely** 342:17
**familia** 84:10
**familiar** 9:23 250:3
**family** 19:4,7 20:25 46:8
**famous** 153:25
**far** 8:17,19 34:24 61:24 67:2 69:23 77:19 97:3 126:9 129:10 176:11 216:18 279:17
**faso** 138:13,14 138:19 139:18 140:1 320:13
**fast** 308:5 352:6
**faster** 141:24
**father** 20:14,20 20:24 46:21,22 46:24 47:5 48:4
**fault** 231:9
**favor** 358:11 358:12
**fbfk** 5:5
**fbfk.law** 5:8
**feather** 245:2
**federal** 75:5 371:18,24
**fee** 66:13
**felt** 18:7 198:13 286:15,24
287:11,14,17 289:11
**festival** 277:3
**field** 365:17
**fighting** 34:19 177:10
**figure** 111:14 234:25 265:1
**figured** 66:14 307:5
**file** 24:21,22 25:10 40:22 64:25 67:10 73:2,18,24 74:2 216:16
**filed** 7:8 40:13 43:19 44:17 45:3,5 46:6 47:12,19,24 48:5,8 51:15 67:17,24 68:4 68:10 69:18 71:23 72:5,8 72:10 75:22 76:11 120:20 351:21 353:15
**filing** 44:13 48:9 71:17
**filters** 320:18
**final** 211:14
**finance** 104:25 105:1,2 253:20
**finances** 32:18

**financial** 28:7,9 28:11 43:14 150:18 197:21
**financially** 40:2 55:13 370:15
**financing** 99:24 100:1
**find** 119:21 121:2 123:20 141:11 143:19 175:1,3 220:17 301:16 304:16 306:11,23 307:2,7 348:17 351:11,14
**finding** 314:9 352:13
**fine** 216:21 366:20
**finger** 155:5,7 155:9
**finish** 14:13 35:18 72:16,17 72:22 152:25 165:16 200:6 205:3 294:25 300:6 307:17
**finished** 14:8 165:9,15 168:1 324:4
**finishes** 41:18 181:19 336:24
**finishing** 139:15
**fire** 210:9 308:14,15
**fired** 60:18 165:14 169:17 169:17,18 210:13
**firm** 26:7 66:7 75:7,10 103:4
**first** 8:3 17:2 25:23 30:7 42:17 47:14,18 47:20,20,23 61:25 88:17 90:13,20 91:5 91:8,12,23 92:8,20 120:13 120:19 129:2,3 172:4 178:4 179:25 187:17 190:24 198:1 210:10 216:11 229:5,11 250:4 281:7 285:14 286:2 336:11 345:6 358:6
**fitzgerald** 83:23
**five** 29:1,2 81:14 82:5,25 83:11 84:5 98:20 119:20 150:3,21 171:6 222:25 240:20 241:11,16,19 242:2,9 251:6 257:2 287:20 355:1,4
**fix** 321:13
**fl** 371:14
**flabbergasted** 33:14
**flat** 129:22
**florida** 1:2 2:8 3:16 4:12,21 7:9,12 23:3,4 23:16 24:14,18 24:19 42:3,5 50:18 77:3 140:5 141:3 167:6 227:21 316:19 370:19 371:18,24
**flow** 40:20 70:25 205:16 205:20 270:11
**flows** 208:24
**fluidly** 216:3
**focus** 145:7 164:1 308:9 345:3
**focused** 184:1 237:13
**focusing** 148:23 157:5 174:14 210:16
**folks** 109:11,13 114:8
**follow** 81:22 141:7 218:20 222:19 349:1
**followed** 90:6 207:6
**following** 180:6
**follows** 8:5
**forces** 165:19
**foregoing** 370:3,4 372:20
**foreign** 136:18 234:2
**forensic** 220:10
**forensics** 220:8
**forever** 119:17 153:24 202:10
**forge** 319:12 349:5,6,7
**forged** 124:20 124:23 314:10 314:15 345:25 346:8,14 347:20,22 348:17 350:19 351:7
**forgeries** 314:1 314:7,10,19 348:4 349:23 352:16 354:12
**forgery** 127:18 128:7,8 213:8 213:10,17,18 213:25 214:10 315:5 349:17

351:19 354:5
**forgetting** 167:7
**forging** 313:15
**forgot** 289:10
**form** 14:2,16 15:18 35:16,21 36:8 53:21 55:1 61:13 65:3 68:10 69:19 72:6,10 73:2,13,18 74:2,5 92:1 101:19 102:8 102:19 103:20 104:7 108:21 110:11 112:8 113:4 115:12 118:15,19 144:3,20,25 146:3 147:9 148:2 175:12 180:18 189:15 193:15 201:16 205:10 218:10 218:17 224:16 235:21 238:12 287:13 295:5 295:24 296:20 303:15 305:17 310:7 318:23 325:15 336:7,8 336:10 338:6 339:3,14 340:3 341:9 344:1 346:3 350:23 353:7,17 357:10,19,23 364:5 366:8
**formality** 338:16
**formally** 145:8
**former** 159:17
**forms** 67:24 71:17,23 77:21
**forth** 281:16
**forward** 24:17 101:11 105:16 152:24 308:21
**forwarding** 186:20 200:25
**found** 89:22 107:13 111:1 114:8,9 129:13 222:13,14 260:13 346:23 346:24 351:14 354:7
**founded** 50:11
**four** 25:14 39:10 83:15 149:22 169:18 171:7 191:25 228:20,23 229:1,7 230:18 231:1,2,10,13 231:16 232:19 232:22 233:6 233:10,15,23 234:7,22 235:4 235:9,11,12,16 236:13,16 263:16,21,24 264:4,7 320:2 320:6 353:25
**fourth** 53:11,17
**fractional** 33:16
**fraud** 39:18 41:19 42:12,21 43:19 45:7 293:21,24 353:12
**frauds** 313:13
**free** 321:6 322:8,8
**freeway** 5:6
**friend** 116:21
**friendly** 260:14
**friends** 25:17 33:12 34:15 113:15,16 115:22,23 116:14 362:5
**front** 31:14 35:11 98:7 122:17 227:19 241:2 284:21 312:22 333:8 353:21
**fuel** 30:5,5,5,7 179:20 186:11 186:14,14,20 188:13,20,25 189:3,7 200:24 237:7,7 264:8 264:21,21 265:25 266:2 316:18,19,20 316:24 317:6 317:12,15 339:25 358:9
**full** 27:16 65:22 87:5 181:9,15 181:24 182:1 182:25 184:23 185:7,20 186:4 255:11,15 306:14 316:13 323:14 349:2
**fully** 142:2 182:9 188:7 189:13,17,21 195:4 309:21 367:6
**function** 187:7 188:7
**functional** 175:9 189:13
**functionally** 60:4
**functioning** 195:2,4
**fund** 27:23 28:13 33:4,6,7 97:24 101:7,10

197:23 198:3 241:24 251:10 280:4 283:11
**funded** 281:2
**funding** 27:14 27:16 106:13 106:14 168:18 168:22 197:20 217:5 269:14 269:15,16 270:1,14,17,23 270:25 271:2
**fundraising** 28:17
**funds** 39:8 208:19 215:5 218:24 236:24 241:16 251:9 251:24 252:13 252:20 257:16 258:1 268:22 274:24 275:5 275:25 276:2,3 276:3 283:10 300:15 362:17
**funny** 13:19,22 13:24 14:3,11 14:13,18,19,20 14:23 15:1,7 137:19 151:2 152:20 245:21 245:23 246:4,9 246:14,20 247:2 346:8,12
**further** 293:20 370:12
**fyi** 97:14,16 98:3 100:5,14 100:19 101:15 106:20,20 107:8,24 120:24 121:4,7 125:22,25,25 126:4,6,10,12 126:18 129:9 129:17 198:7 198:13 211:5,6 211:11,17,21 237:15 238:11 239:18 258:12 272:17 358:22 362:4,6 364:8
**fyi's** 211:11,17 239:19

**g**

**g** 7:1 166:15 250:5 257:19
**gabriella** 4:7
**gabriella.lanz...** 4:14
**game** 105:16 111:22 218:5
**garrett** 86:11 86:14,15 109:14,15,16 110:2,21 111:1 111:5 205:19 208:21 209:13 216:10,17 227:13 248:19 248:22 283:6,7 325:20
**garrett's** 110:22,25
**gas** 30:4 38:13 265:25 321:17 354:2
**gasparilla** 277:3
**gather** 43:23
**gathering** 111:24
**ge** 30:17 331:7
**gear** 264:9,20 269:6
**gen** 30:4,18,19 31:16,25 40:25 183:20 203:8 267:20 298:9 299:5 331:10
**general** 30:22 59:16 159:17
**generally** 9:23 43:13
**generate** 175:9 177:20
**generation** 21:8 22:10,11 33:1 176:16
**generator** 22:25 23:6 30:3,10,14 31:6,7 38:12 50:2 93:12 94:12,18,21 95:2,9,14,17,21 96:6,11 97:5 97:13 99:6,14 141:22 150:11 178:19 179:20 186:15,24 188:20 189:6 189:12,24 191:11,12 195:21 196:3 196:23 199:8 203:20,22 226:7,8 234:17 234:19 264:12 264:16,17,25 265:7,12,17,22 265:24 266:1,3 266:18 267:16 267:19 268:2 291:7,7,19 297:22,24,24 298:2,25 300:24 318:4,7 318:11,12,20 327:20 328:1,5 329:1 333:17 336:4 359:19 359:22,24
**generators** 13:17 14:5,7

15:4,9 23:14 31:2,3 97:9 136:18,22 137:12,22 138:2,9,18,21 138:22 139:2 139:17,19,25 140:4,5,20 141:2 143:8,10 148:10,14,20 149:4 150:3,21 151:12 164:25 165:3,6,11,22 167:20 168:8 168:10,11,15 169:23 170:12 170:18 171:4 171:12,15,23 172:17,20 173:10 175:1,3 175:8,23 176:4 176:11,21,23 177:2,17,19,23 177:24 178:9 178:11,25 179:3,3,6,25 180:3,5 184:2 184:7 185:10 187:6 188:5,11 188:19 190:5 190:14,15 191:23,24 192:12,14 193:12 194:13 194:16,19 195:5 196:6,9 200:11,15 201:9,10,13,21 203:14 204:9 205:9 206:3,15 207:15 214:25 219:2,14,23 220:20 221:5 221:16 225:7 225:12,14,15 225:16,23 226:2,3,5,20 227:5,9,16,20 228:6,12,20,24 229:1 230:19 231:1,3,11,13 231:17 232:19 232:22 233:6 233:11,15,23 234:7 235:11 235:12,16 236:14,16 263:17,18,24 264:5,7,18 266:23 294:7,9 294:10,16,22 295:2,8,11,14 295:22 296:1 296:12,15 297:15,19,20 298:11,14,23 299:22 300:8 301:5,10,21 302:5,9,16 327:23 330:21 330:22 356:2

**genertek** 1:9,10 4:3,3 27:6 28:19 29:10,19 29:20,21,21,24 30:1 32:1,6 34:8,22 36:11 36:14,19,19 37:21,24 38:4 38:6 41:22 52:2,22 53:19 54:4,5,5,11,12 54:13,18,21,24 55:3,4,7,15,21 56:6,20,25 57:21,22 58:13 58:17,17,23 59:3,6,23,25 60:17 61:1,9 61:25 62:13 68:24 84:14,16 84:18 85:21 142:17 143:15 144:11 158:10 158:17 164:3 164:21,22,24 165:2,11,22 170:10,10,11 170:11,17 171:4,10,22,23 257:4 278:23 279:5,8,19 324:8,10 325:1

**genertek's** 58:25 60:23 66:20 70:13

**gentleman** 20:22 21:15 22:22 23:9 29:4 114:12 322:4 325:23

**gentleman's** 321:4,18,24 322:5,13,17 325:11,24 326:5

**germany** 20:19

**gestores** 1:18 257:18,21,21 257:23,25

**getting** 34:1 43:4 53:23 54:17 98:7 103:18 105:15 167:10 185:9 197:25 224:13 244:20 245:1 283:4 310:2 340:10 347:19

**gifting** 123:14 123:16

**gigawatts** 217:14

**ginsermer** 139:4,8

**girl** 287:7
**give** 13:12 23:13 27:17 49:6 54:16 82:22 83:22 86:10 87:8 107:23 130:17 147:19 165:20 169:7 182:3 184:23,23 185:23 219:8 248:14 295:13 295:15 320:11 321:8,11,14 322:8,8 326:11 326:14 332:6 344:18 346:15 346:16 357:3
**given** 82:17,24 84:4 86:8 115:4 326:12 332:23
**gives** 53:18
**giving** 53:14 114:8 192:16 242:23 315:24 341:15
**glazer** 33:17
**go** 19:23 20:2 29:8,8 32:13 32:21 33:7,7 41:15 88:2,19 100:9 103:7,17 106:24 112:10 119:19,20 131:5 143:17 147:21 150:10 154:4 155:14 155:16 160:6 179:14 181:9 188:6 196:21 196:23 203:13 210:8 220:20 220:25 222:16 222:23 223:6 228:8 229:12 243:23 244:16 245:22 260:14 267:11 271:21 272:11 290:5 299:24 304:25 306:18 307:14 308:24 319:25 321:12 322:11 325:25 326:1 326:15 343:11 345:14 346:16 348:1,22 349:14 350:17 350:24 353:12 356:7 358:9 359:6 366:1 367:11
**goal** 62:10
**god** 25:7 78:15 138:14 184:3
**goes** 33:20 41:11,11,18 97:20 115:3 223:10 271:12 335:12
**going** 7:3 16:14 22:16 32:22 33:4,5,13 34:3 34:19 39:1,20 40:9,23 46:2 48:10 57:7,12 70:4 71:2 72:18 74:13 87:6 97:22,24 98:8,8 101:6 101:11 105:12 105:16 106:2 106:14,16,19 106:24 107:7 107:11 111:13 117:6 120:8,10 122:12 123:5 131:18 151:14 151:16 152:24 153:6,10,18,21 154:6,7,11,13 154:17,21 155:23 168:25 168:25 169:2,2 169:13 176:17 177:23 178:21 181:25 182:25 183:9 187:13 187:17,18,19 191:3 192:1,13 197:24 198:8 198:14 199:5 200:10,14 201:8 203:17 203:18 204:23 205:7,12 206:2 206:14,17,20 206:24 207:4 207:14,22 208:14,20 210:23 211:1,4 212:8,13,16,17 218:20 219:18 219:18 220:25 222:3,19,22 223:3,8 224:11 224:21 231:21 232:14 234:25 237:8 239:14 244:18,19,19 245:4 246:5 250:7 251:21 256:24 258:5 262:9,21 265:1 268:19 271:25 272:7 274:14 282:25 284:8 287:20 289:20 289:22 291:18 295:6,7,10 296:2,2 298:5 307:7 308:17 308:21,21 309:16,23 310:3 312:15

312:16 329:24 331:8 332:9,10 333:16 334:19 335:3,5 337:18 341:5,20 342:1 342:25 343:1 344:18 349:4 349:12,13,14 349:18 350:2,3 350:5,8 351:10 352:22,24 355:11,12 359:18 360:5,6 361:11 362:20 363:4,13,21,23 366:21,24
**gold** 40:7 230:12
**good** 7:2 8:10 8:11 18:12 32:13 33:12 61:18 74:15,18 90:10 91:10 112:3 116:21 122:5 197:12 223:13 224:9 246:13 284:12 284:13 286:6 297:10,13,14 297:17 311:15 325:8 335:2 336:2,9 339:9 350:15 361:11 361:15 368:20
**google** 110:7,9 119:23 256:20 334:16
**gosh** 21:3
**gotten** 237:20 239:1
**government** 24:7 99:16 108:1,5,9 116:1 134:17 134:20 159:23 160:14,20 163:4 244:9 350:21
**gracious** 113:14
**gradually** 71:13
**graduated** 20:18
**grand** 25:1
**graphic** 271:4,8 271:23
**gravity** 244:5
**grease** 181:22
**great** 43:15 57:13 74:17 121:1 131:5 153:25 308:9 336:5,12,19,21 338:3,25 339:5 339:9,16,18,24 340:6 362:9
**greenberg** 2:5 3:6,14 7:11
**grid** 237:10
**grin** 243:18 245:17
**grindstone** 254:23
**grinning** 13:19 14:23 15:2 243:15
**grossly** 307:22
**ground** 31:10 141:16 226:7,9 299:12
**group** 20:18 27:14 28:6,12 30:23 32:14 33:12 39:1 49:12 51:18 121:1 142:14 143:1 158:1 230:8 234:18 349:10,15
**grow** 37:18 145:3
**grown** 283:19
**gtlaw.com** 3:9 3:10,17
**guarantee** 101:10 185:4,5 187:1,13 295:16
**guaranteed** 185:7
**guess** 37:19 164:2 239:13 279:13 289:16 289:24 312:17 339:10 340:7 361:5 366:17
**guessing** 22:18 22:18 129:6,18
**gulf** 281:5,10 281:22
**guy** 27:12 28:6 33:17 268:19 351:17 362:4
**guys** 169:1 220:14 241:12

**h**

**h** 6:6 29:5 166:17 268:6,6 372:3
**h&** 239:12
**h&s** 1:16 130:9 130:24 131:8 131:11,21 132:2,16 236:21,23 237:1,21,25 238:3,7,7,18,24 239:4,5,6,12,14 240:10 251:1 271:19 367:21
**half** 32:12 34:6 39:19 49:23 56:7,11 57:24

63:6,23 74:14 145:18 173:12 195:14 282:9
**hand** 7:22 122:12 212:16 312:16 332:9
**handed** 133:25
**handle** 302:1
**handled** 103:4 106:18 130:19
**handles** 317:15
**handling** 186:14
**hang** 280:22,24
**happen** 98:8 105:14 106:15 133:10 191:4 192:19 245:5 293:3 308:21
**happened** 11:24 12:3 16:11 27:25 38:19 45:19 55:15 90:5,11 92:17 106:21 107:18 169:20 171:2 208:23 260:18 304:17 307:21 309:24 311:16 351:2 364:11
**happening** 44:8 108:25 322:9
**happens** 187:22
**happy** 339:10
**hard** 32:17 315:8
**harder** 339:22
**hat** 245:3
**he'll** 326:1
**head** 90:23 254:2,3
**headquarters** 161:11 225:24 226:3 227:21
**heads** 186:13 256:16
**hear** 19:14
**heard** 108:12 116:6,15,15,18 116:19 160:5 275:12
**heart** 19:24
**heat** 141:21 156:16
**heavy** 30:5 179:20 186:11 188:13,20,25 189:7 264:8,21 266:2
**heck** 347:11
**height** 255:7
**held** 7:10 30:24 106:9
**help** 19:25 24:24 25:2 31:24 57:11 72:18 91:20 130:17,19 132:7 151:17 175:20 195:9 198:12 218:25 254:19 255:2 287:23 309:20 326:16 358:4 359:19
**helped** 34:12 208:23
**helpful** 300:11
**hereto** 370:14
**hesitation** 127:12
**hey** 71:2
**hfo** 183:9 186:14,15 195:21 196:4 200:16,24 201:11 203:10 203:21 226:25 237:7 298:2,3 298:7,9 339:25 356:5,6
**hi** 8:10 286:19
**hidalgo** 274:20 274:22
**hiding** 197:21
**high** 30:6 141:21
**higher** 289:4
**highest** 316:16
**highly** 157:13
**hilliard** 267:4,5 267:8
**hire** 41:12,12 41:21 115:14 134:7 308:15 308:15
**hired** 25:6 32:13 49:17 169:4 271:19
**historically** 321:2
**history** 118:23 131:11,22 146:19 147:7 297:4 310:12 361:25 362:16
**hit** 40:10 43:13 55:19 217:19 366:13,15
**hklaw.com** 4:13,14,15,22 371:1
**hmm** 110:8 209:5 257:22
**hold** 22:19 217:6 246:5 285:14
**holding** 1:18 217:1 228:15 228:18,25 229:13 230:3 230:18 231:2

231:25 235:19 236:10,13 251:20 252:20
**holdings** 1:17 234:8 268:17 268:21
**holland** 4:10,19 75:7
**holmes** 5:13
**home** 33:23 78:6,9 79:14 150:10 280:8,9 280:14,16,22 280:24 281:6,7 281:7,15,16,18 282:16,16
**honest** 44:14 45:22
**hoped** 308:18
**houma** 21:10
**hour** 176:10 177:4 178:7,15 178:16,17,20 179:11,12,15 179:19 181:5,6 181:14,18 182:7,13 185:23 189:6 191:24 192:14 195:20 202:1 203:20 226:6 226:12,19 229:9 291:11 291:22 292:7 292:13,15 295:12 298:3,9 299:8,9,10 336:8 340:9,11 354:21
**houred** 293:1 299:15
**houring** 336:23
**hours** 74:14 175:4 178:3 179:10 180:8 181:2,7,15 184:9,12 185:3 185:10,22 186:5,8,22 187:2,9,10,11 188:8,13,18 191:25 193:14 194:15,25 195:6 196:4 200:12,16 201:11 266:5 292:25 294:8 328:4 342:24
**house** 30:15 31:21 77:24 78:17,23 79:6 79:6,11,12,21 80:4,13,14,15 195:16 277:17 277:19 280:25 281:19,24,25 282:2,2 361:2
**houses** 202:7 270:8 278:16 278:16
**housings** 31:15
**houston** 5:7 46:15,16 170:22 171:13 171:17,21 202:16 230:9 230:15,19 231:3 234:16 265:9 266:1,7 267:21 268:3 333:16 335:2 336:2
**hs** 129:24,25 215:20 216:8 272:16
**huge** 40:7 198:17 217:2
**huh** 9:8 28:20 47:7 53:7 58:7 79:13 80:22 91:7 121:23 167:13 170:19 232:21 264:14 288:16 290:3 293:14 294:12 330:16 345:10
**human** 153:19 254:2,3,17 284:2
**humble** 113:15
**hundred** 15:4 23:7 163:22
**hundreds** 15:17 34:10 163:25 255:9 319:21
**hunt** 9:2,4 10:15 74:25 76:11 88:9,11 145:10,16,19
**hurry** 220:9
**hurting** 40:1

**i**

**idea** 9:19 73:14 105:25 177:2 183:12 190:23 215:13,18 242:6 243:6,11 249:14 252:9 252:11 255:1 258:22 259:8 269:13 275:21 275:23 280:6 280:15 282:5 283:13 289:9 290:24 292:24 307:3 309:16 323:18 344:14 353:18 357:12
**ideeco** 24:8
**identical** 212:24

**identification** 122:16 212:19 284:23 312:20 332:13 344:20 350:14 355:16 360:11
**identified** 69:3 111:5
**identifies** 65:3
**identify** 216:4 223:9 254:19 255:2 363:3
**identifying** 67:18,25 68:11 72:6,10 73:3,4 73:19,20 74:3 262:14 263:11 263:13
**illegitimate** 283:8
**illinois** 20:25
**illustrated** 93:20
**image** 87:5,17
**imaging** 86:21 86:24
**immediate** 25:14 45:11
**immediately** 108:23 149:24 169:14 201:4 336:6
**impact** 157:1,2 157:3 307:25
**important** 10:14 102:12 133:5 203:12 206:16
**importantly** 253:11
**impossible** 349:12
**inability** 222:7
**inaccurate** 328:18
**inactive** 59:5
**inappropriate** 44:19 155:14 337:25 343:6
**incidental** 248:13
**include** 62:15 63:16 186:24 192:15,18 255:24 256:1,3 354:16
**included** 62:18 63:2,13,14,15 142:18 146:25 159:6 190:20 191:7,14,18 214:15 234:20 239:19 242:17 263:25 348:25 349:1 366:6
**includes** 66:21 86:5,6 104:13 240:14,16 248:17,17,18 248:18,21,23 256:5 320:21 322:17
**including** 38:13 88:13 104:2,5 104:17 156:18 184:7 185:11 205:8 214:9 219:16 222:20 225:15 247:24 255:9 258:15 262:5,8 300:13 306:21 338:19 353:4 356:4
**income** 65:9,11 65:14,15 66:4 67:1 69:2 70:3 70:7 72:7,13 73:10,11 74:7 74:9 77:22 80:21 81:14,18 81:20 82:1 218:6
**incomplete** 366:24
**incorporates** 144:18
**incorporating** 50:17
**incorporation** 50:8
**incorrect** 103:21 292:8 292:10
**increase** 217:11
**incredible** 121:1 158:13
**incurred** 259:2
**independent** 65:5,20,24 66:22,24 67:6 67:7,15,18,22 67:25 68:3,4,6 68:11 69:3,17 71:15,23 72:5 72:9,11 73:3,4 73:7,19,21 74:3
**india** 234:19 259:24
**indian** 241:22
**indicates** 185:14
**indirectly** 80:18 256:8
**individual** 87:9 87:9 114:5,16 208:12 317:14 317:19
**individually** 125:5,8 299:5
**individuals** 82:19,21,22,24 83:10,19,22 244:7 260:4
**industrial** 62:21,24 77:13

225:21 277:8 278:24 318:17
**industries** 1:9 1:11 4:2,3 7:7 52:3 54:13 56:6 57:1 73:4 85:15,24 129:25,25 130:25 131:8 371:4 372:1
**industry** 1:16 40:11 115:22 130:10 131:11 131:22 132:3 132:16 181:9 236:21,23 237:21,25 238:3,7,7,18,24 239:5,5,7 240:10 251:2 278:19 319:24
**inevitable** 105:17
**infection** 223:2
**inflammation** 223:1
**influence** 62:9
**inform** 134:23
**information** 93:15 111:5,24 111:25 132:8 150:15 273:1 293:4 324:23 356:1 358:1
**informed** 104:24 157:13
**informing** 333:15
**inherited** 77:25 78:22,22 79:9 79:23
**initial** 99:11
**initially** 99:5 231:10
**injection** 30:5,6 30:7 316:18,20 316:21,24 317:6,12,15
**injector** 320:18 321:7,8
**injectors** 186:13 326:12
**injury** 361:1
**inmobiliarios** 1:18 257:18
**inquire** 121:19
**inquired** 118:11
**inquiries** 110:22
**inquiry** 89:19
**insanity** 315:13
**inside** 181:25 186:7
**insisted** 367:5
**inspect** 106:6 106:10 321:12
**inspected** 204:6
**inspection** 106:2 200:5 241:3,25 333:17 336:4 338:25 340:14 340:22,23 341:5,6,21,24 343:22
**inspections** 1:14,16
**install** 31:12,13 31:14 175:8 188:19 198:15 203:22 237:8 238:8
**installation** 98:5 198:12 237:13,15 239:18,19
**installations** 268:2
**installed** 140:6 143:3 177:19 189:9 240:7
**installing** 196:6 237:7
**instruct** 218:11 218:18 224:20 224:21
**instructed** 217:25
**instructing** 224:14
**instruction** 218:21 224:18 236:8
**instructions** 236:2
**insulting** 106:15
**insurmounting** 42:1
**integrity** 349:4
**intellectual** 63:12,16
**intend** 13:6 347:5 353:2
**intended** 195:24 294:6 311:19,25 312:6 338:4,22 339:1,21,24 347:21
**intention** 202:12
**intentions** 307:3
**inter** 267:15 268:1,1
**interacted** 166:12
**interest** 56:2 361:14
**interested** 27:15 28:13 89:20 99:9 112:18 144:5

