**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CELEC EP,

Plaintiff,

v.

PROGEN INDUSTRIES, LLC, *et al.*,

Defendants

Case No. 8:25-cv-03433

Judge Jung

**PLAINTIFF'S MOTION FOR FINAL DEFAULT JUDGMENT AGAINST DEFENDANT, A.P. INSPECTIONS LATINOAMERICA, S.A.**

Plaintiff, the Ecuadorian government acting through the Strategic Public Company Electric Corporation of Ecuador ("CELEC") pursuant to Fed. R. Civ. P. 55(b), L.R. 1.10(c) and 3.01, and DEs 181, 183, respectfully requests entry of a Final Default Judgment against Defendant A.P. Inspections Latinoamerica, S.A. ("A.P. Latinoamerica").

## Introduction

This action arises from a fraudulent scheme perpetrated against the Ecuadorian government by A.P. Latinoamerica and its co-conspirators, through which Defendants formed an enterprise that stole nearly $110 million from the government of Ecuador and its people during a period of acute national vulnerability. *See* DE 128 (Amended Complaint). CELEC brings this motion for final default judgment against one of the central participants in that scheme: A.P. Latinoamerica, an Ecuadorian corporation that issued at least ten sham inspection reports of the generators at issue in this lawsuit.

Those sham inspection reports were used to fraudulently induce CELEC to make payments totaling nearly $110 million to Defendant Progen Industries, LLC ("Progen") for used and defective power generators.

Despite having been properly served in this action, A.P. Latinoamerica has failed to appear, answer, or otherwise defend this action. The Clerk of Court entered a default against A.P. Latinoamerica on August 17, 2026. Accordingly, all well-pleaded factual allegations of the Amended Complaint are deemed to have been admitted as true by Defendant A.P. Latinoamerica. *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) ("A defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." (internal quotation marks omitted)); *Miller v. Paradise of Port Richey*, Inc., 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999) (explaining it is well-settled that when a defendant fails to plead or otherwise defend, the "defaulted defendant admits well-pleaded allegations of liability.").

Because the Amended Complaint's well-pleaded allegations establish A.P. Latinoamerica's liability on all counts against it, and because this Court has jurisdiction over this action and over A.P. Latinoamerica, CELEC respectfully requests that the Court enter a final default judgment against A.P. Latinoamerica.

## Factual Background

In 2024, Ecuador experienced a severe energy crisis after a prolonged drought depleted water levels at hydroelectric plants. The Ecuadorian government declared a

national emergency and imposed daily blackouts of up to fourteen hours, causing hundreds of millions of dollars in economic harm each month and leading to increased crime, house fires, and adverse public health impacts. In response, CELEC solicited bids on an expedited emergency basis for two terrestrial thermal generation projects—one in Quevedo, Ecuador (the "Quevedo Contract") and one in Salitral, Ecuador (the "Salitral Contract") (together, the "Contracts").

Progen, exploiting Ecuador's desperate need for power generation, submitted bids for both Contracts that were laden with false representations and forged documents, including a forged certificate from Lakeland Electric purporting to show prior project experience that Progen never had. *See* DE 128 (Ex A).[1] Based on those misrepresentations, CELEC awarded both Contracts to Progen and ultimately paid Progen a total of approximately $107,370,000 across the two Contracts—$37,790,000 under the Quevedo Contract and $69,580,000 under the Salitral Contract—through international wire transfers to Progen's account at Regions Bank in Birmingham, Alabama. Progen delivered nothing of value: the generators it eventually imported into Ecuador were used, defective, or non-functional, and, critically, the generators were not compliant with the Contracts' specifications, which required they be new.[2]

---

[1] Relevant discovery obtained from the City of Lakeland, demonstrating the certificate was a forgery, is attached to this Motion as Exhibit A.

[2] The Contracts required that the generators be "new" and have zero hours of use. *See* DE 128-2 (Ex. B) (Quevedo Contract); DE 128-7 (Ex. E) (Salitral Contract). Specifically, the Quevedo Contract required that the generators ("los grupos electrógenos") be "nuevos con cero horas de uso"—in English, new with zero hours of use. *See* DE 128-2 at § 5.1. And the Salitral Contract also specifically required the

A.P. Latinoamerica was an indispensable participant in the above fraudulent scheme. A.P. Latinoamerica is an Ecuadorian corporation whose principal place of business is in Quito, Ecuador. A.P. Latinoamerica's U.S. operations have been conducted through its designated affiliate and agent, A.P. Inspections LLC, a Texas limited liability company ("A.P. Texas"), pursuant to a verbal agreement entered into in 2009 between Ricardo Nunez, Sr. (a member of A.P. Texas) and A.P. Latinoamerica's principals (Pamela Dillon and Vinicio Izuerieta). *See* DE 62 at Ex. 1 (Nunez Declaration). Under that agreement, A.P. Texas has for approximately 17 years served as A.P. Latinoamerica's U.S.-based agent, responsible for all of A.P. Latinoamerica's business within the United States.

