**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CELEC EP,

Plaintiff,

v. Case No. 8:25-cv-3433-WFJ-SPF

PROGEN INDUSTRIES, LLC;
GENERTEK POWER CORP.;
GENERTEK POWER INDUSTRIES,
LLC; JOHN B. MANNING; W. WADE
MANNING; ANDREW S. WILLIAMSON;
ASTROBRYXA, S.A.; ASTROBRYXA, LLC;
AP INSPECTIONS LATINOAMERICA, S.A.;
A.P. INSPECTIONS LLC; H&S INDUSTRY, LLC;
TWO LIONS HOLDINGS, LLC; AOT HOLDINGS
AG; GESTORES INMOBILIARIOS
LIGHTBLUE, S.A.; and DOES 1-95,

Defendants.
______________________________

PROGEN INDUSTRIES, LLC,

Counter-Plaintiff,

v.

CELEC EP,

Counter-Defendant;
______________________________/

**PROGEN'S MOTION TO COMPEL**
**CELEC'S PRODUCTION OF DOCUMENTS**

Under Rule 37(a) of the Federal Rules of Civil Procedure, Defendant Progen Industries, LLC ("Progen") respectfully moves this Court for an order compelling Plaintiff CELEC EP's ("CELEC") production of documents to ensure that this case may proceed on a full and fair record.

## INTRODUCTION

Over six months ago, on April 14, 2026, Progen served 38 requests for production on CELEC ("RFPs") seeking documents and communications concerning the award, performance, and termination of the Quevedo and Salitral Contracts, as well as the other issues raised by CELEC's claims and Progen's counterclaims. **Exhibit A**. On May 28, 2026, CELEC responded with objections and a vague commitment to produce documents at a "mutually convenient time and place." CELEC then produced approximately 560 documents between June 17 and June 30. In July, Progen identified deficiencies in CELEC's written responses and production. Three months later, on September 30, CELEC amended its written response and produced only approximately 550 more documents. **Exhibit B.** These roughly **1,100 documents** produced by CELEC cannot reflect the requested record of two multi-million-dollar international engineering, procurement, and construction (EPC) Quevedo and Salitral Contracts ("Contracts") that arose from a national energy crisis and culminated in the prosecution of over 20 individuals, most CELEC employees. Progen, by contrast, has already produced more than **31,000 documents** (a volume commensurate with a dispute of this kind).

CELEC has set out to make discovery in this action a one-way street. It intentionally availed itself of this venue so that it could wield the "full procedural arsenal of the Federal Rules of Civil Procedure." *See* DE 166-1 at 2. Yet it ignores that the same Rules that entitle it to documents and information also impose reciprocal obligations. CELEC cannot continue to reap the benefits of the Federal Rules while selectively disregarding the obligations they impose, to Progen's detriment.

Progen has repeatedly put CELEC on notice of deficiencies in its production since July. On July 20, August 10, and October 13, 2026, Progen sent deficiency notices

specifically identifying inadequacies of CELEC's production, and counsel met and conferred regarding the issues. On August 19, CELEC committed to producing documents by September 9. Progen trusted CELEC's need for an additional month's time (in addition to the three months it had already had) to produce documents that would address its deficiencies. Only after Progen followed up, on September 30, did CELEC produce a mere 500 documents. Progen's trust, extended in good faith, proved misplaced.

The September 30th production cured only a trivial fraction of the deficiencies Progen had patiently waited for months to see resolved. It consists largely of documents Progen already has: its own letters to CELEC, its own invoices, and CELEC's letters to it. It is devoid of internal memos, minutes of meetings, internal emails, text messages, or other communications among the CELEC officials who awarded, administered, and then wrongfully terminated the Contracts (i.e. the very documents and communications most relevant to this dispute).

Progen again raised deficiencies in CELEC's production. Counsel for Progen again met to confer with counsel for CELEC. Progen and CELEC were able to resolve a couple of issues, but the bulk of the deficiencies remain.