357:6 370:15
**interests** 57:20 58:22
**interfere** 152:14,14,17 152:21
**internal** 67:10 68:5 204:24 262:13 306:9
**internally** 111:3
**international** 113:18 361:21 362:14
**interrupt** 224:20 296:3
**interrupting** 245:15
**introduce** 107:2,5
**introduced** 33:16,18 88:16 88:17,21 113:15,16,17 190:19 229:6 362:3
**introducing** 297:7
**inventory** 63:11,15
**investors** 166:5 166:20
**invites** 91:20
**invoice** 34:13 274:4
**invoices** 35:9 35:20 36:5,10 39:4 250:22 258:2 274:2,5 274:7
**involve** 109:23
**involved** 11:1 16:13 25:24 26:4 34:17 43:20 46:7 53:12 87:12 105:3 216:19 252:14 272:11 283:12
**involving** 60:23
**ip** 63:11
**irresponsibly** 13:2
**irs** 64:25 67:17 67:24 68:10,19 69:4,19,21 70:5 71:14,18 71:24 72:6,10 73:3,9,18 74:2 74:8 81:10
**iso** 32:20
**issue** 97:22 105:13 151:5 160:2 175:2 187:5 192:19 204:6
**issued** 36:11 81:23 105:6 248:4,11,15 269:2
**issues** 41:14 62:9 105:7 184:20
**it'd** 141:14 179:12
**it'll** 97:11 183:6 185:2 228:3
**itemized** 207:14 209:7 212:12 238:24 240:10
**itemizes** 221:11
**itemizing** 206:1 208:19 212:7 239:9
**items** 319:9 328:6
**itineraries** 92:12

**j**

**j** 166:15 250:5
**jacinto** 20:9,11
**jail** 290:16 291:6
**jam** 326:10,16
**jaramillo** 5:4 367:11,15,18 367:19
**jay** 317:20,21 317:22
**jennifer** 16:20 16:21,25 17:7 17:15 19:9 48:21
**jesus** 346:6
**jewish** 166:17
**jiangsu** 250:4,7 250:8,13,16,16 250:21 251:17 251:24
**jimenez** 4:6 14:2,16 15:18 35:16,21 36:8 53:21 55:1 61:13 72:22 73:13 87:25 92:1 101:19 102:8,19 103:20 104:7 108:21 110:11 112:8 113:4 115:12 117:5 117:23 118:15 118:19 132:24 144:3,20,25 146:3 147:9 148:2 152:11 152:16,19,22 152:25 153:8 153:12 154:17 154:21 155:2 155:19 156:4

175:12 189:15 193:15 201:16 205:10 218:10 218:17 224:16 235:21 238:12 243:18,21 244:1 287:13 295:5,24 296:20 303:15 305:17 310:7 318:23 325:15 330:8 332:17 332:20,23,25 333:3 335:4,10 335:12,15,21 337:3,5,8,10,13 337:15,17,22 338:6,11 339:3 339:14 341:9 341:11,15,18 342:1,3,7,11,17 342:23 343:7 343:11,14,17 343:24 344:1 346:3 350:23 353:7,17 354:19 357:10 357:19,23 364:5 366:8,15 367:3,23 368:5 368:12,23 369:1 371:1
**joaquin** 113:20 114:10,13,16 114:20,22 115:1,4,24 116:4,9 118:13 119:5,8,11,13
**job** 2:10 111:9 151:7,8 273:7 298:8
**joe** 166:13
**johannesburg** 38:11
**john** 1:11 2:2 4:4 6:2 7:5 8:2 101:12 131:4 282:17 371:4,8 371:10,12 372:2,23
**johnson** 3:4
**joined** 85:6,9 165:19
**joint** 145:20 364:2,6
**jointly** 132:21
**jorge** 352:4
**jose** 94:9 120:18,24 121:3 122:19 123:9 125:4,14 125:19 126:5,7 126:8,9 129:21 238:2,4 239:17 239:20 258:12 272:5,16,19,20 272:25 273:11 273:17 274:4,6 274:9,20,22 276:6 312:5 327:3,7 351:21 352:8 353:3 359:16 360:19 361:7,21 362:15,21 363:7,9,16 364:1,12,22 365:9 367:21
**jose's** 6:8,9 214:1,5 238:2
**judge** 41:5 260:17
**july** 136:11,12 136:15 285:24 286:3 287:10 289:11 314:15 319:8 326:23 329:14 345:1,8 345:9,11 355:21,21 358:7,9 359:17
**june** 136:10,15
**justifiable** 253:8
**justifications** 258:3

**k**

**k** 259:21
**karla** 88:15 90:6,14,20 91:1,6,9,13,24 92:8,18,19 93:22 94:4,5 94:10,11,15,22 95:1,9,12 96:5 96:20 97:5 99:4,9,14,14 100:4,5,13,14 100:18,19 101:13,14,14 102:4,14 103:12 104:24 107:1,4,7,20,23 107:24 108:18 108:19 109:6 110:19 112:5,9 112:25 113:11 113:25 114:7 115:2,6,10,17 115:20 116:4,5 116:8,11 117:17 118:12 118:12,23 119:9,24 120:2 120:3,8,14,24 121:3,9,13 123:9 125:8,13 125:20 126:4,6 126:6,8 129:21 130:3,5,9,14,15 130:23 131:5 132:2,12,13,16 132:20 133:2,6 133:25 134:18 134:23,24

135:3,8,10,15 135:20,22 136:7,16 143:9 145:14,25 146:7,12 147:12,13 160:12 162:10 191:18 215:24 216:3 238:1,3 239:17,20 258:11 272:5 272:16,19,25 273:11,17 274:4,6,9 285:1,6,17,20 286:6,7,9,11,15 286:19,20 287:11 290:12 290:15,22 291:19 293:20 294:18 312:5 313:1,9,14,25 314:5,16,18 315:17 318:18 327:3,7 328:15 329:10 330:6 333:11,15,20 334:13 335:2 336:2 338:24 344:24 345:17 345:21 347:2 347:14,20,21 348:3 349:20 350:6 351:8,9 351:21 352:4,8 352:18 353:2 353:23 354:11 355:23,25 356:10,18,21 357:1,6,21 359:10,16 362:3,19 363:6 363:7 364:1,8 364:21 365:1,9 366:1 367:21

**karla's** 132:2

**kathy** 46:14

**keep** 15:3 34:2 46:2 62:7 72:15 167:7 206:16 207:18 297:15,16

**keeps** 150:18

**kennedy** 2:6 7:12

**keppel's** 234:19

**kept** 20:14 222:12 251:22 308:11,21,22 347:24

**key** 105:1

**kicked** 25:5

**kids** 256:24 283:19,20

**kilobytes** 340:13

**kilovolts** 340:16

**kilowatt** 327:20 327:23

**kind** 18:12 54:9 61:16 65:16 104:21 113:14 135:10 141:21 144:18 152:23 153:1 190:4 193:7 206:11 207:13 208:17 211:22 221:10 239:6,9 240:9 251:22 269:8 271:14 287:21 325:5 361:15

**kinds** 158:19

**kiss** 154:24

**knee** 310:1

**knew** 20:24 39:20 107:9,12 107:19 113:13 114:9 115:22 129:11 157:17 174:15,18 178:8 182:5 185:9 191:3 198:13 229:7 272:9 308:12 327:3 363:14 365:11,13,19

**knight** 4:10,19 75:7

**knocked** 61:16

**know** 8:17 9:22 10:7 12:9 15:8 18:13 19:10 21:3 22:17 24:6 33:15,15 34:12,19 37:4 40:7,20 41:13 41:13,16 45:4 45:13,18,21,25 46:1 48:7,11 48:18 49:19 50:9,20,21,21 56:19 57:14 60:14 62:2,12 64:9,11 66:5,7 66:14 67:11 68:20 70:7,17 70:20 71:2,3,4 71:6 72:14,19 73:8,12,16,23 73:25 74:5 75:3,20,21 76:18,19,21,23 76:24 77:1,2,4 77:5,9 78:3,15 79:5,7 82:2,2 83:5 86:7,12 87:6,13,15,15 88:18 89:11,15 89:20 90:3,17 91:3,19,19 92:3,10,12,13 93:2,2,5,12,17 97:10 98:10,17

101:9 102:25
105:9,11,23
106:8,13,18
107:4,14 108:4
108:14 109:25
110:6,12,17
111:2,12
112:21 113:13
113:14 114:9
115:25 116:14
118:3 119:3,14
119:21 120:15
120:15,17
121:2,2 123:15
124:5,6 125:10
125:16 126:9
126:11 127:5
128:14 129:19
130:4,6,8
134:6 136:14
137:5 138:6,7
140:25 142:3,7
143:17 144:13
147:2,3 148:3
149:5,7,8,15
150:6,12,14
151:9,11,13
154:4 156:20
158:4,11 159:5
162:14 165:14
165:17,24
166:3,4,5,6,21
168:1,14
169:20 171:2
173:21 175:2
176:15,19
179:17 181:18
182:17,22
184:3,21 185:2
185:3 186:7,18
186:19 187:11
187:22 188:2
190:17,24,25
191:15 192:21
192:25,25,25
193:2,6,16,17
193:19 197:8
197:17 203:9
203:25 205:12
205:16,17
206:5,18,18,23
206:23,24
207:10,18
208:14 209:17
213:6,9,12
216:4,9,9,18,18
216:20 217:9
217:13 218:3
219:6,6,9
220:1,15
222:23 228:1,1
228:3,14,16,19
229:15,16
230:20,25
231:5,6 232:1
232:10,12,16
232:17,24
233:2,16 234:2
234:10,20,24
235:1,10,14,22
235:23,23,25
236:22,25
237:22,22,24
238:19,21
239:13,16
240:1,5,16,24
241:9,23 242:8
242:9,10,16
243:2,4,7,13,16
244:4 245:7
246:3,15,18
247:18 248:11
248:16,16
249:4,5,18,18
249:21,23
250:6 252:8,15
252:16,21,24
253:8,12,17,19
253:21,25
254:9,9,10,14
254:15,16,18
255:7,8,8,9,15
255:20,21
257:1,1,5,5,8
257:14,14,17
257:24 258:2,8
258:12,21,21
259:3,11,17
260:2,3,6,8,11
260:14,17
262:24,25
263:1,4,10
264:19,21,22
268:25 269:3
269:18,19,23
269:24 270:2,2
270:20,22
271:1,3,16,18
272:10 273:4
273:14,23
274:3,16,18,21
274:25,25
275:3,6,7,9,12
276:18,18
277:6,9,21,22
278:10,10,11
278:12 279:3
279:15,17,18
280:8,10 282:3
282:8,8,9,15
283:12 284:8
284:10 285:9
285:12,14
286:16,17
287:1,19,20
288:1 289:1
290:1,2 292:22
292:24,24
293:2,3,5,6
296:23 299:14
299:24 301:23
302:1 304:6
305:7,18,20,22
307:2,5,16,23
308:16,20
310:1,8,11,16

310:17,24 313:17 314:8 314:11 315:12 315:19,19,20 315:22,22 317:13,18 318:1,1,2 319:11 320:19 321:15,23,25 323:17 324:19 325:9,14,18,21 325:22 329:4,8 329:9,17,17 330:10 331:24 332:2 333:4,12 333:22 334:10 334:14,18,25 335:7 337:2,20 337:23 340:11 344:4,10 348:6 348:7,12,18,19 349:4,6,25 350:1 351:2 353:16 354:17 356:20,20,23 357:11,25 358:2,19 359:1 361:5 362:4,6 362:9,10,11,22 362:23,24 363:1,11 364:12,17,24 364:25 365:1,5 365:12,14,25

**knowing** 13:5 287:11 335:18

**knowledge** 126:23 370:9

**known** 119:14 153:25 260:19 286:20,23 287:5 314:12

**knows** 118:20 282:1 321:25 322:3

**kuntz** 241:14 242:4,10,12,22 242:23 243:8 245:24,24 246:10,21 247:3,11,12 268:18,23

**kv** 340:16,18

**kyle** 86:11,15 109:14,15,16 109:17 110:2 216:10

**kyle's** 110:21

**l**

**l** 3:7 24:4 252:7 252:9,12 257:20 259:21

**la** 84:10

**label** 290:6 312:17 313:3,3 332:10 347:10 350:9 355:12 356:8 359:6

**labeled** 122:13 213:2 312:24 345:14 359:7 360:14

**labels** 271:9

**labor** 39:5 267:17

**lack** 151:2,4 159:9,14,15 174:4,9 176:25

**laesa** 24:2,4,6

**lakeland** 23:6 26:22 27:19 28:18 29:9 90:16 144:9 158:7 182:20 192:5 281:7,7 320:10,21 321:2,5,11,18 321:21 322:4 322:14,18 323:5,23 324:2 324:11 325:1 325:10 331:8 345:22 349:21 354:1

**land** 78:7,12,14 78:18,24 79:17 79:19,22,23 80:4,5,7,14,15 290:16 291:6

**language** 123:1 123:2,12 327:22 334:13 365:16

**languages** 286:18

**lanzas** 4:7 369:2

**large** 269:5 316:9

**largest** 20:23 27:8,11 146:18 147:6 234:4 310:6,22 311:1 311:5

**lascano** 5:13

**lasted** 45:2 61:21

**latin** 119:19 258:10 326:19 327:10

**latino** 116:14

**latinoamerica** 1:15

**laugh** 184:21 194:2 246:18 260:3 277:17

**laughing** 13:19

**laura** 19:13,16 256:11,12 282:20,22

**laurence** 21:16 21:17 26:3

**laurence's** 22:21

**law** 5:5 19:10 54:1 75:7,10 80:6,6 89:1,8 90:25 96:19 105:11,13 149:18 150:23 198:19 248:18 256:3 350:4
**lawlor** 19:10 88:17 89:1,9 89:13,23 90:23 150:16 256:11
**lawsuit** 9:2,3 9:11 11:7,8,11 18:2 43:19 45:3 76:2,4,6 76:10,11 120:20 217:20 346:24 351:21 353:14
**lawsuits** 40:21 60:25 61:2,5,7 75:22 219:17
**lawyers** 218:7 218:15
**laying** 135:10
**leader** 174:3
**leah** 333:19
**learned** 114:10 120:19,21 233:10
**learning** 81:21
**leased** 242:6 281:15,24 282:1 317:24
**leasing** 62:22 62:23 240:20 240:22,23 241:11,16 242:3 251:6 282:2,3
**leave** 181:22 210:5 276:2 366:24
**leaving** 342:23
**left** 20:4 22:20 34:3,20 103:2 155:5,14 173:14 209:25 210:3 222:15
**legal** 50:16 51:15 117:13 134:8,13 371:23
**legally** 52:14 67:9
**legit** 110:20
**legitimacy** 111:10
**lengthy** 126:3
**lenient** 70:20
**lent** 83:10 242:4,14 243:8 246:11,22
**letter** 190:19 192:16 290:15 290:19,23,24 291:6 318:19 328:10 352:3,9
**letterhead** 315:10
**letters** 135:12 135:14,19 315:23 316:3 316:13
**letting** 321:14
**lie** 244:19 246:17
**lied** 39:15 46:9
**lies** 152:3,6 153:16 154:8
**lieu** 53:16
**life** 18:25 19:1 19:3,5 50:2 181:15,24 182:1 183:1 185:7,20 311:6
**lightblue** 1:19 257:18,20
**lighter** 189:3
**liked** 52:5 287:11
**likes** 153:19
**limit** 248:12
**limited** 218:6
**limits** 135:4
**line** 37:21 372:4,7,10,13 372:16
**liners** 186:13
**lines** 97:25 237:9
**linkedin** 256:17
**lions** 1:17
**list** 63:17,18 150:11 189:4 206:8 248:14 348:11
**listed** 360:22
**listen** 154:7
**literally** 24:13 65:22 141:11 206:6 217:22 351:16 353:1
**litigation** 10:15 25:24 26:4,6,8 34:7,17 36:15 43:19,23 44:6 44:10 46:7,17 46:20 48:16,22 53:11,18 60:22 75:18 88:12 124:9 174:9 213:5 227:6,9 285:20
**litigations** 174:4 218:9,16
**little** 12:12 19:13 35:3 41:24 50:4 94:1 141:22 151:12 153:21 156:12,13 187:12 216:23 245:2,18 248:11

**lived** 281:8,10 281:21 282:14 282:15
**lives** 116:22 317:15
**llc** 1:9,11,14,16 1:17,17 4:2,4 5:3 7:7 29:22 29:23,24 129:25,25 240:20 241:11 242:3
**llcs** 40:15
**llp** 4:10,19
**load** 31:16 142:1
**loaded** 228:8
**loan** 65:15 82:7 242:19,21 243:3,4 253:14 253:23
**loaned** 240:25 241:21,23 242:1 247:17
**loaning** 241:4
**loans** 45:19 81:16,23 82:10 82:17,20,23,24 83:16,17,18,25 84:4 242:22 245:25 247:5 247:12,15,20 247:23,24 268:23 269:2
**lobbying** 121:7
**local** 25:4 103:4 108:2 365:14
**locate** 187:17
**located** 7:11 26:19 80:13 360:25
**location** 2:5 38:15 328:3
**locomotive** 20:23 21:9
**logo** 348:13
**logos** 347:15
**long** 32:1 36:3 36:23 38:7 49:18 73:15 75:19 84:25 103:14 106:22 107:18 116:14 118:7 137:6 141:1 162:8 169:13 180:24 205:16 282:15 304:10,19 332:8
**longer** 34:15 87:3 141:23 208:22 209:21 210:1 331:6 354:19
**longest** 61:22
**look** 25:12 90:20 127:25 143:12 157:16 158:11 172:8 192:3 260:16 260:25 275:13 305:19 306:9 306:21 316:4,7 323:17 329:16 336:5,7,21 337:1,1 338:22 339:8,11,12,15 339:16,18,20
**looked** 12:13 261:2 315:6 327:11 336:12 336:16,19 338:3,4,5,25 339:1 349:25
**looking** 48:20 73:15 97:12 193:24 240:2 260:14 315:13 329:7 339:4,9 339:24 340:5 350:2
**looks** 289:5
**lose** 251:21
**losing** 308:12
**loss** 305:23
**lost** 156:7,24 219:16 224:13
**lot** 25:9 26:5 35:2 39:19 40:1,12 61:17 70:17 79:6 82:3 93:13,13 93:15 106:20 109:22 111:24 112:2 113:21 114:5 115:24 116:13 123:18 124:20,23 139:8 149:7 153:23 172:13 172:24 175:17 175:17 197:12 200:17,19 203:24 217:17 219:18 222:12 245:21 246:15 261:6 271:11 321:13 340:10 361:14
**lots** 79:4 315:23
**loud** 334:19
**louisiana** 21:11
**love** 41:21 62:8 62:11 350:16 350:19,24
**low** 186:5 266:17
**lower** 289:15
**luis** 274:20,22
**lunch** 122:5
**luque** 144:9 157:15 159:20 161:1,11 182:6 182:14 190:22

229:6 322:24 322:25
**lying** 109:6 153:14,19 154:2 244:18

**m**

**m** 114:14,15 215:9 257:20 275:8,20
**m&a** 169:5
**machine** 182:11
**machinery** 238:9
**machining** 319:9,13
**made** 12:3 15:6 24:23 25:9 34:14 78:25 95:1,17 134:10 191:5 247:5 252:18 304:12 304:17,18 310:15,23 311:1 322:15 326:23
**magnitude** 157:8,12 164:6 173:22
**maiden** 16:23
**mail** 89:10,19 89:24,25 95:24 96:22,25 115:7 119:11 193:6 215:19,22,23 216:1,5,8 233:4,8,14 236:6 240:8 247:25 250:21 262:1,3 266:25 274:8,16 300:12 315:12 316:5 327:7 344:23 347:9 358:7 366:1 369:2
**main** 62:23,24 79:6 199:20 232:1 270:4,10 308:9 309:22 319:9
**maintain** 187:15,16,19 296:10
**maintained** 227:18
**maintaining** 187:24 228:11
**maintenance** 186:16 316:14 319:5
**major** 128:15 181:15 202:15
**majority** 103:8 169:6,8,10
**make** 23:16 62:12 87:4,11 87:17 100:12 104:6 134:1 135:3 136:5 200:11,15 201:10 237:16 245:2 269:6 278:18,19 289:19,20,22 307:4,11,18 308:18 309:16 310:3,18 311:9 311:12,19,25 312:7 319:24 330:17,19,22 330:22,23 341:2 344:15
**makes** 185:12 246:8,18 267:5 271:5 306:5 319:23 331:6
**making** 30:17 59:17 111:23 188:17 196:3 243:22,24 278:16 304:14 305:20 306:25 309:15 331:6 338:11
**man** 100:11 246:13 287:8 338:7 352:6 356:20
**man's** 315:4
**manage** 57:11 81:2 123:9 198:12 237:14 237:16 238:10 249:16
**managed** 237:18 258:11 272:15
**management** 105:9 161:16 162:5 174:3 215:24 216:10 216:17 256:17
**management's** 216:20
**manager** 84:19 84:20 113:19 159:17 174:8
**manages** 256:19,20
**manipulated** 227:15
**manned** 317:14
**manning** 1:11 1:12 2:2 4:4,4 6:2 7:6 8:2,10 8:12 10:2 16:8 16:21 17:5,7 17:13,15,23 18:11 19:8,9 44:11 46:6,10 47:6,13,25 48:3,21 74:24 122:11 137:10

154:20 155:1,9 156:4,11 157:5 158:20 191:8 192:9,21 198:22 199:16 200:2,8 205:23 212:23 214:20 220:24 221:1 223:20 224:23 244:4,21 245:6 245:7,10,14 284:20 292:10 293:7,8 295:19 296:6 297:2,12 298:11 309:4 312:23 315:15 329:22 331:12 333:8 334:2 338:2,10,14,21 338:24 341:23 343:21 344:23 349:20 351:6 351:20 355:9 366:21 367:10 367:25 371:4,8 371:10,12 372:2,23

**manning's** 12:11,16 13:13 13:14 16:16 17:1 367:20

**manpower** 49:1

**manrique** 122:20 125:5 125:14,19 126:5 272:5 276:6 351:22 352:4,8 353:3 359:16 360:19 361:7,21 362:15 363:7,9 363:17 364:1 364:22 365:9

**manufacture** 31:3 148:20 149:4 150:3 270:7 318:14 319:20,22

**manufactured** 30:15,19 31:5 31:9,19 140:1 140:5 226:7,8 271:14

**manufacturer** 331:5

**manufactures** 316:19 318:3 318:11 319:3 319:16

**manufacturing** 148:9,13 318:20

**march** 178:21

**marine** 21:10 21:23,25 22:10 22:11

**marique** 361:23

**mark** 212:17 360:6

**marked** 122:15 212:18 284:22 312:19 332:12 344:19 350:13 355:15 360:10

**market** 31:25 33:9 40:8,11 45:17 64:2 178:10

**marketing** 19:21 89:19 90:19 142:9 276:23

**marketplace** 175:4

**married** 18:13 19:16 283:5,7 283:18

**massive** 23:6 101:25 123:8 183:10 197:4

**massively** 201:25

**materials** 86:3 113:1 142:10 162:2,11 200:19 201:12 249:22 265:4 268:8,9 269:10 326:10

**matter** 7:7 25:20 75:1,2,8 75:11 185:22 213:5 265:2 322:11

**matters** 116:24

**mavares** 113:20 114:10 114:13,14,15 114:16,20,22 115:1,24 116:4 116:9 118:13 119:5,8 122:1

**mean** 11:2,22 30:10,11 31:3 36:4,11 51:2 61:16 62:4 64:21,23,25 88:10,24 93:13 98:15,22 99:25 107:5 118:3 120:6,24 136:25 137:4 138:4 160:3 166:2,4 167:6 176:24 179:11 180:12 181:7 184:23 186:8 194:2 201:23 210:6 216:13 225:21 230:5,6 241:9 260:2 261:22 268:15 273:14 281:19

292:14,19,21 293:9 299:25 320:10 330:25 336:19 339:18 340:25 356:8 362:7 365:11 365:23
**meaning** 54:23 102:6 141:2 179:8 181:5 184:8 189:13 214:24 216:1 277:11 358:21
**meaningful** 102:17
**means** 31:10 161:6 164:2 178:17 180:13 180:17 181:4 181:10,11,19 182:2,10 184:12 185:10 185:18,19 186:22,23,23 187:20 265:15 286:17 293:6 293:12,15,17 319:18 335:7 336:21 340:17
**meant** 160:2 181:13 287:25 291:7 349:6,6
**media** 7:4 74:21 122:8 156:2 223:17 256:16,18 284:17
**mediation** 308:13,25
**medium** 327:20
**meet** 42:14 88:15 90:19 110:4,23 111:6 111:7 160:13 160:19 177:25 179:9 217:11 326:1
**meeting** 90:13 91:6,9,12,19,23 92:8,12,15,20 93:1 159:11,16 159:25 160:25 161:3,10,14 162:3,12 163:2 192:15
**meetings** 94:5 105:8,10 160:23 163:5,8 163:11 190:18 191:25 196:14 262:23
**meets** 325:25
**mega** 34:10
**megawatt** 6:17 49:12,15 51:13 51:15,16 52:2 53:1,5,6,13,17 53:23 54:18 84:23 99:2,3 149:15 164:7,9 164:14,15,17 164:22 165:2,7 165:10,21,24 166:2,11 167:20 168:5,8 168:11 169:22 170:4 172:15 172:19 173:3,5 173:6 176:7,7 189:18 195:11 195:12,14 208:2,3 217:2 237:2,4 239:24 239:25 240:1,4 240:6 345:17 345:18 349:21 354:2 358:14
**megawatt's** 53:15
**megawatts** 23:8 50:19 164:25 170:14 195:11 197:13 197:14,14,14 358:13
**member** 46:8
**memorializing** 67:13 92:11
**memory** 11:21 11:23 12:4 150:13
**mentioned** 77:20 82:18 89:18 128:9 132:11 139:3 156:11 169:21 169:24
**meredith** 3:13
**meredith.yates** 3:17
**message** 96:24 135:18 162:23 190:3,10 191:22 192:11 193:7 207:12 212:1 236:6 284:25 285:22 298:24 312:25 314:16 316:1 329:11 333:10 348:4 355:12 355:20
**messages** 6:10 6:12,13,16 11:10,16,19 12:2,8 18:20 86:6 87:22 88:13 91:22 135:17 162:19 196:13,18 198:24 205:25 233:5,9,14 239:8 248:1 261:5 262:4 267:1,13

268:14 274:9 285:10,19 300:2,13,21 301:5 314:1 327:8
**met** 29:14 88:20 90:8 91:1,4 92:18 107:6 111:18 159:22 190:22 325:23
**meta** 217:16
**metal** 182:10 182:23 278:14 278:17
**methods** 32:20
**mexico** 265:8
**miami** 4:12 23:3 171:7 172:4
**microphone** 27:10
**mid** 47:5 48:4
**middle** 1:2 7:9 121:5 128:24 129:1 137:4 146:8 147:13 147:14 166:20
**milestone** 7:15
**million** 13:24 14:15 15:16 33:5 49:23 56:7,11,15 57:25 58:3,22 59:10,14 63:6 63:13,23 64:5 64:14 66:18 69:14,22 70:12 71:12 123:17 140:13,17,19 140:22 145:9 145:15,19 146:2,10,23,23 147:16 148:1 151:19 156:14 165:4,7 171:24 172:1,12 173:1 173:6,14,19 194:4,6,9,12,18 195:2,4,10,24 196:21,22 198:5 199:6,12 199:22,22 200:9,10 201:8 201:8 203:16 203:18 204:8 204:15,16,22 205:7 206:2,13 207:14,17,22 207:24 208:1,9 210:17,18,21 210:22 211:8 211:12,18,23 212:8,12 214:21,23 217:6 218:14 218:23 219:3 219:10,13,22 220:3,4 221:4 221:12 228:17 229:1,22 230:18 236:9 236:24 238:6 238:25 239:2,5 239:10 240:11 241:15 243:12 244:8 245:8 246:16 247:7 247:11,20 249:7,20 250:13 251:1,6 251:17 252:1 252:12 253:1 257:16,25 263:3,25 264:1 264:6,13,17 265:16 266:4 266:15 267:7 269:17 276:13 288:3,9,14,23 289:12,23 294:6 302:24 303:12 304:12 304:13,24 305:16 306:12 307:1,11,12,14 308:4 309:12 310:5,13,15,18 311:4,19 312:1 312:7
**millionaire** 34:10
**millions** 15:20 15:25,25 24:23 33:8 34:11 63:11,15 151:24 156:24 163:22,25 169:14 201:3 241:2 246:25 247:4 260:9
**mind** 139:15
**mine** 113:15 116:21 230:12 231:20,21 248:12 366:14
**mines** 40:15
**minimum** 248:23,25
**mining** 38:12 40:4,14 230:11 230:13 231:5 231:21,22,24 232:3 233:19 234:3,4 240:23
**minister** 159:20 308:15
**minority** 27:11
**minute** 329:12 355:1,4
**minutes** 123:4 190:18 287:20 354:21
**mischaracteri...** 246:17