A.P. Latinoamerica—and its Texas affiliate, A.P. Texas,[3] who acted at the direction of A.P. Latinoamerica—issued at least ten sham inspection reports in connection with the generators at issue in this litigation, falsely certifying that Progen had successfully manufactured new power generators in compliance with the Contracts' specifications, and that those generators were ready for delivery and

---

generators ("los grupos electrógenos") be "nuevos con cero horas de uso"—in English, new with zero hours of use. *See* DE 128-7 at Clause 5 (Cláusula Quinta).

[3] With respect to their role in the inspection of generators at issue in this action—consistent with their 2009 agreement—A.P. Latinoamerica directed A.P. Texas to handle all of A.P. Latinoamerica's inspection and reporting activities within the United States, save for inspection in Florida for which A.P. Texas did not have sufficient coverage. *See* DEs 62, 63. A.P. Texas carried out its inspection work and issued reports at the direction of A.P. Latinoamerica. All findings, report content and document transmission were subject to A.P. Latinoamerica's final approval.

installation. These reports were specifically designed to, and indeed ***did***, fraudulently induce CELEC to release payment to Progen.

With respect to the Salitral Contract, A.P. Latinoamerica issued three reports dated September 13, 14, and 15, 2024, falsely stating that Progen had successfully manufactured new power generators under the Salitral Contract, and parts were "all good, new and properly fabricated." Those reports are attached to this Motion as Exhibit B (Salitral Reports). The Salitral Reports show one of A.P. Latinoamerica's principals, Pamela Dillon, attended the inspections. CELEC, in turn, wired $69,580,000 to Progen on September 30, 2024, shortly after the issuance of these three sham reports. *See* DE 128-8 (Ex. F) (CELEC's Wire Transfer to Progen's Account at Regions Bank). CELEC later confirmed that none of the 29 power generators delivered under the Salitral Contract were new, all were used, defective, or non-functioning, and the inspection reports were demonstrably false. *See* DE 128-12 (Ex. J)

Critically, Progen has conceded that the generators were not new. *See* DE 141 (Counterclaim ¶¶ 29–30 (alleging that Progen was only required to provide "zero hour" generators, not "factory new" ones) and ¶¶ 34–35, 40–41 (admitting that Progen imported and installed "zero-hour" generators, not new ones).

With respect to the Quevedo Contract, A.P. Latinoamerica issued multiple reports between January 15 and February 24, 2025, falsely stating that Progen had manufactured new power generators under the Quevedo Contract and that those generators were ready for delivery and installation—"100% finished" and "satisfactory." Those reports are attached to this Motion as Exhibit C (Quevedo

Reports). The Quevedo Reports show that one of A.P. Latinoamerica's principals, Vinicio Izuerieta, attended some inspections. From January 24 to March 5, 2025, shortly after these seven sham reports were issued, CELEC wired $37,790,000 to Progen through five separate international wire transfers. *See* DE 128-3 (Ex. C) (CELEC's Wire Transfers to Progen's Account at Regions Bank). None of the 17 generators that Progen imported under the Quevedo Contract were new; all were used, defective, or non-functioning, and several had been repainted to hide rust.

**Procedural Background**

On December 15, 2025, CELEC filed its original complaint [DE 1], naming A.P. Latinoamerica as a Defendant to Counts I (federal RICO), II (Florida RICO), III (FDUTPA), and IV (Conversion). On December 23, 2025, A.P. Latinoamerica was served [DE 11]. A.P. Latinoamerica's deadline to answer or otherwise respond to the Complaint was January 13, 2026; A.P. Latinoamerica has failed to appear, answer, or otherwise defend this action.

On February 23, 2026, CELEC filed its first Motion for Entry of Clerk's Default Against AP Inspections Latinoamerica, S.A. [DE 56]. On February 25, 2026, the Court denied that motion without prejudice. *See* DE 59. On February 27, 2026, CELEC filed a Renewed Motion for Entry of Clerk's Default Against A.P. Inspections Latinoamerica, S.A. [DE 62], supported by the Declaration of Ricardo Nunez, Sr. of A.P. Texas, which established that A.P. Texas serves as A.P. Latinoamerica's designated affiliate and general agent in the United States, and that A.P. Texas transmitted the Complaint to A.P. Latinoamerica promptly after service.