CELEC's delays and deficient production have cost Progen *months* of essential discovery, while CELEC has received tens of thousands of documents. Each further delay compounds that prejudice. Progen therefore respectfully requests that the Court compel CELEC to meet its obligations under Federal Rule of Civil Procedure 34 so that this case may proceed on a full and fair record.[1]

[1] Given the number of deficiencies in CELEC's production, and for the Court's convenience, Progen attaches as Annex A a concise chart organizing the deficiencies addressed in this Motion by Request for Production. Annex A does not raise any additional issues; it summarizes only the points set forth herein.

## ARGUMENT

Under Rule 37(a)(3)(B) of the Federal Rules of Civil Procedure, a party may move for an order compelling disclosure or discovery. This includes when a party "fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iv). "The court has broad discretion in managing pretrial discovery matters and in compelling document productions." *Nguyen v. Raymond James & Assocs., Inc.*, No. 8:20-CV-195-T-36AAS, 2020 WL 6801874, at *1 (M.D. Fla. Nov. 19, 2020) (citing *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1306 (11th Cir. 2011)).

When considering motions to compel averring that an entity is withholding discoverable materials, courts look for evidence of withholding. *See Talentscale, Inc. v. Aery Aviation, LLC*, 351 F.R.D. 58, 61 (N.D. Fla. 2026).[2] Such evidence may consist of "a statement from a person that he sent or received a letter/email/communication to the entity, and the entity never produced the item during the discovery process," "the existence of requested items—for example, emails—that the responding entity alleged do not exist," or "any combination of facts from which a court can deduce that requested materials are being withheld intentionally or inadvertently." *Id.* at 62.

### A. Global Issues

Four failures pervade CELEC's entire production: CELEC has (1) stripped its documents of metadata and failed to produce them in native format; (2) produced only a

[2] Although *Talentscale* considered a motion to compel production of documents under Rule 45 of the Federal Rules of Civil Procedure, in relevant part it relied on cases considering such motions under Rule 37 and there is no distinction between the two that is relevant to the instant dispute. Thus, *Talentscale* is applicable.

handful of internal emails; (3) not produced a single text message; and (4) produced only a couple of internal meeting minutes.

*i. Metadata, file paths, and native formats*

Progen's RFPs to CELEC request that CELEC produce responsive documents in their native format.[3] Instead, CELEC converted its electronic documents, other than excel sheets, and including emails, to static PDFs. This runs counter to Rule 34 of the Federal Rules of Civil Procedure, which obligates a party to "produce documents as they are kept in the usual course of business." *See* Fed. R. Civ. P. 34(b)(2)(E)(i). When Progen raised this deficiency, CELEC maintained that it had produced its documents as they are kept in the usual course of business. That position is untenable. No modern enterprise, let alone a national electricity company, maintains its emails (particularly those from the last two years) as static, metadata-free PDFs in the ordinary course of its operations. *See Teledyne Instruments, Inc. v. Cairns*, No. 6:12-CV-854-ORL-28, 2013 WL 5781274, at *9 (M.D. Fla. Oct. 25, 2013) ("A file that is converted to another format solely for production, or for which the application metadata has been scrubbed or altered, is not produced as kept in the ordinary course of business.").

Even documents that may natively exist as PDFs were produced without requested file paths, the basic information needed to understand how they relate to one another.[4] Progen has been left to guess which letters carry which attachments or referenced annex, which documents belong to the same family, and how they were organized in folders.

[3] **Ex. A** at 5 ("All documents must be produced in native format.").

[4] Progen's RFPs define "document(s)" to "include the files in which any documents are maintained, including file folders or file jackets, and adjacent or related supporting or background materials where filed or maintained." In other words, Progen requested a documents' file path.

Several of CELEC's documents reference annexes that appear never to have been produced. Any that were produced arrived as standalone PDFs, severed from their parent documents and without file paths.[5] CELEC must produce responsive attachments to responsive documents; if it has produced all of them, Progen cannot be left to guess and it must produce them in the format requested by Progen's RFPs and as required by Fed. R. Civ. P. 34(b)(2)(E)(i).