**mischaracteri...** 297:16
**mischaracteri...** 41:4 48:17
**mischaracteri...** 104:23
**misleading** 292:17 343:8
**missed** 98:13
**mistake** 78:25
**mister** 342:22
**misunderstood** 160:1,10
**mixed** 264:25
**mixture** 179:16
**mobile** 87:19 202:7,10,23
**mobilizing** 310:1
**model** 271:13
**modem** 332:6
**module** 202:23
**modules** 195:15 202:7 202:10 203:4
**mohammad** 166:16,16,17
**molding** 319:12
**mom** 77:24,24
**moment** 9:22 136:16 336:8 358:10
**money** 25:9 27:17 34:9 49:16 53:16 58:6,8 59:20 65:14 73:5,10 73:20 81:12,25 82:5 83:5,6,11 83:25 103:6 105:2 139:13 139:22 196:2 207:5 210:8 218:24 219:1 220:11 228:18 229:23,24 230:18,20,24 231:8 232:13 234:24,25 235:2,23 236:3 238:7,25 239:10 240:11 240:25 241:4,6 241:21,23 242:1,4,7,8,12 243:7 244:11 246:10,21 249:7,20 250:15 251:1,6 251:22 252:2 252:19 253:2 258:4 262:4 263:3,4,6,22 264:23,24,25 267:8,25 269:17,19,20 270:19,23,24 271:25 272:7 275:15,16,17 284:1 289:12 289:14,19,20 289:23,23 302:21,22,22 302:25 303:6,9 303:13,14,19 304:15,17,18 307:18 308:8 308:12 311:9 311:12 359:23
**monies** 265:3
**monitor** 223:18 284:18 332:7
**month** 8:23,25 9:15 75:1 169:15 210:11 217:6 315:20
**months** 11:13 11:14,20 18:21 34:4 39:6,7 70:23 123:6 141:10,13 183:13,16 187:17 282:25 286:21,24 287:5,11 307:22,23,23 324:5 365:11
**morning** 7:2 8:10,11 286:6 288:6 289:18 335:2 336:2
**mortgage** 269:15,25 270:5,17
**mortgaged** 270:9,12
**mortgages** 269:22
**mother** 77:25 78:22,23 79:1 79:2,9,23 80:2 80:6,6
**motor** 37:9,10 37:11,20,23 38:3,7,14,16,19 39:25 40:10 42:6,7,8,20,25 44:9 45:9 46:1 49:2,4,5 50:6 51:8 52:10,19 52:23 54:23 85:5,11 166:2
**motors** 30:22
**mouth** 223:3 338:19,19,20
**move** 22:25 23:2,3 27:18 60:17 97:4 202:11,13 343:19
**moved** 20:24 23:5 26:22 28:18 45:13 281:8,11,18,20 281:22 308:5

**moves** 99:13
**moving** 343:10 344:11
**mskw** 358:12
**mulberry** 203:5 225:20,24 282:11
**muller** 113:19 114:4 116:21 117:24
**multimillion** 260:10
**multinational** 269:6
**multiple** 50:24 51:3,6 77:21 99:7 111:22 124:9 135:25 218:8,15 273:7 273:25
**muslim** 166:18
**my's** 111:23
**mybox** 276:20 276:21,25 277:7,11,14,20 278:7 279:2,12 280:2

**n**

**n** 3:1 4:1 5:1 6:1 7:1 29:5,5 250:5 257:20 275:20
**nah** 108:13
**name** 7:13 16:19,23 21:17 21:25 23:9,20 23:25 24:8,15 28:21 29:3,3 29:19,24 37:8 42:2,3 46:1,2 48:25 49:9,10 50:8,14,23 51:14,22,23,25 52:5 53:24,25 57:3,5,7,18,19 61:24 75:3,12 75:13 84:7 85:13 114:13 119:24 120:9 126:14 137:18 137:19,19,24 138:11,15 142:14,25 144:11 145:12 147:19 157:9 157:18,22 158:9,12 166:14 167:7,7 168:4 170:7,22 171:20,21 182:15 209:20 209:23 229:21 239:16 241:13 249:24 250:1,3 252:12 258:10 258:10 260:22 260:23 266:24 268:6 271:16 275:9,11 279:2 279:3 282:3,18 300:1 301:8 313:16,18,19 315:4 317:2,19 320:5,8,9 321:23,25 322:3 325:9 357:9
**named** 18:1 22:2 28:6 29:25 33:17 52:2 54:4,14 76:24 120:16 158:16 159:5 239:15
**nameplates** 271:6
**names** 46:13 50:20 51:12 62:7 82:22 83:3,4,22 137:3,25 143:5 147:22 150:7 270:22 271:22 348:13
**narrate** 153:20
**narratives** 217:25
**national** 21:19 21:20,22 22:6 237:10
**nations** 136:24 137:2
**natural** 30:4 112:17 265:25 321:17
**navigate** 365:16
**nearly** 148:14 194:12,18 249:6 288:8
**necessary** 100:15,19 201:12 203:21 319:4
**neck** 222:16
**need** 34:2 41:12 70:21 71:3 83:1 96:12 100:13 101:5 105:21 107:21 141:24 150:8 150:22 151:18 152:5,7 153:3 154:13 159:14 210:6 227:11 227:13,14 258:4 261:24 293:5 296:1 299:24 304:7 321:9 324:16 324:19,23 326:15 333:23 340:25 341:2 362:25

**needed** 37:17 84:1 93:6,10 95:22 99:5 101:4,6,7,8,17 101:20 102:5 102:16,22,25 107:21,25 110:4 111:1,2 133:23 135:5 180:2 227:11 327:4,6 354:16
**needs** 104:21 129:13 183:5 354:13
**nefarious** 326:16
**nefariously** 13:2
**negotiated** 98:12 103:9 104:24 163:17 231:6 232:3,15 232:17 265:10
**negotiating** 101:25 197:1 365:24
**negotiations** 101:22 105:14 105:17,23 106:22
**neighborhood** 79:20
**neither** 94:23 138:11 323:7 323:10 370:10
**network** 113:12
**never** 13:21 17:17,18,19,20 17:21 20:1 26:5 35:12 58:11 64:18 67:7 73:7 83:5 98:8 111:21 116:15 127:9 129:6,10 135:1 139:11 177:5 180:15,15,15 180:18 181:4 185:8 188:2 191:5 202:19 207:25 208:8 208:11 224:17 234:9,14 239:2 246:16 251:18 252:3 253:7 260:6,6,12 272:9 279:10 293:12,15,18 294:2 306:14 306:15 307:21 307:23 309:13 309:22,24 310:20 311:16 312:3,3,9,11 327:15 333:19 346:15 349:25
**new** 26:8 30:16 30:18,18,24 31:9,19 32:14 32:22 41:8 46:3 54:4,11 145:2 148:10 176:5,10,12,15 177:4 178:1,6 178:9,11,11,19 179:10,12,13 179:14,16,16 179:22 180:7 180:12,13,17 181:2,3,14,23 182:3,12 184:1 184:8,18,24 185:13,21 186:1,12,20 188:12,17 189:5 190:7,15 191:2,12,24 192:13 193:13 194:15,25 195:6,17,19 196:3 200:11 200:16,22 201:10 203:19 226:11,18,23 228:20,23,23 229:1,8 234:17 263:17,18 264:12,16 265:22,23 281:2 282:16 291:10,12,15 291:20,23,24 292:2,4,5,6,8 292:11,12,13 292:15,16,19 293:9,12,15,17 293:21,24 299:17 308:15 308:15 319:23 328:3,6 329:25 330:14,17,21 330:22,25 331:2,2,6,9,13 331:17 336:7 336:19 337:1,8 338:4,5,23 339:1,12 344:11 352:14
**newly** 141:15 176:9 177:3 178:5,14 179:3 179:6,19 180:2 180:5 183:5,6 183:9 195:21 203:10 226:5 291:10,21,24 292:3,4,6,12 293:17 295:11 297:23 298:1,9
**nice** 286:18
**nick** 5:12 7:13
**nickel** 231:4,20 231:21 234:4

**nie** 32:15
**nigeria** 136:24
**night** 288:6 289:18
**nine** 34:4 49:23
**nobody's** 97:22 193:1
**noise** 59:17
**nomur** 275:20 275:24
**non** 165:18
**nope** 166:23
**normal** 269:21 319:25 346:12
**normally** 260:15 262:23
**norman** 32:14
**north** 4:20
**northwest** 3:7 277:20 279:6,9
**nose** 254:23
**notarize** 349:10 349:11,15
**notarized** 213:21 328:11 329:19 347:15 350:3 354:13 354:15
**notary** 213:20 349:10,14 370:18
**notary's** 349:7
**note** 133:6 371:10
**noted** 7:18
**notes** 92:7 196:14
**nothing's** 142:24
**notice** 45:3 284:7 352:3,9
**noticed** 13:18 48:9 315:9
**notification** 274:14
**notified** 227:23
**notify** 44:13
**november** 128:4
**nrec** 22:2,3,12
**nuances** 245:18
**number** 7:5,10 41:13 42:10 60:7 122:8 156:2 180:6 210:17 212:17 212:24 213:16 213:17 215:8,9 215:9,12,15,17 223:17 232:6 238:10 255:15 262:21 267:24 284:21 285:3,3 285:6,17 312:17,24 313:3 327:22 332:11 344:18 350:12
**numbers** 23:6 147:1,3 149:8 166:24 240:1 254:10 266:20 319:11
**nvidia** 217:16

**o**

**o** 7:1 24:9 166:15 257:19 257:20,20 275:20
**o'connell** 16:24
**oath** 191:8 219:11 253:1 258:6 322:2 357:16
**object** 334:22 342:1 367:3,7
**objection** 14:2 14:16 15:18 35:16,21 36:8 53:21 55:1 61:13 73:13 87:25 92:1 101:19 102:8 102:19 103:20 104:7 108:21 110:11 112:8 113:4 115:12 117:5,23 118:15,19 144:3,20,25 146:3 147:9 148:2 153:6,9 153:12 175:12 189:15 193:15 201:16 205:10 218:10,17 224:16 235:21 238:12 287:13 295:5,24 296:20 303:15 305:17 310:7 318:23 325:15 330:8 335:20 335:22,24 337:3,5 338:6 339:3,14 341:9 342:14 343:24 346:3 350:23 353:7,17 357:10,19,23 364:5 366:8 367:23
**objections** 243:25 335:13 337:25 343:5 343:13
**obligation** 211:11,17
**obligations** 136:3,3 176:2 283:17,22
**obtain** 100:6,15 100:19 101:15 132:21 133:3 201:9 236:13

253:22
**obtaining** 99:23 100:1
**obvious** 54:9 199:13 302:18
**obviously** 77:2 120:1
**occasions** 134:11
**occupation** 65:19
**occur** 363:4
**occurring** 364:7
**october** 66:16 283:19
**odds** 45:16
**oem** 182:12
**offer** 32:16 101:2 332:5,7
**offered** 27:13 184:23 203:3 329:4
**offers** 25:16 331:12,16
**offhand** 193:1 252:10 299:25 317:13 320:8
**office** 17:20 222:15 280:21 368:9,12
**officer** 370:1,2
**officers** 10:16
**offices** 7:11 197:6
**official** 134:7 163:3
**officially** 60:5 107:22 117:2
**officials** 160:13 160:20
**oh** 17:4,9 18:25 21:3 32:2 35:22 38:23 42:7 78:15 96:17 97:10 131:17 152:2 160:15 184:3 214:11 250:10 254:14 271:11 281:13 317:7 345:12 358:12 359:18
**ohio** 331:4
**oil** 38:13 145:11 170:20 186:3 188:13 188:21,25 189:8 265:5,16 266:4 276:11 276:16
**okay** 9:18,21 9:23 10:15 12:1,6,10,15 13:18,22 15:5 15:11,24 16:2 16:19 17:5,12 17:22 18:1,7 18:15,17 19:6 23:18 26:16,24 29:12 33:22 36:14 38:7 41:24 42:25 44:4,8,23 45:9 46:5,20,24 47:10 48:2,12 48:12,24 50:15 52:6,9 54:8,15 56:9 61:9 63:10 67:17 69:6,12,21 74:15 76:22 79:22 80:11 83:23 84:13 95:12 97:1 98:18 100:24 103:16 104:4 104:15 106:24 108:11,13 109:2 110:22 111:3,17 112:4 114:12 115:16 118:10 120:13 122:24 124:11 124:16 127:4 127:11,14,17 128:9 129:4,8 129:20 131:5 132:20 143:21 144:13 145:1 149:23 153:10 159:21 160:3 163:19,24 168:24 171:19 172:2 173:15 175:16,25 177:9 181:1 183:2,4 184:22 185:19 187:10 193:22 194:1 195:8 199:19 200:7,18,20 201:20 208:13 212:16 213:7 213:10,13 214:12,14,19 215:4,14 227:4 231:19 238:6 240:14 245:22 248:3 249:15 249:17,19 250:24 253:4 253:18 254:7 261:7 263:6 266:12 267:12 267:15 272:4 274:20 275:2 278:12 284:11 285:25 287:14 290:9 293:20 294:1,15 295:14 296:17 298:25 301:13 306:8 310:4 313:24 316:6

316:11 319:2 324:25 325:7 331:20,23 333:3,19 334:12 339:7 340:2 342:21 344:6,9,16 345:19 346:17 347:4 348:10 350:5,10 352:12,22 355:4 356:14 358:14 359:6,9 361:6 366:2,11 368:13
**old** 13:16 14:5 14:6 15:4,9 16:7 41:8 151:12 167:10 175:2 176:21 176:22 177:2 178:25 181:22 203:13 292:19 292:21,22,22 292:23,23 293:2,5,10 294:7,9,10,16 294:22 295:3,7 295:13,22 296:1,12,14 297:15 298:6 330:25 334:24
**older** 46:15,16
**ollie** 78:13 79:18
**once** 62:22 121:17 189:5 273:19 280:17 280:18,19
**ones** 75:24 95:4 136:4 149:9 267:18 308:15 308:15 349:12
**ongoing** 107:18 121:18 320:17
**online** 81:5,6 260:17 323:18
**open** 40:5 102:15 127:23 366:25
**opened** 21:8,10 22:10 24:13 26:8 28:18 29:9 38:10 40:14 227:16 227:17 347:23
**operate** 50:5 51:11 52:21 60:4 187:15,16 187:19 188:13 188:20 296:9
**operated** 50:11 51:4,12 58:12 61:23
**operates** 277:12 278:3,9
**operating** 181:15 187:23 189:18,21 278:4 298:3 319:5
**operation** 21:15 22:1 32:20 187:2 223:1
**operational** 189:14
**operations** 33:7 57:22 60:23 63:20 84:19,20 143:25 144:19 189:19 252:15 304:2 320:3,7 320:17
**opinions** 113:23
**opportunities** 71:8 102:15
**opportunity** 97:6 272:2 321:16
**opposed** 189:1
**oral** 223:5
**orange** 3:15
**order** 6:15 31:8 37:18 83:2 90:12 94:25 102:5 105:21 107:21 145:18 145:19 150:19 177:16 217:8 241:3 253:12 262:11 273:8 293:2 304:3 324:5 327:4 349:11 367:22 368:17,21
**ordered** 284:3
**ordering** 371:15
**orders** 136:5 262:7,10 300:5 300:10 301:4 301:17
**ordinary** 306:4
**organizational** 260:11
**organized** 92:14
**original** 123:11 183:12 331:5
**originally** 89:21 99:21 107:6 112:16 149:25 180:14 188:1 198:10 230:8,8 231:7 231:18 232:4 233:17 235:2 263:22,23 272:16 288:11 293:1
**orlando** 3:16

**outcome** 370:15
**outfit** 264:21
**outfitted** 234:13
**outlined** 135:24 207:13
**outlines** 239:22
**outlining** 204:21 205:25
**outright** 153:16
**outside** 28:6 62:9 79:20 106:17 107:15 137:12 181:25 227:19,22 228:6 280:21 336:23,25 338:5 339:2
**overhaul** 182:1 319:4 320:19
**overhauls** 181:16 185:3
**overhead** 237:9
**overseas** 45:18
**overwhelmin...** 156:22
**owe** 246:25 247:3,7 251:19
**owed** 25:1 34:9 34:25 139:13 139:22 242:4 277:18
**owes** 247:11
**owing** 171:24 172:1,11
**owl** 281:14,23 282:14 360:23 360:25
**own** 24:13,25 25:18 28:24 34:6 35:3 37:7 50:5 51:11 52:17,18 57:7 57:7 70:5 78:5 78:6,21 80:12 80:17,18 81:3 82:7 113:5,12 120:9 145:2,2 153:20 175:25 195:16 205:19 217:25 218:24 248:11,12 260:4 270:3 283:20 316:18 316:19 318:3,7 318:11,20 330:22,23 334:5,7
**owned** 21:15 24:5 27:11 29:6 30:21 50:25 51:3,12 61:23 120:17 126:4,6 130:3 130:4,9 230:7 232:10,10,16 233:25 238:4 242:3 245:24 268:18 272:20 273:16 278:23 279:5,9,10,19
**owner** 24:5 28:24 32:7,14 37:11 41:11 55:4,11,14 126:10 237:21 259:25
**owners** 10:16 169:6
**ownership** 55:14 56:2 57:20 130:8 132:5,6 168:20 169:7,10 237:23,24 279:23
**owns** 241:11 260:11 269:2 270:4 271:2 276:21 277:7 277:11,14,20 278:7 281:25 316:17,24 317:23

**p**

**p** 3:1,1,13 4:1,1 5:1,1 7:1
**p.a.** 2:5 3:6,14 249:17,25 250:2
**p.m.** 122:9 155:24 156:3 223:18 284:19 355:4,7 356:12 368:15 369:7
**pacific** 354:2
**package** 22:25 179:19 183:9 297:23 350:9 353:20
**packaged** 23:6 30:4 141:15 176:9 177:4 178:5,15,18 179:3,6 180:2 180:5,14 183:5 183:6 195:20 195:21 202:24 203:3,10,10 226:5 291:10 291:21,24 292:3,4,6,12 293:17 295:11 298:1,9 299:1 299:5
**packages** 318:7
**packaging** 30:18
**packing** 38:12
**page** 6:3,7 13:10 51:17 127:3,20,25 169:5 213:14

286:2 345:7,14 345:20 356:7 358:6 372:4,7 372:10,13,16
**pages** 312:23
**paid** 13:24 14:12,15 41:9 43:4 49:25 56:8 58:2,5,8,9 58:10,17,22 59:9,11,15 66:12 69:15 70:18,19,21 71:4 73:6 81:18 84:1 98:7 101:17 102:6,9,10,16 102:22 103:1,5 103:15,18,23 105:15,20 106:13 139:1 139:19 140:8 145:9 151:20 165:7 166:6,6 173:2,13 197:7 197:25 199:25 201:5 230:10 230:21,22 234:23 237:11 237:20 239:21 239:22,23 241:6 264:24 265:15 266:14 266:15 267:7 267:25 268:9 269:20 275:15 275:16,16 276:17,18,25 283:25 301:14 301:19 302:14 302:23,25 306:14,15 309:19,21 340:24 341:6 341:20,25 343:23
**paint** 175:5 268:1
**painted** 184:15 184:17
**painting** 185:16 186:23 267:19
**paints** 185:12
**pan** 31:11,12
**panels** 318:6
**pans** 182:24 295:17 331:3
**paperwork** 112:6 133:7 366:2
**paragraph** 316:8 319:2 326:17
**paragraphs** 344:12
**parallel** 44:23
**parkway** 62:21 62:25 77:13 318:17
**part** 38:2,5 59:10,14 63:7 102:17 117:10 120:16 129:3 142:18 144:1 157:21 185:12 218:14 241:4 257:11 274:23 275:4 278:20 283:10 303:4,4 320:18 328:16 330:10 367:24
**partially** 209:2 227:2,3
**participate** 101:3 104:16
**particular** 108:16 141:17
**parties** 81:24 82:6,10,17 100:1 124:10 126:19 272:1 370:11,14 371:15
**partner** 24:6 25:4 27:4,7 28:15 32:11,25 35:5 84:13 166:18,18 168:1 237:1
**partnered** 30:17 49:12
**partnering** 331:7
**partners** 28:4 52:17 61:5 130:7 168:19
**parts** 31:23 138:24 179:7,8 180:7,8,17 184:7,12 185:11 188:19 209:2 250:16 267:6,6,9 301:20 316:13 319:3,3,16,16 320:13,14,15 320:17,25 321:14 326:18 327:9
**party** 18:1 202:2 259:25
**pass** 46:25 340:14,22 341:5,6,20,24 343:22
**passed** 46:15 77:25 79:1 80:7
**passing** 47:5 48:4 340:23
**past** 11:14,20 18:21 76:15 81:14 82:5,25

83:11 84:5 144:5,6,6 157:25 158:8 161:18 174:14 180:23 257:3 326:12 362:5
**paused** 193:11
**pawn** 82:19 83:8 84:6,7,8
**pay** 24:25 25:2 25:16 33:5 34:14 39:5 42:22 43:9 44:20 49:16 51:16,18 53:5 56:5 67:1 70:12 75:20 103:8 105:25 106:6,10 165:2 165:21 169:13 171:22 172:16 172:19 173:6 190:15 191:12 191:24 192:13 193:13 194:8 194:12,17 195:1,3,10,25 198:18,20 199:14,25 200:3 203:17 204:4,5 214:20 218:8,15 234:15 237:12 241:7 249:7,7 251:1,6,10 269:20 272:8 274:5 280:14 284:3,6 302:14 303:3
**payable** 34:25 39:20 275:14
**paying** 39:3,12 39:13,16 41:17 53:13 70:14 71:13 123:19 162:16 190:6 217:5 218:7 239:3
**payment** 98:10 98:12 102:6 104:16 105:7 105:13 174:4 174:10 197:1 198:16 199:25 235:3 263:25 264:1 300:15
**payments** 42:11 73:22 263:25 268:21 283:11,15,24 366:6
**payne** 28:6,7,9
**payroll** 254:17 254:19 255:2 255:12 256:2 256:13,22 257:7
**pays** 210:1
**pdfs** 313:2
**peaking** 323:20
**pedro** 4:8
**penalties** 219:17 372:20
**pending** 9:11 75:2,18 76:11 155:15,18
**people** 13:8 18:14 27:15 83:4 93:4 111:22 113:12 116:18 142:15 144:9 153:14 157:2 210:7,8 213:11 217:15 246:15 255:9 255:12 258:14 300:22 320:15 325:21 333:16 335:3 336:3 348:8,15 351:3
**percent** 23:24 25:16 27:22 28:24,25 29:6 32:6 33:6 37:10 52:20 83:8 104:4,8 104:17 106:1 127:10 168:17 169:12 193:20 196:8,9,15,16 196:21,22 197:8,10 198:18,20 199:4,6,11,18 199:21 200:9 200:10 201:7 203:17 204:3 210:18,21 236:20 243:1 250:19 305:2,5 305:7,8,10,13 305:15,21 306:6,11,25 307:4 308:18 309:24 316:23 318:22,25 319:18 323:14 361:19
**percentage** 105:7,15 168:19
**perfect** 326:6,7
**perfectly** 66:8 106:5 174:18 176:13 191:1 246:14 253:8 318:10
**perform** 102:7 105:20 106:12 185:13
**performance** 99:23 100:14 100:15,20 101:10,15 125:25 165:18

238:10
**performed** 135:5 136:18 239:2
**period** 44:23 45:11 51:7,9 84:3,22 85:4 97:25 112:20 185:14 217:12 233:3 259:3
**perjury** 372:20
**permanent** 326:18 327:2
**permanently** 112:21
**person** 18:14 87:16 90:1 112:13 118:11 119:22 260:20 260:24 274:23 325:10 365:15
**personable** 113:14
**personal** 26:24 57:4,18,18 59:1 82:20,23 83:7,16,19,25 84:4 259:5,11 309:14 350:7 358:11,11
**personally** 9:7 9:9 58:18 62:14 75:15,17 75:23 76:1,3 76:25 83:13,18 86:20 91:24 94:15,22 95:2 95:9,14,17,22 96:7,11 97:5 99:14 107:5 111:25 125:5,8 132:7 163:20 247:3,8 275:10
**personnel** 62:1 157:23 158:8 187:16 227:11 227:12 316:15
**persons** 260:20 349:9
**perspective** 12:21,22 13:1 13:6,8,9 91:20 124:12
**peru** 137:5
**petitioned** 25:11
**pg&e** 39:1 345:21 349:22
**ph** 139:5,8 146:21 166:16 166:16,17 333:19 361:23
**phone** 86:20,23 87:5,7,8,10,17 87:19,23 88:7 89:10 119:13 166:24 167:16 191:16 285:3,3 285:6,13,16 301:6 350:7 353:24
**phones** 86:10
**photographed** 228:12
**phyllis** 46:14
**physical** 134:5
**physically** 130:19 133:8 133:25 202:18
**pick** 274:1,1
**piece** 202:10 283:20
**pieces** 80:12 175:21 204:1
**piping** 200:25
**pissed** 153:18 153:22
**pistons** 186:12
**placards** 271:6
**place** 45:15 159:17 228:7 274:18 277:2
**placed** 284:21 312:22
**places** 65:6 119:16 299:2
**plaintiff** 1:6 3:2 9:3
**plaintiffs** 7:6
**plan** 105:16 188:1 297:25 307:10 336:10
**planned** 264:10 305:20 306:24 307:20 326:24 327:1
**planning** 306:19,21
**plans** 112:20 183:14 211:12
**plant** 23:22 31:22 41:8 99:3 158:7,15 177:6,7 187:20 189:17 192:5 195:12,13 196:5,22 197:18,23 198:2,16 199:12 200:21 200:23 201:13 202:22,23 204:15 205:8 206:3,15 207:16 208:2,3 214:25 217:2 219:15,25 221:6,16 236:18 237:9 240:7 288:24 294:6 328:2,6 331:8
**plants** 23:7 30:3 98:5 176:5,6,17 177:14,17,22