On March 3, 2026, the Court granted CELEC's Renewed Motion, finding that CELEC had complied with the requirements of Rule 4(h)(1)(B) by delivering service to a person authorized to accept it on behalf of A.P. Latinoamerica, and directed the Clerk to enter default against A.P. Latinoamerica [DE 63]. That same day, the Clerk entered default against A.P. Latinoamerica. [DE 64]. CELEC then filed a Motion for Final Default Judgment [DE 71], which the Court denied [DE 139].

On June 2, 2026, CELEC filed an Amended Complaint [DE 128]. CELEC served A.P. Inspections (via A.P. Texas) with the Amended Complaint on June 29, 2026. *See* DE 160. CELEC moved for entry of Clerk's default, *see* DE 177, which the Court granted, *see* DEs 181, 183, again finding A.P. Inspections was proper served under Rule 4(h)(1)(B).

CELEC now moves for entry of default final judgment against A.P. Latinoamerica under the Amended Complaint [DE 128].

**<u>Legal Standard</u>**

The Federal Rules of Civil Procedure establish a two-step process for obtaining default judgment. *See* Fed. R. Civ. P. 55. First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, . . . the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Second, after obtaining a clerk's default, the plaintiff must move for default judgment. *See* Fed. R. Civ. P. 55(b); *see also* M.D. Fla. L. R. 1.10.

Before entering default judgment, the Court must ensure that it has jurisdiction over the claims and parties, and that the well-pleaded factual allegations, which are

assumed to be true, adequately state a claim for which relief may be granted. *See Nishimatsu Constr. Co. v. Hou. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).

## Argument

### I. Personal and Subject Matter Jurisdiction Are Proper.

Before entering default judgment, the Court must satisfy itself that it has both subject matter jurisdiction over the action and personal jurisdiction over the defaulting Defendant, A.P. Latinoamerica. *See Rismed Oncology Sys., Inc. v. Baron*, 638 Fed. App. 800, 805–06 (11th Cir. 2015). Further, the Court must ensure service of A.P. Latinoamerica was proper. *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990); *see*, *e.g.*, *Cohan v. Cape Canaveral Foods Grp. LLC*, 2022 WL 1289336, at *1 (M.D. Fla. Apr. 29, 2022) (explaining that "[s]ervice of process is a jurisdictional requirement," and that "courts lack jurisdiction over a defendant when the defendant has not been served"). All requirements are satisfied here.

First, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because CELEC asserts a claim under the federal civil RICO statute, 18 U.S.C. § 1962(c). The Court has supplemental jurisdiction over CELEC's state law claims (Counts II, III, IV) pursuant to 28 U.S.C. § 1367, because those claims arise out of the same nucleus of operative facts as CELEC's federal RICO claim—namely, the same fraudulent scheme in which A.P. Latinoamerica and its co-conspirators, operating as part of a criminal enterprise: (1) submitted false documents in bids for government contracts, (2) issued sham inspection reports falsely certifying that Progen had manufactured new, Contract-compliant power generators, thereby fraudulently

inducing CELEC to wire nearly $110 million to Progen's U.S. bank account, (3) failed to deliver Contract-compliant generators to CELEC, and (4) converted funds received from CELEC for the benefit of the enterprise.

Second, this Court has personal jurisdiction over A.P. Latinoamerica for the following (non-exhaustive) reasons: (1) the Amended Complaint alleges—and A.P. Latinoamerica has admitted by virtue of its default—that A.P. Latinoamerica conspired with and engaged in tortious conduct in and related to Florida, pursuant to Fla. Stat. § 48.193(1)(a), or otherwise engaged in substantial and not isolated activity within the State of Florida; (2) A.P. Latinoamerica participated in a fraudulent scheme that was directed from and centered in Florida, as the scheme's principal architect, Progen, is a Florida-registered company with its principal place of business in Florida; (3) A.P. Latinoamerica's false inspection reports were used to induce CELEC to wire funds to Progen's account at Regions Bank, and those wire transfers—totaling approximately $110,000,000—flowed to Progen, a Florida entity; and (4) some of A.P. Latinoamerica's generator inspections occurred in Florida.[4]

Third, this Court has already determined that service was proper. In its order granting CELEC's Motion for Entry of Clerk's Default [DE 177], the Court expressly found that "Plaintiff has submitted enough information for the Court to determine that

---

[4] Alternatively, the nationwide service of process provision of the federal civil RICO statute, 18 U.S.C. § 1965(d), provides that in a civil RICO action, process may be served "on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs," and Federal Rule of Civil Procedure 4(k) states that such service establishes personal jurisdiction. Here, A.P. Latinoamerica was served on its U.S.-based agent, A.P. Texas.

Plaintiff complied with the requirements of Rule 4(h)(1)(B) by delivering service to someone authorized to accept it on behalf of A.P. Inspections Latinoamerica." DE 181. A.P. Latinoamerica was properly served with the Amended Complaint via its U.S. agent, A.P. Texas, on June 29, 2026. *See* DEs 63-1, 160, 177, 181.