*ii. Internal emails*

In at least 24 RFPs, Progen requested "Communications," which Progen defined to expressly include emails.[6] CELEC produced less than 100 emails. By comparison, Progen has produced over 9,700 emails relevant to this litigation. That is the magnitude of documents that is reasonable for this litigation – not 100 emails in total. And the expected magnitude is not speculation; among Progen's over 9,700 produced emails, over 1,400 are to or from a CELEC email address. CELEC produced one tenth of even those emails.

What's worse is that only around 48 of CELEC's around 100 produced emails are internal to CELEC. By contrast, Progen produced over 3,000 internal emails, sent from one @progen1.com address to another @progen1.com account alone. 3,000 emails

---

[5] CELEC's belated attempt to cure these defects was illusory. On October 13, Progen's counsel identified for CELEC specific documents that reference attachments Progen could not locate or match. Five days later, on October 21, CELEC produced an Excel sheet purporting to capture the documents' metadata. It offers file names and authors for some documents, and columns apparently meant to identify document families that do not do so. CELEC did not even match the specific examples Progen had identified. Instead, five months after production became due, CELEC's counsel offered only to ask CELEC *if* it could match documents—yet another delay tactic.

[6] **Ex. A** at 4 ("Communication(s)" means any oral, recorded or written statement, including any letter, memorandum, correspondence, electronic mail, e-mail, text message, CC-mail, electronic message, handwritten message, facsimile, voice mail, telephone call recording, conversation recording, dialogue, colloquialism, discussion, conversation, agreement, and any document memorializing or describing any of the foregoing.").

among Progen employees reflect a company working diligently to complete two large EPC Contracts. 48 internal emails cannot plausibly reflect or capture a government entity's deliberations over the award of multi million dollar contracts, its administration of those Contracts, its response to alleged fraud, its site issues, its payment delays, its turnover of contract administrators and general managers, its inspection coordination delays, its handling of internal corruption tied to the Contracts, or its decisions to terminate the Contracts. *See Talentscale*, 351 F.R.D. at 62 (listing "any combination of facts from which a court can deduce that requested materials are being withheld intentionally or inadvertently" and "anomalous search results that suggest a lack of full compliance" as evidence of withholding).

CELEC's deficient production reveals, *at best*, a foreign government entity abusing the U.S. discovery system to extract information from Progen while withholding the very evidence it needs to defend itself and prosecute its counterclaims. *At* worst, it reveals that CELEC has something to hide. Either way, having chosen this forum, CELEC is bound by its discovery obligations—and is deliberately failing to meet them.

*iii. WhatsApp and text messages*

Further, despite abundant evidence that many of the individuals and entities involved, including CELEC's officers and personnel, communicate about issues in dispute via text messages and WhatsApp messages,[7] CELEC's production is devoid of any such messages.[8] *See* **Composite Exhibit C**; **Exhibit D**.

---

[7] Progen defined Communications to include text messages. *Id.*

[8] CELEC's WhatsApp messages are likely responsive to, at least, Request Nos. 4, 6, 7, 9, 10, 13, 33, 34, 35, and 37.

Progen produced over 940 chat files, including WhatsApp chats (i) among Progen employees; (ii) between Progen's principals and Astrobryxa's principals; (iii) between Progen's principals and subcontractors and providers in Ecuador; and (iv) between Progen's principals and CELEC and other Ecuadorian government officials. Progen knows CELEC officials communicated via Whatsapp about relevant issues responsive to Progen's RFPs because it itself produced the portions of some of these communications that are in its possession. *See* **Comp. Ex. C**. CELEC has elected to withhold these chats.[9] *See Talentscale*, 351 F.R.D. at 62 (including "a statement from a person that he sent or received a letter/email/communication to the entity, and the entity never produced the item during the discovery process" as evidence of withholding").