177:24 180:1,2 184:7 187:6 188:6 189:9,11 189:22 195:2,5 195:11,12,18 195:18,21,25 197:13 203:11 203:23 210:19 210:24 211:1,7 211:19 212:13 225:8,10 238:9 327:5
**platform** 81:6
**platinum** 40:6 40:9,11
**please** 7:19,21 14:13 69:8 72:16,16 97:7 114:13 127:23 152:15 153:3 154:11 166:14 174:5 193:10 209:23 220:9 224:19 243:19 243:20,24 287:24 294:25 300:6 337:12 337:14,16 343:16,19 368:23 371:12
**pleased** 336:22
**plenty** 27:19
**plus** 78:24 104:12 105:16 202:14 228:20
**pocket** 219:21 307:15
**point** 34:1,18 52:16,19 54:1 54:15 89:3 91:1 98:16 99:13 108:15 108:16,17 111:17 112:25 113:11 120:8 134:23 136:10 145:13 159:10 159:22 174:1,6 190:13,19 191:5 196:10 198:9 204:21 210:13 211:21 212:5,10 235:17 241:1 243:15,21 245:2 250:24 253:13 271:24 272:4,6 274:22 286:20 288:2 289:9 309:6 310:12 311:17 311:23 312:4 314:5,17 324:6 334:22,23 347:18 350:3 362:8 363:16 363:25 366:5 366:25
**pointless** 70:10
**points** 193:3
**police** 25:4
**policy** 32:19
**political** 32:15 218:5
**polk** 77:5,7
**pompano** 23:4 24:8 26:19 27:25 29:15
**poor** 27:20
**port** 171:7 228:8
**portion** 102:10 103:3 106:10 123:6 198:1 237:14 303:2
**portions** 71:11 237:12
**position** 174:20 174:23
**possession** 320:25 323:22 324:10
**possible** 213:10 213:11
**post** 256:19
**posted** 345:6
**posts** 256:17
**potentially** 35:13 76:14 258:24 325:20
**power** 1:10,10 4:3,3 21:8 22:2 22:4,9,11,12 23:7,13,22 24:7,14,17,18 24:19 30:3 31:13 32:25 41:8 42:5 49:1 52:3 54:12,13 54:14,18,21 55:3,5,7,15,21 56:6,20,21,25 57:21,22 58:23 58:23 59:23 84:14,16,18 98:5 108:3 148:10 149:4 150:3 158:7,14 164:19,19,21 164:22,24,24 165:3 167:6,20 168:8,11 169:23 170:12 170:18 171:4 171:12,23 172:17,20 173:9 175:23 176:5,6,17 177:6,7,13,16 177:17,19,20 177:22,24 179:3 180:1,2 180:2 181:23 184:7 185:24 186:1,10,25 187:6,6,20

188:5,6,25
189:9,11,17,21
192:5 194:19
195:2,5,5,10,12
195:13,15,17
195:18,21,25
196:5,6,21
197:13,18,23
198:2 199:12
201:9,10,13,13
202:7,10,22,23
203:4,10,23
204:9,14 205:8
205:8 206:3,3
206:14,15
207:15,15
210:19,24
211:1,7,12,18
212:13 214:25
214:25 217:2
217:14 219:2
219:13,15,23
219:25 221:5,6
221:16,16
225:6,8,10,12
227:20 228:5
229:1 230:18
231:1,2,10,13
231:16 232:19
232:22 233:6,8
233:10,15,23
234:7 235:9,11
235:12,16
236:14,16,18
237:10 238:9
240:7 250:4
263:24 264:4
288:24 294:6
295:2 297:19
298:11,13,23
299:22 300:8
301:9,20 302:9
302:15 327:5
331:10
**powerpoint**
161:20,24
205:24 206:10
207:11 221:2
306:22
**powerteam**
52:6,12,21,21
53:1 54:17,24
85:10 164:3
167:8,9,19,19
167:25 168:6,7
170:9 172:16
172:17,19,20
173:4,7,10
**pr** 6:15
**practical**
106:16 108:23
**practice** 287:3
306:4 328:24
**prairie** 62:20
62:24 63:2,4
63:14 77:13,17
161:8 225:21
270:12 277:7
278:24 318:16
**pratt** 119:18
**predecessor**
158:9 159:5
**predecessors**
54:22
**predicated**
145:17
**predictive**
186:16
**prelude** 186:19
**prepackaged**
195:15
**prepare** 112:5
113:1 204:21
211:21
**prepared** 70:2
70:2 96:20
133:23 208:5
208:16 212:7
221:21,23
239:7
**preparing** 96:5
96:9,13 208:25
209:4,7 314:5
**prepping** 32:12
**prerogative**
304:19
**presence**
112:21
**present** 5:11
65:18,25 66:22
67:7,14 68:25
69:15 76:4,5
85:15 91:13
93:1 94:9
228:13 349:14
**presentation**
161:20,24
162:18,24
190:4,11
191:22 192:10
193:7 206:10
207:12
**presentations**
196:19 198:25
205:5,25 221:2
239:8 306:22
**presented**
107:10 134:19
134:20 206:5,8
237:19 240:5
**presently** 76:16
**preserve** 87:21
334:21 335:9
335:11,20
**preserving**
88:12
**president** 19:20
32:24 84:20,20
85:15,17
119:18 149:19
**pressure** 30:6
**presumably**
269:1
**preto** 137:1,1
**pretty** 214:1,4
259:3 277:9

366:18
**prevent** 304:15
**preventative** 186:16
**prevented** 15:22
**previous** 9:18 51:22 142:23 158:12 159:4
**previously** 7:18 66:18 159:21 174:8 180:20 278:23 306:20 358:24
**price** 53:6 57:24 63:13 69:13 71:12 103:19 104:9 104:13 203:16 204:3,8,13 211:7 237:2,4 239:24 240:4,6 264:12,15 273:20 289:3 289:15 307:11
**pricing** 173:20
**primarily** 94:2 161:17 248:4
**primary** 65:19
**principal** 126:12 166:11 229:13
**principles** 260:16
**printout** 357:4
**prior** 26:2 47:5 48:4 84:22 87:16,23 102:17,23 111:19 114:17 115:10,21 116:4,9 118:12 118:23,25 120:1 121:8 132:12 134:14 134:23 135:8 135:20 142:13 143:9,24 144:1 144:17,19 145:14,25 146:7,11 147:12,13,24 148:7,12,18 149:2 150:1,20 157:18,19 158:21 159:18 159:23 160:12 160:15,17,21 161:12 162:6 163:5,8 164:1 164:1 251:24 322:25 361:20 362:14 363:9 363:25 364:20 365:7 370:5
**private** 114:11 116:2
**privilege** 117:8 117:25
**privileged** 88:2 117:25
**probably** 17:4 22:16 30:24 56:14 83:15 86:12 93:16,19 96:25 119:12 129:2 135:16 140:25 142:1 150:17 156:16 161:22 173:1 191:17 217:13 219:9 232:24 247:18 258:10 271:19 284:8 289:5 301:3,6 320:14 329:17 362:21
**problem** 98:2 101:12 153:17 198:7
**problems** 22:24 118:8 120:23 144:13 351:12
**procedure** 371:24,24
**procedures** 32:20
**proceed** 7:20 102:15 103:13 367:7
**proceeding** 369:8
**proceedings** 370:3,4,6,8
**process** 98:20 130:17,19 132:7 133:21 177:3 217:4 272:12 273:24 273:25 351:24 365:15,24
**processes** 272:15,21,22 273:2,13 274:10
**processing** 133:6 365:2 366:2
**procure** 201:9
**produce** 367:2
**produced** 86:2 124:9 213:4 285:20 334:3,4 334:6
**producing** 213:24
**product** 14:7,8 153:25 177:6 299:18
**production** 106:9 202:17 202:20 214:10 217:6,11 252:16 262:23

319:10 366:22
**products** 145:2 325:5
**professional** 20:13 26:25 27:1,3 65:19 115:14 250:1 293:4
**professionally** 83:13
**professor** 32:15
**profit** 104:1,5,9 104:12,14,18 105:16 304:14 304:22 305:16 306:4,12,14,25 308:4 309:12 310:5,6,14,16 310:19,22 311:1,5,15,20 312:1,7
**profits** 104:3 304:21 311:8
**progen** 1:9 4:2 7:7 9:2,5 10:16 12:23 13:7,9 13:10 17:12,16 17:18,20 18:5 36:11 41:23 49:5 50:6 51:9 55:9,10,13,16 55:18,22,25 56:3,5,22 57:1 57:3 60:17 64:16,18 65:4 65:21,24 66:3 66:23 67:6,8 67:14,19,22 68:12,24 69:1 69:2,16,18 72:11 73:4,20 74:4,25 75:8 75:10,15,23,25 76:10,15,19,22 77:3,6 85:14 85:24 86:9,10 88:23 89:9 90:22 93:1,6 93:10 94:12,19 94:21,23 95:1 95:3,8,13,17,20 96:2,4,5,6,9,10 96:12,13,16 97:4 98:4 99:6 99:7,15,15,19 100:23 101:2 101:16,17,20 102:4,14,16,23 103:7,12,23 104:6,12,15,18 107:25 108:8 108:20 109:2,4 109:5,9,10,21 110:4,22 111:6 111:17,18 112:5,25 113:2 113:8,10,25 114:17,23 115:2,7,9,17,20 116:3,5,8,12,23 117:1,13,17,24 118:11,22 119:1,7,23 120:3,3,8 121:8,10,12,14 121:17,19 122:1,19 123:24 125:1,4 125:7,12,18,24 126:16,17,19 127:1,9 128:10 129:17 130:14 130:16,24 131:7,10,21 132:15,21 133:3,12,13,13 133:15,18,20 134:8,13,16,22 134:24,25 135:9,14,19,22 136:3,8,17,17 136:21 137:8,8 137:11,11,21 138:2,9,19 139:2,17,19,25 140:5,8,20 141:1 142:14 142:15,15,23 143:9,10,14,16 143:21,23 144:5,12,16,18 145:8,8,13,15 145:24 146:1,7 146:8,13,15,19 147:1,7,15,25 148:7,8,8,12,18 148:19,21,23 148:25 149:2 149:11,12,19 149:19 150:1 150:14,19 151:3,4,9 157:5,6,9,10,14 158:4,4,13,17 158:20,22,24 159:2,3,4,5,8,9 159:10,13,18 159:22 160:12 160:13,19 161:5,10,15,15 161:25 162:2,2 162:4,4,19,24 162:25 163:4 164:2 168:17 174:22 175:1,7 175:7,8 177:11 177:17,23 179:1 180:1 184:4,6,18 185:11 187:3,5 188:3,11,19 189:5 190:5,13 191:9,10 193:13 194:8 195:24 196:11 198:7 199:1,23

200:10,15 201:9 203:17 203:19 204:20 205:24 206:11 207:11 208:5 208:16 209:25 209:25 210:9 210:13 211:2,3 211:4,10,13,17 211:19,22,25 212:6,6,11 213:2,4 214:21 216:2,5,7,8,21 218:7,14 219:12,21 221:2,7,11 225:6,9,12,16 225:20 227:7,8 227:20 228:9 228:17 230:17 230:19 231:2,3 231:11,14,17 232:19,22 235:11,12,16 235:17 236:9 236:13,23 238:6,18,24 239:8 240:10 241:16 242:4 242:14,22,24 243:9,14 246:1 246:11,15,23 247:8,9,10,15 248:4 249:1,6 250:12,15,25 250:25 251:4,5 251:8,15,16,25 253:13,22 254:3,8,24 255:6,12,17,18 256:13,15,23 257:7 258:15 260:8 261:15 262:5,14 263:2 263:8,19 264:4 265:3,15,17 266:3,9,14,22 267:7,25 268:9 268:22 269:22 269:25 270:3 270:12,24,25 271:9,24 272:7 273:2,13 274:23 276:3,7 277:12 278:3 279:24,24 299:21 300:14 300:15 301:8 301:14,18 302:3,7,12,13 302:25 303:19 303:22 305:16 306:5,12,24 307:11 311:18 311:24 312:5 313:21,21 315:16 316:13 316:17,24 317:3,5,6,12,23 318:3,11,20 319:2,7,8,15 322:14,18,25 325:10,11 326:4,17 327:19 328:21 328:25 329:18 329:19,19,20 329:23,25 330:14,17 331:12,16 332:8 346:1,8 346:14,20 351:1,16,21,25 352:2,7 353:2 356:4 359:10 359:17,23 360:20,22 361:3,8,20,21 361:22 362:13 363:8,15,17,24 364:19 365:7 365:21 366:4 371:4 372:1

**progen's** 126:1 133:7 134:14 142:9,18 144:1 145:1 146:13 150:12 157:18 161:11 174:20 175:21 176:2 211:6 216:24 225:24 226:3 226:21 227:16 237:1 255:23 276:3 277:25 278:20 316:20 331:22 356:1 361:8 365:8 367:23

**progen1.com.** 215:20

**progens** 60:5

**programs** 205:1

**progress** 176:25 183:21

**progression** 112:18 364:10

**project** 38:25 39:2 40:17 41:1,16 42:10 43:2,8,18,20 44:25 45:7 49:11,13 90:20 92:22 93:7,10 93:19 97:14,15 97:16,17,18,24 97:24 98:4,6 98:12,14,15,18 98:22,23,23 99:10 101:7,7 101:8,22,24,24 103:3,6 104:9 104:23,25 105:2,20 106:4 106:12 107:8,9

107:12,14,16 110:18 111:14 112:4,18 120:25,25 121:5,16 123:7 128:15 139:4,7 139:9 146:23 151:10,25 158:6,19 164:7 164:9 165:15 165:16 183:13 190:25 191:5 196:1,20 197:20 198:3 200:1 201:4 204:2 205:17 206:19 207:3,5 207:25 208:4 215:6,24 216:10,17,20 218:23,25 219:1,10 228:24,25 229:5,5,7,11,12 230:9,10,12,14 230:21,23 231:22 232:3 233:19 234:14 234:16,21,23 235:2,6 237:2 237:3,5,6,17 239:2 240:4,22 240:24 241:8,8 241:18,24,25 261:21,22 265:11 270:9 272:10 273:10 273:18 276:19 281:9 288:12 303:20 304:3 304:13,16 306:10,24 307:17,19 308:22 310:3 310:15 311:11 328:21 348:11 348:13 354:18 361:13 363:20 364:8,11

**project's** 101:23

**projects** 30:9 37:16,18 45:16 61:18 64:10 98:25,25 102:2 102:24,25 103:5 105:5 106:20 111:10 112:19 118:4 123:11 126:22 134:20 142:13 143:13 144:6 149:8,15 157:17,19,25 158:13 159:4 176:8 202:18 204:19 205:20 208:1 216:25 217:9 228:21 229:10 230:16 240:25 241:17 245:8 251:23 254:15 264:10 265:4 268:16 270:11 271:12 278:17 307:1 309:20 311:13 362:5 364:13 364:17

**promised** 49:16 51:17

**promote** 256:19

**promoting** 114:6,11,17 142:22

**prompted** 115:6

**pronounce** 250:6,7

**proof** 352:1 354:17 359:10

**proper** 157:9

**properly** 187:7 188:7 203:22

**properties** 63:1 78:4,21 269:25 270:3,16

**property** 62:16 62:18 63:12,14 63:16 77:13,15 77:18 78:2,17 78:21 79:1,8 80:12,17 83:25 280:1 281:2,12 282:11 303:19

**proposal** 95:1 96:15 101:14

**proposals** 93:16 95:6,8 95:13,16,20,23 96:1,5,10,20 134:20

**propose** 105:4 208:4

**proposed** 94:24 159:3 208:1 217:4

**proposing** 99:10,15 107:7 217:10

**prosecute** 218:4

**prospects** 112:19

**protection** 201:1

**protective** 367:22

**proud** 158:16

**prove** 13:6 220:8 350:25 351:1

**proved** 25:8 290:2 306:3 308:14

**provenance** 362:17
**provide** 31:23 65:20 86:23 93:18 97:13 125:22 138:24 142:4 175:19 177:17,18,24 178:14 180:1 184:6 269:10 272:13 273:12 276:10 290:22 291:1 294:21 295:1,21 296:17,22 297:2 298:1 325:6 347:21
**provided** 82:6 82:9 83:12,19 86:20 87:13 93:15 115:1 142:10 162:11 222:7 236:2 245:25 247:15 247:21 250:17 268:24 270:23 270:25 271:8 273:1,3 297:4 299:21 300:23 301:9,15,19 314:8 321:2 326:4 346:1,8 346:18,21,25 347:1,7 350:20 351:7 352:16 354:15 358:22
**provider** 316:13
**providing** 23:14 65:7 111:20 117:13 125:22,25 314:6 321:6 353:4
**provision** 6:8,9 214:2,5
**provoke** 152:10 153:2 155:20
**provoked** 152:12,17 155:19
**public** 32:13,22 33:8,12,13 85:24 218:2,4 370:18
**publicity** 217:20
**pulecio** 3:3 6:4 8:9 14:10,17 15:23 35:17 36:1,13 47:11 49:3 53:10 54:3 55:2 61:19 73:1,17 74:13,23 81:1 82:16 88:5 92:4 102:3,13 102:21 103:22 104:11 109:1 110:14 112:23 113:6 115:15 117:11 118:5 118:16,21 122:4,10 124:25 133:1 144:14,22 145:5 146:6 147:11 148:4 152:13,18,21 152:24 153:5 153:10 154:15 154:19,25 155:4,17 156:10 175:13 189:20 193:21 201:19 205:22 212:22 214:6 218:13,19 223:13,19 224:19,22 236:1 238:16 243:24 244:3 284:11,20,24 287:16 291:3,4 295:18 296:5 297:1 303:21 306:1 310:9 312:12,15,21 319:1 325:19 330:12,24 332:9,15,22 333:6 334:21 335:1,9,11,13 335:19,23 336:1 337:9,12 337:14,16,20 337:23 338:1,9 338:12 339:6 339:17 341:22 342:6,9,13,22 343:3,5,9,12,20 344:2,22 346:4 350:8,11,18 351:5 353:8,19 355:3,8,11,17 355:19 357:15 357:20 358:5 360:5,8,12 364:14 366:11 366:16,19 368:19
**puleciooboekd** 3:9
**pulled** 222:25
**pulling** 182:24
**pump** 186:14 326:13
**pumping** 217:21
**pumps** 186:2,3 186:19,19,20 186:24 188:25
**purchase** 36:22 53:6 57:24 63:13 69:13 71:12 95:2

200:11,15 201:11,21 203:19,21 214:24 261:23 262:7,10,11 264:15 265:16 280:9 281:2 298:22 300:5 300:10 301:4 301:17
**purchased** 36:21,25 38:3 79:24 80:4 137:21 139:17 201:22 203:1 231:2 235:13 262:15 266:3 279:11 280:1 281:11 282:11 297:21 298:14 298:19
**purchasing** 79:17 252:17 275:14 301:25
**purely** 120:9
**purpose** 155:20 247:23
**purposes** 122:13 299:10 327:21
**pursuant** 81:13
**pursued** 37:23
**pushed** 329:18
**pushing** 297:17
**put** 32:16,17,22 32:22 48:25 83:16,24 91:20 98:3 112:10 180:16 181:4 181:23 185:6 186:1 189:6,25 201:3 208:2,23 217:24 266:5 277:1,2 279:2 279:3 293:18 313:16 315:2 328:15 331:10 333:7 336:9 338:18 353:21
**putnam** 249:17 249:19,21 250:2
**putting** 91:23 125:23 199:8 278:16 337:10 337:11

**q**

**qualified** 56:17 107:20 109:4 109:10,21 110:4 185:23 316:15 370:7
**qualify** 32:21 107:22 108:19 112:12 185:19 185:22 186:3,9
**quality** 32:19 154:1
**question** 14:13 35:19 59:18 72:16,17,23 90:10 91:10 95:15 109:8 113:24 120:5 120:11 127:6 132:25 133:10 137:9 139:16 144:15 145:22 147:4,6 148:11 150:9 152:1 154:11 155:15 155:17 160:1 168:3 173:12 192:6,8,22,24 192:25 198:22 200:6 205:3 210:20 218:12 224:12 240:8 246:13 295:1 300:6 309:4 314:14 366:1 366:10
**questioning** 155:7,10 324:20,21 338:13,15
**questions** 12:19 17:25 115:19 115:20 214:17 245:23 293:8 342:5
**quevedo** 31:21 99:2 174:22 176:1 194:3,5 194:7 195:13 201:23 202:24 204:16 208:18 219:14,24 225:25 226:1 242:5,14,24 243:9 246:1,12 246:23 247:6 247:16 249:13 250:17 253:23 258:25 259:7 259:16 261:15 262:16,21 263:9 265:10 265:19 266:10 267:9 268:10 268:15 269:11 271:10,12 288:4,14,20,25 289:8,12 290:15 291:8,9 291:20 294:4 295:2,23 297:19 298:12 298:23 299:18 299:23 300:9 300:25 301:10 301:21 302:5 302:10,16 304:1,5,23

311:20 312:1,7 316:10 328:2 329:23 360:3 364:3,20 365:8
**quick** 106:3,4 355:1
**quickly** 202:14
**quit** 24:20 26:7 32:10 251:20 284:14
**quite** 343:7
**quote** 105:6
**quoted** 217:14
**quotes** 273:7
**quoting** 99:10

**r**

**r** 3:1 4:1 5:1 7:1 114:14,15 126:14 166:15 209:24 257:19 257:20 275:20 372:3,3
**rail** 30:7
**railway** 21:19 21:20,23 22:6
**raise** 7:21 27:16 28:4 29:15
**raised** 166:19
**ran** 55:8 61:10 272:15,21 274:10
**rapid** 176:8
**rascals** 351:4
**rather** 176:21
**ray** 241:13,13 242:9
**rayk** 268:17,21
**raymond** 242:3 242:12,19,21 242:23 243:8 246:10,21 247:3,11,12 268:18,23
**reach** 33:23 88:24 89:7,8 115:7
**reached** 88:23 88:25 89:14,17 90:1 139:14
**reaction** 152:23 153:2
**reactions** 153:4
**read** 123:4 296:23 316:12 328:16 333:13 333:22 334:10 334:18,19 340:25 367:10 368:1 371:8 372:20
**reading** 315:7
**reads** 368:5
**ready** 33:2 64:3 105:18 122:23 189:18 227:23 228:7 241:3 283:4 310:2 336:5 340:22 352:11
**real** 26:17 34:13,24 36:11 62:15,18 63:1 63:14 65:13 77:10,15,22 78:4,20 80:12 80:17 106:11 111:3,11,14 112:1 127:14 195:23 220:21 222:11,17 279:24 326:16 348:7 351:3 353:1 358:25 361:17,17
**realistically** 101:21
**reality** 106:16 297:16
**realize** 197:8
**realized** 120:3 190:25 197:12 197:15
**realizes** 120:8
**really** 19:14 22:18 37:4 60:8 104:20,21 106:12 111:9 111:13,21 115:25 131:1 140:14 146:16 149:9 153:22 184:3 185:2 193:17 203:12 257:1,5,14 259:18 300:10 307:2 308:5,8 335:16 339:10 346:12 348:8 350:15 351:13 363:1
**realms** 304:10
**rear** 31:14
**reason** 14:22 24:22 27:3 34:10 42:1,8 43:8,12 50:22 57:14 97:15 107:23 131:25 135:1,2 182:3 183:19 197:7,9 222:6 246:4 272:2 357:6 363:5,11 364:9 365:4,11 371:10 372:6,9 372:12,15,18
**reasonable** 371:17
**reasons** 26:24 26:25 27:1 42:25 143:5
**rebuild** 175:23

**rebuilder** 20:23
**rebuilt** 20:25 31:19 202:1 203:2 299:8
**recall** 8:19,24 9:20 11:11 12:3 35:10,13 35:19,22,23 36:23,24 38:9 44:14 45:4,11 45:12,13 46:4 47:1,4,16,25 48:1,10,24 49:4 50:7,10 50:12,13,13,16 50:18 52:13,15 52:25 53:2 60:2,6,8,24 61:3,4 63:3 75:12,16,22,24 76:3,8,10,14,15 76:17,17 77:19 78:16 85:7,12 87:12,20,20 88:16,18,20 89:12 90:9,10 90:15,17,17 91:4,10,11,14 92:17,18 93:4 94:7,8,9 116:10,13 118:11 119:4 119:25 121:11 124:2 125:9,10 126:23 131:9 131:12 132:18 136:7,9 137:19 137:25 138:9 138:11,20 140:10,12,14 140:15,18 141:5,7,8,9 142:3 143:12 143:19 145:7 146:16 147:1 147:17,20,22 149:10 156:15 157:7 159:1 160:4,6,17 162:13 163:10 163:11 164:10 168:4 169:12 170:7,14,15 171:20,22 172:8,9,10,11 172:15,24 173:25 191:21 192:10 193:9 193:22,23,24 209:3,6 210:10 210:12 212:9 212:15 229:15 229:17,21 242:16 249:1 267:23,24 275:9,11 285:8 288:1,10,13,22 289:25 301:8 301:18 304:25 305:1 311:1 314:2 329:6 330:2,4 333:13 336:13
**recalling** 171:16 336:14
**receipt** 371:17
**receive** 42:11 65:4 66:3 145:24 146:1 194:8 245:11 249:19 252:1 253:14 257:15 257:25 269:16
**received** 17:18 56:13 59:14,20 66:5,8,12,19,21 67:21 69:1,9 69:10,17,22 70:3 72:7,13 73:10,20 74:8 74:9 81:12 82:10 95:24 105:22 140:20 146:9 147:15 147:25 168:10 168:11 218:15 219:1,10 221:12 239:6 245:7 252:12 263:7 265:3 268:22,25 269:1 276:2,3 315:5 329:11 359:11 366:23
**receiving** 15:15 145:18 274:23 275:4,25 314:15,18 315:16 361:20 362:14,24 363:9
**recently** 138:24 151:15 280:12 280:13
**recognize** 249:24 315:4 348:14
**recognized** 314:21,21,23
**recollection** 48:22 51:10 91:16 131:14 131:20 341:4 361:18 365:6
**recommend** 25:13
**record** 7:3,18 74:19,21 92:7 122:6,8 153:20 155:21,24,25 156:2 223:15 223:17 245:3 250:5 284:15 284:17 327:21 345:25 355:5,7 366:12 367:12

368:7,11,15 369:5 370:9
**recorded** 7:5 245:16 370:6
**recording** 370:8
**records** 25:9,12 37:4 143:13,18 147:21 150:18 150:18 221:2,9 254:17,19 255:2 263:11 263:13 320:24
**recover** 36:7
**red** 339:16
**reduced** 370:6
**reed** 2:9 7:15 370:2,17
**refer** 286:9,11 286:25 287:5 338:13,14
**reference** 262:18
**referenced** 66:18 159:12 371:6
**references** 262:20
**referencing** 159:16
**referred** 286:7
**referring** 207:22
**refers** 129:24 249:25
**refinery** 170:20
**reflected** 221:9
**reflects** 360:19
**refresh** 48:22 91:15 131:14 131:20 150:12
**refreshed** 12:4
**refunding** 123:16
**refurbishing** 340:9
**refurbishment** 336:23
**refused** 24:23 97:18 99:12 129:22,23 328:17 349:3
**regard** 180:22 371:19
**regarding** 118:12 125:25 205:6 245:23 262:4 273:2 274:9 300:3,7 300:14 306:10
**regions** 59:8,12 59:21,22 252:19 253:6 283:10,25
**register** 335:21
**registered** 50:17 52:15
365:3
**regular** 70:23 191:16
**reiterate** 136:1
**related** 11:3 44:10 125:19 206:3,15 207:15 214:25 219:3,15,25 221:5,16 241:18 256:7 257:6 258:25 259:6 264:13 264:16 370:11
**relating** 173:16 267:13 367:20
**relation** 249:13
**relationship** 67:13 121:3 365:9,21 366:5
**relationships** 160:8
**relative** 370:13
**relatively** 61:15
**relevant** 104:17
**reliable** 320:2,7
**relief** 343:10
**remain** 155:13
**remanufactur...** 141:16 182:8,9 182:15,16 203:2 265:24 291:11,22 292:7,14
293:19
**remanufactur...** 21:1 182:22 292:15
**remember** 8:18 11:23 25:21,22 35:25 44:12,13 45:22,23,23 48:8 49:8,9,10 49:15 50:23 51:14,23 52:9 52:14 83:4 90:9 123:1,13 137:3,6,18,23 138:5,14,15 139:23 145:12 149:9 167:10 170:22 191:25 238:20 260:22 260:23 261:1,3 266:24 276:15 290:17 299:25 301:12,13 342:8 356:13 362:24
**remind** 292:18
**remove** 223:3,7
**rename** 53:19 54:16,17,18 57:6
**rent** 65:13 77:22,23 234:15