## II. Elements of Counts I–IV Are Established as to Defendant A.P. Latinoamerica.

A.P. Latinoamerica's default establishes its liability on each of Counts I through IV, as the Amended Complaint's well-pleaded allegations—now admitted—satisfy every element of each claim.

### A. Counts I and II – Federal RICO and Florida RICO

A civil RICO claim under 18 U.S.C. § 1962(c) requires: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

18 U.S.C. § 1962, RICO provides that any "person injured in his business or property by reason of a violation" of § 1962—having experienced that injury domestically,[5] *see RJR Nabisco Inc. v. European Community*, 136 S. Ct. 2090, 2111 (2016)—may bring a civil action for damages in federal district court, 18 U.S.C. § 1964(c). Subsection 1962(c) prohibits a person associated with "an

[5] "[D]etermining whether a plaintiff has alleged a domestic injury for purposes of RICO is a context-specific inquiry that turns largely on the particular facts alleged in a complaint. Specifically, courts should look to the circumstances surrounding the alleged injury to assess whether it arose in the United States. That means looking to the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Yegiazaryan v. Smagin*, 599 U.S. 533, 543–44 (2023) (citation and quotation modified).

enterprise" from participating, "directly or indirectly," in the enterprise's affairs "through a pattern of racketeering activity." For RICO purposes, an "enterprise" "[i]ncludes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). And "racketeering activity" includes, among other so-called "predicate" acts, the acts "indictable" under the mail and wire fraud statutes.[6] *See* 18 U.S.C. §§ 1341, 1343; 18 U.S.C. § 1961(1)(B). To make out a "pattern" of racketeering activity, a plaintiff must plead at least two related acts of mail or wire fraud, *see* 18 U.S.C. § 1961(5), and—with respect to each such act—allege with particularity the defendants' intentional participation in a "scheme . . . to defraud another of money or property" and their use of either the mails or wires to execute the scheme, *see United States v. Ward,* 486 F.3d 1212, 1222 (11th Cir. 2007); Fed. R. Civ. P. 9(b); *American Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1291 (11th Cir. 2010).

The elements of a Florida state RICO claim under Fla. Stat. § 895.03, with predicate acts of mail and wire fraud, *see id.* § 895.02(8)(b), are the same as the federal RICO requirements. *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1263–

[6] "Aside from the means by which a fraud is effectuated, the elements of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, are identical." *United States v. Ward*, 486 F.3d 1212, 1221 (11th Cir. 2007); *see Beck v. Prupis,* 162 F.3d 1090, 1095 & n. 9 (11th Cir. 1998). Both offenses require that a person (1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or "causes" the use of the mails or wires for the purpose of executing the scheme or artifice. *United States v. Hewes,* 729 F.2d 1302, 1320 (11th Cir. 1984) (mail fraud); *United States v. Hasson,* 333 F.3d 1264, 1270 (11th Cir. 2003) (wire fraud).

64 (11th Cir. 2004); *see also Gov't Emps. Ins. Co. v. Landau & Assocs., P.A.*, 2019 WL 12493609, at *13 (M.D. Fla. Mar. 29, 2019) ("Florida RICO is patterned on federal RICO, and courts analyze Florida RICO claims under the same analysis as federal RICO claims.").

Here, the well-pleaded facts of CELEC's Amended Complaint [DE 128[ demonstrate how the elements of both RICO claims are satisfied:

The Amended Complaint alleges that the RICO enterprise consists of Progen, Genertek Power Corp., Genertek Power Industries, John B. Manning, W. Wade Manning, Andrew S. Williamson, Astrobryxa S.A., Astrobryxa LLC, A.P. Latinoamerica, A.P. Inspections LLC [DE 128 at ¶ 85]. These Defendants formed an associated-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), organized for the common purpose of defrauding the Ecuadorian government out of nearly $110 million by exploiting Ecuador's 2024 energy crisis [DE 128 ¶¶ 1–2, 85–86]. The enterprise's activities affected interstate and foreign commerce because the predicate acts of mail and wire fraud were committed in the United States and were directed at enriching Defendants in the United States [DE 128 at ¶ 86]. A.P. Latinoamerica participated in conducting and managing the affairs of this enterprise by, among other things, coordinating with Progen and the other Defendants to issue false inspection reports that served as the mechanism through which payments were triggered and funds extracted from CELEC [DE 128 ¶¶ 55–62, 85–91].