Ecuadorian media have also published the contents of WhatsApp chats among CELEC employees, including exchanges showing that CELEC's contract administrator for the Quevedo Contract improperly backdated contractual notices sent to Progen. *See, e.g.*, **Ex. D**. Yet CELEC has not produced a single such message. *See Talentscale*, 351 F.R.D. at 62 (listing "the existence of requested items—for example, emails—that the responding entity alleged do not exist" as evidence of withholding); *Bailey Indus., Inc. v. CLJP, Inc.*, 270 F.R.D. 662, 671–72 (N.D. Fla. 2010) (compelling production where the movant demonstrated that more responsive emails existed than were produced); *Bank of*

[9] During the parties' last meet and confer, CELEC's counsel noted that, unlike the other deficiencies in this Motion, Progen did not specifically raise WhatsApp text messages until October 16. That is true but it is also beside the point. Progen has raised CELEC's failure to produce Communications for months, and the RFPs expressly define "Communications" to include text messages. CELEC cannot hide behind the specificity of deficiency letters to excuse its noncompliance. CELEC has known since April that it must collect and produce responsive text messages, yet as of October 21 it would commit only to "confirm whether there are any additional responsive documents." Six months on, CELEC has not even begun to look. Court intervention is necessary to end this delay and the resulting prejudice to Progen. If CELEC confirms that no additional documents exist or produces them, Progen will promptly amend this Motion accordingly.

*Mongolia v. M & P Glob. Fin. Servs., Inc.*, 258 F.R.D. 514, 517, 522 (S.D. Fla. 2009) (compelling production of documents that the movant received from other entities and "that appeared should have been produced by" the responding party but were not").

*iv. Minutes of meeting*

CELEC's production of meeting minutes is likewise deficient.[10] Although CELEC has produced a handful of minutes, they are confined to July 2024 and prior and relate solely to the procurement process. Progen expressly defined "Documents" to include "minutes" and "all memorials of any conversations, meetings or conferences." **Ex. A** at 3. CELEC has produced no minutes of any meeting of its Board of Directors or senior management, and no minutes of any meeting held during the performance or termination of the Contracts.[11] CELEC, a state-owned enterprise that documents its decision-making through formal memoranda, resolutions, and minutes, cannot credibly claim it has not identified such records. And yet, it has chosen not to produce them. *See Talentscale,* 351 F.R.D. at 62; *Bank of Mongolia*, 258 F.R.D. at 517, 522.

---

[10] Meeting minutes, whether from CELEC's Board of Directors or from other management, would likely be responsive to at least, RFPs Nos. 10, 12, 14, 15, 16, 33, 37, 38. *See* **Ex. A** at 7–8, 10–11.

11 At the parties' latest meet and confer, CELEC's counsel attributed the scarcity of meeting minutes in part to in-house counsel's attendance at relevant meetings. That does not explain why CELEC produced minutes on the award of the Contracts but none on its performance or termination. Regardless, counsel's presence does not make minutes privileged; privilege covers only legal advice, and even then the proper course is redaction, not wholesale withholding. CELEC should not be permitted to rely on counsel's mere presence to withhold documents reflecting its decision-making on the issues in dispute that are responsive to Progen's RFPs.

### B. Issues with Specific Requests for Production

CELEC's production (or, more accurately, its lack thereof) in response to specific RFPs remains woefully deficient despite repeated deficiency notices and attempts to resolve.

**Request No. 5:** All contracts between CELEC and Astrobryxa.
**Response:** "CELEC objects to this request as it is overbroad in that it seeks documents outside the scope of discovery that are not relevant to the claims and defenses pending in this case. In particular, the request is not limited to the projects that are the subject matter of this action. Subject to and without waiving these objections, CELEC states that, after a reasonable search, it has not identified any responsive, non-privileged documents or communications."

Progen's RFPs define "Astrobryxa" to include its principals, Karla Saud Calero and Jose Manrique.[12] Contracts between CELEC and Astrobryxa are relevant because they bear directly on the undisclosed relationship between Saud and CELEC, a relationship central to Progen's fraudulent inducement counterclaim and its defenses. CELEC, acting through its agent Saud, induced Progen to enter the Contracts, and Saud never disclosed her longstanding ties to CELEC and its officials. CELEC states that it has not identified any responsive contracts. Yet Jose Julio Neira, member of CELEC's Board of Directors, has stated publicly that Karla Saud has had several contracts with CELEC and since 2023, has been "firmly established at CELEC." *See* **Exhibit E**. CELEC's Board member publicizes that Saud's questionable ties to CELEC are relevant for the issues in dispute and yet CELEC refuses to produce them. *See Id.*; *See Talentscale*, 351 F.R.D. at 62; *Bank of Mongolia*, 258 F.R.D. at 517, 522.