**rental** 81:11 361:2
**rented** 234:16
**rep** 114:24,24
**repackaged** 203:9
**repaint** 181:20
**repay** 268:23
**repeat** 77:14 96:8 97:7 120:5 132:24 148:11 174:5 210:20
**rephrase** 200:14
**replace** 295:17
**replaced** 326:14
**replacing** 186:23
**reply** 329:16
**report** 71:14 74:7 81:10
**reported** 2:9 69:21,25 70:1 74:9
**reporter** 7:14 7:19,21 8:6 47:8,10 49:2 53:8 72:20 74:17 80:23 82:14 124:22 152:15 214:3 291:1 312:13 330:18,20 332:16,18,24 333:1 354:22 355:1,14 360:7 360:9 366:13 367:9,13,16,25 368:3,8,13,16 368:20,24 369:4
**reporting** 7:16 71:16
**represent** 85:23 112:14 124:8 134:25 312:24
**representations** 322:15
**representative** 5:13 112:15 114:25 134:7,8 134:13
**represented** 130:2,6 132:12
**representing** 75:8,10 309:3 367:19
**republic** 22:23 22:25 23:10,14 23:15,17 230:10 231:22
**requested** 367:5 370:21
**require** 103:5 336:9
**required** 51:25 53:25 68:19 109:3,20 112:12 150:21 175:23 182:5,7 187:1 197:7 198:16 204:4 273:25 328:12 340:8
**requirement** 88:8 108:2
**requirements** 109:9 110:3,23 111:7,19 132:8 133:8 134:3 178:1 188:10
**requires** 340:11
**requiring** 148:13,19 149:3 150:2 190:20
**research** 109:22,23 260:16
**reserved** 369:6
**reside** 78:24
**resigned** 21:12 22:13 24:9 32:2 33:24 34:3
**resold** 231:23
**resources** 254:2,3,17 284:3
**respect** 119:8 174:21 338:16 338:18
**respectively** 328:3 354:1
**respond** 173:12 173:13 224:21 224:21 293:7 341:18 346:5,7 347:9
**responds** 347:14
**response** 100:4 101:13 223:23
**responsibilities** 123:19 135:4 135:11,23
**responsibility** 156:19 273:4 304:11
**responsible** 96:4,9,13 119:7 208:25 252:16 267:18
**responsibly** 101:21 303:20 304:20 308:7
**rest** 198:3 316:4 329:16
**restart** 156:5
**restrepo** 3:4
**result** 42:12 44:6 53:17

77:16 96:1 100:18 105:17 108:19 111:22 123:10 233:9 236:8,12 272:21 311:20 312:1,7
**results** 192:3
**retain** 218:8
**retained** 272:22
**retaining** 109:23
**retire** 166:1
**retiring** 55:19
**return** 181:11
**returned** 371:16
**returns** 70:1,3 81:16
**revamp** 183:14
**revamping** 72:1
**revenue** 67:10 68:2,5,6,7,8 69:2,9,10,17 73:5 81:10,11 81:14,15,16 216:22,24 217:18
**revenue's** 70:18
**reverted** 294:8
**review** 10:13 10:20,24 11:6 11:23 17:12 108:5,8 134:1 350:19 352:24 370:21 371:7
**reviewed** 10:25 11:5,9,9,10,13 11:15,18 12:3 12:6,12 18:17 313:1 316:2 329:12
**reviewing** 18:21 113:22 351:13
**reviews** 256:20
**rewind** 175:4
**rewrite** 308:23
**rfq** 135:6
**rfqs** 105:6,6 111:10
**rg** 24:5
**ribeirao** 136:25 137:1,1
**rich** 27:20
**right** 7:22 18:2 20:15 26:22 28:14 33:17 35:1 38:7,14 41:20,21,23 43:5,16 44:1 44:15,17 45:15 49:18 50:14,22 52:16 65:11,16 68:18,21 71:8 71:25 72:2 77:5 82:19,20 90:2,6 105:6,7 106:11 124:11 137:3 138:1 147:6 150:7,25 153:22 154:14 154:18 170:15 176:5 179:13 179:14,14 180:10 181:4 183:17 185:25 186:9 187:3 193:24 197:15 199:13 201:22 204:7 206:17 207:6,8 213:2 215:8 217:14 218:6 220:2,5 220:7 241:10 243:11 255:4 261:2 262:20 284:16 290:6 295:14 297:6 298:25 299:14 301:12 305:19 307:23 311:8 311:10 313:4 318:15 320:8 322:23 329:13 334:11,18,22 340:14 341:10 345:4,15 348:19,23 354:25 355:17 356:8 358:12 359:7 360:14 368:14,20,24
**righty** 297:10 332:14
**road** 78:13 79:18 281:14 281:23 282:14 323:18
**roberto** 23:11 23:12 157:14 159:20 161:1 182:14
**roberto's** 25:15
**rods** 186:13
**role** 19:18 68:3 84:18 85:14 254:5 256:15
**room** 155:14 222:16
**round** 53:11,18
**ruin** 349:4
**rule** 371:24,25
**rules** 9:24 371:18
**run** 19:25 31:4 181:24 185:22 186:8 187:9 188:13,25 266:2 356:5
**running** 31:25 52:11 57:12

61:22 118:8 189:7
**rush** 368:18,19

**s**

**s** 1:12 3:1 4:1,4 5:1 6:6 7:1 24:4 29:5 114:14,15 250:5 257:19 257:19,20 317:22,22 372:3
**s.a.** 1:13,15,19 5:2
**sad** 82:12
**salary** 17:18 210:1
**sale** 38:1 59:15 62:19 63:2 66:20 67:3 68:8,24 69:10 70:12 77:12 81:13 84:22 85:20 95:21 97:9 104:9,13 176:3,4 204:3 204:8,13 233:5
**sales** 19:20 89:19 90:19 150:12
**salitral** 31:23 99:2 174:22 176:1 194:3,5 194:7 201:24 202:9,16 203:6 204:15 208:18 219:15,24 225:25 235:6,8 242:5,15,24 243:9 246:1,12 246:23 247:6 247:16 249:13 250:17 253:24 259:1,7,16 261:16 262:16 263:9 267:9 268:11 269:12 271:10 299:19 304:1,5,23 311:20 312:1 312:10 316:10 328:2 329:24 333:17 336:4 364:3,21 365:8
**san** 4:8 20:9,11
**sanctionable** 343:6
**sand** 181:19
**sandy** 209:22
**sat** 265:8
**satisfaction** 168:12
**satisfactory** 102:23
**satisfied** 110:22 138:21 165:10
**saud** 88:15 90:7,14 91:2,6 91:9,13,24 92:8,19 93:22 94:5,11,15,22 95:1,9,12 96:6 96:20 97:5 99:4 100:4 101:13 103:12 107:1,23 112:5 112:25 113:11 114:1 115:2,6 115:10,17,21 116:4,5,8,11 117:18 118:12 118:12,23 119:9 121:9,13 125:8,13,20 126:4 130:9,14 130:23 132:12 132:13,17,20 133:2 134:18 134:23,24 135:8,10,15,20 135:22 136:8 136:16 143:9 145:14,25 146:7,12 160:12 191:18 216:3 272:5,25 273:11 285:1 285:17,20 286:7,15,20 290:12,22 291:19 293:21 312:5 313:1,9 313:15,25 314:5,17,19 315:17 318:18 329:11 330:6 333:11 338:24 344:24 345:18 345:21 347:2 347:14,20,21 348:3 349:20 350:6 351:8,9 351:21 352:4,8 352:18 353:2 353:23 354:11 355:23,25 356:10,18,21 357:1,6,22 359:10,16 363:6,7 364:1 364:22 365:9 366:2 367:21
**saud's** 101:14 119:24 120:14 285:6
**savage** 266:12 266:15 267:1
**saved** 22:24
**savings** 45:19
**saw** 10:8,9 127:22 162:7 179:18 314:20 315:3

**saying** 12:1 15:4 21:14 34:20 65:9 66:17 71:2 81:23 82:4 99:4 107:5 129:15 132:1 132:18 134:6 142:16,21 143:22 144:16 152:1,19 156:15 162:1 183:18 185:13 206:16 220:6,6 246:15 274:12 276:1,2 289:17 296:1 297:15 298:5 324:20 333:20,25 334:4,17,17 336:16,18,25 338:3 362:20
**says** 18:12 127:4 131:4 215:9 238:1 253:11 290:17 291:21 292:14 296:25 318:3 319:2,15,20,23 320:1 326:17 326:21 328:7 328:10,12 333:5 334:11 334:18 335:5,7 340:2 345:17 347:11 356:15 357:5
**sba** 253:15
**sbm** 257:13,15
**schedule** 39:3 97:11 102:7 237:17 367:4
**sciences** 32:15
**scientific** 111:12
**scope** 157:8,12 164:6 173:23
**scott** 90:23,25
**screwed** 40:16 210:7 218:25 247:1
**seating** 277:1
**second** 42:13 43:8 127:3 169:24 170:1 210:11
**sector** 114:11
**securities** 81:3 81:3
**see** 17:24 34:18 42:19 48:12 51:24 57:16 67:4 68:23 71:10 90:20 96:12 103:11 110:18 111:13 122:18 123:20 127:2,19,20,23 128:2,4,5 131:24 139:14 143:13,22 144:11 174:13 184:4 186:22 201:6 212:23 212:24 213:1 213:13 215:8 215:10,14,15 215:19,20 243:15 286:1 290:6,9,10 292:5 304:7 313:2,5,8 315:8 316:22 327:21,24 330:14 333:7 344:23 345:3,5 345:12,15,21 345:23 346:5,7 347:10,11,12 347:16 348:1 349:2 353:20 354:2 355:20 356:10,11,12 356:15 358:6 359:8,9,12,14 359:15 360:13 360:14,16,17
**seek** 366:21
**seeking** 41:1
**seeled** 347:15
**seemed** 113:13 234:2
**seems** 275:12
**seen** 124:2 221:20 238:22 259:9 285:15
**sees** 217:23
**segment** 354:20
**select** 105:5
**selected** 274:11
**self** 202:6
**sell** 31:20,22 49:14 55:22 56:12,16 57:4 57:20 64:1,13 94:21 107:7 140:17 164:20 168:25 231:16 232:15,19,22 233:10,14 269:10 292:9 309:20 320:13 320:19
**seller** 164:19
**selling** 23:1 166:9 171:14 233:16 295:25 296:14
**send** 71:2 95:17 228:17 232:7 236:23 242:8 251:16 274:2,4 284:6 330:6 349:20 353:24 358:2 363:13 366:1

**sending** 39:8 97:3 110:19 251:17,24 290:12 313:10 313:25 345:18 345:21 348:20 349:25 350:6 355:25 356:14 356:21 357:1 357:21 359:10 359:16 360:19 361:8 366:6
**sends** 354:11
**senior** 32:25
**sense** 49:6 100:12 344:15
**sent** 25:4 89:25 95:8,20 96:5 96:10,22 135:14,19 193:8,25 221:7 228:25 230:17 238:6 241:16 241:19 249:6 258:4 262:5 263:2 276:6 303:1,13 315:14,23 328:16 329:9,9 329:10 347:22 347:23 348:3 348:11 349:24 351:17 352:2,7 356:12 358:3 359:11 361:15 362:22 363:17 364:16
**sentence** 15:7 330:13
**separate** 31:11 104:22 175:6,6 203:4 204:19 264:1
**separated** 281:22 282:22 283:2
**separately** 200:1 202:25
**serious** 314:10
**seriously** 244:24
**seriousness** 338:16
**serve** 277:4,5
**servers** 86:10
**service** 6:8,9,15 31:23,24,24 67:10 68:5 180:16 181:4 181:15,24 182:1 183:1 185:20 186:4 187:1 214:2,5 293:18 316:13 326:18 327:5,9 327:10
**services** 65:8 65:20 69:18 170:9 266:16 267:2,15 316:14 321:1 321:14
**set** 21:13,22 22:5 27:13 30:11 31:6,7 31:16 101:12 150:11 201:12 215:23 216:2 216:17 231:1 265:7 297:23 318:7 359:22
**sets** 23:1,7 30:3 30:4,18,19 31:25 38:12 40:25 50:2 93:12 94:12,18 95:2,10,14,18 95:21 96:6,11 97:6,13 99:6 99:14 178:19 179:20 183:20 189:6,12,24 191:11,12 195:22 196:3 199:8 203:8,20 203:22 226:7,8 234:17,20 264:25 266:19 267:16,19,20 268:2 291:7,7 291:20 297:24 297:24 298:2 298:10 299:1,5 300:24 328:1,1 329:1 333:17 336:4 359:19 359:24
**setting** 69:13
**settle** 39:22
**settled** 49:19
**seven** 61:21 354:21 366:13 366:15,19
**several** 11:12 21:1 23:7 38:9 49:25 61:17 64:9 95:4,6,8 95:20 98:25 113:21 137:2 155:8 163:22 169:14 171:8 248:10 252:19 290:12 325:21 340:17
**shane** 19:10,16 19:18 88:17 89:1,8,13,18,23 90:23,25 96:18 137:25 149:18 150:16,23 162:15 227:12 248:18,19,20
**shane's** 256:10
**shape** 180:18 307:16

**share** 18:16
**shareholders** 260:15
**shares** 130:12 168:17
**sheet** 371:11,13
**shinn** 27:8 28:22 33:10 36:15
**ship** 23:16 98:7 102:10,11 103:1 138:2 175:5,8 197:24 198:9,11 227:24 266:23 339:11
**shipment** 102:17,23 103:19,24 172:3 336:10 336:11
**shipped** 15:17 15:19,25 103:9 103:15,25 104:5,10 137:11 171:6 183:21 189:8 189:25 198:19 199:15 204:5 225:15,16 265:9,12,17 266:9 336:6
**shipping** 170:23 249:22 266:13,15,18 267:2
**shocked** 353:1
**sholar** 254:1 284:2
**shop** 21:1 82:19 83:9 84:6,7 183:11 227:12 270:7 278:14 284:9
**short** 49:18 182:22 257:21
**show** 89:23 110:17 131:13 131:18,19 158:7 182:20 192:2 320:25 321:5 322:18 323:22 350:5 355:11 360:5 361:15
**showed** 155:6 157:20 158:15 161:22 162:2 322:21 325:4
**showing** 123:23 126:25 129:14 129:16 155:9 324:10 361:10
**shows** 324:18 331:10 351:15
**shut** 28:2,3 38:20,23,24 40:20 42:8,17 46:3 59:23 60:1 62:1 85:5 183:19
**shuts** 42:20 43:1 45:9 49:5 50:6 51:8 52:11,20
**shutting** 41:17
**siblings** 46:11 46:18
**sic** 42:1 96:4 129:25 130:1 132:10 164:25 267:1 352:4
**sick** 33:20
**side** 144:12 218:4
**sides** 54:2
**sign** 33:10 39:25 123:24 125:1,4,7,12 127:13 129:10 129:22 136:2 190:21 242:10 252:22 348:9 348:22 371:12
**signature** 127:20,25 128:3 163:13 313:10,12,15 313:17,18 314:24 315:3 349:7 365:7 369:6 370:16
**signatures** 127:20 213:13 315:18 349:9
**signed** 35:7 36:4,9 54:2 56:21,21 57:19 64:12 67:12 68:25 69:16 111:15 125:15 125:18 127:7,9 128:10,13 129:17 163:16 163:18 169:16 213:20 239:11 254:13 303:2 313:16,18 371:21
**signing** 34:12 35:13,19 129:5 160:21 161:12 163:5 211:14 329:7 349:11 359:3 363:25 364:20
**silencers** 278:19
**silly** 15:3,16,16 151:20
**silver** 6:14 345:23 349:22 354:1
**similar** 157:8 257:4 300:22 352:3,10

**simply** 104:24
**single** 39:4 50:24 51:1,2 191:1 193:6 201:23 207:17 220:15 221:12 223:10 260:23 274:5,15 299:3 299:3 301:8 305:21 359:22
**sir** 80:10 82:3 152:5 213:1 255:3,3 295:20 309:5
**sister** 46:15,16 286:9,11,25 287:5,18,22
**sisters** 46:12,13
**sit** 76:2,9 118:10 123:3 138:8 145:6 154:7 157:6 163:19 191:20 191:20 192:9 193:5 196:17 198:23 202:9 202:10 206:9 209:3,6 229:20 247:10 249:10 252:25 258:6 301:7 310:25
**site** 128:16 177:18 183:11 183:15 187:15 198:15 237:9 271:20 277:3
**sites** 176:25 196:6,22,23 199:12 255:10
**sitting** 143:18 150:6 225:18 225:19,23 226:2,20 227:18,22 228:6 230:14 234:12 241:10 243:11 275:17 357:16
**situation** 244:5
**six** 11:14,20 18:21 32:14 187:17 324:5 336:5,11,12 338:3,25 339:1 339:23
**size** 98:25 149:10 151:6 173:23 197:13
**sizes** 151:15
**skeptical** 120:22
**sketchy** 358:25
**skid** 183:8
**skids** 30:12 202:4,25 203:7 203:8 270:8 278:15,15
**skills** 370:10
**skipping** 335:6
**small** 45:15,16 70:15 156:17 156:18 157:1,4 216:25 253:14 253:22
**smile** 245:17,20 246:8
**smokescreen** 183:19
**social** 256:16 256:18
**sold** 20:18,20 24:7 30:22,25 49:21,22 51:13 51:15 52:1 53:1 55:16,18 57:5 62:13,14 63:8,21 66:11 70:14,15 77:11 77:15 79:2 80:2 139:4 143:2 149:13 164:10,19,24 169:6 180:15 180:20,23 230:7,8,19 231:3,4,7,10,13 231:18,20,22 232:4,9,11,12 232:14,18 233:23,24,25 234:1,6 235:12 235:16,18 261:7,14 263:18,21,22 265:6 279:1 281:6 320:12 320:14 323:13
**sole** 55:4 126:16
**soluenergy** 271:15,17 272:8 273:15
**solution** 290:1
**solutions** 52:7 52:12,21,21 53:1 54:17,19 54:21 55:4,5,7 55:15,22 56:20 56:25 57:21,22 85:10 371:23
**solved** 22:23
**somebody** 90:1 94:25 147:3 152:9 162:15 177:1 241:12 258:22 266:21 287:6
**somebody's** 92:15
**son** 19:10 86:15 86:16 89:1,8 89:17,23 90:25 96:19 109:15 109:18 110:3 149:18 150:23

209:15 248:18 248:19,19 256:3,5 266:12 266:15 283:6,7 325:20
**soon** 169:16
**sooner** 142:3
**sorry** 13:7 18:22 20:10 27:10 34:16 35:18 36:2,4 42:2 51:7 52:6 53:9 55:12,17 59:17 60:19 64:22 68:16 73:25 80:25,25 89:2 93:9 95:4 100:11 110:13 118:6 124:22 131:18 136:4 137:9 140:12 143:21 146:1 151:1 159:13 164:16 165:21 166:16 167:9 171:18,25 184:21 192:8 193:11 194:2 194:24 200:7 201:23 205:4 208:11 210:20 214:3 216:14 218:23 223:7 228:22 231:9 245:22 248:22 260:2 262:2 266:14 277:17 280:23 282:17 282:19 285:7 286:13 288:3 291:1,14 297:12 298:17 317:4,21 324:14 325:17 336:17 345:3 362:1 367:13 367:15
**sort** 66:12 83:6 191:15 198:25 238:17,23
**sorts** 145:10
**sought** 23:10 23:13
**sounds** 74:18 310:20 311:4 354:24 368:20
**source** 39:17 49:1 299:7 300:4,7 302:4 302:8
**sourced** 202:1 202:3 299:1,6 299:7
**sources** 65:10 65:10,11 77:21 80:20 81:10,14 216:22,24 217:18 299:14
**south** 3:15 57:14 119:14 136:25
**southern** 271:4 271:8,23
**southwest** 5:6
**spanish** 93:25 94:1 258:10 333:14,23 334:1,7,8,9,10
**spare** 319:3,16 320:13,18,18
**speak** 10:4 12:10 20:13 150:22 153:1 245:14 334:1,8 365:15
**speaking** 94:1 119:5 153:6,8 243:25 343:13 363:6 367:14 367:17
**specific** 12:18 31:4 123:2 132:10 135:6 141:20,20 145:22 147:15 147:21 154:3 168:3 189:4 192:8 193:18 193:22,23 196:2 198:22 240:8 241:5 314:14 319:15
**specifically** 99:19 111:1,4 131:2 136:5 137:11 144:15 145:13 147:23 148:8 157:6,6 161:4 174:21 176:15,18 178:12 197:19 205:6 219:20 224:10 239:4 241:7 246:9,20 253:9 315:25 348:25 365:20 367:5
**specifications** 356:1
**specifics** 13:12 16:12 252:21
**speed** 327:20
**spell** 24:3 29:3 66:7 114:13 166:14 209:23 250:4 257:19 268:5
**spelled** 349:18
**spend** 207:4 238:25 240:11 241:2,8 280:25 304:13,15
**spending** 218:24
**spent** 32:11 115:24 196:3,5

196:24 204:23 205:14 206:6,6 206:14,17,20 206:21 207:4 207:15,22 208:10 210:23 211:23 212:8 212:14 217:9 218:22,24 219:1,2,5,12,22 221:4 241:7 251:21 253:11 265:3
**spilling** 104:20
**split** 70:23 281:20
**splitting** 182:23
**spontaneously** 335:17
**sporadic** 273:23
**spreadsheet** 205:24 207:11 207:17
**spreadsheets** 206:22 207:18 208:17 209:16
**springs** 23:4
**stages** 113:22
**stake** 23:24
**stamped** 313:4 315:3
**stand** 245:4
**standard** 141:22 306:4 319:24 328:21 328:24 329:25 330:14 331:13 331:17,21,25 331:25 332:2,2 332:5
**standards** 316:16
**standing** 335:24 342:13
**stands** 278:18
**stanford** 32:16
**star** 240:20 241:11,16,19 242:2,9 251:6
**start** 24:25 27:4 40:16 46:3 49:8 55:3 64:15 107:3 149:19 177:2 225:9 295:6
**started** 11:12 11:12 19:21 20:13,15 25:17 27:24 32:2 34:6 37:7,13 37:23 39:2 45:24,24,25 52:1,11 118:8 121:16 123:7 128:15 145:19 149:25 178:14 201:4 272:9 310:2 315:20 344:11 351:13
**starting** 31:11 49:6 215:15
**starts** 215:9
**starvation** 40:19
**stash** 81:6
**state** 13:23 14:12,14 15:15 50:17 52:15 75:5,6 99:8 100:10 284:4 293:20 367:14 367:16 370:19
**stated** 179:2 187:4 188:4 372:21
**statement** 318:20 326:22 328:8,14 330:5
**statements** 221:10 290:19
**states** 1:1 7:8 27:12 42:23,24 97:23 137:13 160:23 161:1,4 163:2 166:22 184:6 189:7,25
**stationary** 31:22 195:12 202:8,22 328:2
**statute** 371:18
**stay** 57:11 273:8
**stayed** 281:18
**staying** 64:8
**stenographic** 7:18
**stepping** 155:7 155:10
**steps** 109:3 131:8 351:8,11 361:22 363:8
**stickers** 271:5,7 271:9
**stickler** 98:9
**stiff** 34:11
**stinnis** 20:19
**stipulated** 53:24
**stock** 81:8 261:20 262:24 262:25
**stocks** 65:13 80:21 81:5,7 81:11
**stood** 25:13,15
**stop** 39:12 154:25 172:3 243:19,20,24 296:1 343:2
**stopped** 39:7 40:5,13,16 41:17 171:7 239:3

**story** 49:18 97:25 115:3
**straightforward** 224:15
**strain** 223:9
**strangely** 82:1
**strangeness** 41:20
**strategies** 62:7 202:22
**strategy** 15:8 145:20 202:20 202:20,21 217:10
**street** 3:7 4:20 24:14 38:14
**stretching** 338:7
**strike** 41:20
**strong** 166:9
**structure** 157:23 158:3 237:23
**structured** 70:21 166:3
**structures** 260:11
**struggled** 45:21
**struggling** 51:23
**stuart** 83:23
**stuck** 172:13
**studying** 20:6
**stuff** 186:21 216:19 256:21 262:23 269:8,9 297:11,13,14 297:17 315:11 366:3
**stuffs** 264:9
**stupid** 297:5
**sub** 291:12,15 291:23
**subcontractor** 211:6,9 258:11
**subcontractors** 175:7 258:9 272:10,23
**subject** 48:5,7 219:14,24 222:22 270:16 299:23 300:8 300:25 301:10 301:21 302:10 302:16
**submission** 159:24
**submit** 112:6 113:1 115:10 115:21 116:5 116:11 118:13 118:25 120:2 121:9 130:15 130:18,21 132:13,21,23 133:2 134:12 316:3 318:19
**submittal** 133:7
**submittals** 112:12 130:20
**submitted** 10:20 95:13 121:13 133:11 133:18,24 134:18 135:8 135:22 136:8 136:17 147:12 348:6
**submitting** 130:23 134:5 134:23 143:9 145:14,25 146:7,12 147:14 158:21 159:18 160:12 160:15,16 163:9
**subpoenaed** 241:12
**subsidiary** 234:7 235:18
**substantial** 27:12
**substantially** 128:15 219:6
**substantiate** 151:14
**substation** 201:2 269:7
**successful** 61:11,14,17
**successor** 143:23 144:17 146:13 148:21
**sucked** 107:16
**sudden** 39:7
**sue** 36:15 40:22 44:1 53:6 165:17 353:2
**sued** 34:21 40:21 44:2,10 46:22 47:6,14 47:15 48:3 54:6 74:25 75:15,17 76:15 76:19 357:9
**sufficient** 287:17
**sufficiently** 286:24
**suggest** 343:1
**suggested** 371:16
**suggesting** 342:18
**suing** 39:18 44:12,24,25 45:6 47:16 53:16 76:22 77:3,6
**suite** 2:7 3:7,15 5:6

**summarize** 80:11 174:23
**summarizes** 221:11
**summers** 20:16
**sun** 291:13
**suntrust** 361:4 361:6,8
**super** 368:19
**supervision** 113:8
**supplied** 202:6 328:9,20 329:23
**supplier** 319:19
**suppliers** 75:19 207:2 219:17 319:11
**supplies** 316:20
**supply** 108:3 177:22 299:9
**support** 34:23 103:7 283:11 283:14,16,17 283:21,24 320:16,17 326:9 328:5
**supporting** 39:21 320:1,6
**supposed** 123:9 139:11 145:17 221:25 273:22 302:23 344:7
**supposedly** 245:25 246:11 246:22 360:2
**sure** 15:6 26:17 32:4 53:4 66:2 75:18 81:22 91:17 92:10 111:23 134:1 134:10 135:3 136:9,13 152:2 165:15 167:5 167:15 168:22 173:21 190:17 193:20 197:5 199:4 213:22 214:1,4 220:5 221:14,18,19 221:20 222:11 230:17 233:7 235:14 237:16 247:19 250:14 253:7 258:4 259:3,9 261:6 261:24 263:10 273:6 274:5 276:16 277:10 278:12 304:6 314:2,3 340:12 341:2 344:25
**surgery** 222:20 222:22,24,24 223:5
**surplus** 176:10 177:4 178:1,6 179:10,12,16 179:17 180:7 180:12,13,17 181:2,3 184:8 188:12,17 189:6 190:7,15 191:12,24 192:13 193:13 194:15,25 195:6 196:3 200:12,16 201:10 203:20 228:23,24 229:1,8 234:17 263:17,18 264:12,16 265:22,23 328:4
**surprised** 266:17 362:22
**surrounding** 60:22
**suspicious** 108:14
**swear** 7:19
**swedish** 234:3
**swelled** 222:17
**swelling** 223:2
**swift** 269:14,15 269:16 270:1 270:13,17,19 270:20,23,25 271:2
**switch** 264:9,20 269:6
**switchgear** 139:9 186:17 200:22 202:5 250:11
**switzerland** 229:18
**sworn** 8:3 370:5
**synced** 366:18
**system** 186:17 264:22
**systems** 22:2,4 22:12 24:14,18 24:19 30:5,6,7 30:14 54:13 186:14,14 237:7 271:4,8 316:21