The Amended Complaint also alleges—and A.P. Latinoamerica has admitted by defaulting—that the enterprise engaged in a pattern of racketeering activity through

multiple acts of wire fraud in violation of 18 U.S.C. § 1343 [DE 128 ¶¶ 87–91]. The pattern includes at least the following predicate acts in which A.P. Latinoamerica participated: (a) coordinating and causing the delivery to CELEC of three sham inspection reports dated September 13, 14, and 15, 2024, falsely certifying that Progen had manufactured new contract-compliant power generators under the Salitral Contract, which were transmitted via interstate and foreign wires and caused CELEC to wire $69,580,000 to Progen's U.S. bank account on September 30, 2024 [DE 128 ¶¶ 57–59]; and (b) coordinating and causing the delivery to CELEC of seven sham inspection reports between January 15 and February 24, 2025, falsely certifying that Progen had manufactured new, contract-compliant power generators under the Quevedo Contract, which were transmitted via interstate and foreign wires and caused CELEC to wire $37,790,000 to Progen's U.S. bank account through five separate international wire transfers between January 24 and March 5, 2025 [DE 128 ¶¶ 60–61]. *See* Exhibits B & C. Each report was false, as CELEC's expert later confirmed. All were used, defective, or non-functioning, and several had been repainted to hide rust. [DE 128 ¶¶ 59, 62–65; DE 128-11; DE 128-12.] These multiple acts of wire fraud are related—they share the same purpose (inducing CELEC to pay Progen for non-compliant generators), the same participants (including A.P. Latinoamerica, Progen, and the other Defendants), and the same victim (CELEC)—and they amount to or pose a threat of continued criminal activity, satisfying RICO's continuity requirement.

Further, the Amended Complaint alleges, and A.P. Latinoamerica has admitted by defaulting, that CELEC suffered domestic injury [DE 128 ¶¶ 92–96]. Specifically:

(1) many of the activities giving rise to the dispute occurred in or had a nexus to the United States, as the wire fraud predicates were committed in the United States and directed at U.S. bank accounts; (2) Defendants directed their scheme from the United States, specifically from Florida; (3) Defendants received the benefit of their misconduct through domestic bank accounts located in Birmingham, Alabama; (4) CELEC suffered injuries in the United States because the fraudulent scheme deprived it of the opportunity to contract with reputable U.S.-based bidders who would have actually performed the Contract, and (5) CELEC had to expend resources to investigate the extent of Defendants wrongdoing and had to retain U.S. counsel.

Finally, A.P. Latinoamerica's participation in the issuance of the sham inspection reports was the direct and proximate cause of CELEC's injuries. Causation is established: CELEC wired $69,580,000 and $37,790,000 to Progen shortly after A.P. Latinoamerica issued its Salitral and Quevedo reports, respectively—payments that would not have been made but for those false certifications [DE 128 ¶¶ 55–62].

Because all elements of Counts I and II are established by the Amended Complaint (and A.P. Latinoamerica's admitted conduct by defaulting), default judgment is warranted on both the federal and Florida RICO claims. The same predicate acts of wire fraud that satisfy the federal RICO elements equally satisfy the Florida RICO elements under Fla. Stat. § 895.03, with predicate offenses constituting federal wire fraud and violations of Fla. Stat. § 817.034, as alleged in the Amended Complaint [DE 128 ¶ 100].

**B. Count III – FDUTPA**

The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," Fla. Stat. § 501.204(1), and requires proof of (1) a deceptive or unfair practice, (2) causation, and (3) actual damages. *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006); *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 n.25 (11th Cir. 2012).

Here, the well-pleaded facts of the Amended Complaint, admitted as true by A.P. Latinoamerica's default, establish each of these three elements:

First, the Amended Complaint alleges that A.P. Latinoamerica engaged in deceptive and unfair acts and practices in the conduct of trade or commerce by coordinating and causing the delivery to CELEC of at least ten sham inspection reports that falsely certified that Progen had manufactured new, contract-compliant power generators [DE 128 ¶¶ 55–62, 103–107]. These acts were deceptive because they were intended to mislead, and did mislead, CELEC into believing that the power generators Progen had purportedly manufactured were new, met the Contracts' specifications, and were ready for delivery and installation—when in fact none of that was true [DE 128 ¶ 105]. Specifically, A.P. Latinoamerica's three Salitral inspection reports, dated September 13, 14, and 15, 2024, falsely stated that Progen's generators were "all good, new and properly fabricated," and A.P. Latinoamerica's multiple Quevedo inspection reports, issued between January 15 and February 24, 2025, falsely certified that the parts were "100% finished" and "completed and satisfactory." DE 128 ¶¶ 55–62. These

acts also constitute unfair and unconscionable practices because they were part of a coordinated scheme, centered in Florida, which exploited a national emergency to extract nearly $110 million from the Ecuadorian government through misrepresentation and fraud [DE 128 ¶¶ 4, 20, 26–27, 93–94, 103–107]. Each of these acts falls squarely within the scope of FDUTPA's prohibition on "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). A.P. Latinoamerica was engaged in trade or commerce within the meaning of FDUTPA: it held itself out as a professional inspection and certification company, it solicited and provided inspection services in connection with commercial contracts involving the provision of power generation equipment, and it participated in the commercial transactions giving rise to this action [DE 128 ¶¶ 103–107].