**Request No. 11:** All reports, analyses, or evaluations of the generators conducted by or on behalf of CELEC, whether before or after delivery.
**Response:** "CELEC objects to this request as it is overbroad in that it seeks documents outside the scope of discovery that are not relevant to the claims and defenses pending in

[12] **Ex. A** at 2, (""Astrobryxa" means Astrobryxa, S.A., including its principals Karla Saud Calero ("Saud") and Jose Walther Manrique Suarez ("Manrique"), and any person acting on its behalf").

this case. In particular, the request is not limited to the projects that are the subject matter of this action. Subject to and without waiving this objection, CELEC will produce non-privileged documents responsive to this request as relates to the Contracts at a mutually agreed upon time and place, to the extent such documents exist and are within its custody, control or possession. However, CELEC confirms that nothing was delivered (as admitted by John Manning during his deposition)."[13]

In response to RFP No. 11, CELEC produced expert reports it commissioned in July 2025, after it terminated the Contracts. It has not produced its own evaluations of the generators upon their arrival in Ecuador, before termination.[14] CELEC's claim rests on the premise that it received old and used generators, while Progen contends that CELEC breached the Contracts by, in part, preventing Progen from completing performance or curing any alleged deficiencies. If CELEC terminated the Contracts because the generators did not meet contractual specifications, it must have documented its inspection of them in Ecuador prior to CELEC's wrongful termination of the Contracts. Any such evaluation would reflect the stage of performance at which the generators arrived: before Progen had completed the on-site, pre-installation work that CELEC itself prevented Progen from finishing.[15] CELEC must produce those evaluations. If none exist

---

[13] CELEC misuses its response to advance arguments and misrepresents the facts instead of responding to the RFP in a productive manner. John Manning never testified that "nothing was delivered" during his deposition. These misrepresentations do not advance discovery proceedings nor the resolution of this case, especially because the "delivery" of generators is not in dispute. The Amended Complaint is replete with allegations that generators were delivered to Ecuador: "repainted generators are the ones Progen delivered to CELEC" (¶ 54); "…inspect the power generators that Progen had imported to Ecuador" (¶ 63); "By 2025, the majority of the power generators had been imported into Ecuador" (¶ 63); "Of the 17 power generators that Progen imported into Ecuador…" (¶64).

[14] On October 21, six months after receiving the request and following multiple deficiency letters and meet and confers, CELEC's counsel stated that they were awaiting confirmation from CELEC as to whether additional assessments of the generators exist. Each month of delay has prejudiced Progen, and Progen cannot afford to wait months more for a confirmation and months beyond that for the documents. If CELEC confirms that no additional documents exist or produces them, Progen will promptly amend this Motion accordingly.

[15] At the time of their arrival in Ecuador, the generators required additional work by Progen to complete the zero-hour process and prior to installation. The parties' plan always called for this

because CELEC knew the generators could not be meaningfully evaluated while its own interference left the work unfinished, CELEC must amend its response to say so.

**Request No. 13:** All internal memoranda, analyses, or communications relating to CELEC's decision to terminate the Contracts.
**Response:** "CELEC will produce non-privileged documents responsive to this request at a mutually convenient time and place, to the extent such documents exist and are within its custody, control or possession."

CELEC has produced technical expert reports and formal resolutions regarding the termination of the Contracts. However, CELEC has not produced internal emails, meeting minutes, or text messages about the decision to terminate the Contracts. These documents go to the heart of Progen's counterclaim that CELEC breached the Contracts by, among other things, terminating them without proper notice and an opportunity to cure. CELEC has withheld precisely the internal communications most likely to reveal why and how it made that decision.

**Request No. 16**: All Documents reflecting any investigations, charges, disciplinary actions or proceedings relating to conflicts of interest, self-dealing, fraud or malfeasance against any current or former CELEC officials involved in the Contracts.
**Response**: CELEC objects to this request as it is overbroad in that it seeks documents outside the scope of discovery that are not relevant to the claims and defenses pending in this case. In particular, the request is not limited to the projects that are the subject matter of this action. Additionally, CELEC will not produce documents that are subject to the confidentiality of criminal proceedings in Ecuador, including to preserve the integrity of criminal investigations. As Andrew Williamson knows, he is a target of such criminal investigations. Subject to and without waiving this objection, at a mutually convenient time and place, CELEC will produce the criminal complaint it has filed in Ecuador.