**t**

**t** 6:6 257:19 317:22 372:3,3
**take** 23:13 33:13 36:18 54:16 74:15 81:18 87:14 99:1 109:2 121:7 123:5,11 123:17 131:7 141:1 144:8 151:5,21 153:21 154:13

154:17,18,21 154:22,23 175:2,7,21 181:17 186:7 215:7 244:20 244:23 245:13 262:24 351:8 361:22 363:4,8 368:10
**taken** 7:6 141:23,25 244:8,11 370:3 370:12
**takes** 340:10
**talk** 33:23 40:24 107:17 119:13 130:12
**talked** 33:20 110:16 253:7 263:16 273:9
**talking** 42:3 77:20 105:15 254:11 308:6,6 352:6 363:19
**tallahassee** 351:16,17
**tampa** 1:3 2:8 4:20,21 7:9,12 9:11 33:18 116:22 266:13
**tanks** 237:7
**tasks** 135:5
**tax** 65:3 66:13 70:1,3 71:19 81:16,19 82:3 144:12
**taxes** 65:16 67:11 77:8
**team** 62:3 90:18,19 143:2 158:16,16 161:16 162:5 174:3 175:6,6 197:15 215:25 316:15 333:16 335:3 336:3
**teams** 105:10
**technical** 87:9 87:16 320:16 321:11 326:9
**technically** 198:13
**teeth** 222:25
**telephone** 215:15,17 301:3 315:11
**tell** 8:4 24:24 33:22 83:3 92:19 94:11 122:23 130:23 150:7,25 168:24 174:24 175:25 196:24 225:2 233:2 251:19 295:4 313:14,24 316:2 321:13
**telling** 99:5 100:18 152:3 255:14 307:3 334:12 349:3 361:13
**tells** 107:1 271:13 354:12
**temper** 156:7
**ten** 30:25 60:3 60:9,15 119:21 138:6,9,18,18 138:21 139:17 139:25 140:4,4 140:19 143:8 164:1 167:2 180:23 187:20
**tens** 151:23 156:24
**term** 106:22 116:14 123:10 181:8 190:20 199:14 293:9
**terminology** 296:15
**terms** 12:6 98:10,12,19 101:20 102:1,6 104:23 105:11 107:17 153:21 181:10 197:1,3 197:6 232:5 332:2 368:24
**terry** 46:14
**terry's** 46:14
**test** 31:16
**tested** 142:2
**testified** 8:5 34:9 35:4,11 306:20 358:24
**testify** 35:6 144:16 222:4,7
**testifying** 76:2 76:9 118:10 138:8 145:6 157:7 161:14 163:19 191:20 191:21 192:9 193:5 196:17 198:23 206:9 209:6 221:25 229:20 242:2 247:10 249:10 253:1 258:6 301:7 303:12 310:25 322:2 370:5
**testimony** 171:10 177:9 177:11 178:24 179:1,24 191:8 194:17 219:11 219:21 272:19 357:16 367:20 371:8,17
**texas** 5:7 9:12 9:13 74:25 75:3 76:12

**text** 11:4,10,15 11:19 12:2,8 18:20 86:6 87:21 88:13 89:9 91:22 96:24 119:11 119:12 135:17 135:18 162:19 162:23 190:3 190:10,17 191:21 192:11 193:6 196:13 196:18 198:24 205:25 207:12 212:1 233:5,9 233:14 236:6 239:8 247:25 262:3 266:25 267:13 268:13 274:9 284:25 285:10,19,22 298:24 300:2 300:13,21 301:5 312:25 316:1,4,12 327:8 329:11 333:10 335:5 348:1,4 355:12 355:20 358:9 363:3

**thank** 8:6 25:7 122:12 159:13 194:18 212:20 212:21 295:14 312:16 333:3 343:4 344:21 355:10,17 360:9

**thanks** 214:18

**that'd** 74:17 362:9

**theirs** 326:14

**thereunder** 176:2

**thing** 32:17 34:3 45:2,19 65:17 104:21 106:15 154:3 178:22 184:1 186:2 191:1 206:21 207:19 216:18 217:19 217:19 220:20 277:6 308:5 322:9 329:6 331:21 332:3 340:25 348:16 350:16

**things** 11:4,23 12:19 15:20 26:3 30:8 34:13 37:17 48:18 61:16 62:6 65:13 72:14 76:18 82:13 91:20 92:13,16 93:14 93:15 97:12 110:20 111:2 111:16 116:24 124:20 139:9 139:10 140:17 151:22 153:15 238:8 245:3 257:4 261:20 264:9,19,20 269:7 274:17 278:18,19 301:25 304:15 319:12 321:6 342:7 352:14 353:12 364:10

**think** 9:10 12:24 15:14 25:21 26:14 30:23 36:6,9 37:3,3 45:16 45:24 47:1 48:9 50:7 53:2 58:12 62:20 63:19 72:1,2 74:14 78:13 79:25 81:7 83:24 86:11 87:13 89:5 94:8 102:11 104:19 119:20 122:4 128:21 129:13 133:5 139:6,22 146:16,22,25 147:17,23 149:1,21 151:19 153:13 159:1 160:3,4 169:5,11 170:15,15 172:8 173:19 173:20 193:18 204:16 206:9 216:15 223:6 223:14 229:18 231:5 232:14 233:24,25 235:14 238:13 239:24,25 241:13 246:13 248:12,20,22 254:21 255:7 258:8 261:18 261:23 265:6 265:13 267:23 268:7,8 269:18 270:6 271:18 274:12,13,16 276:8,16 277:9 280:8 281:7 282:12 284:11 284:13 288:10 288:11 289:20 289:22 299:2 304:6 305:14 310:16 314:12 314:20,23 315:7,13 320:11 326:6

326:12,13 329:5 337:6 340:16,19,20 346:24 347:23 350:16 354:7 358:20 359:2,4 360:1,4,4,18 361:10,12,15 361:19 362:6 362:21 363:14 363:14,20,20 364:16 365:5 365:13,18,23 366:15
**thinking** 30:23 55:23 173:20 289:15,25
**third** 43:12,22 81:24 82:6,10 82:17 100:1 202:2 210:11 316:8 354:17
**thoroughly** 184:14 324:18
**thoroughness** 324:24
**thought** 13:8 26:18 34:2 131:17,17 160:5,7 202:12 289:2,4 348:19 348:20,21,24 364:8
**threads** 363:3
**three** 21:5 42:19 46:12,13 49:23 56:7,11 57:24 63:6,23 70:4 81:7 83:15 86:25 87:17,23 139:23 149:21 169:17 177:25 179:9 187:12 187:13 193:4 225:18,19,23 226:2,20 227:16,20 228:5 229:10 268:16 283:19 306:3 308:13 328:22,25 329:5,25 331:13,17,21 332:1 342:24 347:23 348:3
**threw** 41:5
**throat** 222:9,10
**throwing** 245:3
**tie** 237:9
**tied** 171:9 172:5 202:19
**tiffany** 2:9 7:15 370:2,17
**time** 2:4 7:19 17:2 20:7,17 25:23 28:16 31:7,15 35:8 36:3,23 40:1,2 40:5 44:24 45:5 46:5 47:14 51:5 55:19 59:22 61:16,23 65:22 70:22,22 72:21 73:15 74:15,21 82:12,12 84:2 84:22 85:9,12 87:18 91:5,8 96:25 101:25 107:18 111:18 112:20 113:23 115:24 120:13 120:19 122:5,9 129:7,11 136:13,13,16 138:25,25 142:1 152:4,15 155:16 156:3 159:10 160:16 160:17 163:12 163:14,16,18 164:2 172:13 174:2,7 185:14 190:14,22,23 193:2 196:10 204:21 205:16 211:21 212:5 212:10 217:12 220:17 223:13 223:18 229:10 232:16 233:3 237:17 241:1 243:15 250:24 253:13 254:16 255:11,15 259:2 265:25 271:24 272:4,6 280:2,25 282:13 284:12 284:13,18 285:14 289:25 292:9 295:7 296:2,3 308:2 308:16,23 309:6,7 311:17 311:23 312:4 314:5,12,13,18 314:23 315:8 320:12,16,16 324:7 326:9,9 326:22 330:6 332:8 334:23 336:12,15 345:13 347:18 348:5 355:7 361:12 362:6 363:16,21,25 364:7 366:5 367:4
**timeline** 61:20 91:21 108:23
**times** 8:14,15 8:16 15:4 63:24 70:17

92:13 94:10 160:19,22 187:11,11 193:4 253:10 306:3 308:13 342:25
**timing** 45:12
**tired** 281:16
**title** 149:24
**today** 16:14 21:11 71:22 138:8 144:16 145:6 150:6 191:21 193:5 198:23 209:3,6 219:11 222:24 223:5,21,25 229:20 247:10 249:10 252:25 314:9 322:2 357:16
**toe** 154:5,5
**together** 16:18 17:2 18:16 23:23 29:9 31:13 32:16,18 100:5,15,19 101:14 133:3 166:19 189:7 189:25 199:8 202:15,19 203:4 205:16 208:2,24 280:22,24 282:24,25 283:3 328:15
**told** 88:6 92:23 93:5 97:15 99:6 100:13 107:14 117:20 130:9,14 132:2 155:13 158:12 177:12 184:5 197:11,17 224:25 233:13 234:6 238:3 281:1 341:13 344:10 347:9 347:25 348:25 349:16 359:20
**tolerances** 182:12
**tomorrow** 222:1,4,7 368:25
**tongue** 223:4
**took** 39:18 49:24,25 87:14 107:20 133:21 143:14 158:6 159:16 178:17 182:20 246:15 253:1 348:16 348:21
**top** 215:8 277:1 286:2 345:6
**total** 66:1,19 172:6,10 173:17 194:6 239:25 264:5 304:23 314:9
**totally** 41:3 69:5 299:8 331:2
**touche** 32:25
**touched** 227:15
**tough** 101:24 106:3
**tours** 326:2
**towards** 97:8 121:4 165:24 176:20 264:23 286:2,15 287:12,17 304:11
**track** 32:14 220:16
**tractor** 82:12
**train** 187:15
**transaction** 58:14
**transcript** 48:20 160:7 368:4,18 370:21 371:6 371:20
**transcriptionist** 370:7
**transcripts** 371:14
**transfer** 80:5 232:6 236:12
**transferred** 60:6 143:15 235:23
**transfers** 58:24 58:25 206:7
**transformer** 364:18
**transformers** 200:21 250:10
**transitioning** 173:5
**translate** 132:8 334:16 335:5 337:18,18 343:2
**translated** 333:24 342:4 342:12,18 343:2 344:5,8 344:12
**translating** 341:12
**translation** 334:22 335:14 335:16 337:13
**translator** 333:23 334:15
**traurig** 2:5 3:6 3:14 7:11
**travel** 248:8,10 248:13
**traveled** 90:22 90:25 91:9

**treat** 244:14
**treatment** 222:19 237:7 264:9,22
**tried** 13:3 19:25 27:13,14 33:25 34:11 40:22 49:14 129:21 171:8 172:3
**trips** 92:12 113:21
**troubles** 315:20
**trucks** 228:8
**true** 14:21 77:1 91:3 125:10,15 127:5 128:6 151:23 154:4 178:23 182:5 184:22 245:4 245:13 303:18 326:22 329:22 330:3,5,9 331:12,15,16 346:14 361:19 370:9 372:21
**trump** 170:24
**trust** 131:25 169:9
**trustee** 25:14
**truth** 8:4,4,5 297:16,18,18 338:18
**truthful** 342:21
**truthfully** 225:3
**try** 103:11 108:19 147:19 151:14 207:8 307:7 346:13
**trying** 14:4 40:24 68:18 71:14 153:20 156:22 166:1 174:23 175:20 179:24 217:4 218:3 224:12 245:2,19 246:7 251:19 275:18 308:11 309:20 341:1
**tumor** 223:3
**turbochargers** 185:20
**turbos** 187:22
**turn** 39:4 345:20
**turned** 33:10 49:25 168:21 178:13 305:23 351:3
**turning** 336:22
**turnkey** 189:13 225:10 240:7
**turns** 229:4 308:19 351:2
**twice** 342:24
**two** 1:17 8:17 8:22 25:3 32:11 36:10 41:20 42:9 56:15 58:3 69:14 70:24 80:12 98:21 118:1 127:20 138:16,17 140:11,21 141:2,3 142:11 143:7 169:21 174:2,7 176:4 176:6 177:13 177:16,22,24 180:2,6 184:6 188:6 189:11 189:21 190:6 195:2,4,10,17 195:25 199:24 202:21 203:22 204:19 208:7 210:19,22,24 211:1,7,12,18 225:8,10 238:7 238:9,10 261:1 263:25 264:1 282:9 308:3 312:16,23,23 313:20 316:12 321:8 326:13 332:4,5,20
**type** 31:4 196:19
**types** 189:3
**typewriting** 370:7

**u**

**u** 166:17 250:5 268:6 275:20
**u.s.** 43:1,15,20 44:24 45:18 105:2
**uh** 28:20 47:7 53:7 80:22 170:19 288:16 290:3 309:11 309:11 330:16
**ultimately** 95:12 112:3,24 120:7 171:12
**unable** 28:4
**unaware** 193:6 252:25 253:3 258:7 260:4 283:24
**under** 57:7 64:2 88:8 98:18,21 101:22 105:5 113:7 123:8 133:7 135:5 143:15 154:5 157:9,17 158:17 167:24

175:22 190:6 191:8 194:7 219:11 253:1 258:6 288:24 291:8 302:5 303:1 304:22 317:5 319:13 319:13 322:2 332:1 357:9,16 367:22 371:18 372:20
**undermining** 121:4
**underneath** 215:14,19 313:19
**understand** 12:25 13:7 33:14 67:4 68:23 86:5 93:25 95:15 103:11 105:19 111:2 112:11 120:12 121:6 143:22 174:19 179:24 184:4 218:5 333:25 334:5,14 339:22 358:1 365:16 366:9
**understanding** 106:23 175:22 176:1 194:11 231:10 238:5 273:10 321:10 322:6
**understood** 42:10,19 57:16 71:10 134:2 135:3 184:11 186:22 203:13 223:12 230:17 238:8 239:17 273:24 335:19
**undertaking** 183:10
**underwrite** 33:9
**unfair** 342:15
**unfortunate** 351:2
**unfortunately** 143:18
**unique** 332:7
**unison** 202:15
**unit** 4:11 7:4 31:20 74:21 122:8 156:2 202:16 223:17 271:14 276:10 276:12,14,16 276:16,17 284:17 332:6
**united** 1:1 7:8 27:12 42:23,24 97:23 137:13 160:23,25 161:3 163:2 166:22 189:7 189:25
**units** 39:1 139:11 141:17 141:19 158:10 170:23 172:4 179:17 180:13 181:5 184:24 201:24,25,25 202:8,9,15,24 203:6 229:8,8 230:7,23 231:23 232:2,8 234:12 240:23 241:3 262:21 263:14 271:6 291:10,20,21 291:25 292:2,3 292:4,5,6,11,12 292:13,13,15 292:19 293:9 293:12,12,15 293:15,17 299:18 328:4 336:5,6,11,12 338:3,25 339:1 339:11,23 340:2,5,13 341:24 343:22
**unnormal** 287:2
**unpack** 41:24 50:4
**unpaid** 41:1
**unrelated** 241:17
**unused** 176:10 177:4 178:3,6 178:16 179:10 179:14 180:9 180:25 181:2,3 184:9 188:12 188:17 189:6 190:7 328:3,6
**unusual** 156:8
**upset** 244:18
**upwards** 173:1
**urge** 307:9 329:15
**use** 31:8 36:25 93:6,10 95:14 120:4 152:7 170:8 184:1 207:1 239:10 248:7 251:1,5 261:21,21 265:8 272:7 276:24 292:18 293:2,9 294:16 294:17 302:22 303:19 305:9 305:10 322:18 325:2,4,11
**used** 10:23 13:16 14:5,6 15:4,9 16:7 151:12 167:22

175:3 176:21 176:23 177:2 178:25 180:18 199:22 200:10 200:14 201:9 203:13,18 206:2 208:20 214:23,24 220:19 221:15 235:5,7,7 240:24 248:4 248:13 251:10 251:11 258:14 258:17 259:15 262:9,16,21 263:8 266:21 266:22 268:10 270:7 271:25 273:5 283:11 292:19,21,23 292:23,23 293:3,6,10,13 293:16 294:7,9 294:10,16,22 295:3,7,13,22 296:1,12,14 297:15 298:6 299:22 302:22 303:22,25 304:4,8 334:16 334:25 360:2 371:20
**uses** 248:9 249:2
**using** 95:10 120:10 218:14 242:8 262:12 262:19 263:22 264:10 265:24 296:15 302:21 335:15
**utilize** 215:5
**utilized** 215:5
**utilizing** 178:6 178:15

**v**

**v** 1:7 7:7 114:14,15 209:24 371:4 372:1
**value** 64:2,8 84:8 103:25 104:2 106:1 194:4,5 305:2 305:13,15
**various** 319:11 319:14,21
**vendor** 35:20 36:5
**vendors** 25:1,2 34:9,11,21 35:4 36:7 61:2 75:21 76:16 206:8 207:1 219:17 220:15
**venezuela** 115:25 119:16 164:9,10 169:24 170:3,4 170:5,8,13,18 170:25 171:11 171:14 173:16 173:24
**venezuelan** 114:21
**venture** 28:23 29:17 85:11 145:20 364:2,7
**veracity** 36:5
**verbal** 223:23
**verbally** 159:2 159:7,11 365:23
**vereb** 209:22
**verifiable** 35:8
**verified** 35:7 36:10 206:7
**verify** 34:24 108:15,15 111:9 118:23 121:20 122:21 122:24 123:21 124:6 131:8,11 131:21 361:18 361:22 363:1,8 371:9
**veritext** 7:14,15 7:16 371:14,23
**veritext.com** 371:14
**versus** 119:20 202:7
**vet** 118:22
**viability** 202:17
**vice** 19:20 119:18 149:19
**video** 7:5 10:8 10:9,13,18 12:13,14 15:2 18:11 48:13,20 74:21 122:8 155:23 156:2 223:17,18 245:15 284:17 284:18 355:6 368:7,15
**videoconfere...** 3:5 4:7,9 5:4 5:14
**videographer** 5:12 7:2,14 74:20 122:7 155:23 156:1 223:16 284:16 354:20,24 355:6 366:17 368:6,10,14
**videotaped** 2:1
**view** 12:20
**violate** 303:8
**violated** 305:23
**visit** 158:2,7 159:8 178:8 280:20

**visited** 157:15 280:16 322:25 323:2
**volts** 340:17
**volume** 66:1
**volunteering** 105:12
**vouch** 363:7
**vouched** 362:19

**w**

**w** 1:12 4:4 64:19,20,21
**wade** 1:12 4:4 10:1 12:11,16 13:13,14 16:8 16:16 17:1,5 17:13,22 18:11 19:8 40:22,22 44:11 46:6,10 46:22 47:6,13 47:24 48:3 139:3 241:23
**wade's** 283:5
**wait** 49:6 72:23 152:11,11,11 174:25 220:7 367:5
**waiting** 220:8
**waits** 223:6
**walk** 105:18 154:5
**walter** 361:23
**want** 19:14 56:18 77:10 82:2 94:25 97:18 103:23 106:9 123:3 131:15 154:13 169:7,8 181:9 181:22 192:22 192:24 202:11 203:14 207:8 224:20 230:24 239:13 294:21 295:1,21 296:7 296:11,17 297:2 304:21 319:24 322:11 324:24 327:5 335:21 339:8 339:11,12,15 339:16,18,20 342:20 368:3,8 368:17,21
**wanted** 17:24 22:23,24 34:24 74:14 92:21 94:12,18 98:17 99:7 112:14 120:24,25 129:10 137:7 156:6 167:25 168:19 174:12 184:25 232:6 273:6 303:7,14 303:23 304:9 304:14 308:22 309:19 311:7,8 311:9,11 315:23 348:23 357:8 359:3
**wanting** 28:13 99:14 174:11 303:17
**wants** 33:23 107:2 154:10
**warrantied** 188:7
**warranties** 182:4 203:2 295:22 328:25
**warranty** 181:14 182:2,3 183:1 184:20 184:24,24,25 185:7,12,14,20 185:24 186:4 187:2,5,23 294:19,22 295:2,16 296:7 296:9,11,18,22 296:25 297:3,5 328:22 329:25 330:14 331:14 331:18,22 332:3,5
**washington** 3:8
**wasting** 152:4 220:17
**watch** 17:1,22 18:8
**watched** 16:18 17:2
**watching** 10:18
**water** 186:2 246:5
**way** 14:21 25:10 58:21 61:25 62:6 71:7 95:19 103:2 106:16 118:7 134:15 141:8 142:19 154:10 163:16 171:16 178:22 179:13 180:18 197:19,22,24 198:1 206:17 218:22 220:21 224:15 244:22 245:21 246:3 258:25 260:14 263:12 271:22 286:19 287:22 296:8 307:20 315:21 335:18 341:1 342:20 347:25 349:3
**we've** 18:13 39:13,19 41:14 50:1 66:16 74:13 75:17,19 122:13 134:19

134:19,20 145:11,11 149:7,9,10,14 151:15 153:24 185:8 197:14 205:15 206:25 216:25 217:3 217:13,13 218:23 219:16 223:21 253:7 284:20 320:20 320:20 326:12 331:9,9 332:8 333:7 348:15 366:23
**website** 348:15
**weeds** 224:13 224:25
**week** 17:4 33:15 39:4,14 223:6
**weeks** 10:2 25:3 39:6,6,6 39:10 48:21 70:24 86:25 87:18,24 222:11,13 223:10,11 261:1
**welcome** 122:11 355:9
**weld** 182:11
**went** 20:1,22 25:8 32:20 34:4 35:3 36:19 39:6,16 40:11,12,12,18 41:2,2,19 49:17 90:18,19 98:19 101:25 105:23 143:5 158:3,18 161:23 165:17 176:20 192:7 207:6 214:15 220:16 222:24 230:10 234:9 244:1 263:14 264:8,20,23,23 265:3 272:18 273:9 274:6 308:13 323:2 340:20 348:8 349:13
**whatsapp** 6:10 6:12,13,16 11:4 97:3 190:17 191:16 261:1,4 284:25 285:10,17,22 313:10 314:1 314:16 315:7,9 329:9,10,16 330:7 333:10 344:24 348:1 350:7 353:24 353:25 354:12
**whatsoever** 134:13 176:4 272:3 298:16
**where'd** 348:21
**whitney** 119:18
**wide** 181:9
**wife** 16:18,19 16:25 17:6,15 18:1 19:9 48:21 77:25 78:20,22,23 79:9,23 80:9 80:11 82:7 256:10 281:17 281:18,21 282:7,18,19,21 282:22 361:2
**wife's** 79:1
**wildly** 343:6
**willed** 79:2
**william** 4:8
**william.sanp...** 4:15
**williams** 85:21 230:1
**williamson** 1:13 4:5 12:11 16:5,9 17:7 56:1 57:1,18 58:2,5,21 59:7 59:9,15 62:15 63:21 64:2,13 66:20 69:14,22 70:12 71:12 72:7 73:5,11 73:21 74:8 77:11,16 81:13 84:13,21,25 86:19 109:16 109:17 128:3 150:16,17,22 161:17 209:9 216:12,14 221:25 222:18 248:5,24 251:11 252:18 256:1 257:7 258:15,20,24 259:15 279:1 280:2,4,20 281:1,10,21 282:6,10,18,21 283:15,21 308:1 309:9 311:19,25 312:6 313:11 313:13,14,24 322:3 325:9 326:3 356:24 356:25 357:7,8 357:18
**williamson's** 86:16 109:15 109:18 110:3 209:15 256:5 313:19 356:11 356:19,22

**williamsondi...** 356:16
**willing** 105:4 112:10 184:22
**win** 39:21
**wind** 24:24 25:2 58:14 211:14 297:9 308:17
**winding** 60:23
**winds** 62:13
**winston** 323:20
**wire** 58:24,24 206:7 229:23 231:8 232:6 235:23 236:3 236:12 274:5 359:11,11 361:21 362:15 363:2,4,10
**wired** 229:22 229:24 236:9 250:12,15
**wires** 260:9
**wiring** 200:25
**wise** 149:17
**wish** 244:25
**withdrawals** 252:19 253:2,5
**witness** 6:2 7:20 8:3 14:3 15:19 35:14,22 36:9 47:9 53:9 53:22 61:14 72:24 73:14 74:16,18 80:25 82:15 88:4 92:2 101:20 102:9,20 103:21 104:8 108:22 110:12 112:9 113:5 115:13 117:9 118:2,20 124:23 144:4 144:21 145:1 146:4 147:10 148:3 153:13 154:23 155:5 156:6 189:16 193:16 201:17 205:11 214:4 218:11,18 235:22 238:13 243:20 284:13 287:14 295:6 295:25 296:21 303:16 305:18 310:8 318:25 325:16 330:9 330:19,21 332:14 333:4 334:24 337:4,6 338:7 339:4,15 341:10,13,17 341:19 342:2 342:15,20 343:4,8,16,19 343:25 350:10 350:15,24 353:6,18 357:11,24 364:6 366:9 368:2 370:4 371:20
**witnesses** 155:8
**won** 273:16
**wondering** 14:23
**word** 123:14 131:23 169:1 224:18
**wording** 314:22 315:13 325:8
**words** 152:8 156:5 175:25 205:15 226:4 304:12 334:5,7 337:11 338:11 338:19
**work** 18:4 20:22 41:2,19 41:22 84:21 106:19 112:10 114:6 123:19 128:15 133:9 134:5 183:21 185:2 197:6 211:5 237:13 237:14,15,17 237:18 239:18 239:19,20,20 268:4 307:20 316:17 336:9 340:10,12 365:2,18
**worked** 20:17 32:6,17 54:6 55:20 57:13 62:5 76:18 84:25 86:9 163:20 182:19 209:11,15 217:1 232:5 257:3 307:19
**working** 20:14 20:15,16 40:23 64:15 74:11 86:12 92:22 112:16 132:7 132:21 133:3,6 143:15 255:9 321:16 364:2 364:21,25 365:12
**works** 19:11 37:9,10,11,20 37:23 38:3,7 38:14,16,19 39:25 42:6,7,8 42:20,25 44:9 45:9 46:2 49:2 49:4,5 50:6 51:8 52:10,20 52:23 54:23

85:5,11 123:17 208:22 209:21 271:20
**world** 20:23 30:8 158:14,14 234:5 331:4
**worried** 185:1 223:1 308:8
**worry** 100:13
**worrying** 288:5 288:9 289:17
**worth** 41:6 63:4,22,24 81:7 151:24 165:4 276:12 289:8
**would've** 57:13 96:22 121:12 128:14,20,21 129:2 136:10 140:20 141:23 141:25 163:12 163:14 169:11 173:19 188:23 191:4 205:18 208:5,9,16,23 208:25 209:9 209:11,15,18 213:20,21 216:10,16,17 221:24 236:5 237:20 239:1 241:4,5,6,21 242:1 252:12
253:19,20 255:11,15 268:22 269:1 269:20,21 274:13 282:10 282:13 283:14 357:2,2 359:23 364:25
**wound** 23:4 39:17 98:21 129:5 171:24 172:1 193:2 197:2 230:13 265:7 308:8
**wow** 348:20 353:1
**wrapping** 271:12
**write** 334:17
**writing** 134:14 158:25 175:18 190:10 192:10 236:6 247:24 292:18 293:9
**written** 56:23 57:19 63:21 64:12 69:16 71:1 77:16 96:20 125:24 134:14 135:9 162:18 238:19 238:21 296:23 368:11
**wrong** 16:3 69:5 87:1 154:6 160:5 174:20 175:16 217:22 290:2
**wrote** 336:14