Second, the Amended Complaint alleges that A.P. Latinoamerica's deceptive and unfair acts directly and proximately caused CELEC's injuries [DE 128 ¶¶ 106–107]. The false inspection reports that A.P. Latinoamerica issued were specifically designed to trigger payment milestones under the Contracts. The Contracts expressly conditioned the release of payment on receipt of inspection and factory approval reports certifying that the generators had been manufactured and were ready for delivery. *See* DE 128 ¶¶ 55–62; DE 128-2 at Clause 7.2(a); DE 128-7 at Clause 7.2(a). A.P. Latinoamerica's false reports satisfied—or purported to satisfy—those contractual conditions, thereby directly inducing CELEC to release funds. As a direct result, CELEC wired approximately $107,370,000 to Progen—payments triggered by A.P. Latinoamerica's false certifications and that CELEC would not have made absent

those misrepresentations [DE 128 ¶¶ 34, 43, 55–62, 106; DE 128-3, 128-8, 128-11, 128-12].

Third, the Amended Complaint alleges, and A.P. Latinoamerica has admitted by defaulting, that CELEC suffered actual damages as a direct result of A.P. Latinoamerica's deceptive and unfair practices [DE 128 ¶¶ 34, 43, 63–65, 106–107]. CELEC paid Progen a total of approximately $107,370,000 in reliance on, among other things, A.P. Latinoamerica's false inspection reports. In exchange for those payments, CELEC received generators that were used, defective, or non-functional, that did not comply with the Contracts' specifications, and that were never installed or commissioned [DE 128 ¶¶ 63–65; DE 128-11, 128-12]. As confirmed by CELEC's expert, the generators were practically worthless [128 ¶¶ 63–65; DE 128-11, 128-12]. CELEC also incurred significant additional costs investigating the extent of Defendants' wrongdoing and retaining U.S. counsel to pursue this action [128 ¶ 96]. These constitute actual damages within the meaning of FDUTPA.

Because all three elements of the FDUTPA claim are established by the well-pleaded allegations of the Amended Complaint—which A.P. Latinoamerica has admitted by defaulting—default judgment is warranted on Count III.

**C. Count IV – Conversion**

The elements of a common law claim for conversion under Florida law are (1) defendant(s) wrongfully asserted dominion; (2) over a plaintiff's property; (3) that was inconsistent with plaintiff's ownership therein. *See Skye Energy Ventures LLC v. Hollander*, 2025 WL 1795964, at *6 (M.D. Fla. June 30, 2025).

Here, the well-pleaded facts of the Amended Complaint, admitted as true by A.P. Latinoamerica's default, establish each of these three elements:

First, A.P. Latinoamerica wrongfully asserted dominion over CELEC's funds. The Amended Complaint alleges—and A.P. Latinoamerica has admitted by defaulting—that A.P. Latinoamerica participated in the wrongful and intentional transfer and removal of funds belonging to CELEC by coordinating and issuing at least ten sham inspection reports containing false statements that were used to trigger the release of those funds to Progen [DE 128 ¶¶ 55–62, 109–112; DE 128-2; DE 128-7]. Specifically, A.P. Latinoamerica's false inspection reports—which falsely certified that Progen's generators were new, Contract-compliant, and ready for delivery—were specifically designed to, and did, satisfy the contractual payment conditions under both Contracts, thereby causing CELEC to release funds that it otherwise would not have released [DE 128 ¶¶ 55–62, 109]. A.P. Latinoamerica's inspection reports were demonstrably false: CELEC later confirmed that none of the generators delivered under either Contract were new—all were used, defective, or non-functioning—directly contradicting the representations contained in A.P. Latinoamerica's reports [DE 128 ¶¶ 63–65; DE 128-11, 128-12]. By participating in a scheme to issue false certifications for the purpose of extracting payments from CELEC under false pretenses, A.P. Latinoamerica wrongfully asserted dominion over those funds within the meaning of Florida conversion law.

Second, the funds over which A.P. Latinoamerica wrongfully asserted dominion were CELEC's property. The Amended Complaint alleges—and A.P.