CELEC's relevance objection cannot be taken seriously. The Request is limited to investigations of individuals "involved in the Contracts," and CELEC's officials' mismanagement of the Contracts have triggered precisely such investigations. Shortly after the termination of the Contracts, CELEC fired more than 300 employees, several for

---

work would be done in Ecuador. CELEC's actions and improper termination prevented Progen from completing its work on the generators.

their conduct relating to the Contracts, and the government of Ecuador has accused more than 20 CELEC employees and other government officials of crimes arising solely from the Contracts. *See* **Exhibit F**; **Exhibit G**. Those investigations go to the core of Progen's defenses and counterclaims, which allege that CELEC employees, acting with Astrobryxa, fraudulently induced Progen to enter into the Contracts and then interfered with Progen's performance of them.

CELEC has produced one responsive document: its July 2025 criminal complaint to Ecuador's Fiscalía General del Estado (Attorney General's Office) for "delincuencia organizada" (organized crime) against its own employees, unit managers, former General Manager, and Contract administrators. It has not produced the complaint's annexes (or, if it has, Progen cannot identify them, *see supra* Section A.i), any communications related to the complaint, any communications about the resulting investigation, any communication regarding the firing of employees for actions related to the Contracts, or any disciplinary records for the accused employees. A state-owned enterprise that accused its own leadership of organized crime over these Contracts cannot credibly claim a lone complaint is all the responsive documentation it has.

**Request No. 33:** All Documents and Communications related to the delegation of CELEC employees that traveled to Florida to inspect the generators under the Salitral Contract, including Documents identifying the employees, travel itineraries, plane tickets, hotel rooms, travel authorizations, pre-trip planning or objectives, post-trip summaries or recommendations to CELEC leadership, etc.
**Response**: "CELEC objects to this request as it is overbroad in that it seeks documents outside the scope of discovery that are not relevant to the claims and defenses pending in this case. In particular, the request is not limited to the projects that are the subject matter of this action. Subject to and without waiving this objection, at a mutually convenient time and place, CELEC will produce documents sufficient to identify the employees who traveled to Florida to inspect the generators under the Salitral Contract and any post-trip summaries or recommendations to CELEC leadership."

CELEC produced travel authorizations, planning correspondence, and individual post-trip reports (each with one-line conclusions or observations) for the delegation that inspected the Quevedo and Salitral generators in the United States. But CELEC has produced no documentation of any meetings between the delegation members and Byron Orozco (Manager of CELEC division, who signed the Contracts on CELEC's behalf), or anyone else at CELEC, whether held in Florida or Texas, virtually during the trip, or after the delegation returned to Ecuador. Indeed, a delegation member has reportedly testified that he recorded a meeting at which he, Byron Orozco, and other CELEC employees discussed altering their account of the generators CELEC had inspected and approved for shipment. *See* **Exhibit H**. Yet CELEC has produced no recording, minutes, or other record of that meeting. Nor has CELEC produced internal emails, text messages, or other communications among delegation members or with others at CELEC reacting to the trip or to the delegation's conclusions in the days and weeks that followed; the only internal communications produced concern pre-trip logistics and planning.

**Request No. 35:** All Documents and Communications relating to the visit of Fabian Calero and Robert Luque to Progen's facilities in Florida, prior to the award of the Contracts, including travel itineraries, plane tickets, hotel rooms, travel authorizations, any internal Communications by or between Calero and Luque regarding the visit etc.
**Response:** "CELEC objects to this request as it is overbroad in that it seeks documents outside the scope of discovery that are not relevant to the claims and defenses pending in this case. CELEC has no control over the documents of Roberto Luque, who was never a CELEC employee. Subject to and without waiving this objection, at a mutually convenient time and place, CELEC will produce available reports regarding the trip to Florida that was fraudulently orchestrated[16] by Progen and its co-conspirators, to the extent such documents exist and are within its custody, control or possession."