**x**

**x** 6:1,6 370:21

**y**

**y** 126:14 166:17
**yar** 126:13
**yard** 225:18,19
**yates** 3:13
**ybor** 276:25
**yeah** 9:14 10:12 11:2,5 12:1,5 13:22 14:3,25 15:3 15:19 16:6 18:22,25 19:17 20:5 21:6,21 22:7,12,14 23:16,19 24:16 25:25 26:10,12 26:21 27:21 28:6,10,12 29:2,16,18,23 29:25,25,25 32:9 33:17 34:13 36:21 37:5,12,15,15 37:19,22 42:18
43:21,22,25 44:22 46:12 48:17,17 50:7 50:7 54:7,14 56:19 58:19 59:18,24 60:19 60:21,21,21 61:12,15 62:13 63:3,5,9 64:24 65:2,6 66:24 68:1 70:1 71:19,21,21 72:3,24 74:16 76:5,5,8 77:1,4 79:25 80:16 82:8 83:21 86:7,17,22 87:2 88:23 89:6 91:3 92:5 93:8 94:17 95:4,5 100:3,3 100:25 104:4 107:22 109:11 109:12,16,19 109:22 110:16 112:3 114:2,15 114:24 117:9 117:10 118:14 119:12 124:8 124:18 125:1 126:15 127:22 128:1 129:1 130:11 135:18 135:21 137:1,9

138:13,23
140:23 141:22
142:7,8,22
145:10,23
147:5,17,18,23
148:22,24
156:6 160:1,18
160:22 161:19
162:21,22
164:23 165:7
167:15,17,24
168:6 170:4,4
170:16 171:14
172:14 177:15
177:21 180:4
180:25 184:13
185:5 187:2
189:2 190:8
192:7 195:14
199:7,10
204:10,14
208:3 209:2,11
209:12,14
210:25 213:12
214:11,22
216:6 219:16
220:5,12 222:2
222:9,13,15,17
226:10 231:15
235:20 236:4,4
242:18 243:20
243:21 245:9
247:17,22
248:13 250:9
250:14,19,23
253:3 254:4,21
254:21 255:4
256:4,11,14
257:10 258:18
261:9,11,13,17
261:18 262:7
263:5,14
264:10 265:1
265:13,13,13
265:14 266:2
267:3,17 268:4
268:20 269:8
269:18 271:11
271:20 272:19
273:18 277:10
278:4,22
279:13 280:3
280:13 281:24
285:23 286:22
287:6 289:6,19
291:9,9 300:18
300:19,20
301:1,3 307:13
313:8 314:3
320:10 321:20
322:7,20
324:18,23
325:18 326:25
327:11,25
328:19,23
329:15 333:1
334:15 339:5
340:1,4,7,7
341:19 343:16
345:24 346:23
347:8,14,18
352:19 353:13
354:7,8,24
355:3 356:13
358:25 359:15
360:1 361:5,5
362:7,18
365:23 366:17
366:19 369:4
**year** 20:2 21:2
21:12 32:12
34:5 37:2
39:18 49:15
50:16 52:10,25
53:2,4 58:14
58:15 70:4,11
70:14 71:22
78:1 81:19,20
141:6,25
180:14 184:25
187:11 210:11
217:9 232:25
254:11,12,25
261:2 280:10
280:11 282:9
282:25 294:19
294:21 295:1
295:15,16,21
297:3,5 324:1
328:22,25
329:25 331:13
331:17,22,25
332:2,5
**years** 8:24
18:13 20:24
21:1,5 27:21
30:25 32:11
38:9 41:14
45:22 49:7,25
50:11 51:9
57:11 58:19
60:7 61:17,21
62:6 64:9 70:6
70:7 71:20
72:8 74:10,10
76:16 78:8,15
79:3,3,18,24,25
80:3 81:14
82:5,25 83:11
84:2,5 119:19
134:21 136:23
140:23,24,25
149:14,22
163:23 164:1
167:3 171:8
172:5 180:23
180:23 185:8
187:8,10,13,20
197:15 240:23
256:24 257:2
260:12,19
261:2 279:17
281:6,8 282:9
283:7,18
295:15 296:8,9
296:13 321:10

329:5 332:1,4
**yemen** 137:4 164:7,12,15 165:13,18,23 166:4 167:20 168:8,10 169:23 172:21 173:11,24
**yep** 39:9 87:16 88:11 160:9 253:16 311:14 356:7 366:16
**york** 30:24 32:14 275:8
**young** 25:25 47:4
**youngest** 46:16

**z**

**z** 268:6
**zero** 175:4 176:10 177:4 178:3,7,15,16 178:17,20 179:10,11,11 179:14,19 180:8 181:1,2 181:5,6,7,13,18 182:7,13,21,25 184:9,11 185:10,15,16 185:23 186:22 188:12,18 189:6 191:24 192:14 193:14 194:15,25 195:6,20 196:4 200:12,16 201:11 202:1 203:20 226:6 226:12,19 229:9 291:11 291:22 292:7 292:13,15 294:8 295:12 297:24 298:3,5 298:9 299:8,9 299:10,15 328:4 336:8,23 340:9,11 342:24
**zeroed** 202:3 226:4,14,17,22 226:22 266:5,5 293:1 297:20 298:2 331:1
**zeroing** 185:18 188:18,18 294:25 295:3 295:23 296:13
**zhuhai** 268:5

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Platform:** WhatsApp **Timezone:** UTC+0000

18185876454@s.whatsapp.net Karla's New Number
18185876454@s.whatsapp.net

18634506795@s.whatsapp.net John Manning (Owner)
18634506795@s.whatsapp.net

System Message

2025/06/07

18185876454@s.whatsapp.net Karla's New Number

Buenos días John
01:07:35 pm

Let me know when you are ready
01:08:49 pm

18634506795@s.whatsapp.net John Manning (Owner)

I will be able to talk -5 9:40
01:20:27 pm

System Message

John Manning (18634506795@s.whatsapp.net owner) started a call.
status: NotAnswered
type: video call
duration: 00:00:00
1 joined:
John Manning (18634506795@s.whatsapp.net owner)
01:30:55 pm

18185876454@s.whatsapp.net Karla's New Number

Ok
01:33:46 pm

**Exhibit "C"**

I call you back

01:33:50 pm

System Message

Karla's New Number (18185876454@s.whatsapp.net) started a call.
status: Answered
type: video call
duration: 00:09:21
2 joined:
Karla's New Number (18185876454@s.whatsapp.net)
(owner)

01:42:26 pm

18185876454@s.whatsapp.net Karla's New Number




01:46:18 pm




01:46:18 pm

System Message

Karla's New Number (18185876454@s.whatsapp.net) started a call.
status: Answered
type: audio call
duration: 00:09:50
2 joined:
Karla's New Number (18185876454@s.whatsapp.net)
(owner)
01:52:15 pm

18634506795@s.whatsapp.net John Manning (Owner)

Dalgo & Asociados - Abogados y Asesores Tributarios https://g.co/kgs/ByUA5AS
01:56:09 pm

System Message

Karla's New Number (18185876454@s.whatsapp.net) started a call.
status: Rejected
type: audio call
duration: 00:00:00
1 joined:
Karla's New Number (18185876454@s.whatsapp.net)
02:02:50 pm

18634506795@s.whatsapp.net John Manning (Owner)

Hi Karla,
I'll call you back bad signal area!
02:08:43 pm

18185876454@s.whatsapp.net Karla's New Number

🚫 Deleted by the sender
02:11:00 pm

🚫 Deleted by the sender
02:13:00 pm

🚫 Deleted by the sender
02:14:59 pm

🚫 Deleted by the sender
02:16:55 pm

🚫 Deleted by the sender
02:18:54 pm

🚫 Deleted by the sender
02:25:48 pm

🚫 Deleted by the sender
02:29:44 pm

🚫 Deleted by the sender
02:33:31 pm

🚫 Deleted by the sender
02:40:14 pm

🚫 Deleted by the sender
02:44:07 pm

🚫 Deleted by the sender
02:46:29 pm

18634506795@s.whatsapp.net John Manning (Owner)

Maybe Edison will load you and Jose the money
02:50:17 pm

18185876454@s.whatsapp.net Karla's New Number

I think one hundred percent that this is our way out to be able to finish The best way for projects .
02:51:53 pm

🚫 Deleted by the sender
02:51:59 pm

🚫 Deleted by the sender
02:55:28 pm

18634506795@s.whatsapp.net John Manning (Owner)

Karla I will not do it
02:56:12 pm

18185876454@s.whatsapp.net Karla's New Number

🚫 Deleted by the sender
03:00:05 pm

🚫 Deleted by the sender
03:03:08 pm

🚫 Deleted by the sender
03:04:41 pm

🚫 Deleted by the sender
03:05:22 pm

18634506795@s.whatsapp.net John Manning (Owner)

We will win
03:06:16 pm

18185876454@s.whatsapp.net Karla's New Number

🚫 Deleted by the sender
03:07:56 pm

🚫 Deleted by the sender
03:08:05 pm

🚫 Deleted by the sender
03:09:26 pm

🚫 Deleted by the sender
03:11:29 pm

😰😞
03:11:48 pm

🚫 Deleted by the sender
03:12:09 pm

🚫 Deleted by the sender
03:12:49 pm

18634506795@s.whatsapp.net John Manning (Owner)

The fact that you would even think to ask me to do something illegal like that is shocking Karla.

I and ProGen and every employee of ProGen will never be involved in paying abroad to anyone for anything whatsoever never ever especially to a judge.

That is not who we are nor have ever been in 45 years of doing business. I will not be a part to it and advocate for it under any circumstance whatsoever. That is corrupted and highest level, which is exactly what we're fighting back against on CELEC. If corruption is what Ecuador is all about and we'll fight the corruption no matter what's the end. But we will never be a party to any such suggestion or paying money to anyone specially any judicial member or anything legal or any government or any person whatsoever.

We already know that Select is corrupt in this way, which is why we are here right now in God's name would even think about doing the same illegal corrupt act to try to fight a corrupt act ???

03:13:16 pm

That is 100% NO, end of story not open for discussion.

Love you love you, but this ain't happening

03:13:53 pm

18185876454@s.whatsapp.net Karla's New Number

🚫 Deleted by the sender

03:19:07 pm

18634506795@s.whatsapp.net John Manning (Owner)

We never have and never will pay a bribe or pay off anyone Karla. This is why I have stayed away from government projects for decades.

03:21:21 pm

18185876454@s.whatsapp.net Karla's New Number

🚫 Deleted by the sender

03:22:20 pm

🚫 Deleted by the sender
03:26:17 pm

🚫 Deleted by the sender
03:28:27 pm

In the end I will do what you say.
Have a good day 🥰🙏😞😓
03:29:15 pm

18634506795@s.whatsapp.net John Manning (Owner)

You too
03:29:50 pm

✓ Delivered

**From:** Enrique Jaramillo
**To:** Pulecio-Boek, Daniel (Shld-DC-LT); Johnson Restrepo, Daniela E. (Assoc-DC-LT); Jessica Flores; Kenneth Holt; adolfo.jimenez@hklaw.com; Phil.Rothschild@hklaw.com; anne.colbert@hklaw.com; gabriella.lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** Keller, Courtney M. (Shld-ORL-LT); Pusateri, Michael (Shld-DC-LT); Yates, Meredith (Assoc-ORL-LT)
**Subject:** Re: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF
**Date:** Monday, August 3, 2026 12:56:00 PM
**Attachments:** image001.png
image002.png
e5b791b6-adb8-4381-ab90-d398663cdaf1.png
Image.png

---

Daniel, you're asking questions that you should already know the answers to. Ms. Saud is a U.S. citizen who has been instructed by a Spanish court to remain in Spain until the extradition notice initiated by the Ecuadorian government is resolved. Your client has been kept informed about these proceedings. Mr. Neira, a board member of CELEC, has frequently tweeted about the issue.

Returning to Ecuador is not a viable option because your client has created circumstances where being there poses a significant risk of death to Astrobryxa's shareholders. This should also be familiar to you, as it has been previously discussed in this case.

I'd be happy to answer any further questions, provided they're not ones you should be able to figure out on your own.

Best,

**ENRIQUE JARAMILLO**
Attorney / Shareholder

**FBFK LAW**
(713) 403-4200 Office | (713) 403-4201 Fax
3200 Southwest Freeway, Suite 3200
Houston, Texas 77027
ejaramillo@fbfk.law
www.fbfk.law

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended

Exhibit "D"

recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

---

**From:** pulecioboekd@gtlaw.com <pulecioboekd@gtlaw.com>
**Sent:** Sunday, August 2, 2026 5:31 AM
**To:** Enrique Jaramillo <ejaramillo@fbfk.law>; Daniela.JohnsonRestrepo@gtlaw.com <Daniela.JohnsonRestrepo@gtlaw.com>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; adolfo.jimenez@hklaw.com <adolfo.jimenez@hklaw.com>; Phil.Rothschild@hklaw.com <Phil.Rothschild@hklaw.com>; anne.colbert@hklaw.com <anne.colbert@hklaw.com>; gabriella.lanzas@hklaw.com <gabriella.lanzas@hklaw.com>; Adam.Poe@hklaw.com <Adam.Poe@hklaw.com>; William.SanPedro@hklaw.com <William.SanPedro@hklaw.com>; anabel.pargas@hklaw.com <anabel.pargas@hklaw.com>; Kelly.Sweeney@hklaw.com <Kelly.Sweeney@hklaw.com>; wendysue.henry@hklaw.com <wendysue.henry@hklaw.com>
**Cc:** kellerc@gtlaw.com <kellerc@gtlaw.com>; pusaterim@gtlaw.com <pusaterim@gtlaw.com>; Meredith.Yates@gtlaw.com <Meredith.Yates@gtlaw.com>
**Subject:** Re: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

The continued threat of sanctions is unnecesary and unprofessional.

If you have motions you think you should file, you are welcome to do so.

Is Ms. Saud a U.S. person? Or does she require a US visa to enter the US. I am unaware of travel being restricted by a US person to the US based on a Red Notice. If you contend any such restriction exists, provide support.

Why cant Manrique and Saud travel to Ecuador so the depositions take place there? Or to another country where everyone in this case doesnt need to wait two months for you to obtain a visa.

We expect answer Monday COB, at the latest.

Thanks

**Daniel Pulecio-Boek**
Shareholder
Chair Washington DC Cross-Border Disputes Group

Greenberg Traurig, LLP
2101 L Street N.W. | Suite 1000 | Washington, D.C. 20037
T +1 202.331.3117
pulecioboekd@gtlaw.com | www.gtlaw.com | View GT Biography

GT GreenbergTraurig

---

**From:** Enrique Jaramillo <ejaramillo@fbfk.law>
**Sent:** Saturday, August 1, 2026 7:31:52 PM
**To:** Pulecio-Boek, Daniel (Shld-DC-LT) <pulecioboekd@gtlaw.com>; Johnson Restrepo, Daniela E. (Assoc-DC-LT) <Daniela.JohnsonRestrepo@gtlaw.com>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; adolfo.jimenez@hklaw.com <adolfo.jimenez@hklaw.com>; Phil.Rothschild@hklaw.com <Phil.Rothschild@hklaw.com>; anne.colbert@hklaw.com <anne.colbert@hklaw.com>; gabriella.lanzas@hklaw.com <gabriella.lanzas@hklaw.com>; Adam.Poe@hklaw.com <Adam.Poe@hklaw.com>; William.SanPedro@hklaw.com <William.SanPedro@hklaw.com>; anabel.pargas@hklaw.com <anabel.pargas@hklaw.com>; Kelly.Sweeney@hklaw.com <Kelly.Sweeney@hklaw.com>; wendysue.henry@hklaw.com <wendysue.henry@hklaw.com>
**Cc:** Keller, Courtney M. (Shld-ORL-LT) <kellerc@gtlaw.com>; Pusateri, Michael (Shld-DC-LT) <pusaterim@gtlaw.com>; Yates, Meredith (Assoc-ORL-LT) <Meredith.Yates@gtlaw.com>
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

Daniel,

Ms. Saud is unable to travel to the United States because the Government of Ecuador, as part of its ongoing campaign against her, has caused an Interpol Red Notice to be issued for her arrest. Mr. Manrique is unable to travel to the United States because he does not possess a valid U.S. visa.

As for travel to Spain, the person who requires a visa is me. I am lead counsel for Astrobyxa in this matter and the only member of Astrobyxa's legal team who is fluent in Spanish. As previously explained, neither Mr. Manrique nor Ms. Saud communicates fluently in English. It is therefore necessary for me to be physically present at their depositions to ensure effective communication and representation.

I have already taken all available steps to obtain the required visa. The application must be submitted in person. The earliest appointment available to submit the application was September 2, 2026 (see attached), and I secured that appointment as soon as it became available. Based on the information provided by the Spanish consulate, visas are not issued until at least 25 days after the application is submitted. Accordingly, the earliest date on which I could realistically travel to Madrid would be during the week of October 5, 2026, as I have other commitments during the preceding week.

Please let us know whether your client wish to proceed with the depositions (1) remotely on the dates we previously offered (August 25 and 28), or (2) in person in Madrid in October. We would appreciate a prompt response because the Progen Defendants have already indicated their willingness to proceed remotely on the dates we proposed.

In the meantime, unless you withdraw or amend the deposition notices setting the depositions of Mr. Manrique and Ms. Saud in Madrid on August 25 and 28, we will file a motion for protective order and will ask the court to award fees and expenses. If you choose not to withdraw/amend the notices, we can discuss the matter during our next meet-and-confer regarding the other instances of discovery misconduct that will be the subject of our forthcoming motions for sanctions.

Best,

**ENRIQUE JARAMILLO**
Attorney / Shareholder

**FBFK LAW**
(713) 403-4200 Office | (713) 403-4201 Fax
3200 Southwest Freeway, Suite 3200
Houston, Texas 77027
ejaramillo@fbfk.law
www.fbfk.law

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

**From:** pulecioboekd@gtlaw.com <pulecioboekd@gtlaw.com>
**Sent:** Saturday, August 1, 2026 5:03 AM
**To:** Enrique Jaramillo <ejaramillo@fbfk.law>; Daniela.JohnsonRestrepo@gtlaw.com; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** kellerc@gtlaw.com; pusaterim@gtlaw.com; Meredith.Yates@gtlaw.com

**Subject:** Re: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

?

**Daniel Pulecio-Boek**
Shareholder
Chair Washington DC Cross-Border Disputes Group

Greenberg Traurig, LLP
2101 L Street N.W. | Suite 1000 | Washington, D.C. 20037

T +1 202.331.3117
pulecioboekd@gtlaw.com | www.gtlaw.com | View GT Biography

GT GreenbergTraurig

---

**From:** Pulecio-Boek, Daniel (Shld-DC-LT)
**Sent:** Tuesday, 28 July 2026 15:11:48
**To:** Enrique Jaramillo <ejaramillo@fbfk.law>; Johnson Restrepo, Daniela E. (Assoc-DC-LT) <Daniela.JohnsonRestrepo@gtlaw.com>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com <Adolfo.Jimenez@hklaw.com>; Phil.Rothschild@hklaw.com <Phil.Rothschild@hklaw.com>; Anne.Colbert@hklaw.com <Anne.Colbert@hklaw.com>; Gabriella.Lanzas@hklaw.com <Gabriella.Lanzas@hklaw.com>; Adam.Poe@hklaw.com <Adam.Poe@hklaw.com>; William.SanPedro@hklaw.com <William.SanPedro@hklaw.com>; anabel.pargas@hklaw.com <anabel.pargas@hklaw.com>; Kelly.Sweeney@hklaw.com <Kelly.Sweeney@hklaw.com>; wendysue.henry@hklaw.com <wendysue.henry@hklaw.com>
**Cc:** Keller, Courtney M. (Shld-ORL-LT) <kellerc@gtlaw.com>; Pusateri, Michael (Shld-DC-LT) <pusaterim@gtlaw.com>; Yates, Meredith (Assoc-ORL-LT) <Meredith.Yates@gtlaw.com>
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

Yes, we will serve the notices.

Again, we can reschedule if the visa process takes longer.

We need details, however, on who is it that needs a visa and why the depositions cannot proceed without that person being physically present in Madrid (as opposed to joining via Zoom).

We would expect that person who supposedly needs a visa for the deposition to proceed to act expeditiously in obtaining the visa.

We also need an explanation as to why Manrique and Calero are outside of the jurisdiction of which they availed themselves, and why they are not in their country of residence, forcing all of us to have to take depositions in Europe.

---

**From:** Enrique Jaramillo <ejaramillo@fbfk.law>
**Sent:** Tuesday, July 28, 2026 3:03 PM
**To:** Pulecio-Boek, Daniel (Shld-DC-LT) <pulecioboekd@gtlaw.com>; Johnson Restrepo, Daniela E. (Assoc-DC-LT) <Daniela.JohnsonRestrepo@gtlaw.com>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** Keller, Courtney M. (Shld-ORL-LT) <kellerc@gtlaw.com>; Pusateri, Michael (Shld-DC-LT) <pusaterim@gtlaw.com>; Yates, Meredith (Assoc-ORL-LT) <Meredith.Yates@gtlaw.com>
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

According to our research the visa can take up to 45 days. This is not a fixed time. It depends entirely on the embassy/consulate. We are willing to accommodate but this is obviously out of our control. You are free to serve the notice, of course. If you do so, we will challenge it and ask the court to sanction you for acting in bad faith.

**ENRIQUE JARAMILLO**
Attorney / Shareholder

FBFK LAW

BEST LAW FIRMS RANKED BY Best Lawyers UNITED STATES 2026

**FBFK LAW**
(713) 403-4200 Office | (713) 403-4201 Fax
3200 Southwest Freeway, Suite 3200
Houston, Texas 77027
ejaramillo@fbfk.law
www.fbfk.law

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at

our Dallas telephone number: (972) 378-9111.

**From:** puleciobockd@gtlaw.com <puleciobockd@gtlaw.com>
**Sent:** Tuesday, July 28, 2026 1:45 PM
**To:** Enrique Jaramillo <ejaramillo@fbfk.law>; Daniela.JohnsonRestrepo@gtlaw.com; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** kellerc@gtlaw.com; pusaterim@gtlaw.com; Meredith.Yates@gtlaw.com
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

I don't see a reason why we cannot keep same dates already discussed.

We will notice them for the agreed upon dates in Madrid.

There is no reason for delay when visas take a few days to be issued.

---

**From:** Enrique Jaramillo <ejaramillo@fbfk.law>
**Sent:** Tuesday, July 28, 2026 12:28 PM
**To:** Pulecio-Boek, Daniel (Shld-DC-LT) <puleciobockd@gtlaw.com>; Johnson Restrepo, Daniela E. (Assoc-DC-LT) <Daniela.JohnsonRestrepo@gtlaw.com>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** Keller, Courtney M. (Shld-ORL-LT) <kellerc@gtlaw.com>; Pusateri, Michael (Shld-DC-LT) <pusaterim@gtlaw.com>; Yates, Meredith (Assoc-ORL-LT) <Meredith.Yates@gtlaw.com>
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

The depositions could take place in Madrid, Spain.

**ENRIQUE JARAMILLO**
Attorney / Shareholder

**FBFK LAW**
(713) 403-4200 Office | (713) 403-4201 Fax
3200 Southwest Freeway, Suite 3200

Houston, Texas 77027
ejaramillo@fbfk.law
www.fbfk.law

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

---

**From:** puleciobоekd@gtlaw.com <puleciobоekd@gtlaw.com>
**Sent:** Tuesday, July 28, 2026 10:03 AM
**To:** Enrique Jaramillo <ejaramillo@fbfk.law>; Daniela.JohnsonRestrepo@gtlaw.com; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** kellerc@gtlaw.com; pusaterim@gtlaw.com; Meredith.Yates@gtlaw.com
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

What country in Europe, please?

---

**From:** Enrique Jaramillo <ejaramillo@fbfk.law>
**Sent:** Tuesday, July 28, 2026 10:52 AM
**To:** Pulecio-Boek, Daniel (Shld-DC-LT) <puleciobоekd@gtlaw.com>; Johnson Restrepo, Daniela E. (Assoc-DC-LT) <Daniela.JohnsonRestrepo@gtlaw.com>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** Keller, Courtney M. (Shld-ORL-LT) <kellerc@gtlaw.com>; Pusateri, Michael (Shld-DC-LT) <pusaterim@gtlaw.com>; Yates, Meredith (Assoc-ORL-LT) <Meredith.Yates@gtlaw.com>
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

There are non-U.S. persons on our team. Let me know whether you are interested in pursuing that, and I'll provide an estimate of when we could schedule the depositions. Otherwise, Mr. Manrique and Ms. Saus remain available on the dates previously scheduled via Zoom.

**ENRIQUE JARAMILLO**
Attorney / Shareholder

**FBFK LAW**
(713) 403-4200 Office | (713) 403-4201 Fax
3200 Southwest Freeway, Suite 3200
Houston, Texas 77027
ejaramillo@fbfk.law
www.fbfk.law

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

---

**From:** pulecioboekd@gtlaw.com <pulecioboekd@gtlaw.com>
**Sent:** Tuesday, July 28, 2026 9:48 AM
**To:** Enrique Jaramillo <ejaramillo@fbfk.law>; Daniela.JohnsonRestrepo@gtlaw.com; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** kellerc@gtlaw.com; pusaterim@gtlaw.com; Meredith.Yates@gtlaw.com
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

Where in Europe?

And US persons don’t need visa to get to Europe, so no reason for delay.

---

**From:** Enrique Jaramillo <ejaramillo@fbfk.law>
**Sent:** Tuesday, July 28, 2026 10:45 AM
**To:** Johnson Restrepo, Daniela E. (Assoc-DC-LT) <Daniela.JohnsonRestrepo@gtlaw.com>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** Pulecio-Boek, Daniel (Shld-DC-LT) <pulecioboekd@gtlaw.com>; Keller, Courtney M. (Shld-ORL-LT) <kellerc@gtlaw.com>; Pusateri, Michael (Shld-DC-LT) <pusaterim@gtlaw.com>; Yates, Meredith (Assoc-ORL-LT) <Meredith.Yates@gtlaw.com>

**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

Hi Daniela,

Apologies for the delay. Mr. Manrique and Ms. Saud are unable to come to the United States. They are currently in Europe. Are you interested in taking the depositions in a foreign country? We would not oppose it, but we would have to move the dates because some people in our team would have to get visas.

Thanks,

**ENRIQUE JARAMILLO**
Attorney / Shareholder

FBFK LAW

BEST LAW FIRMS RANKED BY Best Lawyers UNITED STATES 2026

**FBFK LAW**
(713) 403-4200 Office | (713) 403-4201 Fax
3200 Southwest Freeway, Suite 3200
Houston, Texas 77027
ejaramillo@fbfk.law
www.fbfk.law

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

---

**From:** Daniela.JohnsonRestrepo@gtlaw.com <Daniela.JohnsonRestrepo@gtlaw.com>
**Sent:** Tuesday, July 28, 2026 9:28 AM
**To:** Enrique Jaramillo <ejaramillo@fbfk.law>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** pulecioboekd@gtlaw.com; kellerc@gtlaw.com; pusaterim@gtlaw.com; Meredith.Yates@gtlaw.com
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-

WFJ-SPF

Hi Enrique,

I am following up on my previous email.

We would like to identify a mutually convenient location for the depositions of Mr. Manrique and Ms. Saud so that we can plan accordingly.