Latinoamerica has admitted—that CELEC had a legitimate property interest in the approximately $107,370,000 that was transferred to Progen as a result of the fraudulent documentation, including the false inspection reports issued by A.P. Latinoamerica [DE 128 ¶¶ 28–44, 55–62, 68–73, 109–11]. CELEC transferred those funds to Progen only because Progen and its co-conspirators—including A.P. Latinoamerica—created a false basis for payment by submitting forged bid documents, making material misrepresentations about the nature and quality of the generators, and issuing sham inspection reports that purported to certify the generators' compliance with the Contracts' specifications [DE 128 ¶¶ 28–44, 110–111]. Because those funds were obtained through fraud and misrepresentation, CELEC retained a legitimate property interest in them.

Third, A.P. Latinoamerica's wrongful assertion of dominion over CELEC's funds was inconsistent with CELEC's ownership therein. The Amended Complaint alleges that Defendants' conduct was, and remains, inconsistent with and in denial of CELEC's rights to those funds [DE 128 ¶ 112]. CELEC transferred approximately $107,370,000 to Progen in reliance on A.P. Latinoamerica's false representations that the generators had been manufactured in compliance with the Contracts' specifications [DE 128 ¶¶ 34, 43, 55–62, 109–112]. Progen and its co-conspirators, including A.P. Latinoamerica, then retained and used those funds despite having delivered nothing of value: not a single generator was ever installed or commissioned, the generators that were imported were used, defective, or non-functional and not compliant with the Contracts' specifications, and $20 million of the funds were

transferred to co-Defendant Astrobryxa, S.A.—a sham company—ostensibly for subcontracting services that were never performed [DE 128 ¶¶ 48–50, 63–65, 89(viii)]. The retention and use of these funds by Defendants—funds that were obtained through A.P. Latinoamerica's fraudulent inspection reports and that CELEC never intended to transfer absent those false certifications—is plainly inconsistent with CELEC's ownership rights in those funds.

Because all three elements of the conversion claim are established by the well-pled allegations of the Amended Complaint—which A.P. Latinoamerica has admitted by defaulting—default judgment is warranted on Count IV. A.P. Latinoamerica's participation in the issuance of false inspection reports that fraudulently induced CELEC to release nearly $110 million, combined with Defendants' retention of those funds—and ongoing refusal to identify where the funds are currently located [*see* DE 70 at Exhibit A (Correspondence with Counsel For Progen)]—despite delivering nothing of value in return, constitutes a wrongful deprivation of CELEC's property that is actionable as conversion under Florida law.

## III. CELEC is Entitled to Damages, Treble Damages, and Attorney's Fees.

Having established A.P. Latinoamerica's liability on each of Counts I through IV, the Court must determine the appropriate measure of damages. Unlike liability, damages are not established by default alone and must be proven to a reasonable certainty. *See Baker v. Advanced Imaging of Port Charlotte, LLC*, 2018 WL 4279244, at *1 (M.D. Fla. Sept. 7, 2018). Here, the record establishes CELEC's damages with precision, and they are subject to mandatory trebling under RICO.

CELEC's actual damages are the $107,370,000 it wired to Progen's Regions Bank account in reliance on the fraudulent scheme in which A.P. Latinoamerica participated: $69,580,000 wired on September 30, 2024, under the Salitral Contract, and $37,790,000 wired in five separate transfers between January 24 and March 5, 2025, under the Quevedo Contract [DE 128 ¶¶ 34, 43, 55–62; DE 128-3, 128-8]. Those amounts are established by the wire transfer records [*see* DE 128-3, 128-8].

In exchange for those payments, CELEC received nothing of value. Progen's own Answer in this action admits that it did not deliver new generators to CELEC. *See* DE 141 (Counterclaim at ¶¶ 29–30 (alleging that Progen was only required to provide "zero hour" generators, not "factory new" ones) and ¶¶ 34–35, 40–41 (stating that Progen imported and installed "zero-hour" generators, not new ones). This is in direct contradiction to the Contracts' specifications, requiring the generators to be new. *See* DE 128 ¶¶ 2, 35, 44, 63–65; DEs 128-2, 128-7. Specifically, the Quevedo Contract required that the generators ("los grupos electrógenos") be "nuevos con cero horas de uso"—in English, new with zero hours of use [DE 128-2 § 5.1]. And the Salitral Contract also specifically required the generators ("los grupos electrógenos") be "nuevos con cero horas de uso"—in English, new with zero hours of use [*see* DE 128-7 at Clause 5].

A.P. Latinoamerica, by failing to appear and defaulting, has likewise admitted that the generators were used and defective and that they were never installed [DE 128 ¶¶ 63–65; DE 128-11, 128-12]. The fraudulent nature of the scheme is further confirmed by Lakeland Electric's confirmation—submitted to CELEC during

discovery—that the certificate Progen submitted in its Contracts bids purportedly signed by Lakeland Electric's representative Stephen Brown is not authentic, that Lakeland Electric has never done any business with Progen, and that no such project was ever performed. *See* Exhibit A. These admissions and confirmations establish that CELEC received no value whatsoever in exchange for its $107,370,000 in payments, and that its actual damages equal the full amount transferred.