[16] *See Sup*ra n. 13. The "fraudulently orchestrated" characterization did not appear in CELEC's original response to this Request; CELEC added it in its amended response. Progen thus waited two months for an amended response that added an opportunistic accusation rather than a productive response or real commitment to produce documents.

Despite committing to producing documents responsive to Request No. 35, CELEC has not produced internal emails or text messages about Fabian Calero's[17] (then CELEC's General Manager) and Roberto Luque's (then Minister of Energy) pre-award visit to Progen, including communications in the days and weeks after the trip concluded. These communications are essential to Progen's claims and defenses. CELEC alleges that Progen "fraudulently orchestrated" the visit. Progen contends the opposite: during the visit, Progen took CELEC's officials to a generator plant that Progen's predecessor company had delivered, so those officials understood Progen's capabilities and what was being offered by Progen. In other words, Progen avers that CELEC's officials were aware of exactly what Progen was in the process of delivering when CELEC breached the Contracts and prevented Progen from completing performance. What those officials saw, understood, and reported before the award will show that CELEC was not deceived but instead knew precisely what it was contracting for. CELEC cannot continue to withhold them.

## CONCLUSION

CELEC has set out to make discovery in this action a one-way street. It has received more than 31,000 documents from Progen, yet it has withheld or delayed producing the very documents Progen needs to defend against CELEC's meritless claims and to prosecute its own counterclaims. It has produced no text or WhatsApp messages and questionably few internal emails and meeting minutes. The documents it has produced

---

[17] CELEC has certified that it has no backups or audit records for the Microsoft Office 365 account of Fabian Calero, a central figure in this litigation. Calero was CELEC's General Manager during the bidding, signing, and most of the execution of the Contracts. That his account was not preserved, even though the Contracts' execution was already faltering when CELEC fired him, is extraordinary and raises serious questions about CELEC's preservation of evidence.

have been converted to PDFs, stripped of their metadata, and not produced with their file paths as requested and required by the rules. The Federal Rules do not permit CELEC to take the benefits of discovery in this Court while withholding the very evidence that bears on its own claims and on Progen's defenses and counterclaims.

For the foregoing reasons, Progen respectfully requests that this Court enter an order:

1. Compelling production of responsive documents and communications and production in their native format, with file paths, and with all metadata;
2. Requiring CELEC to provide affidavits explaining in detail the steps it took to search for and produce responsive communications, including WhatsApp and text messages and emails, and documents for each of Request Nos. 4, 5, 6, 7, 9, 10, 11, 13, 30, 31, 33, 34, 35, and 37.
3. Granting such other and further relief as this Court deems just and appropriate.

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), undersigned counsel certifies that counsel for Progen has conferred in good faith with counsel for CELEC regarding production of the documents. Counsel conferred via teleconference on October 19, 2026, in an effort to resolve the issues raised in this Motion without Court action, and CELEC opposes the relief sought herein.

Dated: October 26, 2026

Respectfully submitted,

*/s/ Adolfo E. Jiménez*

Adolfo E. Jiménez
Florida Bar No. 869295
Adolfo.Jimenez@hklaw.com
Gabriella A. Lanzas
Florida Bar No. 1059806
Gabriella.Lanzas@hklaw.com
**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

and

Jason H. Baruch
Florida Bar No. 10280
Jason.Baruch@hklaw.com
Anne Colbert
Florida Bar No. 1026226
Anne.Colbert@hklaw.com
**HOLLAND & KNIGHT LLP**
100 N. Tampa Street, Suite 4100
Tampa, FL 33602
Telephone: (813) 227-8500
Facsimile: (813) 229-0134

*Attorneys for Defendants Progen Industries, LLC; Genertek Power Corp.; Genertek Power Industries, LLC; John B. Manning; W. Wade*

*Manning; Andrew S. Williamson; and Two Lions Holdings, LLC.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 26, 2026 I electronically served Progen's Motion to Compel on all counsel of record.

*/s/Adolfo E. Jiménez*
Adolfo E. Jiménez