Thank you,
Daniela

**Daniela Johnson Restrepo**
T +1 202.530.8563 | C 202.352.4991
Daniela.JohnsonRestrepo@gtlaw.com

---

**From:** Johnson Restrepo, Daniela E. (Assoc-DC-LT)
**Sent:** Thursday, July 23, 2026 10:48 AM
**To:** 'Enrique Jaramillo' <ejaramillo@fbfk.law>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** Pulecio-Boek, Daniel (Shld-DC-LT) <pulecioboekd@gtlaw.com>; Keller, Courtney M. (Shld-ORL-LT) <kellerc@gtlaw.com>; Pusateri, Michael (Shld-DC-LT) <pusaterim@gtlaw.com>; Yates, Meredith (Assoc-ORL-LT) <Meredith.Yates@gtlaw.com>
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

Hi Enrique,

Thank you for your prompt response.

We are confirming the depositions of Mr. Manrique on August 25 at 10 a.m. CT and Ms. Saud on August 28 at 10 a.m. CT. We will arrange for interpreters for both depositions.

We intend to conduct both depositions in person and would like to identify a mutually convenient location. Please let me know where you think would be best. We can conduct depositions at any GT office but are also open to alternative locations.

Thank you,
Daniela

**Daniela Johnson Restrepo**

T +1 202.530.8563 | C 202.352.4991
Daniela.JohnsonRestrepo@gtlaw.com

---

**From:** Enrique Jaramillo <ejaramillo@fbfk.law>
**Sent:** Tuesday, July 21, 2026 9:11 PM
**To:** Johnson Restrepo, Daniela E. (Assoc-DC-LT) <Daniela.JohnsonRestrepo@gtlaw.com>; Jessica Flores <jflores@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** Pulecio-Boek, Daniel (Shld-DC-LT) <pulecioboekd@gtlaw.com>; Keller, Courtney M. (Shld-ORL-LT) <kellerc@gtlaw.com>; Pusateri, Michael (Shld-DC-LT) <pusaterim@gtlaw.com>; Yates, Meredith (Assoc-ORL-LT) <Meredith.Yates@gtlaw.com>
**Subject:** RE: Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

***EXTERNAL TO GT***

Hello Daniela,

Unfortunately, the first week of August is not possible. Mr. Manrique is available on August 25 at 10:00 a.m. CT, and Ms. Saud is available on August 28 at 10:00 a.m. CT. Please note that both will require an interpreter proficient in English and Spanish.

Best,

**ENRIQUE JARAMILLO**
Attorney / Shareholder

FBFK LAW

BEST LAW FIRMS RANKED BY Best Lawyers UNITED STATES 2026

**FBFK LAW**
(713) 403-4200 Office | (713) 403-4201 Fax
3200 Southwest Freeway, Suite 3200
Houston, Texas 77027
ejaramillo@fbfk.law
www.fbfk.law

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination,

distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

---

**From:** Daniela.JohnsonRestrepo@gtlaw.com <Daniela.JohnsonRestrepo@gtlaw.com>
**Sent:** Friday, July 17, 2026 11:48 AM
**To:** Jessica Flores <jflores@fbfk.law>; Enrique Jaramillo <ejaramillo@fbfk.law>; Kenneth Holt <kholt@fbfk.law>; Adolfo.Jimenez@hklaw.com; Phil.Rothschild@hklaw.com; Anne.Colbert@hklaw.com; Gabriella.Lanzas@hklaw.com; Adam.Poe@hklaw.com; William.SanPedro@hklaw.com; anabel.pargas@hklaw.com; Kelly.Sweeney@hklaw.com; wendysue.henry@hklaw.com
**Cc:** pulecioboekd@gtlaw.com; kellerc@gtlaw.com; pusaterim@gtlaw.com; Meredith.Yates@gtlaw.com
**Subject:** Depositions of Karla Saud Calero and Jose Walther Manrique Suarez - 8:25-cv-03433-WFJ-SPF

Good afternoon,

We intend to take the depositions of Karla Saud Calero and Jose Walther Manrique Suarez. Please provide their availability for the first week of August.

Thank you,
Daniela

**Daniela Johnson Restrepo**
Associate

Greenberg Traurig, LLP
2101 L Street N.W. | Suite 1000 | Washington, D.C. 20037

T +1 202.530.8563 | C 202.352.4991
Daniela.JohnsonRestrepo@gtlaw.com | www.gtlaw.com | View GT Biography

GT GreenbergTraurig

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.

***Attorney-Client Work Product***
*Privileged & Confidential*

June 12, 2026

To: Gabriel Secaira, Andrea Aguilar, and Veronica Alcivar of CELEC
From: Daniel Pulecio-Boek of Greenberg Traurig
**Re: Financial Tracing Strategy**

This memorandum sets forth the financial tracing strategy that Greenberg Traurig is executing on behalf of Corporación Eléctrica del Ecuador ("CELEC") in the litigation pending in the United States District Court against Progen Industries LLC, its affiliated entities, and the individual and corporate defendants alleged to have participated in the diversion and laundering of institutional funds paid by CELEC (the "Action"). The Action asserts, among other claims, civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and common law causes of action sounding in fraud, civil conspiracy, conversion, and unjust enrichment.

The federal claims pleaded—and in particular the RICO predicate acts of wire fraud, money laundering, and engagement in monetary transactions in property derived from specified unlawful activity—provide our team with the full procedural arsenal of the Federal Rules of Civil Procedure to conduct broad, fund-by-fund tracing of the monies paid by CELEC to Progen. Specifically, Rules 26, 34, and 45 authorize CELEC to compel production of records from parties and non-parties alike, including banking institutions, suppliers, downstream payees, escrow agents, professional service providers, and individual recipients believed to have received, transmitted, or benefitted from misappropriated funds. Federal courts have repeatedly recognized that, where (as here) a plaintiff pleads a RICO enterprise and a fraudulent scheme involving the movement of funds through multiple accounts and intermediaries, the discovery of complete banking and transactional records of both defendants and third-party recipients constitutes essential, proportional, and legally protected evidentiary development necessary to (i) prove the existence and structure of the enterprise, (ii) establish the pattern of racketeering activity, (iii) trace the proceeds to their ultimate destinations, and (iv) support remedies including disgorgement, constructive trust, and treble damages.

Consistent with that strategy, our team has, to date, served forty-one (41) third-party subpoenas and seven (7) sets of Requests for Production on party defendants. The records obtained have permitted us to identify principal downstream recipients of the funds Progen received from CELEC, the secondary recipients of the funds Astrobryxa received from Progen, and a preliminary inventory of identifiable real property assets held by certain Defendants.

This memorandum summarizes (i) the discovery and subpoena program executed to date, (ii) the principal recipients of funds traced thus far, (iii) identifiable real property assets, and (iv) the next phases of tracing, including additional subpoena targets, anticipated motion practice, and the limitations bearing on ultimate recovery of the approximately $110 million owed to CELEC.



**Exhibit "E"**

EXHIBIT
E

## Section I: Third Parties Subpoenaed and Parties Served With Discovery

The charts that follow summarize the formal evidentiary development executed to date in furtherance of CELEC's financial tracing strategy. The first chart sets forth each non-party recipient that has been served with a Rule 45 subpoena duces tecum, the date of service, the response deadline, and the dates upon which responsive documents have been received (or notation that the response remains outstanding or that the entity has since been named as a Defendant). The second chart sets forth each party defendant served with Requests for Production under Rule 34, together with the corresponding production status. Together, these charts reflect the breadth of the discovery program through which we are reconstructing the flow of funds from CELEC to Progen and onward to downstream recipients.

Third Parties Subpoenaed

| RECIPIENT | SERVED | RESPONSE DUE | DOCS RECEIVED |
|---|---|---|---|
| **Regions Bank (1st Subpoena)** | 02-13-2026 | 03-05-2026 | 03-24-2026 via email<br>03-27-2026 via email<br>04-15-2026 via email |
| **Lakeland Electric** | 03-04-2026 | 03-20-2026 | 03-11-2026 via email<br>03-17-2026 via email |
| **Pacific Gas & Electric Company** | 03-04-2026 | 03-20-2026 | 04-10-2026 via email |
| **Clearing House Payments Company** | 03-05-2026 | 03-23-2026 | 04-25-2026 via email |
| **The Federal Reserve Bank of New York** | 03-06-2026 | 03-23-2026 | 05-11-2026 via email |
| **Regions Bank (2nd Subpoena)** | 03-26-2026 | 04-08-2026 | 04-07-2026 via email |
| **ABB Inc.** | 05-05-2026 | 05-11-2026 | Outstanding (no response) |
| **American Express Company** | 04-24-2026 | 05-11-2026 | N/A (requested that subpoena be sent to sub-entity of AMEX) |
| **Apollo Electric Inc. of Texas** | 05-04-2026 | 05-11-2026 | 05-04-2026 via email |

| | | | |
|---|---|---|---|
| **A.R. Savage & Son LLC** | 04-29-2026 | 05-11-2026 | 05-13-2026 via email |
| **Bank of America Corporation N.A.** | 04-24-2026 | 05-11-2026 | 05-12-2026 via email<br>06-08-2026 via email |
| **Click Capital Group LLC** | 04-27-2026 | 05-11-2026 | Outstanding (no response) |
| **Enerset Electric Ltd** | 05-16-2026 | 06-15-2026 | -<br>(deadline not yet passed) |
| **Five Star Leasing LLC** | 05-04-2026 | 05-11-2026 | 05-04-2026 via email |
| **H&S Industry LLC** | 04-27-2026 | 05-11-2026 | N/A (now a Defendant) |
| **Hilliard Enterprises, Inc.** | 05-11-2026 | 05-11-2026 | 05-13-2026 via email |
| **Industrial Surplus Inc.** | 05-26-2026 | 06-15-2026 | -<br>(deadline not yet passed) |
| **Instafunders LLC** | 05-04-2026 | 05-11-2026 | Outstanding (no response) |
| **InterFab Services LLC** | 04-27-2026 | 05-11-2026 | 06-02-2026 via email |
| **Lucky 8 Ventures** | 5-20-2026 | 06-15-2026 | -<br>(deadline not yet passed) |
| **Mid-America Engine Inc.** | 04-30-2026 | 05-11-2026 | Outstanding (no response) |
| **My Box Inc.** | 05-02-2026 | 05-11-2026 | 05-26-2026 via email |
| **RayK Holdings LLC** | 05-20-2026 | 06-15-2025 | 06-10-2026 via email |
| **Raymond Kuntz** | 05-06-2026 | 06-15-2026 | 06-10-2026 via email |
| **Resa Power LLC** | 04-27-2026 | 05-11-2026 | Outstanding (no response) |
| **SBM Construction Services LLC** | Outstanding<br>(awaiting service) | 06-15-2026 | -<br>(not yet served) |
| **Simple Management Group Inc.** | 04-27-2026 | 05-11-2026 | 05-08-2026 via email |
| **Spirit Specialty Alloy & Metals** | 04-29-2026 | 05-11-2026 | Outstanding (no response) |
| **Swift Funding Source Inc.** | 05-21-2026 | 06-15-2026 | Outstanding (no response) |
| **Two Lions' Holdings LLC** | 05-02-2026 | 05-11-2026 | N/A (now a Defendant) |
| **American Express National Bank** | 05-14-2026 | 06-01-2026 | Outstanding (no response) |
| **American Express Travel Related Services Company Inc.** | 05-14-2026 | 06-01-2026 | Outstanding (no response) |
| **Renewable Investment Corp** | Outstanding<br>(awaiting service) | 07-06-2026 | -<br>(not yet served) |

| | | | |
|---|---|---|---|
| **Via Energy Solutions, LLC** | 06-08-2026 | 07-06-2026 | -<br>(deadline not yet passed) |
| **Kronos Saashr, Inc.** | Outstanding<br>(awaiting service) | 07-06-2026 | -<br>(not yet served) |
| **Acrecent Financial Corporation** | Outstanding<br>(awaiting service) | 07-06-2026 | -<br>(not yet served) |
| **Garrett K. Williamson** | 6/5/2026 | 07-06-2026 | -<br>(deadline not yet passed) |
| **Shane Lawlor** | Outstanding<br>(awaiting service) | 07-06-2026 | -<br>(not yet served) |
| **Standard Chartered Bank (New York)** | 6/11/2026 | 07-06-2026 | Objections received via email on 6/12/2026. |
| **Edward D Jones And Company, L.P.** | 06-08-2026 | 07-06-2026 | -<br>(deadline not yet passed) |
| **Wonderland Escrow, Inc Trust Account** | 06-09-2026 | 07-06-2026 | -<br>(deadline not yet passed) |

Parties Served With Requests for Production

| PARTY DEFENDANT | SERVED | DOCS RECEIVED |
|---|---|---|
| **Progen Industry LLC** | 02-13-2026 | *Document Production Ongoing* |
| **Genertek Power Corp.** | 02-13-2026 | *Document Production Ongoing* |
| **Genertek Power Industries LLC** | 02-13-2026 | *Document Production Ongoing* |
| **Andrew Williamson** | 03-03-2026 | *Document Production Ongoing* |
| **John Manning** | 03-03-2026 | *Document Production Ongoing* |
| **Wade Manning** | 03-03-2026 | Outstanding<br>(Followed up on: 5-4-2026, 5-28-2026, 6-12-2026) |

| | | |
|---|---|---|
| **Astrobryxa S.A.** | 02-13-2026 | Outstanding<br>(Defeated Astrobryxa's Motion to prevent discovery and have been engaging in good faith discussions to obtain discovery. Will file a Motion to Compel on Monday (6-15-2026) if no status updated by then) |

Other Documents Received

- AP Inspections LLC in Texas provided all documents and communications pertaining to four (4) generator inspections voluntarily
  - AP Inspections LLC also provided a signed declaration regarding the same

To date, the most probative materials produced have come from two sources:

First, the records produced by Regions Bank in response to our two subpoenas have allowed us to reconstruct, on a transaction-by-transaction basis, the movement of funds out of Progen's primary operating account following Progen's receipt of CELEC's payments, and to identify the principal downstream recipients of those funds.

Second, the records produced by Bank of America have allowed us to trace the funds that Astrobryxa S.A. (operating in the United States as Astrobryxa, LLC) received from Progen, and to identify the secondary recipients to whom those funds were redirected—including international wires to Ecuadorian financial institutions and transfers to individuals affiliated with the alleged enterprise.

Section II below presents our preliminary analysis of the principal recipients identified through these two productions, organized by source account.

## Section II: Primary Recipients of Funds Progen Received From CELEC

Set forth below is a preliminary identification of the principal recipients of outbound funds from four accounts central to the tracing analysis: (1) Progen Industries LLC's primary Regions Bank operating account; (2) Astrobryxa S.A. (d/b/a Astrobryxa LLC)'s Bank of America business account; (3) the personal and business accounts of Karla Saud-Calero, a principal of the Astrobryxa entities; and (4) the personal account of Jose Walther Manrique Suarez, also affiliated with the Astrobryxa entities. The rankings reflect the aggregate dollar value of outbound transactions to each recipient during the periods indicated, based on bank statements, wire transfer reports, withdrawal records, and check images produced in response to the subpoenas referenced in Section I.[1]

### 1. Progen Industries LLC — Top Recipients of Outbound Funds

Account: Regions Bank Advantage Business Checking, Account No. [redacted]7917
Period: June 2024 through January 2026
Sources reviewed: Bank statements, wire transfer reports, withdrawals, and check images
Transaction types included: Wire transfers (domestic and international), ACH payments, checks, payroll debits, internal transfers, withdrawals, loan payments, credit card payments, and bank fees.

| Rank | Recipient | Aggregate Amount | Transactions | Type |
|---|---|---|---|---|
| 1 | Astrobryxa (S.A. / LLC) | [redacted] | 7 | Wire |
| 2 | Apollo Electric, Inc. | [redacted] | 10 | Wire |
| 3 | Prefunddbt / AWilliamson | [redacted] | 35 | Payroll |
| 4 | AOT Holding AG | [redacted] | [redacted] | Wire (international) |
| 5 | H&S Industry LLC | [redacted] | 2 | Wire |
| 6 | Five Star Leasing, LLC | [redacted] | [redacted] | Wire |
| 7 | Chase Credit Card | [redacted] | 32 | Electronic payment |

[1] The figures and rankings set forth in this Section reflect the work product of Greenberg Traurig's legal team based on a review of the bank records produced to date. These figures have not been independently verified or audited by a forensic accountant, and accordingly we cannot guarantee 100% numerical accuracy. Should litigation advance to trial, we anticipate retaining a forensic accounting expert to validate, refine, and expand this analysis, including by reconciling figures against records still being produced and tracing flows beyond the immediate downstream recipients identified herein.

***Attorney-Client Work Product***
*Privileged & Confidential*

| | | | | |
|---|---|---|---|---|
| | (*Believed to belong to Andrew Williamson*) | | | |
| 8 | Putnam & Creighton, P.A. | [redacted] | 3 | Wire |
| 9 | Jiangsu First Power Co. Ltd | [redacted] | 9 | Wire (international) |
| 10 | Prefunddbt / LAdam | [redacted] | 497 | Payroll |
| 11 | EB Transfer to Acct. #[redacted]1804 (*A different Progen Regions account*) | [redacted] | 11 | Internal transfer |
| 12 | Bank Debit (Withdrawals) (*Believed to be withdrawn by Andrew Williamson*) | [redacted] | 7 | Debit (Checking Withdrawl) |
| 13 | INYCOFYI Ingenieria y Construccion | [redacted] | 4 | Wire (international) |
| 14 | SBA EIDL Loan Payment | [redacted] | 28 | Loan payment |
| 15 | Prefunddbt / DSholar | [redacted] | 271 | Payroll |
| 16 | SBM Construction | [redacted] | 15 | Wire |
| 17 | Gestores Inmobiliarios Lightblue | [redacted] | 2 | Wire (international) |
| 18 | AMEX / Andrew William | [redacted] | 53 | ACH |
| 19 | Akil Corporation | [redacted] | 3 | Wire (international) |
| 20 | Enerset Electric, Ltd | [redacted] | 2 | Wire |
| 21 | Coastoil Dynamic S.A. de C.V. | [redacted] | [redacted] | Wire (international) |
| 22 | A.R. Savage & Son, LLC | [redacted] | 4 | Wire |
| 23 | Hilliard Enterprises, Inc. | [redacted] | 11 | Wire / ACH |
| 24 | Inter Fab Services LLC | [redacted] | 27 | Wire |
| 25 | Zhuhai Comking Electric Co. Ltd | [redacted] | 11 | Wire (international) |
| 26 | RayK Holdings LLC | [redacted] | 3 | Wire |

| | | | | |
|---|---|---|---|---|
| 27 | ABB Inc | [redacted] | 3 | Wire |
| 28 | Swift Funding | [redacted] | 27 | ACH / Wire |
| 29 | Southern Graphic Systems | [redacted] | 13 | ACH |

**2. Astrobryxa S.A. (d/b/a Astrobryxa LLC) — Top Recipients of Outbound Funds**

Account: Bank of America – Account No. [redacted] 5230 (Business Advantage Relationship Banking)
Period: February 2025 through April 2026
Sources reviewed: Bank statements, wire transfer reports
Transaction types included: Wires, Zelle, checks, ACH debits, and card transactions
Total Outgoing Transactions: 776 transactions totaling [redacted]

| Rank | Recipient | # of Transactions | Transaction Types | Aggregate Total |
|---|---|---|---|---|
| 1 | Astrobryxa SA | 7 | International wires (Banco del Austro, Ecuador) | [redacted] |
| 2 | Consorcio Soluenergy | 3 | International wires (Banco del Austro, Ecuador) | [redacted] |
| 3 | Jose Luis Hidalgo | 1 | International wire (Banco Pichincha, Ecuador) | [redacted] |
| 4 | Consorcio Autotrafo EC 202 | 2 | Domestic book wires | [redacted] |
| 5 | Anthony M. York | 3 | Domestic book wires | [redacted] |
| 6 | Constructora Nomur SA | 3 | International wires (Banco Pichincha, Ecuador) | [redacted] |
| 7 | Alex Duenas | 2 | International wires (Banco Pichincha, Ecuador) | [redacted] |
| 8 | Constructora Raices Altave | 3 | 1 international wire + 2 debit card purchases | [redacted] |
| 9 | Jose Walther Manrique Suarez | 3 | Domestic book wires | [redacted] |
| 10 | Pamela Chiriboga | 1 | Domestic wire | [redacted] |

### 3. Karla Saud-Calero (of Astrobryxa LLC and Astrobryxa S.A.) — Top Recipients of Outbound Funds

Account: Bank of America – Account No. [redacted] 0025 (personal checking) and No. [redacted] 2766 (E.Z. Saver Insurance, business)
Period: December 2023 through May 2026
Sources reviewed: Bank statements
Total Outgoing Transactions: 1,270 transactions totaling [redacted]

(*Note: The E.Z. Saver Insurance business account had minimal outgoing activity [primarily monthly service fees and three teller withdrawals totaling $*[redacted]*]. The overwhelming majority of transactions were from the personal account.*)

| Rank | Recipient | # of Transactions | Transaction Types | Aggregate Total |
|---|---|---|---|---|
| 1 | Freedom Mortgage | 12 | 1 wire payoff + 11 ACH mortgage payments | [redacted] |
| 2 | Amazonsupply Cia. Ltda. | 1 | International wire (Banco de la Produccion, Ecuador) | [redacted] |
| 3 | Freddy Pastor | 9 | Zelle payments | [redacted] |
| 4 | Cash (teller withdrawals) | 3 | In-branch teller withdrawals | [redacted] |
| 5 | Copa Airlines | 22 | Debit card purchases | [redacted] |
| 6 | ATM Withdrawals (Bank of America) | 17 | ATM cash withdrawals | [redacted] |
| 7 | Maricela Moran | 6 | Zelle payments (described as "Esposa Freddy Pastor") | [redacted] |
| 8 | Two Degrys ATE | 1 | Check #846; memo: "Aire Acondicionado" | [redacted] |
| 9 | The Alfaro Law Group (Houston) | 1 | Debit card purchase | [redacted] |
| 10 | Corpco | 10 | Debit card purchases | [redacted] |

**4. Jose Walther Manrique Suarez (of Astrobryxa LLC and Astrobryxa S.A.) — Top Recipients of Outbound Funds**

Account: Bank of America – Account No. [redacted] 7884 (Adv Plus Banking)
Period: December 2023 through April 2026
Sources reviewed: Bank statements
Total Outgoing Transactions: 600 transactions totaling $[redacted]

| Rank | Recipient | # of Transactions | Transaction Types | Aggregate Total |
|---|---|---|---|---|
| 1 | Progen Industries LLC | 3 | 2 domestic wires + 1 bank transfer | [redacted] |
| 2 | Wonderland Escrow, Inc. Trust | 3 | Domestic wires (Citizens Business Bank) | [redacted] |
| 3 | Anthony M. York | 3 | Domestic book wires | [redacted] |
| 4 | Sieyuan Electric S.A. LLC | 1 | Domestic book wire | [redacted] |
| 5 | Karla Saud-Calero | 8 | 7 domestic book/international wires + 1 Zelle | [redacted] |
| 6 | Pamela Chiriboga | 1 | Domestic wire (JPMorgan Chase) | [redacted] |
| 7 | Ferguson Braswell Fraser | 1 | Domestic wire | [redacted] |
| 8 | H & S Industry LLC | 2 | Domestic book wires | [redacted] |
| 9 | Angela Maria Manrique Suarez | 3 | International wires (via Citibank) | [redacted] |
| 10 | Best Buy | 2 | In-store purchases (Lakeland, FL) | [redacted] |

## Section III – Identifiable Real Property Assets

In parallel with the financial tracing described above, our team has begun identifying real property assets held by certain Defendants and their affiliated entities that may be available to satisfy a future judgment or that may be subject to equitable remedies such as a constructive trust. The table below is a preliminary, non-exhaustive sampling of identifiable real property assets located through publicly available records (county property appraiser databases, deed records, and corporate filings). It is not intended to represent a complete inventory of all real property holdings of the Defendants or related individuals and entities, and additional asset identification—including out-of-state properties, properties held by nominees, and personal property assets—remains ongoing.

| Owner | Address | Approx. Value |
|---|---|---|
| Andrew Williamson | [redacted] | [redacted] |
| Andrew Williamson | [redacted] | [redacted] |
| John & Jennifer Manning | [redacted] | [redacted] |
| Jennifer Manning | [redacted] | [redacted] |
| John & Jennifer Manning | [redacted] | [redacted] |
| MyBox (Williamson Entity) | [redacted] | [redacted] |
| MyBox (Williamson Entity) | [redacted] | [redacted] |
| MyBox (Williamson Entity) | [redacted] | [redacted] |
| MyBox (Williamson Entity) | [redacted] | [redacted] |
| **TOTAL** | | [redacted] |

## Conclusion

The financial tracing strategy outlined above remains in active execution and will continue to expand as additional records are produced. Based on the analysis to date, we have identified material flows of funds from Progen and the Astrobryxa entities to dozens of downstream recipients, including domestic suppliers, international payees in Ecuador and elsewhere, individual insiders of the alleged enterprise, credit-card and consumer accounts associated with the individual Defendants, and real property holdings with an aggregate sampled value of approximately $[redacted].

**Areas of Continued Focus.** We anticipate the following next steps in the tracing program:

1. **Additional Third-Party Subpoenas.** Based on records received to date, we intend to issue further Rule 45 subpoenas to additional downstream recipients identified in the Regions and Bank of America productions as well as additional financial institutions identified as receiving second-tier transfers.

2. **Motion Practice.** We will move to compel production from Wade Manning if no substantive response is received by Monday, June 15, 2026, and from Astrobryxa S.A. on the same date if good-faith negotiations have not produced an enforceable production schedule. We will also litigate the objections received from Standard Chartered Bank (New York) on June 12, 2026.

3. **Forensic Accounting.** If this case advances to trial, we recommend engaging a forensic accounting expert to (i) validate the preliminary figures set forth in Section II, (ii) construct a complete fund-flow model from CELEC's payments through all identifiable downstream recipients, (iii) identify commingled or layered transactions consistent with money laundering predicate acts under 18 U.S.C. §§ 1956 and 1957, and (iv) prepare expert reports and trial exhibits.

4. **Asset Identification and Preservation.** We will expand the real property inventory to include holdings outside Florida and properties held through nominee entities, and will evaluate the appropriateness of seeking prejudgment remedies (preliminary injunction, lis pendens, constructive trust, asset freeze) as the tracing record matures.

**Limitations and Likelihood of Recovery.** While the tracing program has been productive and is legally well-supported under the federal RICO and fraud claims pleaded, several limitations bear directly on the likelihood of recovering the full approximately $110 million owed to CELEC:

- **International Dissipation.** A material portion of the funds traced from Progen and Astrobryxa has been wired to recipients in Ecuador, China, Mexico, and Switzerland. Recovery of funds that have left the United States banking system depends on the

cooperation of foreign financial institutions and judicial authorities, and may require parallel proceedings or recognition of a U.S. judgment abroad. These processes are time-consuming, expensive, and uncertain in outcome.

- **Dissipation Through Consumption and Layering.** Significant portions of the traced funds appear to have been consumed (credit card payments, payroll, ATM withdrawals, consumer purchases) or layered through multiple individual and entity accounts in ways that may render them non-recoverable as a practical matter.

- **Non-Responsive and Outstanding Subpoenas.** A substantial number of subpoenaed third parties have not yet responded, and certain anticipated productions may be subject to objections or motion practice that will delay or limit available evidence.

- **Solvency of Defendants.** Even assuming a favorable judgment, the ultimate recovery will depend on the solvency and asset positions of the Defendants. The identifiable real property holdings sampled in Section III [redacted]), while material, fall well short of CELEC's total damages, and additional asset discovery will be necessary to assess realistic recovery scenarios.

Notwithstanding these limitations, the legal framework provided by the RICO and fraud claims—and the broad discovery tools available in federal court—give CELEC the strongest available platform on which to construct a comprehensive evidentiary record of the alleged conspiracy, the structure of the enterprise, the pattern of racketeering activity, and the final destination of the institutional funds.