Further, under the federal civil RICO statute, a plaintiff who proves a RICO violation "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees . . . ." 18 U.S.C. § 1964(c). Trebling is mandatory, not discretionary. *See Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1333 (S.D. Fla. 2009) ("Under the plain language of the RICO Act . . . the final judgment must reflect an amount that is three times the amount of actual damages."); *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337 (S.D. Fla. 2002) ("The RICO claims entitle successful Plaintiffs to treble damages."). Because CELEC's actual damages are $107,370,000, its RICO damages—after mandatory trebling—are **$322,110,000**.

A.P. Latinoamerica is jointly and severally liable for the full amount of CELEC's damages.[7] There is no basis—legal or factual—to apportion damages among

[7] The Eleventh Circuit has held, in the context of a criminal forfeiture, that RICO conspirators are properly held jointly and severally liable for the damages resulting from each other's illegal acts. *See United States v. McKay,* 285 Fed. App. 637, 640 (11th Cir. 2008). Indeed, "[e]very circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise

the Defendants or to limit A.P. Latinoamerica's liability to only that portion of the scheme attributable to its own specific acts. A.P. Latinoamerica participated as a member of the same associated-in-fact enterprise, its sham inspection reports were an integral and indispensable component of the scheme, and it is jointly and severally liable for the entirety of the damages that the enterprise caused. Accordingly, the Court should enter judgment against A.P. Latinoamerica for the full trebled amount of $322,110,000.

In addition to treble damages, the civil RICO statute entitles a prevailing plaintiff to the cost of the suit, including a reasonable attorney's fees. 18 U.S.C. § 1964(c). ELEC will submit a motion for attorneys' fees and costs following entry of final default judgment, as contemplated by Fed. R. Civ. P. 54(d) and L. R. 7.01(a).

**<u>Conclusion</u>**

For the foregoing reasons, CELEC respectfully requests that the Court enter final default judgment against A.P. Latinoamerica on all counts against it in the

---

responsible for the RICO violations." *United States v. Philip Morris USA,* 316 F. Supp. 2d 19, 27 (D.D.C. 2004) (collecting cases). The United States District Court for the Middle District of Florida has found that RICO Act defendants are subject to joint and several liability. *See Cont'l 332 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124, 1140 n.3 (M.D. Fla. 2018); *Gov't Emps. Ins. Co. v. KJ Chiropractic Ctr. LLC*, 2017 WL 9939048, at *3 (M.D. Fla. Aug. 22, 2017) ("While the Eleventh Circuit has not specifically addressed the issue of joint and several liability in civil RICO cases, it has allowed joint and several liability in a criminal RICO case. Moreover, several other circuit courts of appeal have found defendants jointly and severally liable in relation to civil RICO claims." (internal citation omitted)); *see also Sihler v. Glob. E-Trading, LLC*, 2025 WL 1425400, at *8 (M.D. Fla. May 16, 2025) ("The Court stands by its previous determination that joint and several liability is available in . . . civil RICO."). So has the Southern District Court of Florida. *See Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1334 (S.D. Fla. 2009).

amount of $322,110,000, representing treble the actual damages of $107,370,000; pre- and post-judgment interest; an award of attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c) and Fla. Stat. § 895.05(1), in an amount to be determined by subsequent motion; and such other and further relief as the Court deems just and proper.

## **Certificate of Good Faith Conference**

A.P. Latinoamerica has not appeared in this action, so CELEC has been unable to confer with A.P. Latinoamerica about the relief requested in this Motion.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 21, 2026, I electronically filed the foregoing **Plaintiff's Motion for Final Default Judgment Against A.P. Inspections Latinoamerica, S.A.** through the Court's CM/ECF system which will send an electronic copy to all counsel of record.

By: */s/ Courtney M. Keller*

Courtney M. Keller, Esquire
Florida Bar No. 28668
Meredith P. Yates, Esquire
Florida Bar No. 1058373

**GREENBERG TRAURIG, P.A.**
450 South Orange Avenue, Suite 650
Orlando, Florida 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Email: kellerc@gtlaw.com
Meredith.yates@gtlaw.com
Nef-iws@gtlaw.com
ORLLitDock@gtlaw.com

Daniel Pulecio-Beck, Esquire
(admitted *pro hac vice*)
Michael Pusateri, Esquire
(admitted *pro hac vice*)

**GREENBERG TRAURIG, P.A.**
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone: (202) 331-3117
Email: pulecioboekd@gtlaw.com
pusaterim@gtlaw.com

*Counsel for Plaintiff*